PETER J. ELIASBERG, SBN 189110
 peliasberg@aclu-sc.org
AHILAN ARULANANTHAM, SBN 237841
 aarulanantham@aclu-sc.org
PETER BIBRING, SBN 223981
 pbibring@aclu-sc.org
JENNIFER PASQUARELLA, SBN 263241
 jpasquarella@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, California 90017
Phone:  (213) 977-9500
Facsimile:  (213) 977-5299

BARRETT S. LITT, SBN 45527
 blitt@kmbllaw.com
LINDSAY B. BATTLES, SBN 262862
 lbattles@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT, LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Attorneys for Plaintiffs
(continued on next page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUNCAN ROY; ALAIN MARTINEZ-PEREZ, on behalf of himself and others similarly situated; ANNIKA ALLIKSOO, on behalf of herself and others similarly situated; CLEMENTE DE LA CERDA, on behalf of himself and others similarly situated, et al, <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF LOS ANGELES; LEROY D.  BACA, Sheriff of Los Angeles County, in his official capacity, <br><br> Defendants. | CASE NO. CV-12-09012 BRO (FFMX) <br><br> [Hon. Beverly Reid O'Connell] <br><br><br> ***SECOND*** **AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES** |

OMAR C. JADWAT *(pro hac vice)*
 ojadwat@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 549-2660

KATHERINE DESORMEAU, SBN 266463
 kdesormeau@aclu.org
CECILLIA D. WANG, SBN 187782
 cwang@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 343-0775

CHRIS NEWMAN, SBN 255616
 newman@ndlon.org
JESSICA KARP, SBN 277347
 jkarp@ndlon.org
NATIONAL DAY LABOR ORGANIZING NETWORK
675 S. Park View Street, Suite B
Los Angeles, California 90057
Telephone: (213) 380-2785
Facsimile: (213) 380-2787

# I.      INTRODUCTION

## A.      The Challenged Practices

1.      This case challenges the legality of two practices of the Los Angeles County Sheriff's Department:  (1) denying bail to thousands of people who want to post bail and have already obtained a court order setting bail purely on the ground that the federal government has placed an "immigration hold" on them;[1] and (2) denying them release from Los Angeles County jail for 48 hours or more on the basis of the immigration hold, even though all charges against them have been dismissed, they have been acquitted of the charge for which they were being held, they were ordered released, or they have served their sentence.  These practices violate state law, as well as the Fourth and Fourteenth Amendments to the U.S. Constitution, and their state law analogues (Cal. Constitution, Articles 1, 7, and 13).  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1367, and 2201-02, and Article III of the U.S. Constitution.  Venue is proper under 28 U.S.C. § 1391(b)(2).

2.      "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *U.S. v. Salerno*, 481 U.S. 739, 755 (1987).  Yet the Los Angeles County Sheriff's Department and Sheriff Leroy Baca have turned these norms upside down by detaining tens of thousands of individuals subject to so-called "immigration holds" (also known as "immigration detainers" or "ICE holds"), beyond the time that state law mandates that they be released.

---

[1] Prior to filing this complaint, the LASD responded to a letter from Plaintiffs' counsel and stated that it was not their intention to deny inmates with ICE holds the opportunity to post bail on their state law charges.  LASD further agreed to 1) promulgate a policy that makes clear that the existence of an ICE hold does not provide a basis to prevent the posting of bail on any pending criminal charge, and 2) notify LASD employees of this policy, and 3) review its database systems to determine whether they could modify the "no bail" notation it places on the files of persons with immigration holds.

3.      Although these inmates are presumed to be innocent and are eligible for bail, LASD has, until this week, forced them to languish in jail while they await trial – at the cost of their jobs, their reputations, and their family and community ties.  This prolonged pretrial detention also coerces many to take plea deals they would not otherwise accept because it is the only way to secure their rapid release from jail.

4.      In addition, LASD has unlawfully incarcerated, and continues to unlawfully incarcerate, many thousands more individuals for days beyond their release date after any state law basis for their custody has expired, because they have been ordered released on their own recognizance, they have served their sentences, their charges have been dropped, or they have been found not guilty solely on the purported authority of the immigration holds.  LASD subjected 19,725 individuals to such unlawful continued detention in 2011 alone.

**B.      These Two Practices are not only Illegal, but are also Bad Policy in Light of the Capacity Constraints of the County Jails**

5.      On any given day, there are approximately 2,100 inmates in the Los Angeles County Jails who have immigration holds (or 14% of the total jail population).  *See* James F. Austin, et al., "Evaluation of the Current and Future Los Angeles County Jail Population," at page 21, Table 10, *available at* http://www.aclu-sc.org/issues/prisoners-rights/jails-project/austin-report/ (hereafter "Austin").

6.      Approximately 43% of the inmates who will be released to ICE are classified as "low custody," strongly suggesting that they are charged with minor offenses.  *Id*.  Accordingly, many of them will have low bail.  On information and belief, many of them would have posted bail given the low bail amounts and been released to ICE, or to the community if ICE is no longer interested in them, much sooner if LASD had not denied them the opportunity to post bail.

7.      Keeping an inmate in the County jail costs $100 to $150 per night.

1  The County is currently considering various measures—including expanding early

2  release options into programmed community beds, and even the drastic possibility

3  of shipping inmates to Kern County—to respond to the influx of more than 8,000

4  inmates into the L.A. County jails as a result of realignment.

5          8.      Even as pressures on the jail population mount, Sheriff Baca has

6  expressed his strong desire to stop housing inmates in Men's Central Jail because

7  it is an archaic and dangerous facility. *ACLU Study: Men's Central Jail Can Be*

8  *Shuttered By 2013*, CBS Local News, April 10, 2012, http://losangeles.

9  cbslocal.com/2012/04/10/aclu-study-mens-central-jail-can-be-shuttered-by-2013/.

10  The past practice of keeping inmates in jail who want to post bail, and the ongoing

11  practice of holding them for 48 hours or more after they are otherwise entitled to

12  release, is inconsistent with the County's efforts to manage its jail population and

13  close Men's Central Jail, and is a waste of taxpayer money.

14  **II.   PARTIES**

15          9.      Plaintiff Duncan Roy is a 52-year-old British citizen.  Mr. Roy is an

16  acclaimed film director who owns a home in Malibu, California.  He suffers from

17  prostate and colon cancer and requires regular monitoring to prevent recurrent

18  cancer.  From November 15, 2011 to February 8, 2012, Defendants unlawfully

19  detained him for 89 days in the Lost Hills station and then in the "gay ward" of

20  Men's Central Jail by unlawfully refusing to allow him to post the bail set by the

21  court in his criminal case.

22          10.     Plaintiff Alain Martinez-Perez is a 37-year-old Mexican citizen.  Mr.

23  Martinez-Perez has a one and a half-year-old U.S. citizen son.  He lives in

24  Claremont, California and works as a dog trainer.  From December 14 to

25  December 20, 2011, Defendants unlawfully detained him for six days in City of

26  Industry station first by refusing to allow him to post bail under the judicially-

27  determined County bail schedule based on his arresting charge, and, subsequently,

28  by continuing to detain him solely on the basis of the immigration hold after the

district attorney declined to file criminal charges against him.  Plaintiff Martinez-Perez seeks damages on behalf of himself and all others similarly situated for LASD's practice of refusing to honor bail (Damages Classes One and Two) and for LASD's practice of prolonging detention beyond the time that state law mandates release (Damages Classes Three and Four).  Plaintiff Martinez-Perez also seeks damages on behalf of himself and all others similarly situated for LASD's practice of prolonging detention for more than 48 hours beyond the time that state law mandates their release (Damages Classes Five and Six).

11.    Plaintiff Annika Alliksoo is a 34-year-old Estonian citizen.  Ms. Alliksoo is married to a U.S. citizen and lives near Palmdale, California.  From July 12 to July 30, 2012, Defendants unlawfully detained her for 18 days in the Palmdale station and then in the Lynwood Jail.  Defendants first refused to allow her to post bail under the judicially-determined County bail schedule and then under court-ordered bail.  Then, after a superior court judge ordered her released on her own recognizance, Defendants continued to detain her for an additional three days solely on the immigration hold.  Plaintiff Alliksoo seeks damages on behalf of herself and all others similarly situated for LASD's practice of refusing to honor bail (Damages Classes One and Two) and for LASD's practice of prolonging detention beyond the time that state law mandates their release (Damages Classes Three and Four).   Plaintiff Alliksoo also seeks damages on behalf of herself and all others similarly situated for LASD's practice of prolonging detention for more than 48 hours beyond the time that state law mandates their release (Damages Classes Five and Six).

12.    Plaintiff Clemente De La Cerda is a 36-year-old Mexican citizen and lawful permanent resident of the United States.  He is also possibly a United States citizen based on acquisition at birth.  He has lived in the United States since he was four years old.  Mr. De La Cerda lives in Brea, California.  He is currently in LASD custody and an immigration hold is lodged against him.  Plaintiff De La

Cerda seeks injunctive and declaratory relief on behalf of himself and all individuals currently in the custody of and who will in the future be in the custody of the Defendants on the basis of the immigration hold (Equitable Relief Class). On behalf of this class, he seeks to bar Defendants from prolonging the detention of him and other members of the class beyond the time that state law mandates release solely on the basis of an immigration hold not supported by a probable cause determination.

13.     Defendant Leroy Baca is the Sheriff of Los Angeles County.  As Sheriff, he is the chief executive officer of LASD.  He is responsible for the management and control of all Los Angeles County Jails.  He is responsible for the custody of all inmates housed in the County Jails and jailed at LASD field stations.  Plaintiffs sue Sheriff Baca in his official capacity only.

14.     Defendant County of Los Angeles is a county of the State of California duly organized under the laws of the State of California.  The Los Angeles County Sheriff's Department ("LASD") is an agency of Defendant County and the largest sheriff's department in the nation.  It has a range of law enforcement responsibilities, including the policing of various unincorporated areas of the County and operating all of the County's jails and field stations. Sheriff Baca directs LASD's work.

III.   STATEMENT OF FACTS

15.     LASD runs the largest jail system in the nation, with an average daily population of approximately 15,000 inmates. The great majority of those housed in the jail are pretrial detainees.  On average, 2,100 inmates per day (or 14 percent of the daily jail population) have immigration holds lodged against them.  These inmates spend on average 20.6 days longer in Los Angeles County jails than inmates without immigration holds, despite almost half of them being classified as low custody, meaning they are likely being held pre-trial on low level non-violent offenses and thus are, on average, better candidates for pre-trial release or other

1    diversion programs than the average inmate in the jails who does not have an
2    immigration hold.

3         16.    In recent years, LASD has *alone* detained more individuals on
4    immigration holds for the purposes of assisting the federal government with its
5    deportation efforts than any other county in the nation, and indeed more than any
6    other state except California and Texas.  It has done so absent the requisite legal
7    authority to do so in outright and reckless disregard for the detainees'
8    constitutional rights and their most basic right to liberty.  And it has done so
9    despite the fact that ICE could simply obtain custody of any person subject to an
10   immigration hold at the point at which they would normally be released from
11   LASD custody, without requiring LASD to detain them unconstitutionally for an
12   additional period of time.

13        17.    Although immigration holds are voluntary requests, as explained
14   below, as a matter of practice and policy, LASD detains every person who
15   receives an immigration hold beyond their release dates solely on the basis of the
16   hold.  Indeed, in August 2012, Sheriff Baca told members of the media that he
17   was mandated under federal law to detain any person for whom ICE lodges a
18   hold, despite the fact that federal law makes clear that immigration holds are not
19   mandatory but voluntary requests.

20   **A.    Immigration Detainers, also Known as ICE Holds**

21        18.    In August 2009, LASD, together with the federal immigration agency,
22   Immigration and Customs Enforcement ("ICE") of the Department of Homeland
23   Security ("DHS"), activated the "Secure Communities" (or "S-Comm") program
24   in Los Angeles County jails and stations.  The program links the criminal justice
25   and immigration systems through the sharing of fingerprints.  Under S-Comm,
26   LASD shares the fingerprints and booking information with ICE of every arrestee
27   during the booking process.  An agent in ICE's Law Enforcement Support Center
28   ("LESC") checks the fingerprints against immigration and FBI databases to make

1    an immigration status determination and sends a notification to ICE's

2    Enforcement and Removal Operations unit ("ERO").

3         19.    If the reviewing agent at ERO determines that ICE would like to take

4    some action with respect to the person detained, the agent sends LASD or the

5    local law enforcement agency a Form I-247, known as an "immigration detainer"

6    or an "ICE hold."

7         20.    An immigration hold is an administrative notice by ICE to a local law

8    enforcement agency.

9         21.    Pursuant to 8 C.F.R. § 287.7(a), the purpose of an immigration hold is

10   to "advise another law enforcement agency that [DHS] seeks custody of an alien

11   presently in the custody of that agency, for the purpose of arresting and removing

12   the alien.  The detainer is a request that such agency advise [DHS], prior to release

13   of the alien, in order for [DHS] to arrange to assume custody, in situations when

14   gaining immediate physical custody is either impracticable or impossible."

15        22.    The detainer form also states that ICE is requesting that the agency

16   hold the alien for a period of no more than 48 hours excluding Saturdays,

17   Sundays, and holidays "*beyond the time when the subject would have otherwise*

18   *been released from your custody*." 8 C.F.R. § 287.7(d) (emphasis added).

19        23.    Immigration holds are issued for various reasons.  The face of the

20   Form I-247 lists four possible reasons for ICE to issue the hold, including that ICE

21   has "[i]nitiated an investigation to determine whether this person is subject to

22   removal from the United States;" "[i]nitiated removal proceedings and served a

23   Notice to Appear or other charging document," with the charging document

24   attached; "[s]erved a warrant of arrest for removal proceedings," with the warrant

25   attached; or "[o]btained an order of deportation or removal from the United States

26   for this person."  The ICE agent may check a box next to one of these four reasons

27   to indicate the reason he or she is issuing the hold.

28

24.     Upon information and belief, the box marked "initiated an investigation to determine whether this person is subject to removal from the United States" is checked when the agent wishes to begin an investigation to determine whether the person is subject to removal.  This decision is made by the individual ICE agent reviewing the person's fingerprints and ICE records.  Upon information and belief, ICE checks the box on the I-247 form for "[i]nitiated an investigation to determine whether this person is subject to removal from the United States" on approximately 78% of the holds it issues to the LASD.

25.     In practice, ICE agents routinely issue immigration holds for the "[i]nitiat[ion of] an investigation" without probable cause to believe a person is removable from the United States.  An I-247 form with the investigation box checked does not indicate that there has been any prior determination by ICE (let alone a neutral decisionmaker) as to the person's immigration status, and it does not indicate that there is any warrant or court order as to the person's immigration status.

26.     Upon information and belief, ICE does not require that its agents have probable cause to believe a person is removable from the United States before issuing a Notice to Appear or arrest warrants, nor does ICE require that agents have probable cause to believe a person is removable from the United States before issuing an I-247 detainer form with the boxes checked for arrest warrant or a Notice to Appear or other charging document.

27.     Due to ICE's failure to apply any evidentiary standards and common errors in immigration databases, ICE often places immigration holds in error on persons who are not subject to removal, such as United States citizens and lawful permanent residents who are not subject to removal.  For example, in November 2011, ICE placed a hold on Romy Campos, a 19-year-old U.S.-born woman who is a dual citizen with the United States and Spain, simply because years prior when traveling alone as a minor she had entered the country on her Spanish

8

passport and in spite of other evidence that demonstrated her U.S. citizenship. LASD detained Ms. Campos for two days on the immigration hold beyond her release date despite her repeated protestations that she was an American citizen.

28.     ICE provides no meaningful way for a detainee to contest the immigration hold lodged against him or her.  Rather, a detainee must wait to be finally transferred to immigration custody before he or she will have an opportunity to demonstrate that he or she is not in fact removable and/or that he or she should be released.

29.     Pursuant to 8 U.S.C. § 1357(d), Congress authorized DHS to issue immigration holds only to non-citizens in state or local custody only in those circumstances where the offenses related to controlled substance violations. However, ICE places holds on anyone without regard to whether or not they have been charged with a controlled substance violation.

30.     The implementing regulation, 8 C.F.R. § 287.7(d), purports to authorize DHS to issue immigration holds for any noncitizen regardless of the underlying criminal offense.

31.     The regulation also purports to require law enforcement agencies to comply with the request, stating "[u]pon a determination by the Department to issue a hold for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department."  The Form I-247 immigration detainer form states: "IT IS REQUESTED THAT YOU: Maintain custody of the subject for a period NOT TO EXCEED 48 HOURS, excluding Saturdays, Sundays and holidays,

1   beyond the time when the subject would have otherwise been released from your

2   custody to allow DHS to take custody of the subject."[2]

3          32.    The LASD knew or should have known that ICE holds are voluntary

4   requests.  ICE admits, and the law is and has been clear, that ICE holds are and

5   always have been voluntary requests, and neither legally require, nor purport to

6   legally require, that a person be held against their will on that basis. The principle

7   "*Ignorantia juris non excusat*" applies if anything with greater force to LASD

8   than to private citizens, and whether LASD properly understood or appreciated the

9   lawful reach of an ICE hold is not a justification for violating Plaintiffs' rights.

10         33.    In 2010, ICE clarified in communications with members of Congress

11  and Santa Clara County that ICE holds are voluntary requests.[3]

12         34.    From at least 2005 until May 2015, ICE had an office in the Inmate

13  Reception Center area of the LASD jail system, where approximately one dozen

14  ICE agents were stationed.  These agents worked alongside LASD staff on a daily

15  basis.  LASD staff, from the senior leadership down to the deputies and custody

16  assistants, communicated on a regular basis with ICE.  Upon information and

17  belief, any communication between LASD and ICE regarding whether or not

18  immigration holds were mandatory or voluntary requests made clear that they were

19  only voluntary.

20         35.    In December 2012, California Attorney General Kamala D. Harris

21  issued an Information Bulletin to state and local law enforcement agencies which

22

23  ---
    [2]  *See* http://www.ice.gov/doclib/secure-communities/pdf/immigration-detainer-form.pdf.

24  [3] *See* Letter from David Venturella, Assistant Director, Secure Communities to
    Miguel Marquez, Santa Clara County Counsel at 3, Aug. 16, 2010, *available at*

25  http://media.sjbeez.org/files/2011/10/4-ICE-response-to-SCC.pdf ("ICE views an
    immigration detainer as a request . . . .");  ICE Memorandum on Secure

26  Communities Briefing to Congressional Hispanic Caucus at 3, Oct. 28, 2010,
    *available at* http://bit.ly/sHibJ7 ("Local LEAs are not mandated to honor a

27
28  detainer, and in some jurisdictions they do not.").

1    stated that "immigration detainers are not compulsory.  Instead, they are merely

2    requests enforcement *at the discretion of the agency* holding the individual

3    arrestee."

4         36.    In January 2014, California legislation known as the TRUST Act, or

5    AB4, went into effect, which stated in its preamble that "[e]xisting federal law

6    provides that the detainer is a request that the agency advise the department, prior

7    to release of the alien, in order for the department to arrange to assume custody in

8    situations when gaining immediate physical custody is either impracticable or

9    impossible."

10        37.    On April 7, 2014, LASD received a memorandum from the attorney

11   for the California Sheriff's Association stating that immigration detainers were

12   optional requests.

13        38.    The LASD knew or should have known that immigration detainers

14   were not lawful detention requests.

15        39.    Unlike criminal detainers or holds, an immigration hold is not

16   accompanied by a judicial warrant or judicial determination of probable cause.

17   Rather, it is solely an administrative request, signed by a single ICE officer.

18   Although it is called a detainer, it is not accompanied by the same procedural

19   protections as criminal detainers.

20        40.    LASD's legal authority to detain persons beyond the time when they

21   became entitled to release on the charges on which LASD was holding them

22   extends only to hold those for whom there was probable cause to believe the

23   detainee had committed a crime. While a warrant is facially a document based on

24   probable cause to believe the detainee had committed a crime, an ICE detainer on

25   its face does not establish or purport to establish such probable cause.

26        41.    In January 2014, the TRUST Act (AB4) went into effect, which stated

27   "[u]nlike criminal detainers, which are supported by a warrant and require

28   probable cause, there is no requirement for a warrant and no established proof,

1    such as reasonable suspicion or probable cause, for issuing an ICE detainer

2    request.  Immigration detainers have erroneously been placed on United States

3    citizens, as well as immigrants who are not deportable."

4         42.    Because immigration detainers have never been accompanied by a

5    judicial warrant, any detention by LASD on an immigration detainer constituted a

6    warrantless arrest.  LASD made such warrantless arrests despite not bringing

7    inmates held on the sole authority of an immigration detainer before a judicial

8    officer within 48 hours for a probable cause determination, as is required by the

9    Fourth Amendment. In a document circulated among LASD staff in February 2014

10   titled "ICE study guide" about the ICE Desk in the LASD Inmate Reception

11   Center, the LASD changed its policy stating "[w]e will not detain a person on the

12   basis of an immigration hold for longer than 48hrs, including weekends and

13   holidays" and explaining that "[a]lthough DHS generally requests a detention of

14   48hrs excluding weekends and holidays, and detention longer than 48hours

15   requires a probable cause hearing before a magistrate judge.  DHS doesn't provide

16   such hearings, therefore the local law enforcement agency will limit detention on

17   the basis of an ICE hold to 48hrs, including weekends and holidays."

18        43.    While LASD treated immigration detainers as mandatory holds, it did

19   not subject them to basic verification and tracking procedures that govern the

20   processing of warrants. Upon receipt of a warrant, LASD confirms the status of the

21   warrant and that the description matches the inmate. The unit responsible for

22   processing warrants, reviews the name, date of birth, height, weight, and CI

23   number (unique identifying number). Once this information has been verified,

24   LASD places a hold in its system, notifies the requesting agency that a hold has

25   been placed, and delivers copies of the warrant notification to the inmate. Any

26   warrants disputed by inmates are investigated and recorded in a disputed warrant

27   log. When all Los Angeles County criminal matters conclude and the inmate

28   becomes due for release, LASD notifies the requesting agency of the inmate's

availability and calendars the deadline for release (specific number of days LASD may hold the inmate solely on the basis of the warrant). LASD tracks time elapsed against the deadline using a "tickler file, " which is reviewed on a daily basis to ensure that the inmate is not over-detained. Inmates not picked up before the deadline are processed for release. LASD did not subject ICE holds to these procedures. LASD implemented no procedures to ensure or confirm the validity of the ICE hold, that it matched the inmate in custody or that the ICE detainer provided a basis for detention within the scope of LASD's legal authority. LASD likewise maintained no procedures to calendar the deadline for release, track the deadline, and ensure release processing before the deadline elapsed. Thus, LASD's handling of ICE detainers represents a significant deviation from normal LASD practices with regard to warrants and holds.

44.    An individual detained by LASD solely on the basis of an immigration hold remains in the legal and actual custody of LASD.

45.    DHS does not reimburse local law enforcement agencies for the cost incurred in detaining an inmate on an immigration hold.  According to 8 C.F.R. §287.7(e), DHS incurs no fiscal responsibility for detention pursuant to an immigration hold.

46.    The issuance of an immigration hold does not ensure that ICE will assume custody over the detainee or that ICE will take any action against the detainee.  ICE may or may not pick up the detainee held on the immigration detainer.  If ICE picks up the detainee, it may or may not initiate removal proceedings against the detainee after interviewing the individual and reviewing the case.  In some cases, ICE may discover that the detainee is not actually removable, in which case ICE will take no action and release the individual.  In other cases, ICE may initiate or reinstate removal proceedings against the individual.  Once ICE initiates proceedings, an individual who is not subject to

1    mandatory immigration detention may be eligible for release on his or her own

2    recognizance, supervised released, or bond.

3        **B.    LASD's Pattern and Practice of Refusing to Allow Posting of Bail**
         **when an Immigration Hold has been Lodged Against an Inmate.**
4

5        47.    Until this week, LASD had a pattern and practice of refusing to allow

6    inmates admitted to bail by state law to post their bail bonds if they have an

7    immigration hold, thus preventing them from securing their release from custody

8    pending resolution of the charges against them.

9        48.    The California Constitution provides a fundamental right to bail.  The

10   existence of an immigration hold legally has no affect on a person's right to post

11   bail and be released from criminal custody.

12       49.    Upon information and belief, LASD electronically codes every

13   immigration hold as "no bail."  This coding applies to every person in LASD

14   custody, as well as to every person in the custody of police departments within Los

15   Angeles County.  The "no bail" notation is placed on the record of any detainee

16   subject to an immigration hold, regardless of their eligibility for bail under the

17   County bail schedule or court order.

18       50.    Upon information and belief, LASD jailers and bail administrators

19   have interpreted this coding to mean that they are not permitted to allow a person

20   subject to an immigration hold to post bail.  As a result, they have routinely turned

21   away and refused to accept lawfully-tendered bail bonds from bail bondsmen,

22   family members and others when they attempt to lawfully post bail for an inmate.

23       51.    Over the past few years, Plaintiffs' counsel have represented or

24   assisted dozens of individuals who remained in LASD custody after their LASD

25   jailers would not permit them to post bail on account of an immigration hold

26   lodged against them.

27

28

52.     Numerous bail bondsmen have confirmed that in the overwhelming majority of cases, LASD personnel at both LASD stations and at the County Jails will not permit them to post bail for individuals with an immigration hold.

53.     The California state bail agency, Golden State Bail Bonds, reported in a recent memo that Los Angeles County is one county in California where its members are not able to post bail if their clients have an immigration hold.

54.     Numerous phone calls to jailers at LASD jails and stations confirm that, until this week, LASD's practice was not to allow detainees with ICE holds to post bail.

55.     LASD's practice of refusing to allow detainees to post bail if they had an immigration hold has affected the practice of police departments within Los Angeles County as well.  Upon information and belief, immigration hold information is routed to police departments through LASD, and those departments also rely on the LASD's "no bail" notation for ICE holds.  Accordingly, most, if not all, police departments in Los Angeles County follow LASD's practice of refusing to allow inmates to post bail if they have an immigration hold.  As a result, many police stations transfer individuals to LASD custody who they otherwise would have released on bail prior to their arraignment.

56.     Unlike other "no bail holds" in the criminal system, such as parole holds, there is no legal authority that permits LASD to deny a person with an ICE hold the opportunity to post bail.

**C.      LASD's Continuing Pattern and Practice of Prolonging Inmates' Detention Solely on the Basis of the Immigration Hold.**

57.     LASD has a continuing pattern and practice of prolonging inmates' detention solely on the basis of the immigration hold after the expiration of any state law authority to detain them.

58.     LASD, as a matter of policy and practice, detains every person with an ICE hold beyond their release date on the sole basis of the immigration hold. Thus, LASD continues the detention of every person subject to an immigration

59.     hold beyond the state-mandated release date.  In other words, the LASD ignores its mandatory duty under state law to release detainees subject to immigration holds after, for example, no charges were filed against them, they have served the entirety of their sentence, they are ordered released on their own recognizance, they have posted bail, or a jury has found them not guilty of the crime with which they have been charged.  Most commonly, LASD continues the detention for 48 hours, excluding weekends and holidays.  It regularly detains individuals for more than 48 hours after they would otherwise be released from custody.

60.     The LASD asks every person booked into its custody what country they were born in.  Upon information and belief, even when a detainee declares that he or she was born in the United States, LASD nonetheless complies with the immigration hold.

**D.     Plaintiffs' Allegations**

      **1.  *Duncan Roy***

61.     On November 15, 2011, LASD arrested Mr. Roy in Malibu, California on an extortion charge for threatening to blog about an allegedly fraudulent real estate deal.  LASD booked him into the custody of the Lost Hills Station in Malibu.

62.     After booking, Mr. Roy was eligible for release on bail at $35,000 according to the Los Angeles County bail schedule.  Within hours of his arrest, a bail bondsman traveled to the station and attempted to post bail for him.  The jailer refused to accept the bond, stating that Mr. Roy was going to have an immigration hold lodged on him.  Hours later, ICE lodged an immigration hold.  LASD coded Mr. Roy's inmate information as "no bail."

16

63.    The bail bondsman again attempted to post the bail bond but the jailer refused to accept it, stating that he could not post bail because Mr. Roy had an ICE hold.

64.    At arraignment on the charge, a judge approved Mr. Roy's bail at the $35,000 amount.  Afterwards, LASD transferred him to Men's Central Jail.  The bail bondsman again attempted on multiple occasions and over the course of multiple days to post bail for Mr. Roy, but each time LASD personnel refused to allow him to post bail for Mr. Roy.  LASD personnel stated that they could not accept the bail bond because of the immigration hold lodged against Mr. Roy.

65.    LASD also prevented the bail bondsman from meeting with Mr. Roy, telling him that he was not permitted to visit with him because he was not permitted to post bail for him.

66.    Mr. Roy hired a criminal defense attorney and an immigration lawyer. Neither of them was able to persuade LASD that it was obligated to accept Mr. Roy's bail bond.

67.    Mr. Roy was detained in the so-called "gay dorm" in Men's Central Jail.

68.    Mr. Roy suffers prostate and colon cancer and requires routine monitoring to ensure that his cancer does not regress.  Mr. Roy requested medical care to check on his cancer, but LASD did not comply with his requests.

69.    Mr. Roy also filed complaints with LASD stating that he could not post bail due to the immigration hold and requesting that an ICE agent speak to him so that he could tell them that the immigration hold was placed in error. LASD never responded to his complaints and did not provide him an opportunity to speak with an ICE agent.

70.    After LASD held Mr. Roy in jail for 89 days, ICE lifted his immigration hold on humanitarian grounds and LASD finally permitted Mr. Roy's

bail bondsman to post bail.  Mr. Roy was released from LASD custody on February 8, 2012.

71.    Mr. Roy lost substantial income as a result of his imprisonment, and it has affected his reputation.  His mental and physical health also significantly declined.

72.    Plaintiff Roy seeks damages for himself and not on behalf of any class for LASD's practice of refusing to honor bail. Prior to his arrest, Roy was granted humanitarian immigration parole due to his ongoing cancer therapy and monitoring.  After his parole expired, he received an extension to remain in the United States until December 23, 2011.  Had he left the U.S. in compliance with the deadline, he would not have incurred unlawful presence and implications for his future ability to return to the United States.  Though Roy booked a plane ticket to return to Europe on December 23, and intended to return on that flight, he was prevented from leaving because LASD refused to accept bail, unlawfully detaining him until February 8, 2012.  His inability to comply with his immigration requirements has created barriers to his ability to be readmitted into the United States.

73.    As a result of the Defendants' unlawful conduct as alleged herein, Plaintiff Roy suffered serious emotional distress, was not adequately treated for his medical condition, and suffered lost income, profits and business opportunity. Regarding the latter, at the time of his arrest, Mr. Roy was scheduled to begin production on a film shortly after the date of his arrest. The film project fell apart due to Roy's 89-day, unlawful imprisonment.  Plaintiff Roy lost income associated with the film project.  He also lost rental income associated with three months of lost rental bookings on the home he owns in Malibu, California because his incarceration prevented him from renting his home as he normally does.

## 2. *Alain Martinez-Perez*

74.     On December 14, 2011, LASD arrested Mr. Martinez-Perez about 6 a.m. on a domestic battery charge arising from a domestic dispute.  Mr. Martinez-Perez had left the house after his partner became physically violent with him.  Enraged, his partner called the police in an attempt to bribe Mr. Martinez-Perez to come home.  When the police arrived, Mr. Martinez-Perez explained that his partner had in fact battered him.  Nonetheless, LASD officers arrested him.

75.     LASD booked Mr. Martinez-Perez into the Industry station.  He was eligible for release on bail by Los Angeles County bail schedule in the amount of $20,000.

76.     Within a matter of hours, ICE lodged an immigration hold against him.  LASD coded Mr. Martinez-Perez's inmate information as "no bail."

77.     Mr. Martinez-Perez's cousin contacted a bail bondsman to post bail for him.  The bail bondsman attempted to post bail but LASD would not allow him to post bail because of the immigration hold.

78.     On December 16, 2011, LASD provided Mr. Martinez-Perez with a certificate of release and clearance letter pursuant to California Penal Code § 849.5 informing him that no charges were filed against him and that his arrest shall not be deemed to be an arrest but a detention only.

79.     LASD did not release him, however.  It maintained custody over him until December 20, 2011 at 3 p.m. solely on the basis of the immigration hold.  At that time, ICE came and picked him up.

80.     After interviewing him, ICE issued a Notice to Appear – a document charging him with grounds of removability from the United States – and booked him into immigration custody.  ICE detained him at the Mira Loma immigration detention facility in Lancaster, California before Mr. Martinez bonded out of immigration custody.

81.     LASD detained Mr. Martinez-Perez for approximately two days as a result of its refusal to allow him to post bail on account of the immigration hold.  It detained him for approximately four additional days beyond his release date solely on the immigration hold.

### 3.  *Annika Alliksoo*

82.     On July 12, 2012, LASD arrested Ms. Alliksoo outside a Walmart in Palmdale, California charging her with grand theft.  LASD accused her of attempting to steal groceries.

83.     LASD booked her into custody at the Palmdale station.  She was eligible to be released on bail of $20,000 according to Los Angeles County bail schedule.  Within a matter of hours, ICE lodged an immigration hold on her.

84.     Ms. Alliksoo's husband contacted two bail bondsmen on or about July 12 to post bail for her.  Both bail bondsmen attempted independently to post bail for Ms. Alliksoo, but LASD personnel at the Palmdale station would not allow them to post bail for her due to the presence of the immigration hold.

85.     At arraignment, the District Attorney filed a petty theft charge against Ms. Alliksoo, and the court admitted her to bail at $10,000.  LASD transferred her to Lynwood Jail.

86.     Once in the custody of Lynwood Jail, the bail bondsmen again attempted to post bail for her but the jailer would not accept the bail bond due to the presence of the immigration hold.

87.     At Ms. Alliksoo's next court hearing on July 27, having already spent 15 days in jail on a charge of petty theft, the judge ordered her released on her own recognizance because she was not able to bail out.

88.     LASD did not release her.  Rather, they maintained custody over her solely on the basis of the immigration hold until July 30.

89.     On July 30, ICE picked Ms. Alliksoo up.  After interviewing her, ICE booked her into custody and issued a Notice to Appear charging her with grounds of removability.  Hours later, ICE released her from custody on supervised release.

90.     LASD detained Ms. Alliksoo for approximately 15 days due to its refusal to allow her to post bail due to the immigration hold.  It then detained her an additional three days solely on the immigration hold.

### 4.  *Clemente De La Cerda*

91.     On October 5, 2012, the Whittier police department arrested Plaintiff De La Cerda for a probation violation and misdemeanor possession of nunchucks, which the police apparently believed to be a weapon.  Mr. De La Cerda uses nunchucks in his Tae Kwon Do practice and carried the nunchucks in his backpack because he had gone to his Tae Kwon Do studio earlier that day.

92.     Upon information and belief, ICE placed an immigration hold on Mr. De La Cerda shortly after he was booked into custody.

93.     Mr. De La Cerda pled no contest to the possession of nunchucks charge.  Mr. De La Cerda has an upcoming hearing on October 29, 2012 regarding a probation violation.  He expects that he may be ordered released on or around that date, but due to the immigration hold, will be detained by the LASD beyond his release date.

## IV.   CLASS ACTION ALLEGATIONS FOR EQUITABLE RELIEF

94.     Plaintiffs De La Cerda and Varela seek class-wide injunctive and declaratory relief, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), on behalf of a class and a subclass.

### 1.  *The Equitable Relief Class*

95.     The equitable relief class is defined as all persons who are or will be (1) detained in the custody of the LASD, (2) have an immigration hold placed on them by ICE while in LASD custody that was not supported by a lawful probable cause determination, (3) are entitled to be released from LASD custody under

applicable federal or state law (which creates a liberty interest in such release), (4) due to LASD policy and practice are not released (to the extent that they were otherwise entitled to release) but held in LASD custody on the authority of the ICE hold after they were eligible for release from LASD custody.

### a. Numerosity

96.   The class meets the numerosity requirement of Rule 23(a)(1).  There are approximately 20,000 inmates confined in the Los Angeles County Jails each year who are being or will be detained for 48 hours or more by LASD after they would otherwise be entitled to release on the sole basis of the ICE hold.   The membership of the class continuously changes, rendering joinder of all members impracticable.  The inclusion within the class of future inmates in the class also makes joinder of all members impracticable.

### b. Commonality

97.   The class meets the commonality requirement of Rule 23(a)(2).  Questions of law and fact presented by the named plaintiffs are common to other members of the class.  The common contentions that unite the claims of the class include the following:

- The practice of holding class members in the Los Angeles County jails for 48 hours or more after they are otherwise entitled to release on the basis of an ICE hold violates the Fourth Amendment of the United States Constitution.

- The practice of holding class members in the Los Angeles County jails for 48 hours or more after they are otherwise entitled to release on the basis of an ICE hold violates the Fourteenth Amendment of the United States Constitution.

- The practice of holding class members in the Los Angeles County jails for 48 hours or more on the basis of an ICE hold after they are otherwise entitled to release violates the state common law protections against false

imprisonment;

- The practice of holding class members in the Los Angeles County jails for 48 hours or more after they are otherwise entitled to release on the basis of an ICE hold constitutes an unreasonable seizure under Article I, Section 13 of the California Constitution; and

- The practice of holding class members in the Los Angeles County jails for 48 hours or more after they are otherwise entitled to release on the basis of an ICE hold violates the due process guarantee of Article I, Section 7 of the California Constitution

### c. Typicality

98.     The claims of Plaintiffs De La Cerda and Varela are typical of those of the class as a whole because they have an ICE hold placed on them that was not supported by a lawful probable cause determination while they were in LASD custody and will shortly be otherwise eligible for release, but will be detained for 48 or more hours by Defendants as a result of the ICE hold.

### d. Adequacy of Representation

99.     Plaintiffs are adequate class representatives and thus meet the requirements of Rule 23(a)(4).  De La Cerda and Varela are presently in the custody of the LASD, have an ICE hold placed on them that is not based on probable cause, and are being denied the opportunity to be released by LASD because they have an ICE hold placed on them.  They have no conflict of interest with other class members, they will fairly and adequately protect the interests of the class, and they understand their responsibilities as class representatives.

100.   The foregoing Plaintiffs (as well as those Plaintiffs acting as class representatives for the class damages claims, who are discussed *infra*) are represented by highly qualified and experienced counsel:  The ACLU of Southern California, the ACLU Immigrants Rights Project, the National Day Laborer Organizing Network and Kaye, McLane, Bednarski & Litt, who, as elaborated

23

below, are all highly experienced in cases of this type.

101.   Plaintiffs' co-lead counsel on behalf of the ACLU of Southern California, Peter Eliasberg, is the Legal Director of the ACLU Foundation of Southern California.  Since its founding in 1923, the ACLU of Southern California has been litigating a broad variety of civil rights cases, including prisoners' rights cases.  Attorney Eliasberg has been lead counsel or co-lead counsel in numerous federal civil rights class actions in the Central District of California as well as co-counsel on a federal habeas petition on behalf of Susan McDougal.  He has been lead counsel in civil rights matters before the United States Court of Appeals for the Ninth Circuit, the California Supreme Court, and the United States Supreme Court, and has argued a case before the U.S. Supreme Court.  Since 2009, Eliasberg has served as co-lead class counsel for all the inmates in Los Angeles County Jails in *Rutherford v. Baca* and in 2012 was named co-lead counsel for all the inmates in Men's Central Jail and Twin Towers in *Rosas v. Baca*, a federal class action in this Court.  In addition, co-counsel Jennie Pasquarella, Peter Bibring, and Ahilan Arulanantham all have experience serving as class counsel in large civil rights cases litigated in federal court.

102.   Plaintiffs' co-lead counsel on behalf of the Immigrants' Rights Project of the American Civil Liberties Union is Cecilia Wang.  Ms. Wang is Director of the Immigrants' Rights Project of the ACLU Foundation ("ACLU IRP").  She has substantial experience serving as plaintiffs' counsel in certified class action lawsuits in federal court, including *Lopez-Valenzuela, et al. v. Maricopa County*, No. 08-660 (D. Ariz. filed April 4, 2008), which seeks relief on behalf of pretrial detainees in Arizona who are ineligible for bail because of their immigration status, and *Ortega Melendres v. Arpaio, et al.*, No. 07-02513 (D. Ariz. filed Dec. 12, 2007), which challenges the Maricopa County Sheriff's Office's practice of race discrimination and Fourth Amendment violations in traffic stops.  In addition, Omar Jadwat and Kate Desormeau, staff attorneys at ACLU IRP, have experience

serving as counsel in class-action lawsuits including *Valle Del Sol v. Whiting,* No.10-01061 (D. Ariz. filed May 17, 2010), and *Utah Coalition of La Raza, et al. v. Herbert*, No. 11-00401 (D. Utah filed May 3, 2011).  Founded in 1987, the ACLU IRP has extensive experience litigating civil rights and class action lawsuits on behalf of detained individuals, including *Franco-Gonzalez v. Napolitano et al.*, No. 10-02211 (C.D. Cal filed March 26, 2010), and *Rodriguez v. Robbins*, No. 07-03239 (C.D. Cal filed May 16, 2007).  The ACLU IRP will commit its expertise and resources to successfully represent the proposed classes in this action.

103.   Plaintiffs' co-lead counsel on behalf of the National Day Laborer Organizing Network (NDLON), Chris Newman, is the Legal Director of the National Day Laborer Organizing Network.  Since its founding in 2001, NDLON has litigated a variety of constitutional and civil rights cases.  Attorney Newman currently serves as co-counsel in the civil rights class action *Valle Del Sol v. Whiting*, No.10-01061 (D. Ariz. filed May 17, 2010).  He  has also been counsel in constitutional and civil rights matters before the United States Court of Appeals for the Ninth and Eleventh Circuits, including *Hispanic Interest Coalition of Alabama v. Bentley*, No. 11-14535 (11th Cir.), as well as the Central District of California. In addition, Jessica Karp, staff attorney at NDLON, has experience serving as counsel in civil rights class action *Valle Del Sol v. Whiting*, and has been counsel in constitutional and civil rights matters before the United States Court of Appeals for the Ninth and Eleventh Circuits.

104.   Plaintiffs' co-lead counsel on behalf of Kaye, McLane, Bednarski & Litt, Barrett S. Litt, specializes in complex civil rights litigation, particularly civil rights class actions, and has extensive experience handling jail matters. The law enforcement or jail/prison class actions in which he has been named class counsel in certified classes are listed below. (Where there is a reported decision, the cite is provided.)

➢ *Multi-Ethnic Immigrant Worker Network v. City of Los Angeles*, Case No.: CV 07-3072 AHM (FMMx) (class action for injunctive relief and damages for challenging the LAPD's assault on a lawful immigrant rights rally in MacArthur Park on May 1, 2007: *Multi-Ethnic Immigrant Worker Network v. City of Los Angeles*, 24 F.R.D. 621 (C.D. Cal. 2007) (certifying class).

➢ *Williams v. Block*, Case No.: CV-97-03826-CW (Central District of California) and related cases (a series of county jail overdetention and strip search cases, settled for $27 Million and a complete revamp of jail procedures); *Streit v. County of Los Angeles*, 236 F.3d 552, 556 (9th Cir. 2001) (finding that sheriff is a county actor and referring, at fn. 2, to the concurrent, unreported reversal of the denial of class certification by the district court).

➢ *Craft v. County of San Bernardino,* Case No.: EDCV05-00359 SGL (C.D.Cal.) (certified class action against the Sheriff of San Bernardino County for blanket strip searches of detainees, arrestees, and persons ordered released from custody; partial summary judgment decided for plaintiffs; $25.5 Million settlement approved April 1, 2008); *Craft v. County of San Bernardino*, 468 F.Supp.2d 1172 (C.D.Cal. 2006) (approving class settlement).

➢ *Lopez v. Youngblood*, No. CV07-00474 LJO (DLBx) (E.D. Calif.) (class action against Kern County, California, for unlawful pre-arraignment and post-release strip searches and strip searches not conducted in private; class certification and summary judgment on liability granted; settlement approved in 2011for class fund of approximately $7 Million); *Lopez v. Youngblood*, 2009 WL 909817 (E.D. Cal. Apr. 1, 2009).

➢ *Bynum v. District of Columbia*, Case No.: 02-956 (RCL) (D.D.C.) (class action against the District of Columbia for overdetentions and blanket

strip searches of pretrial jail detainees after they have been ordered released from custody; final approval of $12,000,000 settlement occurred January 2006); *Bynum v. Dist. of Columbia*, 214 F.R.D. 27 (D.D.C. 2003) (certifying class)

➢ *Barnes v. District of Columbia,* Civil Action No: 06-315 (RCL) (D.D.C.) (class action against District of Columbia for continuing to both over-detain and strip search post-release inmates despite settlement in *Bynum, supra*; class certification granted; partial summary judgment granted plaintiffs and remaining issues to be set for trial); *Barnes v. Dist. of Columbia*, 242 F.R.D. 113 (D.D.C. 2007) (certifying class)]

➢ *Johnson v. District of Columbia*, Case No. 02-2364 (RMC) (D.D.C.) (class action against the District of Columbia and United States Marshals for blanket strip searches of arrestees initially taken to jail without reasonable suspicion and not involved in drug or violent activity; judgment for defendant on appeal); *Johnson v. Dist. of Columbia*, 248 F.R.D. 46 (D.D.C. 2008) (certifying class).

➢ *Jones v. Murphy*, Case No. CCB 05 CV 1287 (D. Maryland) (class action challenging overdetentions and illegal strip searches in Central Booking in Baltimore, MD, jail; class certification granted in part and denied in part; summary judgment motions pending); *Jones v. Murphy*, 256 F.R.D. 519 (D. Md. 2009) (certifying class).

➢ *Gail Marie Harrington-Wisely, et al. v. State of California, et al.*, Superior Court Case No.: BC 227373 (backscatter x-ray searches of visitors to California prisons without reasonable suspicion; class certification granted; stipulated injunction entered; case recently remanded back to state court for further proceedings).

105.   Mr. Litt has authored articles on law enforcement related class certification issues. See "Class Certification in Police/Law Enforcement Cases",

27

1   *Civil Rights Litigation and Attorney's Fee Annual Handbook*, Vol.18, Ch.3, West

2   Publishing 2002; "Obtaining Class Attorney's Fee*s*," *Civil Rights Litigation and*

3   *Attorney's Fee Annual Handbook*, Vol. 26,  Ch. 15, West Publishing 2010.

4       106.   Plaintiffs meet the requirement of Rule 23(b)(2), as the Defendant has

5   acted, or omitted to act, on grounds generally applicable to the class, thereby

6   making equitable relief appropriate with respect to the class as a whole.

7             **2.   *The Equitable Relief Sub-class***

8       107.   The equitable relief sub-class is defined as all persons who are or will

9   be (1) detained in the custody of the LASD, (2) have an immigration hold placed

10  on them by ICE while in LASD custody that was issued to initiate an investigation

11  to determine whether the person is subject to removal, issued on the basis of a

12  warrant of arrest for removal proceedings, or issued on the basis of initiating

13  removal proceedings and serving a Notice to Appear or other charging documents,

14  (3) are entitled to be released from LASD custody under applicable federal or state

15  law (which creates a liberty interest in such release), (4) due to LASD policy and

16  practice are not released (to the extent that they were otherwise entitled to release)

17  but held in LASD custody on the authority of the ICE hold (5) for more than 48

18  hours after they were eligible for release from LASD custody without a probable

19  cause hearing before a neutral decisionmaker for a probable cause determination.

20  The distinctions between this sub-class and the equitable relief class are that this

21  sub-class asserts that, even if an ICE hold for 48 hours total is permissible,

22  additional holding time beyond 48 hours without a probable cause hearing before a

23  neutral decisionmaker is not, whereas the equitable relief class asserts that no

24  period of an ICE hold is permissible.

25           a.  Numerosity

26      108.   The subclass for class two meets the numerosity requirement of Rule

27  23(a)(1).  There are approximately 20,000 inmates confined in the Los Angeles

28  County Jails each year who LASD will detain for ICE because ICE has placed a

1    hold on them, who are being, or will be, detained for more than 48 hours by LASD

2    after they would otherwise be entitled to release on the basis of the ICE hold.

3    More than 15,000 of those holds are issued as "investigatory holds" or on the basis

4    of a warrant issued by an ICE officer.  For approximately 31% of those 15,000,

5    with investigatory or ICE officer warrant ICE holds, or 4,650 of the 15,000, their

6    continued detention on the ICE hold will run more than 48 hours because they are

7    held on Saturday, Sunday or holiday.  Thus, approximately 4,650 will be held by

8    LASD for more than 48 hours after they were eligible for release from LASD

9    custody without a probable cause determination by a neutral decisionmaker.  The

10   membership of the subclass continuously changes, rendering joinder of all

11   members impracticable.  The inclusion within the subclass of future inmates in the

12   downtown Jail Complex also makes joinder of all members impracticable.

13                            b.  <u>Commonality</u>

14   109.   The subclass meets the commonality requirement of Rule 23(a)(2).

15   Questions of law and fact presented by the named plaintiffs are common to other

16   members of the class.  The common contentions that unite the claims of the class

17   include the following:

18   •    The practice of holding subclass members in the Los Angeles County

19        jails for more than 48 hours after they are otherwise entitled to release on

20        the basis of an ICE hold without a probable cause determination by a

21        neutral decisionmaker violates the Fourth Amendment of the United

22        States Constitution;

23   •    The practice of holding subclass members in the Los Angeles County

24        jails for more than 48 hours after they are otherwise entitled to release on

25        the basis of an ICE hold without a probable cause determination by a

26        neutral decisionmaker violates the due process guarantee of Fourteenth

27        Amendment of the United States Constitution;

28   •    The practice of holding subclass members in the Los Angeles County

jails for more than 48 hours after they are otherwise entitled to release on the basis of an ICE hold without a probable cause determination by a neutral decisionmaker violates the state common law protections against false imprisonment;

- The practice of holding subclass members in the Los Angeles County jails for more than 48 hours after they are otherwise entitled to release on the basis of an ICE hold without a probable cause determination by a neutral decisionmaker constitutes an unreasonable seizure under Article I, Section 13 of the California Constitution.

- The practice of holding subclass members in the Los Angeles County jails for more than 48 hours after they are otherwise entitled to release on the basis of an ICE hold without a probable cause determination by a neutral decisionmaker violates the due process guarantee of Article 1, Section 7 of the California Constitution.

### c. Typicality

110.   The claims of Plaintiff Varela are typical of those of those of the sub-class because, due to the timing of Mr. Varela's release date, he will be detained more than 48 hours and over the weekend without a probable cause determination by a neutral decisionmaker solely on the basis of the ICE hold.

### d. Adequacy of Representation

111.   Plaintiffs are adequate class representatives and thus meet the requirements of Rule 23(a)(4).  Plaintiff Varela is presently in custody of the LASD and will have been held for more than 48 hours after he is otherwise entitled to relief on the basis of an ICE hold without a probable cause determination by a neutral decisionmaker.  He has no conflict of interest with other class members, and he will fairly and adequately protect the interests of the class.  He and the sub-class are represented by highly qualified and experienced counsel:  The ACLU of Southern California, the ACLU Immigrants Rights Project, the National Day

1  Laborer Organizing Network and Kaye, McLane, Bednarski & Litt.  Plaintiffs

2  incorporate by reference the allegations set forth in paragraphs 93-98 above.

3      112.   Plaintiffs meet the requirement of Rule 23(b)(2) as the Defendant has

4  acted, or omitted to act, on grounds generally applicable to the class, thereby

5  making habeas corpus relief appropriate with respect to the class as a whole.

6  **V.     CLASS ACTION ALLEGATIONS FOR DAMAGES**

7      113.   Plaintiffs Martinez-Perez and Alliksoo bring this damages claim based

8  on federal and supplemental state law claims, including under 42 U.S.C. §1983,

9  seeking class-wide relief, pursuant to Federal Rules of Civil Procedure 23(a) and

10  (b)(3), on behalf of all Damages Classes alleged below.

11      114.   The foregoing named Plaintiffs are also collectively referred to as the

12  "Damages Class Representatives."

13          **1.    *Damages Classes One and Two (Federal and State***

14              ***Respectively)***

15      115.   Damages Class One (hereafter and in the course of this litigation also

16  referred to as the "Federal Bail Damages Class") is defined as all persons who,

17  during the two years prior to the filing of this complaint, and continuing until the

18  practice has ceased or until entry of judgment, whichever is sooner, have been or

19  will be (1) detained in the custody of the LASD, (2) have an immigration hold

20  placed on them by ICE while in LASD custody, (3) were eligible to post bail on

21  the basis of the County-wide bail schedule as provided by statute, an arrest

22  warrant, or a court order setting the amount of bail (4) but are not allowed to post

23  bail and be released due to LASD policy and practice.

24      116.   Damages Class Two (hereafter and in the course of this litigation also

25  referred to as the "State Bail Damages Class") is defined as all persons who,

26  beginning November 7, 2011 (six months before filing the initial state law 910

27

28

31

1   class claim by Antonio Montejano),[4] and continuing until cessation of the practice

2   or entry of judgment, whichever is sooner, have been or will be (1) detained in the

3   custody of the LASD, (2) have an immigration hold placed on them by ICE while

4   in LASD custody, (3) are eligible to post bail on the basis of the County-wide bail

5   schedule as provided by statute, an arrest warrant, or a court order setting the

6   amount of bail (4) but were or are not allowed to post bail and be released due to

7   LASD policy and practice.

8      **2.   *Damages Classes Three and Four (Federal and State***

9          ***Respectively)***

10      117.   Damages Class Three (hereafter and in the course of this litigation

11   also referred to as the "Federal ICE Damages Class") is defined as all persons who,

12   during the two years prior to the filing of this complaint, and continuing until the

13   practice has ceased or until entry of judgment, whichever is sooner, have been or

14   will be (1) detained in the custody of the LASD, (2) have an immigration hold

15   placed on them by ICE while in LASD custody that was not supported by a lawful

16   probable cause determination, (3) are entitled to be released from LASD custody

17   under applicable federal or state law (which creates a liberty interest in such

18   release), and (4) due to LASD policy and practice are not released (to the extent

19   that they were otherwise entitled to release) but held in LASD custody on the

20   authority of the ICE hold after they were eligible for release from LASD custody.

21      118.   Damages Class Four (hereafter and in the course of this litigation also

22   referred to as the "State ICE Damages Class") is defined as all persons who,

23   beginning November 7, 2011 (six months before filing the initial state law 910

24   class claim by Antonio Montejano), and continuing until cessation of the practice

25

26   _____

[4] Should the Court conclude for some reason that the Montejano 910 claim does

27   not begin the running of the period for which a claim can be made, there were also
subsequent 910 class claims filed that Plaintiffs can assert if necessary. This

28   applies to the other state damages classes asserted herein.

or entry of judgment, whichever is sooner, have been or will be (1) detained in the custody of the LASD, (2) have an immigration hold placed on them by ICE while in LASD custody that was not supported by a lawful probable cause determination, (3) are entitled to be released from LASD custody under applicable federal or state law (which creates a liberty interest in such release), and (4) due to LASD policy and practice are not released (to the extent that they were otherwise entitled to release) but held in LASD custody on the authority of the ICE hold after they were eligible for release from LASD custody.

### 3. *Damages Sub-Classes to Damages Classes Three and Four, AKA Classes Five and Six (Federal and State Respectively)*

119.   As alleged previously regarding the injunctive relied sub-class, there are also sub-classes to the ICE Damages Classes. Because a sub-class is ultimately treated as a separate class, should it become appropriate to distinguish it from the class of which it is a part, Plaintiffs also refer to the sub-classes alleged in this section as Classes Five and Six.

120.   The sub-class to Damages Class Three (hereafter and in the course of this litigation also referred to as Damages Class Five or the "Federal Post-48 Hour ICE Damages Class") is defined as all persons who, during the two years prior to the filing of this complaint, and continuing until the practice has ceased or until entry of judgment, whichever is sooner, have been or will be (1) detained in the custody of the LASD, (2) have an immigration hold placed on them by ICE while in LASD custody that was issued to initiate an investigation to determine whether the person is subject to removal, on the basis of a warrant of arrest for removal proceedings, or on the basis of initiating removal proceedings and serving a Notice to Appear or other charging documents (3) are entitled to be released from LASD custody under applicable federal or state law (which creates a liberty interest in such release), (4) due to LASD policy and practice are not released (to the extent that they were otherwise entitled to release) but held in LASD custody on the

33

authority of the ICE hold (5) for more than 48 hours after they were eligible for release from LASD custody without a probable cause hearing before a neutral decisionmaker for a determination of probable cause.

121.   The sub-class to Damages Class Four (hereafter and in the course of this litigation also referred to as Damages Class Six or the "State Post-48 Hour ICE Damages Class") is defined as all persons who, beginning on November 7, 2011 (six months before the filing of the initial state law 910 class claim by Antonio Montejano), and continuing until cessation of the practice or entry of judgment, whichever is sooner, have been or will be (1) detained in the custody of the LASD, (2) have an immigration hold placed on them by ICE while in LASD custody that was issued to initiate an investigation to determine whether the person is subject to removal, on the basis of a warrant of arrest for removal proceedings, or on the basis of initiating removal proceedings and serving a Notice to Appear or other charging documents, (3) are entitled to be released from LASD custody under applicable federal or state law (which creates a liberty interest in such release), (4) due to LASD policy and practice are not released (to the extent that they were otherwise entitled to release) but held in LASD custody on the authority of the ICE hold (5) for more than 48 hours after they were eligible for release from LASD custody without a probable cause determination by a neutral decisionmaker.

## VI.   THE FOREGOING DAMAGES CLASSES MEET THE REQUIREMENTS OF FEDERAL RULES OF CIVIL PROCEDURE 23(A).

122.   Damages Classes One and Two meet the requirements of Rule 23 as follows:

### 1.   *Numerosity*

123.   The classes meet the numerosity requirement of Rule 23(a)(1).  There are approximately 20,000 inmates (rounded to the nearest thousand) confined in the Los Angeles County Jails each year who will be released to ICE because ICE

has placed a hold on them.  Austin at pg. 21.  Approximately 45% of the 20,000, or 9,000 are held solely on pre-trial status; in other words they are not serving a sentence.  Approximately 43% of them, or 3,870, are classified as "low custody" and are thus likely to be held pre-trial on a minor charge and therefore a low bail amount under the County-wide bail schedule as provided by statute, an arrest warrant, or court order.  On information and belief, well over 1000 such individuals (quite likely substantially more) would have posted bail in a given year in light of the low bail amounts set for those charged with low level offenses, except for the LASD practice of refusing to allow them to post bail.

### 2.  *Commonality*

124.   The classes meet the commonality requirement of Rule 23(a)(2).  Questions of law and fact presented by the named plaintiffs are common to other members of the class.  The common contentions that unite the claims of the class include the following:

- The practice of denying the ability to post bail to inmates with ICE holds violates the right to due process of laws of the 14th Amendment of the United States Constitution;

- The practice of denying the ability to post bail to inmates with ICE holds violates the state common law protection against false imprisonment;

- The practice of denying the ability to post bail to inmates with ICE holds violates California Penal Code Section Cal. Penal Code § 1269b(g);

- The practice of denying the ability to post bail to inmates with ICE holds violates Article I, section 12 of the California Constitution.

### 3.  *Typicality*

125.   Plaintiffs meet the typicality requirement of Rule 23(a)(3), since, as alleged below, the claims of the Plaintiffs are typical of those of the class.

126.   Plaintiff Martinez-Perez was denied the ability to post bail due to the presence of an ICE hold, and was held beyond the expiration of any state law basis

1    to detain him for four days, including over the weekend, on the ICE hold.

2          127.   Plaintiff Alliksoo was denied the ability to post bail due to the

3    presence of an ICE hold and was held beyond the expiration of any state law basis

4    to detain her for three days, including over the weekend, on the ICE hold.

5                    **4.  *Adequacy of Representation***

6          128.   Plaintiffs are adequate class representatives and thus meet the

7    requirements of Rule 23(a)(4).  Plaintiffs Martinez-Perez and Alliksoo were in the

8    custody of the LASD, were eligible for bail by County-wide bail schedule as

9    provided by statute, an arrest warrant, or had a court-ordered bail amount, had an

10   ICE hold placed on them, and were denied the opportunity to be released on bail

11   by Sheriff Baca because they had an ICE hold placed on them. They have no

12   conflict of interest with other class members, they will fairly and adequately

13   protect the interests of the class, and they understand their responsibilities as class

14   representatives.

15         129.   The foregoing Plaintiffs (as well as those Plaintiffs acting as class

16   representatives for the class damages claims, who are discussed *infra*) are

17   represented by highly qualified and experienced counsel:  The ACLU of Southern

18   California, the ACLU Immigrants Rights Project, the National Day Labor

19   Organizing Network and Kaye, McLane, Bednarski & Litt, who, as elaborated in

20   paragraphs 93-98, are all highly experienced in cases of this type.

21         130.   Plaintiffs incorporate paragraphs 94 to 112, above, regarding the

22   parallel equitable relief class and its subclass.   Except for the fact that the

23   Damages Class Representatives are out of custody, and the particular facts

24   showing that the claims are typical of the classes on whose behalf each acts as a

25   representative, the allegations contained in the foregoing paragraphs apply as well

26   to the Damages Class Representatives, and need not be repeated here, Damages

27   Classes One through Six accordingly meet the requirements of Federal Rule of

28   Civil Procedure 23(a) – numerosity, commonality, typicality and adequacy of

representation.

## VII. THE FOREGOING DAMAGES CLASSES MEET THE REQUIREMENTS OF FEDERAL RULES OF CIVIL PROCEDURE 23(B)(3).

131.   Damages Classes One through Six also meet the requirements of Federal Rule of Civil Procedure 23(b)(3).

### 1. *Predominance of Common Questions*

132.   The questions of law or fact common to class members predominate over any questions affecting only individual members because the dominant issue for all class members is whether there exists or existed a policy, custom and/or practice of 1) refusing to allow class members to post bail because there was an ICE hold on them, and 2) refusing to release class members otherwise entitled to release on the basis of an ICE hold (either for the whole period – Damages Classes Three and Four – or after the expiration of 48 hours after becoming entitled to release – Damages Classes Five and Six.

133.   The predominance of those issues for each damages class is sufficient to certify the class under Rule 23(b)(3) pursuant to the provisions of F.R.Civ.P 23(c)(4), which authorizes the certification of a class "with respect to particular issues," even if there are other issues to be tried individually.

### 2. *Superiority*

134.   A class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Most of the class members were detained unlawfully for sufficiently few days that an individual lawsuit for such damages is not economically viable, given the complexity of the issues, and lawyers are unlikely to take such cases individually. The great majority of class members accordingly do not have an individual interest in controlling the prosecution of the case. This district is the proper forum for the claims encompassed by this action, and there are no individual cases of which Plaintiffs are aware pending in this

37

District pursuing damages for the violations at issue here despite the prevalence of the problem.

135.   The action is manageable. At a minimum, it will decide the critical issue of *Monell* liability for all class members, and, given the nature of the claims, it will also decide causation because the reason for the unlawful continuing detention will be the policies asserted herein. These are all the issues that need to be determined to establish liability to the respective classes.

136.   General damages inherent in the constitutional violation could be proven on a class wide basis. Individual (special) damages, to the extent a class member chose to pursue them, would be proven on an individual basis under procedures to be set by the Court.

137.   Because the classes are confined to those regarding whom there should be computerized jail records that will show, inter alia, the date of arrest, whether bail was set, whether an ICE hold was placed on a person, the date of the ICE hold, the date the person was entitled to release absent the ICE hold, and the date of release or transfer to ICE, identifying the universe of likely class members will be readily accomplished based on jail (and possibly court, if needed) records.

138.   Thus, the proposed classes are manageable, and, without class treatment, the overwhelming majority of class members would not have a viable individual claim.

## VIII.   EXHAUSTION OF ADMINISTRATIVE REMEDIES FOR STATE DAMAGES CLAIMS

139.   Plaintiffs have complied with the jurisdictional prerequisites for filing a tort claim for damages against the County.  *See* Cal. Gov't Code § 911.2.

140.   On May 9, 2012, Plaintiff Duncan Roy filed an administrative tort claim against the Los Angeles County Sheriff's Department on behalf of himself and the representative class.  On May 23, 2012, he filed an amended claim.  On May 29, 2012, the County rejected his claim.

141.   On May 7, 2012, Antonio Montejano, a U.S. citizen detained by LASD on an immigration hold, filed an administrative tort claim against the Los Angeles County Sheriff's Department on behalf of himself and the representative class of persons detained solely on the basis of the immigration hold.  On May 23, 2012, he filed an amended claim.  On May 29, 2012, the County rejected his claim. On September 13, 2012, Plaintiff Annika Alliksoo filed an administrative tort claim against the Los Angeles County Sheriff's Department on behalf of herself and the representative class.  On October 9, 2012, she filed an amended claim.

IX.   **FIRST CAUSE OF ACTION: <u>FOURTEENTH AMENDMENT VIOLATION (DUE PROCESS); 42 U.S.C. § 1983</u>**

**(All Plaintiffs against all Defendants[5])**

142.   Plaintiffs incorporate the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

143.   As set forth above, Defendants refused to allow Plaintiffs and those similarly situated to post bail for which they were eligible under the County-wide bail schedule, prior to Plaintiffs' arraignment, thus depriving Plaintiffs of their liberty without due process of law.

144.   As set forth above, Defendants refused to allow Plaintiffs and those similarly situated to post the bail set for Plaintiffs by the courts in their criminal cases, thus depriving Plaintiffs of their liberty without due process of law.

145.   As set forth above, Defendants continued to detain Plaintiffs and those similarly situated after their criminal cases had been resolved and all state law

---

[5] For all causes of action pled, all claims for damages are made against Defendant County of Los Angeles.  All claims for injunctive relief are made against both Defendant County of Los Angeles and Defendant Baca in his official capacity. Claims by Plaintiff Defendant Roy are made for damages on his own behalf. Claims by Plaintiffs Alain Martinez-Perez and Annika Alliksoo are made for damages on behalf of themselves and others similarly situated.  Claims by Plaintiffs Clemente De La Cerda and Christian Michel Varela are made for injunctive relief on behalf of themselves and others similarly situated.

grounds to detain them had evaporated solely on the basis of the immigration hold, thus depriving Plaintiffs of their liberty without due process of law.

## X.   SECOND CAUSE OF ACTION: <u>FOURTH AMENDMENT VIOLATION (UNLAWFUL SEIZURE); 42 U.S.C. § 1983</u>

### (All Plaintiffs against all Defendants)

146.   Plaintiffs incorporate the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

147.   As set forth above, Defendants refused to allow Plaintiffs and those similarly situated to post bail for which they were eligible according to their warrant of arrest or under the County-wide bail schedule, prior to Plaintiffs' arraignment, thus seizing Plaintiffs in violation of the Fourth Amendment.

148.   As set forth above, Defendants continued to detain Plaintiffs and those similarly situated after their release date and the expiration of any and all state law basis to detain them solely on the basis that ICE issued a Form I-247, and without probable cause to believe that Plaintiffs were removable, thus seizing Plaintiffs in violation of the Fourth Amendment.

149.   Absent an emergency or other extraordinary circumstance, a detention of over 48 hours prior to judicial determination of probable cause violates the Fourth Amendment as a matter of law.  *See County of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991).  The 48 hours includes weekends and holidays.

150.   As set forth above, Defendants as a routine matter continued to detain Plaintiffs and those similarly situated for more than 48 hours after their release date and the expiration of any and all state law basis to detain them solely on the basis that ICE issued a Form I-247 without providing a judicial or quasi-judicial determination of probable cause on any purported immigration charges, thus seizing Plaintiffs in violation of the Fourth Amendment.

## XI.   FOURTH CAUSE OF ACTION: <u>FALSE IMPRISONMENT</u>

### (All Plaintiffs against all Defendants)

151.   Plaintiffs incorporate the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

152.   The duty of a jailor to release an inmate on bail is mandatory under California law.  California courts have held that jailers who failed to release an inmate who satisfied bail requirements acted unlawfully and are liable for false imprisonment.  *See Shakespeare v City of Pasadena*, 230 Cal. App. 2d 375, 384 (1964)*; Moore v. City & County of San Francisco*, 5 Cal. App. 3d 728 (1970).

153.   As set forth above, Defendants refused to allow Plaintiffs and those similarly situated to post bail for which they were eligible according to their warrant of arrest or under the County-wide bail schedule, prior to Plaintiffs' arraignment, thus non-consensually and intentionally confining Plaintiffs without lawful privilege.

154.   As set forth above, Defendants refused to allow Plaintiffs and those similarly situated to post the bail set for Plaintiffs by the courts in their criminal cases, thus non-consensually and intentionally confining Plaintiffs without lawful privilege.

155.   The duty of a jailor to release a detainee after a judge has ordered her released on her own recognizance, after she has served her sentence, after charges are dismissed or no charges are filed, or after the expiration of any other state law basis to detain is also mandatory.  *See, e.g.*, Cal. Penal Code § 1384 ("If the judge or magistrate directs the action to be dismissed, the defendant must, if in custody, be discharged therefrom . . . ."); *Sullivan v. Los Angeles*, 12 Cal.3d 710, 722 n.11 (1974) ("Release of a prisoner after dismissal of charges against him is non-discretionary since it is specifically mandated by Penal Code section 1384.").

156.   State law provides no authority for LASD to continue to detain an individual beyond her release date and the expiration of any and all state law basis to detain her solely on the basis of the immigration hold.

157.   As set forth above, Defendants continued to detain Plaintiffs and those similarly situated after their release date and the expiration of any and all state law basis to detain them, thus non-consensually and intentionally confining Plaintiffs without lawful privilege.

158.   Defendants are liable for the tort of false imprisonment of Plaintiffs, because their employees, acting within the course and scope of their duties, would have been liable for the tort of false imprisonment, based on the allegations above. California Government Code § 815.2.

## XII.   FIFTH CAUSE OF ACTION: <u>CALIFORNIA GOVERNMENT CODE §§ 815.2 AND 815.6</u>

### (All Plaintiffs against all Defendants)

159.   Plaintiffs incorporate the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

160.   California law imposes a mandatory duty on LASD to release on bail any arrestee or inmate who meets the statutory conditions for bail.  *See, e.g.*, Cal. Const., Art. 1, section 12; Cal. Penal Code §§ 1268, 1269b, 1295(a).  Further, the federal and state constitutional provisions cited previously (due process, and search and seizure) constitute mandatory duties under Article 1, § 26 of the California Constitution.

161.   As set forth above, Defendants refused to allow Plaintiffs and those similarly situated to post bail for which they were eligible under a warrant of arrest or the County-wide bail schedule, prior to Plaintiffs' arraignment, thus failing to discharge their mandatory duties under California law and causing Plaintiffs and those similarly situated injuries those duties were designed to prevent.

162.   As set forth above, Defendants refused to allow Plaintiffs and those similarly situated to post the bail set for Plaintiffs by the courts in their criminal cases, thus failing to discharge their mandatory duties under California law and

1  causing Plaintiffs and those similarly situated injuries those duties were designed
2  to prevent.

3       163.   As set forth above, California law also imposes a mandatory duty on
4  LASD to release a detainee after a judge has ordered her released on her own
5  recognizance, after she has served her sentence, after charges are dismissed or no
6  charges are filed, or after the expiration of any other state law basis to detain is also
7  mandatory.

8       164.   State law provides no authority for LASD to continue to detain an
9  individual beyond her release date and the expiration of any and all state law basis
10 to detain her solely on the basis of the immigration hold.

11      165.   As set forth above, Defendants continued to detain Plaintiffs and those
12 similarly situated after their release date and the expiration of any and all state law
13 basis to detain them solely on the basis of the immigration hold, thus failing to
14 discharge their mandatory duties under California law and causing Plaintiffs and
15 those similarly situated injuries those duties were designed to prevent.

16      166.   Defendants are therefore liable to Plaintiffs and those similarly
17 situated under California Government Code § 815.6.

18 **XIII. SIXTH CAUSE OF ACTION: <u>NEGLIGENCE PER SE</u>**
19            **(All Plaintiffs against all Defendants)**

20      167.   Plaintiffs incorporate the allegations of the preceding and subsequent
21 paragraphs as if fully set forth herein.

22      168.   As set forth above, Defendants' employees refused to allow Plaintiffs
23 and those similarly situated to post bail for which they were eligible under a
24 warrant of arrest or the County-wide bail schedule, prior to Plaintiffs' arraignment,
25 thus violating their obligations under California law and causing injury to Plaintiffs
26 and those similarly situated in a manner in which California's guarantees of the
27 right to post bail were designed to prevent, for the benefit of Plaintiffs and those
28 similarly situated.

43

169.   As set forth above, Defendants' employees refused to allow Plaintiffs and those similarly situated to post the bail set for Plaintiffs by the courts in their criminal cases, thus violating their obligations under California law and causing injury to Plaintiffs and those similarly situated in a manner in which California's guarantees of the right to post bail were designed to prevent, for the benefit of Plaintiffs and those similarly situated.

170.   As set forth above, Defendants continued to detain Plaintiffs and those similarly situated after their release date and the expiration of any and all state law basis to detain them solely on the basis of the immigration hold, in spite of their mandatory duty under state law to release them, thus violating their obligations under California law and causing injury to Plaintiffs and those similarly situated in a manner in which California's guarantees of release were designed to prevent, for the benefit of Plaintiffs and those similarly situated.

171.   Defendants are therefore liable to Plaintiffs and those similarly situated for negligence *per se* under California Government Code § 815.6.

## XIV.   EIGHTH CAUSE OF ACTION: <u>CIVIL CODE § 52.1 – VIOLATION OF RIGHT TO TIMELY RELEASE [FOURTH AMENDMENT/DUE PROCESS, PENAL CODE §§ 1384 AND 3000(B)(2)(A)]</u>

193.   Plaintiffs incorporate the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

194.   Defendants engaged in coercive acts that separately and independently interfered with or attempted to interfere with the rights of Plaintiffs and Damages Classes Two, Four, and Six to be timely released when they were entitled to release in violation of their right to be free from unlawful seizure under the Fourth Amendment and the Due Process clause, and their California equivalents, and in violation of Penal Code §§ 1384 and 3000(b)(2)(A) (defendant must be discharged from custody after dismissal [1384] or at the expiration of sentence [3000(b)(2)(A)]).

195.   For purposes of this cause of action, and any other claims pursuant to

44

Cal. Civil Code § 52.1, the phrase "class members" refers collectively to members of any of Classes Two, Four and Six.

196.   LASD's record-keeping practices with regard to ICE holds constitute coercion that is separate and independent from over-detention. While class members were in the custody of LASD, Defendants recorded ICE detainers in their electronic record systems as mandatory holds, treating such detainers as a valid, lawful basis to deny release, including to release on bail, even though LASD knew or should have known that an ICE detainer was nothing more than a voluntary request, and provided no lawful basis to detain someone.

197.   LASD's practice of characterizing and recording ICE detainers as mandatory holds was both unlawful and coercive. It was unlawful because the detainers provided no lawful basis for detention.  It was coercive because it falsely communicated to employees and agents that ICE holds authorized and required class members to be detained. This misrepresentation initiated various unlawful consequences, including over-detention, denial of the right to post bail and exclusion from various alternatives to custody programs.

198.   LASD's coercive and unlawful record-keeping practices were separate and independent from the consequences that flowed from this record keeping: LASD's failure to release inmates when all criminal matters resolved (i.e. illegal detention for civil purposes despite the absence of legal authority to do so).

199.   ICE admits, and the law is clear, that ICE detainers are voluntary requests, and neither legally require, nor purport to legally require, that a person be held against their will on that basis. Defendants knew or should have known that an ICE detainer was nothing more than a voluntary request and was not a lawful basis to detain someone after they became otherwise entitled to release, including release on bail; that, in 2010, ICE submitted communications to Congress explaining that ICE holds are voluntary requests; that ICE had an office

1   in LASD where inquiries about ICE's view of their authority was readily

2   available; that the ICE detention forms on their face were requests and not orders

3   or mandatory detainers; that the relevant federal regulations state that an ICE

4   detainer is a "request"; and that an ICE detainer was not accompanied by a

5   judicial warrant or judicial determination of probable cause.

6        200.   As a result of the foregoing unlawful data entries, when class

7   members became entitled to release from custody, they were not released, but

8   Defendants continued to hold them, including unlawfully holding them without a

9   warrant on the sole authority of the ICE detainer for more than 48 hours without

10   bringing them before a judicial officer for a determination of probable cause.

11   Separate from the predicate acts described previously, this failure a) violated their

12   Fourth Amendment right to be released, b) alternatively violated their due process

13   right to be released, and c) violated their right to be released pursuant to Penal

14   Code §§ 1384 and 3000(b)(2)(A).

15   **XV.   NINTH CAUSE OF ACTION: <u>CIVIL CODE § 52.1 – VIOLATION OF</u>**
16   **<u>RIGHT TO RELEASE ON BAIL</u>**

17        201.   Plaintiffs incorporate the allegations of the preceding and subsequent

18   paragraphs as if fully set forth herein.

19        202.   Defendants engaged in coercive acts that separately and independently

20   interfered with or attempted to interfere with the rights of Plaintiffs and Damages

21   Classes Two, Four, and Six to be released on bail when they were entitled to such

22   release, in violation of their right to bail under Cal. Const. Article 1 § 12 ("a

23   person shall be released on bail by sufficient sureties" except for capital crimes

24   and certain felonies after court determination based on clear and convincing

25   evidence" that bail should be denied) and Penal Code § 1296(b)(g) (establishing a

26   jailer's mandatory duty to release a person upon posting of bail).

27        203.   For purposes of this cause of action, and any other claims pursuant to

28   Cal. Civil Code § 52.1, the phrase "class members" refers collectively to members

of any of Classes Two, Four and Six.

204.   LASD's record-keeping practices with regard to ICE holds constitute coercion that is separate and independent from the violation of class members' rights to be released on bail. While class members were in the custody of LASD, Defendants recorded ICE detainers in their electronic record systems as mandatory holds, treating such detainers as a valid, lawful basis to deny release, including to release on bail, even though LASD knew or should have known that an ICE detainer was nothing more than a voluntary request, and provided no lawful basis to detain someone. Defendants routinely entered into their data systems that persons with an ICE detainer were "No Bail" inmates even though they otherwise qualified for release on bail.

205.   LASD's practice of characterizing and recording ICE detainers as mandatory holds was both unlawful and coercive. It was unlawful because the detainers provided no lawful basis for detention.  It was coercive because it falsely communicated to employees and agents that ICE holds authorized and required class members to be detained. This misrepresentation initiated various unlawful consequences, including over-detention, denial of the right to post bail and exclusion from various alternatives to custody programs.

206.   LASD's coercive and unlawful record-keeping practices were separate and independent from the consequences that flowed from this record keeping: LASD's failure to accept bail and release Plaintiffs and class members on bail.

207.   ICE admits, and the law is clear, that ICE detainers are voluntary requests, and neither legally require, nor purport to legally require, that a person be held against their will on that basis. Defendants knew or should have known that an ICE detainer was nothing more than a voluntary request and was not a lawful basis to detain someone after they became otherwise entitled to release, including release on bail; that, in 2010, ICE submitted communications to

47

Congress explaining that ICE holds are voluntary requests; that ICE had an office in LASD where inquiries about ICE's view of their authority was readily available; that the ICE detention forms on their face were requests and not orders or mandatory detainers; that the relevant federal regulations state that an ICE detainer is a "request"; and that an ICE detainer was not accompanied by a judicial warrant or judicial determination of probable cause.

208.   As a result of the foregoing unlawful data entries, when class members became entitled to release from custody on bail, they were not so released, but Defendants continued to hold them. Separate from the predicate data entry acts described previously this failure violated their Fourth and Fourteenth Amendment rights to be released on bail.

209.   As a further result of the foregoing unlawful data entries, class members were effectively prevented from seeking the assistance of lawyers, family members or bail bondsmen to procure their release, and thereby deprived of their constitutional right to bail and their constitutional right to court redress.

210.   As a further result of the foregoing unlawful data entries, bail bondsmen were deterred, dissuaded or prevented from posting, agreeing to post, or attempting to post, bail on class members' behalf, thereby depriving class members of their ability to post bail.

**XVI.  PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that the Court grant the following relief:

(1)   Enter a judgment declaring that Defendants' refusal to allow inmates admitted to bail under state law from posting bail due to the presence of an immigration hold violated state and federal law;

(2)   Issue an injunction ordering Defendants not to detain any individual solely on the basis of the immigration hold;

(3)     In the alternative, issue an injunction ordering Defendants not to detain any individual solely on the basis of the immigration hold beyond 48 hours without a probable cause hearing;

(4)     Enter a judgment declaring that Defendants' detention of Plaintiffs and other members of the proposed class solely on the immigration hold was and is unauthorized by state and federal law;

(5)     In the alternative, enter a judgment declaring that Defendants' detention of Plaintiffs and other members of the proposed class solely on the immigration hold beyond 48 hours without a probable cause hearing was and is unauthorized by federal law;

(6)     Award Plaintiff Duncan Roy individually compensatory damages according to proof, or (to the extent applicable) up to treble his actual damages pursuant to the provisions of the California Civil Code § 52(a), whichever is greater;

(7)     Award Plaintiffs Martinez-Perez and Alliksoo and members of the proposed Damages Classes One, Three and Five general monetary damages on a class wide basis for the time unlawfully spent in LASD custody and establish a procedure for class members to seek individualized damages beyond general damages;

(8)     Award Plaintiffs Martinez-Perez and Alliksoo and members of the proposed Damages Classes Two, Four and Six up to three times their general monetary damages (to the extent applicable) on a class-wide basis for the time unlawfully spent in LASD custody, or statutory damages of $4000 per violation, whichever is greater, and establish a procedure for class members to seek individualized damages beyond general damages;

(9)     Award Plaintiffs and other members of the proposed class reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, CCP § 1021.5, and/or California Civil Code §§ 52(b)(3), 52.1(h); and

1    (10)   Grant any other relief that this Court may deem fit and proper.

2  Dated:  December 4, 2015                Respectfully submitted,

3                                          Kaye, McLane, Bednarski & Litt, LLP

4

5                                          By:_/s/ Barrett S. Litt_____

6                                              Barrett S. Litt

7

8                              **<u>JURY DEMAND</u>**

9       Trial by jury of all issues is demanded.

10 Dated:  December 4, 2015                Respectfully submitted,

11                                         Kaye, McLane, Bednarski & Litt, LLP

12

13                                         By:_/s/ Barrett S. Litt_____

14                                             Barrett S. Litt

15

16

17

18

19

20

21

22

23

24

25

26

27

28