ORIGINAL



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


DUNCAN ROY; ET AL.,                 )
                                    )
        PLAINTIFFS,                 )
                                    )
    VS.                             )   NO. CV 12-09012 BRO
                                    )       (FFMx)
COUNTY OF LOS ANGELES; ET           )
AL.,                                )
                                    )
        DEFENDANTS.                 )
_____     )
                                    )   CONSOLIDATED WITH:
GERARDO GONZALEZ; ET AL.,           )
                                    )
        PLAINTIFFS,                 )
                                    )
    VS.                             )   NO. CV 130-04416
                                    )       BRO (FFMx)
IMMIGRATION AND CUSTOMS             )
ENFORCEMENT, AN ENTITY; ET          )
AL.                                 )
                                    )
        DEFENDANTS.                 )
_____     )


CONFIDENTIAL TRANSCRIPT

FRCP RULE 30(B)(6) DEPOSITION OF GREGORY SIVARD

Pasadena, California

Thursday, April 21, 2016


REPORTED BY:

JOHN M. TAXTER
CSR NO. 3579, RPR

JOB NO.
84447KAY

LUDWIG KLEIN
REPORTERS & VIDEO, INC.
1450 West Colorado Blvd., Suite 200
Pasadena, California 91105
800.540.0681
email: lois@ludwigklein.com

**Exhibit "B"**

31

```
 1                    UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4   DUNCAN ROY; ET AL.,              )
                                      )
 5            PLAINTIFFS,             )
                                      )
 6      VS.                           )  NO. CV 12-09012 BRO
                                      )  (FFMx)
 7   COUNTY OF LOS ANGELES; ET        )
     AL.,                             )
 8                                    )
              DEFENDANTS.             )
 9   _____)
                                      )  CONSOLIDATED WITH:
10   GERARDO GONZALEZ; ET AL.,        )
                                      )
11            PLAINTIFFS,             )
                                      )
12      VS.                           )  NO. CV 130-04416
                                      )     BRO (FFMX)
13   IMMIGRATION AND CUSTOMS          )
     ENFORCEMENT, AN ENTITY; ET       )
14   AL.                              )
                                      )
15            DEFENDANTS.             )
     _____)
16

17            FRCP Rule 30(b)(6) deposition of GREGORY

18   SIVARD, Witness, taken on behalf of Plaintiffs at 234

19   East Colorado Boulevard, Suite 230, Pasadena,

20   California, commencing at 10:16 a.m. on Thursday, April

21   21, 2016, before John M. Taxter, CSR No. 3579, RPR, a

22   Certified Shorthand Reporter in and for the County of

23   Los Angeles, State of California.

24

25
```

Exhibit "B"

32

GREGORY SIVARD - April 21, 2016
CONFIDENTIAL - ROY VS. COUNTY OF LOS ANGELES

1    as knowledgeable as Ms. Molinar about the transfer of

2    inmates to ICE?

3            MR. CLARK:  Same objections.

4            THE WITNESS:  Her direct supervisors.

5    BY MS. BATTLES:

6        Q    We can go through the detainer acceptance

7    policies, but I want to move through this a little bit

8    more quickly, if we can.  So before we discussed a June

9    6th, 2014, detainer policy that set a new deadline for

10   processing inmates to ICE.  Let me just hand you a copy

11   of this.  This was Exhibit 107 to the previous

12   deposition.  And if you would look on the first page on

13   the last paragraph on the page, second clause of that --

14   of the first sentence says:

15               "The inmate shall be immediately

16               made available to ICE custody and

17               transported within a period not to

18               exceed 12 hours, 6 hours for bail or

19               bond.  Delayed processing shall be

20               immediately reported to the watch

21               commander."

22               And then on the second page midway through the

23   list of bullet points it says:

24               "ICE will be allowed up to

25               24 hours to pick up the detainees."

Exhibit "B"

33

GREGORY SIVARD - April 21, 2016
CONFIDENTIAL - ROY VS. COUNTY OF LOS ANGELES

1          So as I read these, both of these established

2    deadlines for transferring an inmate to ICE custody.

3          Is that your understanding?

4     A    Yes.

5     Q    Okay.  At the time that this policy was in

6    place who within the Sheriff's Department would have

7    been responsible for tracking compliance with this

8    deadline?

9     A    Personnel assigned to the ICE desk.

10    Q    And would this have been the AB4 ICE desk?

11    A    Yes.

12    Q    Do you have any understanding of the mechanism

13   that they used to track that deadline?

14    A    No.

15    Q    Do you know whether that deadline was actually

16   tracked?

17    A    No.

18    Q    For the 2013 deadline do you have any

19   understanding of the mechanism that that ICE desk would

20   have used to track time elapsed in transferring an

21   inmate to ICE?

22    A    No.

23    Q    As far as you're aware, was there any mechanism

24   to track that deadline?

25    A    I'm not aware.

Exhibit "B"

34

GREGORY SIVARD - April 21, 2016
CONFIDENTIAL - ROY VS. COUNTY OF LOS ANGELES

1    hold?  Is that associated with a bail amount?

2        A    No.

3        Q    Would that show up as no bail?

4        A    Yes.

5        Q    And if there's a probation hold, can someone

6    post bail?

7        A    On the probation hold?

8        Q    On the probation hold.

9        A    Not if it's no bail.

10       Q    Okay.  So for state prison holds it says "no

11   bail," and you cannot post bail because you're not

12   eligible to post bail; correct?

13       A    Correct.

14       Q    And the same for probation holds?

15       A    Yes.

16       Q    Okay.  Are there any other types of holds aside

17   from immigration holds that would show as no bail?

18            MR. CLARK:  Objection.  Asked and answered.

19            Other than the two he just talked about?

20   BY MS. BATTLES:

21       Q    Other than the two you just testified to.

22       A    It would be any law enforcement warrant that

23   did not come associated with a bail amount.

24       Q    Are there any other types of warrants that

25   don't come associated with a bail amount for which

**Exhibit "B"**

35

1    someone actually could post bail of one of their cases?

2        A    Anybody can post on an L.A. County matter, if

3    there's a bailable charge.

4        Q    So if you look at the screen and you see an

5    immigration hold and it says "no bail" -- and you

6    testified previously there was some confusion as to

7    whether that meant that someone could bail out of jail

8    or whether that "no bail" notation meant that the person

9    could not post bail; right?

10            MR. CLARK:  Objection.  Misstates prior

11    testimony.

12            THE WITNESS:  There was no confusion on our

13    part.  There was confusion back in whatever year -- 2013

14    and '14 -- that some believed because it said "no bail"

15    that no bail could be posted.  However, the Sheriff's

16    Department's assertion has always been as it pertains to

17    the MPP with that, if you have a bailable amount in

18    L.A. County, then you can bail out for that amount of

19    money.

20    BY MS. BATTLES:

21        Q    I think you previously testified that there was

22    confusion as to, quote, whether or not a bond could be

23    posted for someone who had a no bail hold and that,

24    quote, the belief by some was that the mere fact that

25    there's no bail attached, even though he could bail out

Exhibit "B"

36

GREGORY SIVARD - April 21, 2016
CONFIDENTIAL - ROY VS. COUNTY OF LOS ANGELES

1    on $100 for an L.A. County matter, he's still not

2    getting out of custody for that.  He's still going to be

3    held on this no bail charge, and in that case they would

4    say, "No.  You can't post for that reason."

5        A    What I said back then stands; that there were

6    certain individuals that believed because there was a no

7    bail associated not with this L.A. County matter but

8    with the hold that they could -- they're saving

9    themselves because the inmate could not go out onto the

10   street to be released.

11       Q    I see.

12       A    But -- and that's why we put in play that we

13   need to clarify again to us it always was that an inmate

14   who has an L.A. County matter with a postable bail

15   amount may post bail at that -- for that sum and be

16   released on that L.A. County matter.

17       Q    And when you say "clarify" that, do you mean

18   clarify internally?

19       A    Yes.

20       Q    Clarify through a change in policy?

21       A    Yes.  Not a change.

22       Q    Okay.

23       A    Yeah.  Just a clarification of policy.

24       Q    Okay.  And if you want to talk about those

25   policies, then we will move on to that in a second.  But

Exhibit "B"

37

GREGORY SIVARD - April 21, 2016
CONFIDENTIAL - ROY VS. COUNTY OF LOS ANGELES

1    hypothetical.  Vague and ambiguous.

2              THE WITNESS:  The person -- the warrant itself

3    they would not be able to post on because there's no

4    bail amount associated with it.  If it's an L.A. County

5    matter, they can still post the bond for whatever the

6    L.A. County matter bail is.

7    BY MS. BATTLES:

8        Q    If they're held without any other L.A. County

9    matter -- so let's take someone who is in custody and

10   they have a probation hold.

11             Is there ever a situation where you would have

12   a probation hold and there were no other L.A. County

13   matters?

14       A    Since realignment, nobody should be in custody

15   with a probation or parole hold that isn't being handled

16   in L.A. County now.

17             MS. BATTLES:  Okay.  So I'm going to hand you a

18   copy of what we'll mark as Exhibit 8 to your deposition.

19             (Exhibit 8 was marked for identification

20             by the Certified Shorthand Reporter.)

21             (Mr. Clark confers with the witness.)

22   BY MS. BATTLES:

23       Q    Are you familiar with this document?

24       A    Yes.

25       Q    Okay.  And is this from the custody division

Exhibit "B"
38

1   manual?

2           MR. CLARK:  Lindsay, I'm sorry.  Do you have

3   one for me?

4           THE WITNESS:  I can't say whether it's the --

5   part of the MPP or the custody manual.  It looks like

6   it's probably going to be custody.

7   BY MS. BATTLES:

8       Q    There's a bullet point at the bottom of the

9   first page that says:

10              "Please refer to manual of

11              policy and procedures."

12           If there's a reference there, does that mean

13  this is likely from the manual of policy and procedures,

14  or does this tell us anything at all about whether this

15  is part of the manual of policy and procedures?

16      A    Well, you could have something that is

17  referring back to the manual of policy and procedures as

18  from the custody manual, but seeing that these are the

19  same numbers, it's probably one and the same.

20      Q    Do they use the same numbers, or do they use

21  different numbers?

22      A    No, but they could have -- they usually use

23  different numbers, but it could be, you know, still

24  within the contents of this entire section that it's

25  referring to with OR releases or acceptance of bail.

Exhibit "B"

39

GREGORY SIVARD - April 21, 2016
CONFIDENTIAL - ROY VS. COUNTY OF LOS ANGELES

1      Q     Okay.  So this looks to me like the revision

2    date was January 27th, 2013.  I'm getting that on the

3    second page.  This clari -- the first page of this

4    clarifies that the bail or "a bond or bail presented on

5    behalf of an inmate for a bondable charge...shall be

6    accepted," including inmates who are being held on an

7    immigration and customs enforcement detainer.  The

8    second bullet point says:

9               "No inmate shall be denied the

10              right to post bond or bail solely due

11              to the existence of an ICE hold."

12              And then second page also clarifies that "a

13   bond or bail presented...shall be accepted."

14              Is this the policy clarification that you were

15   referring to earlier, or was it clarified in other

16   policies, as well?

17     A     No.  I believe it's just this one.

18              MS. BATTLES:  Okay.  I'm going to hand you a

19   copy of what we'll mark as Exhibit 9 to your deposition.

20   This document, like the one I just showed you, has the

21   No. 5-03/110.07.

22              (Exhibit 9 was marked for identification

23              by the Certified Shorthand Reporter.)

24   BY MS. BATTLES:

25     Q     Are these -- are these the different versions

Exhibit "B"

40

GREGORY SIVARD - April 21, 2016
CONFIDENTIAL - ROY VS. COUNTY OF LOS ANGELES

1    of the same policy, as far as you can tell?

2        A    Yes.

3        Q    Okay.  And the revision date on this policy is

4    October 18th, 2009.

5             Are you aware of any versions that were issued

6    in between the 2009 policy and the 2013 policy?

7        A    I was not, except for the fact that Exhibit 8

8    says it also was revised on 6/1 of '12.

9        Q    June 1st.  Do you know whether the June, 2012,

10   policy specifically addressed accepting bail for inmates

11   with ICE holds?

12       A    I don't.

13       Q    Do you know if there are any documents or

14   policy documents aside from -- well, any policy document

15   aside from this excerpt from, it looks like, the manual

16   of policy and procedures that would have addressed

17   whether or not Sheriff's Department personnel could

18   accept bail for inmates with ICE holds?

19       A    I'm not aware.

20       Q    In 2010 are you aware of any policies or

21   guidance issued by the Sheriff's Department to their own

22   personnel regarding the acceptance of bail or bond for

23   inmates with ICE holds?

24       A    Any new issue other than the one that was from

25   10/18 of '09?

Exhibit "B"

41

GREGORY SIVARD - April 21, 2016
CONFIDENTIAL - ROY VS. COUNTY OF LOS ANGELES

```
 1      Q    Well, the one from 10/18/09, as far as I can
 2  tell, doesn't address inmates with ICE holds or the
 3  acceptance of bail for inmates with ICE holds.
 4      A    Okay.  So it doesn't clarify like the one
 5  that's Exhibit 8.  But, again, that's why it probably
 6  was revised because they determined there needed to be
 7  clarification.
 8      Q    So my -- right.  My read of this is that the
 9  2009 policy -- well, I'll read it.  It says:
10              "Any time a proper bail bond,
11              surety bond, or cash bail is
12              presented on behalf of an inmate for
13              a bondable charge, it shall be
14              accepted."
15              The policy that was issued in 2013 clarifies
16  that it shall be accepted.  It says "a bond...presented
17  on behalf of an inmate for a bondable charge" with an
18  ICE hold or immigration detainer shall be accepted.  So
19  the 2009 policy, as far as I can tell, doesn't say
20  anything about inmates with immigration holds.
21              MR. CLARK:  Objection.  The document speaks for
22  itself.
23              THE WITNESS:  Exactly.  This didn't state
24  specifically, but the intention was the same as what's
25  in 13, just clarified.
```

Exhibit "B"

42

GREGORY SIVARD - April 21, 2016
CONFIDENTIAL - ROY VS. COUNTY OF LOS ANGELES

1    BY MS. BATTLES:

2        Q    And what is the basis for your conclusion that

3    the intention was the same?

4        A    (Reading:)

5             "Any time a proper bail bond,

6             surety bond, or cash bail is

7             presented on behalf of an inmate for

8             a bondable charge, it shall be

9             accepted."

10       Q    Okay.

11       A    That alone means that any L.A. County matter

12   which has a bail amount associated with it we should be

13   accepted.

14       Q    Okay.  Are you aware of any other policies that

15   specifically address the issue of accepting bond for

16   inmates with ICE holds between 2009 and 2013?

17       A    I am not.

18       Q    Is there -- are there any training materials

19   or memos or any similar documents that would have

20   provided guidance to Sheriff's Department personnel

21   about accepting bond -- bail or bond for inmates with

22   ICE holds between 2009 and 2013?

23       A    No, only this manual of policies and

24   procedures.

25            MS. BATTLES:  Just the 2009 policy.  Okay.  So

LUDWIG KLEIN REPORTERS & VIDEO, INC. - 800.540.0681        106

Exhibit "B"

43

GREGORY SIVARD - April 21, 2016
CONFIDENTIAL - ROY VS. COUNTY OF LOS ANGELES

1    this is where the deposition gets very exciting and we

2    can look at more AJIS data.  I'm handing you a copy of

3    what we'll mark as Exhibit 10.

4            (Exhibit 10 was marked for identification

5            by the Certified Shorthand Reporter.)

6    BY MS. BATTLES:

7       Q    And the only reason that I'm going through

8    these is to make sure that I understand the data that's

9    in here.  I'm just going to go through a few to make

10   sure that I understand the information that's contained

11   in the different fields.  So this is an -- we've titled

12   this.  This is a document that we prepared, and we

13   titled it a spontaneous release for an inmate with an

14   ICE hold.  The reason why it was deemed a spontaneous

15   release is I think generally we classified these based

16   on cases who -- we want sentence status cases.  Well,

17   the inmate has no scheduled release date.  Here the

18   actual release date is February 21st, 2012.

19           MR. WEINTRAUB:  Were we off the protective

20   order?

21           MS. BATTLES:  We were not.  We just stayed on,

22   as far as I know.

23           MR. WEINTRAUB:  Okay.

24   BY MS. BATTLES:

25      Q    And on the second page we have the date of

LUDWIG KLEIN REPORTERS & VIDEO, INC. - 800.540.0681        107

Exhibit "B"

44

1                          EXAMINATION

2    BY MR. WEINTRAUB:

3        Q    So when during the release process was it

4    Sheriff's Department policy before the -- before The

5    TRUST Act and after to notify ICE, if they had someone

6    that was ready to be picked up?

7              MR. CLARK:  Objection.  Beyond the scope of the

8    witness' designation.

9              You can answer.

10             THE WITNESS:  The notification will be made by

11   the ICE desk personnel to ICE, and that would be prior

12   to it being a 24-hour desk, and then we worked day

13   shift.  It could the next day that they would contact

14   ICE.

15   BY MR. WEINTRAUB:

16       Q    And you had said that there was no tracking of

17   the post or otherwise release date time leading up to

18   the 48 hours?

19             MR. CLARK:  Objection.  Misstates prior

20   testimony.  I think he said he wasn't aware of it.

21   BY MR. WEINTRAUB:

22       Q    Are you aware of any tracking that ICE does

23   now?

24       A    Well, again, the tracking that I'm under the

25   belief would have occurred would be that somebody within

Exhibit "B"

45

GREGORY SIVARD - April 21, 2016
CONFIDENTIAL - ROY VS. COUNTY OF LOS ANGELES

1   the confines of IRC would say that this is the zero mark

2   and this is the 48-hour mark, and I don't believe

3   there's any such person or program that has that.  And I

4   don't -- I'm not aware of any person that does it.

5       Q    Are you aware if it's LASD policy to hold

6   somebody beyond the otherwise release date now?

7       A    That --

8            MR. CLARK:  You're asking currently; right?

9            MR. WEINTRAUB:  Yeah.  I said "now."

10           THE WITNESS:  No.

11  BY MR. WEINTRAUB:

12      Q    And then last, go to Exhibit 4 which is the

13  inmate information on Mr. Perez.

14           And you were asked a bunch of questions about

15  this starting with there being an ICE hold on this case,

16  and I just -- just for information, can you show me on

17  here how you would know that there's an ICE hold from

18  looking at this?

19           I just -- I don't know enough about this form.

20           MR. CLARK:  You're referring to Exhibit 4?

21           MR. WEINTRAUB:  Yes.

22           THE WITNESS:  No.  I don't see where on here it

23  would say that it was -- he had a no bail hold of some

24  sort, but I --

25  BY MR. WEINTRAUB:

Exhibit "B"
46

1                    REPORTER'S CERTIFICATE

2

3          I, John M. Taxter, CSR No. 3579, RPR, a

4    Certified Shorthand Reporter in and for the State of

5    California, do hereby certify:

6              That prior to being examined, the witness named

7    in the foregoing proceedings declared under penalty of

8    perjury to testify to the truth, the whole truth,

9    and nothing but the truth;

10             That said proceedings were taken by me in

11   shorthand at the time and place herein named and were

12   thereafter transcribed into typewriting under my

13   direction, said transcript being a true and correct

14   transcription of my shorthand notes;

15             Pursuant to Federal Rule 30(e), transcript

16   review was requested;

17             I further certify that I have no interest in

18   the outcome of this action.

19
                      May 4, 2016
20

21

22             _____
               John M. Taxter
23             CSR No. 3579, RPR

24

25

Exhibit "B"

47

1                   UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                                        ORIGINAL

    -----------------------------

4    DUNCAN ROY; et al.,          ) No. CV 12-09012

5                Plaintiffs,      )      BRO (FFMx)

6         vs.                     ) Consolidated with

7    COUNTY OF LOS ANGELES,       ) No. CV 13-04416

8    et al.,                      )      BRO (FFMx)

9                Defendants.      ) VOLUME I

    -----------------------------

10

11           PORTIONS OF TRANSCRIPT SUBJECT

12              TO THE PROTECTIVE ORDER

13

14           DEPOSITION OF CHARLES HOUSE

15              Los Angeles, California

16              Tuesday, March 29, 2016

17                   Volume I

18

19   Reported by:

20   SONDIA JOHNSON

21   CSR No. 6602

22   Job No. 2279024

23

24   PAGES 1 - 221

25   PAGES 167 - 221 ARE SUBJECT TO PROTECTIVE ORDER

                                          Page 1

Exhibit "C"
48

```
 1                  UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4      ------------------------------

 5   DUNCAN ROY; et al.,            )  No. CV 12-09012

 6               Plaintiffs,        )     BRO (FFMx)

 7        vs.                       )  Consolidated with

 8   COUNTY OF LOS ANGELES,         )  No. CV 13-04416

 9   et al.,                        )     BRO (FFMx)

10               Defendants.        )  VOLUME I

11      ------------------------------

12

13

14

15        Deposition of CHARLES HOUSE, Volume 1, taken

16   on behalf of Plaintiffs, at 1313 West 8th Street,

17   Los Angeles, California, beginning at 10:01 a.m.

18   and ending at 5:08 p.m. on Tuesday, March 29, 2016,

19   before SONDIA JOHNSON, Certified Shorthand Reporter

20   No. 6602.

21

22

23

24

25

                                              Page 2
```

Exhibit "C"

49

1  in the court?

2      A.   My background check stayed on my desk.

3  Nothing was ever flagged on my case jacket until

4  they were convicted of an AB4 qualifying charge.

5      Q.   So what would happen in the case of someone

6  who was eligible for pretrial release but had a

7  court date, but had an immigration detainer?

8          MR. CLARK:  Objection.  Incomplete

9  hypothetical, lacks foundation, calls for

10  speculation.

11         THE WITNESS:  There would never be anything

12  put on the jacket until there was an actual

13  conviction.

14         Does that make sense?

15  BY MS. PASQUARELLA:

16     Q.   That makes sense.

17         I guess my question is was -- say somebody

18  was posting bail but they had an immigration

19  detainer, and say they're on your list of court

20  pending, what would happen then?

21         MR. CLARK:  Objection.  Lacks foundation,

22  vague and ambiguous, calls for speculation,

23  incomplete hypothetical.

24         THE WITNESS:  Bail is done separately by

25  county clerks, so that would -- our status or -- if

                                        Page 52

Exhibit "C"

1  they were AB4 qualifying would never have an effect

2  on bail process.

3  BY MS. PASQUARELLA:

4      Q.   Well, my question, I guess, is would they

5  be screened against AB4 if they were posting bail

6  but had an immigration detainer?

7          MR. CLARK:  Same objections.  Incomplete

8  hypothetical, vague and ambiguous, lacks foundation,

9  calls for speculation.

10         THE WITNESS:  Can you reword that question.

11  I don't understand.

12  BY MS. PASQUARELLA:

13     Q.   So I'm trying to understand.  So say the

14  detainer is on your desk, you're awaiting

15  determination from the court, but that person goes

16  ahead and posts bail.

17     A.   They would be bailed out and it would --

18  the stat would be the stat and that's it, thrown

19  away, the paperwork.

20     Q.   Would you be notified that the person

21  bailed out?

22     A.   No.

23         MR. CLARK:  Try to wait until she's

24  finished asking the question.

25         THE WITNESS:  Yes, monitoring the case I

                                            Page 53

1    would say, oh, a day later he bailed out, maybe if I

2    have paperwork I'll throw it in the folder, if it's

3    available.  But generally once they're out of the

4    system those folders get filed away in boxes and

5    sent off to like Norwalk or something.  So it would

6    just be stat and thrown away.

7    BY MS. PASQUARELLA:

8        Q.    So you would find out that the person

9    bailed out through looking at the databases that you

10   mentioned?

11       A.    Yes, the internal AJIS, A-J-I-S, database

12   that the sheriff's department provides.

13       Q.    And AJIS would tell you whether somebody

14   posted bail?

15       A.    Well, after they're bonded out and released

16   that's when it would show.  I would never know

17   beforehand.

18       Q.    And AB4 cancellations at the bottom of the

19   form, what does that refer to?

20       A.    Occasionally Secure Communities sends --

21   or -- you know, faxed over detainers that were not

22   AB4 qualifying, and we stat those as can't do

23   anything with it, basically, meaning AB4

24   cancellation.

25       Q.    And other than marking the -- putting that

Page 54

1    up.

2        Q.    So that's to verify when they picked the

3    people up?

4        A.    And who did.

5        Q.    And then what would happen to the complete

6    manifest?

7        A.    This one?

8        Q.    Or any of them.

9        A.    The ones that are signed?

10       Q.    Yes.

11       A.    They're stored in our office.    But

12   everything's -- these manifests are kept

13   electronically, but not with the signature

14   obviously.    Signature ones are ones with the big

15   pile in the box, basically.

16       Q.    And where are they stored electronically,

17   the manifests?

18       A.    Shared drive, county computer.    It's like

19   the blank ones, basically.    And if they're filled

20   out like this, like names, who knows.    It's all on

21   the file, basically.

22           (Deposition Exhibit 135 was

23       marked for identification.)

24   BY MS. PASQUARELLA:

25       Q.    Are you familiar with this document?

Page 159

Exhibit "C"

53

1      A.    I don't remember.  I understand it, I don't
2   really remember the e-mail specifically.
3      Q.    Does the e-mail reflect policy at the time
4   with respect to notifying the bond desk when someone
5   was being released?
6      A.    Apparently that was to -- like the bond
7   goes through.  It was -- I guess they were
8   telling to the bond agency they don't want to post
9   bail.  It gives the family the opportunity if they
10  want to cancel the bond because they get
11  immigration.  But it wouldn't matter -- how do I say
12  that.  It's basically to give the family options at
13  that time.
14     Q.    So at the ICE Desk would you tell the bond
15  desk when there was a detainer on somebody who was
16  bonding out?
17     A.    A couple times for a minute, and then they
18  got rid of that thing.
19     Q.    Then what?
20     A.    Then they got rid of like the whole thing,
21  whatever, what they were going to go with --
22     Q.    I didn't hear that.  Can you repeat.
23     A.    A couple times I came across this.  At the
24  time basically, yes -- the bond people that deal
25  with that, the clerks, they have the jacket.  So

Page 160

Exhibit "C"
54

```
 1    they saw usually like my stuff in there or

 2    somebody's stuff in there.  So they'd -- sometimes

 3    they'd call me and ask, hey, is this person going to

 4    be held or in custody release, and I tell them yes

 5    or no.  They still process the bond, but they -- I

 6    think the bond issue is one they were hoping to

 7    recontact them so they can inform the family, hey,

 8    we'll still take the bond, but just so you know, if

 9    you bond him he's going to go into custody release.

10    That's what I'm trying to --

11        Q.   Is that still the procedure that the bond

12    does?

13        A.   Now we don't even say anything at all.  It

14    is what it is.

15        Q.   So the bond desk wouldn't tell?

16        A.   They wouldn't know.  I wouldn't know.

17        Q.   What do you mean you wouldn't know?

18        A.   If there's a bond I would know the bond,

19    but we don't let the bond company know if there's

20    going to be immigration in custody release, that

21    kind of thing.

22        Q.   Do you know why?

23        A.   It's county uppers.  They just want to stay

24    away from messing with the whole bond process.

25    ///
```

Page 161

Exhibit "C"

55

SUBJECT TO PROTECTIVE ORDER

1    of the revised manifest for the ICE Desk, and the

2    three items there under Doryce Rushing's e-mail.

3           If you flip to the back of that page it

4    lists the same items in bold; is that right?

5        A.    Looks to be.

6        Q.    Looking at that thing, does it look like

7    those are reasons for cancellations of detainers?

8        A.    Possibly.   That looks like what she's

9    getting at.   I just don't remember this e-mail.   Too

10   long ago.

11       Q.    You said that sometimes inmates get

12   released before ICE takes them.   You said that you

13   miss them and they're released.

14          Do you notify ICE when you miss them and

15   they're released?

16       A.    We talk about it, yes, and I stat it in our

17   system, our monthly stats.

18       Q.    I just have one last question.

19          Take a look at Exhibit 139, please.   Got

20   it?

21       A.    Yes.

22       Q.    Under the blocks there's a bolded portion

23   that begins, "It is therefore requested that you,"

24   and it goes on to say, "serve a copy of this form on

25   the subject."   Then it says, "and maintain custody

Page 217

**Exhibit "C"**
56

SUBJECT TO PROTECTIVE ORDER

```
 1    of them for a period not to exceed 48 hours beyond

 2    the time when he or she would otherwise have been

 3    released from your custody."

 4          Does the sheriff department hold inmates

 5    beyond their release date?

 6          MR. CLARK:  Objection.  Vague and

 7    ambiguous.

 8          You mean currently?

 9          MR. WEINTRAUB:  Yes.

10          THE WITNESS:  Beyond their release dates?

11    BY MR. WEINTRAUB:

12      Q.    The form says that -- requests that the

13    sheriff department maintain custody of the inmate

14    for a period not to exceed 48 hours beyond the time

15    when that inmate would otherwise have been released

16    from sheriff department custody.

17          Does ICE maintain custody beyond the

18    release date?

19      A.    Of course not.

20      Q.    Even though the form says you can?

21      A.    No, we don't keep them past their release

22    date based on detainers.

23          MR. WEINTRAUB:  I have no further

24    questions.

25          MR. CLARK:  You want to propose a stip?
```

Page 218

Exhibit "C"

57

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place therein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were placed under oath; that a

8     record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; further, that the foregoing

      transcript is a true record of the testimony given.

11         Further, that if the foregoing pertains to

12    the original transcript of a deposition in a Federal

13    Case, before completion of the proceedings, review

14    of the transcript [ ] was [ ] was not requested.

15         I further, certify that I am neither

16    financially interested in the action nor a relative

17    or employee of any attorney or any party to this

18    action.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21         Dated: 4/25/2016

22

23         *Sondia Johnson*

           SONDIA JOHNSON, CSR No. 6602

24

25         CSR No. 6602

                                        Page 221

**Exhibit "C"**

58

## 5-03/110.07 ACCEPTANCE OF BAIL PRESENTED ON ONE OR MORE CASES/MULTIPLE CHARGES AND OWN RECOGNIZANCE (OR) RELEASES

**The below bullets are designed to assist you will the processing of inmates who post bond or bail and also have an Immigration and Customs Enforcement (ICE) detainer.**

- A bond or bail presented on behalf of an inmate for a bondable charge(s) shall be accepted, this includes those inmates who are being held on an Immigration and Customs Enforcement (ICE) detainer.

- No inmate shall be denied the right to post bond or bail solely due to the existence of an ICE hold.

- If the inmate is being held at a Station, the Station shall keep the inmate in custody until transfer to the custody of ICE agents.

- The transfer of custody shall occur within 48 hours, excluding week-ends and Holidays, from the posting of the cash bail or bond.

- ICE has confirmed that Local Law Enforcement Agencies can call ICE Detention and Removal Operations (DRO) at (213) 830-4925 and the inmate will be picked up and transported to Federal Custody.

- A second option, when ICE is not immediately available to transport, is to deliver the new arrestee to the Federal Detention Center, located at 300 N. Los Angeles Street, Los Angeles, Ca. 90012.

- If ICE does not take custody of an inmate who has posted bond or bail on an acceptable charge within the required time period, the inmate shall be released on the bondable charge(s). The Station Watch Commander will be considered the officer authorizing the new arrestee's release.

- Please refer to Manual of Policy and Procedures section 5-03/110.07 for further information on the acceptance of Bail and Own Recognizance (OR) releases.



EXHIBIT
8 for ID
4-21-16 SMH

8-1

**COUNTY 25**
**Exhibit "D"**

## 5-03/110.07 ACCEPTANCE OF BAIL PRESENTED ON ONE OR MORE CASES/MULTIPLE CHARGES AND OWN RECOGNIZANCE (OR) RELEASES

A bond or bail presented on behalf of an inmate for a bondable charge(s) shall be accepted.

A bond or bail presented on behalf of an inmate for a bondable charge(s) being held on an Immigration and Customs Enforcement (ICE) Detainer shall be accepted at a Station or the Inmate Reception Center (IRC):

If the inmate's booking record is maintained at the IRC, the IRC shall make the inmate available to the custody of ICE agents.

- If the inmate is being held at a Station, the Station shall keep the inmate in custody until transfer to the custody of ICE agents.
- If an inmate has one or more cases/multiple charges, the total amount of bail must equal the amount necessary for ALL charges which require bail per MPP Section 5-03/110.05, prior to release.

When an inmate has charges which allow for release on a promise to appear, in addition to charges which require bail:

- If bail is presented for only the charges which require bail, the bail shall be accepted and citations prepared for the remaining charges.
- If bail is presented for all the charges, the bail shall be accepted and the inmate processed for release.

Own Recognizance (OR) Releases

When bail or bond is presented and the inmate has been granted a release on their own recognizance (OR) by the bail commission, the bail shall be rejected and the inmate processed for OR release.

**Revised 01/27/13**
**Revised 06/01/12**
**Revised 10/18/09**



EXHIBIT
402
Sivard



## 5-03/110.07 ACCEPTANCE OF BAIL PRESENTED ON MULTIPLE CHARGES AND/OR RELEASES

Any time a proper bail bond, surety bond, or cash bail is presented on behalf of an inmate for a bondable charge, it shall be accepted. If an inmate has multiple cases/charges, the total amount of bail must equal the amount necessary for ALL charges which require bail per MPP Section 5-03/110.05, prior to release.

When an inmate has charges which allow for release on a promise to appear, in addition to charges which require bail:

- If bail is presented for only the charges which require bail, the bail shall be accepted and citations prepared for the remaining charges.
- If bail is presented for all the charges, the bail shall be accepted and the inmate processed for release.

When bail or bond is presented and the inmate has been granted a release on their own recognizance (OR) by the bail commission, the bail shall be rejected and the inmate processed for OR release.

The intent of this policy is to ensure the release of eligible inmates as quickly as possible.

Also see MPP Section 5-03/110.05.

**Revised 10/18/09**



**Exhibit "E"**

*Confidential*

# Rebuttal Expert Report

## of

## Mark A. Gustafson

## In the Matter

## of

### *Duncan Roy et al.,*

### *v.*

### *County of Los Angeles; Leroy D. Baca, Sheriff of Los Angeles County, in His Official Capacity*

**Exhibit "F"**

62

# Table of Contents

I.    ASSIGNMENT ................................................................................................. 1

II.   QUALIFICATIONS .......................................................................................... 1

III.  DOCUMENTS CONSIDERED ........................................................................ 2

IV.   SUMMARY OF OPINIONS ............................................................................. 2

V.    BACKGROUND ............................................................................................... 4

    A.    LASD Cooperation with U.S. Immigration and Customs Enforcement ............... 4

    B.    Plaintiff's Allegations ................................................................................. 4

    C.    Class Definitions ........................................................................................ 4

        1.    Jail Classes ...................................................................................... 5

        2.    No-Bail Notation Classes ................................................................. 6

        3.    No-Money Bail Classes .................................................................... 6

VI.   SUMMARY OF DR. KRIEGLER'S OPINIONS ............................................. 7

    A.    Number of Potential Class Members / Preliminary Estimated Class Sizes ........... 8

    B.    Comparisons .............................................................................................. 8

VII.  ANALYSIS AND COMMENTS RELATED TO DR. KRIEGLER'S OPINIONS ....... 10

    A.    Dr. Kriegler Failed to Account For Weekends and Holidays in His Estimate of the Gerstein Post-48-Hour Subclasses Class Size and His Comparison of the Number of Days Inmates With ICE Holds Are Held Longer Than Inmates With No Holds ................................................................. 10

        1.    Dr. Kriegler's estimate of the Gerstein Post-48-Hour Subclasses class sizes is overstated by more than 70 percent ................................... 10

        2.    Dr. Kriegler overstates the length of time inmates with ICE Holds are detained beyond their Expected Exit Date by 63 percent for SPON inmates and 131 percent for SENTREL inmates ......................... 11

    B.    Dr. Kriegler Falsely Assumed That the AJIS Release Date and Time Accurately Reflect the Actual Release Date and Time, Which Is Not Always True ................................................................................................ 12

    C.    Dr. Kreigler Failed To Analyze How Changes in LASD Policy Affected All Putative Class Members ......................................................................... 14

    D.    With the Exception of the Gerstein Post-48-Hour Subclasses, All Other Putative Jail Classes Are Premised on the Assumption that the LASD Policy of Enforcing ICE Holds Was Unconstitutional and/or Unlawful ............ 15

**Exhibit "F"**

ANALYSIS GROUP, INC.

63

*Confidential*

E.      While the Exact Percentage of the Putative No-Bail Notation Class That
        Was Not Damaged Cannot Be Known Without Individual Inquiry, Based
        on the AJIS Data Most Putative Class Members for the Putative No-Bail
        Notation Class Were Not Damaged ................................................................. 16

F.      Individual Inquiry Would be Needed to Determine Whether the Inmates
        Dr. Kriegler Identified as Potential Members of the Putative No-Bail
        Classes Would Have Been Denied the Opportunity to Post Bail For
        Reasons Other Than the ICE Hold ................................................................. 17

G.      Dr. Kriegler's Method for Estimating the Size of the Putative No-Money
        Bail Classes is Flawed Leading Him to Overestimate the Size of the
        Putative No-Money Bail Classes By Approximately 100 Percent ..................... 18

H.      Dr. Kriegler's Analysis of the Length of Time People With ICE Holds and
        Only Misdemeanors For Which Other People are Arrested and Released
        on the Same Day Includes Several Groups of People That Should Be
        Omitted ........................................................................................................ 21

Appendix A ................................................................................................................. 23

Appendix B ................................................................................................................. 34

ANALYSIS GROUP, INC.

**Exhibit "F"**
64

*Confidential*

**Rebuttal Expert Report of Mark A. Gustafson**
*Duncan Roy et al., v. County of Los Angeles; Leroy D. Baca, Sheriff of Los Angeles County,
in His Official Capacity*

## I.    ASSIGNMENT

1.    I have been retained by Lawrence Beach Allen & Choi, counsel for the Los Angeles County Sheriff's Department ("LASD"), in the matter of *Duncan Roy et al. v. LASD*, pending in the United States District Court, Central District of California.  I have been asked by counsel for LASD to review and comment on the Declaration of Brian Kriegler.[1]  I have also been asked to comment on economic issues related to class certification based on my review of the Kriegler Declaration and of the LASD data analyzed by Dr. Kriegler.

## II.    QUALIFICATIONS

2.    I am a Vice President with Analysis Group with over 15 years of experience working on litigation and non-litigation engagements.  I have worked across numerous practice areas including insurance, health care, class actions, and public policy in which I have analyzed significant amounts of data.  I regularly analyze client data to understand the impact of different decisions and behaviors, identify patterns indicating the presence or lack of certain actions, and to simulate what may have happened if certain actors had behaved differently.  For example, I am currently working on a class action involving a large telecom company in which I am analyzing over two terabytes of data containing all of the company's billing data for residential customers in California to determine the number and amount of late payment charges paid by customers.  In another active case, I am analyzing over a decade of hospital claims data for over forty hospitals to evaluate whether admission practices differ across hospitals and, if so, what may explain the difference.  These examples are representative of a large portfolio of data-intensive cases that I have been responsible for either by personally conducting the analysis or leading a team to perform the analysis.

3.    I earned a Master of Public Policy with a concentration in economics from the Kennedy School of Government at Harvard University where I also taught graduate-level economics as a course assistant.

---

[1] Declaration of Brian Kriegler, Ph. D. in Support of Plaintiffs' Motion for Class Certification, May 9, 2016 (hereafter "Kriegler Declaration").

ANALYSIS GROUP, INC.

**Exhibit "F"**
**65**

*Confidential*

4.   I have authored and co-authored numerous publications including "Expert Analysis of Class Certification Issues" in the Fifth Edition of the Litigation Services Handbook.

5.   A copy of my curriculum vitae summarizing my background and qualifications is attached as **Appendix A** to this report.

6.   Analysis Group is compensated at my hourly rate of $560 per hour for my time spent on this matter.  I have directed the work of other Analysis Group staff members with hourly billing rates ranging from $275 to $400.  Neither Analysis Group's nor my compensation is dependent in any way on the outcome of this case.

## III.    DOCUMENTS CONSIDERED

7.   In preparing this report, I reviewed among other materials the complaint, the Kriegler Declaration, the Deposition of Gregory Sivard, the Immigration and Customs Enforcement webpage, the 2016 Bail Schedule for Infractions and Misdemeanors, the 2016 Felony Bail Schedule, data from the Automated Justice Information System ("AJIS") and the Jail Information Management Systems ("JIMS"), IMOVE File Definitions, and Non-IMOVE File Definitions.  I also had multiple telephone conversations with Greg Sivard and other LASD personnel.

8.   A list of documents and data sources that I relied on in this matter is given in **Appendix B** to this report and/or in the text of this report and its accompanying exhibits and appendices.

## IV.    SUMMARY OF OPINIONS

9.   The opinions I have reached in this matter as of the date this report was submitted are as follows.

- ▪ Dr. Kriegler failed to account for weekends and holidays in his analysis, leading him to overstate his estimate of the Gerstein Post-48-Hour Subclasses class size by more than 70 percent and to overstate the percentage of inmates subject to ICE holds released longer than two days after the date they otherwise would have been released by between 61 percent for SPON inmates and over 131 percent for SENTREL inmates.

- ▪ Dr. Kriegler falsely assumes that the AJIS release date and time accurately reflect the actual release date and time, which is not always accurate because the AJIS release date and time represents when the inmate's release was entered into AJIS, not when

2

**Exhibit "F"**
66

*Confidential*

the inmate was actually released. This leads him to overstate by an unknown amount the length of time required to release inmates with ICE holds. Individual inquiry would be required to determine the actual release date and time.

- Dr. Kreiger failed to analyze how changes in LASD policy related to the release of inmates with ICE holds affected all members of the proposed putative classes. An analysis of the changes shows that inmates released after May 2014 were rarely held longer than two days (excluding weekends and holidays) after the date they otherwise would have been released but for the ICE hold. Therefore, most putative class members released after May 2014 did not suffer harm from over-detention assuming the LASD enforcement of ICE holds was constitutional and lawful.

- With the exception of the Gerstein Post-48-Hour Subclasses, all other putative jail classes are premised on the assumption that the LASD policy of enforcing ICE holds was unconstitutional and/or unlawful. If LASD enforcement of ICE holds was constitutional and lawful then at least approximately 62 percent of the SPON inmates and 84 percent of the SENTREL inmates in the Putative Jail Classes other than the Gerstein Post-48-Hour Subclasses suffered no harm from over-detention because they were released before two days. The distinction between the inmates that would not have been over-detained if the LASD practices were acceptable and those that may have been over-detained introduces the possibility of a conflict between the two groups of putative jail class members.

- In order for putative class members in the putative No-Bail Notation class to have been damaged, the alleged inability to post bail must have changed their behavior. If they would not have successfully posted bail if the ICE hold had not been placed, the presence of the ICE hold had no effect on whether the inmate would post bail or not. While the exact percentage of the putative No-Bail Notation class that would not have posted bail and therefore was not damaged cannot be known without individual inquiry, based on the AJIS data, most putative No-Bail Notation class members would not have successfully posted bail and, therefore, were not damaged.

- Individual inquiry would be needed to determine whether the inmates Dr. Kriegler identified as potential members of the putative No-Bail Classes would have been denied the opportunity to post bail for reasons other than the ICE hold.

- Dr. Kriegler's method for estimating the size of the putative No-Money Bail Classes is flawed leading him to overestimate the size of the putative No-Money Bail Classes by approximately 100 percent.

- Dr. Kriegler's analysis of the length of time people with ICE holds and only misdemeanors for which other people are arrested and released on the same day includes several groups of people that should be omitted.

10. My analysis and conclusions are based on the information available to me as of the date this report was submitted. Should additional information become available to me as this matter proceeds, I reserve the right to update my analysis and refine my opinions as appropriate.

**Exhibit "F"**
**67**

*Confidential*

## V.    BACKGROUND

### A.    LASD Cooperation with U.S. Immigration and Customs Enforcement

11. I understand that U.S. Immigration and Customs Enforcement ("ICE") may investigate an inmate who has been detained by LASD.  As a part of the U.S. Department of Homeland Security, ICE "enforces federal laws governing border control, customs, trade and immigration to promote homeland security and public safety."[2]  ICE may "investigat[e] a wide range of domestic and international activities arising from the illegal movement of people and goods into, within and out of the United States."[3]  In order to ensure that an inmate is detained during an investigation, ICE may place a hold on the inmate, which LASD enforces by holding the inmate for two days, not counting weekends and holidays.[4]  At the conclusion of the two day hold, ICE may take the inmate into custody if further detention is required.

### B.    Plaintiff's Allegations

12. Plaintiffs allege that LASD's cooperation with ICE has denied some inmates the opportunity to post bail and detained inmates beyond the time they otherwise would have been released from custody.[5]  Plaintiffs allege that inmates who had an ICE hold were not allowed the opportunity to post bail "purely on the ground that the federal government ha[d] placed an 'immigration hold' on them."[6]  In addition, Plaintiffs allege that some inmates were held "for days beyond their release date…solely on the purported authority of the immigration holds."[7]

### C.    Class Definitions

13. Each of the proposed classes fits into one of three broad classes: the Jail Classes, the No-Bail Notation Classes, or the No-Money Bail Classes.[8]  The numbering (a) through (h) below is consistent with Dr. Kriegler's numbering of the putative classes in his declaration.[9]  Proposed

---

[2] "Who We Are." https://www.ice.gov/about. Accessed June 2016.

[3] "Who We Are." https://www.ice.gov/about. Accessed June 2016.

[4] Complaint, ¶ 23.

[5] Complaint, ¶ 1.

[6] Complaint, ¶ 1.

[7] Complaint, ¶ 4.

[8] Kriegler Declaration, ¶¶ 22-26.

[9] Kriegler Declaration, ¶ 8.

ANALYSIS GROUP, INC.

**Exhibit "F"**
68

*Confidential*

classes (a) through (f) are Jail Classes, while (g) is a No-Bail Notation Class and (h) is a No-Money Bail Class.

### 1.    Jail Classes

14. The Jail Classes represent inmates who Plaintiffs allege were detained for longer than they would have been but for the ICE hold.[10]  Plaintiffs have proposed the following Jail Classes.[11]

    a.  False Imprisonment Equitable Relief Class: All LASD inmates detained beyond the time they are due for release from criminal custody, solely on the basis of immigration detainers, excluding inmates who have a final order of removal as indicated on the face of the detainer.

    b.  Gerstein Equitable Relief Class: All LASD inmates held beyond the time they are eligible for release on criminal matters, solely on the basis of immigration detainers, excluding inmates who have a final order of removal, or ongoing removal proceedings, as indicated on the face of the immigration detainer.

    c.  False Imprisonment Damages Class: From November 7, 2011 to Present Day, all LASD inmates who were detained beyond the time they were eligible for release from criminal custody, solely on the basis of immigration detainers, excluding inmates who had a final order of removal as indicated on the face of the immigration detainer.

    d.  Gerstein Damages Class: All LASD inmates who were detained beyond the time they were eligible for release from criminal custody solely on the basis of immigration detainers, excluding inmates who had a final order of removal or ongoing removal proceedings, as indicated on the face of the immigration detainer. The class period for the federal class ranges from October 19, 2010 to Present Day, and the class period for the California §52.1 class ranges from November 7, 2011 through June 5, 2014.

    e.  Post-48-Hour Gerstein Subclass: All inmates detained for more than 48 hours beyond the time they were due for release from criminal custody, based solely on an immigration detainer, excluding inmates who had a final order of removal or ongoing removal proceedings as indicated on the face of the detainer. The class period for the federal class ranges from October 19, 2010 to Present Day, and the class period for the California §52.1 class ranges from November 7, 2011 through June 5, 2014.

    f.  Investigative Detained Damages Class: All LASD inmates who were detained beyond the time they were due for release from criminal custody based solely on "investigative detainers." The class period for the federal

---

[10] Kriegler Declaration, ¶ 8.

[11] Kriegler Declaration, ¶ 8.

ANALYSIS GROUP, INC.

**Exhibit "F"**
69

*Confidential*

class ranges from October 19, 2010 to Present Day, and the class period
for the California §52.1 class ranges from November 7, 2011 through June
5, 2014. My understanding is that the Department of Homeland Security
ceased issuing investigative detainers in December 2012. Some
individuals may have been held on investigative detainers after December
2012.

### 2.    *No-Bail Notation Classes*

15. The No-Bail Notation Classes represent inmates who Plaintiffs allege were not given
the opportunity to post bail and would have been afforded the chance if they didn't have an ICE
hold.[12]  Plaintiffs have proposed the following No-Bail Notation Classes.[13]

> g.    No-Bail Notation Class: All LASD inmates on whom an immigration
> detainer had been lodged and recorded in LASD's AJIS database, and who
> were held on charges for which they would have been eligible to post bail.
> The class period for the federal class ranges from October 19, 2010 to
> October 18, 2012, and the class period for the California §52.1 class
> ranges from November 7, 2011 through October 18, 2012.

### 3.    *No-Money Bail Classes*

16. The No-Money Bail Classes represent inmates that have only misdemeanor charges
and an aggregate bail amount of less than $25,000; Plaintiffs allege these inmates were detained
only because they had an ICE hold placed on them.[14]  Plaintiffs have proposed the following No-
Money Bail Classes.[15]

> h.    No-Money Bail Class: All LASD inmates on whom an immigration
> detainer had been lodged, who would otherwise have been subject to
> LASD's policy of rejecting for booking misdemeanor defendants with bail
> of less than $25,000 (including Order of Own Recognizance (OR)). The
> class period for the federal class ranges from October 19, 2010 to Present
> Day, and the class period for the California §52.1 class ranges from
> November 7, 2011 through Present Day.

---

[12] Kriegler Declaration, ¶¶ 23-24.

[13] Kriegler Declaration, ¶ 8.

[14] Kriegler Declaration, ¶¶ 25-26.

[15] Kriegler Declaration, ¶ 8.

ANALYSIS GROUP, INC.

Exhibit "F"
70

## VI.    SUMMARY OF DR. KRIEGLER'S OPINIONS

17.  In his declaration, Dr. Kriegler estimates the number of putative class members in each of the Plaintiffs' proposed putative classes and presents comparisons between putative class members and non-class members using data from AJIS and JIMS.[16]

18. In order to estimate the number of putative class members and to conduct his analyses, Dr. Kriegler develops the following rules to classify inmates.

- Releases with an ICE hold – Dr. Kriegler defines "Releases with an ICE hold" as inmates who "had an open ICE hold and/or were ultimately released to ICE, and who had no domestic holds, detainers, or warrants."[17]

- Expiration of Sentence Releases vs. Spontaneous Releases – Dr. Kriegler distinguishes between those inmates who had an expired sentence and those who did not.  Dr. Kriegler defines an inmate "whose Expected Exit Date is a result of an expired sentence as an 'Expiration of Sentence Release' or 'SENTREL.'"[18]  An inmate is classified as a SENTREL "if the Scheduled Release Date is on or after the latest Date of Sentence."[19] Dr. Kriegler defines an inmate "whose Expected Exit Date is not based on a sentence as a 'Spontaneous Release' or 'SPON.'"[20]  An inmate is classified as a SPON "if the Scheduled Release Date is either missing or before the latest Date of Sentence."[21]

- Expected Exit Date – Dr. Kriegler calculates an Expected Exit Date, which is his calculation of when an inmate should have been released.  The classification rule depends on whether the inmate is a SENTREL or a SPON.  For SENTREL inmates, the Expected Exit Date is the Scheduled Release Date.[22]  For SPON inmates, the Expected Exit Date is the latest Date of Sentence, or the Last Update Date if no Date of Sentence is available.[23]

---

[16] Kriegler Declaration, ¶ 9 and ¶¶ 12-13.

[17] Kriegler Declaration, ¶¶ 10, 18.

[18] Kriegler Declaration, ¶ 10.

[19] Kriegler Declaration, ¶ 17.

[20] Kriegler Declaration, ¶ 10.

[21] Kriegler Declaration, ¶ 17.

[22] Kriegler Declaration, ¶ 17.

[23] Kriegler Declaration, ¶ 17.

**Exhibit "F"**
71

*Confidential*

19. Dr. Kriegler presents three categories of results: Number of Potential Class Members, Preliminary Estimated Class Sizes, and Comparisons.

## A.     Number of Potential Class Members / Preliminary Estimated Class Sizes

20. Using AJIS and JIMS data, Dr. Kriegler estimates what he refers to as the number of potential class members in each class.  The reason he does not identify specific class members and the actual number of people in each class is that he is unable to do so.  Several of the putative classes exclude inmates that had a final order of removal as indicated on the face of the detainer or ongoing removal proceedings.  Similarly, the Investigative Detainer Damages Class is limited to inmates with "investigative detainers."[24]  Dr. Kriegler notes that he is unable to identify which inmates should be excluded based on these criteria, but claims that ICE maintains the data needed for him to make this determination.[25]  Therefore, Dr. Kriegler ignores these exclusions to estimate the potential number of putative class members.  To estimate the putative class sizes without access to the required ICE data, Dr. Kriegler reduces his estimate of potential putative class members in each putative class to 78 percent of his estimate of potential class members, which is based on Plaintiffs' allegation that "78 percent of immigration detainers were 'investigative.'"[26, 27]

## B.     Comparisons

21. Dr. Kriegler conducts two comparisons.

---

[24] Kriegler Declaration, ¶ 8.

[25] Kriegler Declaration, ¶ 9.

[26] Kriegler Declaration, ¶ 30.

[27] Plaintiffs contend that Form I-247 is used to initiate an ICE hold and has four possible reasons for issuing a hold; ICE will issue a hold if it has:

I.    "[i]nitiated an investigation to determine whether this person is subject to removal from the United States,"

II.   "[i]nitiated removal proceedings and served a Notice to Appear or other charging document,"

III.  "[s]erved a warrant of arrest for removal proceedings," or

IV.   "[o]btained an order of deportation or removal from the United States for this person." (Complaint, ¶ 24).

Plaintiffs allege that ICE checks the above option (I) for 78% of all ICE holds.  This option results in the initiation of an investigation to determine if an inmate should be subject to removal from the United States (Complaint, ¶ 25). Plaintiffs allege that ICE chooses option (I) often without probable cause (Complaint, ¶¶ 26-27).

ANALYSIS GROUP, INC.

**Exhibit "F"**
**72**

*Confidential*

22. The first attempts to compare the number of days after the Expected Exit Date inmates with ICE holds were released relative to inmates without any holds.[28]  Dr. Kriegler limits this comparison to inmates released from October 19, 2010 to December 31, 2013 because "LASD began to change some of its policies regarding people with immigration detainers in 2014."[29]  Dr. Kriegler finds that both SENTREL and SPON inmates with an ICE hold are generally held for a longer period of time past their Expected Exit Date than inmates without holds.[30]  Dr. Kriegler finds that over 98 percent of inmates without ICE holds are released within two days of their Expected Exit Date compared to 39 percent for SPON inmates and 62 percent of SENTREL inmates.[31]

23. The second analysis examines the number of days an inmate with only misdemeanor charges and an ICE hold remained in custody after being arrested on the charges for which other inmates without an ICE hold were released on the same day.[32]  Dr. Kriegler's analysis covers the period from October 19, 2010 through March 20, 2015, during which he identified 9,105 people held with an ICE hold that were arrested on a misdemeanor charge for which other people were booked and released on the same day.[33]  For these inmates, Dr. Kriegler finds that "[w]ith very rare exceptions, nobody with an with [sic] ICE hold was released on the same day as their booking date, and over 99 percent of people with ICE holds were released two or more calendar days after their booking date."[34]  Dr. Kriegler states that "[t]hese results are consistent with Plaintiffs' theory that LASD had a widespread practice of holding people with ICE holds who otherwise would have been released subject to LASD's policy of releasing people charged with misdemeanors, in which the aggregate bail amount summed to less than $25,000.[35]

---

[28] Kriegler Declaration, Exhibit 4.

[29] Kriegler Declaration, ¶ 31.

[30] Kriegler Declaration, ¶ 31.

[31] Kriegler Declaration, Exhibit 4.

[32] Kriegler Declaration, ¶¶ 32-33 and Exhibit 5.

[33] Kriegler Declaration, Exhibit 5.

[34] Kriegler Declaration, ¶ 33.

[35] Kriegler Declaration, ¶ 33.

ANALYSIS GROUP, INC.

Exhibit "F"
73

*Confidential*

## VII.    ANALYSIS AND COMMENTS RELATED TO DR. KRIEGLER'S OPINIONS

24. I was not given access to Dr. Kriegler's programs that he used in his analysis; however, I was generally able to reproduce his results.  Based on my replication of his results, I find that Dr. Kreigler's results are overstated, downplay the difficulty in identifying putative class members, ignore the need for individual inquiry, and fail to analyze whether members of the putative classes may not have been damaged.

### A.    Dr. Kriegler Failed to Account For Weekends and Holidays in His Estimate of the Gerstein Post-48-Hour Subclasses Class Size and His Comparison of the Number of Days Inmates With ICE Holds Are Held Longer Than Inmates With No Holds

25. I understand and Plaintiffs state in their complaint that an ICE hold is requested for a period of up to "48 hours excluding Saturdays, Sundays, and holidays."[36]  Therefore, I understand the LASD is justified in holding inmates for a period of up to 48 hours excluding Saturdays, Sundays, and holidays beyond the time they otherwise would have been released.  Dr. Kriegler did not control for weekends and holidays in his estimate of the Gerstein Post-48-Hour Subclass nor in his comparison of the number of days that inmates with ICE holds were held longer than inmates with no holds.

### 1.    *Dr. Kriegler's estimate of the Gerstein Post-48-Hour Subclasses class sizes is overstated by more than 70 percent*

26. For both the Gerstein Post-48-Hour Subclass (Federal) and the Gerstein Post-48-Hour Subclass (California §52.1), the Number of Periods of Incarceration that Dr. Kriegler calculates are overstated because he does not exclude weekends and holidays when determining which inmates were potentially over-detained.[37, 38]  **Table 1** below compares the results from Dr. Kreigler's Table 1 in which he presented his estimate of potential putative class members with the results he would have obtained if he had controlled for weekends and holidays.  After correcting for weekends and holidays, I find that the Number of Periods of Incarceration for the

---

[36] Complaint, ¶ 23.

[37] Kriegler Declaration, ¶ 8.

[38] Each Period of Incarceration represents the unique detainment of an inmate and corresponds to a booking number in the AJIS and JIMS databases.  A person who was arrested and released and then arrested again would have a different booking number associated with each of the two arrests and each of their detainments is considered a different Period of Incarceration.

ANALYSIS GROUP, INC.

**Exhibit "F"**
**74**

*Confidential*

possible putative classes are 4,205 for the putative Gerstein Post-48-Hour Subclass (Federal),
compared to Dr. Kriegler's 7,197, and 3,164 for the putative Gerstein Post-48-Hour Subclass
(California §52.1), compared to Dr. Kriegler's 5,480.  Dr. Kriegler overstates the number of
putative class members by 71 percent for the putative Gerstein Post-48-Hour Subclass (Federal)
and by 73 percent for the putative Gerstein Post-48-Hour Subclass (California §52.1).[39]

## Table 1
## Number of Periods of Incarceration
## Gerstein Post-48-Hour Federal and California Subclasses

|  | Class Period | Number of Periods of Incarceration per Dr. Kriegler's Table 1 | Number of Periods of Incarceration, Adjusted for Weekends and Holidays | Percentage Overstatement by Dr. Kriegler |
|---|---|---|---|---|
| Gerstein Post-48-Hour Subclass (Federal) | 10/19/2010 - Present Day | 7,197 | 4,205 | 71% |
| Gerstein Post-48-Hour Subclass (California §52.1) | 11/7/2011 - 6/5/2014 | 5,480 | 3,164 | 73% |

**Sources:** AJIS database; JIMS database; Kriegler Declaration.

> **2.**    *Dr. Kriegler overstates the length of time inmates with ICE Holds are
> detained beyond their Expected Exit Date by 63 percent for SPON inmates
> and 131 percent for SENTREL inmates*

27. In Dr. Kriegler's Exhibit 4, he presents his analysis of the number of days that
inmates were held beyond their Expected Exit Date and compares results for inmates with ICE
holds to those without ICE holds.[40]  Because Dr. Kriegler fails to exclude weekends and holidays
from his analysis, Dr. Kriegler's results are biased for inmates with ICE holds and make it appear
that more inmates with ICE holds were potentially over-detained.

28. I corrected Dr. Kriegler's analysis to take into account weekends and holidays and
present my results in **Exhibit 1**, which compares my corrected results to the results Dr. Kreigler
presents.  **Exhibit 1** shows that 62.2 percent of SPON inmates with ICE holds and 83.6 percent
of SENTREL inmates with ICE holds were released within two days of their Expected Exit Date

---

[39] For the putative Gerstein Post-48-Hour Subclass (Federal), the difference is calculated as (7,197 – 4,205) / 4,205
= 71%.  For the putative Gerstein Post-48-Hour Subclass (California §52.1), the difference is calculated as (5,480 –
3,164) / 3,164 = 73%.

[40] Kriegler Declaration, ¶ 31.

ANALYSIS GROUP, INC.

Exhibit "F"
75

*Confidential*

when appropriately excluding weekends and holidays.  These figures are much higher than those presented by Dr. Kriegler, which were 38.9 percent of SPON inmates and 62.2 percent of SENTREL inmates with ICE holds.[41]  Dr. Kriegler overstates the number of inmates with ICE holds which were potentially over-detained (held for three or more days past their Expected Exit Date) by 63 percent for SPON inmates and 131 percent for SENTREL inmates.[42]

29. After correcting for weekends and holidays, it is apparent that Dr. Kriegler's estimate of the putative class size for the Gerstein Post-48-Hour Subclasses and his analysis of the number of inmates with ICE holds detained beyond their Expected Release Date are overstated. This analysis also shows that at least 84 percent of SENTREL inmates and 62 percent of SPON inmates were not harmed because they were released before they were required to be released.

**B.    Dr. Kriegler Falsely Assumed That the AJIS Release Date and Time Accurately Reflect the Actual Release Date and Time, Which Is Not Always True**

30. I understand that the Release Date and Release Time variables in AJIS often contain date and time information that is later than the actual time the inmate was released.[43]  I understand that these variables are populated at the time an LASD employee enters into the system that an inmate has been released, which is an administrative function completed after the inmate was actually released.[44]  For ICE holds, this means that after an inmate is released into ICE custody, their inmate file, which is referred to as a jacket, must be taken from where the inmate was released, which is generally the Inmate Reception Center ("IRC") near downtown Los Angeles for men or the Century Regional Detention Facility ("CRDF") in Lynwood, CA for women, to a designated area within the IRC and then entered into AJIS.  Due to the time it takes for the jacket to travel to the designated area within IRC and subsequently be entered into the system, I understand that the Release Time variable is likely to be populated with a time that is anywhere from a couple of hours to an entire shift or more later than when the inmate was

---

[41] Kriegler Declaration, Exhibit 4.

[42] For SPON inmates with ICE holds, the difference is calculated as ((1-.389) – (1-.624)) / (1-.624) = 63%.  For SENTREL inmates with ICE holds, the difference is calculated as ((1-.624) – (1-.837)) / (1-.837) = 131%.

[43] Deposition of Gregory Sivard, April 21, 2016, p. 30.

[44] Telephone conversation with Greg Sivard, June 16, 2016.

**Exhibit "F"**

*Confidential*

actually released into ICE custody.[45],[46] Due to this delay, inmates with ICE holds were likely released into ICE custody earlier than the AJIS Release Date and Time indicate.

31. I understand that the delay between AJIS Release Date and Time variables and the actual release date and time when the inmate was released into ICE custody is even longer for women because of the distance between CRDF in Lynnwood and IRC near downtown Los Angeles, which is approximately 16 miles.[47],[48] I understand that jackets are physically transferred from CRDF to IRC and it is not uncommon for there to be delays in the delivery of jackets to the IRC because of the required drive.

32. The fact that the AJIS Release Date and Release Time differ from the actual release date and time is not a surprise to me as a data analyst. When one attempts to use data to answer questions the data were not originally intended to answer, one often identifies issues that are unexpected and bias the results if not controlled for.

33. Dr. Kriegler's assumption that the AJIS Release Date and Release Time is the actual release date and time causes him to overestimate by an unknown amount the number of inmates with ICE holds that were held beyond the time they should have been released. It also causes him to overstate his estimate of the length of time that inmates with ICE holds are held beyond the time they should have been released

34. I understand that in order to determine that actual time when an inmate was released into ICE custody, a manual review of archived manifests would be needed.[49] This would require LASD personnel to retrieve the paper manifests from storage and then LASD personnel or another party would need to manually review the manifests in order to determine the actual date and time each individual inmate with an ICE hold was released from LASD custody.[50]

---

[45] Deposition of Gregory Sivard, April 21, 2016, pp. 30-31.

[46] Telephone conversation with Greg Sivard, June 16, 2016.

[47] Deposition of Gregory Sivard, April 21, 2016, pp. 30-31.

[48] https://www.google.com/maps. Accessed June 2016.

[49] Telephone conversation with Greg Sivard, June 16, 2016.

[50] Telephone conversation with Greg Sivard, June 16, 2016.

ANALYSIS GROUP, INC.

**Exhibit "F"**
**77**

*Confidential*

### C.   Dr. Kreigler Failed To Analyze How Changes in LASD Policy Affected All Putative Class Members

35. I understand that LASD policy regarding ICE holds changed during the period at issue in this litigation.  For example, after 2014, inmates were not transferred from court back to the IRC based solely on having an ICE hold, except for LAPD inmates.[51]  Additionally, around the time the TRUST Act came into effect on January 1, 2014, people with misdemeanor charges and aggregate bail under $25,000 were no longer accepted for booking at IRC.[52, 53]  Also, I understand that by May 31, 2014, LASD was no longer detaining inmates beyond their release dates on the basis of having an ICE hold.  Because LASD policies regarding the enforcement of ICE holds varied over the period at issue, not all inmates subject to ICE holds received the same treatment.

36. To analyze whether these changes may have an impact on Dr. Kriegler's results, I replicated his analysis of the number of days that inmates were held beyond their Expected Exit Date, but split the analysis into three distinct time periods.  The first is October 19, 2010 to October 31, 2012.  I understand that on November 1, 2012, a new version of the immigration detainer form began to be used.  The second period is November 1, 2012 to May 31, 2014 when I understand the LASD was no longer detaining inmates beyond their release dates based on having an ICE hold.  The third period is June 1, 2014 through the end of the production.  The results of the analysis are shown in **Exhibit 2**.

37. **Exhibit 2** shows that LASD's practices with regard to inmates with ICE holds are different in the third period from June 1, 2014 forward.  For example, in the first two periods, SPON inmates were released at the end of two days after their Expected Exit Date 63.3 percent and 60.2 percent of the time, respectively.  In the third period, the percentage increased to 92.4 percent.  A similar pattern can be seen among SENTREL inmates.  In the first two periods, 83.8 percent and 86.8 percent were released by the end of the second day after the Expected Release Date.  By the third period beginning in June 2014, the percentage was 99.1 percent.

---

[51] Deposition of Gregory Sivard, April 21, 2016, pp. 61-62.

[52] Deposition of Gregory Sivard, April 21, 2016, pp. 78-82.

[53] "Information Bulletin: Responsibilities of Local Law Enforcement Agencies under Secure Communities and the TRUST Act." http://oag.ca.gov/sites/all/files/agweb/pdfs/law_enforcement/14-01_le_info_bulletin.pdf.  Accessed June 2016.

ANALYSIS GROUP, INC.

Exhibit "F"

78

*Confidential*

38. These results show that the LASD's practices with regards to how it processed inmates with ICE holds were not constant across the period at issue. While it is true that the majority of putative class members were released within two days of their Expected Release Date regardless of the time period considered, during the third time period almost all inmates were released before two days. Therefore, to lump all inmates together and ignore the fact that LASD practices changed also ignores important and relevant intra-class variation.

### D. With the Exception of the Gerstein Post-48-Hour Subclasses, All Other Putative Jail Classes Are Premised on the Assumption that the LASD Policy of Enforcing ICE Holds Was Unconstitutional and/or Unlawful

39. The Gerstein Post-48-Hour Subclasses are the only Putative Jail Classes identified by Dr. Kriegler that account for the possibility that LASD was operating lawfully and within its constitutional authority by holding inmates for up to 48 hours excluding weekends and holidays following the time the inmate otherwise would have been released. In other words, all the other Putative Jail Classes assume that enforcing ICE holds was unconstitutional and unlawful.

40. Based on **Exhibit 1,** 62.2 percent of SPON inmates and 83.6 percent of SENTREL inmates with ICE holds were released within two days of their Expected Exit Date when appropriately accounting for weekends and holidays. As noted above in section VII.B, these figures are likely even higher when considering that the AJIS release date and time may not reflect that actual date and time an inmate was released. This means that if the LASD was within its authority to hold inmates with ICE holds for two days not including weekends and holidays, then at least approximately 62 percent of the SPON inmates and 84 percent of the SENTREL inmates in the Putative Jail Classes other than the Gerstein Post-48-Hour Subclasses suffered no harm from over-detention because they were released before two days.

41. The distinction between the inmates that would not have been over-detained if the LASD practices were acceptable and those that may have been over-detained also introduces the possibility of a conflict between the two groups of putative class members. For example, those inmates released before two days must argue that the LASD policy of enforcing ICE holds was unconstitutional and unlawful in order to have any financial recovery. In contrast, those that were held longer than two days may prefer not to dispute the legality of enforcing ICE holds in general, but rather focus on the fact that inmates held subject to an ICE hold should be released within two days.

ANALYSIS GROUP, INC.

Exhibit "F"

79

*Confidential*

**E.      While the Exact Percentage of the Putative No-Bail Notation Class That Was Not Damaged Cannot Be Known Without Individual Inquiry, Based on the AJIS Data Most Putative Class Members for the Putative No-Bail Notation Class Were Not Damaged**

42. The putative No-Bail Notation Class includes "All LASD inmates on whom an immigration detainer had been lodged and recorded in LASD's AJIS database, and who were held on charges for which they would have been eligible to post bail."[54]  I understand Plaintiffs allege that members of the putative No-Bail Notation Class were denied the option of posting bail and were harmed as a result.  Based on my review of the AJIS data, however, most putative class members were unlikely to have actually posted bail if they had been given the opportunity.  Therefore, the argument that all members of the putative No-Bail Notation Class were damaged is not consistent with reality.

43. In order to successfully post bail, an inmate (1) needs the resources to satisfy the bail either by posting bail him or herself or having it posted on his or her behalf by an individual or bail bondsmen, (2) needs to attempt to post bail, and (3) needs to be allowed to post bail.  If either of the first two requirements is not met, then regardless of whether the inmate would be allowed to post bail, the inmate will be unable to successfully post bail.

44. Whether or not an inmate had the resources to post bail at the time of his or her detainment is not easy to determine on an ex-post basis and would require individual inquiry.  In order to accurately determine if an inmate would have had the ability to post bail, an inmate's personal and family finances at the time of detainment would need to be investigated.  In addition, an assessment of whether or not a bail bondsman would have been willing to make a loan in order for the inmate to post bail may be necessary.  Whether the inmate or a person on the inmate's behalf attempted to post bail is another piece of information that is not easily available.  For example, I understand that the LASD does not retain this information.[55]  One might make the argument that an inmate didn't attempt to post bail, but would have but for the ICE hold, but this further complicates the problem as one now needs to understand what people knew and believed months or years in the past.  Individual inquiry would be required to

---

[54] Kriegler Declaration, ¶ 8.

[55] Deposition of Gregory Sivard, April 21, 2016, p. 11.

ANALYSIS GROUP, INC.

**Exhibit "F"**
**80**

*Confidential*

determine both whether an inmate had the resources needed to satisfy bail and whether they attempted to post bail or would have attempted to post bail but for the ICE hold.

45. Lacking the ability to perform individual inquiry, I analyzed the AJIS data to estimate what fraction of the putative No-Bail Notation Class would have been likely to successfully post bail. Using AJIS, I find that only 12.6 percent of all inmates without an ICE hold and with no other holds had a release reason of "BOND" or "BAIL." Therefore, approximately 87 percent of putative class members in the putative No-Bail Notation Class were unlikely to have successfully posted bail if they had been allowed to post bail. In other words, approximately 87 percent of putative class members in the putative No-Bail Notation Class were not damaged.

46. Given that an inmate with an ICE hold who posts bail would likely be released to ICE and not to the street, I would expect fewer people with ICE holds would attempt to post bail compared to inmates without an ICE hold.

**F.    Individual Inquiry Would be Needed to Determine Whether the Inmates Dr. Kriegler Identified as Potential Members of the Putative No-Bail Classes Would Have Been Denied the Opportunity to Post Bail For Reasons Other Than the ICE Hold**

47. In his discussion of his proposed method to calculate the size of the putative No-Bail Classes, Dr. Kriegler notes that there are "certain exceptions" to the practice of LASD not holding people with a maximum aggregate bail amount of less than $25,000.[56] Dr. Kriegler does not explain what the exceptions are, however. He cites a July 3, 2012 Sheriff's Department Broadcast to support his understand on the LASD policy, which lists the exceptions; several may require a manual, individualized review of documents to determine whether they affected the decision of the LASD to hold the inmate.[57] Specifically, an inmate with a misdemeanor arrest with bail under $25,000 could be detained if he or she met one of the following criteria.[58]

- Refused to sign the citation
- Demanded to appear before a magistrate
- Could not provide satisfactory evidence of personal identification

---

[56] Kriegler Declaration, ¶ 25.

[57] Kriegler Declaration, Exhibit 3.

[58] Kriegler Declaration, Exhibit 3.

ANALYSIS GROUP, INC.

**Exhibit "F"**
**81**

*Confidential*

- Was intoxicated

48. It is not possible to determine whether one of these criteria may have applied to an inmate from the AJIS data alone.  I understand one would need to review other documents to understand whether one of these exceptions had been applied.[59]  Therefore, one cannot know from the available data whether LASD may have detained the inmate for a reason in addition to the ICE hold.

G.    **Dr. Kriegler's Method for Estimating the Size of the Putative No-Money Bail Classes is Flawed Leading Him to Overestimate the Size of the Putative No-Money Bail Classes By Approximately 100 Percent**

49. Dr. Kriegler argues that LASD has a policy to "not hold people who are booked on charges that, in the aggregate, have a bail amount of $25,000 or less."[60]  For this reason, Dr. Kriegler attempts to identify inmates with ICE holds and bail amounts less than $25,000 whom Dr. Kriegler claims would never have been detained but for the ICE holds.[61]  In his estimation of the putative No-Money Bail Classes, Dr. Kriegler does not use the bail amount variable given in the Arrest Charge dataset because he appears to believe it is inaccurate.  In his report he states, "Based on my review of [the bail amount in the AJIS Arrest Charge table], along with my initial review of the misdemeanor bail schedule, it is not clear if and how one would use this information.  Among misdemeanors and infractions, I identified over 18,000 charges with recommended bail in excess of $1 million, which I understand is incredulously high."[62]  In place of the Arrest Charge bail amount field, he simply excludes any inmates who had arrest charges that were not a misdemeanor or infraction.

50. Based on my conversations with counsel and LASD and my experience working with data extracted from system like AJIS, I understand that bail amounts in AJIS are given in pennies and need to be divided by 100 in order to obtain dollar amounts.  Therefore, the 18,000 charges that Dr. Kriegeler identified with recommended bail amounts in excess of $1 million in reality have recommended bail amounts in excess of $10,000.[63]  Beginning with the set of inmates

---

[59] Telephone Conversation with Greg Sivard, June 27, 2016.

[60] Kriegler Declaration, ¶ 25.

[61] Kriegler Declaration, ¶ 8.

[62] Kriegler Declaration, ¶ 25, Footnote 10.

[63] $10,000 = $1,000,000 / 100.

ANALYSIS GROUP, INC.

**Exhibit "F"**
**82**

*Confidential*

identified by Dr. Kriegler and then obtaining the total dollar bail amounts for each inmate by summing the bail amounts across all charges in the Arrest Charge dataset for each inmate and then dividing by 100 reveals that 49.1% of the inmates in Dr. Kriegler's putative No-Money Bail Class (Federal) and 50.3% of the inmates in Dr. Kriegler's putative No-Money Bail Class (California §52.1) have bail amounts greater than $25,000. In other words, by ignoring the bail amount variable in the Arrest Charge dataset, Dr. Kriegler reports class sizes for the putative No-Money Bail Classes which are approximately double what they should be.  As shown in **Table 2**, I find that using Dr. Kriegler's methodology and properly excluding inmates with bail amounts in excess of $25,000 leads to counts of 4,652 and 2,998 for the Federal and California No-Money Bail Classes, respectively, as compared to Dr. Kriegler's estimates of 9,197 and 6,052.

**Table 2**
**Number of Periods of Incarceration**
**No-Money Bail Federal and California Classes**

| | Class Period | Number of Periods of Incarceration per Dr. Kriegler's Table 1 | Number of Periods of Incarceration, Removing Inmates with Bail Greater Than $25,000 | Percentage Overstatement by Dr. Kriegler |
|---|---|---|---|---|
| No-Money Bail Class (Federal) | 10/19/2010 - Present Day | 9,197 | 4,652 | 98% |
| No-Money Bail Class (California §52.1) | 11/7/2011 - Present Day | 6,052 | 2,998 | 102% |

**Sources:** AJIS database; Kriegler Declaration.

51. A few examples of inmates Dr. Kriegler incorrectly includes in his No-Money Bail Classes are given in **Table 3.**  The first inmate, booking number 2778591, has a bail amount over $25,000 for one charge (assault with a deadly weapon) alone, making this inmate inappropriate to include in the putative No-Money Bail Classes.  The second inmate, booking number 3006290, has five different charges, all of which are under $25,000 but sum to an amount over $25,000.  Like the first example, this inmate should not be included in the putative No-Money Bail Classes.  Both of these examples demonstrate the need to use the bail amount variable from the Arrest Charge dataset in order to determine potential members of the putative No-Money Bail Classes.  By failing to consider this variable, Dr. Kriegler approximately doubles the size of the putative No-Money Bail Classes by including inmates which undoubtedly do not belong in the putative classes.

**Exhibit "F"**
83

*Confidential*

**Table 3**

**Examples Of Erroneous Inmates in Dr. Kriegler's No-Money Bail Classes**

| Booking Number | Arrest Charge | Arrest Charge Description[1] | Arrest Charge Level | Arrest Charge Bail | Actual Bail Amount |
|---|---|---|---|---|---|
| 2778591 | 245(A)(1)PC | Assault with a Deadly Weapon | M | 3000000 | $30,000 |
| 2778591 | 23152(A)VC | Driving Under Influence of Alcohol and/or Drugs | M | 1000000 | $10,000 |
| | | | | **Total Bail** | **$40,000** |
| 3006290 | 148(A)(1)PC | Interfere with a Police Officer | M | 1000000 | $10,000 |
| 3006290 | 23152(A)VC | Driving Under Influence of Alcohol and/or Drugs | M | 500000 | $5,000 |
| 3006290 | 23152(B)VC | Driving Under Influence of Alcohol and/or Drugs - One Prior Conviction Within 10 Years | M | 500000 | $5,000 |
| 3006290 | 12500(A)VC | Unlawful to Drive Unless Licensed (No License) | M | 10000 | $100 |
| 3006290 | 23103(A)VC | Reckless Driving | M | 500000 | $5,000 |
| | | | | **Total Bail** | **$25,100** |

**Notes and Sources:**
[1] Arrest Charge Description was populated using "2016 Bail Schedule for Infractions and Misdemeanors," https://www.lacourt.org/division/criminal/pdf/misd.pdf, accessed June 2016.
[2] All variables except Arrest Charge Description were pulled or calculated from the Arrest Charge dataset in the AJIS database.

Exhibit "F"
84
ANALYSIS GROUP, INC.

*Confidential*

52. As discussed in section VII.F above, there are a number of reasons why a person may be held even if their aggregate bail amount is less than $25,000.  Therefore, the figures I provided above likely include individuals that were held for reasons other than an ICE hold.

### H.    Dr. Kriegler's Analysis of the Length of Time People With ICE Holds and Only Misdemeanors For Which Other People are Arrested and Released on the Same Day Includes Several Groups of People That Should Be Omitted

53. In his analysis of the length of time that inmates with ICE holds and only misdemeanor charges for which other people were arrested and released on the same day, Dr. Kriegler identified 9,105 inmates.[64]  I do not have access to the programs Dr. Kriegler's used to produce his results and I have not been able replicate his analysis.  Based on my replication, however, I find far fewer inmates with misdemeanor charges and ICE holds than Dr. Kriegler.  My comments related to Dr. Kriegler's analysis are based on the analysis he describes in his report and what I understand he did based on my attempt to replicate his work.

54. Based on Dr. Kriegler's description of his analysis, he failed to exclude or control for three important groups of people.[65]  The first group is people with aggregate bail amounts in excess of $25,000.  As discussed above in section VII.G, I find that approximately half of the people Dr. Kriegler determined were in the putative No-Money Bail Class in reality had aggregate bail amounts in excess of $25,000.  Based on the number of people Dr. Kreiger reports in his analysis, he has included these people in his analysis.  The second group is people that would have been held even if they had not had an ICE hold because they were subject to one of the exceptions to the LASD policy of releasing people with aggregate bail amounts of less than $25,000.  For example, they may have been intoxicated.  This group of people is discussed in more detail above in section VII.F.  The third group is people that were sentenced and served time.  Dr. Kriegler appears to include the entire period an inmate was held in LASD custody from arrest to release.  Given Dr. Kriegler is attempting to evaluate the length of time that a person is held due to an alleged failure to release the individual on bail on the day they were booked, it is incorrect to consider the time the individual was serving time.  Dr. Kriegler should have either excluded these people from his analysis or excluded from his analysis the period of time following the inmate's conviction.

---

[64] Kriegler Declaration, ¶ 32 and Exhibit 5.

[65] Kriegler Declaration, ¶ 32-33.

ANALYSIS GROUP, INC.

**Exhibit "F"**
**85**

*Confidential*

55. When I attempt to replicate Dr. Kriegler's analysis and exclude inmates held with aggregate bail amounts in excess of $25,000, I find only 2,149 inmates. If I then exclude inmates that were sentenced, the number falls to 1,742.

Signed on the 28th day of June, 2016, at Los Angeles, CA

ANALYSIS GROUP, INC.

**Exhibit "F"**

86

*Confidential*

# APPENDIX A

## MARK A. GUSTAFSON
### Vice President

Phone:  (213) 896-4563                                                                      333 South Hope Street
Fax:  (213) 623-4112                                                                               27th Floor
mgustafson@analysisgroup.com                                                      Los Angeles, CA 90071

Mr. Gustafson applies his expertise in economics, econometrics, and modeling to litigation, complex business issues, and the analysis of public policy issues. He has worked extensively in the areas of commercial damages, health care, insurance, finance, intellectual property, and class actions.

He has provided deposition and trial testimony relating to retirement benefits and employment compensation, and he has critiqued plaintiffs' proposed damages formula in several class actions. His recent case work has involved evaluating plaintiff's damage claim in a wrongful termination matter, assessing claims of excessive investment fees in corporate 401(k) defined contribution plans, analyzing health insurance claims to identify instances of inappropriate billing by hospital providers, and auditing risk-pool reconciliations that set the level of at-risk payments to a hospital group and its physician partners. Mr. Gustafson has explored economic issues associated with a wide range of insurance products, including disability, health, life, product liability, and property insurance, as well as variable annuities. He has also conducted numerous lost profit analyses in the context of intellectual property and commercial damage engagements.  Additionally, he has extensive experience assembling and analyzing large, proprietary data sets common in insurance and health care engagements.

Mr. Gustafson is a coauthor of "Use of Statistical Sampling in Litigation" and "Expert Analysis of Class Certification Issues," both in the 5th Edition of the *Litigation Services Handbook*. He is also the coauthor of a paper investigating the post-stop actions taken by officers of the Los Angeles Police Department to determine if the observed behavior was consistent with racial profiling.

Prior to joining Analysis Group, Mr. Gustafson was the business manager in Tokyo for an international nonprofit. He also taught economics as a course assistant at Harvard University's John F. Kennedy School of Government.

## EDUCATION

M.P.P.                          Kennedy School of Government, Harvard University

B.A.                            Business Economics and Political Science, University of California, Los Angeles

## PROFESSIONAL EXPERIENCE

2000 – Present          Analysis Group, Los Angeles, CA and Boston, MA

1999 – 2000             Research Assistant, Harvard Institute for International Development, Harvard University, Cambridge, MA

1998 – 1999             Course Assistant, Kennedy School of Government, Harvard University, Cambridge, MA

ANALYSIS GROUP, INC.

**Exhibit "F"**
87

*Confidential*

## DESIGNATIONS AND TESTIFYING EXPERIENCE

▪ **Hunter's Run et al. v. WCA**
Submitted expert report on behalf of the defendant analyzing plaintiff's expert's damage claims.

▪ **David Couch v. Morgan Stanley & Co., Incorporated and Morgan Stanley Smith Barney, LLC**
Submitted expert report on behalf of the defendant analyzing plaintiff's expert's damage claims and providing an alternative damage analysis related to plaintiff's alleged wrongful termination.

▪ **Stevenson v. The Bank of New York**
Provided deposition and trial testimony related to retirement benefits and employment compensation due to plaintiff resulted from the Bank's alleged failure to continue to accrue retirement benefits while the plaintiff was seconded to an affiliated bank and alleged failure to reemploy the plaintiff following the end of his service with the affiliated bank.

▪ **Guillory et al v. County of Los Angeles**
Submitted declaration analyzing plaintiffs' class wide damages due to alleged improper administration of the County's general relief welfare program.

▪ **Prime Healthcare Cases**
Submitted declaration related to Defendant's identification and analysis of Plaintiff's disputed hospital claims.

▪ **In re. Urethane Antitrust Litigation**
Submitted three declarations analyzing plaintiffs' expert's damage model to demonstrate that portions of the class either had zero or negative damages.

▪ **Willingham v. Life Partners, Inc.**
Authored rebuttal report analyzing plaintiff's proposed class wide damage model submitted in support of certification for a putative class of investors in life settlements.

▪ **Kaiser v. Vanguard**
Designated to analyze health care claims data used by a statistical expert to estimate damages in a payer/provider dispute.

## SELECTED CASE ASSIGNMENTS

### Class Certification

▪ **Elkind and Rose et al. v. Revlon Consumer Products Corporation** (October 2015 to date)
Supported expert rebutting plaintiff's claim that Revlon's use of the term DNA Advantage was false and misleading.

▪ **Yaeger et al. v. Subaru of America, Inc. and Fuji Heavy Industries, Ltd.** (September 2014 to June 2015)
Estimated exposure in support of settlement negotiations related to claims of excess oil consumption for certain Subaru vehicles.

ANALYSIS GROUP, INC.

**Exhibit "F"**
**88**

*Confidential*

- **Coba et al. v. Ford Motor Company** (May 2014 to date)
  Analyzed plaintiff's claim of excess depreciation related to F-series and E-series Ford vehicles related to fuel tank delamination.

- **Guillory et al. v. County of Los Angeles** (June 2013 to October 2014)
  Submitted declaration analyzing plaintiffs' class wide damages due to alleged improper administration of the County's general relief welfare program.

- **Margie Daniel, et al. v. Ford Motor Company** (November 2012 to May 2013)
  Estimated excess depreciation experienced by owners of the Ford Focus resulting from an allegedly defective suspension system and evaluated claims of premature tire wear.

- **Zakskorn, et al. v. American Honda Motor Co. Inc.** (July 2012 to February 2013)
  Estimated excess depreciation experienced by owners of accused Honda vehicles resulting from an allegedly defective braking system.

- **Charlotte Phillips, et al. v. WellPoint Inc.** (August 2011 - March 2012)
  Supported expert rebutting plaintiff's proposed damages model related to RightCHOICE's withdrawal from the Illinois insurance market.

- **Karen Herbert, et al. v. Endemol USA, Inc.** (June 2011)
  Estimated the response rate for proposed class action settlement.

- **Diaz v. First American Home Buyers Protection Corp.** (November 2010 - July 2011)
  Supported expert rebutting plaintiff's proposed damages model related to First American's alleged failure to honor its home warranties.

- **Multiple Class Actions v. KIA Motors America, Inc.** (March 2005 - July 2005)
  Estimated excess depreciation experienced by owners of the Kia Sephia resulting from an allegedly defective braking system.

- **Class Actions v. Monsanto Co. et al.** (2002)
  Analyzed the level of heterogeneity between members of a proposed class in price fixing case.

**Commercial Damages**

- **Franchisee Lawsuits/Arbitrations v. United Parcel Service et al.** (July 2006 - January 2008)
  Investigated the reasons and information analyzed to support the decision to rebranding Mail Box Etc. as The UPS Store.

- **Caruso Affiliated Holdings, LLC v. General Growth Properties, Inc. and GGP/Homart II, LLC** (November 2005 - November 2007)
  Analyzed plaintiffs' damage claim for construction delay and lost income damages resulting from the alleged delay in construction of the Americana At Brand due to alleged misconduct by General Growth Properties, Inc. and GGP/Homart II, LLC.

- **Sargon Enterprises Inc., v. University of Southern California et al.** (January 2007 - August 2007)

**Exhibit "F"**
**89**

*Confidential*

Analyzed plaintiffs' damage claim for lost profits in the dental implant business stemming from the defendants' failure to properly conduct a clinical trial.

- **Take It Away, Inc. v. Home Depot, Inc.** (October 2006 - January 2007)
  Reviewed and critiqued plaintiff's business model and profit forecasts that formed the basis of its damage claim.

- **Eldorado Stone, LLC and Eldorado Stone Operation, LLC v. Renaissance Stone, Inc. et al.** (August 2006 - July 2004)
  Assisted expert in rebutting plaintiff's statistical expert's testimony related to the probability that the defendant could have obtained certain stone colors by random chance.

- **Vought Aircraft Industries, Inc. v. Gulfstream Aerospace Corp.** (March 2006 - June 2006)
  Estimated the value of redesigning the manufacturing process for Gulfstream jets and the effect on the sale of Gulfstream jets.

## Intellectual Property

- **TracBeam LLC v. Google, Inc.** (May 2013 – May 2014)
  Supported expert analyzing the Google's alleged use of TracBeam's device location identification patent.

- **Capital Funding Group Inc. v. Walker & Dunlop LLC** (November 2010 - June 2012)
  Supported expert analyzing the defendant's use of Capital Funding Group's proprietary information.

- **Grunstein, et al. v. Silva, et al.** (September 2012 - January 2013)
  Supported expert analyzing the defendant's use of plaintiff's proprietary information.

- **Konami Digital Entertainment, Inc. and Konami Corporation v. Vintage Sports Cards Inc; The Upper Deck Company, a California Corporation; and The Upper Deck Company, a Nevada Corporation** (July 2009 - March 2010)
  Calculated lost profit and disgorgement damages resulting from counterfeiting of Yu-Gi-Oh! trading card game cards by Upper Deck.

- **L-3 Communications Integrated Systems v. Lockheed Martin Corporation** (2008 - 2010)
  Reviewed and rebutted plaintiffs damages claim stemming from L-3's claim that Lockheed Martin violated the Sherman Act in claiming that only Lockheed Martin had the rights to perform refurbishment services for P-3 "Orion" military aircraft for foreign powers. The analysis included examining the impact of Lockheed Martin's alleged actions on L-3's sales related to both loss of current revenue streams and future customers, and evaluating the damages estimates submitted by L-3 Communications Integrated Systems' expert.

- **Candela Corporation v. Palomar Medical Technologies, Inc.** (December 2007 - September 2008)
  Estimated lost profits and reasonable royalty for the wrinkle reduction feature of medical

ANALYSIS GROUP, INC.

**Exhibit "F"**
**90**

*Confidential*

lasers.

- **AllCare Health Management System Inc. v. Highmark, Inc.** (December 2007 - September 2008)
  Estimated reasonable royalty for a system allowing computerized adjudication and payment of physician claims.

- **Dial Industries, Inc. v. Lipper International, Inc.** (May 2006 - October 2006)
  Estimated reasonable royalty for the expandable feature of expandable drawer organizers.

- **Altnet, Inc. et al. vs. Recording Industry Association of America et al.** (March 2006 - April 2006)
  Estimated reasonable royalty for an internet file sharing protocol.

- **Rent Information Technology v. The Home Depot** (January 2006 - May 2006)
  Analyzed issues related to damages for alleged theft of trade secret.

- **Israeli Bio-Engineering Project v. Amgen** (2003 - December 2005)
  Determined reasonable royalty for Amgen's alleged infringement of Israeli Bio-Engineering Project's patent related to tumor necrosis factor binding protein II.  Supported rebuttal of opponent's damages expert.

- **Confidential Patent Infringement Litigation** (September 2005 - November 2005)
  Analyzed issues related to reasonable royalty for alleged infringement of patent covering traffic cones.

- **Confidential Patent Infringement Litigation** (June 2005 - September 2005)
  Analyzed issues related to alleged infringement of patent in the biotechnology field.  Assisted counsel in successful settlement negotiations.

- **Confidential Negotiations** (April 2005 - May 2005)
  Estimated reasonable royalty for patent related to internet dating to support client in negotiation with alleged infringer.

- **Shell & Slate Software v. Adobe Systems** (November 2003 - December 2004)
  Calculated disgorgement of profits and reasonable royalty for alleged theft of trade secrets concerning digital photo manipulation.

## Employment

- **Rosario J. Lopez v. PVH Neckwear, Inc. at al.**  (February 2016 – March 2016)
  Estimated damages and potential exposure related to claim of pregnancy discrimination and wrongful termination.

- **David Couch v. Morgan Stanley & Co., Incorporated and Morgan Stanley Smith Barney, LLC** (March 2015 – to date)
  Submitted expert report on behalf of the defendant analyzing plaintiff's expert's damage claims and providing an alternative damage analysis related to plaintiff's alleged wrongful termination.

ANALYSIS GROUP, INC.

**Exhibit "F"**
**91**

*Confidential*

- **Stevenson v. The Bank of New York** (August 2011 - January 2013)
  Provided deposition and trial testimony related to retirement benefits and employment compensation due to plaintiff.

- **Nancy Sweet v. United Parcel Service** (July 2010)
  Analyzed time records to determine whether the FLSA Motor Carrier Exemption applied in these wage and hour matters.

- **Confidential Criminal Investigation** (May 2006 - June 2006)
  Investigated claims by the United States government of illegal employment practices during a lockout.

- **Confidential Wrongful Termination Litigation** (June 2005)
  Investigated lost earnings damages related to an alleged wrongful termination of an employee and damages related to an alleged breach of contract and fiduciary duty.

- **Class Action v. McDonnell Douglas** (January 2003)
  Assisted in estimation of individual damages to approximately 1,100 terminated class members.

- **Confidential Executive Compensation Litigation** (2001)
  Estimated the value of a Parisian employee stock option using Monte Carlo simulation to evaluate the claim that executive compensation post-merger violated their pre-merger employment agreement.

- **Confidential Corporate Reorganization** (2001)
  Analyzed the impact of a reduction in force on protected classes in the utility industry.

## Insurance

- **Willingham v. Life Partners, Inc.** (July 2012 to February 2014)
  Authored rebuttal report analyzing plaintiff's proposed class wide damage model submitted in support of certification.

- **Redwood Health Services, v. Anthem Blue Cross Life and Health Insurance Company** (November 2012 - February 2013)
  Critiqued plaintiff's lost profit damage model resulting from Anthem's allegedly improper termination of a high deductible insurance product and its prohibition of wrapping in the mid-sized group market.

- **Best Buy Co., Inc. v. Developers Diversified Realty** (November 2006 - July 2010)
  Supported testifying expert in analysis of insurance costs applicable to common areas of retail developments.

- **Confidential Insurance Remediation** (March 2005 - January 2010)
  Consulted with international insurance company related to remediation of alleged failure to annuitize variable annuity products according to the contract.

- **Barnes & Noble v. DDR** (May 2005 - April 2006)
  Supported testifying expert in analysis of insurance costs applicable to common areas of retail developments.

ANALYSIS GROUP, INC.

**Exhibit "F"**

92

- **Confidential Asbestos Litigation** (September 2001 - June 2003)
  Consulted with a large property insurance company to assist them in determining their potential asbestos exposure to support arbitration negotiations with asbestos manufacturers. Designed and implemented detailed review of over 500 individual asbestos case files.

- **Confidential Regulatory Investigation** (August 2001 - May 2003)
  Worked with insurance company and outside actuaries to quantify the number of affected policies and financial implications of alleged violation of IRS rules related to whole life insurance products. Aggregated data for both active and legacy systems containing over 80 million records.

- **Class Action v. Knights of Columbus** (2001 - June 2004)
  Assisted economic expert for the Knights of Columbus in a major sales practices litigation involving over 500,000 policyholders. Estimated the damage to policyholders under alternative theories of liability, including development of computer-based policy performance models.

- **Confidential Disability Insurance Sales Practices Litigation** (September 2000 - December 2002)
  Supported consulting expert for issues related to the sale and product performance of individual disability insurance policies. Designed and implemented large data abstracting effort involving almost 1.5 million claim and policy records and 17 million accounting records for the insurance company defendant and assisted in the development of a settlement for tens of thousands of policyholders.

<u>**Healthcare**</u> (litigation and non-litigation assignments)

- **Bodner and Felker et al. v. Blue Shield of California Life and Health Insurance Company** (October 2015 to date)
  Supported multiple experts addressing issues of class certification, damages, and availability of policies with certain plan designs during the period 2008 to 2012.

- **Prime Healthcare Cases** (November 2008 to date)
  Submitted declaration related to Defendant's identification and analysis of Plaintiff's disputed hospital claims.

- **Washington State Hospital Association** (July 2011 to date)
  Consulted with the Washington State Hospital Association related to the Hospital Safety Net Assessment.

- **Allegheny General Hospital v. UPMC Health Plan** (April 2009 to date)
  Supported damages expert in payer/provider dispute brought under Pennsylvania's Act 68.

- **Accountable Health Care IPA and Accountable Health Care MSO v. Memorial Hospital of Gardena et al.** (December 2012 - March 2013)
  Supported expert in replicating risk pool reconciliations that were the basis for at-risk payments to Accountable Health Care IPA and Memorial Hospital of Gardena.

**Exhibit "F"**
ANALYSIS GROUP, INC.
93

*Confidential*

- **Premera Blue Cross v. MultiCare Health System** (September 2012 - December 2012)
  Estimated actual change in reimbursements to MultiCare Health System following an allegedly revenue neutral transition to an APC payment methodology.

- **CareCentrix v. Apria Healthcare Group** (June 2012 - September 2012)
  Supported expert in benchmarking the rate of increase in Apria's billed charges for particular services against rates of increases for similar services offered by other providers.

- **Jane Kakkis, M.D. v. Breastlink Medical Group, Inc.** (January 2011 - May 2011)
  Reviewed and critiqued method used by employer health plan in setting employee health insurance compensation rates in support of expert rebutting plaintiffs' damages claim.

- **Ned-Sthran v. Methodist Hospitals of Dallas, et al.** (January - April 2009)
  Reviewed and critiqued method used by employer health plan in setting employee health insurance compensation rates in support of expert rebutting plaintiffs' damages claim.

- **Confidential White Paper** (April - October 2008)
  Assisted academic affiliate in drafting white paper on the level of competition in a specific hospital market to assist hospital in obtaining a certificate of need from state regulators.

- **Kimberly Gandy-Quinn vs. Blue Shield of California et al.** (May - June 2008)
  **Twilla and Martin Willey vs. Blue Shield of California et al.** (May - June 2008)
  Supported three defense experts opining on damages, National Committee for Quality Assurance standards, and the appropriateness of capitation, respectively. Both cases resulted in favorable settlements for Blue Shield.

- **Confidential Pharmaceutical Engagement** (September 2007)
  Estimated the impact of possible regulatory changes on the profitability of a large pharmaceutical company for use in its long-range planning.

- **Confidential White Paper** (April 2006 - April 2007)
  Estimated the extent to which underpayment of Medicaid claims affects the cost of commercial insurance in California and the subsequent number of people who are therefore unable to afford coverage.

- **Thu-Hang Tran, Pharm.D., et al. vs. Orange County Health Authority, et al.** (2006)
  **Guy Nguyen, R.Ph., et al. vs. Orange County Health Authority, et al.** (2006)
  Consulted on alleged damages resulting from the temporary suspension of plaintiff pharmacies from Cal-Optima's Medi-Cal drug reimbursement program.

- **John Muir Medical Center v. Health Net, Inc.** (July 2005 - May 2006)
  Evaluated whether inflation in hospital charges exceeded the amount allowed in a provider services contract.

- **U.S. Department of Justice v. Tenet Healthcare Corporation** (July 2003 - January 2005)
  Assisted the Department of Justice in investigating billing irregularities by select Tenet hospitals. Implemented sampling plan developed by sampling expert to determine the rate of billing errors from a random sample of hospital detailed bills. Managed audit of selected detailed bills. Tenet settled with the Department of Justice for more than $900 million.

ANALYSIS GROUP, INC.

**Exhibit "F"**
**94**

*Confidential*

- **In Re: Managed Care Litigation** (August 2003 - January 2005)
  Supported health insurance company in litigation involving allegations of improper claim adjudication and late payment.  Analyzed over 500 million records for more than 100 million unique claims.

- **Drug Cost Effectiveness Paper** (2001)
  Drafted paper on the cost effectiveness of rHu-EPO in the treatment of anemia.

- **Drug Study of rHu-EPO** (2001)
  Analyzed results of drug study to assess the effectiveness of rHu-EPO to alleviate anemia.

## Valuation

- **Marshall Hospital v. Eliot R. Drell, M.D. et al.** (July 2006 - December 2006)
  Valued a single specialty, gastroenterology ambulatory surgery center for an arbitration between the general and limited partners.

- **Peter Vagenas vs. Demeterios Kefallinos et al.** (September 2006 - December 2006)
  Valued two-location hamburger restaurant for a lawsuit between business partners.

## Securities/Finance

- **City of Burlington, VT v. Morgan Stanley** (February 2011 - March 2011)
  Supported expert who evaluated whether Morgan Stanley execution costs were excessive and rebutted plaintiffs' damage claim.

- **Robin E. Figas v. Wells Fargo & Company et al.** (August 2010 - March 2011)
  Supported expert who evaluated allegations that the fees for certain investment options available in the Wells Fargo 401(k) Plan were excessive and rebutted plaintiffs' damage claim.

- **David v. Alphin** (January 2010 - August 2010)
  Supported expert who evaluated allegations that the fees for certain investment options available in the Bank of America 401(k) Plan were excessive and rebutted plaintiffs' damage claim.

- **Compudyne Corp., et al. vs. Hilary L. Shane et al.** (May 2006 - November 2006)
  Investigated defendant's profit from short selling in advance of a PIPE placement.

- **Securities & Exchange Commission v. Henry Yuen et al.** (November 2004 - December 2005)
  Provided consulting support on liability issues related to revenue recognition and market acceptance of a new interactive programming guide offered by Gemstar-T.V. Guide International.

- **Internet Law Library v. Southbridge Capital, LLC** (2003)
  Investigated claims of alleged stock price manipulation by a hedge fund.

**Exhibit "F"**
ANALYSIS GROUP, INC.
95

*Confidential*

## Government / Public Policy

- **City of Los Angeles** (January 2006 - July 2006)
  Analyzed factors influencing post-stop sanctions by the Los Angeles Police Department to determine if observed officer behavior was consistent with racial profiling.

- **California State Auditor** (October 2003 - February 2004)
  Consulted with the California State Auditor's office to support their review of a decision by CalPERS to limit the hospital network available to health plan enrollees.

- **Review of California Proposition 79** (September 2005)
  Analyzed the impact of Proposition 79 on the California economy and coauthored final report.

- **Economic Impact of Federal Participation in Terrorism Risk** (May 2004 - September 2004)
  Contributed to study with Professor Glenn Hubbard, former Chair of the Council of Economic Advisers. Study focused on the economic impact of the Federal TRIA terrorism legislation and the economic impact of failing to renew the legislation. Study commissioned by numerous insurance trade organizations.

## Utilities

- **Federal Energy Regulatory Commission Assistance** (October 2003)
  Simulated the California electricity generation market to identify generator profits under different assumptions.

## PUBLICATIONS AND PRESENTATIONS

"Expert Analysis of Class Certification Issues" (with Chris Chorba, Lee Heavner, and Peter Simon), in *Litigation Services Handbook: The Role of the Financial Expert, 5th Edition*, Roman L. Weil (Ed.), Wiley New York. 2012.

"Use of Statistical Sampling in Litigation" (with Peter Simon), in *Litigation Services Handbook: The Role of the Financial Expert, 5th Edition*, Roman L. Weil (Ed.), Wiley New York, 2012.

"Economic Analysis of Reductions-in-Force and Pay Equity" (with Flavia Bainbridge and Debo Sarkar), in *Litigation Services Handbook: The Role of the Financial Expert, 2011 Cumulative Supplement, 4th Edition*, Roman L. Weil (Ed.), Wiley New York, 2011.

"Use of Statistical Sampling in Litigation" (with Peter Simon), in *Litigation Services Handbook: The Role of the Financial Expert, 2011 Cumulative Supplement, 4th Edition*, Roman L. Weil (Ed.), Wiley New York, 2011.

"Combating STAT Abuse," *Law360*, March 23, 2010.

"Use of Statistical Sampling in Litigation" (with Peter Simon), in *Litigation Services Handbook: The Role of the Financial Expert, 2009 Cumulative Supplement, 4th Edition*, Roman L. Weil (Ed.), Wiley New York, 2009.

"Challenges in RIF Analyses," (with Debo Sarkar), *Law360*, March 29, 2009.

ANALYSIS GROUP, INC.

Exhibit "F"
96

*Confidential*

"How to Analyze Terabytes of Data with a Word," presented at the *Western Users of SAS Software Conference*, September 2006.

"Dynamic Code Creation Using Call Symput and the SAS Macro Language," presented at the *Western Users of SAS Software Conference*, September 2006.

"Pedestrian and Motor Vehicle Post-Stop Data Analysis Report," (with Geoffrey Alpert, Elizabeth Becker, Alan Meister, Michael Smith, and Bruce Strombom) presented to the City of Los Angeles, July 2006.

 "A Hybrid Approach to Valuing American Barrier and Parisian Options," (with Gaurav Jetley) presented at the *Conference on Computational Finance & Its Applications*, April 2004.

"Cost Effectiveness of rHuEPO in Oncology," (with Pierre-Yves Cremieux, Ellison Dial, Brenda Sarokhan, and Mitch Slavin), in *Recombinant Human Erythropoietin (rhEPO) in Clinical Oncology: Scientific and Clinical Aspects of Anemia in Cancer*, M.R. Nowrousian (Ed.), SpringerWien New York, 2002.

Contributed to "California Public Employees' Retirement System: It Relies Heavily on Blue Shield of California's Exclusive Provider Network Analysis, an Analysis That is Reasonable in Approach but Includes Some Questionable Elements and Possibly Overstates Estimated Savings," California State Auditor, March 2005.

## PROFESSIONAL MEMBERSHIPS

American Economic Association

American Bar Association

American Society of Health Economists

International Health Economics Association

Society of Labor Economists

American Risk and Insurance Association

ANALYSIS GROUP, INC.

Exhibit "F"
97

*Confidential*

# APPENDIX B

## DOCUMENTS CONSIDERED

**Expert Declarations and Reports**

Declaration of Brian Kriegler, Ph. D. in Support of Plaintiffs' Motion for Class Certification, May 9, 2016

**Legal Filings Related to This Matter**

Complaint for Injunctive Relief and Declaratory Relief and Damages, October, 19, 2012

**Depositions**

Deposition of Gergory Sivard, April 21, 2016 and associated exhibits

**Publically Available Documents**

"Who We Are," https://www.ice.gov/about

Google Maps, https://www.google.com/maps

"2016 Bail Schedule for Infractions and Misdemeanors," https://www.lacourt.org/division/criminal/pdf/mids.pdf

"2016 Felony Bail Schedule," https://www.lacourt.org/division/criminal/pdf/felony.pdf

"Information Bulletin: Responsibilities of Local Law Enforcement Agencies under Secure Communities and the TRUST Act," http://oag.ca.gov/sites/all/files/agweb/pdfs/law_enforcement/14-01_le_info_bulletin.pdf

**Other Case Documents**

Automated Justice Information System data

Jail Information Management Systems data

Telephone conversation with Greg Sivard, June 16, 2016

Telephone conversation with Greg Sivard, June 27, 2016

IMOVE File Definitions.pdf

Non IMOVE File Definitions.pdf

Case_Dispositions.txt

Release_Codes.txt

ANALYSIS GROUP, INC.

**Exhibit "F"**

**98**

*Confidential*

## Exhibit 1
## Distribution of Days Held Beyond the Expected Exit Date for Inmates Subject to ICE Holds
*October 19, 2010 - December 31, 2013*
*Adjusted for Holidays and Weekends*

| | SPON ICE Holds | | | | | SENTREL ICE Holds | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| Days After Expected Exit Date | Share of Releases per Dr. Kriegler's Exhibit 4 | Cumulative Share of Releases per Dr. Kriegler's Exhibit 4 | Adjusted Share of Releases | Adjusted Cumulative Share of Releases | Cumulative Share Understated by Dr. Kriegler (4) - (2) | Share of Releases per Dr. Kriegler's Exhibit 4 | Cumulative Share of Releases per Dr. Kriegler's Exhibit 4 | Adjusted Share of Releases | Adjusted Cumulative Share of Releases | Cumulative Share Understated by Dr. Kriegler (9) - (7) |
| 0 Days | 0.4% | 0.4% | 0.3% | 0.3% | -0.1% | 13.8% | 13.8% | 13.8% | 13.8% | 0.0% |
| 1 Day | 2.0% | 2.4% | 3.6% | 3.9% | 1.5% | 21.6% | 35.4% | 29.9% | 43.7% | 8.3% |
| 2 Days | 36.6% | 39.0% | 58.2% | 62.2% | 23.2% | 27.0% | 62.4% | 39.9% | 83.6% | 21.2% |
| 3 Days | 20.9% | 59.9% | 30.4% | 92.6% | 32.7% | 18.9% | 81.3% | 12.8% | 96.4% | 15.1% |
| 4 Days | 19.0% | 78.9% | 5.2% | 97.7% | 18.8% | 10.4% | 91.7% | 2.4% | 98.8% | 7.1% |
| 5 Days | 13.4% | 92.3% | 1.1% | 98.9% | 6.6% | 5.2% | 96.9% | 0.5% | 99.3% | 2.4% |
| 6 Days | 4.8% | 97.1% | 0.4% | 99.3% | 2.2% | 1.7% | 98.6% | 0.2% | 99.5% | 0.9% |
| 7 Days | 1.6% | 98.7% | 0.2% | 99.5% | 0.8% | 0.6% | 99.2% | 0.1% | 99.6% | 0.4% |
| 8 Days | 0.5% | 99.2% | 0.1% | 99.6% | 0.4% | 0.1% | 99.3% | 0.0% | 99.6% | 0.3% |
| 9 Days | 0.2% | 99.4% | 0.0% | 99.6% | 0.2% | 0.1% | 99.4% | 0.1% | 99.7% | 0.3% |
| 10 Days | 0.1% | 99.5% | 0.0% | 99.6% | 0.1% | 0.2% | 99.6% | 0.0% | 99.7% | 0.1% |
| 11-20 Days | 0.3% | 99.8% | 0.2% | 99.8% | 0.0% | 0.2% | 99.8% | 0.1% | 99.8% | 0.0% |
| 21-30 Days | 0.1% | 99.9% | 0.0% | 99.9% | 0.0% | 0.0% | 99.8% | 0.1% | 99.9% | 0.1% |
| 31-40 Days | 0.0% | 99.9% | 0.0% | 99.9% | 0.0% | 0.1% | 99.9% | 0.0% | 99.9% | 0.0% |
| 41-50 Days | 0.0% | 99.9% | 0.0% | 99.9% | 0.0% | 0.0% | 99.9% | 0.0% | 99.9% | 0.0% |
| 51-60 Days | 0.0% | 99.9% | 0.0% | 99.9% | 0.0% | 0.0% | 99.9% | 0.0% | 100.0% | 0.1% |
| 61-70 Days | 0.0% | 99.9% | 0.0% | 99.9% | 0.0% | 0.0% | 99.9% | 0.0% | 100.0% | 0.1% |
| 71-80 Days | 0.0% | 99.9% | 0.0% | 99.9% | 0.0% | 0.0% | 99.9% | 0.0% | 100.0% | 0.1% |
| 81-90 Days | 0.0% | 99.9% | 0.0% | 99.9% | 0.0% | 0.0% | 99.9% | 0.0% | 100.0% | 0.1% |
| 91-100 Days | 0.0% | 99.9% | 0.0% | 99.9% | 0.0% | 0.0% | 99.9% | 0.0% | 100.0% | 0.1% |
| 101+ Days | 0.1% | 100.0% | 0.1% | 100.0% | 0.0% | 0.0% | 99.9% | 0.0% | 100.0% | 0.1% |

**Sources:** AJIS Database; Exhibit 4, Declaration of Brian Kriegler, Ph. D. in Support of Plaintiffs' Motion for Class Certification, May 9, 2016.

**Exhibit "F"**

ANALYSIS GROUP, INC.

*Confidential*

**Exhibit 2**
**Cumulative Distribution of Days Held Beyond the Expected Exit Date for Inmates Subject to ICE Holds, By Time Period**
*Adjusted for Holidays and Weekends*

| | SPON ICE Holds | | | | SENTREL ICE Holds | | | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Days After Expected Exit Date | Cumulative Share of Releases per Dr. Kriegler's Exhibit 4: October 19, 2010 through December 31, 2013 | Period 1 Cumulative Adjusted Share of Releases: October 19, 2010 - October 31, 2012 | Period 2 Cumulative Adjusted Share of Releases: November 1, 2012 - May 31, 2014 | Period 3 Cumulative Adjusted Share of Releases: June 1, 2014 - Date of Data Production | Cumulative Share of Releases per Dr. Kriegler's Exhibit 4: October 19, 2010 through December 31, 2013 | Period 1 Cumulative Adjusted Share of Releases: October 19, 2010 - October 31, 2012 | Period 2 Cumulative Adjusted Share of Releases: November 1, 2012 - May 31, 2014 | Period 3 Cumulative Adjusted Share of Releases: June 1, 2014 - Date of Data Production |
| 0 Days | 0.4% | 0.4% | 0.6% | 10.9% | 13.8% | 14.0% | 17.5% | 42.8% |
| 1 Day | 2.4% | 4.1% | 6.1% | 72.5% | 35.4% | 45.4% | 50.7% | 94.7% |
| 2 Days | 39.0% | 63.3% | 60.2% | 92.4% | 62.4% | 83.8% | 86.8% | 99.1% |
| 3 Days | 59.9% | 91.4% | 94.1% | 99.5% | 81.3% | 96.1% | 97.5% | 99.4% |
| 4 Days | 78.9% | 97.2% | 98.7% | 100.0% | 91.7% | 98.7% | 99.3% | 99.7% |
| 5 Days | 92.3% | 98.5% | 99.5% | 100.0% | 96.9% | 99.3% | 99.5% | 100.0% |
| 6 Days | 97.1% | 99.0% | 99.7% | 100.0% | 98.6% | 99.4% | 99.7% | 100.0% |
| 7 Days | 98.7% | 99.4% | 99.7% | 100.0% | 99.2% | 99.4% | 99.8% | 100.0% |
| 8 Days | 99.2% | 99.5% | 99.7% | 100.0% | 99.3% | 99.5% | 99.8% | 100.0% |
| 9 Days | 99.4% | 99.5% | 99.7% | 100.0% | 99.4% | 99.6% | 99.8% | 100.0% |
| 10 Days | 99.5% | 99.6% | 99.7% | 100.0% | 99.6% | 99.6% | 99.8% | 100.0% |
| 11-20 Days | 99.8% | 99.8% | 99.8% | 100.0% | 99.8% | 99.8% | 99.9% | 100.0% |
| 21-30 Days | 99.9% | 99.9% | 99.9% | 100.0% | 99.8% | 99.9% | 100.0% | 100.0% |
| 31-40 Days | 99.9% | 99.9% | 99.9% | 100.0% | 99.9% | 99.9% | 100.0% | 100.0% |
| 41-50 Days | 99.9% | 99.9% | 99.9% | 100.0% | 99.9% | 99.9% | 100.0% | 100.0% |
| 51-60 Days | 99.9% | 99.9% | 99.9% | 100.0% | 99.9% | 100.0% | 100.0% | 100.0% |
| 61-70 Days | 99.9% | 99.9% | 99.9% | 100.0% | 99.9% | 100.0% | 100.0% | 100.0% |
| 71-80 Days | 99.9% | 99.9% | 99.9% | 100.0% | 99.9% | 100.0% | 100.0% | 100.0% |
| 81-90 Days | 99.9% | 99.9% | 99.9% | 100.0% | 99.9% | 100.0% | 100.0% | 100.0% |
| 91-100 Days | 99.9% | 99.9% | 99.9% | 100.0% | 99.9% | 100.0% | 100.0% | 100.0% |
| 101+ Days | 100.0% | 100.0% | 100.0% | 100.0% | 99.9% | 100.0% | 100.0% | 100.0% |

**Note:**
[1] Each time period corresponds to a distinct change in the policies of LASD used to handle inmates subject to ICE Holds.

**Sources:** AJIS Database; Exhibit 4, Declaration of Brian Kriegler, Ph. D. in Support of Plaintiffs' Motion for Class Certification, May 9, 2016.

**Exhibit "F"**

ANALYSIS GROUP, INC.