# EXHIBIT A

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3

4    DUNCAN ROY; et al.,        )  Case No.:
                                )  CV 12-09012 BRO (FFMx)
5             Plaintiffs,       )
                                )  Consolidated with Case No.:
6        vs.                    )  CV 13-04416 BRO (FFMx)
                                )
7    COUNTY OF LOS ANGELES;     )
     et al.,                    )
8                               )
              Defendants.       )
9    _____)
     GERARDO GONZALEZ; et al., )
10                              )
              Plaintiffs,       )
11                              )
         vs.                    )
12                              )
     IMMIGRATION AND CUSTOMS    )
13   ENFORCEMENT, an entity;    )
     et al.,                    )
14                              )
              Defendants.       )
15   _____)

16

17

18                          DEPOSITION OF

19        PACIFIC ENFORCEMENT RESPONSE CENTER DIRECTOR

20                          BRIAN DEMORE

21          Wednesday, February 10, 2016; 10:00 a.m.

22                    Laguna Niguel, California

23

24

25        Reported by Wendy S. Andino, CSR No. 13004

1    Q.    And based on your knowledge of what's going on at

2    PERC currently, in a typical situation, what kind of --

3    which databases would be reviewed by the contract employee

4    and the deportation officer?

5    A.    Do you want them by name?

6    Q.    Yes.  And before you do that, let me ask you

7    this:

8        Before either a contract employee or the

9    deportation officer does anything with respect to any

10   particular possible 247 form, they have to be notified

11   by -- is it LESC? -- the potential need to do so?

12   A.    Yes.

13   Q.    Does that notification come only from LESC or

14   from some other branch of the DHS?

15   A.    Yes.  Only from the LESC.

16   Q.    And LESC is located in Burlington, Vermont?

17   A.    That's correct.

18   Q.    And how is that notification communicated to

19   PERC?

20   A.    Via a form called an IAR sent via facsimile.

21   Q.    And do you know how LESC makes the determination

22   to issue the IAR to PERC?

23   A.    I don't.  I have not worked at the LESC, so not

24   specifically.

25   Q.    Just based on what you may have heard or read, do

1    you have an understanding as to how LESC comes upon

2    whatever information it does before it sends an IAR to

3    PERC?

4            MR. WEINTRAUB:  Objection.  Calls for

5    speculation.

6            THE WITNESS:  They may or may not run a series of

7    basic checks as well.

8    BY MR. CHOI:

9        Q.   Basic checks relating to someone who has been

10   arrested by a local agency, for example?

11       A.   Correct.

12       Q.   Do you know how LESC even becomes aware of a

13   particular arrest?

14       A.   I do.

15       Q.   How is that?

16       A.   Through a biometric system.

17       Q.   Checking fingerprints?

18       A.   Yes.

19       Q.   What information -- what kind of match has to

20   happen for someone to come on to the radar of the LESC?

21       A.   So we're discussing a system we refer to as

22   interoperability.  Interoperability is a system whereby

23   after an individual is arrested by a LEA they are

24   fingerprinted.  Those fingerprints go to the FBI.  That

25   record is then compared to DHS databases.  If that

1    individual has a preexisting record within a DHS database,

2    a message is sent to the LESC.

3         Q.    A message is sent to the LESC by who?   Which

4    agency?

5         A.    Through the interoperability system.   Through the

6    computer system that we refer to as interoperability.

7         Q.    So there isn't necessarily a separate entity or

8    agency that sends a communiqué to LESC.   It's -- once the

9    fingerprints get run, the interoperability system

10   automatically sends some kind of notification to LESC?

11        A.    That's correct.

12        Q.    And then LESC does -- I think you said they do

13   some basic checks before an IAR is sent to PERC?

14        A.    They may or may not.

15        Q.    And when you say "basic checks," do you

16   know what -- can you be more specific?

17        A.    Basic database checks.

18        Q.    Database checks for what kind of information?

19        A.    Immigration history and criminal history.

20        Q.    Do you happen to know which databases by name

21   LESC personnel may access?

22        A.    I don't.

23        Q.    And once the IAR is received by PERC personnel, I

24   assume, additional investigation and database checks and

25   similar investigative efforts are conducted?

1      A.    Correct.

2      Q.    Would you say they are more than basic?

3      A.    Yes.

4      Q.    I use the word "basic" in connection to LESC.

5   What I took from that is the research that takes place at

6   PERC is more than basic.  Is that fair?

7      A.    Yes.

8      Q.    How is it more -- how is the scope broader than

9   the nature of the searches that might be conducted at

10  LESC?

11     A.    I would look at the LESC as a triage and the PERC

12  as the apparatus by which the investigation is undertaken,

13  and a final decision is made on whether or not to issue a

14  detainer.

15     Q.    And if LESC's checks include at least basic

16  reviews of immigration and criminal history is -- you

17  know, you've described those as basic checks -- do the

18  PERC personnel involved in the reviews of potential

19  detainers, are they much more detailed in terms of the

20  kind of information that is accessed or number and type of

21  databases that are reviewed?  Would you -- could you be

22  more specific as to that?

23     A.    I would say yes to both of those assertions.

24     Q.    Could you approximate how many different

25  databases PERC personnel have access to before a detainer

1    is issued?

2        A.    Because I don't work on the front lines anymore,

3    it's going to be somewhat of a guess, but between five and

4    10.

5        Q.    Is the central index system still used?

6        A.    It is.

7        Q.    Is that one of the main databases?

8        A.    Yes.

9        Q.    That contains criminal history information?

10       A.    No.   Immigration history.

11       Q.    Is that immigration history information on CIS

12   updated by only federal agencies, or does it also include

13   information gathered and updated by nonfederal agencies?

14       A.    I'm not an expert on CIS, but it's my belief that

15   it's a system maintained by a federal agency and only

16   updated by CIS, the agency.   CIS refers to both an agency

17   and a system.

18       Q.    And other than CIS, can you name specifically

19   other databases that PERC personnel use before making a

20   determination to issue a detainer?

21       A.    There's a system called CLAIMS.   There's a system

22   called Eagle, CLETS, JDIC, ENFORCE.   There's others, but I

23   can't think of any.

24       Q.    Do PERC personnel use TECS, T-E-C-S?

25       A.    Yes.

1      Q.    Those that you've named -- and I understand there

2    may be others -- CLAIMS, Eagle, CLETS, JDIC --

3           J-D-I-C?

4      A.    J-D-I-C.

5      Q.    -- ENFORCE and TECS, T-E-C-S, do those databases

6    contain different types or sets of information, or is

7    there, like, overlap; so it's the same information that

8    appears in more than one database?

9      A.    There is overlap.

10     Q.    But there's a reason for the existence of each

11   database?

12     A.    There is.

13     Q.    It's not like one database just copies

14   information in another database?

15     A.    That is correct.

16     Q.    Are you familiar with a database called IDENT,

17   I-D-E-N-T?

18     A.    Yes.

19     Q.    Is that currently in use by PERC personnel?

20     A.    Yes.

21     Q.    How about ADIS, A-D-I-S?

22     A.    Yes.

23     Q.    You mentioned ENFORCE.  Is ENFORCE broken down

24   into like -- let me ask you this way:

25           Are you familiar with the term EARM?

1        A.    Yes.

2        Q.    Is that part of ENFORCE?

3        A.    I don't know.

4        Q.    Is EARM used by PERC personnel?

5        A.    Yes.

6        Q.    How about EADM?

7        A.    I believe so.

8        Q.    How about NCIC?

9        A.    Yes.

10       Q.    That contains criminal information?

11       A.    It does.

12       Q.    And there may be other databases that you just

13   can't recall off the top of your head that PERC personnel

14   currently use?

15       A.    Yes.

16       Q.    Has the scope of responsibilities for PERC

17   changed since -- let me -- it's kind of awkward because

18   PERC is new.

19       A.    Right.

20       Q.    But compared to what was going on at SC3, are the

21   responsibilities of PERC broader than the responsibilities

22   of SC3?

23       A.    In that we cover a larger portion of the

24   United States, yes.

25       Q.    And you testified before about all the different

1    states that PERC provides coverage for?

2        A.    Yes.

3        Q.    How about the type of responsibilities?

4        A.    No.

5        Q.    And are they exact -- basically exactly the same

6    or are they less compared to what was going on at SC3?

7        A.    Well, they're more because we cover more of the

8    United States.

9        Q.    In terms of, you know -- again, by type of

10   responsibility -- whatever SC3 personnel might have been

11   doing, PERC personnel also do; is that fair?

12       A.    That's fair.

13       Q.    And if you can clarify what you meant in your

14   prior deposition about providing coverage.  I understand

15   that PERC personnel issue detainer forms, 247 forms, to

16   LEAs.

17            Is that duty part of the coverage that PERC

18   provides?

19       A.    Yes.

20       Q.    And what else involves -- what else is

21   encompassed when you say it provides coverage?

22       A.    That's what I'm referring to is the issuance of

23   detainers.  That's not the only thing that PERC does.

24       Q.    Is there some -- some personnel are involved in

25   things that are totally unrelated to issuance of

1    detainers; correct?

2        A.    Well, yes and no.  So when we receive an IAR and

3    there's not enough information to issue a detainer, that

4    message, along with the database checks that we've run, is

5    referred to the field office that we're covering for them

6    to either follow up, get conviction documents, interview

7    the person so that they can make a determination on

8    whether or not they want to issue a detainer.

9        Q.    So that kind of communication could be sent to

10   the LA Field Office, for example?

11       A.    Yes.

12       Q.    Does that mean that the primary responsibility of

13   PERC is investigation into and possible issuance of

14   detainer forms?

15       A.    Yes.

16       Q.    And was that true for SC3 as well?

17       A.    Yes.

18       Q.    Since 2010, did SC3 provide coverage, as you're

19   describing it, to the counties covered by the LA Field

20   Office, the seven counties?

21       A.    I didn't arrive until 2013, but it's my

22   understanding that they did.

23       Q.    Since your arrival at SC3, was that true?

24       A.    Yes.

25       Q.    Was the coverage provided by SC3 broader than