1  PAUL B. BEACH, State Bar No. 166265
   pbeach@lbaclaw.com
2  JIN S. CHOI, State Bar No. 180270
   jchoi@lbaclaw.com
3  JUSTIN W. CLARK, State Bar No. 235477
   jclark@lbaclaw.com
4  LAWRENCE BEACH ALLEN & CHOI, PC
   100 West Broadway, Suite 1200
5  Glendale, California 91210-1219
   Telephone No. (818) 545-1925
6  Facsimile No. (818) 545-1937

7  Attorneys for Defendants and Third Parties
   County of Los Angeles and Sheriff Leroy D. Baca
8

9

10              **UNITED STATES DISTRICT COURT**

11             **CENTRAL DISTRICT OF CALIFORNIA**

12  DUNCAN ROY; et al.,                    ) Case No. CV 12-09012 BRO (FFMx)
                                           )
13          Plaintiffs,                    ) Consolidated with:
                                           ) Case No. CV 13-04416 BRO (FFMx)
14      vs.                                )
                                           ) Honorable Beverly Reid O'Connell
15  COUNTY OF LOS ANGELES; et al.,         )
                                           ) **DECLARATIONS AND EXHIBITS**
16          Defendants.                    ) **IN SUPPORT OF DEFENDANTS**
                                           ) **COUNTY OF LOS ANGELES AND**
17  _____       ) **LEROY D. BACA'S MOTION FOR**
                                           ) **SUMMARY JUDGMENT**
18  GERARDO GONZALEZ; et al.,              )
                                           )
19          Plaintiffs,                    )
                                           ) *[Memorandum of Points and*
20      vs.                                ) *Authorities, Separate Statement of*
                                           ) *Undisputed Facts and Conclusions of*
21  IMMIGRATION AND CUSTOMS                ) *Law, and [Proposed] Judgment filed*
    ENFORCEMENT, an entity; et al.,        ) *concurrently herewith]*
22                                         )
            Defendants.                    ) Date: July 24, 2017
23                                         ) Time: 10:00 a.m.
                                           ) Crtm: 7C
24  _____       )

25

26      TO THE HONORABLE COURT, ALL PARTIES, AND TO THEIR

27  COUNSEL OF RECORD:

28  ///

                                    1

1    Defendants County of Los Angeles and Leroy D. Baca's (collectively,

2  "Defendants") hereby submit the following Declarations and Exhibits in support

3  of Defendants' Motion for Summary Judgment or, in the Alternative, Summary

4  Adjudication of Individuals Issues.

5

6  Dated:  May 16, 2017                LAWRENCE BEACH ALLEN & CHOI, PC

7

8                                      By _____ /s/  Justin W. Clark _____

9                                          Justin W. Clark
                                           Attorneys for Defendants
10                                         County of Los Angeles and
                                           Leroy D. Baca
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROY\Declarations and Exhibits re MSJ

## DECLARATION OF RALPH FEROLI

I, Ralph Feroli, declare:

1.     I have personal knowledge of the facts stated herein, except those stated upon information and belief and, as to those matters, I believe them to be true.  If called upon to testify to the matters herein, I could and would competently do so.

2.     I submit this Declaration in support of Defendants' Motion for Summary Judgment in the matter of *Duncan Roy, et al. v. County of Los Angeles, et al.*, U.S.D.C. Case No. CV 12-09012 BRO (FFMx).

3.     I am a sworn peace officer of the Los Angeles County Sheriff's Department ("LASD" or "Department") and have been employed by the LASD for more than 17 years.  I am presently assigned as the operations deputy at the Inmate Reception Center ("IRC").  I have been assigned to the IRC for 15 years, and have worked in both the operations side of the facility (that is responsible for physically booking and releasing inmates in County jail), as well as the Records Unit of IRC, which handles all paperwork associated with booking and releasing inmates.  Because of my work assignments and experience at IRC, I am very familiar with the Department's policies, practices, and procedures as they relate to both the operation of IRC (including how inmates are booked into, and released from, Los Angeles County jail ["County jail" or "LACJ"]), and how immigration detainers (often referred to as "ICE holds") issued by Immigrations and Customs Enforcement ("ICE") are handled by the Department.  I am also familiar with changes to the Department's policies, practices, and procedures related to ICE holds that have occurred since 2010.

4.     I am informed and believe that Plaintiffs in this matter claim that their rights were violated because they were unlawfully detained as a result of the placement of an immigration hold on them by ICE, which is the principle investigative unit of the Department of Homeland Security.  It is my

ROY\Declarations and Exhibits re MSJ

understanding that Plaintiffs allege that the Sheriff's Department's recognition of ICE holds, and the transfer of inmates subject to ICE holds to the custody of ICE, violated their rights under the Fourth and Fourteenth Amendments to the United States Constitution, as well as various California state statutes and the California constitution.

### Background Information Regarding The County Jail System

5.     The LACJ system is the largest county jail system in the country. During the relevant time period (which I am informed and believe is between October, 2010 to present), the Los Angeles County Jail system was averaging a daily population of approximately 18,000 inmates.  The LASD transports an average of 1,400 to 1,600 inmates from its jail facilities to courts every day, Monday through Friday.  In addition, the LASD and other agencies book anywhere between 160,000 to in excess of 180,000 new inmates into the LACJ system each year.  Similarly, the LASD releases approximately the same number of inmates (160,000 to 180,000) from the LACJ each year.

6.     The Department maintains several jails in the downtown Los Angeles and Lynwood areas, as well as several more jails located on a large piece of land in the northern Los Angeles County (Castaic) area.  The downtown jail complex includes the IRC.  IRC is the LASD facility that is primarily responsible for processing male inmates when they enter and exit the County Jail system, classifying them according to security risks, and acting as a hub for transporting inmates to and from court and other locations.  Processing inmates in IRC is a complex process that operates 24 hours a day, seven days a week.  The facility has numerous units and sections including, without limitation, the Records Unit, Property, Document Control, and Cashiering.  IRC processing approximately 120,000 inmates into and out of the County jail system each year, and is responsible for maintenance and storage of all inmate court records, inmate

clothing, inmate property, inmate trust accounts, and receiving and processing incoming inmate mail.

## The Booking Process As It Relates To ICE Holds

7.     When inmates arrive at the IRC (from any number of locations around Southern California), they go through the booking process.  The booking process involves many steps but the details of each step are not relevant to the claims in this case, with one exception.  One step in the booking process involves inputting an inmate's information into the Automated Justice Information System ("AJIS"), which is a computer data base.  AJIS (and its historical archive counterpart – RAJIS) is a set of propriety computer programs designed specifically to track booking records and related information regarding inmates in County jail.  AJIS is more than 30 years old.  Information can be input into AJIS by most law enforcement agencies throughout Southern California (through a separate computer system called the Justice Department Information Computer, or "JDIC").  Accordingly, many inmates have had information about them inputted into AJIS by the arresting agencies, prior to the inmates' arrival at IRC.

8.     In the course of booking an inmate into County jail, a variety of information is input into, and stored in AJIS, including, but not limited to the following:

- Inmate identification information (name, date of birth, social security number, address, identifying marks, aliases, etc.);
- Inmate booking number;
- Arrest details (charge, date, arresting agency, arresting officer's name, etc.);
- Criminal history;
- Sexual preference;
- Gang affiliation;
- Information regarding family members and contact persons;

5

• Bail, bond, and release information;

• Security classifications and special handle codes (which are used to assign appropriate housing);

• Disability related information (such as the need for a wheelchair or other accommodation);

• Court information (such as the assigned Department, case number, and next hearing date); and

• Medical histories.

9.      Because AJIS is used by virtually all law enforcement agencies in Los Angeles County (such as the Los Angeles Police Department), most inmates who arrive at IRC have already been booked into AJIS and received a wristband bearing their inmate information, such as name and booking number encoded on it.  These inmates will bypass the initial steps of the booking process, and proceed directly to the classification area of IRC.

10.      During the booking process (which again, very often takes place before an inmate even arrives at IRC), inmates are live-scanned, which involves fingerprinting them and sending their biometric information to the California Department of Justice ("Cal DOJ") to confirm the individual's identity, and to obtain information on the subject's criminal history.  The information sent to Cal DOJ is automatically shared with the Federal Bureau of Investigation ("FBI"), to check nation-wide databases for criminal history.  The FBI, in turn, automatically shares the information it receives with various federal agencies including, without limitation, the Department of Homeland Security ("DHS") and within DHS, the information is shared with ICE.

11.      I am informed and believe that ICE uses the information it receives to determine whether ICE has had any prior contacts with the subject arrestee as part of their efforts to identify removable aliens. It is my understanding that if ICE has had a prior contacts with the subject arrestee and determines that there is

ROY\Declarations and Exhibits re MSJ

probable cause to believe that the subject is removable from the United States, they will issue a detainer for the subject. The detainer is sent by the Pacific Enforcement Resource Center ("PERC") directly to the arresting agency. I am informed and believe that PERC is the ICE facility responsible for issuing detainers to law enforcement agencies in Southern California. It is my understanding that the arresting agency will print the detainer (which is usually received by either fax or email) and include the detainer in the subject's booking packet, which is a collection of paperwork that includes information such as the arresting charge, the arresting agency, and other information relevant to booking the individual into County custody. I am informed and believe that if ICE has not had any prior contacts with the subject, then no detainer will be issued at the time of booking; however, as explained below, a detainer can be issued at the time of release.

12. As stated above, most inmates have already been live-scanned prior to their arrival at IRC. Accordingly, inmates coming into County custody who have had detainers issued against them by ICE, generally will have had them issued while they were still in the custody of their arresting agencies. Those arresting agencies include the ICE detainers in the inmates' booking packets. But for the arresting agency including the ICE detainer with the booking packet, the LASD would have no knowledge of the existence of the detainer. In fact, only when an inmate is an "over the counter booking" does PERC send the ICE detainer directly to the LASD. "Over the counter bookings" (which again, are only a small fraction of total bookings into County jail), only take place when an individual is arrested by the LASD, when the arresting agency is the California Highway Patrol, or for prisoners who are returned to County jail from the California state prison system.

13. As part of processing the booking packet, the Records Unit of IRC will take the ICE detainer and put a copy of it in the inmate's booking jacket

7

1  (which is the file maintained by IRC with the inmate's booking information).

2  Pursuant to the TRUST Act (AB4), all inmates are personally notified of the fact

3  that ICE has issued a detainer for them.  Specifically, the subject inmate is given a

4  copy of the detainer along with a "Los Angeles County Sheriff's Department

5  Notification to Inmates of Immigration Interview Form."  A true and correct copy

6  of this notice form in its various versions is attached hereto as Exhibit "A".  As of

7  the date of this declaration, no computer record is maintained by the LASD of the

8  existence of the ICE detainer.[1]

9  **The Release Process And Transfer To ICE Custody**

10  14.    The release process for inmates at County jail can vary depending on

11  numerous factors, but there are several common elements and steps which are

12  articulated below.  Each weekday, IRC receives an average of 3,000 to 5,000

13  pieces of paper from the 10 superior court districts and 32 municipal court

14  districts throughout Los Angeles County.  This paperwork includes a variety of

15  miscellaneous forms and transmittals, some of which are uniform among the

16  courts and some of which are not.  These documents are sometimes

17  indecipherable or difficult to interpret.  Because of the number of courts and the

18  lack of uniformity as to how each courtroom conducts its business—all of which

19  is outside the control of the LASD—completion of the paper process takes IRC a

20  significant amount of time.

21  15.    There are two main components to the release process:  processing

22  of paperwork and processing of people.  With respect to processing of people, the

23  release process begins when the LASD becomes aware that an inmate is eligible

24  for release.  Inmates become eligible for release in a number of ways including

25  but not limited to the expiration of their criminal sentence, if they are ordered

26  _____

27  [1] Until approximately June, 2014, part of the booking process involved the

28  arresting agencies inputting the existence of the ICE hold into AJIS (through
   JDIC), in similar fashion to a warrant from another jurisdiction.

ROY\Declarations and Exhibits re MSJ

released by a court, or if the District Attorney declines to pursue criminal charges against them. Depending on the specific circumstances of each individual case, the LASD may or may not have advance notice of an inmate's eligibility for release of the exact date therefor. For example, for inmates serving a state prison term in County jail, the LASD has advance notice of that individual's release date based on the term of their sentence. On the other hand, some inmates are ordered released when they make a court appearance for time served, in which case the LASD would have no advance notice of that inmate's eligibility for release until that day.

16.    Once an inmate is eligible for release, a release pass is generated by IRC and transmitted to the housing module where the inmate is located. The generation of the release pass begins the release process, although the paperwork component of the release process can begin several days before an inmate's actual release date (assuming the LASD has advance notice of an inmate's release date, which is not always the case).

17.    Once a release pass is generated by IRC, it is sent to the inmate's housing location so that the inmate can be directed to come to the release hallway of IRC. If an inmate was housed at an outlying facility (such as the facilities in Castaic), then that inmate will be transported to IRC for further release processing, usually the day before that inmate's release date.

18.    Inmates are provided with their Jail Records Card ("JRC"), to bring with them to the release hallway where the release process proceeds as follows:

A. Inmates first stop at a desk in the release hallway and give their JRC to IRC personnel. A true and correct copy of a photograph showing the release hallway is attached hereto as Exhibit "B". A true and correct copy of an example JRC is attached hereto as Exhibit "C".

B. At the same time, inmates are provided with a notice pursuant to the TRUTH Act, which notifies them that ICE has been advised of their

9

release date. A true and correct copy of the TRUTH Act Notice is attached hereto as Exhibit "D".  This notice is provided to all inmates being released from County custody, whether or not they have been issued an ICE detainer.  True and correct copies of additional photographs showing the tables in the release hallway are attached hereto as Exhibits "E" and "F" respectively.[2]

C. The inmate's release pass is placed in a basket, which is just outside an office that is known as the "AB4 Desk" or "ICE Desk".  The personnel assigned to this office are responsible for interfacing with ICE and running the checks necessary for compliance with the TRUST Act, which allows California law enforcement agencies to transfer custody of an individual to ICE if that person has been convicted of certain qualifying offenses.  [ICE has access to the release passes in the basket, which can be used to identify the inmates in the release area and to determine whether ICE intends to take the inmate into ICE custody.]

D. Next, IRC personnel scan the inmate's fingerprints to verify the inmate's identity, and simultaneously run a check for outstanding wants and warrants.  A true and correct copy of a photograph showing the device used to complete this check, which is handheld, is attached hereto as Exhibit "G".

E. While the BLUE check is being completed, IRC personnel provide the inmate's JRC to the Records Unit (through a window adjacent to the release hallway), so that the inmate's JRC can be matched up with his booking jacket, after which both the booking jacket and the JRC are given back to deputies in the release hallway to continue the

_____

[2] The TRUTH Act notification procedure has been in place since January 2017, following the enactment of the TRUTH Act.

10

release process.  During this time, inmates are placed in holding cells in the release hallway.

F. Next, the JRC is given to personnel that work in the property section of IRC, to locate the inmate's clothing, which was stored when the inmate was first booked into County custody.  The inmate's clothes are returned to the inmate who then is able to get dressed in the holding cell.

G. The inmate is then escorted out of the holding cell, and into the next area of release hallway, which is a separate area where the final steps of the release process are completed.  A true and correct copy of a photograph showing this area of the release hallway is attached hereto as Exhibit "H".

H. In this area of the release hallway, a final identify check is completed, and the inmate is given back his secured personal property (such as cell phones, keys, and wallets).  **Importantly, ICE cannot take custody of an inmate who has entered this area of the release hallway.**

19. As stated above, ICE has access to the release passes in the release hallway, which they use to identify inmates being released.  Up until the inmates enter the final area of the release hallway (described in Paragraph 18-G and H), ICE can inform the LASD that they intend to take an inmate into ICE custody. This means that ICE intends to follow through with an ICE detainer that was issued at the time of booking, or that ICE intends to place a detainer on the subject inmate (if they have had no prior contacts with that individual).  Once ICE informs the LASD that they intend to take an inmate into ICE custody, the following additional steps are completed to effectuate a custody release (meaning, a release to ICE custody):

A. Once ICE notifies the LASD of their intention to take an inmate into

11

ICE custody, the LASD verifies that the requirements of the TRUST Act are met.

B. ICE is denied access to any inmate who does not meet TRUST Act requirements.  The inmate cannot be interviewed by ICE, and will not be released to ICE custody.  The inmate will proceed with the normal release process.

C. Inmates who meet TRUST Act requirements are provided with a "Los Angeles County Sheriff's Department Notification to Inmate of Immigration Detainer Interview" Form.  (*See*, Exhibit "A".

D. Under the TRUST Act, an inmate can consent to an ICE interview, decline to be interviewed by ICE, or choose to have an attorney present for the interview.

E. If ICE elects not to take the inmate into ICE custody, then the inmate will proceed with the normal release process.

F. If ICE elects to take the inmate into ICE custody, all of the documentation necessary to effectuate a custody release is prepared (including a medical discharge summary), and the inmate will be released to ICE custody.

G. Under no circumstances will an inmate's release date be delayed by the transfer of custody to ICE.  For the Court's convenience, a true and correct copy of a flowchart outlining the process for releasing an inmate to ICE custody is attached hereto as Exhibit "I".

**Changes To Policy And Procedure Related To ICE Holds**

20.    I am informed and believe that Plaintiffs' claims in this case cover a period of time from October 2010 to the present.  During that time period, a number of changes have occurred to the policies, procedures, and practices with

12

respect to how the LASD handles immigration detainers.  These changes include the following:

    A. After May 2014, the LASD no longer held inmates beyond their expected release date due to outstanding immigration detainers. Before that time, as stated on the various versions of the detainer form that have been used by ICE since 2010, the LASD would maintain custody of the subject for up to 48 hours, excluding weekends and holidays pursuant to 8 C.F.R. 287.7.

    B. The TRUST Act became effective on January 1, 2014.  Before that time, there was no limitation with respect qualifying criminal convictions as a prerequisite for transfer to ICE custody.  All procedures related to vetting an inmate's TRUST Act qualification, including the creation of the ICE / AB4 desk in the release hallway at IRC, were implemented after January 1, 2014.

    C. Until approximately June, 2014, the LASD (and other arresting agencies in Southern California), input the existence of an ICE detainer into the LASD's computer systems (into AJIS, through JDIC).  Since this date, the existence of an ICE detainer was no longer input into AJIS, and instead, a physical copy of the detainer was placed in the inmate's booking jacket.

    D. The TRUTH Act became effective in January 2017.  Before that time, there was no obligation to provide TRUTH Act notices to inmates.  All procedures related to the TRUTH Act were implemented after January 2017.

### Bail Processing

21.    I am informed and believe that Plaintiffs allege that the LASD refused to allow inmates subject to ICE detainers to post bail on their criminal charges.  Plaintiffs' allegation is false.  The LASD's policy and practice has

always been to allow inmates subject to immigration detainers to post bail.  I am informed and believe that Plaintiffs have repeatedly conflated the "No Bail" designation associated with an immigration detainer to mean, essentially, that the inmate cannot post any bail at all.  This, too, is inaccurate.  In fact, the "No Bail" designation for immigration detainers simply means that the detainer does not have a dollar amount attributed to it, unlike most criminal charges which are assigned a specific bail amount.   Attached hereto as Exhibit "J" is a true and correct copy of the LASD's bail policy, which clearly indicates that bail shall be accepted, even if an inmate is subject to an immigration detainer.

22.    I am further informed and believe that Plaintiffs claim that the LASD characterized ICE holds as mandatory holds within the LASD's computer systems (including AJIS/ RAJIS).  This is a misrepresentation.  When immigration detainers were entered into the LASD's computer system, they were input as "No Bail" holds, which simply means they do not have a dollar amount attributed to them.  This designation does not mean, as Plaintiffs imply, that an inmate subject to an immigration detainer could not post bail on their criminal charges (assuming those charges were bail-able offenses) even if they were subject to an immigration detainer.  On the contrary, the LASD's policy has always been to accept bail on an inmate's state criminal charges (even if they are subject to an immigration detainer).

**Other Information Related To The LASD's Policies Regarding ICE Holds**

23.    I am informed and believe that Plaintiffs claim that ICE detainer were "voluntary holds" and that the LASD was free to ignore them.  On the contrary, ICE holds were never treated as "voluntary" by the LASD and were, in fact, treated as mandatory holds similar to criminal warrants from another jurisdiction.  In fact, a prior version of the I-247 form used by ICE to issue detainers states: "Federal regulations (8 CFR 287.7) **require** that you detain the alien for a period not to exceed 48 hours (excluding Saturdays, Sundays and

14

Federal holidays) to provide adequate time for INS to assume custody of the alien." (Emphasis added.)  A true and correct copy is attached hereto as Exhibit "K".

24.     I am informed and believe that Plaintiffs claim that ICE detainers were not (and are not today) supported by probable cause and therefore, the LASD should have refused to honor them.  I am further informed and believe that Plaintiffs claim that because detainers were not supported by probable cause (according to Plaintiffs), that any detention based on a detainer was unlawful.  First, while the LASD does not issue immigration detainers, the LASD has maintained a working relationship with ICE (and ICE's predecessor agency, the INS) for decades.  Through this working relationship, which includes daily communication between ICE and the LASD, the LASD has developed a basic understanding of ICE's requirements for issuing detainers, and the practices they follow for doing so.  This includes a requirement that ICE agents must have probable cause to believe that a subject inmate is a removable alien.  If LASD personnel (including the personnel assigned to IRC who liaison with ICE) believed that ICE lacked probable cause to issue a detainer, the LASD will not (and would not have) honor the detainer or allow ICE to take custody of the subject inmate.

25.     True and correct copies of policies from the LASD's Custody Division Manual are attached hereto as Exhibit "L" regarding immigration and custom enforcement detainer acceptance and processing.

26.     A true and correct copy of an information bulletin regarding IRC's detainer acceptance policy following the implementation of the TRUST Act (AB4), is attached hereto as Exhibit "M".

27.     A true and correct copy of the IRC's Unit Order Governing ICE Detainer Release Procedures is attached hereto as Exhibit "N".

ROY\Declarations and Exhibits re MSJ

1    I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct.

3    Executed on April 4, 2017 at Los Angeles, California.

4

5

6                                          RALPH FEROLI

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF GREG SIVARD

I, Greg Sivard, declare as follows:

1.     The following facts are within my personal knowledge, except those matters stated on information and belief and, as to those matters, I believe them to be true.  If so called, I could and would testify competently thereto.

2.     I am currently employed by the Los Angeles County Sheriff's Department ("LASD" or "Sheriff's Department") and have been so for employed for the last 32 years.  I am presently assigned as the Records Manager for the Inmate Reception Center ("IRC").

3.     The Records Unit of IRC is responsible for processing and maintaining all booking and release records (among others) for inmates processed into and out of the Los Angeles County jail system.  Through my assignment as the Records Manager and prior positions I have had at IRC in the Records Unit, I am very familiar with LASD's policies, procedures, and practices associated with respect to the operation of IRC including, without limitation, the methods and associated procedures used to calculate inmate release dates and all of the various criteria that can impact that process.  In addition, I am familiar with the LASD's record keeping at IRC as it relates to booking and release processing.  Finally, my experience extends to the operation and functions of the LASD's Automated Justice Information System ("AJIS") and the Replicated Automated Jail Information System, which are the principal computer systems used to process inmate releases and maintain historical data regarding these processes.

3.     I am informed and believe that Plaintiffs in this matter claim that their rights were violated because they were unlawfully detained in as a result of the placement of an immigration hold on them by ICE, which is the principal investigative unit of the Department of Homeland Security.  It is my understanding that Plaintiffs allege that the Sheriff's Department's recognition of ICE holds, and the transfer of inmates subject to ICE holds to the custody of ICE,

17

violated their rights under the Fourth and Fourteenth Amendments to the United States Constitution, and their rights under California state law.  Specifically, it is my understanding that Plaintiffs claim that they were held in LASD custody beyond the date they claim they should have been released and that therefore, they were over-detained.  As explained below, even if Plaintiffs were detained beyond their expected release date due to ICE's issuance of an immigration detainer against them, a lawful basis existed for their detention because of existing court orders in *Rutherford v. Block*, U.S.D.C. Case No. CV 75-04111 DDP.  The details of this order are explained below.

4.     Pursuant to an existing Court order in *Rutherford*, the Sheriff's Department is required to manage the jail system within court approved maximum population limits by discharging inmates according to priorities the Sheriff shall establish.  A true and correct copy of a May 24, 1988 order entitled Jail Management Plan and Order is attached hereto as Exhibit "O".  It provides as follows:

> To ensure that available bed space is utilized for the most serious offenders until additional jail capacity is available, or until the jail population is reduced below capacity, the Sheriff shall manage the inmate population so that no facility exceeds the maximum  permanent inmate capacity previously approved by the Court.  When the inmate population at any facility exceeds those limits, the Sheriff shall manage the jail system with those capacities by discharging or citing inmates to court upon a written promise to appear, according to the priorities that he shall establish:
>
>> 1) Unsentenced defendants with a bail of $2,500 or less.
>>
>> 2) Unconvicted defendants accused of misdemeanors who have been in the Sheriff's custody for more than 60 days, and those whose trials have not begun.

18

3) Beginning 60 days from the date of this order, unconvicted defendants accused of non-violent crimes who have been in the Sheriff's custody for more than 150 days, and whose trials have not begun.

4) Inmates sentenced to 90 days or more, up to 12 days early

5) Sentenced misdemeanants who have less than 12 days remaining on their sentences

6) Sentenced misdemeanants having less than 30 days remaining on their sentences

[When it entered the above order, the Court added (in handwriting), the following]:

This court is reluctant to interfere in the management of the County Jail and with the authority of the state courts over the terms of confinement of their prisoners. However, the court concludes that the present overcrowding of the jail seriously interferes with the constitutional rights of the inmates to be 'treated like human beings'. Also, as    the Sheriff has acknowledged, the above order is needed in order that he may 'safety manage the jail until additional facilities become available'.

5.      In order to comply with the above order and to alleviate over-crowding in the Los Angeles County jail system, the Sheriff's Department has implemented a variety of measures, one of which is a program wherein inmates are released before they have served 100% of the statutory sentence associated with their criminal conviction. The so-called "Early Release Program" or "Percentage Release Program" has been in place since 2001. Depending on inmate population levels, to alleviate over-crowding, the percentage of time that an inmate may serve has fluctuated over the years between as little as 10% to as high as 80%. Inmate release dates are calculated by IRC personnel utilizing this percentage (and taking into account an inmate's good time/work time credits

19

under California Penal Code § 4019).  All inmates, except inmates serving a state prison sentence under AB 109 (Public Safety Realignment), inmates classified as "M7"[3], or parole violators, are eligible for early release under *Rutherford*.

6.       The following is an example of how the early release/percentage relelase program operates.  During the First Quarter of 2016 (covering April – June), inmates serving traditional county sentences (as opposed AB 109, M7, and parole violaters) completed 70% of their court ordered sentences prior to release.  Due to conditions of overcrowding within the jail system, the percentage of time served was reduced incrementally to 30% by the end of the Second Quarter of 2016.  Inmates who were serving sentences for designated serious and/or violent offences (M7 charges) and those sentenced under Penal Code § 1170 (parole violators) served 100% of their sentences, minus any good time or work time credits earned.

7.       I am informed and believe that Plaintiffs' claims in this case cover a period of time from October 2010 to present.  I have been assigned at IRC as the Records Manager since 2006.  At no time since October 2010 has the early release percentage ever been 100%.  Accordingly, for all inmates eligible for early release, even if they were detained beyond their expected release date because of an ICE detainer, a lawful basis to hold them in Los Angeles County jail still existed.  Moreover, the expected release date for each inmate could have fluctuated during that inmate's incarceration based on the population levels in the jail and the adjustment of of the percentage of time being served.

8.       Based on my experience and job responsibilities, I have become very familiar with the Automated Justice Information System ("AJIS"), and its historical archive counterpart – the Replicated Automated Justice Information System ("RAJIS"), which is a set of propriety computer programs designed

---

[3] M7s are inmates who have designated serious and/or violent offenses or have notoriety in the community.

specifically to track booking records and related information regarding inmates in Los Angeles County jail.  AJIS is more than 30 years old.  Information can be input into AJIS by most law enforcement agencies in Southern California as part of the process of booking inmates into County jail.  In the course of booking an inmate into County jail, a variety of information is input into, and stored in, the AJIS system including, but not limited to the following:

- Inmate identification information (name, date of birth, social security number, address, identifying marks, aliases, etc.);
- Inmate booking number;
- Arrest details (charge, date, arresting agency, arresting officer's name, etc.);
- Criminal history;
- Sexual preference;
- Gang affiliation;
- Information regarding family members and contact persons;
- Bail, bond, and release information;
- Security classifications and special handle codes (which are used to assign appropriate housing);
- Disability related information (such as the need for a wheelchair or other accommodation);
- Court information (such as the assigned Department, case number, and next hearing date); and
- medical histories.

This list is not exhaustive, and it is not possible to detail here every piece of information that is recorded in AJIS.

9.     I am aware that data from AJIS / RAJIS was produced to Plaintiffs in discovery in this matter.  The data produced related to inmate's that were subject to immigration detainers and included, without limitation, the specific inmate's

21

ROY\Declarations and Exhibits re MSJ

name, booking number, release reason, the custody agency to which the inmate was released, and the date of the inmate's release.

10.     I am informed and believe that Plaintiffs have argued that AJIS / RAJIS data can be used to determine whether an inmate was falsely imprisoned or over-detained on the basis of an immigration detainer.  Plaintiff's assumption on this point is incorrect and ignores the reality of the many unique factors and circumstances that can and do impact the release of an inmate and the processing associated therewith.  As I have testified in this matter, each release is unique and involves a review of the specific background of the subject inmate, including the inmate's criminal history, security classification, medical history, and the existence of any outstanding wants and warrants.  Before an inmate is released from County jail, a detailed review of an inmate's file is completed, which includes information and materials that are not entered into the AJIS / RAJIS system – information that is contained in the inmate's file, or booking jacket. Essentially, before an inmate is released from LASD custody (whether to the streets or to another custody agency), an individualized inquiry and analysis is completed to ensure a release is appropriate.  It is not possible, as Plaintiffs have suggested, to accurately determine whether an inmate's release was delayed due to the issuance of immigration hold (or some other reason), without specifically and individually examining an inmate's booking jacket and electronic inmate information associated with his / her release from custody.

11.     I am also informed and believe that Plaintiffs contend that the LASD's policy and practice was to deny inmates with ICE Detainers the ability to post bail.  This assertion is incorrect.  In fact, as I testified during both of my depositions in this matter, the LASD's policy and practice has always been to allow inmates subject to immigration detainers the ability to post bail.  As explained below, Plaintiffs in this case have repeatedly conflated the "No Bail" designation associated with an immigration detainer to mean, essentially, that the

inmate cannot post any bail at all.  This, too, is inaccurate.  In fact, the "No Bail" designation for immigration detainers simply means that the detainer does not have a dollar amount attributed to it, unlike most criminal charges which are assigned a specific bail amount.

12.     It is my understanding that the Court in this matter certified a class of inmates who were allegedly denied the ability to post bail.  In seeking this class certification, my understanding is that Plaintiffs informed the Court that the LASD's computer records could identify inmates that fall within the definition of this class.  This is false.  The LASD does not keep electronic or paper records of attempts to post bail; consequently, there is no way from the LASD's records to determine whether an inmate attempted to, but was prevented from, posting bail.  In fact, there is no record whatsoever, either paper or electronic, of attempts to post bail.  While it might be impossible to even conclusively determine whether an inmate attempted to post bail but was prevented from doing so, the evaluation of any particular inmate's claim that he or she was barred from posting bail would necessarily require a fact specific and individualized inquiry into that inmate's specific efforts to post bail.

13.     I am further informed and believe that Plaintiffs' have argued that the LASD characterized detainers as mandatory holds.  This is a misrepresentation.  When immigration detainers were entered into the LASD's computer system, they were input as "No Bail" holds, which simply means they do not have a dollar amount attributed to them.  This designation does not mean, as Plaintiffs imply, that an inmate subject to an immigration detainer could not post bail on their criminal charges (assuming those charges were bailable offenses) even if they were subject to an immigration detainer.

ROY\Declarations and Exhibits re MSJ

1    I declare under penalty of perjury under the laws of the State of California

2    that the foregoing is true and correct.

3    Executed this _//_ day of May, 2017, at Los Angeles, California.

4

5

6    Greg Sivard

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF CHIEF JOANNE SHARP

I, Joanne Sharp, declare:

1.    I have personal knowledge of the facts stated herein, except those stated upon information and belief and, as to those matters, I believe them to be true.  If called upon to testify to the matters herein, I could and would competently do so.

2.    I submit this Declaration in support of Defendants' Motion for Summary Judgment in the matter of *Duncan Roy, et al. v. County of Los Angeles, et al.*, U.S.D.C. Case No. CV 12-09012 BRO (FFMx).

3.    I am the Chief of the General Population Division of the Los Angeles County Sheriff's Department ("LASD").  The General Population Division, together with the Specialized Program Division, is charged with the operation of the Los Angeles County jail system ("County jail" or "LACJ").  I have been in my current assignment since April, 2017.  Over the course of my career with the LASD, I have held many positions in, and associated with, the LASD's custody operations, and through those assignments and attendant experiences, I have become familiar with how the LASD handles immigration detainers and its relationship with Immigration and Customs Enforcement ("ICE") personnel.

4.    I am informed and believe that Plaintiffs in this matter claim that they and the proposed class members were unlawfully detained in County jail as a result of the placement of an immigration hold on them by ICE, which is the principle investigative unit of the Department of Homeland Security.  It is my understanding that Plaintiffs allege that the Sheriff's Department's recognition of ICE holds, and the transfer of inmates subject to ICE holds to the custody of ICE, violated their rights under the Fourth and Fourteenth Amendments to the United States Constitution, as well as various California state statutes and the California constitution.

ROY\Declarations and Exhibits re MSJ

5.     I am further informed and believe that Plaintiffs contend that the LASD should entirely ignore ICE holds, and are seeking an injunction that would limit the LASD's ability to cooperate with ICE, including, without limitation, precluding the LASD from honoring ICE detainers in any respect, precluding the transfer of County jail inmates to ICE custody (on the basis of an ICE hold), and prohibiting the LASD from granting ICE agents access to County jail inmates. As explained below, I strongly disagree with Plaintiffs' claims and I believe that the injunctive relief Plaintiffs seek, if granted, would frustrate the LASD's ability to provide safe and effective law enforcement services to the County of Los Angeles and its residents.

6.     As an initial matter, I believe existing California law – namely, the TRUST and TRUTH Acts, already provide significant protections to persons subject to immigration detainers.  Specifically, it is my understanding that the TRUST Act allows local law enforcement agencies (including the LASD) to transfer custody of an individual subject to an immigration detainer to federal authorities only if that individual has been convicted of certain qualifying offenses.  It is also my understanding and belief that the TRUST Act imposes further regulations on local law enforcement including, for example, a requirement that persons subject to immigration detainers be provided with notice of the existence of the detainer, and their right to decline to be interviewed by ICE.

7.     It is my understanding that Plaintiffs in this matter seek an order from the Court that would prohibit the LASD from cooperating in any respect with ICE.  I believe strongly that such an order, if entered, would be detrimental to public safety and would erode the public's trust and confidence in the LASD. A blanket prohibition of any cooperation between the LASD and ICE would increase the likelihood of a significant expansion of the tracking and enforcement activities of ICE agents throughout the County.  Such enforcement activities

26

would lead to ICE's casting of a wide net over the County of Los Angeles and surrounding communities, which would, in turn, lead to ICE apprehending and detaining those not originally the target of enforcement priorities. The likely result of these activities will be the significant and appreciable loss of trust and cooperation with local law enforcement by law-abiding members of the local community.

8.      The prohibition of cooperation by the LASD with ICE will also prevent custody transfers between the LASD and ICE of persons subject to immigration detainers. Custody transfers allow for a safe, efficient, and controlled process by which ICE takes custody of a person subject to an immigration detainer. The absence of any such cooperation will only increase the scope and breadth of ICE's field activities as ICE agents attempt to bring subjects (who could have been transferred within a custodial setting) into federal custody for removal proceedings. Such activities, carried out in far less controlled environments, will invariably result in incidents where subjects attempt to flee or physically resist apprehension, and ICE agents' responsive uses of force. While these incidents may occur despite limited cooperation between the LASD and ICE, the wholesale elimination of such cooperation can only increase the number of such potentially volatile incidents.

9.      I am informed and believe that Plaintiffs have argued that the Sheriff's Department may revert back to its prior practice of detaining County jail inmates beyond the expiration of their criminal sentence on the basis of an immigration detainer. As stated numerous times by Sheriff's Department personnel (both publicly, in declarations filed in this case, and in deposition testimony), as of May, 2014, the Sheriff's Department no longer detained County jail inmates beyond the date they otherwise would have been released from County jail because of an immigration detainer. The County has no plans or intention to revert back to the prior practice of detaining inmates beyond the

27

1  expiration of their criminal sentence and in fact, has instituted policies and

2  procedures that prohibit holding an inmate beyond their release date because of

3  an immigration detainer.

4  ///

5  ///

6  ///

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROY\Declarations and Exhibits re MSJ

1      I declare under penalty of perjury under the laws of the United States of

2 America that the foregoing is true and correct.

3      Executed on May //, 2017 at Los Angeles, California.

JOANNE SHARP

29

# DECLARATION OF JUSTIN W. CLARK

I, Justin W. Clark, declare as follows:

1.     I am an attorney at law, duly authorized to practice before this Court and I am an associate in the law firm of Lawrence Beach Allen & Choi, A Professional Corporation, attorneys of record for Defendants County of Los Angeles and Leroy D. Baca in the above-entitled action.  I have personal knowledge of the facts stated herein, except those stated upon information and belief and as to those matters, I believe them to be true.  If called to testify to the matters herein, I could and would competently do so.

2.     Pursuant to Local Rule 7-3, on April 7, 2017, Defendants sent Plaintiffs' counsel a meet and confer letter outlining the substance of Defendants' contemplated motion for summary judgment as to the claims in the Second Amended Complaint.  No informal resolution of the contemplated arguments could be reached.

3.     Attached hereto as Exhibit "P" are true and correct copies of the Reporter's Transcript of Proceedings regarding Plaintiff's Motion for Partial Summary Judgment, which was heard on April 24, 2017.

4.     Attached hereto as Exhibit "Q" are true and correct copies of relevant pages from the deposition of Plaintiff Alain Martinez Perez – which went forward on August 30, 2016 – along with copies of the cover and signature pages from the transcript.

5.     Attached hereto as Exhibit "R" are true and correct copies of relevant pages from the deposition of Plaintiff Clemente Kalim De La Cerda – which went forward on September 13, 2016 – along with copies of the cover and signature pages from the transcript.

6.     Attached hereto as Exhibit "S" are true and correct copies of relevant pages from the deposition of Elizabeth Perez-LoPresti – which went forward on

ROY\Declarations and Exhibits re MSJ

September 16, 2016 – along with copies of the cover and signature pages from the transcript.

7. Attached hereto as Exhibit "T" are true and correct copies of relevant pages from the deposition of Brian DeMore – which went forward on December 2, 2015 – along with copies of the cover and signature pages from the transcript.

8. Attached hereto as Exhibit "U" are true and correct copies of relevant pages from the deposition of David Marin – which went forward on December 9, 2015 – along with copies of the cover and signature pages from the transcript.

9. Attached hereto as Exhibit "V" are true and correct copies of relevant pages from the deposition of David Marin – which went forward on February 9, 2016 – along with copies of the cover and signature pages from the transcript.

10. Attached hereto as Exhibit "W" are true and correct copies of relevant pages from the deposition of Brian DeMore – which went forward on February 10, 2016 – along with copies of the cover and signature pages from the transcript.

11. Attached hereto as Exhibit "X" are true and correct copies of relevant pages from the deposition of Daniel Schichel – which went forward on March 4, 2016 – along with copies of the cover and signature pages from the transcript.

12. Attached hereto as Exhibit "Y" are true and correct copies of relevant pages from the deposition of Marc Rapp – which went forward on March 10, 2016 – along with copies of the cover and signature pages from the transcript.

13. Attached hereto as Exhibit "Z" are true and correct copies of relevant pages from the deposition of Marc Rapp – which went forward on March 11, 2016 – along with copies of the cover and signature pages from the transcript.

1    14.    Attached hereto as Exhibit "AA" are true and correct copies of

2  relevant pages from the deposition of James Anthony Hamm – which went

3  forward on March 16, 2016 – along with copies of the cover and signature pages

4  from the transcript.

5    15.    Attached hereto as Exhibit "BB" are true and correct copies of

6  relevant pages from the deposition of James Anthony Hamm – which went

7  forward on March 17, 2016 – along with copies of the cover and signature pages

8  from the transcript.

9    16.    Attached hereto as Exhibit "CC" are true and correct copies of

10  relevant pages from the deposition of Celia Cano – which went forward on

11  September 8, 2016 – along with copies of the cover and signature pages from the

12  transcript.

13    17.    Attached hereto as Exhibit "DD" are true and correct copies of

14  relevant pages from the deposition of Bruce Dennis – which went forward on

15  September 9, 2016 – along with copies of the cover and signature pages from the

16  transcript.

17    18.    Attached hereto as Exhibit "EE" are true and correct copies of

18  relevant pages from the deposition of Vincent Benton – which went forward on

19  August 4, 2016 – along with copies of the cover and signature pages from the

20  transcript.

21  ///

22  ///

23  ///

24

25

26

27

28

ROY\Declarations and Exhibits re MSJ

1    I declare under penalty of perjury under the laws of the United States of

2    America and the State of California that the foregoing is true and correct.

3    Executed on May 16, 2017 at Glendale, California.

4

5                                        /s/  Justin W. Clark

6                                        Justin W. Clark

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

33