PETER J. ELIASBERG SBN 189110
  *peliasberg@aclusocal.org*
AHILAN ARULANANTHAM SBN 237841
  *aarulanantham@aclusocal.org*
PETER BIBRING SBN 223981
  *pbibring@aclusocal.org*
JENNIFER PASQUARELLA SBN 263241
  *jpasquarella@aclusocal.org*
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Phone:  (213) 977-9500
Facsimile:  (213) 977-5299

Attorneys for Plaintiffs
(continued on next page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| DUNCAN ROY; et al.,<br><br>              Plaintiffs,<br><br>      vs.<br><br>LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; et al.,<br><br>              Defendants.<br>_____<br><br>GERARDO GONZALEZ; et al.,<br><br>              Plaintiffs,<br><br>      vs.<br><br>IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>              Defendants. | Case No. CV 12-09012 BRO (FFMx) Consolidated with: Case No. CV 13-04416 BRO (FFMx)<br><br>Honorable Beverly Reid O'Connell<br><br>**PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:    July 24, 2017<br>Hearing Time:  1:30 PM<br>Courtroom:       7C<br><br>Oral Argument Requested |

1   BARRETT S. LITT SBN 45527
        blitt@kmbllaw.com
2   LINDSAY B. BATTLES SBN 262862
        lbattles@kmbllaw.com
3   KAYE, MCLANE, BEDNARSKI, & LITT
    234 E. Colorado Boulevard
4   Pasadena, California 91101
    Telephone: (626) 844-7660
5   Facsimile: (213) 844-7670

6   OMAR C. JADWAT
        ojadwat@aclu.org
7   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
        IMMIGRANTS' RIGHTS PROJECT
8   125 Broad Street, 18th Floor
    New York, New York 10004
9   Telephone: (212) 549-2660

10  CECILLIA D. WANG SBN 187782
        cwang@aclu.org
11  AMERICAN CIVIL LIBERTIES UNION FOUNDATION
        IMMIGRANTS' RIGHTS PROJECT
12  39 Drumm Street
    San Francisco, California 94111
13  Telephone: (415) 343-0775

14  CHRIS NEWMAN SBN 255616
        newman@ndlon.org
15  JESSICA KARP BANSAL SBN 277347
        jbansal@ndlon.org
16  NATIONAL DAY LABOR ORGANIZING NETWORK
    675 S. Park View Street, Suite B
17  Los Angeles, California 90057
    Telephone: (213) 380-2785
18  Facsimile: (213) 380-2787

19  MARK M. FLEMING, pro hac vice
        mfleming@heartlandalliance.org
20  NATIONAL IMMIGRANT JUSTICE CENTER
    208 S. LaSalle Street, Suite 1300
21  Chicago, IL 60604
    Telephone: (312) 660-1628
22  Facsimile: (312) 660-1505

23

24

25

26

27

28

Pursuant to Local Rule 56-1, Plaintiffs Gerardo Gonzalez and Simon Chinivizyan, on behalf of themselves and the Probable Cause Subclass and the Statutory Subclass, hereby submit the following statement of material facts as to which there is no genuine issue, in support of their motion for partial summary judgment.

| No. | Statement of Fact | Supporting Evidence |
|---|---|---|
| **Plaintiff Gonzalez** | | |
| 1. | Plaintiff Gerardo Gonzalez is a natural born U.S. citizen. He was born in Los Angeles, California. By definition, he has never been removable from the United States. | Declaration of Jennifer Pasquarella in Support of Plaintiffs' Motion for Partial Summary Judgment, Exh. 1 (Birth Certificate of Gerardo Gonzalez). |
| 2. | On December 31, 2012, ICE issued an immigration detainer to the Los Angeles County Sheriff's Department requesting that the Sheriff maintain custody of Plaintiff Gonzalez after he would otherwise be released from custody. | Pasquarella Decl. Exh. 2 (Detainer issued to Gerardo Gonzalez). |
| 3. | ICE agent Raul San Martin issued Plaintiff Gonzalez's detainer solely on the basis of electronic database checks. Agent San Martin never interviewed Plaintiff Gonzalez, nor did any other ICE agent. | Pasquarella Decl. Exh. 3 (San Martin Dep. at 36:18-37:16); *id.* Exh. 4 (Declaration of Gerardo Gonzalez in Support of Plaintiffs Motion for Class Certification, at ¶ 11). |
| 4. | Agent San Martin issued Plaintiff Gonzalez's detainer on the basis of one indication in a criminal database that erroneously stated that Plaintiff Gonzalez was born in Mexico and the fact that no records of Plaintiff Gonzalez were found in DHS's immigration databases. | Pasquarella Decl. Exh 3 (San Martin Dep. Tr. at 58:12-59:5, 60:15-61:1, 69:1-69:7). |

1

| | | |
|---|---|---|
| | The criminal databases that Agent San Martin reviewed prior to issuing Plaintiff Gonzalez's detainer indicated once that Plaintiff Gonzalez was born in Mexico and twice that he was born in California. | Pasquarella Decl. Exh. 3 (San Martin Dep. at 58:12-59:5, 61:2-62:5; *id.* Exh. 5 (Excerpt from rap sheet, Exh. 43 to San Martin Dep. introduced at 29:23); *Id.* Exh. 6 (Excerpt from rap sheet, Exh. 44 to San Martin Dep, introduced at 60:11). |
| 5. | Neither ICE nor the Los Angeles County Sheriff's Department ever served a copy of Plaintiff Gonzalez's detainer on him. | Pasquarella Decl. Exh. 4 (Declaration of Gerardo Gonzalez in Support of Plaintiffs Motion for Class Certification, at ¶ 12). |
| 6. | Pursuant to ICE policy and practice, ICE did not make any determination that Plaintiff Gonzalez was likely to escape before a warrant could be obtained before issuing his detainer. | Pasquarella Decl. Exh 7 (Hamm 30(b)(6) Dep. Tr., 58:19-21 ("So do CAP officers make that assessment of fight risk before issuing the detainer? A. No."), 269:3-270:1 ("So ICE doesn't figure out if you have time to issue an ICE warrant before issuing a detainer? That's not part of the process? A. No.")); *Id.* Exh. 8 (Rapp 30(b)(6) Dep. Tr. 168:2-20 (Q. Is there a requirement that an officer make a determination about the likelihood that the individual escape before they can obtain a warrant – before issuing a detainer? . . . . THE WITNESS: There is no headquarters requirement for such action -- . . . for such assessment.")). |
| 7. | Plaintiff Gonzalez represents the certified Probable Cause Sub-Class consisting of all current and future persons who are subject to an immigration detainer issued by an ICE agent located in the Central District of California, where the detainer is not based | Dkt. 184 at 29 (Order granting in part and denying in part Plaintiffs' Motion for Class Certification). |

| | | |
|---|---|---|
| | upon a final order of removal signed by an immigration judge or the individual is not subject to ongoing removal proceedings and the detainer was issued solely on the basis of electronic database checks. | |
| 8. | Plaintiff Gonzalez also represents the certified Statutory subclass, consisting of all current and future persons who are subject to an immigration detainer issued by an ICE agent located in the Central District of California, where the detainer is not based upon a final order of removal signed by an immigration judge or the individual is not subject to ongoing removal proceedings and for whom ICE did not issue an administrative warrant of arrest at the time it issued an immigration detainer. | Dkt. 184 at 29 (Order granting in part and denying in part Plaintiffs' Motion for Class Certification). |
| **Plaintiff Chinivizyan** | | |
| 9. | Plaintiff Simon Chinivizyan became a naturalized United States citizen in 2008, when he was fourteen years old. He is, by definition, not removable. | Pasquarella Decl. Exh. 9 (Chinivizyan Passport, issued November 2008). |
| 10. | On June 19, 2013, ICE issued an immigration detainer to the Los Angeles County Sheriff's Department requesting that the Sheriff maintain custody of Plaintiff Chinivizyan after he would otherwise be released from custody. | Pasquarella Decl. Exh. 10 (Detainer issued to Plaintiff Chinivizyan). |
| 11. | Pursuant to ICE policy and practice, ICE did not make any determination that Plaintiff | Pasquarella Decl. Exh 7 (Hamm 30(b)(6) Dep. Tr., 58:19-21 ("So do CAP officers make that |

3

| | | |
|---|---|---|
| | Chinivizyan was likely to escape before a warrant could be obtained before issuing his detainer. | assessment of fight risk before issuing the detainer? A No."), 269:3-270:1 ("So ICE doesn't figure out if you have time to issue an ICE warrant before issuing a detainer?  That's not part of the process? A. No.")); *Id.* Exh. 8 (Rapp 30(b)(6) Dep. Tr. 168:2-20 (Q. Is there a requirement that an officer make a determination about the likelihood that the individual escape before they can obtain a warrant – before issuing a detainer? . . . . THE WITNESS: There is no headquarters requirement for such action -- . . . for such assessment.")). |
| 12. | Plaintiff Chinivizyan represents the certified Statutory subclass, consisting of all current and future persons who are subject to an immigration detainer issued by an ICE agent located in the Central District of California, where the detainer is not based upon a final order of removal signed by an immigration judge or the individual is not subject to ongoing removal proceedings and for whom ICE did not issue an administrative warrant of arrest at the time it issued an immigration detainer. | Dkt. 184 at 29 (Order granting in part and denying in part Plaintiffs' Motion for Class Certification). |

**UNCONTROVERTED FACTS RELATED TO THE PROBABLE CAUSE SUBCLASS**

**ICE's Immigration Detainer Forms**

| 13. | ICE issues immigration detainers to federal, state, and local law enforcement agencies ("LEAs") to request that the LEA detain the | 8 C.F.R. § 287.7(d); Pasquarella Decl. Exh. 11 (Form I-247A). |

4

| | | |
|---|---|---|
| | individual up to 48 hours beyond the time he or she would otherwise be released from custody. | |
| 14. | Since this lawsuit and its companion lawsuit, *Roy v. County of Los Angeles*, were filed, ICE has used five different detainer forms: the December 2011 revision, the December 2012 revision, the June 2015 Form I-247D, the August 2015 Form I-247X, and the April 2017 Form I-247A. | Pasquarella Decl. Exhs. 11, 12. |
| 15. | The first two versions of the detainer form contain two main sections: checkboxes at the top of the form that explain the basis for issuing the detainer, and checkboxes at the bottom of the form that request that the LEA take certain actions.  The June 2015 I-247D and the August 2015 I-247X versions maintain the content of these two main sections and then include an additional section to explain why the subject of the detainer is an enforcement priority.  The April 2017 I-247A form eliminates the section added to the June 2015 I-247D and August 2015 I-247X explaining why the individual was an enforcement priority, but retains the rest of the sections (while changing the wording in certain places). | Pasquarella Decl. Exhs. 11, 12. |
| 16. | As ICE has changed its detainer forms, it has changed the language on the form indicating the basis for its determination to | Pasquarella Decl. Exh. 12. |

5

| | | | |
|---|---|---|---|
| | | issue a detainer. The December 2011 I-247 detainer stated the reason for the detainer was ICE had "initiated an investigation" into whether the subject was removable from the United States. The December 2012 detainer form, modified less than two months after the *Roy v. County of Los Angeles* lawsuit was filed, stated ICE "determined that there is a reason to believe the individual is an alien subject to removal from the United States." | |
| | 17. | The June 2015 I-247D and August 2015 I-247X detainer forms, which ICE changed in response to court decisions holding ICE's detainers lacked probable cause to justify a warrantless arrest and law enforcement agencies nationwide began to refuse to comply with them, further modified the form's wording to state that "[p]robable cause exists that the subject is a removable alien." | Pasquarella Decl. Exh. 12 (June 2015 I-247D and August 2015 I-247X); *id.* Exh. 13 at ICE 0000222 (DHS Secretary Jeh Johnson Memo re: Secure Communities) (explaining that ICE changed its detainer policies in part "to address the increasing number of federal court decisions that hold that detainer-based detention by state and local law enforcement agencies violates the Fourth Amendment"). |
| | 18. | The June 2015 I-247D and August 2015 I-247X detainers further provided generic boilerplate checkbox options indicating the basis for ICE's assertion of probable cause:<br><br>☐ A final order of removal against the subject;<br>☐ The pendency of ongoing removal proceedings against the subject; | Pasquarella Decl. Exh. 12. |

6

| | | | |
|---|---|---|---|
| | | ☐ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or<br>☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law. | |
| | 19. | The April 2017 I-247A form retained these checkboxes, changing only the word "subject" to "alien." | Pasquarella Decl. Exh. 11. |
| **Immigration Detainers Based Solely on Electronic Database Searches** | | | |
| | 20. | Until recently, detainers were generally issued by ICE agents working inside certain jails and prisons only after agents personally reviewed an individual's complete paper alien file and/or and interviewed the individual to determine alienage | Pasquarella Decl. Exh. 14 at ICE 220.003 (Fact Sheet: IDENT and IAFIS Interoperability) (explaining that, as of August 2008, ICE only screened inmates at "limited number of local jails" and describing initiation of nationwide automatic immigration status |

7

| | | | |
|---|---|---|---|
| | | and whether they were amenable to removal. | checks based on electronic database); Pls. Request for Judicial Notice Exh. G at 2, 4-10 (explaining process wherein "the INS investigator either reviewed the paper file or interviewed the individual to conclusively determine that the individual was an alien" prior to issuing a detainer) |
| | 21. | According to ICE, this manual process of identification was "labor-intensive" and "time-consuming." | Pls. Request for Judicial Notice, Exh. A at 2 (Secure Communities: A Comprehensive Plan to Identify and Remove Criminal Aliens) |
| | 22. | To address these limitations, beginning in September 2006, ICE began to adopt what it calls "biometric interoperability" technology to "link local law enforcement agencies to both FBI and DHS biometric databases." In other words, ICE began to receive—automatically and in real time—the fingerprints of any person booked into a local jail. | Pasquarella Decl. Exh. 14 at ICE 220.002-.003 (Fact Sheet IDENT and IAFIS Interoperability); *see also* Pls' Request for Judicial Notice, Exh. A (Secure Communities: A Comprehensive Plan to Identify and Remove Criminal Aliens). |
| | 23. | This technology, incorporated into ICE's Secure Communities Program, linked for the first time the Federal Bureau of Investigation's ("FBI") fingerprint repository, known as Integrated Automated Fingerprint Identification System ("IAFIS"), with the DHS's fingerprint repository, known as Automated Biometric Identification System ("IDENT"). As a result, any time a jail sent fingerprints to the FBI for a criminal background check (which virtually all jails do at booking), those prints were now | Pasquarella Decl. Exh. 14 at ICE 220.002-.003 (Fact Sheet IDENT and IAFIS Interoperability); *see also id.* Exh. 15 at ICE 68.004, 68.007 (ICE Secure Communities Standard Operating Procedures); *id.* Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 92:15-94:4); *id.* Exh. 8 (ICE 30(b)(6) Rapp Dep. Tr. 182:2-6). |

8

| | | automatically shared with ICE. | |
|---|---|---|---|
| | 24. | Upon receiving fingerprints, ICE claimed that it would be able to "automatically check[]" "the[] immigration status as well as prior criminal history" of any person booked into custody. According to ICE, this promised to "lead to a substantial increase in the number of criminal aliens identified." Under this program, ICE, for the first time, began issuing detainers *en masse* based solely on electronic database checks and nothing more. | Plaintiffs' Request for Judicial Notice, Exh. A at 3 (Secure Communities: A Comprehensive Plan to Identify and Remove Criminal Aliens). |
| | 25. | Indeed, detainer issuance ballooned between 2006 and 2011 during the implementation of interoperability technology.  In Fiscal Year 2006 (Oct. 2005-Sept. 2006), ICE issued 14,837 detainers nationally.  By FY 2007, that number had spiked to 76,620 detainers.  By FY 2008, it had increased more than tenfold, to 186,978 detainers.  At its highest point in FY 2011, by which time Secure Communities had been finally implemented throughout the country, the number of detainers issued nationwide hit 309,697. | Decl. of Susan B. Long, filed concurrently herewith, at ¶¶7-9; *see also* Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 50:17-18 (deployment finished in CA in 2011). |
| | 26. | Between FY 2007 and FY 2015, ICE issued 1,842,327 immigration detainers nationwide.  Many of these people were arrested and detained on ICE's behalf for extended periods in criminal jails and prisons. | Long Decl. at ¶10. |
| | 27. | The vast majority of detainers | Pasquarella Decl. Exh. 16 (ICE |

9

| | | | |
|---|---|---|---|
| | | issued by ICE agents in the Central District of California are issued on the basis of electronic databases alone, without ever interviewing or even coming into physical contact with the subject or conducting any other investigation.  The Pacific Enforcement Response Center (PERC), which only issues detainers based solely on electronic databases, issues more than 70% of all the detainers ICE issues to people within the jurisdiction of the Central District of California (which is coextensive with the ICE Los Angeles Area of Responsibility). | 30(b)(6) Schichel Dep. Tr. 68:6-23, 125:7-126:9, 128:9-130:19, 137:16-138:20, 140:12-142:14, 143:8-144:20, 145:24-147:3, 150:13-19 (describing PERC's practice of relying on database checks without interviewing individuals)). |
| | 28. | The initial steps of the detainer issuance process are entirely automated. Fingerprints taken by local law enforcement agencies at booking are automatically checked against the FBI's and DHS's fingerprint repositories. If there is a fingerprint match in DHS's fingerprint repository—meaning DHS has some record of the person, including a record of the person applying for an immigration benefit —then an Immigrant Alien Query ("IAQ") is automatically generated. The IAQ is automatically sent to ICE's Law Enforcement Support Center ("LESC") in Burlington, Vermont. | Pasquarella Decl. Exh. 15 at 4 (Secure Communities Standard Operating Procedures); *see also id.* Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 92:15-94:4), Exh. 8 (ICE 30(b)(6) Rapp Dep. Tr. 181:10-183:8). |
| | 29. | IAQ's are also automatically generated whenever a fingerprint pertaining to a person with a foreign or unknown place of birth | Pasquarella Decl. Exh. 17 (CJIS Advisory Policy Board (APB) Identification Services (IS) Subcommittee Staff Paper (October |

10

| | | does *not* match any record in DHS's fingerprint repository. | 22, 2008) (approving request by ICE "to provide an IAQ to the LESC for all IAFIS ten-print Criminal submissions based on a Foreign or Unknown POB" and noting that "if the searches result in 'No match,' the outcome will be a biographic-based IAQ and may indicate a first encounter of a potential illegal alien."); *id.* Exh. 8 (ICE 30(b)(6) Rapp Dep. Tr. 190:15-191:12). |
|---|---|---|---|
| | 30. | IAQs automatically enter a data system at ICE's Law Enforcement Support Center, where they are placed in a queue. Once an IAQ rises to the top of the queue, an ICE employee picks it off of the line, conducts cursory initial database queries, and issues an Immigrant Alien Response ("IAR") to ICE's Pacific Enforcement Response Center ("PERC") as well as the law enforcement agency with custody of the individual. | Pasquarella Decl. Exh 8 (ICE 30(b)(6) Rapp Dep. Tr. 181:10-183:8). |
| | 31. | An IAR contains basic biographic information, criminal history information, and a terse statement about the person's immigration status and whether the person may be removable. | Pasquarella Decl. Exh. 15 (Secure Communities Standard Operating Procedure at 4-5, 7); Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. Dep. 107:18-108:3) (referring to Exh. 63); *id.* Exh. 18 (Exh. 63 to Schichel Dep. at ICE 2479, 2482) (sample IAR stating U.S. born citizen was possible visa overstay). |
| | 32. | An IAR based on a match in DHS's fingerprint repository is known as a biometric IAR.  An IAR based on no-match in DHS's fingerprint repository and a | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 37:20-38:11, 101:12-102:16) (confirming the SC3 and PERC received biographic IARs). |

11

|  | | |
|---|---|---|
|  | foreign or unknown place of birth is known as a biographic IAR. | |
| 33. | The PERC (which, before 2015, was known as the Secure Communities Command Center ("SC3")) is located in a federal building in Laguna Niguel, California. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 60:18-60:19). |
| 34. | Today, the PERC issues detainers 24 hours a day within ICE's Los Angeles Area of Responsibility (which is coextensive with the Central District of California) and to 42 states and two U.S. territories after-hours. | Pasquarella Dec. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 64:14-18); *id.* Exh. 19 (Demore Dep. Tr. 32:8-36:8); *id.* Exh. 20 (Map of PERC coverage). |
| 35. | The PERC only issues detainers based on electronic database searches. PERC agents do not conduct interviews of subjects before placing a detainer. | Pasquarella Decl. Exh. 16 (Schichel 30(b)(6) Dep. Tr. 125:7-126:9, 128:9-130:19, 137:16-138:20, 140:12-142:14, 143:8-144:20, 145:24-147:3, 150:13-19) (describing PERC's practice of relying on database checks without interviewing individuals)). |
| 36. | The PERC continues to receive both biometric and biographic IARs from the LESC. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Cont. Dep. Tr. 247:14-18). |
| 37. | When the PERC receives an IAR from the Law Enforcement Support Center, it automatically prints with a stamp at the top containing a checklist of information to be completed by a contractor. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 110:2-111:11); *id.* Exh. 21 (Benton Dep. Tr. 23:13-18, 29:21-23; 31:10-24). |
| 38. | The IAR is then received and reviewed by one of PERC's contractors. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 104:22-105:7). |
| 39. | The contractors (also known as "analysts") are not federal employees and not immigration agents. | Pasquarella Decl. Exh. 19 (Demore Dep. Tr. 40:18-42:12). |
| 40. | The contractors run routine | Pasquarella Decl. Exh. 16 (ICE |

| | | database checks, print the results of those databases, and make a recommendation to an ICE agent responsible for issuing detainers as to whether a detainer should be issued. | 30(b)(6) Schichel Dep. Tr. 104:22-105:7); *id.* Exh. 19 (Demore Dep. Tr. 40:18-42:12); *id.* Exh. 21 (Benton Dep. Tr. 30:2-32:12). |
|---|---|---|---|
| | 41. | A worksheet or a stamp on the top right hand corner of the IAR tells the contractor what databases to check. | Pasquarella Decl. Exh. 21 (Benton Dep. Tr. 31:10-32:6); *id.* Exh. 22 at ICE 652 (Southern California Secure Communities Support Center (SC3): Standard Operating Procedures (Draft) (October 13, 2011)). |
| | 42. | By checking the boxes on the worksheet or the stamp, the contractor indicates what databases he or she checked and whether or not the contractor recommends a detainer. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 110:18-111:11). |
| | 43. | The contractor then presents a packet containing the IAR and the database printouts to an ICE agent. The agent reviews the information and makes a determination whether the individual may be amenable to removal. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 104:22-105:25). |
| | 44. | The agent may or may not conduct his or her own database searches. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 149:11-24); *id.* Exh. 21 Benton Dep. Tr. 42:7-19). |
| | 45. | The agent does not perform any other investigation outside of database checks before determining whether to issue a detainer. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 125:7-126:9, 128:9-130:19, 137:16-138:20, 140:12-142:7, 143:8-144:20, 145:24-147:3)). |
| | 46. | ICE agents are required to record their reasons for issuing a detainer in a field provided in ICE's internal ENFORCE system (now known as EAGLE) | Pasquarella Decl. Exh. 23 (I-213 Narratives for Detainer Cases); *id.* Exh. 24 at 490 (SC3 ENFORCE Reference Guide); *id.* Exh. 16 (ICE 30(b)(6) Schichel 149:5-10). |

13

| | | | |
|---|---|---|---|
| | | whenever a detainer is electronically generated.  The field that agents are instructed to complete consists of a boilerplate fill-in-the-blanks paragraph.  It concludes "upon review of database information it was determined that subject was amenable to DHS/ICE enforcement action as (LPR, Prior Removal, Final Order fugitive, EWI, etc")", without ever providing the individual and particularized reasons why such conclusion was made. | |
| | 47. | During the entirety of this lawsuit, PERC's process for vetting IARs and determining whether to issue a detainer has remained the same. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 104:22-106:11). |
| | | **ICE's Policies and Training on Evidentiary Standard for Detainer Issuance** | |
| | 48. | Until November 2014, ICE provided no formal training to its employees *at all* on detainer issuance.  Agents' training was limited to "on-the-job" training. | Pasquarella Decl. Exh. 7 (ICE 30(b)(6) Hamm Dep. Tr. 23:4-26:20, 67:15-68:13, 103:10-105:10); *see also id.* Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 25:3-11; 150:20-151:4, 167:6-15); *id.* Exh. 3 (San Martin Dep. Tr. 46:12-24, 48:24-49:5); *id.* Exh. 21 (Benton Dep. Tr. 82:5-15). |
| | 49. | In November 2014, ICE announced that it was terminating the Secure Communities program and implementing a new program called the Priority Enforcement Program. At that time, ICE provided a webinar training to its agents on the changes made through its Virtual University online training program. | Pasquarella Decl. Exh. 25 (PEP Webinar). |

14

| | | |
|---|---|---|
| 50. | After the release of the I-247X form, ICE provided another webinar explaining what that detainer form was for. This webinar took only one hour to complete. | Pasquarella Decl. Exh. 26 (I-247X Webinar); *id.* Exh. 27 at ICE 4783. |
| 51. | To date, these are the only training materials ICE has provided its staff on detainer issuance. | *See* Pasquarella Decl. ¶30 (Plaintiffs' Request for Production No. 1 asked for all training materials from December 2012 to the present, but these webinars are the only two provided). |
| 52. | Neither webinar provided any training on what databases ICE agents issuing detainers on the basis of electronic database searches were required to check. | Pasquarella Decl. Exh. 25 (PEP Webinar); Exh. 26 (I-247X Webinar). |
| 53. | Neither webinar provided any training on the content or limitations of the electronic databases available to ICE agents issuing detainers. | *See id.* |
| 54. | Neither webinar provided meaningful guidance on the probable cause standard for issuance of a detainer. | *See id.; see also* Pasquarella Decl. Exh. 21 (Benton Dep. Tr. 35:4-37:12) (ICE PERC agent recalling that he learned "[v]ery little" from the webinar and only recalled that it explained the enforcement priorities). |
| 55. | Both trainings instructed confusingly that an immigration detainer is not an arrest, suggesting that the Fourth Amendment does not apply to immigration detainers as a matter of law. | Pasquarella Decl. Exh. 25 (PEP Webinar) at ICE 4044 ("Although a detainer is not an arrest . . . as a matter of policy DHS requires probable cause . . . ."); *Id.* Exh. 26 at ICE 4152 (I-247X Webinar) ("Although a detainer is not an arrest, as a matter of policy, DHS requires that prior to issuing a detainer, an immigration officer |

15

| | | must possess probable cause that the subject is a removable alien."). |
|---|---|---|
| 56. | The webinars fail to explain what it means to have probable cause other than reciting the four checkboxes listed on the 2015 detainer forms. Curiously, the webinars instruct that "probable cause sufficient to support the issuance of a detainer may be established with, *but is not limited to,* [one of the four checkboxes]." | Pasquarella Decl. Exh. 25 at 4825 (PEP webinar); Exh. 26 at 4147, 4152-53 (I-247X webinar). |
| 57. | The third checkbox for a finding of probable cause—i.e. "biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status, is removable under U.S. immigration law,"—is nowhere explained in any ICE training or written guidance. | Pasquarella Decl. Exh. 25 (PEP webinar); *id.* Exh. 26 (I-247X webinar); *id.* Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 58:24-60:6, 150:4-151:5) (testifying that draft SOP was the only written guidance given to ICE agents regarding detainer issuance and investigatory steps). |
| 58. | In addition to a lack of training, ICE has provided its employees only very vague, limited written guidance on the quantum of evidence required before issuing an immigration detainer based solely on electronic databases. The guidance ICE has provided explains only in very general terms how to complete a detainer form; states what categories of people should be issued detainers based on enforcement priorities; and provides conclusory | Pasquarella Decl. Exh. 28 at ICE 81 (Chapter 43: Detainers, Subpoenas, and Warrants); *id.* Exh. 29 (2012 Morton Memo); *id.* Exh. 30 (2010 Interim Policy on Detainers) ("If an immigration officer has reason to believe that an individual arrested by an LEA is subject to ICE detention for removal or removal proceedings,. . .the Immigration officer may issue a detainer"); *id.* Exh. 13 (2014 Jeh Johnson Memo); *id.* Exh. 25 (PEP webinar); *id.* Exh. 26 (I-247X |

| | | statements about the standard for detainer issuance. | webinar); *id.* Exh. 22 (SC3 Draft SOP, Oct. 2011); *id.* Exh. 31 (2017 Detainer Policy); *id.* Exh. 16 (ICE 30(b)(6) Schichel 58:24-60:6, 150:4-151:5). |
|---|---|---|---|
| | 59. | The only written guidance ICE ever provided that describes in any detail the database checks that ICE contractors and agents are required to perform prior to issuing a detainer is in a draft Standard Operating Procedure that was last updated in 2011. | Pasquarella Decl. Exh. 22 (SC3 Draft SOP, Oct. 2011); *id.* Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 54:13-60:6, 146:12-19; 150:4-19). |
| | 60. | This SOP was never finalized or approved.  Still, ICE's 30(b)(6) witness for the SC3 and PERC testified that agents were provided copies of the draft. To this day, PERC does not have an approved SOP and is operating off the 2011 draft SOP. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 54:13-60:6). |
| | 61. | The SOP provides no guidance on how to review database information for evidence of alienage and removability. | Pasquarella Decl. Exh. 22 (SC3 Draft SOP); *id.* Exh. 16 (ICE 30(b)(6) Schichel Cont. Dep. Tr. 245:15-246:7). |
| | 62. | Neither the SOP nor any other guidance or training provided by ICE instructs how to identify indicators of U.S. citizenship in electronic databases or how to spot or resolve inconsistencies in database information, nor has ICE provided any guidance addressing when database information is too inconclusive to justify issuing a detainer. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 58:24-60:6, 150:4-151:5) (testifying that the draft SOP was the only written guidance given to ICE agents regarding detainer issuance and investigatory steps); *id.* Exh. 22 (SC3 Draft SOP, Oct. 2011). |
| | 63. | Although ICE *policy* has changed during the course of this litigation | Pasquarella Decl. Exh. 32 (Defs' Resp. to RFA 21 & 22). |

17

| | | |
|---|---|---|
| | to expressly require probable cause, the agency has maintained the same legal position all along that "the U.S. Constitution does not mandate that an ICE officer have probable cause of an individual's removability prior to issuing a detainer against that individual and that, instead, a lesser standard suffices." | |
| 64. | ICE has argued in this case that a detainer only requests that a law enforcement agency maintain custody, but does not purport to provide legal authority for the arrest. | Defendants' Motion to Dismiss, Dkt. 31, at 22 ("an immigration detainer may *request* that the *LEA maintain custody* of an individual who would otherwise be released to provide ICE time to assume custody. . . . In other words, none of the functions of an immigration detainer constitute an arrest or are the basis of any deprivation of liberty."). |
| 65. | ICE's 30(b)(6) witness for ICE Headquarters testified that an immigration detainer does not provide authority for a law enforcement agency to continue to detain a person, rather "that would be up to the individual law enforcement agency to determine what authority or right they have to hold an individual beyond the completion of their [] criminal process." | Pasquarella Decl. Exh. 8 (Rapp Dep. Tr. 134:23-135:24). |
| 66. | In the early 1990's, ICE's predecessor, the INS, took an entirely different view on this issue. INS recognized that "[a]ll authority exercised by INS officers must conform to | Pasquarella Decl. Exh. 33 at ICE 189-90 (INS, The Law of Arrest, Search and Seizure for Immigration Officers (January 1993)). |

18

| | | | |
|---|---|---|---|
| | | constitutional limitations, such as the fourth amendment" and noted that INS's statutory authority is "subject to constitutional limitations." | |
| | 67. | INS instructed that "[a] detainer [that requests detention] is an arrest that must be supported by probable cause." | Pasquarella Decl. Exh. 33 at ICE at 208 (INS, The Law of Arrest, Search and Seizure for Immigration Officers (January 1993)). *Id.* at 208; *see also id.* Exh. 34 at ICE 329 (CAP Handbook) (referring to detainers as proxy arrests). |
| | 68. | ICE's indifference to and uncertainty about what quantum of evidence is required before issuing a detainer is reflected not only in the changing language of its detainer form, but also in the testimony and notes of ICE officers who were deposed in this case.  For example, Brian Demore, the Director of PERC, and David Marin, now the ICE Los Angeles Field Office Director—indicated that, prior to the 2015, they understood the evidentiary standard for issuing a detainer to be reasonable suspicion, with probable cause required only to take someone into ICE's physical custody. | Pasquarella Decl. Exh. 35 (Demore's deposition preparation notes); *id.* Exh. 36 (Marin Dep. Tr. 90:21-91:15).  *Cf. id.* Exh. 19 (Demore Dep. Tr. 90:2-21) (testifying that pre-2015 the standard was actually "reason to believe" and that "what hasn't changed is that probable cause has always been applied at the point that alien is arrested or picked up."). |
| | 69. | ICE has similarly reflected uncertainty about the evidentiary standards for detainer issuance in other recent detainer litigation. | Pasquarella Decl. Exh. 37 (ICE Boston Field Office Director Bruce Chadbourne Depo. Tr. 45:3-9, 84:24-86:25, in *Morales v. Chadbourne*, No. 12-301 (D.R.I. 2015) (testifying that "an ICE agent does not have to make a |

| | | |
|---|---|---|
| | | determination that a person is in the country illegally before issuing a detainer" and only "reasonable suspicion" not "probable cause" was necessary to issue a detainer); *id.* Exh. 38 (Oral Argument Transcript at 19, Dkt. 79, *Galarza v. Szalczyk*, No. 10-06815 (E.D. Pa. Jan. 10, 2012)) (government attorney explained ICE uses detainers as "a stop gap measure . . . to give ICE time to investigate and determine whether somebody's an alien, and/or subject to removal, before local law enforcement releases that person from custody."); *id.* Exh. 39 (ICE 30(b)(6) Philip T. Miller Dep. Tr. at 60-61, 88-89, in *Jimenez Moreno v. Napolitano*, No. 11-5452 (N.D. Ill. June 6, 2013) (confirming that the pre-2015 detainers were not "required to be supported by probable cause"). |
| **Electronic Database Searches** | | |
| 70. | ICE requires contractors and agents issuing detainers on the basis of electronic database checks alone to check only four databases prior to issuing a detainer.  Those databases are the following: (1) Central Index System ("CIS"), (2) Computer Linked Application Information Management Systems ("CLAIMS"), (3) Treasury Enforcement Communications System ("TECS"), and (4) Enforcement Case Tracking System ("ENFORCE")/ EARM. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel 149:11-150:3); *id.* Exh. 22 at ICE 618, 652 (SC3 Draft SOP); *id.* Exh. 55 (Secure Communities Worksheet "All Fields Mandatory"). |

| | | |
|---|---|---|
| 71. | There is no requirement that contractors or agents check any other databases; they are left to their discretion to do so if they feel it is necessary. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel  146, 149:11-150:3, 155:23-156:2). |
| 72. | Of the four databases that ICE requires officers to check prior to issuing a detainer, only two—CIS and CLAIMS—contain immigration status and naturalization information. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 159:8-161:22) ("[ICE agents] can go [into CIS] and find immigration status"); *id.* Exh. 22 at ICE 618 (SC3 Draft SOP) ("A [CIS] check is to verify alien number(s), entry status, entry date, and provide quick reference of EOIR decision information."); *id.* ("[CLAIMS] will provide information on benefits that have been approved and those for which an alien has applied.")  *See also id.* Exh. 40 (ICE 30(b)(6) Witness Kerry Kaufman Dep. Tr. 150:2-150:13, *Jimenez Moreno v. Napolitano*, Case No. 11-cv-5254 (N.D. Ill.) (testifying that ICE relies on CIS for naturalization and citizenship information)). |
| 73. | CIS is a database maintained by U.S. Citizenship and Immigration Services ("USCIS"), the agency that "oversees lawful immigration to the United States and is responsible for processing petitions, applications, and other requests for immigration benefits." | Pasquarella Decl. Exh. 54 (2017 Privacy Impact Assessment for the Central Index System). |
| 74. | "CIS serves as a DHS-wide index used to track the location of case files, to include Alien Files (A-File) nationally and to maintain alien status and repository information.  CIS provides | *Id.*; *see also* Pasquarella Decl. Exh. 22 at ICE 618 (SC3 Draft SOP) ("A Central Index System (CIS) is to verify alien number(s), entry status, entry date, and provide quick reference of EOIR decision |

21

| | | information used for granting or denying benefits and capturing subsequent status changes; documenting chain of custody for enforcement; keeping track of immigrant statistics; and control and account of record keeping services in accordance with the Code of Federal Regulations (CFR) to certify the existence or non-existence of records.  CIS is a repository of electronic data that summarizes the history of an immigrant in the adjudication process." | information."). |
|---|---|---|---|
| | 75. | CIS interfaces with 20 other data systems, both internal and external to DHS. | Pasquarella Decl. Exh. 54 (2017 Privacy Impact Assessment for the Central Index System). |
| | 76. | CLAIMS is also a database maintained by USCIS.[1]  It contains information about immigration benefits applications and the disposition of those applications. | Pasquarella Decl. Exh. 7 (ICE 30(b)(6) Hamm 220:22-24); *id.* Exh. 22 at ICE 618 (Draft SC 3 SOP) (describing CLAIMS); *id.* Exh. 41 (Privacy Impact Assessment for CLAIMS 4); *id.* Exh. 42 (Privacy Impact Assessment for CLAIMS 3). |
| | 77. | ENFORCE/EARM, now known as EAGLE, is ICE's electronic booking application. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel 157:25-158:1); *id.* Exh. 7 (ICE 30(b)(6) Hamm Dep. Tr. 41:18). |
| | 78. | Through EAGLE, ICE agents may access "information related | Pls. Request for Judicial Notice, Exh. C at 2 (Privacy Impact |

---

[1] CLAIMS includes both CLAIMS 3, which maintains records of applications for immigration benefits other than naturalization, refugee status, and asylum, and CLAIMS 4, which maintains records of naturalization applications. *See* Pasquarella Decl. Exh. 41 (Privacy Impact Assessment for CLAIMS 4); *id.* Exh. 42 (Privacy Impact Assessment for CLAIMS 3); *id.* Exh. 22 at ICE 618 (SC 3 Draft SOP) (referring only to "CLAIMS").

| | | to the investigation, arrest, booking, detention, and removal of persons encountered during immigration and criminal law enforcement investigations and operations conducted by ICE and U.S. Customs and Border Protection (CBP). | Assessment for EAGLE). |
|---|---|---|---|
| | 79. | TECS contains criminal history information and information on non-immigrant admissions (such as admissions on tourist or other non-immigrant visas). | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel 158:22-159:7) (information in TECS includes criminal history, arrest record, charges and convictions, biographical information, birth dates, and aliases). *See also id*. Exh. 22 at ICE 618 (SC3 Draft SOP) (describing TECS) |
| | 80. | ICE agents and contractors have access to other databases that may contain information that could confirm an individual's citizenship, but agents are not required to check them before issuing a detainer. | *See* Pasquarella Decl. Exh. 22 at ICE 618, 652 (SC3 Draft SOP) (listing minimum required checks). *See also supra* ¶ 71. |
| | 81. | For example, the State Department's CCDI database contains records of U.S. passport holders and California's Live Birth electronic database contains information about all persons born in California. | Pasquarella Decl. Exh. 16 (ICE 30(b)(6) Schichel 167:16-170:5); Exh. 21 (Benton 71:16-19) ("Q Are there any – have you had any instruction that you have to check specific databases to determine whether or not someone is a citizen?  A  No."); *id.* at 71:20-21 ("Q  Do you ever check California live births?  A No."); *id.* at 73:11-14 ("Q  Are there any circumstances under which you are required to check CCDI and that you've received some sort of |

23

| | | |
|---|---|---|
| | | instruction from – that you must check CCDI?  A  No."). |
| 82. | Aside from CIS and CLAIMS—which, as described below, are incomplete and inaccurate—none of the other electronic databases to which ICE officers issuing detainers have access even purport to contain comprehensive information regarding applications for naturalization or other immigration benefits. | *See* Pasquarella Decl. Exh. 7 (ICE 30(b)(6) Hamm Dep. Tr. 220:10-221:4) (testifying that "the only way" to check the information in CIS and CLAIMS "is by looking at the alien file," which is a paper file maintained by USCIS that is not generally reviewed before issuing detainers, *see infra*¶¶ 103-04. |

**Electronic Databases are Unreliable and Incomplete**

| 83. | The electronic databases ICE reviews to determine alienage and immigration status—CIS and CLAIMS—are woefully incomplete and notoriously unreliable. | *See infra* ¶¶ 84-138. |
|---|---|---|

***The Databases are Incomplete Sources of Information about Immigration Status and History***

| 84. | CIS was not designed to provide comprehensive information on an individual's citizenship or immigration status.  Rather, CIS was designed "as an initial screening process to provide a quick look at a person's basic information . . . to determine if there is a need to request the physical [A] file." | Pasquarella Decl. Exh. 43 (2007 Privacy Impact Assessment for CIS). |
|---|---|---|
| 85. | Put another way, "CIS is intended to be a 'pointer' system that will lead to the alien's A-file, which should contain complete information on the alien, or to other databases." | Pls. Request for Judicial Notice, Exh. E (The Rafael Resendez-Ramirez Case: A Review of the INS's Actions and the Operation of Its IDENT Automated Fingerprint Identification System). |
| 86. | CIS was designed to be "used by both law enforcement and benefits bestowing operations to | Pasquarella Decl, Exh. 43 at 7 (2007 Privacy Impact Assessment for CIS) (emphasis added). |

24

| | | | |
|---|---|---|---|
| | | determine if . . . an individual is eligible for an immigration related benefit, or should be detained and/or investigated for enforcement reasons, *in which case the government user would request the physical A-File.*" | |
| | 87. | CLAIMS was designed as a case management system to process applications. "At a very high level, CLAIMS 3 and associated systems are old, legacy mainframe systems that do not have the capability to interface in real-time with other systems or to generate reports, metrics, or aggregated statistics." | *See* Pasquarella Decl. Exh. 42 at 1-2 (CLAIMS 3 Privacy Impact Assessment). |
| | 88. | Contrary to its stated purpose and use, since the outset of Secure Communities, ICE has been using CIS not as a pointer system, but as a comprehensive source of information about alienage and immigration status. | *See supra* ¶¶ 70-72. |
| | 89. | There are significant gaps in records and information in CIS. An ICE 30(b)(6) witness in a similar detainer case in the Northern District of Illinois testified that there are "big gaps" in naturalization records in CIS, especially for records of naturalization before 1990. | Pasquarella Decl. Exh. 40 (ICE 30(b)(6) Witness Kerry Kaufman Dep. Tr. 151:4-15, *Jimenez Moreno v. Napolitano*, Case No. 11-cv-5254 (N.D. Ill.). |
| | 90. | Fingerprint-based searches of CIS and CLAIMS are subject to significant limitations. This is because "ICE investigators only began consistently uploading fingerprints taken from aliens during law enforcement | Pls. Request for Judicial Notice, Exh. F at 4 (DHS OIG Report, Potentially Ineligible Individuals Have Been Granted U.S. Citizenship Because of Incomplete Fingerprint Records). |

25

| | | |
|---|---|---|
| | encounters into the [IDENT] repository around 2010" and USCIS only began consistently uploading fingerprints of individuals who apply for immigration benefits in 2008. Moreover, "when INS initially developed and deployed IDENT in 1994, it did not digitize and upload the fingerprint records it had [previously] collected on paper cards." | |
| 91. | Since pre-2010 records of enforcement encounters and applications for immigration benefits are not consistently associated with digitized fingerprints, electronic fingerprint-based searches of CIS or CLAIMS may not reliably turn up pre-2010 records. | *Id.* |
| 92. | ICE has made some effort to digitize pre-1994 fingerprint records of non-citizens with final removal orders or who were categorized by the agency as fugitives or people convicted of crimes, but those efforts are incomplete.<br><br>ICE does not appear to have made any effort to digitize pre-1994 fingerprints of applicants for naturalization or other immigration benefits. | *Id.* |
| **The Databases are Inaccurate** | | |
| 93. | In addition to the significant gaps of information in CIS and CLAIMS, CIS and CLAIMS databases are also replete with | *See infra* ¶¶ 94-115. |

| | | |
|---|---|---|
| | errors, of which ICE is well aware. | |
| 94. | ICE encounters errors in CIS in approximately three out of ten cases. | Pasquarella Decl. Exh. 7 (ICE 30(b)(6) Hamm Dep. Tr. 219:25-220:2). |
| 95. | The errors include "the date of birth, the name, the court information.  And I would say 'et cetera' because it's data entry by a human being, so there's always that probability for error." | Pasquarella Decl. Exh. 7 (ICE 30(b)(6) Hamm Dep. Tr. 219:21-24). |
| 96. | These errors also include missing or inaccurate immigration status information. In fact, historically, oversight bodies have repeatedly found rampant errors in immigration status and other information in CIS, describing the database as "incomplete and inaccurate," and noting that 22% of records "contained either misspelled names, incorrect name order, or incorrect nationality." | Pls. Request for Judicial Notice, Exh. G at 3, 14-15 (GAO Report, Name-based Systems Limit Ability to Identify Arrested Aliens). |
| 97. | For example, an early report on the Systematic Alien Verification for Entitlements (SAVE) database, which was made up of data pulled from the Central Index System, found that the database's class of admission codes—described as "a critical element because it denotes legal status conferred by immigration law"—were missing in 20% of sample records and incorrect in 11% of sample records, with the result that the database could "erroneously show an alien in a legal or illegal immigration status." | Pls. Request for Judicial Notice, Exh. H at 1 n.3, 3 (GAO Report, Immigration Reform: Alien Verification System Data Base Problems and Corrective Actions). |
| 98. | Recent reports form oversight | Pls. Request for Judicial Notice, |

27

| | | | |
|---|---|---|---|
| | | bodies have found similarly disturbing error levels.  For example, a 2012 DHS Office of Inspector General ("OIG") report found that CIS contained incorrect status information for 12% of individuals it studied. | Exh. I at 1, 3-5 (DHS OIG Report, Improvements needed for SAVE to Accurately Determine Immigration Status of Individuals Ordered Deported) (attributing errors in SAVE to failure to update CIS). |
| | 99. | A 2016 DHS OIG report similarly found that, as a result of problems in implementing a new electronic benefits processing system (the "Electronic Immigration System", or "ELIS"), CIS was failing to accurately reflect up-to-date benefits processing information. As a result, "adjudicators could not determine an applicant's status or received incorrect data from the Central Index System." | Pls. Request for Judicial Notice, Exh. J at 14 (DHS OIG Report, Automation of Immigration Benefits Processing Remains Ineffective). |
| | 100. | Immigration status information is particularly difficult to record accurately in a database because it is dynamic and can be constantly changing—a fact that DHS itself has recognized. "For example, if an individual is apprehended along the border and naturalized two years later, IDENT would contain information on the apprehension but may not contain information on the subsequent naturalization." | Pls. Request for Judicial Notice, Exh. K at 41 (DOJ OIG Report, Follow-up Review of the Status of IDENT/IAFIS Integration). |
| | 101. | CLAIMS, like CIS, is also—in ICE's own words—"outdated," "antiquated," and "not updated appropriately." | Pasquarella Decl. Exh. 7 (ICE 30(b)(6) Hamm Dep. Tr. 220:18-19). |
| | 102. | ICE encounters errors in CLAIMS in three out of ten cases. | Pasquarella Decl. Exh. 7 (ICE 30(b)(6) Hamm Dep. Tr. 221:5-8). |

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7 | 103. | The only way to check the information in CIS and CLAIMS is through the primary A-File a paper file maintained by USCIS. "That is the best way.  It's the only way if you want to look and vet the information that's in the citizenship – or in the CIS database is by looking at the alien file." | Pasquarella Decl. Exh. 7 (ICE 30(b)(6) Hamm Dep. Tr. 220:10-221:4). |
| 8<br>9<br>10<br>11 | 104. | However, ICE employees and contractors issuing detainers based on databases are not required to, and generally do not, check the A-file prior to issuing an immigration detainer. | Pasquarella Decl. Exh. 7 (Hamm Dep. Tr. 59:9-11). |
| 12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 105. | In April 2012, David Marin, a senior ICE official in Los Angeles, wrote to an ICE headquarters official stating "For the past couple of months, AFOD Martinez has noticed an increase in the volume of biometric Immigration Alien Responses (IAR) for individuals that are determined, via agency database checks, to be removable, only to later discover that the person is a United States citizen."  Given this problem, the ICE official asked for a "mechanism in which we can modify the CIS database to indicate the individual's true nationality and citizenship" because "[w]e have found that it is not that easy to get USCIS to change someone's status in CIS." | Pasquarella Decl. Exh. 44 (David Marin Email to Denise Cordova). |
| 26<br>27<br>28 | 106. | Mr. Marin followed up in a subsequent email to ICE headquarters reiterating the LA Field Office's concern that "CIS | Pasquarella Decl. Exh. 45 (David Marin email to Oscar Cortez) (emphasis added). |

| | | |
|---|---|---|
| | is not updating its databases, so when we run our queries and it shows the subject is a LPR, we take appropriate action.  This case appears to be exactly that; CIS databases show the subject as a LPR, so the hold was properly placed based on the information we had at the time.  Now the subject claims to be a USC and has a natz cert; if this is true and the Central Index System was timely updated, we may not have run into this issue.  *Unfortunately these types of cases occur frequently.*" | |
| 107. | At his deposition, Mr. Marin stated that he was unaware whether the problems were addressed and did not know of any policies, documents, or procedures created to resolve the problem. | Pasquarella Decl. Exh. 36 (Marin Dep. Tr. 194:9-195:2, 196:10-18). |
| 108. | It remains very difficult to correct errors and mistakes in CIS.  Only certain designated people at USCIS are authorized to modify CIS.  ICE cannot modify CIS when it encounters errors. | Pasquarella Decl. Exh. 54 at 11 (2017 Privacy Impact Assessment for CIS) ("Only authorized USCIS Records staff have the ability to add or edit data . . . .") |
| 109. | Despite the long and well-documented history of gaps, errors, and inaccuracies in CIS and CLAIMS, neither ICE nor USCIS (the agency that maintains CIS and CLAIMS) performs any regular audit or consistent quality control to assess the overall accuracy and error rate of those databases.  Nor has it taken steps to systematically improve its accuracy or to complete the | Pasquarella Decl. ¶¶ 62-65, Exh. 56 (describing DHS's failure to produce any documents regarding overall accuracy or systemic efforts to correct existing gaps and errors in CIS and CLAIMS in response to subpoena seeking such documents); *id.* Exh. 7 (ICE 30(b)(6) Hamm Dep. Tr. 218:19-23) ("[T]he only ICE database that ICE does quality control on is E-ARM"); *id.* Exh. 16 (ICE 30(b)(6) |

| | | untold numbers of missing fingerprints and records. | Schichel Dep. Tr. 171:11-172:5) (testifying that he does not know whether CIS contains accurate naturalization information). |
|---|---|---|---|
| | 110. | These errors regularly result in ICE issuing detainers on U.S. citizens and other individuals who are not removable. | *See, e.g.,* Declaration of Jennifer Poon, filed concurrently herewith; Gonzalez TAC, Dkt. 44 ¶¶38-47 (citing statistics and cases); *Morales v. Chadbourne*, No. CV 12-301-M-LDA, 2017 WL 354292, at *6 (D.R.I. Jan. 24, 2017) (granting summary judgment for U.S. citizen Plaintiff on claim that her arrest on an immigration detainer that was issued solely on the basis of an indication of foreign birth and no match in electronic databases violated the Fourth Amendment; finding that "CIS is not complete" and "the lack of record in an acknowledged incomplete database cannot form the basis for a probable cause determination"); *Ortega v. ICE*, 737 F.3d 435, 437  (6th Cir. 2013) (dismissing due process claim of U.S. citizen who had been subject to ICE detainer because his "name and birth date resembled, though they did not exactly match, those of an unlawful alien" on ground that there was no clearly established due process right to serve sentence at home); *Makowski v. United States*, 27 F. Supp. 3d 901, 913 (N.D. Ill. 2014) (denying motion to dismiss Privacy Act claim against DHS for willfully violating its Privacy Act duty to retain accurate records where it failed to update U.S. citizen Plaintiff's |

naturalization records for twenty years despite receiving notice that the records were inaccurate, threreby resulting in issuance of immigration detainer against him); *Mayorov v. United States*, 84 F. Supp. 3d 678, 685 (N.D. Ill. 2015) (granting in part and denying in part cross motions for summary judgment where U.S. citizen challenged detention on a detainer issued on the basis of electronic database checks that failed to reflect his citizenship due in part to inconsistencies in his mother's name in the CIS database); *Davila v. United States*, 13-CV-00070, 2017 WL 1162912, at *13-*14 (W.D. Pa. Mar. 28, 2017) (granting motion to reconsider dismissal of false arrest claim where ICE arrested U.S. citizen in reliance on inaccurate electronic database information which turned up three separate A-numbers, each associated with a different immigration status, none of which was accurate); *Castillo v. Skwarksi*, No. C08-5683BHS, 2009 WL 4844801, at *4 (W.D. Wash. Dec. 10, 2009) (denying motion to dismiss Fourth Amendment unreasonable imprisonment claim where ICE issued detainer for U.S. citizen who it had identified as a foreign-born no match as a result of his name being misspelled in the Central Index System); Moreno v. Napolitano, 213 F. Supp. 3d 999, 1001 (N.D. Ill. 2016) (challenging detainers placed on U.S. citizen

| | | and non-removable lawful permanent resident); *Galarza v. Szalczyk*, 745 F.3d 634, 636 (3d Cir. 2014)  (challenging detainer placed on U.S. citizen); *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (same); *Ocampo v. Harrington,* No. 14-3134, 2015 WL 4910164 (C.D. Ill. Aug. 17, 2015) (same). |
|---|---|---|
| 111. | These errors are magnified by the fact that often people subject to detainers have no way to notify ICE that the detainer was placed in error.  In particular, unless the LEA serves the detainer on an inmate—which it often does not do—she may not know that she is subject to a detainer and will not receive the notice provide on the detainer forms regarding who to call at ICE if she is a U.S. citizen or not subject to removal. | Pasquarella Decl. Exh. 4 at ¶ 11 (Decl. of Gerardo Gonzalez) (stating that Los Angeles County Sheriff's Department never served a copy of his detainer on him); *id.* Exh. 46 (LASD 30(b)(6) Hoang Dep. Tr. 59:7-20) (Aug. 9, 2015) (LASD policy did not require that inmates be given copies of their detainers until October 2015); *id.* Exh. 12 (June 2015 I-247D); *id.* Exh. 11 (current I-247A). |
| 112. | While ICE requests that LEAs provide subjects of detainers with a copy of the detainer, it has no mechanism to ensure or keep track of whether the LEA complies with the request. | Pasquarella Decl. Exh. 8 (ICE 30(b)(6) Rapp Dep. Tr. 58:22-60:1) (no ICE mechanism to track whether a person received a copy of his detainer). |
| 113. | Even if an individual is made aware that he is subject to a detainer, he generally has no way to alert ICE that he is a U.S. citizen or not subject to removal because the only means ICE has made available to lodge a complaint is through a toll-free hotline. | Pasquarella Decl. Exh. 12 (June 2015 I-247D) (listing hotline number on second page); *id.* Exh. 11 (current I-247A) (same). |
| 114. | However, discovery in this case | *See, e.g.,* Pasquarella Decl. Exh. 47 |

33

| | | revealed that people in jail generally cannot make toll-free phone calls because phone service does not permit it and that ICE has known that since at least 2012. | (ICE headquarters surveying LEAs to see if they permit inmates to call the 800 numbers listed on the detainer form; Ventura County Sheriff's Department responded that their inmate phone system does not permit 800 calls); *id.* Exh. 48 at 2.10.6.2, COLA 719 (Los Angeles County Sheriff's Department Inmate Telephone System and Services) (blocking all inmates calls to 1-800, 1-877, 1-888, etc. numbers). |
| 115. | As a result, the only way for an individual to notify ICE that he is erroneously subject to a detainer is to have someone else call to report a complaint. | Poon Decl. at ¶¶25-27. |

### The Databases Do Not Contain Information Necessary to Determine Probable Cause of Alienage

| | | | |
|---|---|---|---|
| 116. | In addition to containing significant gaps and inaccuracies, the databases ICE checks prior to issuing a detainer also simply lack entire categories of information necessary to determine alienage.  This is not a result of gaps or inaccuracies in the information contained in the databases; rather the databases simply do not capture (or even attempt to capture) numerous categories of information relevant to assessing alienage. | *See infra* ¶¶ 117-36. |
| 117. | Probable cause of removability depends on there first being probable cause that a person is not a U.S. citizen. | Pasquarella Decl. Exh. 7 (ICE 30(b)(6) Hamm Dep. Tr. at 72:5-73:22) (testifying that establishing alienage is a "key factor" in establishing probable cause of removability). |
| 118. | All persons born in the United | U.S. CONST. amend. XIV § 1. |

34

| | | |
|---|---|---|
| | States are automatically U.S. citizens. | |
| 119. | There is no federal database of U.S. born citizens. | Pasquarella Decl. Exh. 19 (Demore Dep. Tr. 98:11-99:4) (explaining that U.S. citizens generally do not appear in DHS databases). |
| 120. | Persons born abroad may also be United States citizens. Over 17 million U.S. citizens of foreign birth are currently living in the United States (44% of the U.S. foreign-born population). | Pls' Request for Judicial Notice, Exh. L (Census Report, The Foreign Born Population in the United States: 2010).  *See also Morales v. Chadbourne*, 996 F. Supp. 2d 19, 35 (D.R.I. 2014). |
| 121. | People born abroad may acquire citizenship in one of two ways: automatically through their parents (known as "derivative citizenship") or through naturalization. | *See infra*, ¶¶ 122-25. |
| 122. | To naturalize, a person must file an application with USCIS, undergo and interview and naturalization exam, and take the oath of naturalization, upon which time they are presented a naturalization certificate. In theory, CIS and CLAIMS should record these events. | 8 U.S.C. § 1427; *see also supra* ¶¶ 74, 76. |
| 123. | People who derive citizenship through their parents, in contrast, do so *automatically* by operation of law.  Importantly, "no application is filed, no hearing is conducted, and no certificate is issued when such citizenship is acquired." | *See Matter of Fuentes-Martinez*, 21 I. & N. Dec. 893, 896 (BIA 1997). |
| 124. | Determining derivative citizenship can be quite complex. | *See, e.g., United States v. Casasola*, 670 F.3d 1023, 1026-28 (9th Cir. 2012). |

| 125. | Depending on the law in effect when the person was born, a person born abroad may automatically become a U.S. citizen *at birth* if one or both of the parents is a U.S. citizen and other criteria are met. A person born abroad may automatically acquire or derive U.S. citizenship *after birth* if the child is a lawful permanent resident living in the United States and his or her parent(s) naturalizes as a U.S. citizenship before the child turns 18 years old. The specific requirements to determine when a person automatically derives citizenship in this manner depend on the law in effect at the time of the parent(s) naturalization, which vary significantly during different time periods. | 8 U.S.C. § 1401. |
| --- | --- | --- |
| 126. | There is no database that contains complete information about foreign-born U.S. citizens who derived or acquired U.S. citizenship.<br><br>CIS and CLAIMS, would have no record of derivative citizens unless they requested a certificate of citizenship, which they are not required to do. | Pasquarella Decl.  Exh. 16 (ICE 30(b)(6) Schichel Dep. Tr. 172:11-18) ("Would [the database] show if they acquired, if they derived citizenship?  Maybe.  Maybe not. It might not."); *see also supra* ¶ 123 (no application required for derivative citizenship). |
| 127. | Of the population of foreign-born U.S. citizens, DHS estimates that, since 1980, over 1.4 million minors automatically derived U.S. citizenship through a parent's naturalization. | Pls. Request for Judicial Notice, Exh. M at 3 (Estimates of the Lawful Permanent Resident Population in the United States: January 2013). |
| 128. | Additionally, the U.S. Census Bureau estimates that, as of 2015, | Pls. Request for Judicial Notice, Exh. N (U.S. Census Bureau: Place |

| | | | |
|---|---|---|---|
| | | there were 2,765,824 U.S. citizens living in the United States who were born in a foreign country and acquired U.S. citizenship at birth through a U.S. citizen parent. | of Birth by Nativity and Citizenship Status). |
| | 129. | On November 10, 2015, ICE issued a policy directive on ICE's "policy and procedures for ensuring that the potential U.S. citizenship of individuals encountered by [ICE] officers, agents, and attorneys is immediately and carefully investigated and analyzed." | Pasquarella Decl. Exh. 49 at ICE 4073 ("Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE"). |
| | 130. | The policy acknowledges that "ICE cannot assert its civil immigration enforcement authority to arrest and/or detain a U.S. citizen." | *Id.* at 1. |
| | 131. | The policy states that "ICE officers, agents, and attorneys may encounter individuals who are not certain of their citizenship status, who claim to be U.S. citizens, and/or for whom there are indicia warranting further examination to determine whether they may be U.S. citizens." | *Id.* |
| | 132. | ICE agents issuing detainers based solely on electronic databases, and not on interviews or personal encounters with the subject, are thus instructed by this policy to look for indicia of U.S. citizenship.  The policy instructs that if any of these indicia are present, such indicia "trigger the need for further investigation." | *Id.* at 2. |
| | 133. | The investigation should include "review of the A-file and other | *Id.* at 4. |

| | | |
|---|---|---|
| | pertinent documents, an interview of the individual, searches of vital records databases, interviews of family members and other individuals in possession of relevant information, and other appropriate investigation." | |
| 134. | The policy describes ten indicia of U.S. citizenship for agents to look for, all of which reflect the variety of ways a person may automatically acquire U.S. citizenship. | *Id.* |
| 135. | The electronic databases that agents are required to check before issuing a detainer simply cannot reveal most of the indicia the policy instructs ICE agents to look for. | *Id.* at 2 (identifying birth in the U.S.; U.S. citizen parents, siblings, grandparents; service in the U.S. Armed Forces; report from a judge, lawyer, or family member that the person is a U.S. citizen; physical presence of U.S. citizen family members in the United States; adoption by a U.S. citizen; physical presence in the United States prior to the subject's fifth birthday as indicia of possible U.S. citizenship); *id.* Exh. 19 (Demore Dep. Tr. 98:11-99:4 (testifying that U.S. citizens generally do not appear in DHS databases); *id.* Exh. 7 (ICE 30(b)(6) Hamm Dep. Tr. 114:18-118:1) (testifying that ICE cannot determine from databases searches whether an individual has served in the U.S. Armed Forces; whether his grandparents or siblings were born in the U.S.; whether he was present in the U.S. before his fifth birthday; or whether his parents are U.S. citizens). |

| | | |
|---|---|---|
| 136. | In the case of a citizen who derived citizenship from one or both of his or her parents when they naturalized, CIS only reveals the first names of the person's parents, making it impossible in cases where the parents have different last names from the child to research through electronic database searches whether and when the parents naturalized and, thus, whether the child derived citizenship. | *See* Pasquarella Decl. Exh. 50 at 54-55 (Draft CIS User Guide) (stating that the "Father" and "Mother" fields in CIS contain only first names). |
| 137. | Because the databases lack information about most of the indicia of U.S. citizenship, and because individuals subject to detainers generally have no way to make a claim of U.S. citizenship to ICE until they are actually in ICE custody, ICE agents issuing detainers solely based on electronic databases will generally not have access to indicia of U.S. citizenship even where the subject of the detainer is a U.S. citizen. | *See supra* ¶¶ 111-15, 135-36 |
| 138. | ICE agents who issue detainers based solely on electronic databases do not—by definition and by job design—conduct any of the investigatory steps ICE instructs agents to perform in the face of indicia of U.S. citizenship, because they do not pull A-files, conduct interviews, or conduct other types of investigations. | *See supra* ¶¶ 35, 45. |
| | **Detainers Issued on the Basis of Foreign Birth and the Absence of Any Information in the Databases** | |
| 139. | Until June 2015, ICE had a policy and practice of issuing detainers | Pasquarella Decl., Exh. 8 (Rapp 30(b)(6) Dep. Tr. 148:19-149:19) |

| | | based on a person's foreign birth and no records in an immigration database (known as a "foreign born no match"). | ("Q. [W]as it true throughout the entire course of the life of Secure Communities that ICE was issuing detainers on foreign-born no-matches? A. Yes."); *id.* Exh. 51 at ICE4066 (ICE, Priority Enforcement Program) (stating that under Secure Communities, "[s]ome ICE detainers were issued with respect to foreign-born individuals who did not have records or a biometric match in ICE databases without any other additional information"); *id.* Exh. 16 (Schichel 30(b)(6) Dep. Tr. 195:17-196:3). |
|---|---|---|---|
| | 140. | Reflecting the frequency of this practice, ICE developed boilerplate language for recording such "foreign birth-no match" detainers in its databases. | Pasquarella Decl. Exh. 23 (Secure Communities, I-213 Narratives for Detainer Cases). |
| | 141. | ICE admits that evidence of foreign birth and no match in a federal immigration database is not probable cause of removability. | Pasquarella Decl. Exh. 19 (Demore Dep. Tr. 98:11-99:4) (explaining that foreign birth and no match in the database is not sufficient for probable cause because "I would be a no-match, but I'm a U.S. citizen. An individual, similarly, who entered illegally but had never been encountered by a DHS entity would also be a no-match. And so they could be a U.S. citizen or they could be illegally in the country so it means nothing."); *id.* Exh. 7 (Hamm Dep. Tr. 74:24-77:6) (testifying that "you cannot establish probable cause" based only on foreign birth and a no match in electronic databases). |
| | 142. | ICE's definition of probable | Pasquarella Decl. Exh. 11 (I-247A |

| | | cause of removability to issue a detainer explicitly precludes a "foreign born no match" situation, requiring instead that there be a biometric match. | (third checkbox for probable cause due to "biometric confirmation"); *id.* Exh. 51 at ICE 4066 (ICE, Priority Enforcement Program). |
|---|---|---|---|
| | 143. | In 2015 DHS announced that immigration detainers would no longer be issued based on "Foreign Birth-No Match." | Pasquarella Decl. Exh. 51 at ICE4066 (ICE, Priority Enforcement Program); *see also id.* Exh. 31 ¶ 5.1 (2017 Detainer Policy) ("As a matter of policy, an ICE immigration officer may not establish probable cause of alienage and removability, for purposes of detainer issuance, solely based on evidence of foreign birth and the absence of records in available databases ('foreign-born no match')). |
| | 144. | The only formal training ICE has provided on this new policy is a single webinar. | Pasquarella Decl. Exh. 25 at ICE4055 (PEP Webinar). |
| | **DHS's Incomplete and Aborted Effort to Address Widely-Acknowledged Fourth Amendment Deficiencies in Immigration Detainers** | | |
| | 145. | On November 20, 2014, DHS Secretary Jeh Johnson announced that DHS was terminating the Secure Communities program, explaining that: "[g]overnors, mayors, and state and local law enforcement officials around the country have increasingly refused to cooperate with the program, and many have issued executive orders or signed laws prohibiting such cooperation.  A number of federal courts have rejected the authority of state and local law enforcement agencies to detain immigrants pursuant to federal detainers issued under the current Secure Communities program." | Pasquarella Decl. Exh. 13 (2012 Jeh Johnson Memo). |

| | | | |
|---|---|---|---|
| | 146. | DHS left intact the biometric interoperability system, but replaced Secure Communities with the Priority Enforcement Program ("PEP"). Johnson's memo directed ICE to replace detention requests (i.e. detainers) with requests for notification (i.e. requests that LEAs inform ICE of the date and time of a person's release) in order to "address the increasing number of federal court decisions that hold that detainer-based detention by state and local law enforcement agencies violates the Fourth Amendment." Johnson directed ICE to limit detainer requests to "special circumstances" where there is a final order of removal or "other sufficient probable cause to find that the person is removable." | *Id.* at 2 (explaining "ICE should put in [Secure Communities'] place a program that will continue to rely on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies"). |
| | 147. | Johnson's memo also directed ICE to only seek transfer of an individual in state or local law enforcement custody if the individual had been convicted of a crime considered by ICE to be an enforcement priority. | *Id.* |
| | 148. | Following this memo, while ICE did begin issuing notification requests, it did not in fact limit detainer requests to "special circumstances." Instead, it continued to issue significant numbers of detainers nationwide. | Long Decl. ¶¶ 8-9 (In FY 2014, ICE issued 159,210 detainers.  In FY 2015, ICE issued 95,085 detainers.). |
| | 149. | On January 25, 2017, President Donald J. Trump issued Executive Order ("EO") | Executive Order 13768 § 10, 82 Fed. Reg. 8799 (Jan. 25, 2017) |

| | | |
|---|---|---|
| | "Enhancing Public Safety in the Interior of the United States." The EO terminated the PEP program and reinstated the Secure Communities program.  In doing so, the EO eliminated the PEP enforcement priorities. | |
| 150. | On February 20, 2017, DHS Secretary John Kelly issued a memorandum "Enforcement of the Immigration Laws to Serve the National Interest" to implement President Trump's EO. The memo confirms the reinstatement of Secure Communities and the termination of the PEP program, stating the program "added an unnecessary layer of uncertainty for the Department's personnel, and hampered the Department's enforcement of the immigration laws in the interior of the United States." The memo eliminated all existing enforcement priorities and stated "the Department no longer will exempt classes or categories of removable aliens from potential enforcement." | Pasquarella Decl. Exh. 52 at 2-3 (Kelly Memo). |
| **Detainer Statistics** | | |
| 151. | Even after the implementation of the PEP program, ICE detainer issuance remained high while the numbers of individuals actually booked into ICE custody following a detainer was relatively low.  Between May 1, 2015 and February 22, 2016, the PERC issued 12,797 detainers. ICE booked only 2,757 (21.5%) | Pasquarella Decl. ¶¶ 56-57 (describing ICE data produced in response to Pls. Request for Production 44). |

43

| | | of the subjects of these detainers into its custody. | |
|---|---|---|---|
| | 152. | Of 162,494 detainers issued by ICE officers within the ICE Los Angeles Area of Responsibility between October 1, 2010 and February 8, 2016, ICE booked only 50,400 (or 31%) of the subjects into its custody. | Pasquarella Decl. ¶ 58 (describing ICE data produced in response to Pls. Request for Production 44). |
| | 153. | Nationwide, between FY 2007 and FY 2015, ICE prepared 1,842,327 immigration detainers. Only 1,065,698 (or 58%) of the subjects of those detainers were booked into its custody. | Long Decl. ¶ 10. |
| **UNCONTROVERTED FACTS RELATED TO THE STATUTORY SUBCLASS** | | | |
| **ICE Detainers Effect Warrantless Arrests Without Any Assessment of Flight Risk in Violation of the Governing Statute** | | | |
| | 154. | ICE issues detainers without making any determination whether the subject is likely to escape before an administrative warrant can be obtained. | Pasquarella Decl. Exh. 7 (Hamm 30(b)(6) Dep. Tr., 58:19-21 ("So do CAP officers make that assessment of fight risk before issuing the detainer? A No."), 269:3-270:1 ("So ICE doesn't figure out if you have time to issue an ICE warrant before issuing a detainer? That's not part of the process? A. No.")); *id.* Ex. 8 (Rapp 30(b)(6) Dep. Tr. 168:2-20 (Q. Is there a requirement that an officer make a determination about the likelihood that the individual escape before they can obtain a warrant – before issuing a detainer? . . . . THE WITNESS: There is no headquarters requirement for such action -- . . . for such assessment.")). |
| | 155. | Under ICE's 2017 Detainer Policy, ICE now issues an | Govt. Opp. To Pls' Mtn for Partial Summary Judgment, Dkt. No. 225, |

| | | | |
|---|---|---|---|
| | | administrative warrant to accompany an immigration detainer request. | at 3; Pasquarella Decl. Exh. 31 at § 2.4 n.2 (2017 Detainer Policy). |
| | 156. | Detainers issued under ICE's pre-April 2, 2017 policy, including those that were not accompanied by administrative warrants, remain in effect and are not affected by the 2017 Detainer Policy. | *Id.* at § 2.1. |
| | 157. | The 2017 Detainer Policy provides that it "may be modified, rescinded, or superseded at any time without notice" and that "no limitations are placed by this guidance on otherwise lawful enforcement or litigative prerogatives of ICE." | *Id.* at § 9. |
| | 158. | By statute, ICE is authorized to make arrests pursuant to administrative warrants and—under certain circumstances—to make arrests without an administrative warrant.  An arrest without an administrative warrant is permitted only if the ICE officer has a "reason to believe" an individual is removable from the United States and determines the individual "is likely to escape before a warrant can be obtained for his arrest." | 8 U.S.C. § 1357 (warrantless arrest authority); *id.* § 1226(a) (authority to arrest pursuant to administrative warrant). |
| | 159. | Under the 2017 Detainer Policy, despite the issuance of administrative warrants, the detention of an individual in local law enforcement custody pursuant to ICE detainer continues to constitute a warrantless arrest under 8 U.S.C. § 1357 for three reasons. | *See infra* ¶¶ 160-62. |

45

| 160. | First, under DHS regulations, only an immigration officer can make an arrest based on an administrative arrest warrant.[2] Local law enforcement officers are not authorized to make an arrest based on an administrative warrant. | 8 C.F.R. § 236.1(b)(1) (citing 8 C.F.R. § 287.5(e) for the list of immigration officers that can serve administrative arrest warrants); Pasquarella Decl. Exh. 53 (Sample I-200 administrative arrest warrant) (directed to an immigration officer). |
| --- | --- | --- |
| 161. | Second, under DHS regulations, an immigration officer making an arrest pursuant to an administrative warrant must serve the administrative warrant on the individual at the time of arrest. However, ICE's new detainer policy does not request or require service of the administrative arrest warrant on the individual subject to an immigration detainer either when the detainer is issued or when the individual is taken into custody by the local law enforcement agency on the basis of the immigration detainer. | 8 C.F.R. § 236.1(b)(1); Pasquarella Decl. Exh. 31 (2017 Detainer Policy). |
| 162. | Third, under the 2017 Detainer Policy, it remains the detainer alone—and not the administrative warrant—that purports to authorize the local law enforcement authority to detain the individual. ICE's new detainer form, Form I-247A, does not request the receiving law enforcement agency extend the individual's detention based on the accompanying administrative arrest warrant and, in fact, does not even reference the | Pasquarella Decl. Exh. 31 (2017 Detainer Policy); *id.* Exh. 53 (Sample I-200 administrative arrest warrant) |

---

[2] Arrests may also be made based on administrative warrants of removal. The Statutory Subclass does not include anyone with a prior order of removal, so it does not include anyone who could be subject to a warrant of removal.

46

| | | |
|---|---|---|
| | accompanying administrative arrest warrant. | |
| 163. | The subjects of ICE detainers are all in criminal custody and thus, by definition, unlikely to abscond. | Pasquarella Decl. Ex. 31 § 2.3. (2017 Detainer Policy). |
| 164. | The 1993 Immigration and Naturalization Services (INS) detainer guidance, advises: "Since it is difficult to establish that [] aliens [detained by another law enforcement agency] are likely to abscond before a warrant can be obtained to support an arrest without warrant under section 287(a)(2) of the Act [8 U.S.C. § 1357(a)(2)], a warrant of arrest should be issued and served upon the alien.") | Pasquarella Decl. Exh. 33 at ICE 208 (INS, The Law of Arrest, Search and Seizure for Immigration Officers (January 1993)). |

## CONCLUSIONS OF LAW

Plaintiffs have set forth conclusions of law related to the issues in dispute in section V of their Memorandum of Points and Authorities in Support of their Motion for Partial Summary Judgment filed concurrently herewith.

Respectfully submitted,

ACLU FOUNDATION OF SOUTHERN CALIFORNIA

Dated: May 16, 2017        /s/ Jennifer Pasquarella

JENNIFER PASQUARELLA
Counsel for Plaintiffs

47