UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DUNCAN ROY; et al., | Case No. CV 12-09012 AB (FFMx) |
| Plaintiffs, | Consolidated with:<br>Case No. CV 13-04416 AB (FFMx) |
| vs. | Honorable André Birotte Jr. |
| LOS ANGELES COUNTY<br>SHERIFF'S DEPARTMENT; et al., | **JOINT PROPOSED FINAL PRE-TRIAL CONFERENCE ORDER** |
| Defendants. | |
| _____ | Trial Date:  May 7, 2019<br>Time:        8:30 AM<br>Courtroom: 7B |
| GERARDO GONZALEZ; et al., | |
| Plaintiffs, | |
| vs. | |
| IMMIGRATION AND CUSTOMS<br>ENFORCEMENT; et al., | |
| Defendants. | |

## TABLE OF CONTENTS

**THE PARTIES AND PLEADINGS**................................................................1

**JURISDICTION** ......................................................................................3

**TRIAL DURATION** ...............................................................................3

**JURY TRIAL** .........................................................................................4

**ADMITTED FACTS** ...............................................................................4

**STIPULATED FACTS** ...........................................................................8

**PARTIES' CLAIMS AND DEFENSES** ...............................................27

**REMAINING TRIABLE ISSUES** ........................................................29

**DISCOVERY** ........................................................................................30

**DISCLOSURES AND EXHIBIT LIST** ................................................30

**WITNESS LISTS** ..................................................................................31

**MOTIONS IN LIMINE** .........................................................................31

**BIFURCATION** .....................................................................................31

**ADMISSIONS** .......................................................................................31

Following pre-trial proceedings, pursuant to Federal Rule of Civil Procedure 16 and Local Rule 16, IT IS ORDERED:

**THE PARTIES AND PLEADINGS**

**Plaintiffs:**

Plaintiff **Gerardo Gonzalez**, individually and as a representative for the Judicial Determination Class, the Probable Cause Subclass, and the Statutory Subclass.

Plaintiff **Simon Chinivizyan**, individually and as a representative for the Judicial Determination Class and the Statutory Subclass.

The **Judicial Determination Class** is comprised of all current and future persons who are subject to an immigration detainer issued by an ICE agent located in the Central District of California, where the detainer is not based upon a final order of removal signed by an immigration judge or the individual is not subject to ongoing removal proceedings. The Class is limited to those detained for more than 48 hours.[1]

The **Probable Cause Subclass** is comprised of all current and future persons who are subject to an immigration detainer issued by an ICE agent located in the Central District of California, where the detainer is not based upon a final order of removal signed by an immigration judge or the individual is not subject to ongoing

---

[1] Defendants' position: The Court clarified that it was certifying "the following of the Gonzalez Plaintiffs' proposed classes: (1) Judicial Determination Class (limited to those who were detained *for more than forty-eight hours* without receiving a judicial determination of probable cause); (2) Probable Cause Subclass; and, (3) Statutory Subclass." ECF No. 96 at 42 (emphasis added). Moreover, the Court described the Probable Cause class to be a subset of the Judicial Determination class. ECF No. 346 at 6 ("The Probable Cause Subclass includes: All members of the Judicial Determination Class for whom ICE has issued an immigration detainer based solely on checks for the individual in government databases."). The Probable Cause subclass, therefore, must only include individuals who were detained for more than 48 hours, as the Court limited its class certification order. *See*, ECF No. 96 at 42. Plaintiffs should not be permitted to redefine the class definitions at this stage of the proceedings.

1.

removal proceedings and the detainer was issued solely on the basis of electronic database checks.[2]

The **Statutory Subclass** is comprised of all current and future persons who are subject to an immigration detainer issued by an ICE agent located in the Central District of California, where the detainer is not based upon a final order of removal signed by an immigration judge or the individual is not subject to ongoing removal proceedings and for whom ICE did not issue an administrative warrant of arrest at the time it issued an immigration detainer.

//

//

---

[2] Plaintiffs: Plaintiffs' initial proposed definitions of the Probable Cause and Statutory Subclasses described them as subsets of the Judicial Determination Class. Dkt. 184 at 12. The Court in its class certification order *sua sponte* limited the Judicial Determination Class to consist of individuals detained for more than 48 hours because it held that individuals detained less than 48 hours may not have been entitled to a prompt judicial probable cause determination and therefore did not share a common claim that their rights were violated by ICE's failure to provide such a determination. *Id.* at 26. The Court did not indicate that the same limitation would be applied to the Probable Cause or Statutory Subclasses, neither of whose claims depend in any way on being held for more than 48 hours. *See id.* at 27. Accordingly, it is Plaintiffs' understanding that the "48 hour plus" limitation imposed on the Judicial Determination Class was not meant to apply to the Probable Cause or Statutory Subclass. *See id.; see also* Dkt. 346 at 6 (stating that Judicial Determination class is limited to those who were detained more than 48 hours, but not indicating any similar limitation to the Probable Cause or Statutory Subclasses). Because the Judicial Determination Class is now limited to persons held more than 48 hours and the Probable Cause and Statutory Subclasses are not, it does not make sense to describe the Probable Cause and Statutory Subclasses as subsets of the Judicial Determination Class. Therefore, Plaintiffs here provide free-standing definitions of each Subclass. These freestanding definitions are identical in substance to the definitions provided in Plaintiffs' Class Certification Motion and used by this Court in its Summary Judgment decision. Dkt. 184; Dkt 346 at 6 (describing Probable Cause and Statutory Subclasses by reference to the Judicial Determination Class as initially proposed by Plaintiffs and not as subsequently modified by the Court). Should the class definitions need further clarification, Plaintiffs propose to address that once the Court has made any post-trial liability determinations to ensure that the class definitions conform to the liability determinations.

2.

**Defendants:**

Defendant ICE, which is a component of the Department of Homeland Security (DHS).

Defendant Ronald D. Vitiello, in his official capacity as the ICE Deputy Director of ICE and Senior Official Performing the Duties of ICE Director.  Under Federal Rule of Civil Procedure 25(d), Defendant Vitiello is automatically substituted for originally named Defendant Thomas Winkowski, who was previously Acting Director of ICE.

Defendant Thomas P. Giles, in his official capacity as the Acting Field Office Director of the Los Angeles Enforcement and Removal Office for ICE. Under Federal Rule of Civil Procedure 25(d), Defendant Giles is automatically substituted for originally named Defendant David Marin, who was previously the Field Office Director of the Los Angeles Enforcement and Removal Office of ICE.

Defendant Linda Past, in her official capacity as the Unit Chief of ICE's Law Enforcement Service Center.  Under Federal Rule of Civil Procedure 25(d), Defendant Past is automatically substituted for originally named Defendant David C. Palmatier, who was previously the ICE Law Enforcement Service Center Unit Chief.

**Pleadings:**

The pleadings that raise the issues in this case are:

Third Amended Complaint (Dkt. 44).

Answer (Dkt. 73).

**JURISDICTION**

It is stipulated that subject matter jurisdiction over this action exists under 28 U.S.C. § 1331 and, alternatively, under 28 U.S.C. § 2241. Venue is proper in this District and this Division pursuant to 28 U.S.C. § 1391(b)(2).

**TRIAL DURATION**

The trial is estimated to take 7 days.

**JURY TRIAL**

The trial is to be a non-jury trial.

**ADMITTED FACTS**

The following facts are admitted and require no proof. Defendants admitted these facts in their Answer to Plaintiffs' Third Amended Complaint, Dkt. 73, and their interrogatories and requests for admission, as indicated.  Defendants' failure to deny Plaintiffs' allegations—as was the case for facts 8, 9, and 10 below—claiming instead that the documents speak for themselves, constitutes a judicial admission. *Am. Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir. 1988) ("A statement in a complaint, answer or pretrial order is a judicial admission, as is a failure in an answer to deny an allegation."); *Fontes v. Porter*, 156 F.2d 956, 957 (9th Cir. 1946) (allegation that is not denied is deemed admitted); 5 C. Wright et al., Federal Practice and Procedure §§ 1279, 1264 & n.4 (3d ed. 2018) (failure to expressly deny allegations constitutes an admission of the facts alleged; a "claim that 'the documents speak for themselves'" is insufficient to avoid an admission) (collecting cases).[3]

(1)     Plaintiffs Gonzalez and Chinivizyan are U.S. citizens for whom ICE issued detainers. Both Plaintiffs were subject to immigration detainers while in local law enforcement custody, which ICE issued without any judicial involvement. (Answer ¶¶ 57, 71, 96, 98)

(2)     On the booking record for Plaintiff Gonzalez, an LAPD or an LASD employee wrote that Plaintiff Gonzalez was born in Mexico. (Third Amended Complaint, ¶ 61)

---

[3] Defendants' response: Defendants' Answer contains a General Denial provision, clarifying, "To the extent that an allegation is not specifically admitted herein, any and all allegations in the Complaint are denied." ECF No. 73 at 16.  Toward that end, the Court should not recognize every instance in which Plaintiffs assert a "failure to deny Plaintiffs' allegations," as, to the contrary, Defendants denied every allegation they did not specifically admit. *Id.*

(3)    An immigration detainer has three stated purposes: (1) to advise another law enforcement agency that DHS seeks custody of a noncitizen presently in the custody of that agency, for the purpose of arresting and removing the noncitizen, (2) to request that such agency advise DHS, prior to release of the noncitizen, in order for DHS to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible, and (3) to request that the LEA maintain custody of the noncitizen for a period not to exceed 48 hours, in order to permit assumption of custody by DHS.  (Answer ¶ 19)

(4)    ICE's detainer form expressly asks for and purports to authorize this additional period of detention. (Answer ¶ 19)

(5)    Immigration detainers are not warrants or court orders, and they are not issued or approved by judicial officers. Instead, they are unsworn documents that may be issued by a wide variety of immigration officers, including immigration enforcement agents and deportation officers. 8 C.F.R. § 287.7(b). ICE does not provide any post-arrest judicial determination of probable cause of removability for those it causes to be seized on immigration detainers. (Answer ¶ 20)

(6)    ICE does not require that a judicial officer or immigration judge make a determination of probable cause before ICE issues an immigration detainer, within 48 hours after ICE issues a detainer, within 48 hours after the detainer goes into effect, or within 48 hours after the individual is taken into ICE custody.  (RFA 1, 3, 5, 7)

(7)    ICE does not require that a judicial official or immigration judge make a determination of probable cause before ICE serves a warrant of arrest for removal proceedings. (RFA 19)

(8)    Prior to December 21, 2012, ICE detainers contained a check-box stating that ICE had "initiated an investigation" to determine whether a person was subject to removal from the United States. (Answer ¶ 22)

(9)    As one government attorney explained, ICE uses detainers as "a stop gap measure. . . to give ICE time to investigate and determine whether somebody's an

alien, and/or subject to removal, before local law enforcement releases that person from custody." Oral Argument Transcript, ECF #79, *Galarza v. Szalczyk*, No. 10-06815 (E.D. Pa. Jan. 10, 2012). (Answer ¶ 23)[4]

(10)   On December 21, 2012, the Director of ICE issued a policy memorandum regarding ICE's detainer practices. The memorandum stated as a policy matter that "absent extraordinary circumstances, ICE agents and officers should issue a detainer. . . only where. . . they have reason to believe the individual is an alien subject to removal from the United States. . . ." *See* John Morton, Director of ICE, Memorandum: Guidance on the Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems, at 2 (Dec. 21, 2012), available at http://www.ice.gov/doclib/detention-reform/pdf/detainer-policy.pdf. ICE also issued a revised detainer form (Form I-247) on the same date. Both Plaintiffs' detainers were issued using this revised form. (Answer ¶ 25)[5]

---

[4] Defendants' response: Although the attorney making this statement was indeed a "government attorney," in the employ of the U.S. Department of Justice, the case in which this statement arose did not include ICE, the Department of Homeland Security, the United States, or any of its agencies as a party.  Rather, Plaintiff Galarza sued ICE Officers Szalczyk and Marino in their individual capacities, and the attorney representing them could not, therefore, make representations on behalf of ICE, DHS, or the United States. *See, Galarza v. Szalczyk*, No. 10-CV-06815, 2012 WL 1080020, at *4 (E.D. Pa. Mar. 30, 2012), *vacated and remanded*, 745 F.3d 634 (3d Cir. 2014). Moreover, Plaintiffs' "admitted fact" mischaracterizes Defendants' answer to this allegation.  Defendants' answer to Paragraph 23 was as follows: "These allegations characterize public court records, which speak for themselves. To the extent Plaintiffs' allegations regarding the content of the records differ from the records themselves, Defendants deny."  ECF No. 73, ¶ 23.

Plaintiffs' response: Defendants do not point to any allegation by Plaintiffs regarding the content of the records that differs from the records themselves, therefore this fact is admitted.

[5] Defendants' response: This "admission" mischaracterizes Defendants' answer to the relevant allegation.  Rather, Defendants' answer to Paragraph 25 of the Third Amended Complaint was as follows: "These allegations characterize public records, which speak for themselves. To the extent Plaintiffs' allegations regarding the content of the records differ from the records themselves, Defendants deny. Defendants admit that ICE issued requests for detention for Plaintiffs Gonzalez and Chinivizyan on the revised detainer form."  ECF No. 73, ¶ 25. To the extent that Plaintiffs misquoted this

(11)   In a federal lawsuit in the Northern District of Illinois, ICE's 30(b)(6) witness testified in his deposition that ICE's changes to its detainer form and guidance in 2012 did not "change how an immigration officer is instructed to establish a reason to believe an individual is subject to removal" and confirmed that detainers are not "required to be supported by probable cause." Deposition of Philip T. Miller at 60-61, 88-89, *Jimenez Moreno v. Napolitano*, No. 11-5452 (N.D. Ill. June 6, 2013), at http://www.immigrantjustice.org/sites/immigrantjustice.org/files/2013.06.06%20Miller%2C%20Philip%20%28Redacted%29.pdf. *See also* Brief of Federal Defendants, *Ortega v. ICE*, No. 12-6608 (6th Cir. Filed Apr. 10, 2013) ("[T]he *purpose* of issuing the detainer was to allow [ICE] time to conduct an investigation that could have discovered whether Plaintiff-Appellant was removable or was, in fact, a U.S. citizen.") (emphasis in original).  (Answer ¶ 30)[6]

_____

document, ICE denied the allegation.  Moreover, the memorandum did not articulate any required evidentiary standard for issuance, but merely stated as a policy matter that "absent extraordinary circumstances, ICE agents and officers should issue a detainer. . . only where. . . they have reason to believe the individual is an alien subject to removal from the United States. . . ." and evidence that the alien met one of ICE's enforcement priorities.

Plaintiffs' response: Defendants do not point to anything Plaintiffs misquoted or any allegation by Plaintiffs regarding the content of the records that differs from the records themselves, therefore this fact is admitted.

[6] Defendants' response: To the extent this "admitted fact" suggests Defendants admit the content of the statement, Plaintiffs mischaracterize Defendants' answer to this allegation.  Defendants' answer to Paragraph 30 was as follows: "These allegations characterize court records, which speak for themselves. To the extent Plaintiffs' allegations regarding the content of the records differ from the records themselves, Defendants deny."  Further, the non-attorney witness defined "reason to believe" as evidence acquired by the ICE officer which would show "it's more likely than not" that the suspect is an alien subject to removal and stated he thought probable cause was a higher evidentiary standard. *See* Deposition of Philip T. Miller at 60-61, 88-89, *Jimenez Moreno v. Napolitano*, No. 11-5452 (N.D. Ill. June 6, 2013).  Additionally, the Court should not construe the statement from the brief filed in *Ortega* to bind ICE, because the case in which this statement arose did not include ICE, the Department of Homeland Security, the United States, or any of its agencies as a party.  Rather, that case proceeded (as to any cause of action against anyone other than two officers of the city of Louisville, Kentucky) only against ICE Officer Cloyd in his individual capacity, and the attorney representing him could not, therefore, make representations

(12)   ICE officers must conduct an investigation and have sufficient probable cause to find the person is an alien subject to removal from the United States and falls within ICE's enforcement priorities before issuing a request for detention. (Answer ¶ 34)

(13)   ICE's legal position is that the U.S. Constitution does not mandate that an ICE officer have probable cause of an individual's removability prior to issuing a detainer against that individual and that, instead, a lesser standard suffices. (Plfs' RFA No. 21)[7]

(14)   One reason an Alien File number ("A numbers") may be left blank on an immigration detainer is because A-numbers are non-mandatory entry fields within ICE systems of records.  An ICE officer may not have entered an alien file number for several reasons, including, but not limited to, an alien file was not assigned at the time the detainer was created or the ICE officer could not find the alien number at the time the detainer was issued. (Plfs' ROG No. 1)

**STIPULATED FACTS**

The following facts, though stipulated, shall be without prejudice to any evidentiary objection:

//

---

on behalf of ICE, DHS, or the United States. *See, Ortega v. U.S. Immigration & Customs Enf't,* 737 F.3d 435 (6th Cir. 2013) (noting that Ortega's only claim against "the federal immigration agent" who issued the detainer arose under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

[7] Defendants' response: Defendant's response to this request for admission, in June 2015, was as follows: "Admit, but since August 2010, ICE policy required reason to believe that a person was a removable alien to issue detainers and current DHS policy requires probable cause to issue detainers."  (Defs'. Response to Pls'. RFA 21).

Plaintiffs' response: Plaintiffs' request for admission reads as follows: "Admit that, as stated in the parties' Rule 26(f) report, it is ICE's position that 'the U.S. Constitution does not mandate that an ICE officer have probable cause of an individual's removability prior to issuing a detainer against that individual and that, instead, a lesser standard suffices.'" (Plfs' RFA 21).

8.

**Plaintiff Gonzalez**

(1)     Plaintiff Gerardo Gonzalez is a natural born U.S. citizen. He was born in Pacoima, in the City of Los Angeles, California. By definition, he has never been removable from the United States.

(2)     On December 31, 2012, ICE issued an immigration detainer to the Los Angeles County Sheriff's Department requesting that the Sheriff maintain custody of Plaintiff Gonzalez after he would otherwise be released from custody.

(3)     ICE agent Raul San Martin issued Plaintiff Gonzalez's detainer.

(4)     Agent San Martin issued Plaintiff Gonzalez's detainer based on information reviewed in electronic databases.

(5)     Agent San Martin reviewed the following criminal databases: NCIC (National Crime Information Center), which he used to access California Law Enforcement Telecommunications System (CLETS), and the Justice Data Interface Controller (JDIC), which he used to access the Los Angeles County Consolidated Criminal History System (CCHRS), before issuing the detainer. CLETS showed Plaintiff Gonzalez was born in California.  CCHRS showed Plaintiff Gonzalez being born in California and being born in Mexico.

(6)     Agent San Martin also searched Gonzalez's name and date of birth in TECS and CIS (Central Index System) and found no results for Plaintiff Gonzalez in these databases.

(7)     The TECS and CIS search results were accurate for Plaintiff Gonzalez.

(8)     Agent San Martin never interviewed Plaintiff Gonzalez, nor did any other ICE agent.

(9)     Agent San Martin issued Plaintiff Gonzalez's detainer because CCHRS erroneously stated that Plaintiff Gonzalez was born in Mexico and no records of Plaintiff Gonzalez were found in TECS and CIS showing that Plaintiff Gonzalez legally entered the United States or was legally present in the United States.

9.

(10) Plaintiff Gonzalez's arrest and/or booking report documenting his arrest on December 27, 2012, by the Los Angeles Police Department on a felony charge of possession of methamphetamines incorrectly listed his birthplace as Mexico City, Mexico.

(11) Plaintiff Gonzalez does not know whether it was an employee of the Los Angeles Police Department or the Los Angeles Sheriff Department that incorrectly identified him as being born in Mexico.

(12) Neither ICE nor the Los Angeles County Sheriff's Department ever served a copy of Plaintiff Gonzalez's detainer on him.

(13) On June 13, 2013, ICE cancelled the detainer issued to the Los Angeles County Sheriff's Department immediately after Plaintiff Gonzalez filed his complaint in this case and it first learned Plaintiff Gonzalez claimed to be a U.S. citizen.

(14) Plaintiff Gonzalez was never released from Los Angeles County Sheriff Department's custody to ICE.

(15) Plaintiff Gonzalez was never physically arrested or detained by ICE.

**Changes to ICE's Detainer Practices**

(16) ICE issues immigration detainers to federal, state, and local law enforcement agencies ("LEAs") to request that the LEA detain the individual not to exceed 48 hours beyond the time he or she would otherwise be released from custody.

(17) Since this lawsuit and its companion lawsuit, *Roy v. County of Los Angeles*, were filed, ICE has used five different detainer forms: the December 2011 revision, the December 2012 revision, the June 2015 Form I-247D, the August 2015 Form I-247X, and the April 2017 Form I-247A.

(18) The first two versions of the detainer form contain two main sections: checkboxes at the top of the form that explain the basis for issuing the detainer, and checkboxes at the bottom of the form that request that the LEA take certain actions. The June 2015 I-247D and the August 2015 I-247X versions maintain the content of these two main sections and then include an additional section to explain why the

10.

subject of the detainer is an enforcement priority. The April 2017 I-247A form eliminates the section added to the June 2015 I-247D and August 2015 I-247X explaining why the individual was an enforcement priority, but retains the rest of the sections (while changing the wording in certain places)

(19)   As DHS has changed its detainer forms, it has changed the language on the form indicating the basis for its determination to issue a detainer. The December 2011 I-247 detainer stated that DHS had taken the following actions related to the person, including, but not limited to, "initiated an investigation" into whether the subject was removable from the United States. The December 2012 detainer form, modified less than two months after the *Roy v. County of Los Angeles* lawsuit was filed, stated DHS "determined that there is a reason to believe the individual is an alien subject to removal from the United States."

(20)   In November 2014, DHS announced it was terminating the Secure Communities program.

(21)   In a November 20, 2014 memo announcing the termination of the Secure Communities program, DHS Secretary Jeh Johnson wrote "to address the increasing number of federal court decisions that hold that detainer-based detention by state and local law enforcement agencies violates the Fourth Amendment, I am directing ICE to replace requests for detention (*i.e.*, requests that an agency hold an individual beyond the point at which they would otherwise be released) with requests for notification (*i.e.*, requests that state or local law enforcement notify ICE of a pending release during the time that person is otherwise in custody under state or local authority). If in special circumstances ICE seeks to issue a request for detention (rather than a request for notification), it must specify that the person is subject to a final order of removal or there is other sufficient probable cause to find that the person is a removable alien, thereby addressing the Fourth Amendment concerns raised in recent federal court decisions."

11.

(22)   After that announcement, in 2015, DHS created a new form, the I-247N, which requested notification of release dates, rather than detention.

(23)   DHS also created two new detainer forms, the I-247D and the I-247X, both of which requested detention. The I-247D was adopted in June 2015. The I-247X was adopted in August 2015. Both forms modified prior "reason to believe" detainer language to state that "[p]robable cause exists that the subject is a removable alien."

(24)   The June 2015 I-247D and August 2015 I-247X detainers further provided checkbox options indicating ICE's determination of probable cause:

☐ A final order of removal against the subject;

☐ The pendency of ongoing removal proceedings against the subject;

☐ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

(25)   After President Trump took office, and new leadership at DHS was installed, DHS canceled the use of the I-247N and reinstated Secure Communities.

(26)   DHS also canceled the use of the I-247D and the I-247X forms and replaced them with the I-247A form.

(27)   The I-247A form retained the probable cause language of the I-247D and I-247X and requests that the receiving law enforcement agency "maintain custody" of the individual for a "period not to exceed 48 hours."

12.

(28)   Before 1987, some immigration detainers issued by the legacy Immigration and Naturalization Service (INS) requested only that a federal, state or local law enforcement agency notify the INS of a person's release date.

(29)   In 1987, the INS promulgated new regulatory provisions related to detainers that stated for the first time that a law enforcement agency "shall maintain custody of the alien for a period not to exceed forty-eight hours at the request of the Service officer or employee, in order to permit assumption of Service custody."

(30)   In 1997, INS expanded the detention period from 48 hours total to 48 hours plus weekends and holidays, codifying it in 8 C.F.R. § 287.7.

(31)   When this case was filed, DHS's detainer form requested the receiving agency detain the subject for a period not to exceed 48 hours, excluding weekends and holidays.  In June 2015, DHS changed the detainer form to eliminate the weekend and holiday exclusion.

(32)   When this case was filed, ICE had a practice of placing detainers on people it called "Foreign-born No Match[es]." Under this practice, ICE might issue a detainer if the database search and investigation of an individual known to be born outside the United States returned no evidence showing the person legally entered the United States and/or was legally present in the United States  (known as a foreign born, no match). In June 2015, ICE changed its practice, stating it would no longer issue detainers on Foreign Born No Match individuals.

(33)   When this case was filed, ICE did not require administrative warrants to be issued when it issued immigration detainers. In April 2017, ICE changed its policy in response to a district court ruling in the Northern District of Illinois to require that ICE issue an administrative warrant with every detainer it issues.

**State and Local Laws and Policies on ICE Detainers and Interviews**

(34)   ICE issues detainers to law enforcement agencies in all 50 states.

(35)   Some states and localities have laws or policies that require compliance with immigration detainers, while others have laws or policies that prohibit it.

(36)  ICE issues detainers to state and local law enforcement agencies regardless of whether the governing state or local law or policy permits compliance with ICE detainers.

(37)  Today, ICE continues to issue detainers to the Los Angeles Sheriff's Department, although the Los Angeles Sheriff Department has had a policy prohibiting compliance with immigration detainers since 2014.

(38)  On January 1, 2014, the California TRUST Act became law and prohibited California local law enforcement officials from detaining an individual on the basis of an ICE detainer after that individual became eligible for release from custody, unless that individual had been convicted of a specified crime or another exception applied.

(39)  On September 28, 2016, Governor Jerry Brown signed into law Assembly Bill (AB) 2792, known as the Transparent Review of Unjust Transfers and Holds (TRUTH) Act.

(40)  The TRUTH Act requires California law enforcement agencies to provide individuals in their custody with a copy of any ICE notification request issued for them, to inform the individuals if the law enforcement agency intends to notify ICE of an inmate's upcoming date and time of release, and to provide individuals and their representatives with the same notification of release provided to ICE.

(41)  The TRUTH Act requires that the local law enforcement agency (LEA) must comply with several things before permitting ICE to interview a detainee.  The LEA must provide the individual a written consent form that explains, among other things, the purpose of the interview; that it is voluntary; and that the individual may decline to be interviewed. The TRUTH Act requires the consent form to be available in multiple, specified languages.  The TRUTH Act also requires the LEA to provide copies of certain documents, received from ICE, to the detainee and to notify the detainee of the intent of the agency to comply with ICE requests.

(42)  The TRUTH Act requires local law enforcement agencies to make records related to ICE access to inmates public, and it defines "ICE access" as

14.

follows:  "for the purposes of civil immigration enforcement, including when an individual is stopped with or without their consent, arrested, detained, or otherwise under the control of the local law enforcement agency, all of the following: (1) Responding to an ICE hold, notification, or transfer request; (2) Providing notification to ICE in advance of the public that an individual is being or will be released at a certain date and time through data sharing or otherwise; (3) Providing ICE non-publicly available information regarding release dates, home addresses, or work addresses, whether through computer databases, jail logs, or otherwise; (4) Allowing ICE to interview an individual; and (5) Providing ICE information regarding dates and times of probation or parole check-ins."

(43)   ICE has argued in this case that a detainer only requests that a law enforcement agency maintain custody not to exceed 48 hours, and that the state or local law enforcement agency may rely on that federally authorized request.

**Secure Communities Program**

(44)   ICE created the Secure Communities program in part to address the challenges of determining the identities and immigration status of individuals convicted of a crime. In its strategic plan for the Secure Communities program, it noted that "the traditional processes of identification are labor-intensive, time-consuming, and are often limited by the accuracy of the biographic information obtained from the suspect. Exacerbating the problem is the fact that criminal history records and immigration records are held by different organizations in systems that have not been easily linked."

(45)   Beginning in September 2006, DHS began to adopt what it calls "biometric interoperability" technology to "link local law enforcement agencies to both FBI and DHS biometric databases." In other words, DHS began to receive—automatically and in real time—the fingerprints of any person booked into a local jail.

(46)   This technology, incorporated into ICE's Secure Communities Program, linked for the first time the Federal Bureau of Investigation's ("FBI") fingerprint

repository, known as Integrated Automated Fingerprint Identification System ("IAFIS"), with the DHS's fingerprint repository, known as Automated Biometric Identification System ("IDENT"). As a result, when the FBI receives fingerprints for individuals booked into jails and prisons, those prints are now automatically shared with DHS.

(47)   According to ICE's Secure Communities Strategic Plan, written in July 2009, ICE anticipated that "[t]hrough the deployment and use of the biometric-based identification systems, all persons booked into custody will be automatically checked for their immigration status as well as prior criminal history. This will lead to a substantial increase in the number of criminal aliens identified. This increased capability to share information will shorten response time and reduce the risk that an LEA will release a dangerous and removable criminal alien into the community."

(48)   ICE launched the Secure Communities program in 2008. It was fully deployed in California in 2011. It was fully deployed nationwide in 2013.

(49)   The Pacific Enforcement Response Center ("PERC") (which, before 2015, was known as the Southern California Secure Communities Support Center ("SC3")) is located in a federal building in Laguna Niguel, California.

(50)   Today, the PERC issues detainers 24 hours a day within ICE's Los Angeles Area of Responsibility (which is coextensive with the Central District of California) and to 42 states and two U.S. territories after-hours. The PERC does not issue detainers to the following eight states: Alaska, Washington, Oregon, Arizona, New Mexico, Colorado, Oklahoma, and Florida.

(51)   The PERC only issues detainers based on electronic database searches without performing any other investigation outside of database checks.

(52)   PERC agents do not conduct interviews of subjects before placing a detainer.

16.

(53)   When the PERC receives an Immigration Alien Response ("IAR") from the Law Enforcement Support Center ("LESC"), the IAR is generally first reviewed by one of PERC's contractors.

(54)   The contractors (also known as "analysts") are not federal employees and not immigration agents and cannot issue detainers or warrants.

(55)   A contractor reviews database results for each of the ten databases that the LESC automatically checks.

(56)   The ten databases automatically checked through ACRIMe are the following: CIS, CLAIMS 3, CLAIMS 4, ADIS, IDENT, EOIR, SEVIS, EID, NCIC and NLETS.

(57)   The contractor does not run his or her own database checks unless he or she decides additional information is needed.

(58)   Based on the contractor's review of the databases, he or she will make a recommendation to an ICE deportation officer whether a detainer should be issued.

(59)   Between May 1, 2015 and February 22, 2016, the PERC issued 12,797 detainers.

(60)   ICE issued 162,494 detainers within the ICE Los Angeles Area of Responsibility between October 1, 2010 and February 8, 2016.

(61)   Of 31,925 detainer requests that ICE issued to the Los Angeles Sheriff's Department between October 2010 and February 2016, only 5,937 detainers (19%) were based upon a removal order and another 170 detainers (0.5%) were issued where there may have been ongoing removal proceedings.

(62)   If an ICE officer at the PERC believes further investigation is warranted, the officer does not issue a detainer, but refers that IAR to the appropriate ICE Field Office as a Criminal Alien Program (CAP) referral or an "at-large" referral.

(63)   USCIS, ICE and CBP all create and use A-Files in the course of performing their missions. Although each individual should have only one A-File, there are sometimes multiple A-Files for a single individual.

(64)   ICE has electronic access to digitized A-Files for millions of individuals. Digitized A-Files.

**Contents of Databases**

(65)   The SEVIS database accessible through ACRIMe Field contains records of non-citizens who enter the United States as students and exchange visitors (F, M, and J visas), as well as their dependents.  ICE maintains it.

(66)   ICE officers in the Central District of California have electronic access to information from the Department of Justice's Executive Office of Immigration Review ("EOIR") about current and past immigration court proceedings.  This information is automatically checked through ACRIMe Field before an ICE officer issues a detainer.

(67)   When an immigration judge has terminated proceedings, the EOIR database accessible through ACRIMe Field could indicate that proceedings were terminated, but it would not convey the reasons the case was terminated.

(68)   The Enforcement Integrated Database ("EID") database accessible through ACRIMe Field contains records of individuals who have been encountered primarily by ICE or CBP during immigration enforcement actions. EID is a repository for records created in ICE's ENFORCE/EARM/EAGLE booking applications.  ICE owns and operates EID, but EID is also used by U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS) officers.

(69)   Through EID, ICE agents may access "information related to the investigation, arrest, booking, detention, and removal of persons encountered during immigration and criminal law enforcement investigations and operations conducted by ICE, U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS), components within DHS." EID contains information regarding arrests by DHS agencies for criminal and civil violations as well as information about removals and/or voluntary departures from the United States.

18.

(70)    The Department of State issues U.S. passports, as well as numerous immigrant and non-immigrant visas and benefits applied for overseas.

(71)    ICE officers in the Central District of California have access to the Department of State database, Consolidated Consular Database ("CCD"), which contains information about passport and visa issuance.

(72)    ICE officers are currently not required to check CCD before issuing detainers, but may do so if they believe it is necessary for their investigation.

(73)    ICE agents and contractors in the Central District of California automatically view results from USCIS databases through ACRIMe Field, such as, but not limited to, the Central Index System ("CIS") and Computer Linked Application Information Management System ("CLAIMS 3") to obtain information about whether a person has applied for or obtained certain immigration benefits.

(74)    ICE agents and contractors at the PERC can access information about DACA applicants and/or recipients through CLAIMS 3 and PCQS.

(75)    ICE agents and contractors in the Central District of California automatically check results from USCIS databases through ACRIMe Field, including, but not limited to, CLAIMS 4 to obtain information about whether a person has applied for naturalization and/or been issued a naturalization certificate or certificate of U.S. citizenship.

(76)    ICE agents and contractors in the Central District of California automatically check results from the Federal Bureau of Investigation's ("FBI's") National Crime Information Center ("NCIC") database and the National Law Enforcement Telecommunications System ("NLETs") to obtain information about a person's criminal history.

(77)    ICE agents and contractors in the Central District of California automatically check the Arrival and Departure Information System ("ADIS") to obtain information about a person's admission into the United States.  This includes, but is

19.

not limited to, information regarding whether or not a person entered the United States on a visa and whether or not the person overstayed their visa.

(78) The Automated Biometric Identification System (IDENT) was created by the legacy INS in 1994 and was deployed starting in 1995.

(79) IDENT was created as a day-forward system, meaning it did not contain fingerprints prior to its deployment.

(80) Between 1994 and 2004, IDENT was exclusively used by the Border Patrol during its encounters and apprehensions of people illegally crossing the land border between official ports of entry. It was primarily deployed in the southwest border region.

(81) In 2003 or 2004, DHS created the U.S. Visitor and Immigration Status Indicator Technology (US-VISIT) program to serve as an agency-wide system for the storage and processing of biometric data. It did this by expanding IDENT from a system used only by the Border Patrol to a system used by all components of the DHS, as well as certain other agencies, like the Department of State.

(82) In 2004, US-VISIT expanded IDENT to U.S. international airports.

(83) Certain individuals are exempted from biometric fingerprint collection at airports, such as U.S. citizens; Canadian citizens visiting the U.S. temporarily for business or pleasure who are not otherwise required to present a visa or be issued Form I-94 or Form I-95 for admission or parole into the United States; Visitors admitted on an A-1, A-2, C-3, G-1, G-2, G-3, G-4, NATO-1, NATO-2, NATO-2, NATO-4, NATO-5, or NATO-6 visa; children under the age of 14 (unless participating in a trusted traveler program); persons over the age of 79; classes of visitors the Secretary of State and the Secretary of Homeland Security jointly determine shall be exempt; an individual visitor the Secretary of State and the Secretary of Homeland Security or the Director of the Central Intelligence Agency jointly determine shall be exempt; and Taiwanese officials who hold E-1 visas and members of their immediate families who hold E-1 visas.

20.

(84)   Around 2005 or 2006, the Department of State also began using IDENT in consulates overseas.

(85)   Sometime after 2004, DHS rolled IDENT out to land ports of entry for use during secondary inspection.

(86)   As of today, DHS has not deployed IDENT during primary inspections at land ports of entry.

(87)   Following US-VISIT's deployment of IDENT at the airports, borders, and consulates overseas, DHS began to deploy IDENT in other DHS components.

(88)   DHS finished rolling out IDENT hardware needed to enroll fingerprints in IDENT to all USCIS Service Centers two years ago.

(89)   IDENT is the central DHS-wide repository for storage and matching of biometric information, including fingerprints and, where available, facial recognition data. IDENT services all components of DHS, as well as the Department of State's consular affairs and security offices. IDENT is the primary fingerprint repository for these agencies to match a set of fingerprints with any fingerprints stored in the system.

(90)   IDENT contains over 237 million unique identities.

(91)   ICE connects directly to IDENT through its EAGLE interface.

(92)   IDENT contains a "lookout" function that gives rapid responses for derogatory information without requiring the search of full system.

(93)   IDENT users enroll fingerprint biometrics into IDENT by sending IDENT a scanned copy of a person's fingerprints and basic information about the reason the fingerprints were taken.

(94)   The process of IDENT retaining data is referred to as "enrollment."

(95)   Each time an individual's biometrics are enrolled in IDENT, it is a separate and distinct "encounter."

(96)   IDENT assigns each encounter its own number, known as an EID.

(97)   IDENT automatically compares the biometrics from each new encounter with biometrics already contained within the database. If the biometrics do not match

21.

biometrics already in the system, IDENT automatically assigns a new identity for the encounter, and assigns the fingerprints a Fingerprint Identification Number (FIN). If, however, the fingerprints match the fingerprints of someone already in the system, then IDENT appends the encounter to the existing encounters for that identity, linking all of the encounters during which a person's fingerprints were enrolled in IDENT.

(98)   Today, ICE subscribes to IDENT for "search and enroll" functions.  This means they provide fingerprint biometrics to IDENT so that IDENT may search for any match to those fingerprints and enroll those fingerprints into the system as a new IDENT encounter.

(99)   When an agency electronically submits fingerprints to IDENT, the system automatically searches for any fingerprint matches and immediately sends back a report indicating whether any matches were found.  If a match is found in IDENT, an agency receives basic biographical information about the individual and his or her prior encounters during which biometrics stored in IDENT were taken.

(100)  From 1994-2007, IDENT was a two-fingerprint system.

(101)  In 2007, DHS converted IDENT to a ten-fingerprint system.

(102)  In 2008, DHS, DOJ, and the Department of State entered into a memorandum of understanding essentially completing IDENT/IAFIS interoperability, meaning simultaneous searches on both databases on a set of biometrics could be performed, allowing the rapid sharing of biometric and related biographic, criminal history, and immigration information.

(103)  In 2007, a DHS Privacy Impact Assessment report stated that CIS was designed to be "used by both law enforcement and benefits bestowing operations to determine if . . . an individual is eligible for an immigration related benefit, or should be detained and/or investigated for enforcement reasons, *in which case the government user would request the physical A-File.*"  A similar DHS Privacy Impact Assessment report from 2017 did not include that language.

22.

(104) In 1995, the Government Accountability Office found errors in immigration status and other information in CIS, describing the database as "incomplete and inaccurate," and noting that 22% of records "contained either misspelled names, incorrect name order, or incorrect nationality."

(105) In 1989, a Government Accountability Office report on the Systematic Alien Verification for Entitlements (SAVE) database, which was made up of data pulled from the Central Index System, found that the database's class of admission codes—described as "a critical element because it denotes legal status conferred by immigration law"— were missing in 20% of sample records and incorrect in 11% of sample records, with the result that the database could "erroneously show an alien in a legal or illegal immigration status."

(106) Immigration status is dynamic and can change over time, as DOJ OIG recognized in 2004, stating: "For example, if an individual is apprehended along the border and naturalized two years later, IDENT would contain information on the apprehension but may not contain information on the subsequent naturalization. The latter [naturalization] information is kept in other databases that are available to immigration officers."

(107) In April 2012, David Marin, a senior ICE official in Los Angeles, wrote to an ICE headquarters official stating "For the past couple of months, AFOD Martinez has noticed an increase in the volume of biometric Immigration Alien Responses (IAR) for individuals that are determined, via agency database checks, to be removable, only to later discover that the person is a United States citizen." Given this problem, the ICE official asked for a "mechanism in which we can modify the CIS database to indicate the individual's true nationality and citizenship" because "[w]e have found that it is not that easy to get USCIS to change someone's status in CIS."

(108) Mr. Marin followed up in a subsequent email to ICE headquarters reiterating the LA Field Office's concern that "CIS is not updating its databases, so when we run our queries and it shows the subject is a LPR, we take appropriate action.

23.

This case appears to be exactly that; CIS databases show the subject as a LPR, so the hold was properly placed based on the information we had at the time. Now the subject claims to be a USC and has a natz cert; if this is true and the Central Index System was timely updated, we may not have run into this issue. *Unfortunately these types of cases occur frequently*."

**U.S. Citizenship**

(109)  The I-247A detainer form states "If you believe you are a United States citizen or the victim of a crime, please advise DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

(110)  All persons born in the United States are automatically U.S. citizens.

(111)  Under certain circumstances, persons born abroad may also be United States citizens.

(112)  People born abroad may acquire citizenship in one of two ways: automatically through their parents (known as "acquired" or "derived" citizenship) or through naturalization.

(113)  People who acquire or derive citizenship through their parents do so *automatically* by operation of law. Importantly, "no application is filed, no hearing is conducted, and no certificate is issued when such citizenship is acquired."

(114)  Depending on the law in effect when the person was born, a person born abroad may automatically *acquire* U.S. citizenship *at birth* if one or both of the parents is a U.S. citizen and other criteria are met. A person born abroad may automatically *derive* U.S. citizenship *after birth* if the child is a lawful permanent resident living in the United States and his or her parent(s) naturalizes as a U.S. citizenship before the child turns 18 years old. The specific requirements to determine when a person automatically derives citizenship in this manner depend on the law in effect at the time of the parent(s) naturalization, which vary significantly during different time periods.

(115)  There is no database of all foreign-born U.S. citizens who derived or acquired U.S. citizenship.

(116)  Of the population of foreign-born U.S. citizens, DHS estimates that, between 1980 and 2012, over 1.4 million minors automatically derived U.S. citizenship through a parent's naturalization.

(117)  Additionally, the U.S. Census Bureau estimates that, as of 2015, there were 2,765,824 U.S. citizens living in the United States who were born in a foreign country and acquired U.S. citizenship at birth through a U.S. citizen parent.

(118)  On November 10, 2015, ICE issued a policy directive on ICE's "policy and procedures for ensuring that the potential U.S. citizenship of individuals encountered by [ICE] officers, agents, and attorneys is immediately and carefully investigated and analyzed."

(119)  The policy acknowledges that "ICE cannot assert its civil immigration enforcement authority to arrest and/or detain a U.S. citizen."

(120)  The policy states that "ICE officers, agents, and attorneys may encounter individuals who are not certain of their citizenship status, who claim to be U.S. citizens, and/or for whom there are indicia warranting further examination to determine whether they may be U.S. citizens."

(121)  The policy states "ICE personnel must assess the potential U.S. citizenship of an individual encountered by ICE if the individual makes or has made a claim to U.S. citizenship, as well as when certain indicia of potential U.S. citizenship, as identified in this Directive, are present in a case even if the individual does not affirmatively make a claim to U.S. citizenship."  The policy instructs that if an officer encounters any of these indicia, such indicia "trigger the need for further investigation."

(122)  An assessment of potential U.S. citizenship under this policy includes "a factual examination and a legal analysis and shall include a check of all available DHS data systems and any other reasonable means available to the officer."  The factual examination may also include "review of the A-file and other pertinent documents, an interview of the individual, searches of vital records databases, interviews of family

25.

members and other individuals in possession of relevant information, and other appropriate investigation."

(123)  ICE may conduct interviews of individuals who are detained in the custody of other law enforcement agencies either by phone or in person if the person consents to be interviewed and the other law enforcement agency allows the interview.

(124)  CIS only contains fields for the first names of a person's parents, but not the parents' last names.

(125)  CLAIMS 3 only contains fields for the first names of a person's parents, but not the parents' last names.

(126)  CLAIMS 4 does not contain any field for the names of a person's parents.

(127)  Search results of the databases the PERC automatically checks before issuing a detainer do not include the names of a person's grandparents.

(128)  CIS does not contain a field that would indicate whether or not a person has a sibling.

(129)  CLAIMS 3 does not contain a field that would indicate whether or not a person has a sibling.

(130)  CLAIMS 4 does not contain a field that would indicate whether a person has a sibling.

(131)  The records summarized in Plaintiffs' FRE 1006 Summary of Select Record Produced in Discovery of Detainers ICE Placed on US Citizens Based Solely on Database Checks are some of the detainer records produced by ICE in response to Plaintiffs' Request for Production No. 16, which sought "any and all detainers and documents pertaining to such detainers issued against US citizens and lawful permanent residents by the Los Angeles ICE Field Office from December 2012 to the present."

//

//

//

**PARTIES' CLAIMS AND DEFENSES**

**Plaintiff's Claims[8]:**

**A.     Plaintiffs plan to pursue the following claim against Defendant:**

Claim 1:     Unlawful seizure in violation of the Fourth Amendment[9]

**Elements Required to Establish Plaintiffs' Unlawful Seizure Claim:**

1.     Plaintiffs were seized by Defendants

2.     The seizure was unreasonable because it was without lawful authority and/or probable cause.

**B.     The Key Evidence Plaintiff Relies on for Each Claim**

In brief, the key evidence Plaintiffs rely on for their unlawful seizure claim is:

Claim 1:     Unlawful seizure in violation of the Fourth Amendment

---

[8] Plaintiffs' claims are elaborated in their Memorandum of Contentions of Fact and Law, Dkt. 440, and their Proposed Findings of Fact and Conclusions of Law, Dkt. 441.

[9] Plaintiffs: In the alternative, should this Court rule that the detention of Plaintiffs and other class members without lawful authority and/or probable cause is properly analyzed under the Due Process Clause rather than or in addition to the Fourth Amendment, Plaintiff plan to pursue two distinct Fifth Amendment claims. First, Plaintiffs would pursue a claim that the detention of Plaintiffs and other class members without probable cause violates Procedural Due Process. The elements of this claim would be: (1) deprivation of liberty or property (2) with insufficient procedural protection. The key evidence in support of the claim would be same as the key evidence in support of Plaintiffs' Fourth Amendment unreasonable seizure claim, described *infra*. Second, Plaintiffs would pursue a claim that the detention of Plaintiffs and other class members without lawful authority violates the substantive component of the Due Process Clause, which prohibits Defendants from deliberately endangering Plaintiffs' right to liberty by placing them at risk of unlawful detention by state and local agencies. *See Wood v. Ostrander*, 879 F.2d 583, 589 (9th Cir. 1989). The elements of this claim would be: (1) "affirmative conduct" by Defendants (2) that places Plaintiffs and other class members in danger (3) so long as the government acted with "deliberate indifference to a known or obvious danger." *Pauluk v. Savage*, 836 F.3d 1117, 1124-25 (9th Cir. 2016). This claim is purely legal, and requires no additional fact finding.

27.

**<u>Elements Required to Establish Plaintiffs' Unlawful Seizure Claim:</u>**

1.    Plaintiffs are or will be seized by Defendants.

a.    The Court has already determined that, under the facts as alleged in the second amended complaint, class members are or will be subject to arrest by virtue of a civil immigration detainer.[10]

2.    The seizure was or will be unreasonable because it was or will be without lawful authority and/or probable cause.

a.    The Court has already determined that state and local law enforcement agencies lack authority to make arrests for civil immigration violations.[11]

b.    Testimony and documents will demonstrate that the databases ICE relies on to issue immigration detainers are

---

[10] <u>Defendants' response</u>: The Court found, "The injury alleged in the SAC is thus directly traceable to ICE." ECF No. 42 at 8. That injury was directly related to the facts at the time Plaintiffs filed their Second Amended Complaint, before state and local law enforcement agencies and governmental entities stopped honoring detainers. ICE officers now have no expectation that a state or law enforcement agency will honor a detainer by holding the subject beyond the date on which the individual would otherwise be released from the law enforcement agency's custody.

<u>Plaintiffs' response</u>: This Court has already considered, and rejected, Defendants unfounded claim that certain local or state policies (Defendants have only ever raised California specific laws or policies) moot Plaintiffs' claims on behalf of a nationwide class. *See* Dkt. 378 at 5-7.

[11] <u>Defendants' response</u>: This Court did not determine that "state and local law enforcement agencies" lack such authority, but, rather, held only that "*The LASD officers* have no authority to arrest individuals for civil immigration offenses. . . ." ECF No. 346 (emphasis added).

<u>Plaintiffs' response</u>: In explaining its summary judgment holding, the Court found "that local officers generally lack authority to arrest individuals suspected of *civil* immigration violations." Dkt. 346 at 40 (quoting *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 465 (4th Cir. 2013)) (internal quotations omitted).

unreliable sources of information for probable cause determinations.

**Defendant's Affirmative Defenses:**

None.

**REMAINING TRIABLE ISSUES**

In view of the admitted facts and the elements required to establish the claims and affirmative defenses, the following issue(s) remain to be tried:

a. Whether ICE violates the Fourth Amendment by issuing detainers to states and localities that lack authority to make arrests for civil immigration violations, including on immigration detainers.[12]

---

[12] Defendants' response: Plaintiffs raised this claim as a triable issue for the first time in their Memorandum of Contentions of Fact and Law, Dkt. 440, and their Proposed Findings of Fact and Conclusions of Law, Dkt. 441.  The third amended complaint does not include such a claim, nor does it state facts that would have supported such a claim.  *See*, ECF No. 44 (Probable Cause claim defined as "As set forth above, Defendants' issuance of immigration detainers causes Plaintiffs and other class members prejudice by unreasonably taking away, limiting, and otherwise impacting their liberty without probable cause to believe they are removable in violation of the Fourth Amendment.").  Indeed, the third amended complaint is utterly devoid of any claim that states and localities that lack authority to make arrests for civil immigration violations. *See, generally, id.*  Although "the complaint in an ordinary civil case need only provide fair notice of the plaintiff's claim and the grounds on which the claim rests," *Mayle v. Felix*, 545 U.S. 644, 659 (2005), Defendants lacked such notice that Plaintiffs were advancing this claim.  Had Plaintiffs included such a claim, Defendants could have sought summary judgment on that issue, as it is a question that could be determined as a matter of law.  Fed. R. Civ. P. 56(a).  Moreover, Plaintiffs did not raise this new claim in its motion for summary judgment with regard to its Probable Cause Subclass.  Instead, Plaintiffs argued that ICE's issuance of detainers based solely upon the use of the electronic databases violates the Fourth Amendment because such databases are inaccurate and incomplete, ECF. No. 247-1 at 14–20, and that ICE's practice of issuing detainers based on the lack of information in the databases, coupled with some indication of foreign birth also violates the Fourth Amendment. *Id.* at 20–21.  Plaintiffs failed to provide timely fair notice of this claim as part of their Probable Cause cause of action, and this Court should not permit them to include at this late stage as a triable issue.

29.

b. Whether the databases ICE uses to conduct investigations before issuing immigration detainers are unreliable sources of information for probable cause determinations.

**DISCOVERY**

All discovery is complete.

**DISCLOSURES AND EXHIBIT LIST**

All disclosures under Fed. R. Civ. P. 26(a)(3) have been made.

Each party intending to present testimony by way of deposition will mark such depositions in accordance with Local Rule 16-2.7 and exchange with the other party.

The joint exhibit list of the parties has been filed under separate cover as required by L.R. 16-6.1 ("Joint Exhibit List") (Dkt. 437).  In view of the volume of exhibits marked by each party, the parties have incorporated in their Amended Joint Exhibit List which will be filed before trial all agreements regarding admitted exhibits, and all objections, including the grounds therefor. Unless both parties agree that an exhibit should be withdrawn, the parties agree that all exhibits will be admitted without objection at trial where neither party has listed an objection to authenticity or

---

Plaintiffs' response: Plaintiffs' complaint gave Defendants "fair notice of what [Plaintiffs'] claim is and the grounds upon which it rests." 5 Fed. Prac. & Proc. Civ. § 1215 (quoting *Conley v. Gibson*, 355 US 41 (1957)). Specifically, Plaintiffs' complaint clearly alleges that ICE agents "know—and intend—that their detainers will cause the subjects to be imprisoned [by state and local LEAs] for multiple days after they should be released." Third Amended Complaint, Dkt. 44, ¶ 32 ("'DHS expects state entities to cooperate and detain aliens upon receipt of a detainer'"); *see also* ¶¶ 81, 89. The complaint also clearly alleges that immigration detainers are used for civil immigration enforcement, not criminal enforcement. *Id.* ¶¶ 3, 19, 25. Plaintiffs were not required to spell out the particular legal theory they now allege in their complaint. 5 Fed. Prac. & Proc. Civ. § 1219 ("[I]t is unnecessary to set out a legal theory for the plaintiff's claim for relief"); *id.* § 1216 ("[T]he complaint must contain. . . direct allegations on every material point necessary to sustain a recovery on any recognizable legal theory, even though that theory may not be the one suggested or intended by the pleader").

admissibility on their Amended Joint Exhibit List (forthcoming).  As neither party has raised any objection to authenticity on the Joint Exhibit List, the parties stipulate to the authenticity of all exhibits.

**WITNESS LISTS**

Witness lists of the parties were filed with the Court on November 16, 2018. Dkt. 436, 438.  Plaintiffs filed an amended witness list on November 29, 2018.  Dkt. 446.  Only the witnesses identified on the lists will be permitted to testify (other than solely for impeachment).

**MOTIONS IN LIMINE**

There are no pending or contemplated motions *in limine*.

**BIFURCATION**

No bifurcation for trial is ordered.

**ADMISSIONS**

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pre-Trial Order shall supersede the pleadings, and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

//

//

//

//

//

//

//

//

//

//

//

31.

DATED: _____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

Approved as to form and content:

Dated:  April 25, 2019                NATIONAL DAY LABORER
                                      ORGANIZING NETWORK


                                      By: /s/ Jessica Karp Bansal
                                          Jessica Karp Bansal
                                          Counsel for Plaintiffs


Dated:  April 25, 2019                JOSEPH H. HUNT
                                      Assistant Attorney General
                                      Civil Division

                                      WILLIAM C. PEACHEY
                                      Director

                                      JOHN J.W. INKELES
                                      Trial Attorney


                                      By: /s/ J. Max Weintraub
                                      J. MAX WEINTRAUB, VSB 36188
                                      Senior Litigation Counsel
                                      United States Department of Justice
                                      Civil Division
                                      Office of Immigration Litigation
                                      District Court Section
                                      P.O. Box 868, Ben Franklin Station
                                      Washington, D.C. 20044
                                      Tel.: (202) 305-7551
                                      Fax: (202) 305-7000
                                      Email: jacob.weintraub@usdoj.gov

                                      Counsel for Federal Defendants