JOSEPH H. HUNT
Assistant Attorney General
WILLIAM C. PEACHEY
Director
J. MAX WEINTRAUB
Senior Litigation Counsel
JOHN J. W. INKELES
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
Trial Attorney, District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC  20044
Tel:  (202) 305-7551
Fax:  (202) 305-7000
Email:  jacob.weintraub@usdoj.gov
Attorneys for Federal Defendant
The United States of America

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUNCAN ROY; *et al*.,<br>　　　　　Plaintiffs,<br><br>　　　vs.<br><br>COUNTY OF LOS ANGELES, *et al*.,<br>　　　　　Defendants. | Case No. CV 12-09012 AB (FFMx)<br>Consolidated with:<br>Case No. CV 13-04416 AB (FFMx)<br><br>The Honorable André Birotte, Jr. |
| GERARDO GONZALEZ, *et al.*,<br>　　　　　Plaintiffs,<br><br>　　　vs.<br><br>IMMIGRATION AND CUSTOMS<br>ENFORCEMENT, an entity, *et al.*,<br>　　　　　Defendants. | **FEDERAL DEFENDANTS'<br>POST TRIAL MEMORANDUM<br>OF LAW** |

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................1

I.     Burden and the elements of Plaintiffs' Fourth Amendment claim...........3

II.    The ICE detainer process..................................................4

III.   IDENT's role in the ICE detainer process ..................................8

IV.    Plaintiffs have failed to meet their burden to show that the databases
       ICE searches cannot form the basis of a probable cause
       determination ..................................................................10

V.     Plaintiffs have failed to meet their burden to show that issuing a
       detainer to an LEA is a Fourth Amendment violation ...........................21

CONCLUSION....................................................................29

CERTIFICATE OF SERVICE .................................................

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## CASE LAW

*Abel v. United States*,
   362 U.S. 217 (1960) .......................................................................... 24, 25

*Arizona v. United States*,
   567 U.S., 387 (2012) ..............................................................................29

*Baker v. McCollan*,
   443 U.S. 137 (1979) ...................................................................... 13, 14

*Campos v. INS*,
   62 F.3d 311 (9th Cir. 1995) ............................................................ 22, 24

*City of El Cenizo, Texas v. Texas*,
   890 F.3d 164 (5th Cir. 2018) ....................................................... 3, 24, 25

*City of El Cenizo, Texas v. Texas*,
   No. 17-50762, 2017 WL 4250186 (5th Cir. Sept. 25, 2017) ................................29

*Garcia v. Taylor*,
   40 F.3d 299 (9th Cir. 1994) ...................................................................28

*Herring v. United States*,
   555 U.S. 135 (2009) ...............................................................................17

*Illinois v. Gates*,
   462 U.S. 213 (1983) ...............................................................................16

*Lopez v. U.S. I.N.S.*,
   758 F.2d 1393 (10th Cir. 1985) ................................................................24

*Lopez-Lopez v. Cty. of Allegan*,
   321 F.Supp.3d 794 (W.D. Mich. 2018) ..................................................24

*Maryland v. Pringle*,
   540 U.S. 366 (2003) ...........................................................................4, 16

*Morales v. Chadbourne,*
   793 F.3d 208 (1st Cir. 2015) ................................................................. 4

*Nasious v. Two Unknown B.I.C.E. Agents,*
   657 F. Supp. 2d 1218 (D. Colo. 2009), *aff'd*, 366 F. App'x 894 (10th Cir. 2010)
   ................................................................................................................ 22

*Sherman v. U.S. Parole Comm'n,*
   502 F.3d 869 (9th Cir. 2007) ........................................................... 24, 25

*Tenorio-Serrano v. Driscoll,*
   324 F. Supp. 3d 1053 (D. Ariz. 2018) ................................................... 24

*U.S. E.E.O.C. v. Republic Servs.*, Inc.,
   640 F. Supp. 2d 1267 (D. Nev. 2009) .................................................... 19

*United States v. Al Nasser,*
   555 F.3d 722 (9th Cir. 2009) ................................................................... 3

*United States v. Arvizu,*
   534 U.S. 266 (2002) ............................................................................... 16

*United States v. Corral–Villavicencio,*
   753 F.2d 785 (9th Cir. 1985) ............................................................. 4, 13

*United States v. Cortez,*
   449 U.S. 411 (1981) ............................................................................... 17

*United States v. Ibarra,*
   493 F.3d 526 (5th Cir. 2007) ................................................................. 26

*United States v. Juarez-Velasquez,*
   763 F.3d 430 (5th Cir. 2014) ..................................................... 24, 28, 29

*United States v. Lucas,*
   499 F.3d 769 (8th Cir. 2007) ................................................................. 25

*United States v. McDowell,*
   745 F.3d 115 (4th Cir. 2014) ................................................................. 19

iii

*United States v. Mendenhall*,
446 U.S. 544 (1980) ........................................................................................3

*United States v. Ortiz-Hernandez*,
427 F.3d 567 (9th Cir. 2005) ........................................................................17

*United States v. Urbina-Mejia*,
450 F.3d 838 (8th Cir. 2006) ........................................................................19

*Zepeda v. U.S. I.N.S.*,
753 F.2d 719 (9th Cir. 1983) ..........................................................................3

# FEDERAL STATUES

8 U.S.C. § 1226 ..............................................................................................25

8 U.S.C. § 1229a(a)(1) ....................................................................................15

8 U.S.C. § 1229(b)(1) ......................................................................................25

# FEDERAL REGULATIONS

8 C.F.R. § 236.1(c)(8) ....................................................................................25

8 C.F.R. § 236.1(d)(1) ....................................................................................25

8 C.F.R. § 287.3(d) ........................................................................................25

8 C.F.R. § 287.7(d) ....................................................................................3, 22

# STATE STATUTES

2019 Colo. Legis. Serv. H.B. 19-1124 ..........................................................23

Cal. Gov. Code § 7284.6(a)(1)(B) ................................................................23

**INTRODUCTION**

On February 7, 2018, the Court denied motions by Plaintiffs and Federal Defendants for summary judgment as to Plaintiffs' claims that Immigration and Customs Enforcement ("ICE") violates the Fourth Amendment by issuing immigration detainers against the certified class members, using only database searches as the basis for the determination of probable cause of alienage and removability.  As originally filed, Plaintiffs sought to represent three classes, and on October 9, 2016, the Court certified the Plaintiffs' three proposed classes:  (1) the Judicial Determination Class comprised of all current and future individuals who are subject to an immigration detainer issued by an ICE agent located in the Central District of California, where the detainer is not based upon a final order of removal signed by an immigration judge or the individual is not subject to ongoing removal proceedings, and who were detained for more than forty-eight hours without receiving a judicial determination of probable cause; (2) the Probable Cause Subclass, comprised of all members of the Judicial Determination Class for whom ICE has issued an immigration detainer based solely on checks for the individual in government databases; and (3) the Statutory Subclass, comprised of all members of the Judicial Determination Class for whom ICE did not issue an administrative warrant of arrest at the time it issued an immigration detainer.  ECF No 184.  Following prior orders on motions for partial summary judgment in this

action, only the Probable Cause Subclass claims remain.  That class represents individuals who were detained for more than 48 hours in the custody of local, state, and federal law enforcement agencies ("LEAs") across the country for whom an ICE officer in the Central District of California has issued an immigration detainer based solely on checks for the individual in various government databases.  The class is further limited, however, because the subclass expressly excludes individuals who have a prior order of removal or who are in removal proceedings.

At trial, the Court also permitted Plaintiffs to proceed with their claim that ICE violates the Fourth Amendment by issuing detainers to LEAs that lack authorization to make arrests for civil immigration purposes and are prohibited by law and/or policy from detaining an individual pursuant to an immigration detainer issued by ICE.

The facts elicited at trial demonstrate that Federal Defendants are entitled to judgment as to both Fourth Amendment claims.  First, Plaintiffs failed to meet their burden to show that the more than 30 databases ICE searches, reviews, and analyzes before issuing detainers are so incomplete and unreliable that they cannot form the basis of a probable cause determination that an individual is an alien subject to removal.  Second, because detainers are requests, detainers issued to LEAs who do not act upon ICE's request do not create a Fourth Amendment violation.

## I.      Burden and the elements of Plaintiffs' Fourth Amendment claim.

Plaintiffs must demonstrate by a preponderance of the evidence that ICE actions violate the Fourth Amendment's protection against "unreasonable searches and seizures."  U.S. Const. amend. IV; *Zepeda v. U.S. I.N.S.,* 753 F.2d 719, 725 (9th Cir. 1983) (finding that the authority of federal immigration officers to detain and arrest suspected aliens is limited by the strictures of the Fourth Amendment). To prove a Fourth Amendment violation, Plaintiffs must first establish that they have been or will be seized solely because of an immigration detainer issued by ICE.  *See United States v. Mendenhall*, 446 U.S. 544, 553 (1980) (a person is not seized within the meaning of the Fourth Amendment unless "by means of physical force or show of authority, his freedom of movement is restrained."); *see also United States v. Al Nasser*, 555 F.3d 722, 730 (9th Cir. 2009) (a new Fourth Amendment seizure of a person must involve newly constraining that person's liberty by "means intentionally applied."); and 8 C.F.R. § 287.7(d)(detainer requests only apply to aliens "not otherwise detained by a criminal justice agency").

Next, Plaintiffs must show the seizure was unreasonable.  Seizures based on violations of federal immigration law are reasonable under the Fourth Amendment if they are based on probable cause of alienage and removability.  *See City of El Cenizo, Texas v. Texas,* 890 F.3d 164, 187 (5th Cir. 2018) ("It is undisputed that

federal immigration officers may seize aliens based on an administrative warrant attesting to probable cause of removability."); *see also Morales v. Chadbourne*, 793 F.3d 208, 211 (1st Cir. 2015).

As the Supreme Court has stated and this Court has recognized, "[t]he probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), ECF No. 346, p. 32. The Fourth Amendment does not require that an ICE officer have reasonable certainty of alienage and removability before issuing a detainer. *United States v. Corral-Villavicencio*, 753 F.2d 785, 788 (9th Cir. 1985) ("Reasonable certainty 'is a higher standard than that of probable cause, [but] it does not require knowledge beyond a reasonable doubt.'").

## II.    The ICE detainer process

Although ICE has used several different detainer forms throughout the pendency of this litigation, the only relevant form for the Court is the DHS Form I-247A, Immigration Detainer – Notice of Action, which has been the detainer in use since April 2, 2017. Tr. Ex. 96. That form indicates to the recipient law enforcement agencies that DHS has determined that probable cause exists that the subject is a removable alien and further explains the bases underlying the probable cause determination. *Id.* The form includes checkboxes an ICE officer marks to

4

indicate which of the following criteria forms the basis for the determination of probable cause: 1) a final order of removal against the alien; 2) pendency of ongoing removal proceedings against the alien; 3) biometric confirmation of the alien's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or 4) statements made by the alien to an immigration officer and/or other reliable evidence that affirmatively indicate the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.  *Id.*  As noted, *supra,* only one of these criteria is at issue before this Court at this point.

ICE officers in the Central District of California issue detainers 24 hours a day for individuals detained in LEA custody in the Central District of California and after-hours to LEAs in 42 states and two U.S. territories.  As noted *supra*, the only category of detainers at issue before the Court are those ICE detainers where there is a biometric identity match and affirmative database records showing the individual is an alien who lacks lawful authorization to be in the United States and/or notwithstanding such authorization is removable from the United States.

ICE officers in the Central District of California use fingerprints to identify individuals to whom they will issue detainers, after checking for those fingerprints

in several immigration and criminal databases.  This process starts when an individual is arrested and booked into a state or local law enforcement agency.  Tr. Transcript 1435:8-15.  Fingerprints taken by local law enforcement agencies at booking are automatically checked against the FBI's and DHS's fingerprint repositories. Tr. Transcript 1435:21 – 1436:8.

If there is a fingerprint match in DHS's fingerprint repository—meaning DHS has some record of a prior encounter with that person, including a record of the person applying for an immigration benefit—then an Immigrant Alien Query ("IAQ") is automatically generated.  Tr. Transcript 1436:7–12.  The IAQ is automatically sent to ICE's Law Enforcement Support Center ("LESC") in Williston, Vermont.  Tr. Transcript 1436:16–17.  LESC personnel conduct initial database queries, before sending an Immigrant Alien Response ("IAR") to ICE's Pacific Enforcement Response Center ("PERC"), as well as to the law enforcement agency that has criminal custody of the individual.  Tr. Transcript 930:3-5.

When ICE officers at the PERC review the IAR to determine if probable cause exists to issue a detainer, they use a database interface program called ACRIMe Field.  Tr. Transcript. 932:14-19. ACRIMe Field automatically searches the NCIC, NLETS, CIS, CLAIMS 3, CLAIMS 4, EID, IDENT, ADIS, SEVIS, and EOIR databases to match the fingerprint identification number ("FIN") submitted with other encounters for that same fingerprint or FIN, as well as searching by FBI

Number.  Tr. Transcript 932:20 – 933:3; 933:8 -21.  ICE officers at the PERC use ACRIMe Field to biometrically confirm the encounters with law enforcement officers or immigration officials for every individual for whom they receive an IAR to assist with the determination of probable cause that the subject is an alien amenable to removal.  *Id.*  Additionally, ICE officers at the PERC search more than 20 additional databases, including the State Department's Consular Consolidated Database ("CCD") (also referred to as CCDI) passport database; USCIS's Refugees, Asylum, and Parole System ("RAPS") (or Global) database containing refugee, asylum, and parole information; the California Birth database for records of births in the state of California; a California law enforcement database called CLETS; and more than 20 others, using a database search tool called the Person Centric Query Service ("PCQS").  Tr. Transcript 1013:11 – 1021:21.  Several of these databases contain information that could disclose or suggest whether an individual who appears to be an alien is, in fact, a United States citizen, especially when reviewed by a competent and experienced ICE officer.  ICE officers are trained to look for such indicia of U.S. citizenship, to the extent such indicia exists.  *Id.*  If an ICE officer at the PERC believes probable cause exists that the subject is an alien who is amenable to removal, the officer issues a detainer.  As witness Albert Garibay, the PERC IAR Command Center Section Chief, testified, each time an ICE officer at the PERC issues a detainer, it is "based

on reasonably trustworthy information." Tr. Transcript 1048:1-7. If an ICE officer at the PERC issues a detainer, a supervisor is required to review the probable cause determination and to issue a warrant, which is submitted to the appropriate law enforcement agency along with the detainer. Further, supervisors at the PERC are required to review every detainer issued for data quality, separate from the reviews performed in connection with the issuance of detainers. Tr. Transcript 1443 22:25.

If, on the other hand, the ICE officer cannot confirm the identity of an individual for whom there is an IAR, or whether that individual is an alien amenable to removal, then the ICE officer does not issue a detainer. In those cases where an ICE officer at the PERC does not issue a detainer, the officer refers that IAR to the appropriate ICE Field Office as a Criminal Alien Program ("CAP") referral or an at large referral. Tr. Transcript 1139:19-23. Witness Garibay testified, specifically, "If, during the process at the PERC, we don't have the affirmative evidence or enough to state probable cause, we refer the case to the local office as a CAP referral. That way the local officer will continue -- or do additional research on that case or investigation." *Id.*

### III.   IDENT's role in the ICE detainer process

The Automated Biometric Identification System ("IDENT") is the fingerprint identification system operated by the Department of Homeland Security's Office of Biometric Identity Management ("OBIM"). Tr. Transcript

1151:3-8.  IDENT contains over 237 million unique identities.  ECF No. 484, Admitted Fact 90.  IDENT is the repository that components of DHS use to store and match biometric information, including fingerprints and, where available, facial recognition data.  Tr. Transcript 1163:1-15; 1179: 4-9. IDENT is extremely accurate and reliable; as Witness Patrick Nemeth, the OBIM Director of Identity Operations, testified, IDENT's "calculated accuracy for ten-prints for a positive match rate is 98.9 percent" and its "calculated false match rate is .0085 percent." Tr. Transcript 1172:14-16; 1177:17-8.

ICE searches more than ten immigration and criminal databases by IDENT FIN.  Tr. Transcript 932:20 – 933:3; 933:8 -21.  The IDENT FIN enables ICE to compensate for errors in those databases, including multiple spellings, incorrect dates of birth, or blank fields for an individual.  Tr. Transcript 1195:3-13.  As Witness Nemeth explained, "We really don't care what the spelling of the name is. We store it as submitted by the submitting agency, and our future results are independent of any spelling of names."  Tr. Transcript 1165:9-11.  He later clarified, "IDENT is a biometrics system, so it would ignore any differences in name or missing fields and simply indicate back to the requester that these two encounters involved the same set of fingerprints."  Tr. Transcript 1195:10-13.

Plaintiffs' own witnesses explained that several different USCIS forms, petitions, and applications require or required individuals to submit their

fingerprints, including the application for asylum, to adjust status to that of a

lawful permanent resident, to naturalize, for temporary protected status, to renew a

lawful permanent resident card, to obtain a U-Visa, to obtain a T-visa, and to

obtain DACA protection. *See, e.g.,* Patricia Corrales testimony, Tr. Transcript

882:22-887:21.  Based on those fingerprint submissions, ICE can search for those

records by IDENT FIN, rather than relying solely on biographical information.  Tr.

Transcript 1164:21-1165:19.

## IV.   Plaintiffs have failed to meet their burden to show that the databases ICE searches cannot form the basis of a probable cause determination.

Plaintiffs argue that ICE violates the Fourth Amendment by – in certain,

limited instances – issuing detainers for which electronic database searches provide

the information underlying the probable cause determination.  In proffering that

argument, however, Plaintiffs ignore the vast changes in the ICE PERC detainer

practices since the filing of this action.  Those changes include implementing a

new software that automatically searches ten different immigration and criminal

databases by IDENT FIN, requiring PERC personnel to search in excess of 30

databases, mandating that at least four separate individuals review the database

searches for each individual before the PERC issues a detainer, and insisting that a

supervisor, who was not part of the original database searches, conduct a data

quality review of 100% of the detainers the PERC issues.

For instance, the evidence at trial showed that the PERC now searches the
State Departments CCD (also referred to as CCDI) passport database; USCIS's
RAPS (or Global) database containing refugee, asylum, and parole information;
the California Birth database for records of births in the state of California;
CLETS; and others, using a database search tool called PCQS.  Tr. Transcript
1013:11 – 1021:21.  Despite Plaintiffs' Witness Rachel Winkler calling CCD "a
really critical" database (Tr. Transcript 643:21), Plaintiffs refuse to acknowledge
the giant leaps ICE has made throughout the pendency of this litigation.

Additionally, Plaintiffs have failed to recognize the efforts included in the
ICE detainer practice to afford protections to U.S. citizens.  For instance, the
detainer clearly indicates that it is not a valid document if the LEA does not serve
it on the subject.  Tr. Ex. 96; Tr. Transcript 1422: 7-9 (noting that the detainer
includes a provision stating, "The alien must be served with a copy of this form for
the detainer to take effect.").  As Witness Timothy Robbins, Deputy Assistant
Director, Targeting Operations Division, explained, that provision exists because
ICE "do[es] not expect that law enforcement agency to hold that individual past its
point of release, so up to 48 hours, without service of this document."  Tr.
Transcript 1422:16-18.  Witness Robbins added that where the LEA had failed to
serve the detainer on the subject, "I do not expect that individual to be detained a
minute past its release point."  Tr. Transcript 1422:21-1423:4.

Another example of how the ICE detainer policy attempts to protect U.S. citizens is by providing the telephone number included on the detainer form, advising the subject to call if he or she believes the detainer was issued improperly. Tr. Ex. 96; Tr. Transcript 1425:23-1426:1 (noting that the detainer includes a notice to the subject in bold letters that "**If you believe you are a United States citizen or the victim of a crime, please advise DHS by calling the ICE Law Enforcement Support Center toll free**" and listing a telephone number).  When an individual calls the number provided on the detainer, that individual can talk to a live person, after first hearing a recording that explains as follows:

> You have reached the Law Enforcement Support Center's line for individuals subject to an ICE detainer who believe they are a United States citizen or victim or witness of a crime. Your call is very important to ICE. If you are calling as a result of receiving an Immigration Detainer - Notice of Action, DHS Form 1-247, and believe you are a United States citizen, witness to or victim of a crime, or have a complaint regarding a detainer, please hold and the next available operator will assist you momentarily.

Tr. Ex. 269.  Although there was some confusion on this issue at trial, the recording leads to a live person, and, since December 21, 2018, it has included the above language.  Tr. Ex. 269.  Witness Robbins clarified that the purpose of

providing this notification and making the number available is that it "allows the person that is currently in custody, if they can or their family or their counsel, to call this number if they have a United States citizen claim."  Tr. Transcript 1426:13-15.

Connecting the telephone number with the provision requiring service of the detainer on the subject, Witness Robbins explained, "We also expect, and we would really want, this form to be served on the alien because the alien might have information in regards to [his or her] citizenship status, and this form has the number on the back that allows them to call us if there [are] any issues."  Clearly, the evidence shows that ICE's goal is to prevent the detention on immigration grounds of U.S. citizens.

Plaintiffs, further, impute a higher standard to ICE detainers than the law requires.  Essentially, Plaintiffs assert that ICE cannot issue a detainer unless it can "prove," "determine," or "demonstrate" that an individual is a removable alien, when the standard of proof is simply "probable cause."  *See Baker v. McCollan*, 443 U.S. 137, 142 (1979).  One of Plaintiffs' witnesses – former ICE officer Gregory Meinhardt – stated that he thought that probable cause was "similar … to criminal court."  Tr. Transcript 449:18-24.  In criminal proceedings, of course, the standard of proof for conviction is the much higher "beyond a reasonable doubt" standard.  *See Corral–Villavicencio*, 753 F.2d at 788.  The criminal probable cause

standard for arrest would be similar to the probable cause standard for arrest for civil arrest. *See Baker*, 443 U.S. at 145 ("Respondent's innocence of the charge contained in the warrant, while relevant to a tort claim of false imprisonment in most if not all jurisdictions, is largely irrelevant to his claim of deprivation of liberty without due process of law. The Constitution does not guarantee that only the guilty will be arrested.").

Another of Plaintiffs' witnesses, Roxanne Bacon, suggested that ICE was attempting to use the databases "to determine removability." Tr. Transcript 143:19. Plaintiffs' Witness Margaret Stock testified, further, that ICE cannot rely on database searches to "figure out whether somebody is a U.S. citizen" or "to determine immigration status." Tr. Transcript 333:1-2; 369:6-9. Moreover, Plaintiffs' Witness Winkler explained that E-Verify was a better database resource tool than ACRIMe Field, because it allowed the Government to "verify" an individual's immigration status.[1] Tr. Transcript 647:22-25. Plaintiffs' Witness Corrales testified that she believed the question before the Court was whether "the

---

[1] Witness Winkler also discussed a system called SAVE, in which, if a person's identify is not immediately verified, a second verification of the subject's identity will take 3-5 working days. If that verification is not successful, a third more intense attempt to verify the subject's identity will take place. *See* Tr. Transcript 657:3-660:4. This third step in SAVE usually takes 20 days. *See* Tr. Transcript 662:19-21. Even under SAVE, with three attempts to verify the subject's identity that are spread out over the course of 25 days, the subject's identity cannot always be verified. *See* Tr. Transcript 660:5-8.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

information recorded in these databases in and of itself can determine citizenship questions." Tr. Transcript 750:14-16.  Finally, Plaintiffs' Witness Yliana Johansen-Mendez testified that it was her opinion "that relying on the databases alone is insufficient or unreliable to determine someone's legal status." Tr. Transcript 499: 5-7.  The problem with each of those positions, however, is that they do not accurately describe the standard ICE must meet to issue a detainer.

ICE does not make a final determination of removability or verify immigration status when it issues a detainer.  Those are decisions an immigration judge or a USCIS adjudicator might make.  *See, e.g.,* 8 U.S.C. § 1229a(a)(1)("an immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien").  Rather, an ICE officer need only find that probable cause exists that an individual is a removable alien before issuing a detainer.  Tr. Ex. 96; Tr. Transcript 1417:11-13.  Determining probable cause is the first step of the removal process, not the last.  Because the Probable Cause Subclass members are not subject to final orders of removal and are not already in removal proceedings, ICE must place them into removal proceedings to obtain a removal order.  During those proceedings, members can challenge ICE's evidence, submit proof that they should remain in the United States, and appeal adverse decisions. The Court, therefore, should not be swayed by Plaintiffs' witnesses' conclusory

testimony that a higher standard of proof applies to the issuance of ICE detainers and warrants.

Plaintiffs argue that the databases are "notoriously rife with error," citing "errors in the spellings of names, errors in dates of birth, errors in other biographical information." Tr. Transcript 84:4-11.  As explained, *supra*, ICE overcomes many of those errors by searching the databases using IDENT FIN, rather than simply searching using biographic indicators.  Tr. Transcript 1165:9-11; 1195:10-13.  As Witness Nemeth clarified, OBIM and IDENT "really don't care what the spelling of the name is."  Tr. Transcript 1165: 9-10.  Searching by fingerprints or FINs will collect all the spellings, aliases, birthdates, and misordered names into a single response.  ICE need not avoid or obviate every error before issuing a detainer.  It need only reach the probable cause standard.

"The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). The totality of the circumstances includes the officers' "own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002), *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983) (holding that totality of the circumstances analysis applies to probable

1  cause review of warrant issued based on informant's tip).  The Ninth Circuit has

2  further held that law enforcement officers "may rely on the totality of facts

3  available to them when determining whether probable cause exists to make an

4  arrest." *United States v. Ortiz-Hernandez*, 427 F.3d 567, 573 (9th Cir. 2005).

5  Where law enforcement officers use databases to assist in determining

6  probable cause "quantity and quality . . .  are considered in the totality of the

7  circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417

8  (1981).  Moreover, it is well established that a law enforcement agency may rely

9  on computer databases to establish probable cause where, as it is here, it is

10 reasonable to do so.  *See Herring v. United States*, 555 U.S. 135, 146–47 (2009).

11 The databases contain evidence of an individual's alienage and removability.

12 Accordingly, even if the databases are not 100% accurate or complete, it is

13 nonetheless "reasonable" for ICE to rely on searching those databases to determine

14 whether to issue a detainer.

15 Plaintiffs' Witness Johansen-Mendez notably testified that "in some cases

16 [probable cause] will be clear."  Trial Transcript 1518:13.  In difficult or complex

17 cases, however, it might be necessary to engage in further investigation.  And ICE

18 does precisely that – difficult cases are referred to field offices to conduct more

19 extensive investigations.  Both ICE PERC witnesses testified that officers can

20 "CAP refer" cases (those requiring further investigation by local Criminal Alien

17

Program ("CAP") officers, who can interview the suspected alien and/or review alien files) to field offices where the question of probable cause of alienage and removability are not easily answered.  Witness Robbins testified plainly, "Any difficult case where they do not come up to a probable cause standard should be CAP referred to the field."  Tr. Transcript 1458: 24-25.  Additionally, Witness Garibay explained, a CAP referral is warranted if the case "needs further review from the local field office."  Tr. Transcript 973:25-974:1.  He added examples of such scenarios including an individual with a pending naturalization application or a lawful permanent resident with an unclear code of admission, where ICE lacked information about the individual's parents.  Tr. Transcript 974:6-22. Even though investigations at the field officers might take longer than at the PERC, ICE management encourages PERC officers to CAP refer difficult cases.  Witness Robbins clarified that "from the analysts all the way through the senior leadership at the PERC, if there is ever a U.S. citizenship claim, they all have the ability to easily CAP that case, 'CAP that case' meaning send that case to the field office for further investigation.  They all feel comfortable doing it."  Tr. Transcript 1432:1-5.

Plaintiffs also produced evidence and elicited testimony attempting to show that naturalization database records were destroyed after 15 years.  Tr. Transcript

773:11-15; Tr. Ex. 41.[2]  But Defendants produced evidence and elicited testimony showing that even if naturalization database records were so purged, evidence of the submission of the biometrics that accompanied the naturalization application would remain in IDENT for 75 years.  Tr. Transcript 1193:16-1194:15; Tr. Ex. 48. Based on Witness Garibay's testimony that evidence of a naturalization application would trigger further investigation, the Court should not be so troubled by the destruction of the CLAIMS records.  Tr. Transcript 974:6-22.

Moreover, mere anecdotal evidence cannot serve to support a finding that the databases systems ICE checks are unreliable.  *See United States v. McDowell*, 745 F.3d 115, 121-122 (4th Cir. 2014) (rejecting criminal defendant's argument that NCIC was unreliable for sentencing based on anecdotal evidence); *see also U.S. E.E.O.C. v. Republic Servs.*, Inc., 640 F. Supp. 2d 1267, 1319 (D. Nev. 2009) ("the Ninth Circuit considered the anecdotal and circumstantial evidence set forth in 120 declarations, *in addition to* the statistical evidence presented by the plaintiffs.") (emphasis in the original, internal citations omitted).  Absent statistical evidence strongly to the contrary, the Court cannot find the databases are unreliable, especially considering all that ICE does to obviate any errors that it knows might exist.  *See United States v. Urbina-Mejia*, 450 F.3d 838, 839 (8th Cir.

---

[2] Witness Johansen-Mendez testified that this retention schedule is being substantially modified wherein CLAIMS 3 records will be retained for 50 years. *See* Tr. Transcript 532:7-12.

2006) (refusing to invalidate an NCIC database search, despite evidence that over a five-year period, the database was incorrect 0.5% of the time).

Plaintiffs have proffered no such statistical evidence before this Court, other than a few studies describing a percentage of error rate at some time in the past in some or another specific field.  Rather, they produced witnesses testifying about what they had seen, experienced, or believed.  Moreover, they repeatedly cite ICE 30(b)(6) witness James Hamm for the "statistic" that the databases ICE searches return errors 30% of the time, even though he clarified that he had no basis for that figure.  Tr. Transcript 526: 15-527:1.  On the other hand, all three of Federal Defendants' ICE witnesses testified that they would expect their subordinates to have notified them if the databases searches were returning information that was causing them to issue detainers to U.S. citizens, but that they had not received such notifications.  Tr. Transcript 1048: 21-1049:6 6 (Witness Garibay, as a supervisor, would expect to be, but has not been, told if U.S. citizens were being detained because of database searches); 1312:6-13 (Witness Marin, as Acting Deputy Executive Associate Director, would be apprised if U.S. citizens were being detained because of database searched); 1471:19-1472:6 (Witness Robbins would expect to hear if database searches were resulting in detention of U.S. citizens because "I've worked very hard to have open communication channels, not only

from our analysts, to the DOs, to the supervisors, all the way, you know, to me and then above if need be.").

The Court recognized the failure of any effective statistical evidence at trial, querying Federal Defendants' counsel about "reports that suggest error rates that vary in percentages, as high -- you know, like 4 percent, 1 percent, 42 percent?" Tr. Transcript 1628:23-25.  Where no valid statistics demonstrate that an entire database is unreliable, and where ICE has taken numerous steps to overcome the errors that are brought to its attention – such as misspellings, incorrect birthdates, or misordered names – the Court should not find that the databases cannot form the basis of a probable cause determination.

## V.    Plaintiffs have failed to meet their burden to show that issuing a detainer to an LEA is a Fourth Amendment violation.

Federal Defendants renew their argument that the protections of the Fourth Amendment do not arise until and unless there is a seizure – other than the one for which the individual is in the custody of the state or local LEA.  As discussed above, a seizure results from means "intentionally applied."  Because the issuance of a detainer, which is a request, cannot physically seize an alien, the detainer cannot be a seizure and therefore there is no Fourth Amendment violation.

Plaintiffs, however, allege that ICE violates the Fourth Amendment each time it issues a detainer, because each detainer represents a new seizure and because state and local LEAs lack authority to arrest individuals for civil

violations.  Where there is no arrest or seizure based on the immigration detainer, however, there can be no Fourth Amendment violation.

An individual subject to an ICE detainer has been, necessarily, arrested by an LEA and is in the LEA's custody due to that arrest at the time ICE issues the detainer.  *See* Tr. Ex. 111 "Issuance of Immigration Detainers by ICE Immigration Officers" (Mar. 24, 2017) (requiring an alien to be arrested for a criminal offense before a detainer can be issued); *see also* 8 C.F.R. § 287.7(d) (request for detention only applies when an alien is "not otherwise detained by a criminal justice agency").  As Witness Robbins explained at trial, the first step in the detainer process is that "biometric confirmation comes from the subject's prints at time of arrest. Those are verified by IDENT and then sent to the LESC if there is a DHS match." Tr. Transcript 1418:22-24.  Absent a second arrest by a state or local LEA based on the issuance of an ICE detainer, the Court should not find that ICE has *caused* an arrest—a seizure.  *See Campos v. INS*, 62 F.3d 311, 313 (9th Cir. 1995) ("The bare detainer letter alone does not sufficiently place an alien in INS custody to make habeas corpus available.") (citation omitted); *see also Keil v. Spinella*, No. 09-cv-3417, 2011 U.S. Dist. LEXIS 1075, *8-9 (W.D. Mo. Jan. 6, 2011) ("[D]etainer alone does not cause imprisonment or a seizure by ICE. Rather, a seizure only occurs when the agency to which the detainer was issued turns custody over to ICE."); *Nasious v. Two Unknown B.I.C.E. Agents*, 657 F. Supp. 2d

22

1218, 1223, 1225 (D. Colo. 2009), *aff'd*, 366 F. App'x 894 (10th Cir. 2010) ("Plaintiff's detention was imposed by the state of Colorado based on Plaintiff's pending criminal charges; it was not imposed by or in any way impacted by the ICE detainer," and "could not, as a matter of law, constitute a restraint on or deprivation of a liberty"). Rather, that individual's custody remains at the hands of the state or local LEA, with probable cause having been determined by whatever formed the basis of the original custodial decision. *Id.*

Even if it did, when ICE issues detainers to LEAs in states or localities which are prohibited by law and/or policies from cooperating with ICE, ICE's issuance of a detainer could not result in any seizure or arrest. For example, Colorado recently enacted a law prohibiting all its law enforcement officers from arresting or detaining an individual on the basis of a civil immigration detainer request. *See* 2019 Colo. Legis. Serv. H.B. 19-1124 (WEST). In California, the California Values Act prohibits California LEAs from detaining an individual on the basis of an ICE detainer or hold request. *See* Cal. Gov. Code § 7284.6(a)(1)(B). Accordingly, when ICE issues a detainer to an LEA in Colorado or California, there can be no Fourth Amendment violation because no seizure is caused by the ICE detainer.

Accordingly, if the state or local LEA refuses to honor the detainer by failing to hold the individual beyond the otherwise release date, then ICE has not

caused the individual to be arrested.  In such a case, the detainer cannot be found to have had any impact on the detention of the individual who is the subject of that request, because that detention is based solely on the LEA's initial arrest of the subject.  *See, Campos*, 62 F. 3d at 313; *see also United States v. Juarez-Velasquez*, 763 F.3d 430, 436 (5th Cir. 2014) ("[S]tate charges [remain] the impetus for the entire duration of [any] pretrial detention" in such circumstances.).  Moreover, where Plaintiffs can point to no such arrest, whether a state or local LEA has the authority to arrest an individual based on a civil immigration violation is not an issue the Court needs to decide, since there is no Fourth Amendment seizure.

Furthermore, it has long been the case that federal immigration officials in the Executive Branch may function as magistrates by issuing administrative warrants under federal statutes authorizing them to do so. *See, e.g., Abel v. United States*, 362 U.S. 217, 234 (1960); *El Cenizo*, 890 F.3d at 187; *Tenorio-Serrano v. Driscoll*, 324 F. Supp. 3d 1053, 1066 (D. Ariz. 2018); *Lopez-Lopez v. Cty. of Allegan*, 321 F.Supp.3d 794 (W.D. Mich. 2018); *accord Sherman v. U.S. Parole Comm'n*, 502 F.3d 869, 876-80 (9th Cir. 2007) (in immigration context, warrants may be issued "outside the scope of the Fourth Amendment's Warrant Clause"); *Lopez*, 758 F.2d at 1393 (recognizing the validity of an "administrative warrant issued without an order of a magistrate"). And *if* individuals are brought into ICE custody, they may challenge their custody or removal proceedings before the

"magistrate," *i.e.* ICE, as well as the immigration courts. *See* 8 U.S.C. §§ 1226, 1229(b)(1); 8 C.F.R. §§ 236.1(c)(8), 236.1(d)(1), 287.3(d). Given the civil context of immigration detainers, an executive officer can constitutionally make the necessary probable-cause determination outside the scope of the Fourth Amendment's Warrant Clause "without presentment to a judicial officer." *Sherman*, 502 F.3d at 876-80; *accord United States v. Lucas*, 499 F.3d 769, 776 (8th Cir. 2007) (*en banc*) (plurality) (administrative warrants need not be issued by a "neutral and detached magistrate in the sense of a judicial officer"). "[L]egislation giving authority to the Attorney General or his delegate to arrest aliens pending deportation proceedings under an administrative warrant, not a judicial warrant within the scope of the Fourth Amendment," has existed "from almost the beginning of the Nation." *Abel*, 362 U.S. at 234.

Even if there were a seizure, the Fourth Amendment is only implicated if there is an "unreasonable seizure." *See* U.S. Const. amend. IV. As the Fifth Circuit has held, cooperating with an ICE detainer would be reasonable, because the collective knowledge doctrine imputes to the LEA the ICE officer's knowledge of the facts underlying the probable cause determination. *See, City of El Cenizo*, 890 F.3d at 187-88 ("Compliance with an ICE detainer thus constitutes a paradigmatic instance of the collective-knowledge doctrine, where the detainer request itself provides the required 'communication between the arresting officer and an officer

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

who has knowledge of all the necessary facts'.") (quoting *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007).

Importantly, neither of the two named plaintiffs in this case, Gerardo Gonzalez or Simon Chinivizyan, has ever been in the physical custody of ICE, nor was either held by an LEA beyond their otherwise release date.  *See*, ECF No. 44, ¶¶ 68-69, 78, 85.  The Los Angeles Police Department ("LAPD") arrested Plaintiff Gonzalez on December 27, 2012, for felony possession of methamphetamines.  *Id.* ¶ 60.  The LAPD transferred Plaintiff Gonzalez to the custody of the Los Angeles Sheriff's Department ("LASD"), in whose custody he remained at the time he filed the original complaint.  *Id.* ¶¶ 11, 60; *see also* Tr. Ex. 256, Plaintiffs' Responses to Defendants' First Set of Requests for Admission, Response to RFA #6.  On June 19, 2013 – more than a year before Plaintiffs filed their TAC – ICE canceled the detainer lodged against Plaintiff Gonzalez.  *Id.* ¶ 69; Exhibit 2; , *see also* Trial Ex. 256, Plaintiffs' Responses to Defendants' First Set of Requests for Admission, Response to RFA #10 ("Admit that ICE canceled the detainer on Plaintiff Gonzalez on June 19, 2013.").  ICE never took Plaintiff Gonzalez into its custody. *Id.* ¶ 68 (alleging that Plaintiff Gonzalez "faced the imminent threat" of being detained by ICE) (emphasis added); *see also* Trial Ex. 256, Plaintiffs' Responses to Defendants' First Set of Requests for Admission, Response to RFAs #6 ("Admit that Plaintiff Gonzalez was never detained in ICE's physical custody on or after

26

December 31, 2012;" and "Admit that Plaintiff Gonzalez was never moved to an ICE facility on or after December 31, 2012.").  The Burbank Police Department arrested Plaintiff Chinivizyan on June 7, 2013, charging him with two counts of possession of a controlled substance and one count of receiving stolen property. *Id.* ¶ 73.  He pleaded no contest to all three charges on June 19, 2013.  *Id.* ¶ 74.  On June 19, 2013, ICE lodged an immigration detainer against Plaintiff Chinivizyan. *Id.*  ¶ 75; Exhibit 3.  Plaintiffs allege that on July 2, 2013, a California superior court judge sentenced Plaintiff Chinivizyan to spend six months in a residential drug treatment facility and did not sentence him to any jail time.  *Id.* ¶¶ 76-77. Plaintiff Chinivizyan alleges that on July 3, 2013, LASD denied his transfer to the residential drug treatment facility because of the ICE detainer.  *Id.* ¶ 78.  On July 12, 2013 – also more than a year before Plaintiffs filed their TAC – ICE canceled the detainer lodged against Plaintiff Chinivizyan, without ever having taken him into its custody either.  *Id.* ¶ 85; Exhibit 4; *see also* Plaintiffs' Responses to Defendants' First Set of Requests for Admission, Response to RFA #36 (Plaintiff Chinivizyan's detainer "was cancelled on July 12, 2013.").

It is especially true that issuing a detainer does not cause a seizure, because ICE detainers do not solely request that an LEA hold the subject, but also request that the LEA "Notify DHS as early as practicable (at least 48 hours, if possible) before the alien is released from your custody." Tr. Ex. 96; Tr. Transcript 1419:22-

25.  An immigration detainer importantly acts as a means for the LEA to provide notice to ICE that the individual is going to be released so that ICE can take custody of the individual pursuant to ICE's detention authority.  *See* Tr. Transcript 1412:5-9 ("[An immigration detainer] is a notice to a custodian law enforcement agency that we intend to take custody of an individual, and we are asking them to give us notice on when that individual is going to be released and to hold that individual up to 48 hours.").  As Witness Robbins explained, the purposes of the notification request are, first, "to make sure that the identified  alien does not sit in custody longer than they have to" (Tr. Transcript 1420:11-12) and, second, in the situations where "agencies that do not work with ICE but are willing to notify ICE of when they're releasing the subject. . . . [the notification request] allows [ICE] to pick those individuals up that currently have a warrant of arrest and make that arrest." Tr. Transcript 1420: 15-18.  Because a detainer includes the request to notify of a release date, even LEAs that lack authority to make civil immigration arrests can nonetheless comply with detainers and cooperate with ICE.

A federal request for notification is "simply an administrative mechanism that ensure[s] that upon the completion of his state criminal matter, [the alien] [will] be transferred to federal custody." *United States v. Juarez-Velasquez*, 763 F.3d 430, 436 (5th Cir. 5014).  Such requests "do not limit [the receiving agency's] discretion" in any way.  *Garcia v. Taylor*, 40 F.3d 299, 303 (9th Cir. 1994).

28

"[S]tate charges [remain] the impetus for the entire duration of [any] pretrial detention" in such circumstances. *Juarez-Velasquez*, 763 F.3d at 436. A locality's "responding to requests for information about when an alien will be released from their custody," in turn, is a permissible act of cooperation with the federal government and raises no Fourth Amendment—or other constitutional—concerns. *Arizona*, 567 U.S., 387, 410 (2012). Indeed, the Fifth Circuit has affirmed this proposition, staying an injunction of a state law that, among other things, required cooperating with federal requests for notification of an alien's release date, because "defendants are likely to succeed on the merits" of their claim that such cooperation does not violate the Fourth Amendment. *City of El Cenizo, Texas v. Texas*, No. 17-50762, 2017 WL 4250186, at *2 (5th Cir. Sept. 25, 2017).

As Defendants have repeatedly proffered before this Court, where an ICE detainer never causes a seizure, there can be no Fourth Amendment violation. To put it plainly, where there is no seizure, there can be no illegal seizure.

**CONCLUSION**

Plaintiffs have failed to show that ICE officers in the Central District violate the Fourth Amendment when they issue detainers. When they rely solely on databases to form the basis for their probable cause determination, that reliance is justified, and Plaintiffs' evidence does not prove to the contrary. Moreover, when ICE issues detainers to LEAs that do not seize or detain the individual due to the

1    ICE detainer, they do not violate the Fourth Amendment because there is no

2    seizure based on ICE's actions.  Accordingly, the Court should grant judgment in

3

4    favor of Federal Defendants on the final claims that remain in this action.

5

6

7    Dated: June 17, 2019                    Respectfully submitted,

8                                            JOSEPH H. HUNT

9                                            Assistant Attorney General

10                                           WILLIAM C. PEACHEY

11                                           Director

12                                           JOHN J.W. INKELES

13                                           Trial Attorney

14

15                                            /s/ J. Max Weintraub
                                             J. MAX WEINTRAUB
16                                           Senior Litigation Counsel

17                                           United States Department of Justice
                                             Civil Division
18                                           Office of Immigration Litigation

19                                           District Court Section
                                             P.O. Box 868, Ben Franklin Station
20                                           Washington, D.C. 20044

21                                           Telephone: (202) 305-7551
                                             Facsimile: (202) 305-7000
22                                           E-mail: jacob.weintraub@usdoj.gov

23                                           Counsel for Federal Defendants

24

25

26

27

28