Barrett S. Litt, SBN 45527
blitt@kmbllaw.com
Lindsay Battles, SBN 262862
Kaye, McLane, Bednarski & Litt, LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

PETER J. ELIASBERG, SBN 189110
peliasberg@aclu-sc.org
AHILAN   ARULANANTHAM,   SBN
237841
aarulanantham@aclu-sc.org
PETER BIBRING, SBN 223981
pbibring@aclu-sc.org
JENNIFER   PASQUARELLA,   SBN
263241
jpasquarella@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, California 90017
Phone: (213) 977-9500
Facsimile: (213) 977-5299

Attorneys for Plaintiffs
(Other counsel listed below)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUNCAN ROY, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, *et al.*,<br><br>Defendants.<br>. | Case No. CV 12-09012 (FFMx)<br><br>[Honorable André Birotte, Jr.]<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; [PROPOSED] ORDER; DECLARATIONS AND EXHIBITS**<br><br>**Date:** November 20, 2020<br>**Time:** 10:00 A.M.<br>**Place:** Courtroom 10A |

CHRIS NEWMAN, SBN 255616
newman@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
675 South Park View Street, Suite B
Los Angeles, California 90057
Telephone: (213) 380-2214
Facsimile: (213) 380-2787

OMAR C. JADWAT (pro hac vice)
ojadwat@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th floor
New York, NY 10004
Telephone: (212) 549-2660

CECILLIA D. WANG, SBN 187782
cwang@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111

MARK M. FLEMING (pro hac vice)
mfleming@heartlandalliance.org
NATIONAL IMMIGRANT JUSTICE CENTER
208 S. LaSalle Street, Suite 1300
Chicago, IL 60604
Telephone: (312) 660-1628
Facsimile: (312) 660-1505

TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on November 20, 2020, at 10:00 a.m., or as soon thereafter as this matter may be heard in Courtroom 5A of the United States District Court for the Central District of California, 350 West First Street, Los Angeles, California 90012, Plaintiffs will, and hereby do, move the Court to preliminarily approve the proposed settlement in this case, and to authorize the mailing and other forms of notice to class members.

This motion is unopposed and is based on the accompanying Memorandum of Law, the stipulation of all parties to entry of the proposed Preliminary Approval Order, the proposed Preliminary Approval Order and exhibits thereto filed concurrently, the files and records in this case, and on such further evidence as may be presented at a hearing on the motion.

DATED: October 30, 2020                    Respectfully submitted,

Kaye, McLane, Bednarski & Litt, LLP
By: /s/ Barrett S. Litt
Barrett S. Litt
Attorneys for Plaintiffs

By: /s/ Lindsay Battles
Lindsay Battles
Attorneys for Plaintiffs

1

# **TABLE OF CONTENTS**

I.     INTRODUCTION..................................................................................1

II.    CERTIFIED CLASSES & CLASS SIZES .........................................2

    A.     Fourth Amendment ("Gerstein") Class...................................2
    B.     Equal Protection Class ("No Money Bail Class") ...................4
    C.     No Bail Notation Class ............................................................5

III.   TERMS OF THE SETTLEMENT .......................................................5

    A. DISTRIBUTION TO CLASS MEMBERS .............................6

        1.     Per-Diem Compensation for Gerstein and No-Money-Bail Class Members.......................................................6
        2.     Flat Award for No-Bail-Notation Class Members ...................6

    B. CY PRES DISTRIBUTION IN THE EVENT OF A LOW CLAIMS RATE ...............................................................6

    C. ADDITIONAL TERMS...........................................................7

IV.    THE SETTLEMENT SATISFIES THE CRITERIA FOR PRELIMINARY APPROVAL ..................................................................8

    A. PRELIMINARY APPROVAL UNDER FRCP 23(E)(1)(B) ...................8

        1.     Adequacy of Representation.....................................9
        2.     Arms-Length Negotiations ....................................10
        3.     Adequacy of the Relief.........................................10
            a) The Settlement Represents an Excellent Outcome Considering the Costs, Risks and Delay of Trial and Appeal................................................................10
            b) The Settlement Includes a Fair and Effective Means of Distributing the Settlement to Class Members in the Form of Direct Monetary Compensation and Indirect Cy Pres Distributions Should Too Few Class Members Make Claims................................................................12
            c) The Cy Pres Provisions are Reasonable............................13
            d) A Reasonable Attorney Fee Will Be Decided by the Court 15
        4.     Equitable Treatment of Class Members ...................................16

B.  NOTICE PLAN & CLAIMS PROCEDURE .........................................17

C.  CLASS NOTICE VARIATIONS ...........................................................20

V.      CONCLUSION ...........................................................................................22

# TABLE OF AUTHORITIES

Page(s)

Federal Cases

*Chu v. Wells Fargo Investments, LLC,*
2011 WL 672645 (N.D. Cal. Feb. 16, 2011)..........................................................17

*Glass v. UBS Fin. Servs., Inc.,*
2007 WL 221862 (N.D. Cal. Jan.26, 2007) ...........................................................17

*Hopson v. Hanesbrands Inc.,*
2009 WL 928133 (N.D. Cal. 2009).........................................................................17

*In re BankAmerica Corp. Securities Litigation,*
775 F.3d 1060 (8th Cir. 2015) ................................................................................13

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
2016 WL 153265 (N.D. Cal. Jan. 13, 2016) ..........................................................17

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* No. C 06-4333
PJH,
2013 WL 12333442 (N.D. Cal. Jan. 8, 2013) ........................................................14

*In re High-Tech Employee Antitrust Litig.,*
2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) .........................................................17

*In re Music Compact Disc Minimum Advertised Price Litigation,*
216 F.R.D. 197 .......................................................................................................15

*In re NCO Fin. Sys.,*
2002 U.S. Dist. LEXIS 17602 at *24 (E.D. Pa. 2002).........................................15

*Klier v. Elf Atochem North America, Inc.,*
658 F.3d 468 (5th Cir.2011)...................................................................................14

*Masters v. Wilhelmina Model Agency, Inc.,*
473 F.3d 423 (2d Cir. 2007) ..................................................................................14

*Nachshin v. AOL, LLC,*
663 F.3d 1034 (9th Cir. 2011) ...............................................................................13

iii

*Rodriguez v. West Publ. Corp.*,
　2007 WL 2827379, 2007 U.S. Dist. LEXIS 74767, at *40 (C.D. Cal. Sept. 10,
　2007) ................................................................................................................. 15

*Rodriguez v. West Publishing Corp.*,
　563 F.3d 948 (9th Cir. 2009) ........................................................................... 17

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
　904 F.2d 1301 (9th Cir. 1990) ......................................................................... 13

*Staton v. Boeing Co.*,
　327 F.3d 938 (9th Cir. 2003) ........................................................................... 16

*Van Vranken v. Atlantic Richfield Co.*,
　901 F.Supp. 294 (N.D. Cal.1995) .................................................................... 17

Federal Rules

FRCP 23(e)(1) .......................................................................................................... 8
FRCP 23(e)(1)(B) ................................................................................................ 1, 8
Rule 23(e)(2) ........................................................................................................ 8, 9
Rule 23(e)(3) ............................................................................................................. 9

Other Authorities

4 Newberg on Class Actions § 12:32 (5th ed.) ..................................................... 14

## **MEMORANDUM OF POINTS & AUTHORITIES**

### **I.   INTRODUCTION**

This class action arose from the LASD's former policy of detaining persons solely on the basis of immigration detainers, which are issued by Immigration and Customs Enforcement (ICE) for suspected civil immigration violations. Plaintiffs specifically challenged: 1) LASD's practice of holding inmates on detainers after they became due for release on criminal matters (i.e. after they were acquitted or otherwise ordered released by a judge, or after serving a jail sentence);  2) LASD's practice of incarcerating arrestees with bail of less than $25,000 who, in the absence of an immigration detainer, would have been released on their own recognizance pursuant to LASD policy; and 3) LASD's practice of refusing to accept bail on behalf of inmates with immigration detainers.

With regard to the first two practices, Plaintiffs not only established liability on summary judgement, but also established that class members were entitled to classwide general damages for each day of unlawful detention, at a per-diem amount to be determined at trial. The Court's summary judgement decision issued on February 8, 2018. Defendants filed a motion for reconsideration, which was denied on July 11, 2018. (Dkt. 395) The Court simultaneously issued an order denying Defendants' motion to decertify the class and finding that class members were entitled to classwide general damages. (Dkt. 394) ("The Court agrees with these decisions and finds that general damages are available on a class-wide basis here."). With regard to the third practice – whether the LASD maintained a practice of refusing to accept bail on behalf of prisoners with immigration holds – the Court found a dispute of fact to be resolved at trial. Thus, after dispositive motions and class certification litigation, the two issues remaining for trial were: (1) whether the LASD maintained a practice of refusing to accept bail for persons with ICE holds; and, (2) the amount of classwide general damages.

Following the liability and class certification decisions, the parties entered

1

settlement negotiations. While the negotiation process proved more protracted than anticipated, the parties have now reached a settlement. Declaration of Barrett S. Litt (hereafter "Litt Dec.") ¶ 5. On December 3, 2018, the parties participated in a full day settlement conference before Antonio Piazza, a well-known and highly regarded mediator. The December 3, 2018 conference resulted in a settlement in principle, but did not resolve several key terms and a dispute regarding the class size. Even after reaching a settlement in principle, it took well over a year and numerous discussions among or between counsel and Mr. Piazza to agree to the specific settlement terms. The proposed settlement has now been approved by the Los Angeles County Board of Supervisors and is contingent on the Court's approval.

After a bidding process, the parties have selected Heffler Claims Group as the Claims Administrator. Heffler has prepared an extensive notice strategy to overcome notice challenges arising from the fact that the class is comprised mostly of undocumented persons, many of whom were removed from the United States.

Defendants have not yet reviewed this motion, but have advised that they do not anticipate filing an opposition.

## II.   CERTIFIED CLASSES & CLASS SIZES

The damages classes were certified on September 9, 2016, (Dkt. 184), with a 42-page decision issued by Judge Beverly Reid O'Connell. The Court subsequently granted a motion to expand the Fourth Amendment Gerstein class and denied the County's motion for decertification. (Dkt. Nos. 394, 396) Below we describe each of the certified classes and their sizes.

### A. Fourth Amendment ("Gerstein") Class

**Definition:** All LASD inmates who were detained beyond the time they are due for release from criminal custody, solely on the basis of immigration detainers, excluding inmates who had a final order of removal or were subject to ongoing

removal proceedings as indicated on the face of the detainer. [1] (Class period: 10/19/2010 to June 2014).

The parties estimate there are 14,949 members of the Fourth Amendment *Gerstein* class. This estimate includes 11,364 confirmed members plus an estimated 3,565 additional members, whose status will be confirmed with individual review of LASD records for any potential class member who submits a claim.

Using LASD data, Plaintiffs ascertained approximately 16,486[2] prisoners who were held beyond the time they were due for release solely on the basis of an immigration detainer. Not all of these individuals satisfied the class definition because some were subject to a final order of removal or ongoing removal proceedings. While this information cannot be determined from LASD database data, it can be determined from checkboxes on the face of the immigration detainer form (I-247 form) and, in many cases, from ICE databases. By cross-referencing LASD and ICE data, Plaintiffs were able to confirm class membership for 11,364 of the 16,486 potential *Gerstein* class members.

There remain 5,122 *potential* class members who could not be matched to ICE data. [3] Confirming their class membership will require manual review of their I-247

---

[1] There is a checkbox on all versions of the detainer to indicate whether the detainer was supported by a final Order of Removal or by a Notice to Appear, a document that initiates removal proceedings. More than 80 percent of the detainers issued to LASD had neither box checked, which is consistent with ICE data tracking such orders between 2010-2016.

[2] The parties have agreed to make a slight adjustment in the methodology used to identify *Gerstein* class members. This adjustment will result in a slight increase in the total number of potential *Gerstein* members.

[3] Confirming class membership for these 5,122 potential members will ultimately require pulling a copy of their immigration detainer form (I-247 form) scanned by LASD. Instead of retrieving booking jackets for all 5,122 potential *Gerstein* class members before sending notice, the parties agree that it is more efficient to send notice to potential *Gerstein* class members, advising that they *may* be entitled to financial compensation depending on whether their detainer was supported by a final order of removal or ongoing removal proceedings. (This will require a modified version of class notice for these individuals, see below, Section IV, C). Should the parties receive responses from any potential *Gerstein* class members, LASD agrees to retrieve the I-247 form for

forms, which the LASD maintains in electronic format. We conservatively assume that at least 70% of the potential class members (which total 3,585) will be actual class members, and similarly assume that at least 70% of their wrongful detention days will apply. This estimate is based on the fact that approximately 80% of ICE detainers issued to LASD were not supported by ongoing removal proceedings or a removal order.

The parties have agreed that notice will be issued to all 5,122 potential, unconfirmed *Gerstein* class members, advising that they may be entitled to compensation, provided they did not have a final removal order or pending removal proceedings. Should any of the 5,122 potential class members submit claims, LASD will produce a copy of their I-247 form to the Claims Administrator for review to determine whether they satisfy the class definition.

| | Members | Unlawful Detention Days |
|---|---|---|
| **Confirmed Gerstein Class Members** | 11,364 | 39,890 |
| **Estimated Additional Gerstein Class Members (70% of Potential Members)** | 3,585 | 15,846 |
| **ESTIMATED TOTAL** | 14,949 | 55,736 |

**B. Equal Protection Class ("No Money Bail Class")**

**Definition:** All LASD inmates on whom an immigration detainer had been lodged, who would otherwise have been subject to LASD's policy of rejecting for booking misdemeanor defendants with bail of less than $25,000 (including Order of Own Recognizance (OR)). (Class period: 10/19/2010 to June 2014).

The No Money Bail Class has 3,622 members, excluding 6 individuals whose

_____

determination of whether the individual qualifies as a class member. LASD will provide a copy of the I-247 form to the claims administrator.

4

records must be individually reviewed.[4] These class members account for 15,844 days of unlawful detention.

## C. No Bail Notation Class

**Definition:** All LASD inmates on whom an immigration detainer had been lodged and recorded in LASD's AJIS database, and who were held on charges for which they would have been eligible to post bail. (Class period: 10/19/2010 to 10/18/2012).

Plaintiffs have identified 5,776 members of the No Bail Notation Class, who are not also members of the No-Money-Bail class. (We exclude individuals who are also members of the No Money Bail Class because they will be compensated for each day of pretrial incarceration). All of these individuals had bail in excess of $25,000. It is not possible to determine from jail records whether they would have posted bail or in fact attempted to post bail. In response to the notice, these individuals will be asked to attest, under penalty of perjury, whether they had access to over $2,500 and would have posted bail had it not been for LASD's policy, and notwithstanding their immigration hold. (Unlike other class members, whose compensation is based on the number of days they were held by LASD on an ICE hold, these class members receive a relatively low fixed amount of $250.)

## III.   TERMS OF THE SETTLEMENT

The total size of the non-reversionary settlement fund is $14,000,000 from which costs of class administration, consultant/expert and litigation costs, mediation costs, incentive awards, and attorneys' fees will be taken. Depending on a variety of factors, the parties expect the amount available for distribution to the class will be approximately $8,700,000.[5]

---

[4] The LASD agrees to provide booking jackets for these 6 individuals so the parties can determine each person's number of unlawful detention days.

[5] This is the estimated "Remainder" of the Class Fund, a term designating the amount available for distribution to Class Members. The "Remainder" is the amount in the Class Fund *after* payment of attorneys' fees and costs, litigation costs, and mediation costs. The Remainder is estimated to amount to approximately $8,733,334, based on the estimate of

### A.   DISTRIBUTION TO CLASS MEMBERS

#### 1.   *Per-Diem Compensation for Gerstein and No-Money-Bail Class Members*

Under the parties' distribution model, *Gerstein* and No-Money-Bail class members are compensated for each day they were unlawfully detained. The model does not differentiate between unlawful detention days endured by the *Gerstein* and No-Money-Bail classes. Each unlawful detention day is assigned one point which will translate to a per-diem dollar value at the time of distribution. The per-diem value will increase proportionately to a per-day maximum of $1,000. No Class Member shall receive more than $25,000 total, even if their unlawful detention days would otherwise result in more.

#### 2.   *Flat Award for No-Bail-Notation Class Members*

Each No-Bail-Notation class member who responds to the notice by attesting that they would have posted bail will receive a flat amount of $250, irrespective of how long they spent in pretrial custody. Individuals who belong to both the No Bail *and* No Money Bail classes will receive compensation pursuant to the No Money Bail formula (per-diem compensation), but will not receive an extra flat amount as members of the No Bail Notation class.

### B.   CY PRES DISTRIBUTION IN THE EVENT OF A LOW CLAIMS RATE

The parties recognize that there is the possibility of an unusually low claims rate in this case, due in large part to the fact that a significant percentage of Class Members were transferred to ICE custody and subsequently deported. These individuals are likely living abroad and may be difficult or impossible to locate.

Accordingly, as a form of indirect compensation to absent Class Members,

---

the maximum fees to be sought (1/3 of the $14,000,000 Class Fund), estimated litigation costs ($200,000) and estimated class administration costs ($400,000). It could end up varying somewhat depending on certain court rulings and class administration costs, but this is a reasonable estimate.

the settlement agreement provides for *cy pres* distributions to be used solely to fund Los Angeles County programs that provide legal representation to persons who face immigration consequences as a result of a criminal arrest or conviction in Los Angeles County. The *cy pres* provisions apply should the maximum payments to *Gerstein* and No-Money-Bail class members (the number of days corresponding to the number of timely claims, multiplied by the per-diem maximum of $1000), *plus* the $250 payments to No-Bail-Notation class members fail to consume the entirety of the Remainder.

Each party is entitled to designate the recipient of 50% of *cy pres* funds provided that any organizations or programs provide legal representation to persons facing immigration consequences as result of their criminal arrest or conviction in Los Angeles County. The settlement agreement provides that any such disbursements must *augment* (emphasis in settlement agreement) the funding already provided by the County of Los Angeles to support activities that these programs would not be able to pursue without the *cy pres* funds.

The parties agree to work in good faith to reach an agreement regarding the organizations or programs to receive those funds based on the foregoing criteria. If they cannot agree, the parties will separately brief the Court, and the Court will determine the organizations and/or programs to which the *cy pres* funds will be paid, consistent with identified criteria.

The agreement expressly provides that the settlement is non-reversionary. None of the Class Fund shall revert to the LASD or be used to fund LASD programs. No *cy pres* funds may be used to supplant or replace County funding already provided by the Board of Supervisors.

## C.   ADDITIONAL TERMS

The settlement agreement contains the following, additional material terms:

➢   Incentive awards to the two Class Representatives in the amount of $10,000 each (for a total of $20,000).

7

➢ Plaintiffs will file a motion for attorneys' fees and costs to be approved by the Court. The settlement agreement provides that Plaintiffs' counsel may request up to 1/3 of the class fund but not more, plus reimbursement of litigation costs. The final determination of the appropriate attorneys' fee will be made by the Court.

➢ Payment of the third-party class settlement administration costs to the chosen class administrator, with experience locating international class members. After carefully reviewing bids from multiple candidates, Plaintiffs' counsel selected Heffler Claims Group, which has prepared a plan including direct notice via multiple channels (mail, text, email and social media) coupled with robust media outreach and community-based outreach. Heffler estimates a maximum of $350,000 for this undertaking. The parties have agreed to supplement the Administrator's effort with outreach efforts by Justice in Motion, an organization that specializes in international outreach for undocumented persons. Plaintiffs' counsel estimates an additional $50,000 for such community-based outreach. The parties currently estimate a maximum of approximately $400,000 for outreach, notice and administration.

The terms of the settlement are set forth in greater detail in the exhibits attached to the Proposed Preliminary Approval Order (specifically in the Settlement Agreement), which exhibits are as follows:

| | |
|---|---|
| Exhibit A | Settlement Agreement |
| Exhibit B | Proposed Class Notice(s) - Versions 1 – 8 |
| Exhibit C | Claim Forms – Versions 1- 2 |
| Exhibit D | Class Administration Bid and Credentials |

## IV.   THE   SETTLEMENT   SATISFIES   THE   CRITERIA   FOR PRELIMINARY APPROVAL

### A.   PRELIMINARY APPROVAL UNDER FRCP 23(E)(1)(B)

FRCP 23(e)(1) provides the standard for preliminary approval. Notice of a proposed settlement requires the parties to show that: (1) the court will be able to certify the class; and, (2) will "likely" and approve the settlement under Rule

23(e)(2), which sets for criteria for final approval of the settlement proposal. Federal Rule of Civil Procedure 23(e)(1)(B). We do not address the likelihood of class certification since the class has already been certified.

Under Rule 23(e)(2), a settlement may be approved only on a finding that it is fair, reasonable, and adequate after considering the following factors:

(A)  the class representatives and class counsel have adequately represented the class;

(B)  the proposal was negotiated at arm's length;

(C)  the relief provided for the class is adequate, taking into account:

(i)   the costs, risks, and delay of trial and appeal,

(ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)  the terms of any proposed award of attorney's fees, including timing of payment; and

(D)  any agreement required to be identified under Rule 23(e)(3); and

(E)   the proposal treats class members equitably relative to each other.

### 1.  Adequacy of Representation

The class representatives and class counsel adequately represented the class. This case was vigorously litigated. Plaintiffs conducted extensive discovery, including more than 10 depositions, review of tens of thousands of pages of document discovery (including considerable ESI), and extensive analysis of LASD database data to ascertain the identities of prisoners held solely on immigration holds.

Both liability and class certification were heavily contested. Plaintiffs secured certification of the damages classes in 2016 and successfully moved to expand the primary damages class in 2018. The parties also litigated Defendants' 2018 motion to decertify the class on the basis of individual damages. In 2017 – 2018, the parties

litigated cross motions for summary judgment, resulting in the grant of summary judgment on liability for two of the damages classes. The parties further litigated liability in connection with Defendants 2018 motion for reconsideration of the summary judgment decision. Litt Dec., ¶ 3.

### 2.     Arms-Length Negotiations

The settlement terms were negotiated at arms' length with the assistance of an experienced mediator, Antonio Piazza, after one in person mediation session and follow-up sessions. Litt Dec., ¶ 5, 6.

### 3.     Adequacy of the Relief

The proposed settlement represents a highly favorable outcome to class members.

### a)     The Settlement Represents an Excellent Outcome Considering the Costs, Risks and Delay of Trial and Appeal

This settlement qualifies as unique in both its successful legal theories and in recovering significant sums for detainees held on ICE holds. After costs and maximum fees, there will be approximately $8,700,000 to distribute to class members. There is a significant probability that members of the *Gerstein* and No Money Bail classes will receive the maximum of $1,000 per day for each day of over-detention (to a maximum of $25,000).

Because the class is comprised almost entirely of undocumented persons, including a significant percentage of whom were deported by ICE, we anticipate that class members will be difficult to locate. Although the settlement agreement provides for a comprehensive notice plan to reach the maximum number of class members, we expect a claims rate that is lower than the typical claims rate in a jail conditions case, which is between 10% - 20%. Based on the class period (extending back to 2010), and characteristics of the class, we believe the claims rate will likely fall between 5% - 10%. Litt Dec., ¶ 14. Because we do not have data for similar cases, we recognize the possibility of an even lower claims rate.

Provided the claims rate is 10% or less, all claimants will recover the maximum of $1,000 per day (up to a maximum of $25,000 per claimant).[6] The average *Gerstein* class member has 2.3 days of incarceration, meaning their average award would be $2,300. The average No-Money-Bail class member has 4 days of incarceration; their average award would be $4,000. Approximately 1,500 individuals belong to both classes and can anticipate average rewards of over $5,000. Should the claims rate reach 15%, which is higher than we anticipate, each over detention day would be valued at over $700 per day (with average awards of $1,610 and $2,800). The individual recoveries fall on the higher side of recoveries in jail over-detention class actions. Litt Decl. ¶13.

The individual recoveries in this case represent a very favorable outcome for class members. Even with summary judgement on liability, classwide general damages were left to be decided by a jury. The uncertainty of what jurors might award to persons who had been accused of both criminal and civil immigration offenses presented a significant risk. This risk was underscored by the difficulty in locating class members to come forward to participate in a jury trial on damages. And even if Plaintiffs could have secured substantial classwide general damage awards, Defendants made clear they would have challenged any classwide general damages on appeal. Statutory damages were not available in light of the court's ruling dismissing the state law damages claims. Under these circumstances, securing certain monetary recovery for all claiming class members represented a significantly more favorable outcome than trial.

---

[6] Including both the estimated *Gerstein* class members and all No-Money-Bail class members, there are a total of 80,063 over-detention days. Assuming that approximately 10% of No-Bail-Notation class members make claims, each for $250, the total award to that subclass would be $144,250, leaving $8,555,750 for distribution to the *Gerstein* and No-Money-Bail class members. This would compensate 8,556 days at $1,000 per day, which constitutes 10.7% of the total over-detention days attributable to class members.

1  It is also likely that Defendants would have appealed the grant of summary

2  judgment, and the outcome of such an appeal could not be predicted with certainty.

3  Litt Dec., ¶ 19. Given all of these factors, it was the judgment of Plaintiffs' counsel

4  that the settlement represents a fair compromise reflecting plaintiffs' expected

5  recovery balanced against the value of the settlement offer.

6  **b)** ***The Settlement Includes a Fair and Effective Means of***
7  ***Distributing the Settlement to Class Members in the Form of***
   ***Direct Monetary Compensation and Indirect Cy Pres***
8  ***Distributions Should Too Few Class Members Make Claims***

9  The settlement provides for a straightforward claims procedure whereby class

10  members will be able to submit a claim form by mail, email or online. The claim

11  form itself simply requires class members to confirm their identity and contact

12  information, and in the case of No-Bail-Notation claimants, to attest that they would

13  have posted bail.

14  The distribution formula is similarly straightforward. Each No Bail Notation

15  claimant will receive $250. Each *Gerstein* and No Money Bail class member's share

16  of the class fund depends on the number of Class Members who make timely claims,

17  multiplied by the number of unlawful detention days attributable to each claiming

18  class member. This will be accomplished with a point system, with one point per

19  unlawful detention day, up to a maximum of 25 points. Once the claims period closes

20  and the settlement is finally approved, the claims administrator will calculate the

21  total points for all claiming class members who submitted timely claims. Each class

22  member's recovery will be determined based on that Class Member's percentage of

23  the total points for all class members, subject to the maximum per diem and per class

24  member compensation provided in the Settlement Agreement.  (The money per class

25  member making a timely claim will increase proportionately, up to a per-day

26  maximum of $1000 and a maximum total payment per Class Member of $25,000.

27  See Settlement Agreement, ¶¶ 21-25).

28

1

### c)    The Cy Pres Provisions are Reasonable

As further discussed below, the settlement provides for an extensive notice and outreach plan to reach as many class members as possible. However, in the event that exceedingly few class members make claims, the agreement also provides for *cy pres* distributions as a form of indirect compensation.

The *cy pres* provisions are reasonable under the particular circumstances of this case. As noted, the daily and per class member caps were vigorously disputed and resolved only through a mediator's proposal. It was Defendants' assertion that even the mediator's proposal amount constituted an undue windfall to class members while Plaintiffs strongly disagreed, and the maximums used were compromise figures for both sides.

Because the *cy pres* funds only apply to funds after the maximums are hit and where there is a low claims rate, and may only go to organizations or activities that provide legal representation to persons facing immigration consequences as a result of their criminal arrest or conviction in Los Angeles County, they only apply where there exists an issue of arguable excess or windfall recovery and the *cy pres* funds are closely tied to the objectives of this litigation and advance the interests of absent class members. Such limited *cy pres* awards are appropriate. Further, the *cy pres* distributions here only apply to the extent there is a low claims rate (when compared to historic jail settlement claim rates). *See, e.g.*, *In re BankAmerica Corp. Securities Litigation*, 775 F.3d 1060, 1064 (8th Cir. 2015) ("[b]ecause the settlement funds are the property of the class, a cy pres distribution to a third party of unclaimed settlement funds is permissible only when it is not feasible to make further distributions to class members" who have not yet been fully compensated. (quotation marks and alteration omitted); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011) ("federal courts frequently use the cy pres doctrine 'in the settlement of class actions where the proof of individual claims would be burdensome or distribution of damages costly'") (quoting *Six (6) Mexican Workers*

13

*v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990)); *Masters v. Wilhelmina Model Agency, Inc*., 473 F.3d 423, 436 (2d Cir. 2007) (noting with approval that "[w]ith respect to the approval of settlements providing for a Cy Pres remedy, the [Draft of the Principles of the Law of Aggregate Litigation by the American Law Institute] proposes a rule limiting Cy Pres 'to circumstances in which direct distribution to individual class members is not economically feasible, or where funds remain after class members are given a full opportunity to make a claim' ").[7]

Although the parties strenuously disputed the amount of the per-diem maximum to be set (as well as the amount of the per claimant maximum), there was agreement that some per-diem maximum would be appropriate and that any portion of the class fund remaining after claimants received appropriate maximum distributions should be used for indirect compensation to class members. Prevention of windfall recoveries to class members is a well-recognized basis for the use of *cy pres* distributions once claiming class members have been fairly compensated. *See, e.g., Klier v. Elf Atochem North America, Inc.,* 658 F.3d 468, 475 (5th Cir.2011) (pro rata distribution of excess funds to class members should be the norm "except where an additional distribution would provide  a windfall to class members").  Thus, "[c]aps on a maximum *pro rata* distribution are a commonly employed aspect of class action distributions." *In re Dynamic Random Access Memory (DRAM)*

---

[7] "*Cy pres* serves several purposes. *First*, it ensures full disgorgement of the defendant by offering an alternative to reversion of unclaimed funds and therefore serves a deterrent function. *Second*, by sending money to charities that work in the class's interest, it is arguably compensatory, albeit indirectly so. The class benefits from a *cy pres* distribution as it realizes the gains that its charitable contribution can accomplish. This makes *cy pres* preferable to *pro rata* redistribution, as the absent class members realize no gain (other than deterrence) when their fellow class members are enriched at their expense. Escheat also creates a general benefit for the class, as the class members would benefit from the government's greater provision of services. However, *cy pres* may be preferable to escheat because the funds can be targeted more specifically to the class's interests than when they simply go into the general treasury." 4 Newberg on Class Actions § 12:32 (5th ed.), § 12:32.(Cy pres—Generally).

*Antitrust Litig.*, No. C 06-4333 PJH, 2013 WL 12333442, at *82 (N.D. Cal. Jan. 8, 2013), *report and recommendation adopted sub nom. In re Dynamic Random Access Memory Antitrust Litig.*, No. C 06-4333 PJH, 2014 WL 12879520 (N.D. Cal. June 27, 2014) (citing *Rodriguez v. West Publ. Corp.*, 2007 WL 2827379, at *2, 2007 U.S. Dist. LEXIS 74767, at *40 (C.D. Cal. Sept. 10, 2007), *affirmed in part and reversed on other grounds by Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ("The Court rejects the argument of certain Objectors that the possibility of a cap on individual recovery resulting in a *cy pres* award should defeat approval of the Settlement. Those provisions do not render the Settlement inadequate. The Maximum Payment was a heavily negotiated term of the Settlement. Because the Net Settlement Fund is to be distributed *pro rata* among the Class Members who make a valid claim, the Maximum Payment prevents a small group from receiving a … windfall."); *In re NCO Fin. Sys.,* 2002 U.S. Dist. LEXIS 17602 at *24 (E.D. Pa. 2002) (approving a settlement distribution plan that provided that "[t]o the extent that claiming class members' checks are returned or remain uncashed for a period of 120 days after mailing, or each claiming class member receives the maximum share of $75.00 and there still remains a portion of the net settlement fund undistributed, NCO shall transmit to Lead/Liaison Counsel a check representing the remaining portion of the net settlement fund for a *cy pres* distribution"); *In re Music Compact Disc Minimum Advertised Price Litigation, supra,* 216 F.R.D. 197, 208-10 (district court approved a fixed distribution that capped recovery at $25 per consumer).

### d)   A Reasonable Attorney Fee Will Be Decided by the Court

As addressed in the settlement agreement, Plaintiffs' counsel will file a motion for attorneys' fees and costs to be approved by the Court. The agreement provides that Plaintiffs' counsel may request up to 1/3 of the class fund but not more, plus reimbursement of litigation costs.

### 4.        *Equitable Treatment of Class Members*

The treatment of class members is equitable. All class members who were unlawfully detained solely on the basis of immigration detainers will receive the same per-diem compensation. All class members who were deprived of the opportunity to post bail will receive the same flat amount, irrespective of whether they can establish that they would have been able to post bail. The cap of $25,000 reflects the fact that longer over-detentions tend to be compensated at a lower per-diem rate than shorter over-detentions. Both the daily cap of $1000 and the per class member cap of $25,000 were hotly disputed issues in drafting the settlement agreement, and were ultimately the result of a mediator's proposal because the parties were unable to agree. Litt Dec., ¶ 5.

The proposed settlement does not reflect unduly preferential treatment of class representatives. It provides a slight benefit to the two class representatives ($10,000 in addition to their class member formula award). The proposal for incentive awards was at Class Counsel's initiative and the proposed incentive awards to each class representative reflects counsel's assessment of the value of their contributions to the case, the risk taken by them and the size of the settlement. Both publicly revealed themselves as undocumented persons who spent time in jail for alleged criminal offenses and submitted declarations addressing the circumstances of their arrests in connection with the class certification litigation. Both plaintiffs were deposed and responded to discovery requests. The class substantially benefited from their efforts, resulting in a one-of-a-kind class settlement, advancing novel claims regarding the lawfulness of local law enforcement detaining persons on the basis of an ICE hold. No agreements were made with class representatives prior to settlement to seek incentive awards. Litt Dec., ¶ 11.

The requested $10,000 incentive award is well within the range of reasonable incentive awards. *See Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (identifying factors to consider in evaluating the reasonableness of incentive

16

awards); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009) (incentive awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general"); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 153265, at *2–3 (N.D. Cal. Jan. 13, 2016).

The awards here – totaling $20,00 – represent a very small proportion (less than 0.15%) of the Class Fund, also a factor in evaluating the reasonableness of proposed incentive awards. *See, e.g.., id.* at *3 (0.196%.of class fund); *Hopson v. Hanesbrands Inc.*, 2009 WL 928133, *10 (N.D. Cal. 2009) (1.25% of the settlement amount).[8]

## B. NOTICE PLAN & CLAIMS PROCEDURE

This class action presents challenging class notice issues. The settlement class is comprised of former jail detainees, all of whom were held for additional time based on suspected civil immigration violations. Many, though not all, were taken into custody by ICE. Of those who were arrested by ICE, some were released back

---

[8] Numerous cases have approved incentive awards of $10,000 or more. See, e.g., *Cathode Ray Tube (CRT) Antitrust Litig., supra* ($25,000 for each of ten class representatives in $127.45 Million settlement); *Glass v. UBS Fin. Servs., Inc.,* 2007 WL 221862, at *16 (N.D. Cal. Jan.26, 2007) (approving payments of $25,000 to each named plaintiff); *Van Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 299 (N.D. Cal.1995) (awarding $50,000 to a lead plaintiff); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *18 (N.D. Cal. Sept. 2, 2015) (awarding $120,000 and $80,000 to class representatives in a case that settled for $415 million, noting such awards were in line with "megafund" cases, and collecting cases); *Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862, at *17 (N.D. Cal. Jan. 26, 2007) aff'd, 331 F. App'x 452 (9th Cir. 2009) (approving award of $25,000 for each of four class representative in a six-year case settling for $45 million where named plaintiffs provided help with informal discovery, insight into an industry, and "placed something at risk by putting their names on a complaint against one of the largest brokerage houses in America"); *Chu v. Wells Fargo Investments, LLC*, Nos. C 05–4526 MHP, C 06–7924, 2011 WL 672645, *5 (N.D. Cal. Feb. 16, 2011) (awarding $10,000 to two plaintiff representatives involved in case for five years and $4,000 to three representative plaintiffs participating in case for two years, from a $6.9 million settlement fund).

into the community while others were deported from the United States. A significant number were deported by ICE to Mexico and Central American nations, with some deported to nations in other parts of the world. Though some class members remain in the Los Angeles Area, many lack legal status and may be fearful of coming forward to assert claims against a law enforcement agency. It is critically important that they understand that they will not suffer retaliation by the LASD and that their whereabouts will not be disclosed to ICE. Few will have social security numbers, complicating efforts to accurately research their contact information using skip-trace databases.

While we typically expect to see a claims rate of 10% - 25% in jail class actions, it ultimately may not be possible to achieve a claims rate comparable to other jail class actions. Plaintiffs have adopted an aggressive notice plan in an effort to reach as many class members as possible, but recognize that obtaining claims filings from even a modest percentage of class members is a challenge.

The settlement agreement accordingly recognizes the need for an extensive outreach effort to ensure distribution of the award to as many class members as possible. Plaintiffs' counsel sought bids from three potential claims administrators. Each administration candidate was asked to describe their experience with class actions involving transnational outreach efforts, any specific measures they have previously used to disseminate notice to international class members, particularly those with limited economic resources, and any specific strategies they recommend for effectively reaching class members in this case.

After reviewing proposals, Plaintiffs' counsel determined that Heffler Claims Group was in the best position to address the unique notice challenges in this case. Heffler was recently appointed the Claims Administrator in *Owino v. Core Civic, Inc.*, 17-CV-01112, a class action before Judge Janis Sammartino in the Southern District of California. *Owino* challenges a private prisoner operator's practice of using immigration detainees to maintain, clean and operate the Otay Mesa Detention

Facility in San Diego in violation of labor laws. The class consisted of immigration detainees released from an immigration detention facility in Southern California, many of whom were likely deported to Mexico and Central America. Because the case involved a class with many similarities to this case, Heffler's experience in designing and executing a notice plan render it uniquely qualified to develop a notice plan for this case.

Plaintiffs' counsel and Heffler have designed a notice plan for this case that provides for multiple channels of direct notice, tiered media outreach and community-based outreach. Before issuing notice, the Class Administrator will use skip trace databases to locate updated address, mobile phone number and email address information for as many class members as possible. Using this information, the Administrator will issue direct notice to all class members using mail, text, email, direct social media contacts (Facebook and Instagram for all class members whose email address, mobile phone number of name matches a Facebook or Instagram account). Initial direct notice will be reinforced with reminder and follow-up messages for the duration of the class period, which is 180 days.

In addition to these forms of direct notice, the Administrator has developed a tiered approach to media outreach, which will provide the heaviest media weight in the Los Angeles media market and will extend the outreach throughout California, nationwide, in Mexico, and, where data instructs, other Central American countries. The Administrator has also developed a plan to create a halo effect to the media campaign with community-based outreach efforts utilizing influencers and trusted sources such as immigration and human rights advocates, Catholic priests and social workers, among others to extend messaging efforts. The media plan includes approximately 400 30-second television commercials to air in Spanish in the Los Angeles Area and approximately 300, 60-second radio commercials.

In addition to conventional claims administration, Plaintiffs plan to work with an organization that specializes in transnational outreach efforts for migrant workers

and undocumented persons particularly in civil rights and employment class actions. Plaintiffs intend for this organization to work closely with the administrator to devise effective strategies for reaching class members, including radio and networking through community and religious organizations.

## C. CLASS NOTICE VARIATIONS

There are multiple versions of the long-form class notice. Each notice will contain one or more of the following components:

- o Notice for confirmed Gerstein class members advising that they are entitled to financial compensation based on the number of days of unlawful detention;

- o Notice for confirmed No Money Bail class members advising that they are entitled to financial compensation based on the number of days of unlawful detention;

- o Notice for *potential* Gerstein class members, which will explain that entitlement to compensation depends on whether their detainer was supported by a final order of removal or NTA.

- o No Bail Notation Class Members, requesting that they indicate whether they had access to at least $2,500 and would have posted bail.

There are eight possible combinations of the above notice components. The chart below summarizes how many class members will receive each version of the notice.

| | Category | Notice Contents | # Receiving this Notice |
|---|---|---|---|
| 1. | Confirmed No-Money-Bail, NOT Gerstein (All Confirmed No-Money Bail who are not confirmed or potential members of the Gerstein class). Doesn't matter if they are also members of the No-Bail-Notation Class. | Entitled to $ for all pre-trial detention days. [No mention of ability to post bail b/c they will be compensated for all pretrial days by virtue of membership in No-Money-Bail class] | 1,507[9] |

---

[9] Counts below may change slightly once the methodology for identifying *Gerstein* members has been adjusted. For purposes of this request, please assume these numbers.

| | Category | Notice Contents | # Receiving this Notice |
|---|---|---|---|
| 2. | Confirmed No-Money Bail AND Confirmed Gerstein<br><br>Does not matter if they are No-Bail-Notation members. | Entitled to $ for pretrial detention days + $ for over-detention days.<br><br>[No mention of ability to post bail b/c they will be compensated for all pretrial days by virtue of membership in No-Money-Bail class] | 1,514 |
| 3. | Confirmed No-Money-Bail AND *Potential* Gerstein<br>Does not matter if they are No-Bail-Notation members. | Entitled to $ for pretrial detention days + *possibly* entitled to $ over-detention days. (The notice will advise that we will confirm their eligibility for compensation for over-detention days if we receive a claim form).<br><br>[No mention of ability to post bail b/c they will be compensated for all pretrial days by virtue of membership in No-Money-Bail class] | 601 |
| 4. | Confirmed Gerstein Only (NOT members of the No-Money-Bail class, *and* NOT members of the No-Bail-Notation Class) | Entitled to $ for over-detention days (only) | 8,046 |
| 5. | Confirmed Gerstein AND No-Bail Notation class (but NOT No-Money-Bail Class) | Entitled to $ for over-detention days + possibly entitled to $ if would have posted bail.<br><br>Claim form will ask these individuals to self-identify whether they had access to $2,500 and would have posted bail had they been permitted to do so. | 1,803 |
| 6. | Potential Gerstein Only (NOT No-Money-Bail Class, NOT No-Bail-Notation) | *Possibly* entitled to $ over-detention days (only) | 3,898 |

21

| | Category | Notice Contents | # Receiving this Notice |
|---|---|---|---|
| 7. | Potential Gerstein Class AND No-Bail-Notation Class, but NOT No-Money-Bail | *Possibly* entitled to $ for over-detention days + possibly entitled to $ if would have posted bail<br><br>Claim form will ask these individuals to self-identify whether they had access to $2,500 and would have posted bail had they been permitted to do so. | 623 |
| 8. | No-Bail-Notation ONLY (Not No-Money-Bail, No Confirmed or Potential Gerstein) | Entitled to $ if would have posted bail | 3,350 |
| **TOTAL INDIVIDUAL NOTICES** | | | **21,342** |

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs ask that the Court preliminarily approve the settlement, and sign the proposed Preliminary Approval Order (with any revisions the Court deems necessary). The Proposed Preliminary Approval Order contains a provision approving the parties' request to issue notice using a combination of mail, email and text message. The Proposed Order contains dates that have been worked out among the parties and reviewed by the Class Administrator. They assume that the order will be entered by November 20, 2020. If it is later, the dates may need to be modified to allow sufficient time to follow the schedule.

DATED: October 30, 2020          Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT,   LLP

By: */s/ Barrett S. Litt*
        Barrett S. Litt

By: */s/ Lindsay Battles*
        Lindsay Battles

Attorneys for Plaintiffs

22