1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  DUNCAN ROY, *et al.*, | Case No. CV 12-09012 (FFMx) |
| 12         Plaintiffs, | [Honorable André Birotte, Jr.] |
| 13 | **[PROPOSED]** **PRELIMINARY** |
| 14     vs. | **APPROVAL ORDER; EXHIBITS** |
| 15  COUNTY OF LOS ANGELES, *et al.*, | Date:   November 20, 2020 |
| 16         Defendants. | Time:   10:00 a.m. |
| 17 | Place:   Courtroom 10A |
| 18 | |

19
20
21
22
23
24
25
26
27
28

The parties have submitted this joint Preliminary Approval Order of the Class Settlement for the Court's review. Upon review and consideration of the Settlement Agreement (Exhibit A hereto) (the "Settlement Agreement") and the exhibits attached thereto made and entered into by counsel for the parties, who represent that their respective clients have approved the settlement.

The Named Plaintiffs/Class Representatives are Alain Martinez-Perez and Clemente de la Cerda. Plaintiffs are former prisoners of the Los Angeles County Sheriff's Department ("LASD"), whose claims arose from the LASD's policy of detaining inmates beyond the expiration of their state criminal charges on the basis of immigration detainers ("detainers" or "ICE holds"), which are issued by Immigration and Customs Enforcement ("ICE") for suspected immigration violations. Plaintiffs specifically challenged: 1) LASD's practice of holding inmates on detainers after they became due for release on criminal matters (i.e. after they were acquitted or otherwise ordered released by a judge, or after serving a jail sentence);  2) LASD's practice of incarcerating arrestees with bail of less than $25,000 who, in the absence of an immigration detainer, would have been released on their own recognizance pursuant to LASD policy; and 3) LASD's (disputed) practice of refusing to accept bail on behalf of inmates with immigration detainers.

While Defendants continue to dispute the validity of Plaintiffs' allegations, the parties have agreed to enter into a Settlement Agreement to avoid the mutual risks of litigation.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**I.**        **<u>PRELIMINARY APPROVAL OF SETTLEMENT</u>**

1.       This Order incorporates by reference the definitions in the Settlement Agreement, a copy of which is attached to this Order as Exhibit A, and also incorporates Exhibits B through D, thereto. All terms defined therein shall have the same meaning in this Order.

2.      The Settlement Agreement is hereby preliminarily approved, subject to further consideration thereof at the Fairness Hearing provided for below. The Court finds that the class settlement fund of $14,000,000 and its proposed allocation, and the other provisions contained within the Settlement Agreement, are within the range of what would constitute a fair, reasonable, and adequate settlement in the best interests of the Class as a whole, and that the terms of the Settlement Agreement otherwise satisfy the Federal Rules of Civil Procedure 23(e) and due process requirements.

## II.      DEADLINES FOR NOTICE, FILING OBJECTIONS AND OPT-OUTS, AND DATE OF FAIRNESS HEARING

3.      The Court has set the following dates for purposes of this class action:

(a) Final class identifying information, to the extent not already provided, will be provided to Class Administrator Heffler Claims Group no later than Friday, November 27, 2020;

(b) Friday, November 27, 2020: Class member website shall be established and reflect preliminary approval order and provide a means for Class Members to submit claims online;

(c) Friday, January 8, 2021 (or earlier): Class Notice shall be issued by U.S. mail, and electronically by email, text message and social media (for all Class Members whose contact information can be obtained); skip tracing shall have been completed prior to that date.

(d) Friday, January 8, 2021 (or earlier): The LASD will advise on its website of the existence of this Settlement and place a link on the website to connect viewers to the Class Administrator's website. The LASD will also post physical notices (whose content will be agreed on) in all LA County jail facilities, including IRC, MCJ, Twin Towers and CRDF.

(e) Pursuant to a separately filed motion and order thereon, physical

notices be posted at the Adelanto ICE Processing Center, NB18, Musick, Theo Lacey and any other ICE detention facilities in California.

(f)  Friday, February 5, 2021: The Class Administrator will begin periodically reminding Class Members through email/text blasts to file claims;

(g) Friday, March 19, 2021: Filing of Plaintiffs' Motion for Award of Attorneys' Fees and Costs;

(h) Friday, August 9, 2021: Deadline to file Class Members' Objections to any aspect of the Settlement (including Plaintiffs' Motion for Award of Attorneys' Fees and Costs): Must be postmarked or received by that date;

(i)  Friday, August 9, 2021: Deadline to opt-out: Must be postmarked or received by that date;

(j)  Friday, August 9, 2021: Deadline to file class claims: Must be postmarked or received by that date;

(k) Friday, September 3, 2021: Deadline to file Opposition or Reply to Objections (including to objections to award of attorneys' fees and costs);

(l)  Friday, September 3, 2021: Deadline to file proposed final approval order and motion for final approval of settlement;

(m)      Friday, October 1, 2021: Final Approval hearing.

4.     In the event that the class notice is not communicated through text message, email and regular mail by January 8, 2021, the subsequent dates contained herein will be deferred for the number of additional days before such notice occurs without the need for additional Court approval. However, the Court must approve any change of the date of the Final Approval Hearing.

5.     On September 9, 2016, the Court certified various damages classes.

Dkt. 184, 9/9/16 Class Cert Order. The class definitions were later modified to conform to the liability determination. The classes are defined as follows:

**Fourth Amendment ("*Gerstein*") Class:** All LASD inmates who were detained beyond the time they are due for release from criminal custody, solely on the basis of immigration detainers, excluding inmates who had a final order of removal or were subject to ongoing removal proceedings as indicated on the face of the detainer. (Class period: 10/19/2010 to June 6, 2014).

**Equal Protection Class ("No Money Bail Class"):** All LASD inmates on whom an immigration detainer had been lodged, who would otherwise have been subject to LASD's policy of rejecting for booking misdemeanor defendants with bail of less than $25,000 (including Order of Own Recognizance (OR)). (Class period: 10/19/2010 to June 6, 2014).

**No-Bail-Notation Class:** All LASD inmates on whom an immigration detainer had been lodged and recorded in LASD's AJIS database, and who were held on charges for which they would have been eligible to post bail. (Class period: 10/19/2010 to 10/18/2012).

6.      The Parties have identified exclusively from Los Angeles County Jail records Damages Class Members based on who qualifies as a Class Member. Only persons so identified are Damages Class members. There are an estimated 18,571 Class Members and an estimated 71,580 unlawful detention days. (These are estimated because identification of some *Gerstein* Class Members requires more information than is contained in ICE data and will require reviewing LASD booking jackets (which contain an inmate's jail records) and locating the copy of their immigration detainer form (I-247 form) LASD data.) Thus, class notice will be sent to potential as well as confirmed *Gerstein* class members.

7.      The "Class Damages Period" refers to the period between October 19, 2010 (two years before the filing of the complaint) and June 6, 2014.

III.      <u>**SETTLEMENT TERMS.**</u>

8.      In summary, the settlement's basic terms, as they relate to Damages Class Members, are that Defendants will provide payment of a total of Fourteen Million dollars ($14,000,000). From that amount, the following awards will be

4

made, subject to court approval:

    a. Incentive awards to the two Named Plaintiffs in the amount of $10,000 each (for a total of $20,000).

    b. Payment of $1000 to each claiming Gerstein and Equal Protection (No Money Bail) Class Member for each unlawful detention day, except that no Class Member shall receive more than $25,000 total (or 25 overdetention days) even if their unlawful detention days would otherwise result in more.

    c. In addition, No Notation Bail class members who attest that they had access to financial resources to post bail if had been allowed to do so will receive a flat $250.

    d. No claiming Class Member will receive less than $250.

    e. The "Remainder" of the Class Fund, a term referring to the amount available for distribution to Class Members, refers to the amount in the Class Fund *after* payment of attorney's fees and costs, litigation costs, and mediation costs. The Remainder is a figure used for purposes of determining whether *cy pres* payments (discussed below) are made. The Remainder is estimated to amount to approximately $8,733,334, based on the estimate of the maximum fees to be sought (1/3 of the $14,000,000 Class Fund), estimated litigation costs ($200,000) and estimated class administration costs ($400,000).

    f. Each Class Member's share of the Remainder of the class fund depends on the number of Class Members who make Timely Claims, multiplied by the number of unlawful detention days attributable to each claiming Class Member. This will be converted into a point system, with one point per unlawful detention day. To the extent that fewer Class Members make a claim, the money per Class Member making a Timely Claim will increase proportionately, up to a per-day maximum of $1000 and a

5

maximum total payment per Class Member of $25,000.  See Settlement Agreement, ¶¶ 21-25.

g.  Should the Remainder not be consumed by the points allocated to claiming Class Members, limited as indicated in sub-paragraph (b), any residual funds will be allocated as *cy pres* payments as set forth in §VII, below.

h.  The parties and the Court recognize that there is the possibility of an unusually low claims rate in this case, due in large part to the fact that a significant percentage of Class Members were transferred to ICE custody and subsequently deported. These individuals are likely living abroad and may be difficult or impossible to locate. Even those Class Members who were released (and not deported) may be reluctant to come forward to pursue claims against the LASD. Accordingly, as a form of indirect compensation to absent Class Members, if there are funds left after paying out the maximum Class Member compensation ($1000 per day of overdetention, capped at $25,000 for any Class Member), the balance of the available funds will be *cy pres* funds split 50/50 between organizations/activities designated by Plaintiffs (and reasonably approved by the County) and organizations/activities designated by the County (and reasonably approved by the Plaintiffs).

i.  Although each party designates the recipient of 50% of *cy pres* funds, those funds may only be used to fund Los Angeles County programs that provide legal representation to persons facing immigration consequences because of a criminal arrest or conviction in Los Angeles County, and must *augment* (emphasis in settlement agreement) the funding already provided by the County of Los Angeles to support activities that these programs would not be able to pursue without the *cy pres* funds. The parties are to work in good faith to reach an agreement regarding the

6

organizations or programs to receive those funds based on the foregoing criteria. If they cannot agree, the Parties will separately brief the Court, and the Court will determine the organizations and/or programs to which the *cy pres* funds will be paid, consistent with identified criteria

j. The settlement is non-reversionary. None of the Class Fund shall revert to the LASD or be used to fund LASD programs. No *cy pres* funds may be used to supplant or replace County funding already provided by the Board of Supervisors.

k. Payment of the third-party class settlement administration costs to the chosen class administrator, Heffler Claims Group, estimated at a maximum of approximately $350,000. In addition to the Claims Administrator, Plaintiffs anticipate costs of up to $50,000 for community-based outreach in Mexico and Central America. However, depending on the response rate to the notice, Plaintiffs' counsel may request additional outreach, which would increase the cost.

l. Plaintiffs will file a motion for attorney's fees and costs to be approved by the court. The settlement agreement provides that Plaintiffs' counsel may request up to 1/3 of the class fund but not more, plus reimbursement of litigation costs. The final determination of the appropriate attorney's fee will be made by the Court.

m. The remainder of the Class Fund (estimated as a minimum of over $8 Million assuming class notice related costs do not exceed $400,000) shall be distributed to the Class Members (including Named Plaintiffs/Class Representatives) under the formula contained in sub-paragraph Section VI, ¶¶ 21-25 of the Settlement Agreement (Exhibit A to the proposed Preliminary Approval Order), or to *cy pres* funding.

9. Once the claims period closes, the claims administrator will calculate the total points for each Class Member and total points for all claiming Class

Members who submitted timely claims. Each Class Member's recovery will be determined based on that Class Member's percentage of the total points for all Class Members, subject to the maximum per diem and per Class Member compensation provided in the Settlement Agreement.

## IV.        CLASS ADMINISTRATOR

10.    The Court approves the retention of Heffler Claims Group as Class Administrator, to administer the distribution of the Class and Settlement Notice and publication of the Class and Settlement Notice, and to distribute the proceeds of the settlement to all eligible Class Members pursuant to the Plan set out in the Settlement Agreement (Exhibit A) should the Court grant final approval. Exhibit D (the Class Administrator bid) includes Heffler's qualifications, notice proposal and pricing.

11.    The Class Administrator shall preserve all written communications from Class Members in response to the Class and Settlement Notice at least until December 31, 2024, or pursuant to further order of the Court. All written communications received by the Class Administrator from Class Members relating to the Settlement Agreement shall be available at all reasonable times for inspection and copying by Counsel for the Parties, and copies shall be regularly provided to Counsel for the Parties.

12.    The Class Administrator shall be compensated from the Class Damages Fund for its services in connection with notice and administration and for the costs of giving mailed and published notice, and the other services it performs, pursuant to such orders as the Court may enter from time to time.

13.    Within two weeks after this Preliminary Approval Order is signed by the Court, the County of Los Angeles shall deposit or cause to be deposited into an account designated by the Class Administrator by check sent by overnight mail an amount of same day available funds equal to the amount requested by the Class Administrator to cover the costs of notice as provided herein, and will provide

8

additional funds for its administrative work pursuant to the terms of its accepted bid, a copy of which is attached as Exhibit D. Prior to entry of the Final Order of Approval of Settlement, the Class Administrator will not accrue any costs not itemized in Exhibit D unless agreed to by the Plaintiffs' counsel and approved by the Court. If the Court does not enter the Final Order of Approval and Settlement, then all such funds paid to the Class Administrator, to the extent they are available after payment of all accrued class administration expenses, shall be returned to Defendants.

14.     If this settlement does not go through for any reason, a new settlement is not reached, the case goes to trial, and Plaintiffs are not successful in their prosecution of the case, Defendants shall not seek reimbursement from Plaintiffs of class administration funds paid under this settlement.

## V.      CLASS COUNSEL

15.     Barrett S. Litt and Lindsay Battles of Kaye, McLane, Bednarski & Litt, Jennifer Pasquarella and Jessica Bansal of the ACLU of Southern California, and Mark Fleming of the National Immigrant Justice Center and Chris Newman of the National Day Laborer Organizing Network are hereby confirmed as counsel for the Class Representatives and the Class ("Class Counsel").

16.     Class Counsel are authorized to act on behalf of the Class with respect to all acts or consents required by or which may be given pursuant to the Settlement, and such other acts reasonably necessary to consummate the Settlement.

## VI.     CLASS AND SETTLEMENT NOTICE

17.     Class Counsel shall provide the Class and Settlement Notice to the Class Administrator for distribution according to the schedule set forth above. Such notice shall be in substantially the form as proposed in Exhibit B to the Settlement Agreement and shall be communicated as provided in ¶ 3 (c) above (providing for both text message, email and regular mail notice); returned mail

shall be subject to follow up mailings after appropriate searches of the available databases. No notice by publication shall be required because such notice has not proven effective at reaching Class Members, and the resources are better spent on attempting to reach Class Members through electronic email and other means of electronic outreach. See revisions to F.R.Civ.P 23 (c)(2)(B) effective December 2019 (acknowledging that notice "may be by ... electronic means, or other appropriate means" in addition to or in lieu of United States mail).

18.    To the extent not already provided, Defendants will provide the name, address, social security number, date of birth, driver's license information, and any other identifying information of Damages Class Members, to Plaintiffs' counsel, who will transmit it to the Class Administrator. Such information shall be confidential and may not be disclosed to anyone except counsel of record, the Class Administrator, and designated representatives of Defendants. Should the Defendants discover at any time any additional information containing relevant class information, they shall promptly provide it to Plaintiffs' counsel and the Class Administrator.

19.    At least seven days before the Fairness Hearing, Class Counsel and/or the Class Administrator shall serve and file a sworn statement by the Class Administrator attesting to compliance with the provisions of this Order governing Class and Settlement Notice. This shall include a list of all people who have opted out of the class.

20.    The Court approves the Class and Settlement Notice attached as Exhibit B.

21.    The Court approves the Claim Form attached as Exhibit C.

22.    The Court approves the Class Administrator Bid attached as Exhibit D.

23.    The Court finds that the notice required by the foregoing provisions of this Order is the best notice practicable under the circumstances and shall

constitute due and sufficient notice of the Settlement and the Fairness Hearing to all Class Members and other persons affected by and/or entitled to participate in the settlement, in full compliance with the notice requirements of Rule 23 Federal Rules of Civil Procedure and due process.

## VII.    THE FAIRNESS HEARING

24.    A Fairness Hearing shall be held on October 1, 2021, to consider: (a) the fairness, reasonableness, and adequacy of the Settlement; (b) whether a Final Order of Approval and Settlement should be entered in its current or some modified form; and (c) the application by Class Counsel for attorneys' fees and expenses (the "Fee Motion").

25.    By September 3, 2021, Plaintiffs shall submit a proposed Final Approval Order, which shall be approved by Defendants. That proposed order will contain the final provisions the Parties seek the Court to finally approve and the Parties' proposed court orders related to any objections that have been filed. It will not be necessary to file a separate motion for final approval.

26.    The date and time of the Fairness Hearing shall be set forth in the Class and Settlement Notice but shall be subject to adjournment by the Court without further notice to the Class Members other than that which may be posted at the Court and on the Court's web site.

27.    Any Class Member who objects to the approval of the Settlement Agreement, the Fee Motion, the Named Plaintiffs' incentive awards or the proposed allocation of damages among Class Members may appear at the Fairness Hearing and show cause why any one of the foregoing should not be approved as fair, reasonable, and adequate, and why the Final Order of Approval and Settlement should not be entered, except that no such Class Member may appear at the Fairness Hearing unless the Class Member, no later than August 6, 2021 [the date to file objections to the Settlement] (a) files with the Clerk of the Court a notice of such person's intention to appear, a statement that indicates the basis and

11

grounds for such person's objection to the Settlement Agreement, the Fee Petition, the Named Plaintiffs' incentive awards or the proposed allocation of damages among Class Members, and all documentation, papers, or briefs in support of such objection; and by the same date (b) serves upon all Counsel to the Parties (as listed in the Class Notice), either in person or by mail, copies of such notice of intention to appear, statement of objections and all documentation, papers, or briefs that such person files with the Court. The required documentation shall include the information requested on the Claim Form. Final determination of whether any such objector is a Class Member who has standing to object shall be determined solely from the Defendants' records, from which the list of Class Members has been compiled. In the absence of the timely filing and timely service of the notice of intention to appear and all other materials required by this paragraph, any objection shall be deemed untimely and denied.

28.     Pending final approval of the Settlement Agreement, no Class Member shall, either directly, representatively, or in any other capacity, commence, prosecute against any Defendant or participate in any action or proceeding in any court or tribunal asserting any of the matters, claims, or causes of action that are to be released by the Settlement Agreement upon final approval.

29.     In the event of final approval of the Settlement Agreement, all Damages Class Members (except those who have opted out, who by virtue of opting out are no longer Class Members) shall be forever enjoined and barred from asserting any of the matters, claims or causes of action released by the Settlement Agreement, and all such Class Members shall be deemed to have forever released any and all such matters, claims and causes of action as provided for in the Settlement Agreement.

30.     In the event of the final approval of the settlement, the Court will issue an order of final approval of the settlement, which order will provide for the dismissal of the complaint with prejudice and entry of judgment to that effect.

1    **VIII.**   **OTHER PROVISIONS**

2          31.    The Court approves the parties' plan to use text messages to both

3    issue class notice and reminder messages for those Class Members for whom the

4    Claims Administrator is able to locate mobile phone numbers. In sending notice

5    and reminders via text, recipients shall have the ability to "unsubscribe"

6    themselves from further messages.

7          32.    To the extent not otherwise specifically addressed in this Order,

8    Defendants and Class Counsel shall comply with the provisions of the Settlement

9    Agreement.

10          33.    In the event the Settlement is not finally approved or is otherwise

11   terminated in accordance with the provisions of the Settlement Agreement, the

12   Settlement and all proceedings had in connection therewith shall be null and void,

13   except insofar as expressly provided to the contrary in the Settlement Agreement,

14   and without prejudice to the *status quo ante* rights of Plaintiffs, Defendants, and

15   Class Members.

16

17   DATED: November 25, 2020                    _____

18                                               ANDRE BIROTTE JR.
                                                 UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26

27

28

                                        13

**CORRECTED EXHIBIT A**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUNCAN ROY, *et al*., | Case No. CV 12-01012 (FFMx) |
| Plaintiffs, | [Honorable André Birotte, Jr.] |
| vs. | **SETTLEMENT AGREEMENT** |
| COUNTY OF LOS ANGELES, *et al*., | |
| Defendants. | |

Plaintiffs Alain Martinez-Perez and Clemente de la Cerda (individually and on behalf of the classes previously certified in this case (see Dkt. Nos. 184, 395, 396) (collectively "Plaintiffs")) and Defendants County of Los Angeles, the Los Angeles Sheriff's Department ("LASD"), its prior Sheriff, Leroy Baca (collectively, "Defendants"), by and through their respective counsel, hereby enter into the following Settlement Agreement ("Settlement Agreement").

## I.    RECITALS

1.    Plaintiffs are former inmates of the Los Angeles County Sheriff's Department ("LASD").  On October 19, 2012, Plaintiffs filed this action in United States District Court for the Central District of California ("Court") on behalf of themselves and a class of similarly situated inmates.  Their claims arose from the LASD's policy of detaining inmates beyond the expiration of their state criminal charges on the basis of immigration detainers ("detainers" or "ICE holds"), which are issued by Immigration and Customs Enforcement ("ICE") for suspected

1

immigration violations. Plaintiffs specifically challenged:

- LASD's practice of holding inmates on detainers after they became due for release on criminal matters (i.e. after they were acquitted or otherwise ordered released by a judge, or after serving a jail sentence);

- LASD's practice of incarcerating arrestees with bail of less than $25,000 who, in the absence of an immigration detainer, would have been released on their own recognizance pursuant to LASD policy; and

- LASD's (disputed) practice of refusing to accept bail on behalf of inmates with immigration detainers.

Based on these claims, Plaintiffs alleged various causes of action under the Federal and State Constitutions, of 42 U.S.C. §1983, and California Civil Code § 52.1.

2.      On September 9, 2016, the Court certified various damages classes. Dkt. 184, 9/9/16 Class Cert Order. The class definitions were later modified to conform to the liability determination (described below). The classes are defined as follows:

| |
|---|
| **Fourth Amendment ("*Gerstein*") Class:** All LASD inmates who were detained beyond the time they are due for release from criminal custody, solely on the basis of immigration detainers, excluding inmates who had a final order of removal or were subject to ongoing removal proceedings as indicated on the face of the detainer. (Class period: 10/19/2010 to June 2014). |
| **Equal Protection Class ("No Money Bail Class"):** All LASD inmates on whom an immigration detainer had been lodged, who would otherwise have been subject to LASD's policy of rejecting for booking misdemeanor defendants with bail of less than $25,000 (including Order of Own Recognizance (OR)). (Class period: 10/19/2010 to June 2014). |
| **No-Bail-Notation Class:** All LASD inmates on whom an immigration detainer had been lodged and recorded in LASD's AJIS database, and who were held on charges for which they would have been eligible to post bail. (Class period: 10/19/2010 to 10/18/2012). |

3.      On February 8, 2018, Judge André Birotte granted summary judgment to Plaintiffs on their Fourth Amendment and Equal Protection claims. There was no

liability determination regarding the No-Bail-Notation Class. However, the Parties agree that this Settlement includes the No-Bail-Notation Class.

4. Following the Court's summary judgment ruling, the Parties subsequently entered into a protracted arm's length mediation process with the assistance of the mediator Antonio Piazza. The Parties have reached a proposed Settlement subject to the approval of the Los Angeles County Board of Supervisors ("the Board"), and thereafter, the Court. In entering into this Settlement, Defendants deny that they have done anything wrong whatsoever, deny all liability to the defined Classes and do not concede any infirmity in the defenses that they have asserted or could present in these proceedings or any future appeal, but are also cognizant of the time and expense of further litigation and the potential exposure Defendants may have.

5. In the interest of avoiding expense, delay and inconvenience of further litigation of issues raised in this action, and without any admission of liability by Defendants, and in reliance upon the representations contained herein, and in consideration of the mutual promises, covenants and obligations in this Settlement Agreement, and for good and valuable consideration, Plaintiffs and Defendants, through their undersigned counsel, enter into this Settlement Agreement, subject to the approval of the Board and the Court.

6. In summary, this Settlement provides for dismissal of this case with prejudice in exchange for a class damages fund of $14,000,000, from which costs of administration, litigation costs and attorney's fees, class member awards, and *cy pres* distributions will be paid.

7. The Remainder of the Class Fund (defined in Section "q," below) will be distributed to class members who file claims, subject to certain requirements for a maximum *per-diem* recovery, the schedule for which is set forth in Section IV. Should the claims rate be so low that the total number of unlawful detention days corresponding to timely claims, multiplied by the per-diem maximum, plus payments to timely claims by No Bail Designation Class members, does not

consume the entire Remainder, surplus funds will be distributed to the designated *cy pres* organizations (as further discussed in ¶¶ 26-30 *infra)*. Such funds shall be referred to as the Unclaimed Remainder.

## II. DEFINITIONS

8.     The listed terms used throughout this Stipulation of Settlement and Dismissal are intended to have the following meanings:

a)   "Administrator" means the Class Administrator, as agreed upon (or to be agreed upon) by the Parties and appointed by the Court to issue notice, and review claims submitted by a Settlement Class Member ("SCM") (as defined herein), according to the procedures set forth herein.

b)   The "Bar Date" is the deadline for filing a Proof of Claim and Release Form, objections to the Settlement Agreement, or request to be excluded from this Settlement (opt-out). The Bar Date shall be calculated as the close of business eight (8) months  after the last day of issuing of the Class Notice, which is scheduled to occur within two consecutive business days.

c)   "Class Counsel" herein refers to Barrett S. Litt and Lindsay Battles of Kaye, McLane, Bednarski & Litt; Jennifer Pasquarella of the ACLU Foundation of Southern California; Jessica Bansal of the National Day Laborer Organizing Network and Mark Fleming of the National Immigration Justice Center.

d)   The "Class Fund" refers to the amount of $14,000,000, to be paid by Defendants to the Administrator, and out of which administration costs, Plaintiffs' counsel expert/consulting, litigation, and mediation fees and costs, Plaintiffs' counsel's attorney's fees, incentive awards and compensation to damages Class Members will be paid.

e)   The "Class Period" refers to the period between October 19, 2010 and June 6, 2014.

f)    "Class Notice" means the notice to the Class regarding the Settlement, to be sent to Class Members in a form substantially similar to that attached hereto as Exhibit "A", or as otherwise approved by the Court, and such other summary notice to be published in accordance with the terms of this Settlement Agreement.

g)  A "Class Member" is any member of the certified classes defined in ¶2, *supra*.

h)  The "Effective Date" is the date on which the District Court issues an order granting final approval of the Settlement Agreement if no objections are filed. If any objections to the Settlement are submitted to the Court, the Effective Date is the date of the final resolution of any appeal of the Final Approval of this Settlement Agreement, or if no such appeal is filed, thirty days after Final Approval (the expiration of the deadline for filing a Notice of Appeal).

i)  The "Final Order of Approval and Settlement" is the Order finally approving the Settlement, entered by the Court (which may also be referred to herein as "Final Order").

j)  The "Lawsuit" refers to the action styled *Roy v. County of Los Angeles.*, Case No. CV 12-9012 AB (FFMx).

k)  The "Named Plaintiffs" or "Class Representatives" refers to the Plaintiffs Alain Martinez-Perez and Clemente de la Cerda. For purposes of this Settlement, no distinction is made between them.

l)  "Preliminary Approval" is the Court's determination that this Settlement is within the range of possible approval and therefore that a Class Notice should be sent to the Class and a hearing should be held with respect to fairness.

m)  The "Preliminary Approval Order" is an order entered by the Court preliminarily approving the Settlement, after which Class Notice, the opportunity to object and Opt Out, and a Final Approval hearing are to occur.

n)  An "Opt-Out" is any Class Member who files a timely request for exclusion, pursuant to the terms of this Settlement Agreement, to be excluded from this Settlement. (If used as a verb, it refers to the process of filing such exclusion.)

o)  The "Claim Form" means the Proof of Claim and Release Form required to be used in order to make a claim for payment under this Settlement. A copy of the proposed Claim Form is attached as Exhibit "B". The pre-prepared

Claim forms shall be bar coded to link with the Class Member's database information.

p)  "Released Person" means the Defendants and their affiliates, subsidiaries, predecessors, successors, and/or assigns, together with all past, present and future officials, employees, representatives, attorneys, outside counsel, and/or agents of Los Angeles County. "Released Persons" also includes any and all insurance carriers, and/or their representatives and attorneys, for the Released Persons.

q)  "Remainder" refers to the amount in the Class Fund *after* payment of attorney's fees and costs, litigation costs, and mediation costs. The Remainder is a figure used for purposes of determining whether *cy pres* payments are made.

   The Remainder is thus estimated to amount to approximately $8,733,334, based on the estimate of the maximum fees to be sought (1/3 of the $14,000,000 Class Fund), estimated litigation costs ($200,000) and estimated class administration costs ($400,000).

r)  The "Unclaimed Remainder" means any portion of the Class Fund that goes unclaimed after all valid claims, attorney's fees and costs described herein have been paid.

s)  The "Settlement" refers to this agreement.

t)  A "Settlement Class Member" ("SCM") means any Class Member of the as defined herein (whether or not that person files a Timely Claim form), including representatives, successors and assigns, who does not file a valid and timely Request for Exclusion as provided for in this Settlement Agreement.

u)  The "Settlement Fund" is the fund established by the Administrator with funds transferred from Defendants from which the damages to the Class Representatives and Class Members will be paid. The Defendants will pay all moneys they are obligated to pay under the Preliminary Approval Order, and the Settlement approved by the Court, if any, into the Settlement Fund.

v)  A "Timely Claim" is one filed a) within the six (6) month window stated in the Class Notice, and b) to the extent the Court so approves, any late claims

6

(i.e., claims filed after the Class Notice period) that are filed before the Final Approval Order is issued.

## III. DISCLAIMER OF LIABILITY

9.     The Parties acknowledge and agree that all undertakings and agreements contained in this Settlement Agreement have been agreed to solely for the purpose of finally compromising all questions, disputes and issues between them relating to the Lawsuit. This Settlement Agreement and any proceedings taken pursuant hereto shall not in any event be construed as, interpreted as, or deemed to be evidence of an admission or concession by either party for any purpose, or deemed to constitute a waiver of any legal position or any defenses or other rights which either of the Parties might otherwise assert in any context. Neither this Settlement Agreement nor any provision contained therein, nor any documents related hereto, nor any negotiations, statements or testimony taken in connection herewith may be offered or received as evidence, or used for any other purpose, or in any suit, action or legal proceeding which either of them have or in the future may have with any other person, as an admission or concession of liability or wrongdoing on the part of either party, except in connection with any action or legal proceeding to enforce this settlement agreement. The Parties have reached this Settlement through arms-length negotiations and to avoid the costs and delays of further disputes, litigation and negotiations among them and after extensive negotiations with an independent mediator, subject to approval by the Board and the Court. This Settlement Agreement has been entered into without any concession of liability or nonliability whatsoever and has no precedential or evidentiary value whatsoever.

## IV. FINANCIAL TERMS OF SETTLEMENT AGREEMENT AND CLASS DAMAGES ALLOCATION FORMULA

10.     Plaintiffs intend to submit a separate Motion for Attorney's Fees to be heard at the Final Approval Hearing, to be analyzed under the standards for an award of fees and costs to a prevailing plaintiff under the percentage of the fund

Case 2:12-cv-09012-AB-FFM Document 610 Filed 11/25/20 Page 23 of 147 Page ID #2138
*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

doctrine. While the motion will seek a percentage of the fund as a fee award, subsumed within that request will be any statutory attorney's fee to which Plaintiff's counsel would be entitled under 42 U.S.C. § 1988. The Class Notice will advise Class Members of this motion and their right to object to it.

11.    It is not currently possible to determine the amount of the Remainder before the Final Approval Hearing where the full attorney's fee award, and class administration costs will be finally determined.

12.    The Remainder of the Class Fund shall be distributed to the Class Members under the formula provided in this Agreement. Subject to the Court's approval, Named Plaintiffs shall receive Incentive awards in addition to their share of the Class Fund.[1] Incentive awards are proposed at Class Counsel's initiative and are intended to reflect the Named Plaintiffs' commitment to, and active assistance in advancing, this lawsuit since it was filed in 2012:

| NAME | INCENTIVE AWARD |
|---|---|
| Alain Martinez-Perez | $10,000 |
| Clemente de la Cerda | $10,000 |
| TOTAL | $20,000 |

13.    The County represents that it will provide all electronic data in its possession necessary to both identify and contact class members that it is legally authorized to produce. Such information shall include date of birth, social security number (SSN), driver's license/state ID number, and most recent contact information (address, phone and any other available contact information). This data shall include any fields previously produced in this litigation subject to protective order. This information may only be used to reach out to class members to ensure they receive the Class Notice and are aware of how to file a claim pursuant to this Agreement.

14.    In connection with the Preliminary Approval Order, Plaintiffs intend to seek an order (either by way of stipulation with ICE or by way of a noticed  motion)

[1] Plaintiffs' counsel represent that they have no prior agreement with any Named Plaintiff to seek such awards, nor do they have any commitment to propose them.

Case 2:12-cv-09012-AB-FFM Document 610 Filed 11/25/20 Page 24 of 147 Page ID
#:13199
*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

compelling ICE to provide database information reflecting the addresses and contact information provided by deported Class Members at the time of their removal.

## V. IDENTIFICATION OF CLASS MEMBERS & CALCULATION OF UNLAWFUL DETENTION DAYS

15. Using data produced by the LASD, Plaintiffs have identified 3,622 members of the Equal Protection (aka No-Money-Bail) Class. There are 6 individuals whose records must be individually reviewed.[2]

16. Plaintiffs have also identified 16,486[3] persons detained by the LASD, solely on the basis of an ICE hold, after they were due for release on all criminal matters. These individuals are comprised of both confirmed and "potential" *Gerstein* Class Members. (Membership in the Class depends on whether the immigration detainers lodged against them by ICE were supported by a final order of removal or ongoing removal proceedings. This information can be ascertained from checkboxes on the face of the I-247 detainer forms which will be reviewed as part of the Administrator's duties.)

17. Of the 16,486 Gerstein class members, Plaintiffs have identified 11,364 confirmed *Gerstein* class members by cross referencing LASD and ICE data. This leaves 5,122 *potential* class members who could not be matched to ICE data. Confirming class membership for these 5,122 will require reviewing LASD booking jackets (which contain an inmate's jail records) and locating the copy of their immigration detainer form (I-247 form). According to the LASD, this process will take 1-2 minutes per form. Instead of reviewing booking jackets for all 5,122 potential *Gerstein* Class Members before sending Class Notice, the Parties agree that it is more efficient to send Class Notice to potential *Gerstein* class members, advising that they *may* be entitled to financial compensation depending on whether their detainer was supported by a final order of removal or ongoing removal

---

[2] The LASD agrees to provide booking jackets for these 6 individuals so the parties can determine each person's number of unlawful detention days.
[3] Numbers in this section are subject to modification after re-inclusion of individuals with out-of-county warrants who were over-detained beyond five days on the warrant.

*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

proceedings, which will be determined should they file a claim. Should the Parties receive responses from any potential *Gerstein* class members, LASD agrees to review the booking jacket for any such Class Members, and retrieve the subject's I-247 form, so the Administrator can determine whether the individual qualifies as a Class Member. LASD will provide a copy of the I-247 form to the Administrator.

18. Defendants have reviewed Plaintiffs' analysis and concur in the methodology used to identify Class Members and calculate the total number of over-detention days per Class Member. Based on the data, a very small minority of Class Members appear to have been over-detained for longer than 30 days. The Parties agree that it is necessary to ensure that database errors do not produce erroneous results with regard to these outliers. The Parties agree that, for any timely claimant whose LASD data indicates they were over-detained for more than 10 days, the LASD reserves the right to conduct an individual review of the booking jacket for that claimant to ensure that any over-detention is accurately calculated and to verify that a lawful basis did not exist for the claimant's detention.

19. Estimated class sizes and over-detention days are below:

| | Members | Unlawful Detention Days |
|---|---|---|
| **Confirmed *Gerstein* Class Members** | 11,364 | 39,890 |
| **70% of Potential *Gerstein* Class Members** | 3,585 | 15,846 |
| **No Money Bail Class Members** | 3,622 | 15,844 |
| **TOTAL** | 18,571 | 71,580 |

20. Plaintiffs have identified 5,776 members of the No-Bail-Notation Class. This calculation excludes individuals who are members of the No Money Bail Class and who will be compensated for each day of pretrial incarceration as members of that Class. All of these individuals had bail in excess of $25,000. It is not possible to determine from jail records whether they would have posted bail or, in fact, whether they actually attempted to post bail. In response to the notice, these individuals will be asked to attest, under penalty of perjury, whether they had

*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

access to over $2,500 and would have posted bail had it not been for LASD's policy, and notwithstanding their immigration hold.

## VI. DISTRIBUTION FORMULA

21. Each No-Bail-Notation Class member who responds to the notice by attesting that they would have posted bail will receive $250 total regardless of the potential number of over-detention days. This figure is consciously set relatively low because it is unknown whether the individual class member would in fact have been able to post bail.

22. Each *Gerstein* and No-Money-Bail Class Member's share of the Remainder will be determined based on the number of days they were over-detained. Days incurred by both the *Gerstein* and No-Money-Bail classes receive the same *per-diem* award.

23. Each *Gerstein* and No-Money Bail Class Member who makes a Timely Claim will receive one point per day of over-detention. Each class member's distribution will be based on their total points, divided by the total points for all Class Members who make Timely Claims. (As a purely hypothetical example, if Class Member X had 5 points for 5 days of over-detention, and the total points for all Class Members submitting Timely Claims were 1000, Class member X would receive .05% (or .0005) of the Remainder).

24. Under this model, each *Gerstein* and No-Money-Bail Class Member's share of the Remainder depends on the number of Class Members who make Timely Claims. To the extent that fewer Class Members make a claim, the money per Class Member making a Timely Claim will increase proportionately, up to a per-day maximum of $1000.  Should the Remainder not be consumed by the total number of claimed days (over-detention days corresponding to total claims, multiplied by $), any residual funds will be allocated as *cy pres* payments as set forth in §VII, below.

25. No Class Member shall receive more than $25,000, or 25 over-detention days. The chart below reflects maximum recoveries if class members

*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

were to receive the per-day maximum. (The chart reflects the total number of individuals in each group, but the monies will only be distributed to those who make timely claims.)

| MAXIMUM RECOVERIES FOR CONFIRMED *GERSTEIN* CLASS MEMBERS | | |
|---|---|---|
| # Incarceration Days | Maximum Recovery per Class Member | # of Confirmed Gerstein Class Members |
| 1 day | $1000 | 1,159 |
| 2 days | $2000 | 3,725 |
| 3 days | $3000 | 2,184 |
| 4 days | $4000 | 2,124 |
| 5 days | $5000 | 1,368 |
| 6 – 10 days | $6000-$10,000 | 735 |
| 10+ days | $10,000 plus | 69[4] |

| MAXIMUM RECOVERIES FOR NO-MONEY-BAIL CLASS MEMBERS | | |
|---|---|---|
| Days | Maximum Recovery per Class Member | # of Class Members |
| 1 day | $1000 | 1725 |
| 2 days | $2000 | 535 |
| 3 days | $3000 | 365 |
| 4 days | $4000 | 278 |
| 5 days | $5000 | 118 |
| 6 – 10 days | $6000-$10,000 | 280 |
| 10+ days | $10,000 plus | 322 |

## VII.   *CY PRES* DISTRIBUTION

26.    While Plaintiffs are hopeful that the claims rate in this case will reflect

---

[4] Booking records will be individually reviewed to confirm the total over-detention days for any *Gerstein* class member whose database information indicates 10 or more days of over-detention. This review will ensure the accuracy of calculations for the very few class members entitled to larger than average recoveries.

claims rates that have occurred in other jail cases, the Parties recognize that there is the possibility of an unusually low claims rate in this case, due in large part to the fact that a significant percentage of Class Members were transferred to ICE custody and subsequently deported. These individuals are likely living abroad and may be difficult or impossible to locate. Even those Class Members who were released (and not deported) may be reluctant to come forward to pursue claims against the LASD.

27.     In the event that the claims rate is sufficiently low that there are funds remaining after paying the maximum *per-diem* to claiming Class Members, the balance of the available funds will be *cy pres* funds split 50/50 between organizations/activities designated by Plaintiffs (and reasonably approved by the County) and organizations/activities designated by the County (and reasonably approved by the Plaintiffs). *Cy pres* funds shall be used to fund Los Angeles County programs that provide legal representation to persons facing immigration consequences because of a criminal arrest or conviction in Los Angeles County.

28.     *Cy pres* funds may only be used to *augment* the funding already provided by the County of Los Angeles to support activities that these programs would not be able to pursue without the *cy pres* funds. The *cy pres* funds may not be used to supplant or replace County funding provided by the Board of Supervisors.

29.     At the time that it is determined that any additional *cy pres* funds are to be distributed, the Parties will work in good faith to reach an agreement regarding the organizations or programs to receive those funds based on the criteria set forth in the preceding paragraphs. If they cannot agree, the Parties will separately brief the Court, and the Court will determine the organizations and/or programs to which the *cy pres* funds will be paid, consistent with identified criteria.

30.     This is a non-reversionary Settlement. None of the Class Fund shall revert to the LASD or be used to fund LASD programs. No *cy pres* funds may be used to supplant or replace County funding already provided by the Board of Supervisors.

**VIII.     RESOLUTION AND PAYMENT OF CLAIMS**

31.     Defendants agree to the foregoing division of funds between Incentive Awards and the Remainder subject to the approval of the Court.

**IX.     RELEASES AND OTHER SETTLEMENT TERMS**

32.     The Parties enter into this agreement solely for the purposes of this settlement and implementation of the settlement. If the settlement fails to be approved or otherwise fails consummation, then this Settlement Agreement is hereby withdrawn.

33.     An SCM who complies with the requirements set forth in this Settlement Agreement and files a Timely Claim form will be paid specified sums determined by the Settlement distribution process set forth above, which payment shall be in full satisfaction of all claims of that SCM.

34.     The Settlement Agreement, as of the Effective Date, resolves in full all claims against the Released Persons by all of the SCMs, including the Named Plaintiffs, involving violations of law or constitutional rights, including, without limitation, their equal protection rights under federal and California law, their rights under 42 U.S.C. § 1983 and California Civil Code § 52.1, any other rights under any other federal, state or local law, regulation, duty, or obligation, or any other legal theory, action or cause of action, which arise from the class-wide factual allegations alleged in the complaint (hereafter "Covered Claims").

35.     When the Settlement Agreement is final, as of the Effective Date, all SCMs, including the Named Plaintiffs, waive all rights to any and all claims relating to damages or reimbursement of any kind for the Covered Claims. This waiver and release shall include a full release and waiver of unknown rights regarding the Covered Claims that may exist as of the Effective Date.

36.     As of the Effective Date, the SCMs, including the Named Plaintiffs, hereby waive any and all rights to pursue, initiate, prosecute, or commence any action or proceeding before any court, administrative agency or other tribunal, or to file any complaint regarding acts or omissions by the Released Persons with respect

14

Case 2:12-cv-09012-AB-FFM Document 610 Filed 11/25/20 Page 30 of 147 Page ID #21935
*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

to the Covered Claims; and further, as it relates to this waiver or Release, expressly waive the provisions of <u>California Civil Code § 1542</u>, which provides that "a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

37.     Each SCM shall be deemed to have submitted to the jurisdiction of the Court.

38.     This Settlement Agreement is subject to and conditioned on a Final Approval Hearing conducted by the Court and entry of a Final Order of Approval of Settlement by the Court, providing the specified relief as set forth below, which relief shall be pursuant to the terms and conditions of this Settlement Agreement and the Parties' performance of their continuing rights and obligations hereunder. The Final Order of Approval of Settlement shall be deemed final on the Effective Date as defined previously. Such Final Order of Approval of Settlement shall:

a. Dismiss with prejudice all claims in the action as to the Released Persons including all claims for monetary damages, declaratory relief and injunctive relief, each side to bear its own costs and fees except as otherwise provided for in this Settlement Agreement;

b. Order that all SCMs are enjoined from asserting against any Released Person any and all claims that any SCM had, has or may have in the future arising out of or based on the Covered Claims;

c. Release each Released Person from the claims that any SCM has, had or may have in the future against such Released Person arising out of or based on the Covered Claims ;

d. Determine that this Settlement Agreement is entered into in good faith, is reasonable, fair and adequate, and in the best interest of the Class; and

e. Reserve the Court's continuing and exclusive jurisdiction over the Parties to this Settlement Agreement, including Defendants and SCMs, to

administer, supervise, construe and enforce the Settlement Agreement in accordance with its terms for the mutual benefit of all Parties.

39. The Parties will take all necessary and appropriate steps to obtain preliminary and final approvals of the Settlement Agreement, and dismissal of the action with prejudice, all parties bearing their own fees and costs unless otherwise set forth in this Settlement Agreement. If the Court gives final approval of this Settlement Agreement, and if there is an appeal from such decision, the Parties will defend the Settlement Agreement.

## X. CLASS COUNSEL FEES

40. Class counsel will file a Motion for Attorney's Fees and Costs on a percentage of the fund basis, and the payment of said fees and costs is subject to court approval. Class counsel will not seek more than 1/3 of the $14,000,000 Class Fund as the amount of attorney's fees requested; Class Counsel may seek less but may not seek more. (This 1/3 cap is separate from Class Counsel's costs, i.e., Class Counsel may request up to 1/3 of the class fund plus costs.)

## XI. CLASS ADMINISTRATOR SELECTION

41. The parties agree that contacting Class Members may require the expenditure of larger than normal costs with respect to administration. Accordingly, the Parties have agreed that the money set aside for Class Notice and outreach will exceed the amount typically set aside in class actions of similar sizes.

42. Requests for bids will be sent to at least three established Class Administrators. The candidates will be provided with one month to devise proposed strategies for locating Class Members, including Class Members who may be residing abroad. The selection process will focus on the candidates' past experience with challenging classes, including international classes, the strength of their specific proposals for notifying class members in this case, and the relative costs contained in each bid.

43. Based on the capabilities and reputation of the Administrator Plaintiffs will make a recommendation subject to Defendants' reasonable approval.

16

*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

44.    In addition to conventional claims administration, a portion of the claims administration budget will be set aside to retain the services of Justice in Motion, an organization that specializes in outreach efforts to locate migrant class members of employment and civil rights class actions who reside in Mexico and Central America. This organization will work closely with the Administrator to devise effective strategies for reaching Class Members residing abroad, including networking through community, humanitarian and religious organizations. The combined estimated budget for the work of the Class Administrator and Justice In Motion is $450,000.

## XII. CLASS NOTICE

45.    The Administrator shall be responsible for taking any steps deemed appropriate and necessary by class counsel to notify Class Members of their rights to file claims, and to assist them in doing so subject to the limitations of the administration budget.

46.    Before Class Notice issues, the Administrator shall conduct research using a skip-trace vendor (e.g., TransUnion) to locate as many Class Member addresses, phone numbers and email addresses as possible. Depending on the success of the first skip-trace effort, the Administrator may use a second vendor in an effort to generate additional contact information. Before the preliminary approval hearing, the Administrator will advise the Parties and the Court of how much time it needs to perform skip-trace research to obtain available Class Member email addresses, mobile phone numbers, and mailing addresses. The date for mailing the Class Notice shall be set with that time in mind.

47.    Class Notice shall be issued by U.S. mail, and electronically by email, text message and social media (for all Class Members whose contact information can be obtained).

48.    The Administrator shall complete the initial Class Notice mailing within two consecutive business days. The second day of such mailing is the first day of the period for calculating the "Bar Date" (defined previously in ¶ 10(b)).

Case 2:12-cv-09012-AB-FFM   Document 610   Filed 11/25/20   Page 33 of 147   Page ID
#:21938
*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

That mailing shall occur as soon as practicable after the Settlement has been preliminarily approved and no later than the date set by the Court. Throughout the class period, the Administrator shall send follow-up text, email and social media reminders to any Class Members who have not responded.

49.    The Class Notice shall describe the particulars of the case, provide the class definition, provide information for claimants to contact the Administrator for a claim form, notify Class Members of the establishment of a case website, and contain other usual and customary information. Each Class Member's notice will include one or more of the following notice provisions, depending on whether they are a confirmed or potential member of each class. There will be three class notices:

> a. Notice for *confirmed Gerstein* and/or No-Money-Bail Class Members advising that they are entitled to financial compensation based on the number of days of over-detention (some individuals are confirmed members of both classes and will therefore receive notice containing provisions relevant to both classes);
>
> b. Notice for *potential Gerstein* class members, which will explain that entitlement to compensation depends on whether their detainer was supported by a final order of removal or NTA;
>
> c. No-Bail-Notation Class Members, requesting that they indicate whether they had access to at least $25,000 and would have posted bail.

The draft Class Notices for each version of the Notice are attached to this Settlement Agreement as **Exhibit A**.

50.    The Administrator shall set-up and maintain a class website, which shall be designed for mobile phone accessibility and will permit claimants to submit their claim directly via the website. All pages of the website shall toggle between English and Spanish. The Administrator will also maintain a toll-free number for claimant questions, staffed by bilingual, live operators.

*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

51. The LASD will advise on its website of the existence of this Settlement and place a link on the website to connect viewers to the Class Administrator's website. The LASD will also post physical notices (whose content will be agreed on) in all LA County jail facilities, including IRC, MCJ, Twin Towers and CRDF. In connection with the preliminary approval motion, Plaintiffs intend to seek a court order that physical notices be posted at the Adelanto ICE Processing Center, NB18, Musick, Theo Lacey and any other ICE detention facilities in California.

## XIII. CLASS ADMINISTRATION FOR PROOF OF CLAIM FORMS AND PAYMENT SCHEDULE

52. The Administrator shall be responsible for processing Proof of Claim Forms in paper and electronic format. The Administrator shall confirm class membership and determine the amount of funds due to each timely claiming Class Member based on the formula contained in Section VI.

53. A Proof of Claim Form shall be deemed timely submitted under ¶ 10(v) (Definition of "Timely Claim") when received by the Administrator, or postmarked, on or before the Bar Date. Claim Forms received after the Bar Date shall be processed by the Administrator and paid as ultimately ordered by the Court, has the discretion under this Agreement to extend the Bar Date. Based on prior experience, the parties anticipate that claims will be presented after the Bar Date. Although the Class Notice will advise SCMs of the Bar Date, Plaintiffs' counsel will request that the Court allow claims after the Bar Date through at least the Final Approval Hearing, which the Court will be free to accept or not in its discretion. The Administrator will notify claimants of the rejection of untimely Claims after Final Approval occurs.

54. If a Class Member submits a Claim form that is deficient in some respect, the Administrator shall provide written notice and a 30-day time limit to provide a proper claim form, which notice shall inform the Class Member of what she must do in order to submit a proper claim. Failure to cure the deficiency within

the 30-day time limit will bar any further rights for consideration of eligibility. So long as the original claim is received on or before the Bar Date, it shall be considered timely under ¶ 10(v) (Definition of "Timely Claim") if any deficiency is cured within 30 days of the mailing of a notice of deficiency.

55.     The Administrator shall make payments to SCMs who have filed Timely Claims as ultimately determined by the Court in accordance with this Settlement Agreement within a reasonable time not to exceed 90 days after the Effective Date.

56.     If a check to an SCM is not cashed within three months of its mailing, the Administrator shall hold the funds for nine additional months, during which time it shall make reasonable efforts to contact the person to whom the uncashed check was written to make arrangements for its cashing or reissuance. The Administrator shall not make any payment to any SCM until all claims have been submitted to the Administrator, and there has been a determination of whether it is finally approved, pursuant to the terms of this Settlement Agreement.

57.     Where an SCM's check is not cashed within one year, that SCM shall be eliminated as a qualifying Class Member, and that SCM's past and future funds shall become part of the fund for future distribution to Class Members, and allocated to the remaining SCM's during a second round of payments according to the Class Fund Allocation Formula contained in Section VI.

58.     Uncashed funds remaining in the Class Fund one year after the third round of payments shall be given as a donation to the *Cy Pres Fund* (see ¶ 30), to be allocated equally among the qualifying organizations/ programs.

## XIV.     EXCLUSION FROM SETTLEMENT CLASS—OPT OUTS

59.     Any Class Member who wishes to be excluded from the Settlement Class must submit a request to be excluded from the class, a process defined herein as "Opt-Out." The request for exclusion must be delivered to the Administrator, or postmarked, on or before the Bar Date or as the Court may otherwise direct.

60.     Although Named Plaintiffs are entitled to opt out of the Settlement,

*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

Plaintiffs' counsel has conferred with them, and they approve of and support the Settlement, and have advised that they do not intend to opt out.

61.     Each Class Member who chooses to Opt-Out from or object to this Settlement shall be deemed to have submitted to the jurisdiction of the Court with respect to his/her claim.

62.     Any Class Member who does not Opt-Out as set forth in this Settlement Agreement, shall be deemed conclusively to have become an SCM and to be bound by the Settlement Agreement and all subsequent proceedings and orders herein, regardless of whether s/he files a claim form.

63.     Any Class Member who exercises an Opt-Out shall not share in any monetary benefits provided by this Settlement Agreement.

64.     The Administrator will periodically report to Defendants' counsel and Class Counsel regarding all Opt-Outs received and will determine and report to counsel the total number of Opt-Outs no later than 10 days after the Bar Date.

## XV. APPROVALS REQUIRED

65.     The Los Angeles County Board of Supervisors have all approved the terms of this settlement although, after Final Approval, it will have to finally approve the Final Approval Order.

## XVI.     DISPUTE RESOLUTION

66.     In the event of any disputes regarding implementation of the Settlement Agreement as set forth herein, they shall be resolved by the Court.

## XVII.     INTEGRATION

67.     This Settlement Agreement, together with its exhibits, contains all the terms and conditions agreed upon by the Parties regarding the subject matter of the instant proceeding, and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Settlement Agreement shall be deemed to exist, or to bind the Parties, or to vary the terms and conditions contained herein, except as expressly provided herein.

68.     This Settlement Agreement supersedes all prior communications

*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

regarding the matters contained herein between the Parties or their representatives. This Settlement Agreement is an integrated agreement and contains the entire agreement regarding the matters herein between the Parties, and no representations, warranties or promises have been made or relied on by any party hereto other than as set forth herein. This Settlement Agreement was drafted by counsel for the parties hereto, and there shall be no presumption or construction against any party.

## XVIII. FAIRNESS HEARING AND FINAL ORDER OF APPROVAL

69. Before this settlement agreement becomes final and binding on the Parties, the Court shall hold a Fairness Hearing to determine whether to enter the Final Order of Approval of Settlement. A proposed Final Order of Approval of Settlement shall be submitted to the Court incorporating the terms of this Settlement Agreement and addressing related information such as Objections and Opt-Outs.

## XIX. NO THIRD-PARTY BENEFICIARIES INTENDED

70. This Settlement Agreement does not and is not intended to create any rights with respect to any third parties, except as otherwise provided herein.

## XX. CAFA NOTICE

71. Defendants will provide notice to the appropriate state and federal officials within 10 days of the filing of the motion for preliminary approval of the Settlement pursuant to the provisions of 28 U.S.C.A. § 1715.

## XXI. COUNTERPARTS

72. This Settlement Agreement may be signed in counterparts.

DATED: ____5/14/20_____     KAYE, MCLANE, BEDNARSKI & LITT

By: _____
        Barrett S. Litt

By: _____
        Lindsay Battles

22

*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

Attorneys for Plaintiffs

DATED: _5/14/20_____        ACLU of SOUTHERN CALIFORNIA

By:

_____
Jennifer Pasquarella
Attorneys for Plaintiffs

DATED: _5/14/20_____        NATIONAL DAY LABORER
ORGANIZING NETWORK

By:

_____
Chris Newman
Attorneys for Plaintiffs

DATED: _05/14/2020_____       NATIONAL IMMIGRANT JUSTICE
CENTER

By:

_____
Mark Fleming
Attorneys for Plaintiffs

Case 2:12-cv-09012-AB-FFM   Document 610   Filed 11/25/20   Page 39 of 147   Page ID
#:21153
*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

DATED: _____**11/10/2020**_____          GLASER WEIL

                                            By: _____
                                                    Andy Baum
                                                Attorneys for Defendants

DATED: _____          _____

                                            By: _____
                                            ??
                                            Attorneys for Defendants

*Roy v. County of Los Angeles* Settlement Agreement
CONFIDENTIAL SETTLEMENT COMMUNICATION

LIST OF EXHIBITS TO SETTLEMENT AGREEMENT

Exhibit A                    Class Notices

Exhibit B                    Proof of Claim and Release Form

# EXHIBIT B

*Roy v. County of Los Angeles* (v. 1)

### Roy v. County of Los Angeles - CV 12-09012-AB
### (Class Action Lawsuit Against LASD)

### Class and Settlement Notice

*Roy v. County of Los Angeles* is a class action lawsuit against the Los Angeles Sheriff's Department (LASD) for jailing people on immigration detainers (aka "ICE holds"). In 2018, the federal court ruled that the LASD violated the United States constitution by jailing people solely on the basis of ICE holds.

The parties have now reached a settlement that provides for money compensation to class members. The settlement must still be approved by the judge.

You are a class member and may be entitled to **MONEY**, up to $1,000 per day that you were held on the ICE hold before resolution of your criminal charges. To receive money, you must make a claim no later than August 9, 2021. You can make a claim by mailing back a copy of the claim form, submitting it online at [url], or emailing it to [email address].

### What is this lawsuit about?

The lawsuit challenges three things:

> (1) Detaining people whose bail was less than $25,000 and who would not have been booked into jail in the first place, if not for their ICE hold. (October 2010 – June 2014).

> (2) Detaining people after their criminal case finished, where their detainer was not supported by a removal order or ongoing removal proceedings. (October 2010 – June 2014)

> (3) Refusing to accept bail for people with ICE holds (October 2010 - October 2012).

The court has certified this case a group action (called a "class action"). You do not need to do anything else to become part of the lawsuit.

### Why did I receive this notice?

You are receiving this notice because LASD records show that you had a bail amount of less than $25,000 and would not have been booked into jail in the first place if it were not for an ICE hold. Under the settlement, you are entitled to compensation for every day you spent in jail *before* your criminal charges resolved (each day of pretrial detention).

To receive money, you must make a claim by August 9, 2021.

*Roy v. County of Los Angeles* (v. 1)

## What do I need to do to make a claim?

There are three ways to file a claim:

(1)    Go to [website]
(2)    Email a copy of the enclosed claim form [email]
(3)    Mail a copy of the enclosed claim form [address]

If you have questions, email or call 1-_____.

## How much money will I receive?

The amount that will be paid to each person depends on how many class members make claims. Each class member who submits a claim will receive a share of the settlement based on the total number of days they were detained solely on an immigration detainer. Each qualifying class member will receive up to $1,000 *per day* of jail on an immigration detainer, up to a maximum of $25,000.

Certain class members who were not permitted to post bail will also receive $250 for violation of their right to post bail. (This does not apply to you).

If you don't file a claim on time, you will get no money. It is divided only among those who file on time.

## How do I know my information will be kept confidential?

**The parties in this case agree to keep confidential all information you submit in connection with the settlement. We will not tell ICE that you submitted a claim. Your contact information and family members' contact information will not be disclosed to anyone.**

## How much money will the LASD pay for the total settlement?

LASD will pay a total of $14 million dollars. Here's how the money will be divided:

a.    Depending on how many people make claims, and certain decisions by the court, up to $8.7 million will be divided among class members. Each qualifying class member who would not have been booked into the Jail absent an ICE hold, or would have been released when their criminal case ended absent an ICE hold, will receive up to $1,000 per day, for each day they should not have been detained. The amount that will be paid to each person depends on how many class members make claims. The maximum per claimant is $25,000. In addition, certain class members who were not permitted to post bail and who are able to provide

*Roy v. County of Los Angeles* (v. 1)

the appropriate sworn statement will receive $250 for violation of their right to post bail.

b.  The federal district court will decide on a reasonable fee for the attorneys who handled the case. The attorneys' fees will not exceed 33% of the total fund, plus case expenses. The Court may pay the attorneys less than 33% but not more.

c.  Payment of $10,000 to each of the 2 class representatives for their role in starting and supporting the case.

d.  Additional payments to a court appointed class administrator to notify the class and distribute the money.

### Who are the lawyers handling the case?

There is a team of attorneys who have been fighting this case for people who were unconstitutionally detained. This team includes attorneys at the American Civil Liberties Union of Southern California (ACLU SoCal), the National Day Laborer Organizing Network (NDLON), the National Immigrant Justice Center (NIJC) and the law firm Kaye, McLane, Bednarski & Litt.

### How much money will the lawyers be paid?

The court will decide how much the lawyers will be paid. They lawyers may ask the Court for a fee of up to 33% (one third) of the total available class fund (one third of 14 million), plus case expenses.  The Court can award less than that, but not more. You will not personally pay any attorneys' fees that the court awards to the attorneys.

### If I do not like the settlement, what do I do?

You can object to the settlement or exclude yourself completely. Objecting is telling the Court that you do not like something about the settlement, but you are staying in the case.  Excluding yourself or "opting out" is telling the Court that you do not want to be part of the case.  If you exclude yourself, you cannot object because you are no longer part of the case, and the settlement doesn't affect you.

### How do I object?

You can remain a class member and object to any part of the settlement . If you object, you must tell the court specifically what you think is unfair about the settlement or request for fees.

*Roy v. County of Los Angeles* (v. 1)

To do this, mail a written statement explaining the reason why you object. Include your name, address, telephone number. At the top of the page, write the case name and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not forget to sign the statement. (If you previously used a different name, include any names you have used.)

Your objections must be mailed and postmarked no later than August 9, 2021. Send your objection to all of the people in the chart below.

| Barrett Litt | Andy Baum | *Settlement Administrator -* |
|---|---|---|
| Lindsay Battles | Glaser Weil | *Roy v. County of Los* |
| Kaye, McLane, Bednarksi & Litt | 10250 Constellation | *Angeles* |
| 975 E. Green St. | Blvd. | |
| Pasadena, CA 91106 | 19th Floor | [Fill in address] |
| | Los Angeles, CA 90067 | |

The Court will consider your objection and decide whether to overrule it or change the settlement agreement. Either way, you remain a member of the class and will be bound by the settlement agreement and will get your share of the settlement. (This means you're giving up claims against the LASD for violations covered by this case.)

If you wish to appear at the hearing and argue your objection, tell the court you wish to do so.

## Can I exclude myself from the settlement?

If you want to remove yourself from the lawsuit entirely, or if you want to be able to file your own lawsuit, or be part of a different lawsuit, then you must take steps to exclude yourself. This is sometimes referred to as "opting out" of the class.

To do this, mail a written statement that you wish to exclude yourself or similar words. Include your name, address, and telephone number. You do not need to explain why you wish to be excluded. At the top of the page, write the case name and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not forget to sign the statement. (As noted above, by excluding yourself, you are no longer a class member and do not have the right to object to the settlement.)

You must mail your Exclusion Request, postmarked no later than August 9, 2021 to:

*Roy v. County of Los Angeles* Settlement Administrator

*Roy v. County of Los Angeles* (v. 1)

### What if I do nothing?

If you do not file a claim, you will receive no money from the settlement, **and** you will be giving up your rights against the LASD. **Be sure to file a claim form unless you exclude yourself.**

### Am I giving up any rights?

People who submit claims, object, or do nothing, give up their right to sue the LASD (or its employees) for claims covered by this case. This means that you will not be able to sue the LASD for detaining you based solely on an ICE hold between October 19, 2012 and June 1, 2014, nor will you be able to sue because you were unable to post bail as a result of an ICE hold. You are not giving up claims against the LASD unrelated to this case.

People who exclude themselves ("opt out") do *not* give up claims because they are no longer part of the case.

### How long will this process take?

The last day to submit a claim is August 9, 2021. If you do not submit a claim by then, you get no money. So, file early.

The court has scheduled a hearing for September 3, 2021 to decide whether to approve the settlement. After final court approval, it will take at least two to three months, and possibly more, to process claims, calculate the amount due to each class member, and begin payments.

After you file a claim, check the website for this case about the status of court approval and when payment mailings are expected. Or contact the class administrator by calling: [#] or [via the website].

### Where can I learn more?

For more details, go to the website titled www._____.com. The website has links to the complete settlement documents in this case, as well as the motion for attorneys' fees.  If you still have questions, you may call **[phone # for claims administrator].**

*Roy v. County of Los Angeles* (v. 2)

### *Roy v. County of Los Angeles* - CV 12-09012-AB
### (Class Action Lawsuit Against LASD)

### Class and Settlement Notice

*Roy v. County of Los Angeles* is a class action lawsuit against the Los Angeles Sheriff's Department (LASD) for jailing people on immigration detainers (aka "ICE holds"). In 2018, the federal court ruled that the LASD violated the United States constitution by jailing people solely on the basis of ICE holds.

The parties have now reached a settlement that provides for money compensation to class members. The settlement must still be approved by the judge.

You are a class member and may be entitled to **MONEY**, up to $1,000 per day that you were held on the ICE hold before resolution of your criminal charges **and** up to $1,000 per day for each day you were held on the ICE hold after you were entitled to release on your criminal charges. To receive money, you must make a claim no later than August 9, 2021. You can make a claim by mailing back a copy of the claim form, submitting it online at [url], or emailing it to [email address].

### What is this lawsuit about?

The lawsuit challenges three things:

> (1) Detaining people whose bail was less than $25,000 and who would not have been booked into jail in the first place, if not for their ICE hold. (October 2010 – June 2014).

> (2) Detaining people after their criminal case finished, where their detainer was not supported by a removal order or ongoing removal proceedings. (October 2010 – June 2014)

> (3) Refusing to accept bail for people with ICE holds (October 2010 - October 2012).

The court has certified this case a group action (called a "class action"). You do not need to do anything else to become part of the lawsuit.

### Why did I receive this notice?

You are receiving this notice because LASD records show: (1) that you had a bail amount of less than $25,000 and would not have been booked into jail in the first place if it were not for an ICE hold; **and**, (2) you were jailed after you were entitled to release on your criminal charges.

*Roy v. County of Los Angeles* (v. 2)

Under the settlement, you are entitled to compensation for every day you spent in jail *before* your criminal charges resolved (each day of pretrial detention) and each day you were held after your criminal charges resolved (e.g. after a court ordered you released or after you served your sentence).

To receive money, you must make a claim by August 9, 2021.

### What do I need to do to make a claim?

There are three ways to file a claim:

(1)   Go to [website]
(2)   Email a copy of the enclosed claim form [email]
(3)   Mail a copy of the enclosed claim form [address]

If you have questions, email or call 1-_____.

### How much money will I receive?

The amount that will be paid to each person depends on how many class members make claims. Each class member who submits a claim will receive a share of the settlement based on the total number of days they were detained solely on an immigration detainer. Each qualifying class member will receive up to $1,000 *per day* of jail on an immigration detainer, up to a maximum of $25,000.

Certain class members who were not permitted to post bail will also receive $250 for violation of their right to post bail. (This does not apply to you).

If you don't file a claim on time, you will get no money. It is divided only among those who file on time.

### How do I know my information will be kept confidential?

**The parties in this case agree to keep confidential all information you submit in connection with the settlement. We will not tell ICE that you submitted a claim. Your contact information and family members' contact information will not be disclosed to anyone.**

### How much money will the LASD pay for the total settlement?

LASD will pay a total of $14 million dollars. Here's how the money will be divided:

a.   Depending on how many people make claims, and certain decisions by the court, up to $8.7 million will be divided among class members. Each qualifying class member who would not have been booked into the Jail

absent an ICE hold, or would have been released when their criminal case ended absent an ICE hold, will receive up to $1,000 per day, for each day they should not have been detained. The amount that will be paid to each person depends on how many class members make claims. The maximum per claimant is $25,000. In addition, certain class members who were not permitted to post bail and who are able to provide the appropriate sworn statement will receive $250 for violation of their right to post bail.

b.  The federal district court will decide on a reasonable fee for the attorneys who handled the case. The attorneys' fees will not exceed 33% of the total fund, plus case expenses. The Court may pay the attorneys less than 33% but not more.

c.  Payment of $10,000 to each of the 2 class representatives for their role in starting and supporting the case.

d.  Additional payments to a court appointed class administrator to notify the class and distribute the money.

### Who are the lawyers handling the case?

There is a team of attorneys who have been fighting this case for people who were unconstitutionally detained. This team includes attorneys at the American Civil Liberties Union of Southern California (ACLU SoCal), the National Day Laborer Organizing Network (NDLON), the National Immigrant Justice Center (NIJC) and the law firm Kaye, McLane, Bednarski & Litt.

### How much money will the lawyers be paid?

The court will decide how much the lawyers will be paid. They lawyers may ask the Court for a fee of up to 33% (one third) of the total available class fund (one third of 14 million), plus case expenses.  The Court can award less than that, but not more. You will not personally pay any attorneys' fees that the court awards to the attorneys.

### If I do not like the settlement, what do I do?

You can object to the settlement or exclude yourself completely. Objecting is telling the Court that you do not like something about the settlement, but you are staying in the case.  Excluding yourself or "opting out" is telling the Court that you do not want to be part of the case.  If you exclude yourself, you cannot object because you are no longer part of the case, and the settlement doesn't affect you.

*Roy v. County of Los Angeles* (v. 2)

## How do I object?

You can remain a class member and object to any part of the settlement . If you object, you must tell the court specifically what you think is unfair about the settlement or request for fees.

To do this, mail a written statement explaining the reason why you object. Include your name, address, telephone number. At the top of the page, write the case name and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not forget to sign the statement. (If you previously used a different name, include any names you have used.)

Your objections must be mailed and postmarked no later than August 9, 2021. Send your objection to all of the people in the chart below.

| | | |
|---|---|---|
| Barrett Litt<br>Lindsay Battles<br>Kaye, McLane, Bednarksi & Litt<br>975 E. Green St.<br>Pasadena, CA 91106 | Andy Baum<br>Glaser Weil<br>10250 Constellation Blvd.<br>19th Floor<br>Los Angeles, CA 90067 | *Settlement Administrator - Roy v. County of Los Angeles*<br><br>[Fill in address] |

The Court will consider your objection and decide whether to overrule it or change the settlement agreement. Either way, you remain a member of the class and will be bound by the settlement agreement and will get your share of the settlement. (This means you're giving up claims against the LASD for violations covered by this case.)

If you wish to appear at the hearing and argue your objection, tell the court you wish to do so.

## Can I exclude myself from the settlement?

If you want to remove yourself from the lawsuit entirely, or if you want to be able to file your own lawsuit, or be part of a different lawsuit, then you must take steps to exclude yourself.  This is sometimes referred to as "opting out" of the class.

To do this, mail a written statement that you wish to exclude yourself or similar words. Include your name, address, and telephone number. You do not need to explain why you wish to be excluded. At the top of the page, write the case name and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not forget to sign the statement. (As noted above, by excluding yourself, you are no longer a class member and do not have the right to object to the settlement.)

*Roy v. County of Los Angeles* (v. 2)

You must mail your Exclusion Request, postmarked no later than August 9, 2021 to:

*Roy v. County of Los Angeles* Settlement Administrator

## What if I do nothing?

If you do not file a claim, you will receive no money from the settlement, **and** you will be giving up your rights against the LASD. **Be sure to file a claim form unless you exclude yourself.**

## Am I giving up any rights?

People who submit claims, object, or do nothing, give up their right to sue the LASD (or its employees) for claims covered by this case. This means that you will not be able to sue the LASD for detaining you based solely on an ICE hold between October 19, 2012 and June 1, 2014, nor will you be able to sue because you were unable to post bail as a result of an ICE hold. You are not giving up claims against the LASD unrelated to this case.

People who exclude themselves ("opt out") do *not* give up claims because they are no longer part of the case.

## How long will this process take?

The last day to submit a claim is August 9, 2021. If you do not submit a claim by then, you get no money. So, file early.

The court has scheduled a hearing for September 3, 2021 to decide whether to approve the settlement. After final court approval, it will take at least two to three months, and possibly more, to process claims, calculate the amount due to each class member, and begin payments.

After you file a claim, check the website for this case about the status of court approval and when payment mailings are expected. Or contact the class administrator by calling: [#] or [via the website].

## Where can I learn more?

For more details, go to the website titled www._____.com. The website has links to the complete settlement documents in this case, as well as the motion for attorneys' fees.  If you still have questions, you may call **[phone # for claims administrator].**

*Roy v. County of Los Angeles* (v. 3)

### *Roy v. County of Los Angeles* - CV 12-09012-AB
### (Class Action Lawsuit Against LASD)

## Class and Settlement Notice

*Roy v. County of Los Angeles* is a class action lawsuit against the Los Angeles
Sheriff's Department (LASD) for jailing people on immigration detainers (aka
"ICE holds"). In 2018, the federal court ruled that the LASD violated the United
States constitution by jailing people solely on the basis of ICE holds.

The parties have now reached a settlement that provides for money compensation
to class members. The settlement must still be approved by the judge.

You are a class member and may be entitled to **MONEY**, up to $1,000 per day that
you were held on the ICE hold before resolution of your criminal charges. In
addition, you *may* be entitled to **MONEY**, up to $1,000 per day, for each day you
were held on the ICE hold after you were entitled to release on your criminal
charges. (Specifically, if you had pending removal proceedings or a removal order
at the time the detainer was issued, you are not entitled to money under the
settlement.)

To receive money, you must make a claim no later than August 9, 2021. You can
make a claim by mailing back a copy of the claim form, submitting it online at
[url], or emailing it to [email address].

## What is this lawsuit about?

The lawsuit challenges three things:

> (1) Detaining people whose bail was less than $25,000 and who would not
> have been booked into jail in the first place, if not for their ICE hold.
> (October 2010 – June 2014).

> (2) Detaining people after their criminal case finished, where their detainer
> was not supported by a removal order or ongoing removal proceedings.
> (October 2010 – June 2014)

> (3) Refusing to accept bail for people with ICE holds (October 2010 -
> October 2012).

The court has certified this case a group action (called a "class action"). You do
not need to do anything else to become part of the lawsuit.

## Why did I receive this notice?

*Roy v. County of Los Angeles* (v. 3)

You are receiving this notice because LASD records show: (1) that you had a bail amount of less than $25,000 and would not have been booked into jail in the first place if it were not for an ICE hold; ***and***, (2) you were jailed after you were entitled to release on criminal charges.

Under the settlement, you **are** entitled to compensation for every day you spent in jail *before* your criminal charges resolved (each day of pretrial detention).

In addition, you ***may*** be entitled to compensation for each day you were held after your criminal charges resolved (e.g. after a court ordered you released or after you served your sentence). As explained above, whether you can receive compensation for days after your criminal charges resolved depends on whether you had a removal order or pending removal proceedings at the time your detainer was issued. (If you had pending removal proceedings or a removal order at the time the detainer was issued, you are not entitled to money under the settlement.) If you make a claim, LASD will provide the information necessary to confirm your eligibility.

To receive money, you must make a claim by August 9, 2021.

### <u>What do I need to do to make a claim?</u>

There are three ways to file a claim:

(1)    Go to [website]
(2)    Email a copy of the enclosed claim form [email]
(3)    Mail a copy of the enclosed claim form [address]

If you have questions, email or call 1-_____.

### <u>How much money will I receive?</u>

The amount that will be paid to each person depends on how many class members make claims. Each class member who submits a claim will receive a share of the settlement based on the total number of days they were detained solely on an immigration detainer. Each qualifying class member will receive up to $1,000 *per day* of jail on an immigration detainer, up to a maximum of $25,000.

Certain class members who were not permitted to post bail will also receive $250 for violation of their right to post bail. (This does not apply to you).

<u>If you don't file a claim on time, you will get no money. It is divided only among those who file on time.</u>

### <u>How do I know my information will be kept confidential?</u>

*Roy v. County of Los Angeles* (v. 3)

**The parties in this case agree to keep confidential all information you submit in connection with the settlement. We will not tell ICE that you submitted a claim. Your contact information and family members' contact information will not be disclosed to anyone.**

<u>How much money will the LASD pay for the total settlement?</u>

LASD will pay a total of $14 million dollars. Here's how the money will be divided:

a. Depending on how many people make claims, and certain decisions by the court, up to $8.7 million will be divided among class members. Each qualifying class member who would not have been booked into the Jail absent an ICE hold, or would have been released when their criminal case ended absent an ICE hold, will receive up to $1,000 per day, for each day they should not have been detained. The amount that will be paid to each person depends on how many class members make claims. The maximum per claimant is $25,000. In addition, certain class members who were not permitted to post bail and who are able to provide the appropriate sworn statement will receive $250 for violation of their right to post bail.

b. The federal district court will decide on a reasonable fee for the attorneys who handled the case. The attorneys' fees will not exceed 33% of the total fund, plus case expenses. The Court may pay the attorneys less than 33% but not more.

c. Payment of $10,000 to each of the 2 class representatives for their role in starting and supporting the case.

d. Additional payments to a court appointed class administrator to notify the class and distribute the money.

<u>Who are the lawyers handling the case?</u>

There is a team of attorneys who have been fighting this case for people who were unconstitutionally detained. This team includes attorneys at the American Civil Liberties Union of Southern California (ACLU SoCal), the National Day Laborer Organizing Network (NDLON), the National Immigrant Justice Center (NIJC) and the law firm Kaye, McLane, Bednarski & Litt.

<u>How much money will the lawyers be paid?</u>

*Roy v. County of Los Angeles* (v. 3)

The court will decide how much the lawyers will be paid. They lawyers may ask
the Court for a fee of up to 33% (one third) of the total available class fund (one
third of 14 million), plus case expenses.  The Court can award less than that, but
not more. You will not personally pay any attorneys' fees that the court awards to
the attorneys.

### If I do not like the settlement, what do I do?

You can object to the settlement or exclude yourself completely. Objecting is
telling the Court that you do not like something about the settlement, but you are
staying in the case.  Excluding yourself or "opting out" is telling the Court that you
do not want to be part of the case.  If you exclude yourself, you cannot object
because you are no longer part of the case, and the settlement doesn't affect you.

### How do I object?

You can remain a class member and object to any part of the settlement . If you
object, you must tell the court specifically what you think is unfair about the
settlement or request for fees.

To do this, mail a written statement explaining the reason why you object. Include
your name, address, telephone number. At the top of the page, write the case name
and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not
forget to sign the statement. (If you previously used a different name, include any
names you have used.)

Your objections must be mailed and postmarked no later than August 9, 2021.
Send your objection to all of the people in the chart below.

| | | |
|---|---|---|
| Barrett Litt<br>Lindsay Battles<br>Kaye, McLane, Bednarksi & Litt<br>975 E. Green St.<br>Pasadena, CA 91106 | Andy Baum<br>Glaser Weil<br>10250 Constellation Blvd.<br>19th Floor<br>Los Angeles, CA 90067 | *Settlement Administrator -*<br>*Roy v. County of Los*<br>*Angeles*<br><br>[Fill in address] |

The Court will consider your objection and decide whether to overrule it or change
the settlement agreement. Either way, you remain a member of the class and will
be bound by the settlement agreement and will get your share of the settlement.
(This means you're giving up claims against the LASD for violations covered by
this case.)

If you wish to appear at the hearing and argue your objection, tell the court you
wish to do so.

*Roy v. County of Los Angeles* (v. 3)

## Can I exclude myself from the settlement?

If you want to remove yourself from the lawsuit entirely, or if you want to be able to file your own lawsuit, or be part of a different lawsuit, then you must take steps to exclude yourself. This is sometimes referred to as "opting out" of the class.

To do this, mail a written statement that you wish to exclude yourself or similar words. Include your name, address, and telephone number. You do not need to explain why you wish to be excluded. At the top of the page, write the case name and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not forget to sign the statement. (As noted above, by excluding yourself, you are no longer a class member and do not have the right to object to the settlement.)

You must mail your Exclusion Request, postmarked no later than August 9, 2021 to:

*Roy v. County of Los Angeles* Settlement Administrator

## What if I do nothing?

If you do not file a claim, you will receive no money from the settlement, **and** you will be giving up your rights against the LASD. **Be sure to file a claim form unless you exclude yourself.**

## Am I giving up any rights?

People who submit claims, object, or do nothing, give up their right to sue the LASD (or its employees) for claims covered by this case. This means that you will not be able to sue the LASD for detaining you based solely on an ICE hold between October 19, 2012 and June 1, 2014, nor will you be able to sue because you were unable to post bail as a result of an ICE hold. You are not giving up claims against the LASD unrelated to this case.

People who exclude themselves ("opt out") do *not* give up claims because they are no longer part of the case.

## How long will this process take?

The last day to submit a claim is August 9, 2021. If you do not submit a claim by then, you get no money. So, file early.

The court has scheduled a hearing for September 3, 2021 to decide whether to approve the settlement. After final court approval, it will take at least two to three

*Roy v. County of Los Angeles* (v. 3)

months, and possibly more, to process claims, calculate the amount due to each class member, and begin payments.

After you file a claim, check the website for this case about the status of court approval and when payment mailings are expected. Or contact the class administrator by calling: [#] or [via the website].

### **Where can I learn more?**

For more details, go to the website titled www._____.com. The website has links to the complete settlement documents in this case, as well as the motion for attorneys' fees. If you still have questions, you may call **[phone # for claims administrator].**

*Roy v. County of Los Angeles* (v. 4)

### ***Roy v. County of Los Angeles* -** CV 12-09012-AB
### **(Class Action Lawsuit Against LASD)**

### Class and Settlement Notice

*Roy v. County of Los Angeles* is a class action lawsuit against the Los Angeles Sheriff's Department (LASD) for jailing people on immigration detainers (aka "ICE holds"). In 2018, the federal court ruled that the LASD violated the United States constitution by jailing people solely on the basis of ICE holds.

The parties have now reached a settlement that provides for money compensation to class members. The settlement must still be approved by the judge.

You are a class member and may be entitled to **MONEY**, up to $1,000 per day for each day you were held on the ICE hold after you were entitled to release on your criminal charges. To receive money, you must make a claim no later than August 9, 2021. You can make a claim by mailing back a copy of the claim form, submitting it online at [url], or emailing it to [email address].

### What is this lawsuit about?

The lawsuit challenges three things:

> (1) Detaining people whose bail was less than $25,000 and who would not have been booked into jail in the first place, if not for their ICE hold. (October 2010 – June 2014).

> (2) Detaining people after their criminal case finished, where their detainer was not supported by a removal order or ongoing removal proceedings. (October 2010 – June 2014)

> (3) Refusing to accept bail for people with ICE holds (October 2010 - October 2012).

The court has certified this case a group action (called a "class action"). You do not need to do anything else to become part of the lawsuit.

### Why did I receive this notice?

You are receiving this notice because LASD records show that you were jailed after you were entitled to release on your criminal charges. Under the settlement, you are entitled to compensation for each day you were held after your criminal charges resolved (e.g. after a court ordered you released or after you served your sentence).

To receive money, you must make a claim by August 9, 2021.

*Roy v. County of Los Angeles* (v. 4)

## What do I need to do to make a claim?

There are three ways to file a claim:

(1)     Go to [website]
(2)     Email a copy of the enclosed claim form [email]
(3)     Mail a copy of the enclosed claim form [address]

If you have questions, email or call 1-_____.

## How much money will I receive?

The amount that will be paid to each person depends on how many class members make claims. Each class member who submits a claim will receive a share of the settlement based on the total number of days they were detained solely on an immigration detainer. Each qualifying class member will receive up to $1,000 *per day* of jail on an immigration detainer, up to a maximum of $25,000.

In addition, class members who were not permitted to post bail will also receive $250 for violation of their right to post bail if they can make the appropriate sworn statement. (This does not apply to you).

If you don't file a claim on time, you will get no money. It is divided only among those who file on time.

## How do I know my information will be kept confidential?

**The parties in this case agree to keep confidential all information you submit in connection with the settlement. We will not tell ICE that you submitted a claim. Your contact information and family members' contact information will not be disclosed to anyone.**

## How much money will the LASD pay for the total settlement?

LASD will pay a total of $14 million dollars. Here's how the money will be divided:

a.   Depending on how many people make claims, and certain decisions by the court, up to $8.7 million will be divided among class members. Each qualifying class member who would not have been booked into the Jail absent an ICE hold, or would have been released when their criminal case ended absent an ICE hold, will receive up to $1,000 per day, for each day they should not have been detained. The amount that will be paid to each person depends on how many class members make claims. The maximum per claimant is $25,000. In addition, certain class

*Roy v. County of Los Angeles* (v. 4)

    members who were not permitted to post bail and who are able to provide
    the appropriate sworn statement will receive $250 for violation of their
    right to post bail.

b. The federal district court will decide on a reasonable fee for the attorneys
   who handled the case. The attorneys' fees will not exceed 33% of the
   total fund, plus case expenses. The Court may pay the attorneys less than
   33% but not more.

c. Payment of $10,000 to each of the 2 class representatives for their role in
   starting and supporting the case.

d. Additional payments to a court appointed class administrator to notify the
   class and distribute the money.

### Who are the lawyers handling the case?

There is a team of attorneys who have been fighting this case for people who were
unconstitutionally detained. This team includes attorneys at the American Civil
Liberties Union of Southern California (ACLU SoCal), the National Day Laborer
Organizing Network (NDLON), the National Immigrant Justice Center (NIJC) and
the law firm Kaye, McLane, Bednarski & Litt.

### How much money will the lawyers be paid?

The court will decide how much the lawyers will be paid. They lawyers may ask
the Court for a fee of up to 33% (one third) of the total available class fund (one
third of 14 million), plus case expenses.  The Court can award less than that, but
not more. You will not personally pay any attorneys' fees that the court awards to
the attorneys.

### If I do not like the settlement, what do I do?

You can object to the settlement or exclude yourself completely. Objecting is
telling the Court that you do not like something about the settlement, but you are
staying in the case.  Excluding yourself or "opting out" is telling the Court that you
do not want to be part of the case.  If you exclude yourself, you cannot object
because you are no longer part of the case, and the settlement doesn't affect you.

### How do I object?

*Roy v. County of Los Angeles* (v. 4)

You can remain a class member and object to any part of the settlement . If you object, you must tell the court specifically what you think is unfair about the settlement or request for fees.

To do this, mail a written statement explaining the reason why you object. Include your name, address, telephone number. At the top of the page, write the case name and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not forget to sign the statement. (If you previously used a different name, include any names you have used.)

Your objections must be mailed and postmarked no later than August 9, 2021. Send your objection to all of the people in the chart below.

| Barrett Litt<br>Lindsay Battles<br>Kaye, McLane, Bednarksi & Litt<br>975 E. Green St.<br>Pasadena, CA 91106 | Andy Baum<br>Glaser Weil<br>10250 Constellation Blvd.<br>19th Floor<br>Los Angeles, CA 90067 | *Settlement Administrator - Roy v. County of Los Angeles*<br><br>[Fill in address] |
|---|---|---|

The Court will consider your objection and decide whether to overrule it or change the settlement agreement. Either way, you remain a member of the class and will be bound by the settlement agreement and will get your share of the settlement. (This means you're giving up claims against the LASD for violations covered by this case.)

If you wish to appear at the hearing and argue your objection, tell the court you wish to do so.

## **Can I exclude myself from the settlement?**

If you want to remove yourself from the lawsuit entirely, or if you want to be able to file your own lawsuit, or be part of a different lawsuit, then you must take steps to exclude yourself.  This is sometimes referred to as "opting out" of the class.

To do this, mail a written statement that you wish to exclude yourself or similar words. Include your name, address, and telephone number. You do not need to explain why you wish to be excluded. At the top of the page, write the case name and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not forget to sign the statement. (As noted above, by excluding yourself, you are no longer a class member and do not have the right to object to the settlement.)

You must mail your Exclusion Request, postmarked no later than August 9, 2021 to:

*Roy v. County of Los Angeles* (v. 4)

*Roy v. County of Los Angeles* Settlement Administrator

[blue box]

### What if I do nothing?

If you do not file a claim, you will receive no money from the settlement, **and** you will be giving up your rights against the LASD. **Be sure to file a claim form unless you exclude yourself.**

### Am I giving up any rights?

People who submit claims, object, or do nothing, give up their right to sue the LASD (or its employees) for claims covered by this case. This means that you will not be able to sue the LASD for detaining you based solely on an ICE hold between October 19, 2012 and June 1, 2014, nor will you be able to sue because you were unable to post bail as a result of an ICE hold. You are not giving up claims against the LASD unrelated to this case.

People who exclude themselves ("opt out") do *not* give up claims because they are no longer part of the case.

### How long will this process take?

The last day to submit a claim is August 9, 2021. If you do not submit a claim by then, you get no money. So, file early.

The court has scheduled a hearing for September 3, 2021 to decide whether to approve the settlement. After final court approval, it will take at least two to three months, and possibly more, to process claims, calculate the amount due to each class member, and begin payments.

After you file a claim, check the website for this case about the status of court approval and when payment mailings are expected. Or contact the class administrator by calling: [#] or [via the website].

### Where can I learn more?

For more details, go to the website titled www._____.com. The website has links to the complete settlement documents in this case, as well as the motion for attorneys' fees. If you still have questions, you may call **[phone # for claims administrator].**

*Roy v. County of Los Angeles* (v. 5)

## *Roy v. County of Los Angeles* - CV 12-09012-AB
### (Class Action Lawsuit Against LASD)

### Class and Settlement Notice

*Roy v. County of Los Angeles* is a class action lawsuit against the Los Angeles Sheriff's Department (LASD) for jailing people on immigration detainers (aka "ICE holds"). In 2018, the federal court ruled that the LASD violated the United States constitution by jailing people solely on the basis of ICE holds.

The parties have now reached a settlement that provides for money compensation to class members. The settlement must still be approved by the judge.

You are a class member and may be entitled to **MONEY**, including up to $1,000 per day for each day you were held on the ICE hold after you were entitled to release on your criminal charges. In addition, you may be entitled to $250.00 if you were unable to post bail. To receive money, you must make a claim no later than August 9, 2021. You can make a claim by mailing back a copy of the claim form, submitting it online at [url], or emailing it to [email address].

### What is this lawsuit about?

The lawsuit challenges three things:

(1) Detaining people whose bail was less than $25,000 and who would not have been booked into jail in the first place, if not for their ICE hold. (October 2010 – June 2014).

(2) Detaining people after their criminal case finished, where their detainer was not supported by a removal order or ongoing removal proceedings. (October 2010 – June 2014)

(3) Refusing to accept bail for people with ICE holds (October 2010 - October 2012).

The court has certified this case a group action (called a "class action"). You do not need to do anything else to become part of the lawsuit.

### Why did I receive this notice?

You are receiving this notice because LASD records show that you were jailed after you were entitled to release on your criminal charges. LASD records also show that you were entitled to post bail but nonetheless had a "No Bail" notation in LASD records due to your ICE hold.

*Roy v. County of Los Angeles* (v. 5)

Under the settlement, you are entitled to compensation for each day you were held after your criminal charges resolved (e.g. after a court ordered you released or after you served your sentence). You may also be entitled to $250 if you can say, under penalty of perjury, that you had access to $2,500 and would have posted bail had you been permitted to do so.

To receive money, you must make a claim by August 9, 2021.

### What do I need to do to make a claim?

There are three ways to file a claim:

(1)    Go to [website]
(2)    Email a copy of the enclosed claim form [email]
(3)    Mail a copy of the enclosed claim form [address]

If you have questions, email or call 1-_____.

### How much money will I receive?

The amount that will be paid to each person depends on how many class members make claims. Each class member who submits a claim will receive a share of the settlement based on the total number of days they were detained solely on an immigration detainer. Each qualifying class member will receive up to $1,000 *per day* of jail on an immigration detainer, up to a maximum of $25,000.

In addition, class members who were not permitted to post bail will receive $250 for violation of their right to post bail, provided they can make the appropriate sworn statement.

If you don't file a claim on time, you will get no money. It is divided only among those who file on time.

### How do I know my information will be kept confidential?

**The parties in this case agree to keep confidential all information you submit in connection with the settlement. We will not tell ICE that you submitted a claim. Your contact information and family members' contact information will not be disclosed to anyone.**

### How much money will the LASD pay for the total settlement?

LASD will pay a total of $14 million dollars. Here's how the money will be divided:

*Roy v. County of Los Angeles* (v. 5)

    a. Depending on how many people make claims, and certain decisions by
the court, up to $8.7 million will be divided among class members. Each
qualifying class member who would not have been booked into the Jail
absent an ICE hold, or would have been released when their criminal
case ended absent an ICE hold, will receive up to $1,000 per day, for
each day they should not have been detained. The amount that will be
paid to each person depends on how many class members make claims.
The maximum per claimant is $25,000. In addition, certain class
members who were not permitted to post bail and who are able to provide
the appropriate sworn statement will receive $250 for violation of their
right to post bail.

    b. The federal district court will decide on a reasonable fee for the attorneys
who handled the case. The attorneys' fees will not exceed 33% of the
total fund, plus case expenses. The Court may pay the attorneys less than
33% but not more.

    c. Payment of $10,000 to each of the 2 class representatives for their role in
starting and supporting the case.

    d. Additional payments to a court appointed class administrator to notify the
class and distribute the money.

### Who are the lawyers handling the case?

There is a team of attorneys who have been fighting this case for people who were
unconstitutionally detained. This team includes attorneys at the American Civil
Liberties Union of Southern California (ACLU SoCal), the National Day Laborer
Organizing Network (NDLON), the National Immigrant Justice Center (NIJC) and
the law firm Kaye, McLane, Bednarski & Litt.

### How much money will the lawyers be paid?

The court will decide how much the lawyers will be paid. They lawyers may ask
the Court for a fee of up to 33% (one third) of the total available class fund (one
third of 14 million), plus case expenses.  The Court can award less than that, but
not more. You will not personally pay any attorneys' fees that the court awards to
the attorneys.

### If I do not like the settlement, what do I do?

You can object to the settlement or exclude yourself completely. Objecting is
telling the Court that you do not like something about the settlement, but you are

*Roy v. County of Los Angeles* (v. 5)

staying in the case. Excluding yourself or "opting out" is telling the Court that you do not want to be part of the case. If you exclude yourself, you cannot object because you are no longer part of the case, and the settlement doesn't affect you.

### How do I object?

You can remain a class member and object to any part of the settlement . If you object, you must tell the court specifically what you think is unfair about the settlement or request for fees.

To do this, mail a written statement explaining the reason why you object. Include your name, address, telephone number. At the top of the page, write the case name and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not forget to sign the statement. (If you previously used a different name, include any names you have used.)

Your objections must be mailed and postmarked no later than August 9, 2021. Send your objection to all of the people in the chart below.

| | | |
|---|---|---|
| Barrett Litt<br>Lindsay Battles<br>Kaye, McLane, Bednarksi & Litt<br>975 E. Green St.<br>Pasadena, CA 91106 | Andy Baum<br>Glaser Weil<br>10250 Constellation Blvd.<br>19th Floor<br>Los Angeles, CA 90067 | *Settlement Administrator - Roy v. County of Los Angeles*<br><br>[Fill in address] |

The Court will consider your objection and decide whether to overrule it or change the settlement agreement. Either way, you remain a member of the class and will be bound by the settlement agreement and will get your share of the settlement. (This means you're giving up claims against the LASD for violations covered by this case.)

If you wish to appear at the hearing and argue your objection, tell the court you wish to do so.

### Can I exclude myself from the settlement?

If you want to remove yourself from the lawsuit entirely, or if you want to be able to file your own lawsuit, or be part of a different lawsuit, then you must take steps to exclude yourself. This is sometimes referred to as "opting out" of the class.

To do this, mail a written statement that you wish to exclude yourself or similar words. Include your name, address, and telephone number. You do not need to explain why you wish to be excluded. At the top of the page, write the case name and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not

*Roy v. County of Los Angeles* (v. 5)

forget to sign the statement. (As noted above, by excluding yourself, you are no longer a class member and do not have the right to object to the settlement.)

You must mail your Exclusion Request, postmarked no later than August 9, 2021 to:

*Roy v. County of Los Angeles* Settlement Administrator

## What if I do nothing?

If you do not file a claim, you will receive no money from the settlement, **and** you will be giving up your rights against the LASD. **Be sure to file a claim form unless you exclude yourself.**

## Am I giving up any rights?

People who submit claims, object, or do nothing, give up their right to sue the LASD (or its employees) for claims covered by this case. This means that you will not be able to sue the LASD for detaining you based solely on an ICE hold between October 19, 2012 and June 1, 2014, nor will you be able to sue because you were unable to post bail as a result of an ICE hold. You are not giving up claims against the LASD unrelated to this case.

People who exclude themselves ("opt out") do *not* give up claims because they are no longer part of the case.

## How long will this process take?

The last day to submit a claim is August 9, 2021. If you do not submit a claim by then, you get no money. So, file early.

The court has scheduled a hearing for September 3, 2021 to decide whether to approve the settlement. After final court approval, it will take at least two to three months, and possibly more, to process claims, calculate the amount due to each class member, and begin payments.

After you file a claim, check the website for this case about the status of court approval and when payment mailings are expected. Or contact the class administrator by calling: [#] or [via the website].

## Where can I learn more?

*Roy v. County of Los Angeles* (v. 5)


For more details, go to the website titled www._____.com. The website has
links to the complete settlement documents in this case, as well as the motion for
attorneys' fees.  If you still have questions, you may call **[phone # for claims
administrator].**

*Roy v. County of Los Angeles* (v. 6)

### *Roy v. County of Los Angeles* - CV 12-09012-AB
### (Class Action Lawsuit Against LASD)

## Class and Settlement Notice

*Roy v. County of Los Angeles* is a class action lawsuit against the Los Angeles Sheriff's Department (LASD) for jailing people on immigration detainers (aka "ICE holds"). In 2018, the federal court ruled that the LASD violated the United States constitution by jailing people solely on the basis of ICE holds.

The parties have now reached a settlement that provides for money compensation to class members. The settlement must still be approved by the judge.

You may be a class member entitled to **MONEY**, up to $1,000 per day, for each day you were held on the ICE hold after you were entitled to release on your criminal charges. Whether you are entitled to money depends on whether you had a removal order or pending removal proceedings at the time your detainer was issued. (Specifically, if you had pending removal proceedings or a removal order at the time the detainer was issued, you are not entitled to money under the settlement.) To receive money, you must make a claim no later than August 9, 2021. You can make a claim by mailing back a copy of the claim form, submitting it online at [url], or emailing it to [email address].

## What is this lawsuit about?

The lawsuit challenges three things:

> (1) Detaining people whose bail was less than $25,000 and who would not have been booked into jail in the first place, if not for their ICE hold. (October 2010 – June 2014).

> (2) Detaining people after their criminal case finished, where their detainer was not supported by a removal order or ongoing removal proceedings. (October 2010 – June 2014)

> (3) Refusing to accept bail for people with ICE holds (October 2010 - October 2012).

The court has certified this case a group action (called a "class action"). You do not need to do anything else to become part of the lawsuit.

## Why did I receive this notice?

You are receiving this notice because LASD records show that you were jailed after you were entitled to release on criminal charges. You ***may*** be entitled to

*Roy v. County of Los Angeles* (v. 6)

compensation for each day you were held after your criminal charges resolved (e.g. after a court ordered you released or after you served your sentence). As explained above, whether you are entitled to money depends on whether you had a removal order or pending removal proceedings at the time your detainer was issued. If you make a claim, LASD will provide the information necessary to confirm your eligibility.

To receive money, you must make a claim by August 9, 2021.

<u>What do I need to do to make a claim?</u>

There are three ways to file a claim:

(1)     Go to [website]
(2)     Email a copy of the enclosed claim form [email]
(3)     Mail a copy of the enclosed claim form [address]

If you have questions, email or call 1-_____.

<u>How much money will I receive?</u>

The amount that will be paid to each person depends on how many class members make claims. Each class member who submits a claim will receive a share of the settlement based on the total number of days they were detained solely on an immigration detainer. Each qualifying class member will receive up to $1,000 *per day* of jail on an immigration detainer, up to a maximum of $25,000.

Class members who were not permitted to post bail will also receive $250 for violation of their right to post bail. (This does not apply to you).

<u>If you don't file a claim on time, you will get no money. It is divided only among those who file on time.</u>

<u>How do I know my information will be kept confidential?</u>

**The parties in this case agree to keep confidential all information you submit in connection with the settlement. We will not tell ICE that you submitted a claim. Your contact information and family members' contact information will not be disclosed to anyone.**

<u>How much money will the LASD pay for the total settlement?</u>

LASD will pay a total of $14 million dollars. Here's how the money will be divided:

*Roy v. County of Los Angeles* (v. 6)

    a. Depending on how many people make claims, and certain decisions by the court, up to $8.7 million will be divided among class members. Each qualifying class member who would not have been booked into the Jail absent an ICE hold, or would have been released when their criminal case ended absent an ICE hold, will receive up to $1,000 per day, for each day they should not have been detained. In addition, class members who were not permitted to post bail will receive $250 for violation of their right to post bail. The amount that will be paid to each person depends on how many class members make claims. The maximum per claimant is $25,000.

    b. The federal district court will decide on a reasonable fee for the attorneys who handled the case. The attorneys' fees will not exceed 33% of the total fund, plus case expenses. The Court may pay the attorneys less than 33% but not more.

    c. Payment of $10,000 to each of the 2 class representatives for their role in starting and supporting the case.

    d. Additional payments to a court appointed class administrator to notify the class and distribute the money.

### Who are the lawyers handling the case?

There is a team of attorneys who have been fighting this case for people who were unconstitutionally detained. This team includes attorneys at the American Civil Liberties Union of Southern California (ACLU SoCal), the National Day Laborer Organizing Network (NDLON), the National Immigrant Justice Center (NIJC) and the law firm Kaye, McLane, Bednarski & Litt.

### How much money will the lawyers be paid?

The court will decide how much the lawyers will be paid. They lawyers may ask the Court for a fee of up to 33% (one third) of the total available class fund (one third of 14 million), plus case expenses.  The Court can award less than that, but not more. You will not personally pay any attorneys' fees that the court awards to the attorneys.

### If I do not like the settlement, what do I do?

You can object to the settlement or exclude yourself completely. Objecting is telling the Court that you do not like something about the settlement, but you are staying in the case.  Excluding yourself or "opting out" is telling the Court that you

*Roy v. County of Los Angeles* (v. 6)

do not want to be part of the case.  If you exclude yourself, you cannot object
because you are no longer part of the case, and the settlement doesn't affect you.

<h2 align="center"><u>How do I object?</u></h2>

You can remain a class member and object to any part of the settlement . If you
object, you must tell the court specifically what you think is unfair about the
settlement or request for fees.

To do this, mail a written statement explaining the reason why you object. Include
your name, address, telephone number. At the top of the page, write the case name
and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not
forget to sign the statement. (If you previously used a different name, include any
names you have used.)

Your objections must be mailed and postmarked no later than August 9, 2021.
Send your objection to all of the people in the chart below.

| Barrett Litt | Andy Baum | *Settlement Administrator -* |
|---|---|---|
| Lindsay Battles | Glaser Weil | *Roy v. County of Los* |
| Kaye, McLane, Bednarksi & Litt | 10250 Constellation | *Angeles* |
| 975 E. Green St. | Blvd. | |
| Pasadena, CA 91106 | 19th Floor | [Fill in address] |
| | Los Angeles, CA 90067 | |

The Court will consider your objection and decide whether to overrule it or change
the settlement agreement. Either way, you remain a member of the class and will
be bound by the settlement agreement and will get your share of the settlement.
(This means you're giving up claims against the LASD for violations covered by
this case.)

If you wish to appear at the hearing and argue your objection, tell the court you
wish to do so.

<h2 align="center"><u>Can I exclude myself from the settlement?</u></h2>

If you want to remove yourself from the lawsuit entirely, or if you want to be able
to file your own lawsuit, or be part of a different lawsuit, then you must take steps
to exclude yourself.  This is sometimes referred to as "opting out" of the class.

To do this, mail a written statement that you wish to exclude yourself or similar
words. Include your name, address, and telephone number. You do not need to
explain why you wish to be excluded. At the top of the page, write the case name
and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not

*Roy v. County of Los Angeles* (v. 6)

forget to sign the statement. (As noted above, by excluding yourself, you are no longer a class member and do not have the right to object to the settlement.)

You must mail your Exclusion Request, postmarked no later than August 9, 2021 to:

*Roy v. County of Los Angeles* Settlement Administrator

## What if I do nothing?

If you do not file a claim, you will receive no money from the settlement, **and** you will be giving up your rights against the LASD. **Be sure to file a claim form unless you exclude yourself.**

## Am I giving up any rights?

People who submit claims, object, or do nothing, give up their right to sue the LASD (or its employees) for claims covered by this case. This means that you will not be able to sue the LASD for detaining you based solely on an ICE hold between October 19, 2012 and June 1, 2014, nor will you be able to sue because you were unable to post bail as a result of an ICE hold. You are not giving up claims against the LASD unrelated to this case.

People who exclude themselves ("opt out") do *not* give up claims because they are no longer part of the case.

## How long will this process take?

The last day to submit a claim is August 9, 2021. If you do not submit a claim by then, you get no money. So, file early.

The court has scheduled a hearing for September 3, 2021 to decide whether to approve the settlement. After final court approval, it will take at least two to three months, and possibly more, to process claims, calculate the amount due to each class member, and begin payments.

After you file a claim, check the website for this case about the status of court approval and when payment mailings are expected. Or contact the class administrator by calling: [#] or [via the website].

## Where can I learn more?

*Roy v. County of Los Angeles* (v. 6)

For more details, go to the website titled www._____.com. The website has
links to the complete settlement documents in this case, as well as the motion for
attorneys' fees.  If you still have questions, you may call **[phone # for claims
administrator].**

*Roy v. County of Los Angeles* (v. 7)

## *Roy v. County of Los Angeles* - CV 12-09012-AB
### (Class Action Lawsuit Against LASD)

### Class and Settlement Notice

*Roy v. County of Los Angeles* is a class action lawsuit against the Los Angeles Sheriff's Department (LASD) for jailing people on immigration detainers (aka "ICE holds"). In 2018, the federal court ruled that the LASD violated the United States constitution by jailing people solely on the basis of ICE holds.

The parties have now reached a settlement that provides for money compensation to class members. The settlement must still be approved by the judge.

You are a class member and may be entitled to **MONEY**, including $250.00 if you were unable to post bail.

In addition, you may be entitled to as much as $1,000 per day, for each day you were held on the ICE hold after you were entitled to release on your criminal charges. Whether you are entitled to money depends on whether you had a removal order or pending removal proceedings at the time your detainer was issued. (Specifically, if you had pending removal proceedings or a removal order at the time the detainer was issued, you are not entitled to money under the settlement.)

To receive money, you must make a claim no later than August 9, 2021. You can make a claim by mailing back a copy of the claim form, submitting it online at [url], or emailing it to [email address].

### What is this lawsuit about?

The lawsuit challenges three things:

> (1) Detaining people whose bail was less than $25,000 and who would not have been booked into jail in the first place, if not for their ICE hold. (October 2010 – June 2014).

> (2) Detaining people after their criminal case finished, where their detainer was not supported by a removal order or ongoing removal proceedings. (October 2010 – June 2014)

> (3) Refusing to accept bail for people with ICE holds (October 2010 - October 2012).

The court has certified this case a group action (called a "class action"). You do not need to do anything else to become part of the lawsuit.

### Why did I receive this notice?

*Roy v. County of Los Angeles* (v. 7)

You are receiving this notice because LASD records show that you were jailed after you were entitled to release on your criminal charges. LASD records also show that you were entitled to post bail but nonetheless had a "No Bail" notation on your LASD records due to your ICE hold.

Under the settlement, you ***may*** be entitled to compensation for each day you were held after your criminal charges resolved (e.g. after a court ordered you released or after you served your sentence). As explained above, whether you are entitled to money depends on whether you had a removal order or pending removal proceedings at the time your detainer was issued. If you make a claim, LASD will provide the information necessary to confirm your eligibility.

You may also be entitled to $250 if you can say, under penalty of perjury, that you had access to $2,500 and would have posted bail had you been permitted to do so.

To receive money, you must make a claim by August 9, 2021.

<u>What do I need to do to make a claim?</u>

There are three ways to file a claim:

  (1)    Go to [website]
  (2)    Email a copy of the enclosed claim form [email]
  (3)    Mail a copy of the enclosed claim form [address]

If you have questions, email or call 1-_____.

<u>How much money will I receive?</u>

The amount that will be paid to each person depends on how many class members make claims. Class members who were not permitted to post bail will also receive $250 for violation of their right to post bail.

The amount that will be paid to each person who would not have been booked into jail absent an ICE hold, or would have been released when their criminal case ended absent an ICE hold, depends on how many class members make claims. Each qualifying class member who submits a claim will receive a share of the settlement based on the total number of days they were detained solely on an immigration detainer. Each qualifying class member will receive up to $1,000 *per day* of jail on an immigration detainer, up to a maximum of $25,000.

<u>If you don't file a claim on time, you will get no money. It is divided only among those who file on time.</u>

<u>How do I know my information will be kept confidential?</u>

*Roy v. County of Los Angeles* (v. 7)

**The parties in this case agree to keep confidential all information you submit in connection with the settlement. We will not tell ICE that you submitted a claim. Your contact information and family members' contact information will not be disclosed to anyone.**

### How much money will the LASD pay for the total settlement?

LASD will pay a total of $14 million dollars. Here's how the money will be divided:

    a. Depending on how many people make claims, and certain decisions by the court, up to $8.7 million will be divided among class members. Each qualifying class member who would not have been booked into the Jail absent an ICE hold, or would have been released when their criminal case ended absent an ICE hold, will receive up to $1,000 per day, for each day they should not have been detained. In addition, class members who were not permitted to post bail will also receive $250 for violation of their right to post bail. The amount that will be paid to each person depends on how many class members make claims. The maximum per claimant is $25,000.

    b. The federal district court will decide on a reasonable fee for the attorneys who handled the case. The attorneys' fees will not exceed 33% of the total fund, plus case expenses. The Court may pay the attorneys less than 33% but not more.

    c. Payment of $10,000 to each of the 2 class representatives for their role in starting and supporting the case.

    d. Additional payments to a court appointed class administrator to notify the class and distribute the money.

### Who are the lawyers handling the case?

There is a team of attorneys who have been fighting this case for people who were unconstitutionally detained. This team includes attorneys at the American Civil Liberties Union of Southern California (ACLU SoCal), the National Day Laborer Organizing Network (NDLON), the National Immigrant Justice Center (NIJC) and the law firm Kaye, McLane, Bednarski & Litt.

### How much money will the lawyers be paid?

*Roy v. County of Los Angeles* (v. 7)

The court will decide how much the lawyers will be paid. They lawyers may ask the Court for a fee of up to 33% (one third) of the total available class fund (one third of 14 million), plus case expenses. The Court can award less than that, but not more. You will not personally pay any attorneys' fees that the court awards to the attorneys.

### If I do not like the settlement, what do I do?

You can object to the settlement or exclude yourself completely. Objecting is telling the Court that you do not like something about the settlement, but you are staying in the case. Excluding yourself or "opting out" is telling the Court that you do not want to be part of the case. If you exclude yourself, you cannot object because you are no longer part of the case, and the settlement doesn't affect you.

### How do I object?

You can remain a class member and object to any part of the settlement . If you object, you must tell the court specifically what you think is unfair about the settlement or request for fees.

To do this, mail a written statement explaining the reason why you object. Include your name, address, telephone number. At the top of the page, write the case name and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not forget to sign the statement. (If you previously used a different name, include any names you have used.)

Your objections must be mailed and postmarked no later than August 9, 2021. Send your objection to all of the people in the chart below.

| Barrett Litt<br>Lindsay Battles<br>Kaye, McLane, Bednarksi & Litt<br>975 E. Green St.<br>Pasadena, CA 91106 | Andy Baum<br>Glaser Weil<br>10250 Constellation Blvd.<br>19th Floor<br>Los Angeles, CA 90067 | *Settlement Administrator - Roy v. County of Los Angeles*<br><br>[Fill in address] |

The Court will consider your objection and decide whether to overrule it or change the settlement agreement. Either way, you remain a member of the class and will be bound by the settlement agreement and will get your share of the settlement. (This means you're giving up claims against the LASD for violations covered by this case.)

If you wish to appear at the hearing and argue your objection, tell the court you wish to do so.

*Roy v. County of Los Angeles* (v. 7)

## Can I exclude myself from the settlement?

If you want to remove yourself from the lawsuit entirely, or if you want to be able to file your own lawsuit, or be part of a different lawsuit, then you must take steps to exclude yourself. This is sometimes referred to as "opting out" of the class.

To do this, mail a written statement that you wish to exclude yourself or similar words. Include your name, address, and telephone number. You do not need to explain why you wish to be excluded. At the top of the page, write the case name and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not forget to sign the statement. (As noted above, by excluding yourself, you are no longer a class member and do not have the right to object to the settlement.)

You must mail your Exclusion Request, postmarked no later than August 9, 2021 to:

*Roy v. County of Los Angeles* Settlement Administrator

## What if I do nothing?

If you do not file a claim, you will receive no money from the settlement, **and** you will be giving up your rights against the LASD. **Be sure to file a claim form unless you exclude yourself.**

## Am I giving up any rights?

People who submit claims, object, or do nothing, give up their right to sue the LASD (or its employees) for claims covered by this case. This means that you will not be able to sue the LASD for detaining you based solely on an ICE hold between October 19, 2012 and June 1, 2014, nor will you be able to sue because you were unable to post bail as a result of an ICE hold. You are not giving up claims against the LASD unrelated to this case.

People who exclude themselves ("opt out") do *not* give up claims because they are no longer part of the case.

## How long will this process take?

The last day to submit a claim is August 9, 2021. If you do not submit a claim by then, you get no money. So, file early.

The court has scheduled a hearing for September 3, 2021 to decide whether to approve the settlement. After final court approval, it will take at least two to three

*Roy v. County of Los Angeles* (v. 7)

months, and possibly more, to process claims, calculate the amount due to each
class member, and begin payments.

After you file a claim, check the website for this case about the status of court
approval and when payment mailings are expected. Or contact the class
administrator by calling: [#] or [via the website].

### Where can I learn more?

For more details, go to the website titled www._____.com. The website has
links to the complete settlement documents in this case, as well as the motion for
attorneys' fees.  If you still have questions, you may call **[phone # for claims
administrator].**

*Roy v. County of Los Angeles* (v. 8)

### *Roy v. County of Los Angeles* - CV 12-09012-AB
### (Class Action Lawsuit Against LASD)

### Class and Settlement Notice

*Roy v. County of Los Angeles* is a class action lawsuit against the Los Angeles
Sheriff's Department (LASD) for jailing people on immigration detainers (aka
"ICE holds"). In 2018, the federal court ruled that the LASD violated the United
States constitution by jailing people solely on the basis of ICE holds.

The parties have now reached a settlement that provides for money compensation
to class members. The settlement must still be approved by the judge.

You are a class member and may be entitled to **MONEY** if you were unable to
post bail. You are entitled to $250 if you can say, under penalty of perjury, that you
had access to $2,500 and would have posted bail had you been permitted to do so.

To receive money, you must make a claim no later than August 9, 2021. You can
make a claim by mailing back a copy of the claim form, submitting it online at
[url], or emailing it to [email address].

### What is this lawsuit about?

The lawsuit challenges three things:

> (1) Detaining people whose bail was less than $25,000 and who would not
> have been booked into jail in the first place, if not for their ICE hold.
> (October 2010 – June 2014).

> (2) Detaining people after their criminal case finished, where their detainer
> was not supported by a removal order or ongoing removal proceedings.
> (October 2010 – June 2014)

> (3) Refusing to accept bail for people with ICE holds (October 2010 -
> October 2012).

The court has certified this case a group action (called a "class action"). You do
not need to do anything else to become part of the lawsuit.

### Why did I receive this notice?

You are receiving this notice because LASD records show that you were entitled to
post bail but nonetheless had a "No Bail" notation in your LASD records due to
your ICE hold.

*Roy v. County of Los Angeles* (v. 8)

Under the settlement, you are entitled to $250 if you can say, under penalty of
perjury, that you had access to $2,500 and would have posted bail had you been
permitted to do so.

To receive money, you must make a claim by August 9, 2021.

## What do I need to do to make a claim?

There are three ways to file a claim:

(1)   Go to [website]
(2)   Email a copy of the enclosed claim form [email]
(3)   Mail a copy of the enclosed claim form [address]

If you have questions, email or call 1-_____.

## How much money will I receive?

Class members who were not permitted to post bail will receive $250 for violation
of their right to post bail if they qualify and file the proper sworn statement. LASD
records show you as such a person.

The amount that will be paid to each person who would not have been booked into
jail absent an ICE hold, or would have been released when their criminal case
ended absent an ICE hold, depends on how many class members make claims.
Each qualifying class member who submits a claim will receive a share of the
settlement based on the total number of days they were detained solely on an
immigration detainer. Each qualifying class member will receive up to $1,000 *per
day* of jail on an immigration detainer, up to a maximum of $25,000.

If you don't file a claim on time, you will get no money. It is divided only among
those who file on time.

## How do I know my information will be kept confidential?

**The parties in this case agree to keep confidential all information you submit
in connection with the settlement. We will not tell ICE that you submitted a
claim. Your contact information and family members' contact information
will not be disclosed to anyone.**

## How much money will the LASD pay for the total settlement?

LASD will pay a total of $14 million dollars. Here's how the money will be
divided:

*Roy v. County of Los Angeles* (v. 8)

    a. Depending on how many people make claims, and certain decisions by
the court, up to $8.7 million will be divided among class members. Each
qualifying class member who would not have been booked into the Jail
absent an ICE hold, or would have been released when their criminal
case ended absent an ICE hold, will receive up to $1,000 per day, for
each day they should not have been detained. The amount that will be
paid to each person depends on how many class members make claims.
The maximum per claimant is $25,000. In addition, certain class
members who were not permitted to post bail and who are able to provide
the appropriate sworn statement will receive $250 for violation of their
right to post bail.

    b. The federal district court will decide on a reasonable fee for the attorneys
who handled the case. The attorneys' fees will not exceed 33% of the
total fund, plus case expenses. The Court may pay the attorneys less than
33% but not more.

    c. Payment of $10,000 to each of the 2 class representatives for their role in
starting and supporting the case.

    d. Additional payments to a court appointed class administrator to notify the
class and distribute the money.

### Who are the lawyers handling the case?

There is a team of attorneys who have been fighting this case for people who were
unconstitutionally detained. This team includes attorneys at the American Civil
Liberties Union of Southern California (ACLU SoCal), the National Day Laborer
Organizing Network (NDLON), the National Immigrant Justice Center (NIJC) and
the law firm Kaye, McLane, Bednarski & Litt.

### How much money will the lawyers be paid?

The court will decide how much the lawyers will be paid. They lawyers may ask
the Court for a fee of up to 33% (one third) of the total available class fund (one
third of 14 million), plus case expenses.  The Court can award less than that, but
not more. You will not personally pay any attorneys' fees that the court awards to
the attorneys.

### If I do not like the settlement, what do I do?

You can object to the settlement or exclude yourself completely. Objecting is
telling the Court that you do not like something about the settlement, but you are

*Roy v. County of Los Angeles* (v. 8)

staying in the case.  Excluding yourself or "opting out" is telling the Court that you
do not want to be part of the case.  If you exclude yourself, you cannot object
because you are no longer part of the case, and the settlement doesn't affect you.

### How do I object?

You can remain a class member and object to any part of the settlement . If you
object, you must tell the court specifically what you think is unfair about the
settlement or request for fees.

To do this, mail a written statement explaining the reason why you object. Include
your name, address, telephone number. At the top of the page, write the case name
and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not
forget to sign the statement. (If you previously used a different name, include any
names you have used.)

Your objections must be mailed and postmarked no later than August 9, 2021.
Send your objection to all of the people in the chart below.

| | | |
|---|---|---|
| Barrett Litt<br>Lindsay Battles<br>Kaye, McLane, Bednarksi & Litt<br>975 E. Green St.<br>Pasadena, CA 91106 | Andy Baum<br>Glaser Weil<br>10250 Constellation Blvd.<br>19th Floor<br>Los Angeles, CA 90067 | *Settlement Administrator - Roy v. County of Los Angeles*<br><br>[Fill in address] |

The Court will consider your objection and decide whether to overrule it or change
the settlement agreement. Either way, you remain a member of the class and will
be bound by the settlement agreement and will get your share of the settlement.
(This means you're giving up claims against the LASD for violations covered by
this case.)

If you wish to appear at the hearing and argue your objection, tell the court you
wish to do so.

### Can I exclude myself from the settlement?

If you want to remove yourself from the lawsuit entirely, or if you want to be able
to file your own lawsuit, or be part of a different lawsuit, then you must take steps
to exclude yourself.  This is sometimes referred to as "opting out" of the class.

To do this, mail a written statement that you wish to exclude yourself or similar
words. Include your name, address, and telephone number. You do not need to
explain why you wish to be excluded. At the top of the page, write the case name
and number (*Roy v. County of Los Angeles*, Case No. CV 12-09012-AB). Do not

*Roy v. County of Los Angeles* (v. 8)

forget to sign the statement. (As noted above, by excluding yourself, you are no longer a class member and do not have the right to object to the settlement.)

You must mail your Exclusion Request, postmarked no later than August 9, 2021 to:

*Roy v. County of Los Angeles* Settlement Administrator

## What if I do nothing?

If you do not file a claim, you will receive no money from the settlement, **and** you will be giving up your rights against the LASD. **Be sure to file a claim form unless you exclude yourself.**

## Am I giving up any rights?

People who submit claims, object, or do nothing, give up their right to sue the LASD (or its employees) for claims covered by this case. This means that you will not be able to sue the LASD for detaining you based solely on an ICE hold between October 19, 2012 and June 1, 2014, nor will you be able to sue because you were unable to post bail as a result of an ICE hold. You are not giving up claims against the LASD unrelated to this case.

People who exclude themselves ("opt out") do *not* give up claims because they are no longer part of the case.

## How long will this process take?

The last day to submit a claim is August 9, 2021. If you do not submit a claim by then, you get no money. So, file early.

The court has scheduled a hearing for September 3, 2021 to decide whether to approve the settlement. After final court approval, it will take at least two to three months, and possibly more, to process claims, calculate the amount due to each class member, and begin payments.

After you file a claim, check the website for this case about the status of court approval and when payment mailings are expected. Or contact the class administrator by calling: [#] or [via the website].

## Where can I learn more?

*Roy v. County of Los Angeles* (v. 8)


For more details, go to the website titled www._____.com. The website has links to the complete settlement documents in this case, as well as the motion for attorneys' fees.  If you still have questions, you may call **[phone # for claims administrator].**

# EXHIBIT C

Roy v. County of Los Angeles
c/o Heffler Claims Group
P.O. Box XXXX
ADDRESS

# CLASS ACTION CLAIM FORM

In order to receive money from the Settlement, please complete and return this Claim Form to the Settlement Administrator at the above address (postmarked by **DATE**).  **DO NOT DELAY**.

|||||||||||||||||||||||||||||||||||  Claim #:
First Last (pre-print)
c/o (pre-print)
Address (pre-print)
City, ST Zip (pre-print)

Name/Address Changes (if any)

_____   _____
First Name          Last Name

_____
Address

Email address: _____

_____, _____ _____
City                                    State       Zip

Mobile Phone Number                     Alternate Phone (if any)

(_____) _____      (_____) _____
Area Code                               Area Code

Date of Birth: _____ / _____ / _____
                  Month    Day      Year

Last 4 Digits of Social Security Number (if applicable): ____ ____ ____ ____

Other Names I Have Used: _____

**By signing this form, I am confirming under penalty of perjury:**

1. I am the person identified above.
2. I understand I will be limited to the formula for damages approved by the Court and that determinations of the number of days for which I am entitled to compensation, if any, will be based exclusively on the records of the Los Angeles Sheriff's Department (the "LASD").

**Date:** _____   **Signature:** _____
       (mm/dd/yyyy)

**You must keep the Settlement Administrator apprised of your contact information at all times**. If you move, please immediately update the settlement administrator by mail at the address above or by e-mail at EMAIL.

Questions? Visit URL or call toll-free at PHONE.

Version 2

Roy v. County of Los Angeles
c/o Heffler Claims Group
P.O. Box XXXX
ADDRESS

## CLASS ACTION CLAIM FORM

In order to receive money from the Settlement, please complete and return this Claim Form to the Settlement Administrator at the above address (postmarked by **DATE**).  **DO NOT DELAY**.

|||||||||||||||||||||||||||| Claim #:
First Last (pre-print)
c/o (pre-print)
Address (pre-print)
City, ST Zip (pre-print)

Name/Address Changes (if any)

_____    _____
First Name              Last Name

_____
Address

Email address: _____

_____, _____  _____
City                                        State      Zip

Mobile Phone Number

(_____) _____
Area Code

Alternate Phone (if any)

(_____) _____
Area Code

Date of Birth: _____ / _____ / _____
                     Month      Day       Year

Last 4 Digits of Social Security Number (if applicable): ____ ____ ____ ____

Other Names I Have Used: _____

**By signing this form, I am confirming under penalty of perjury:**

1. I am the person identified above.
2. I understand I will be limited to the formula for damages approved by the Court and that determinations of the number of days for which I am entitled to compensation, if any, will be based exclusively on the records of the Los Angeles Sheriff's Department (the "LASD").
3. **At the time of my incarceration I (1) had access to at least $2,500 that could have been used to post bail; and (2) had it not been for my immigration hold, I would have posted bail to be released from jail**.

**Date:** _____     **Signature:** _____
      (mm/dd/yyyy)

**You must keep the Settlement Administrator apprised of your contact information at all times**. If you move, please immediately update the settlement administrator by mail at the address above or by e-mail at EMAIL.

# EXHIBIT D



**HEFFLER CLAIMS**
Group

**FEES & COSTS PROPOSAL**

**Case Name:** Roy v County of Los Angeles                    **Case type:** Civil Rights
**Date:** October 29, 2020
**Firm Submitted to :** Kaye, McLane, Bednarski & Litt, LLP
**Firm Contact :** Lindsay Battles, Esq.
**Submitted by:** Mark Rapazzini, Esq.                    **Phone:** 408-656-0808
**Email:** mrapazzini@hefflerclaims.com
**Submitted by:** Jeanne Finegan, APR                    **Phone:** 503-579-0746
**Email:** jfinegan@hfmediallc.com

| | | VOLUME | | RATE ($) | TOTAL ($) |
|---|---|---|---|---|---|
| **I.** | **Case Setup** | | | | |
| | Skip-Trace the entire class list using TransUnion prior to mailing Notice Packages (mail and email addresses, phone #s) | 21,342 | Number of Records | 0.50 | 10,671.00 |
| **II.** | **Notification/Correspondence Fees & Costs** | | | | |
| | **(1) Printing and Mailing Notice (See Term 2)** | | | | |
| | Set up, format and proof 8 different 5 page notices & claim forms & opt-out form | 20 | Hourly | 125 00 | 2,500.00 |
| | Submit file to NCOA -set up fee (Standardize address formats for postal discounts) | 1 | One-Time | 250.00 | 250.00 |
| | Prin8t, address and deliver to Post Office 8 Notices & Claim Forms & Opt-Out Forms- (Number of Pages 10 per notice package, 5 pages in English and 5 in Spanish) - initally to 21,342 class members, then to 2 Known Acquanintences per | 55,000 | Notices | 0.58 | 31,900 00 |
| | Postage for notice mailing in the US | 40,000 | Notices | 0.42 | 16,800.00 |
| | Postage for notice mailing internationally | 15,000 | Notices | 1.20 | 18,000.00 |
| | **(2) Processing Undeliverable Notices** | | | | |
| | Process Notices returned as undeliverable - Assuming 33% undeliverable of initial mailing | 18,150 | Notices | 0.25 | 4,537.50 |
| | Skip-tracing - Lexis Nexis | 18,150 | Traces | 0.50 | 9,075.00 |
| | Re-mail a returned Notice to a new address (includes data entry, excludes postage) | 10,000 | Notices | 1.00 | 10,000.00 |
| | Postage for remailing returned Notice to new address | 10,000 | Notices | 0.42 | 4,200.00 |
| | **(3) Email Blast - Notification** | | | | |
| | Generate the list of applicable email addresses - 5 different lists | 5 | One-Time Fee | 200 00 | 1,000.00 |
| | Release initial email blast | 1 | Per Blast | 250 00 | 250 00 |
| | Release reminder email blasts (4 times) | 4 | Per Blast | 250 00 | 1,000.00 |
| | Skip-Tracing for emails | | Per bounced email | | - |
| | **(4) Text Blast - Notification** | | | | |
| | Generate the list of applicable cell phone numbers | 5 | One-Time Fee | 500 00 | 2,500.00 |
| | Release text blast | 1 | Per Blast | 1,500 00 | 1,500 00 |
| | Release reminder text blasts (5 times) | 4 | Per Blast | 1,500 00 | 6,000 00 |
| **III.** | **Creation and maintenance of a website (English and Spanish)** | | | | |
| | Set-up website with online Claim Filing capability | 1 | One-Time Fee | 7,000 00 | 7,000.00 |
| | Monthly maintenance, including hosting (per month) | 12 | Months | 150 00 | 1,800.00 |
| | Modifications to post-production website | 1 | Hourly | 150 00 | 150 00 |
| **IV.** | **Call Center (See Term 6)** | | | | |
| | Set-up and training - English and Spanish Speaking Operators | 1 | One-Time Fee | 750 00 | 750 00 |
| | Live Operator - Operator Minutes - assumes 2% of class call and predominantly Spanish speaking class callers | 2,134 | Per Minute | 1.25 | 2,667.50 |
| **V.** | **Media Campaign** | | | | |
| | Standard Size publications: (See Term 4) | | | | |
| | See HF Media's Separate Proposal | 1 | One-Time | 159,577.00 | 159,577.00 |
| **VI.** | **Process Claim Forms, Deficiencies and Rejections** | | | | |
| | Hard Copy Opt In or Claim Forms - includes mail pick up, sorting & entering in system **(from assumptions below)** | 860 | Claims | 3.50 | 3,010.00 |
| | Online Opt In or Claim Forms **(from assumptions below)** | 1,274 | Claims | 0.50 | 637 00 |
| **VII.** | **Dispute Resolutions / Validation of Claims** | | | | |
| | Review of Claims Filed - Blended rate | 25 | Hours | 100 00 | 2,500.00 |
| | Validation of Information on Submitted Claims to database - Blended rate | 20 | Hours | 75 00 | 1,500.00 |



## HEFFLER Claims Group

**FEES & COSTS PROPOSAL**

| | | |
|---|---|---|
| **Case Name:** Roy v County of Los Angeles | | **Case type:** Civil Rights |
| **Date:** October 29, 2020 | | |
| **Firm Submitted to:** Kaye, McLane, Bednarski & Litt, LLP | | |
| **Firm Contact:** Lindsay Battles, Esq. | | |
| **Submitted by:** Mark Rapazzini, Esq. | | **Phone:** 408-656-0808 |
| **Email:** mrapazzini@hefflerclaims.com | | |
| **Submitted by:** Jeanne Finegan, APR | | **Phone:** 503-579-0746 |
| **Email:** jfinegan@hfmediallc.com | | |

### VIII. Distribution Services (See Term 9)

| | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Generate distribution list | 1 | One-Time 750 00 | 750 00 |
| Processing and printing distribution checks to class members - conventional checks | 2,400 | Per Check 0.50 | 1,200.00 |
| Postage for mailing checks - conventional checks | 2,400 | Per Check 0.50 | 1,200.00 |
| Process checks returned as undeliverable (includes data entry) | 24 | Per Check 2.50 | 60 00 |
| All work on reissuance of checks | 8 | Hourly 85 00 | 680 00 |
| Reminder letters/calls to claimants with uncashed checks | 200 | Per Letter 2.50 | 500 00 |
| Postage for correspondence and reminder letters | 200 | Per Check 0.50 | 100 00 |
| Print and Mail Reissues - conventional checks | 24 | Per Check 2.50 | 60 00 |
| Postage for mailing reissued checks - conventional checks | 24 | Per Check 0.50 | 12 00 |

**TAX REPORTING**

| | | | |
|---|---|---|---|
| Recording and reconciling SFA activity during the year | 15 | Hourly 100 00 | 1,500.00 |
| Preparation of Qualified Settlement Fund Annual Federal Form 1120-SF (See Term 7) | 2 | Years 1,500.00 | 3,000 00 |

### IX. Fees

| | | | |
|---|---|---|---|
| Partner | 4 | Hours 230 00 | 920 00 |
| Project Management (includes managers and domain leaders) - blended rates | 140 | Hours 150 00 | 21,000.00 |
| Staff - blended rates | 100 | Hours 85 00 | 8,500.00 |
| Clerical or Data Entry Time (includes time working on broker requests and responses) | 25 | Hours 65 00 | 1,625.00 |
| Technical Consulting - blended rates | 30 | Hours 150 00 | 4,500.00 |

### X. Mail Handling, Scanning & Data/Image Storing (See Term 5 below)

| | | | |
|---|---|---|---|
| Scanning set-up charges | 1 | One-Time Fee 50 00 | 50 00 |
| Scanning/images of Documents (Mail list, claims, correspondence , returns - include all pages and envelopes) | 8,250 | per scan 0.15 | 1,237 50 |
| Data/Image Storage including electronic claims received | 12 | per month 10 00 | 120 00 |

### XI. Out-of-Pocket Costs

| | | | |
|---|---|---|---|
| Cost estimates | | estimated [3,10] | 3,000 |

**ESTIMATED FEES & COSTS**    349,790

**KEY ASSUMPTIONS USED TO PREPARE THIS PROPOSAL - 10% CLAIMS RATE - 60% ELECTRONIC & 40% PAPER**

| | |
|---|---|
| Class Size | 21,342 |
| Estimated Number of Notice/Claim Form Packages Mailed to Class | 55,000 |
| Estimated Number of Notices emailed to Class | |
| Estimated Claim/Opt In Forms Filed Manually | 860 |
| Estimated Claim/Opt In Forms Filed Electronically | 1,274 |

Communication to Claimants

| |
|---|
| Mailed Forms/Notice packages requested |

Call Center
    Number of Calls in IVR System



## HEFFLER CLAIMS Group

**FEES & COSTS PROPOSAL**

| | |
|---|---|
| **Case Name:** Roy v County of Los Angeles | **Case type:** Civil Rights |
| **Date:** October 29, 2020 | |
| **Firm Submitted to :** Kaye, McLane, Bednarski & Litt, LLP | |
| **Firm Contact :** Lindsay Battles, Esq. | |
| **Submitted by:** Mark Rapazzini, Esq. | **Phone:** 408-656-0808 |
| **Email:** mrapazzini@hefflerclaims.com | |
| **Submitted by:** Jeanne Finegan, APR | **Phone:** 503-579-0746 |
| **Email:** jfinegan@hfmediallc.com | |

| | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| # of class members | | | |
| minutes per call | | | |
| Total minutes | 0 | | |

| Number of Calls to Operator | | | |
|---|---|---|---|
| % of class members | 2 00% | | |
| minutes per call | 5 | | |
| Total Minutes | 2,134 | | |
| Total Hours | 36 | | |

**TERMS:**

1. The postage rates on this schedule are at either the full first-class rates or the estimated pre-sort discount first class rates. The actual pre-sort postage discounts received will be passed through and only the net postage amount billed to us will be charged to the case.

2. Notice printing costs is an estimate. The billed cost of printing the Notice will be based on the actual volumes, number of pages and other requirements specified.

3. Out of Pocket expenses include photocopies, document storage, PO Box rental, delivery charges, sales tax, etc. Any bank fees charged by the financial institution for the escrow account will also be included in this section (see term 10).

4. Published Summary Notice amounts are based on standard size ads, actual prices will be determined once the final Notice layout is determined.

5. **Our process is to scan and electronically preserve all undeliverable returned notices and checks. We would then shred and discard the paper versions. This process will be completed for all cases unless the Settlement Agreement or Approval Order requires these hard copy documents to be maintained and stored.**

6. Live operators will be charged based on the time they are available to accept calls based on a reasonably staffed basis during business hours. There will be a minimum monthly charge for the call center services.

7. Time spent on resolving any tax notices received would be charged at our normal hourly rates.

8. The claim form used will be in the format approved by the court. Any modification will be to format the document for printing purposes or for data capture purposes. Any modification will not alter the requirements of the claim form.

9. Post Distribution services are not included in this estimate, unless such specified services are priced, and expressly stated to be included. HCG's standard practice is to mail checks and remail any returned undeliverable checks where the Post Office has provided a forwarding address. Any services beyond HCG's standard practice are considered Post Distribution services and are billed at our hourly rates.

10. The financial institution will charge a fee for the services rendered in processing and clearing checks. This includes processing and disbursement services for all checks presented for payment, positive pay services, image availability, on-line account transaction and exception reporting, full reconciliation reports. **This amount is a pass-through cost and is not included in the total estimate above.**

11. Securities case - for any claims submitted with more than 25 transactions, each group of 25 transactions will be charged as a submitted claim.

**CONDITIONS:**
**The pricing in this proposal is valid for ninety days after submission to Counsel. HCG reserves the right to amend or withdraw the proposal at its discretion after the ninety days has passed.**

The information in the original database should be in proper condition to be used for its intended purpose. HCG will not be responsible for any errors due to modifications needed to the original database to put the information in the proper format. The proposed rates above anticipate that the mailing data is in a useable format. Any detailed work to generate a proper mailing list will be charged our standard billing rates per hour.

HCG requires that postage and any certain printing costs will be payable within 5 days prior to the scheduled mailing date unless other arrangements are agreed to prior to the commencement of the contract.



**Heffler Claims**
Group

**FEES & COSTS PROPOSAL**

**Case Name:** Roy v County of Los Angeles

**Case type: Civil Rights**

**Date:** October 29, 2020

**Firm Submitted to :** Kaye, McLane, Bednarski & Litt, LLP

**Firm Contact :** Lindsay Battles, Esq.

**Submitted by:** Mark Rapazzini, Esq.   **Phone:** 408-656-0808

**Email:** mrapazzini@hefflerclaims.com

**Submitted by:** Jeanne Finegan, APR   **Phone:** 503-579-0746

**Email:** jfinegan@hfmediallc.com

|  | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|

Acceptance of any proposal must be given in written format either by a signed engagement letter or other documented communication.

## Situation Analysis

This lawsuit alleges that the Los Angeles Sheriff's Department improperly held jailed inmates on immigration detainers after they became due for release.

## Approach

There are two of complexities in this case: 1) name, address, email, and phone records may be incomplete and unreliable; and 2) a percentage of the population may no longer reside in the Los Angeles area and are likely dispersed across the state or have been deported back to Mexico or other countries found in defendants' data.

In consideration of these complexities, page six of the Request for Proposal also instructs that most of the detainees were released into the Los Angeles community.  With these factors in mind, the proposed outreach effort will include a tiered[1] approach to notice, which will provide the heaviest media weight in the Los Angeles market and then extend the outreach throughout California, nationwide and in Mexico, and where data instructs, other Central American countries.  All outreach materials, commercials and advertisements will be in Spanish. We also intend to create a 'halo' effect to this outreach by utilizing influencers and trusted sources such as immigration and human rights advocates, religious leaders, Catholic Priests and social workers, among others to extend our messaging.  The Outreach efforts described below are estimated to reach at least 70% of all Hispanic/Spanish speaking adults in the Los Angeles DMA.

*Outreach Snapshot*

|  | Los Angeles | California | United States | Mexico+ |
|---|---|---|---|---|
| Local Spanish Television | X |  |  |  |
| Local Spanish Radio | X |  |  |  |
| Google Search | X | X |  | X |
| Social Media | X | X | X | X |
| Community Outreach | X | X |  | X |
| Press Release | X | X | X | X |

---

[1] A tiered approach to Notice has been approved by courts in other international notice programs including Air Cargo Shipping Services Antitrust Litigation, case number 1:06-md-01775-CBA-VVP, in the U.S. District E.D. New York; *Dover, et al. v. British Airways PLC*, Case No. 1:12-cv-05567, in the U.S. E.D. New York; *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 N.D. Ill. 2000; *In re Western Union Money Transfer Litig.*, No 01-335, 2004 WL 3709932, E.D. NY 2004; and *In Re Royal Ahold N. Sec & Erisa Litig.*, 437 F. Supp 2d 467, D. Md. 2006; among others.

# United States

## Los Angeles Broadcast

Approximately 400, :30-second **television** commercials will air in Spanish over two weeks across KMEX and KFTR.

To further support the effort, over 300, :60-second **radio** commercials will air on:

- KRCD-FM Spanish Adult Hits 103.9
- KTNQ-AM Spanish News/Talk 1020
- KSCA-FM Mexican Regional 101.9
- KMLA-FM Mexican Regional format
- Radio Indígena

The advertising schedules include commercials in popular programming such as Dr. César Lozano Show. Dr. César Lozano has a master's in Public Health and a subspecialty on Health in the Workplace. He is one of the most requested speakers in Mexico, the United States, Central and South America and is the host of "For the pleasure of living" an MVS Radio network broadcast across more than 50 stations in Mexico, Argentina and the United States.

Further, we plan to include Radio Indígena, a radio station for indigenous Mexican languages in the Oxnard-Ventura area.  According to our research, approximately one-third of Mexican and Central American immigrant workers in California speak indigenous languages, including Trique and Mixtec. This station provides programming for thousands of Mexican and Central American workers who speak Mixtec or other indigenous Central American languages.

Radio stations were carefully selected using media research from Arbitron and Scarborough ratings. These research sources identify stations that appeal to Hispanic adults, adults who prefer to speak Spanish and Hispanic adults with a lower household income.

## U.S. Facebook and Instagram

The proposed notice program will include the social media platforms Facebook and Instagram. Using defendant-provided data, we will create a custom list of **known class members** by matching Facebook and Instagram profiles using email addresses, phone numbers or physical addresses.

To expand this targeting to **qualified potential class members**, HF Media will target individuals in California with the names (only) of the class members. This use of class members' names will match Facebook users who have the same names as class members, thereby creating a custom audience of more qualified individuals.

Further, we plan to target followers of immigrant and migration resources, health and welfare services, public defenders in Los Angeles, immigration attorneys in Los Angeles, immigration resource groups, day labor groups and Catholic relief services.

## U.S. Community Based Outreach

Importantly, we recognize that trust in the message will be critically important to this notice program. We plan to extend outreach through associations that provide support or services to migrant and unauthorized immigrant populations.  To the extent possible, we will send an informational cover letter to the identified organizations asking for additional coverage. The cover letter will request that the

organizations distribute information about the Settlement and class member rights via their own email, web, newsletters, blogs and various other channels.  To that end, we plan to work with trusted community, religious and human rights organizations including Justice In Motion, over 60 Catholic churches in Los Angeles, the Catholic Charities of Los Angeles,  International Catholic Migration Commission, Border Angels, the Legal Aid Foundation of Los Angeles, Immigrant Fund of LA, Esperanza Immigrant Rights, numerous Day Labor Centers in LA, Latino Resources.org, Human Rights First Immigration LA, Coalition for Human Rights and the Mexican American Legal Defense, among others.

## U.S. Press Release

A press release will be issued in English and Spanish across the US1 plus National Hispanic newslines (includes distribution in California).  Further, we will encourage the Catholic News Agency to also disseminate our release to various parishes in the United States.

# Mexico

## Mexico Facebook and Instagram

To best utilize the media budget, we propose to heavily rely on the defendant-provided data to narrow and thoughtfully target potential class members through the social media channels Facebook and Instagram.

HF Media will examine the data to determine the best ways to narrowly target potential class members. This could include:

- Facebook custom audience of **qualified potential class members** (consistent with tactics to the U.S.), that matches class member names to individuals in Mexico with those same names.
- Geo-targeting to the hometowns of class members (dependent on available data from defendant.) Alternately, per Migration Policy reporting, we can see where the majority of unauthorized immigrants come from in Mexico and can target using these identified locations.
- We would also look to defendants' data to narrow the targeting by age, gender and geographical location.

## Mexico Search

HF Media will employ keyword search on Google Ads. Representative key terms will include, but are not limited border crossing, Mexico border crossing requirements, migrant jobs, migrant work, legal help for migrants and work in California, among others.

## Mexico Press Release

A press release will be distributed over PR Newswire's Mexico Newslines. PR Newswire delivers to thousands of print and broadcast newsrooms worldwide, as well as websites, databases and online services including featured placement in news sections of leading portals.

## Mexico Community Based Outreach

HF Media will send a cover letter and press release to the identified organizations asking for additional coverage. To the extent possible, HF Media will coordinate with each party to provide information about

the Settlement for the organizations to distribute via email, web, newsletters, blogs and various
postings.  These organizations may include, among others:

- Border Kindness (Mexicali M) Accion d Gracia Immigration Assistance
- New Comienzos
- Bridges for Understanding
- IMUMI
- Consejo Ciudadano
- Yodarta
- Centro de los Dereches del Migrante
- La Casa del Migrante
- Catholic Shelters in Mexico
- Catholic Relief Services of Mexico
- Mexican American Legal Defense

# Key Considerations - Outreach Development

In addition to careful review of the RFP, the basis for our assumptions is derived from a number of research
reports listed below. However, the actual media plan will be highly targeted to reflect the demographics
of the known class members using defendants' records.

## Unauthorized Immigrant Research Studies:

1. Department of Homeland Security Office of Immigration Statistics: Population Estimates: Illegal
   Alien Population Residing in The United States[2];
2. U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal
   Operations Report[3];
3. MigrationPolicy.org: Unauthorized Immigrant Population Profiles[4];

These data reveal key demographic information such as race and ethnic consideration. Here, we see that:

- 68% of the unauthorized population in California is from Mexico
- 52% are Male
- Education:
  - 36% have less than a high school diploma/GED
  - 22% have a high school diploma/GED
  - 25% have some college or more

---

[2] "Origins of Mexican Migrants to the United States by Mexican State of Residence, Number, and Share, 2004-
2015." Migrationpolicy.org, Migration Policy Institute, 9 Aug. 2018, www.migrationpolicy.org/programs/data-
hub/charts/origins-mexican-migrants-united-states-mexican-state-residence-number-and?width=900.
[3] "U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report."
Ice.gov, U.S. Immigration and Customs Enforcement,
www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf.
[4] "Profile of the Unauthorized Population: United States." Migrationpolicy.org, Migration Policy Institute, 1 Oct.
2020, www.migrationpolicy.org/data/unauthorized-immigrant-population/state/us.

- Language:
  - 79% speak Spanish at home
  - 49% Speak English "not well/not at all"[5]
- 84% of unauthorized immigrants residing in the United States in 2015 are age 18-54[4]

## U.S. LOS ANGELES - MEDIA CHOICE RATIONALE

Based on media research tools such as Gfk Mediamark Research and Intelligence LLC[6], the following mediums were selected based on the target audience's media preferences. The target audience focuses on those whose birthplace (Hispanic respondents only) is <u>outside the U.S</u>.

- Television: 90.4% have watched any TV in the past 7 days
- Radio: 84% have listened to radio in the past 7 days
- Digital Media: Search, Display, Social
  - 72.3% have used the internet in the past 30 days
  - 70.8% have used their smartphone to access the internet in the past 30 days
  - 67.3% have used social media

## MEXICO – MEDIA CHOICE RATIONALE

- Digital Media: Search, Display, Social[7]
  - 69% of Mexicans are internet users
  - 69% of Mexicans are active social media users
- 66.7% of Mexican migrants to the United States come from 10 states[8]:



Number and Share of Mexican Migrants to the United States by Mexican State of Residence, 2004-2015

Number of Mexican Migrants to the United States, 2004-2015

\#

\#

\#

[5] "Profile of the Unauthorized Population - Ca." Migrationpolicy.org, Migration Policy Institute, 1 Oct. 2020, www.migrationpolicy.org/data/unauthorized-immigrant-population/state/ca.
[6] MRI 2018 Doublebase - M182Y
[7] Source: Hootsuite Digital 2020 Global Digital Yearbook
[8] "Origins of Mexican Migrants to the United States by Mexican State of Residence, Number, and Share, 2004-2015." Migrationpolicy.org, Migration Policy Institute, 9 Aug. 2018, www.migrationpolicy.org/programs/data-hub/charts/origins-mexican-migrants-united-states-mexican-state-residence-number-and?width=900.

Social media geo targeting may also be weighted by the volume of immigrants originating from the
states below:

| Mexican State | Total by State 2004-2015 | % of Total |
|---|---|---|
| Guanajuato | 742,100 | 12.1% |
| Chiapas | 620,600 | 10.1% |
| Michoacán | 586,300 | 9.6% |
| Jalisco | 440,300 | 7.2% |
| Oaxaca | 353,400 | 5.8% |
| Veracruz | 328,600 | 5.4% |
| Sonora | 259,300 | 4.2% |
| Sinaloa | 253,800 | 4.1% |
| Mexico | 251,490 | 4.1% |
| Guerrero | 249,000 | 4.1% |



## JEANNE C. FINEGAN, APR

**BIOGRAPHY**

Jeanne Finegan, APR, is the Chief Media Officer of HF Media LLC, a division of Heffler Claims Group. She is a member of the Board of Directors for the prestigious Alliance for Audited Media (AAM) and was named by *Diversity Journal* as one of the "Top 100 Women Worth Watching." She is a distinguished legal notice and communications expert with more than 30 years of communications and advertising experience.

She was a lead contributing author for Duke University's School of Law, *"Guidelines and Best Practices Implementing Amendments to Rule 23 Class Action Settlement Provisions."* And more recently, she has been involved with New York School of Law and The Center on Civil Justice (CCJ) assisting with a class action settlement data analysis and comparative visualization tool called the *Aggregate Litigation Project*, designed to help judges make decisions in aggregate cases on the basis of data as opposed to anecdotal information. Moreover, her experience also includes working with the Special Settlement Administrator's team to assist with the outreach strategy for the historic Auto Airbag Settlement, In re: *Takata Airbag Products Liability Litigation* MDL 2599.

During her tenure, she has planned and implemented over 1,000 high-profile, complex legal notice communication programs. She is a recognized notice expert in both the United States and in Canada, with extensive international notice experience spanning more than 170 countries and over 40 languages.

Ms. Finegan has lectured, published and has been cited extensively on various aspects of legal noticing, product recall and crisis communications. She has served the Consumer Product Safety Commission (CPSC) as an expert to determine ways in which the Commission can increase the effectiveness of its product recall campaigns. Further, she has planned and implemented large-scale government enforcement notice programs for the Federal Trade Commission (FTC) and the Securities and Exchange Commission (SEC).

Ms. Finegan is accredited in Public Relations (APR) by the Universal Accreditation Board, which is a program administered by the Public Relations Society of America (PRSA), and is also a recognized member of the Canadian Public Relations Society (CPRS). She has served on examination panels for APR candidates and worked *pro bono* as a judge for prestigious PRSA awards.

Ms. Finegan has provided expert testimony before Congress on issues of notice, and expert testimony in both state and federal courts regarding notification campaigns. She has conducted

numerous media audits of proposed notice programs to assess the adequacy of those programs under Fed R. Civ. P. 23(c)(2) and similar state class action statutes.

She was an early pioneer of plain language in notice (as noted in a RAND study,[1]) and continues to set the standard for modern outreach as the first notice expert to integrate social and mobile media into court approved legal notice programs.

In the course of her class action experience, courts have recognized the merits of, and admitted expert testimony based on, her scientific evaluation of the effectiveness of notice plans.  She has designed legal notices for a wide range of class actions and consumer matters that include product liability, construction defect, antitrust, medical/pharmaceutical, human rights, civil rights, telecommunication, media, environment, government enforcement actions, securities, banking, insurance, mass tort, restructuring and product recall.

## JUDICIAL COMMENTS AND LEGAL NOTICE CASES

In evaluating the adequacy and effectiveness of Ms. Finegan's notice campaigns, courts have repeatedly recognized her excellent work. The following excerpts provide some examples of such judicial approval.

*In re Purdue Pharma L.P.,* No. 19-23649 (Bankr. S.D.N.Y. 2019). Omnibus Hearing, Motion Pursuant to 11 U.S.C. §§ 105(a) and 501 and Fed. R. Bankr. P. 2002 and 3003(c)(3) for Entry of an Order (I)Extending the General Bar Date for a Limited Period and (II) Approving the Form and Manner of Notice Thereof, June 3, 2020, transcript p. 88:10, the Honorable Robert Drain stated:

> *"The notice here is indeed extraordinary, as was detailed on page 8 of Ms. Finegan's declaration in support of the original bar date motion and then in her supplemental declaration from May 20th in support of the current motion, the notice is not only in print media, but extensive television and radio notice, community outreach, -- and I think this is perhaps going to be more of a trend, but it's a major element of the notice here -- online, social media, out of home, i.e. billboards, and earned media, including bloggers and creative messaging. That with a combined with a simplified proof of claims form and the ability to file a claim or first, get more information about filing a claim online -- there was a specific claims website -- and to file a claim either online or by mail. Based on Ms. Finegan's supplemental declaration, it appears clear to me that that process of providing notice has been quite successful in its goal in ultimately reaching roughly 95 percent of all adults in the United States over the age of 18 with an average frequency of message exposure of six times, as well as over 80 percent of all adults in Canada with an average message exposure of over three times."*

---

1 Deborah R. Hensler et al., CLASS ACTION DILEMAS, PURSUING PUBLIC GOALS FOR PRIVATE GAIN.  RAND (2000).

*In Re: PG&E Corporation* Case No . 19-30088 Bankr. (N.D. Cal. 2019). Hearing Establishing, Deadline for Filing Proofs of Claim, (II) establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date and Other Information to all Creditors and Potential Creditors PG&E. *June 26, 2019, Transcript of Hearing p. 21:1, the Honorable Dennis Montali stated:*

> *…the technology and the thought that goes into all these plans is almost incomprehensible. He further stated, p. 201:20 … Ms. Finegan has really impressed me today…*

*Yahoo! Inc. Customer Data Security Breach Litigation,* Case No. 5:16-MD-02752 (ND Cal 2010). In the Order Preliminary Approval, dated July 20, 2019, the Honorable Lucy Kho stated, para 21,

> *"The Court finds that the Approved Notices and Notice Plan set forth in the Amended Settlement Agreement satisfy the requirements of due process and Federal Rule of Civil Procedure 23 and provide the best notice practicable under the circumstances."*

*In re: The Bank of New York Mellon ADR FX Litigation*, 16-CV-00212-JPO-JLC (S.D.N.Y. 2019). In the Final Order and Judgement, dated June 17, 2019, para 5, the Honorable J. Paul Oetkin stated:

> *"The dissemination of notice constituted the best notice practicable under the circumstances."*

*Simerlein et al., v. Toyota Motor Corporation,* Case No. 3:17-cv-01091-VAB (District of CT 2019). In the Ruling and Order on Motion for Preliminarily Approval, dated January 14, 2019, p. 30, the Honorable Victor Bolden stated:

> *"In finding that notice is sufficient to meet both the requirements of Rule 23(c) and due process, the Court has reviewed and appreciated the high-quality submission of proposed Settlement Notice Administrator Jeanne C. Finegan. See Declaration of Jeanne C. Finegan, APR, Ex. G to Agrmt., ECF No. 85-8."*

*Fitzhenry- Russell et al., v Keurig Dr. Pepper Inc.,* Case No. :17-cv-00564-NC, (ND Cal). In the Order Granting Final Approval of Class Action Settlement, Dated April 10, 2019, the Honorable Nathanael Cousins stated:

> *"…the reaction of class members to the proposed Settlement is positive. The parties anticipated that 100,000 claims would be filed under the Settlement (see Dkt. No. 327-5 ¶ 36)—91,254 claims were actually filed (see Finegan Decl ¶ 4). The 4% claim rate was reasonable in light of Heffler's efforts to ensure that notice was adequately provided to the Class."*



***Pettit et al., v. Procter & Gamble Co.,*** Case No. 15-cv-02150-RS ND Cal**.** In the Order Granting Final Approval of the Class Action Settlement and Judgement, Dated March 28, 2019, p. 6,  the Honorable Richard Seeborg stated:

> *"The Court finds that the Notice Plan set forth in the Settlement Agreement, and effectuated pursuant to the Preliminary Approval Order, constituted the best notice practicable under the circumstances and constituted due and sufficient notice to the Settlement Class. …the number of claims received equates to a claims rate of 4.6%, which exceeds the rate in comparable settlements."*

***Carter v Forjas Taurus S.S., Taurus International Manufacturing***, Inc., Case No. 1:13-CV-24583 PAS (S.D. Fl. 2016). In her Final Order and Judgment Granting Plaintiffs Motion for Final Approval of Class Action Settlement, the Honorable Patricia Seitz stated:

> *"The Court considered the extensive experience of Jeanne C. Finegan and the notice program she developed. …There is no national firearms registry and Taurus sale records do not provide names and addresses of the ultimate purchasers… Thus the form and method used for notifying Class Members of the terms of the Settlement was the best notice practicable. …The court-approved notice plan used peer-accepted national research to identify the optimal traditional, online, mobile and social media platforms to reach the Settlement Class Members."*

Additionally, in January 20, 2016, Transcript of Class Notice Hearing, p. 5 Judge Seitz, noted:

> *"I would like to compliment Ms. Finegan and her company because I was quite impressed with the scope and the effort of communicating with the Class."*

***Cook et. al v. Rockwell International Corp. and the Dow Chemical Co.,*** *No. 90-cv-00181- KLK (D.Colo. 2017)., aka, Rocky Flats Nuclear Weapons Plant Contamination***.** In the Order Granting Final Approval, dated April 28, 2017, p.3, the Honorable John L. Kane said:

> *The Court-approved Notice Plan, which was successfully implemented by [HF Media- emphasis added] (see **Doc. 2432**), constituted the best notice practicable under the circumstances. In making this determination, the Court finds that the Notice Plan that was implemented, as set forth in Declaration of Jeanne C. Finegan, APR Concerning Implementation and Adequacy of Class Member Notification (**Doc. 2432**), provided for individual notice to all members of the Class whose identities and addresses were identified through reasonable efforts, … and a comprehensive national publication notice program that included, inter alia, print, television, radio and internet banner advertisements. …Pursuant to, and in accordance with, Rule 23 of the Federal Rules of Civil Procedure, the Court finds that the Notice Plan provided the best notice practicable to the Class.*



***In re: Domestic Drywall Antitrust Litigation,*** MDL. No. 2437, in the U.S. District Court for the Eastern District of Pennsylvania. For each of the four settlements, Finegan implemented and extensive outreach effort including traditional, online, social, mobile and advanced television and online video. In the Order Granting Preliminary Approval to the IPP Settlement, Judge Michael M. Baylson  stated:

> *"The Court finds that the dissemination of the Notice and summary Notice constitutes the best notice practicable under the circumstances; is valid, due, and sufficient notice to all persons… and complies fully with the requirements of the Federal rule of Civil Procedure."*

***Warner v. Toyota Motor Sales, U.S.A. Inc., Case No 2:15-cv-02171-FMO FFMx (C.D. Cal. 2017).*** In the Order Re: Final Approval of Class Action Settlement; Approval of Attorney's Fees, Costs & Service Awards, dated May 21, 2017, the Honorable Fernando M. Olguin stated:

> *Finegan, the court-appointed settlement notice administrator, has implemented the multiprong notice program. …the court finds that the class notice and the notice process fairly and adequately informed the class members of the nature of the action, the terms of the proposed settlement, the effect of the action and release of claims, the class members' right to exclude themselves from the action, and their right to object to the proposed settlement. (See <u>Dkt. 98</u>, PAO at 25-28).*

***Michael Allagas, et al., v. BP Solar International, Inc., et al., BP Solar Panel Settlement***, Case No. 3:14-cv-00560- SI (N.D. Cal., San Francisco Div. 2016). In the Order Granting Final Approval, Dated December 22, 2016, The Honorable Susan Illston stated:

> *Class Notice was reasonable and constituted due, adequate and sufficient notice to all persons entitled to be provided with notice; and d. fully satisfied the requirements of the Federal Rules of Civil Procedure, including <u>Fed. R. Civ. P. 23(c)(2)</u> and (e), the United States Constitution (including the Due Process Clause), the Rules of this Court, and any other applicable law*.

***Foster v. L-3 Communications*** *EOTech*, Inc. et al (6:15-cv-03519), Missouri Western District Court.

> *In the Court's  Final Order, dated July 7, 2017, The Honorable Judge Brian Wimes stated: "The Court has determined that the Notice given to the Settlement Class fully and accurately informed members of the Settlement Class of all material elements of the Settlement and constituted the best notice practicable."*



*In re: Skechers Toning Shoes Products Liability Litigation*, No. 3:11-MD-2308-TBR (W.D. Ky. 2012). In his Final Order and Judgment granting the Motion for Preliminary Approval of Settlement, the Honorable Thomas B. Russell stated:

> … *The comprehensive nature of the class notice leaves little doubt that, upon receipt, class members will be able to make an informed and intelligent decision about participating in the settlement.*

*Brody v. Merck & Co., Inc., et al,* No. 3:12-cv-04774-PGS-DEA (N.J.) (Jt Hearing for Prelim App, Sept. 27, 2012, transcript page 34). During the Hearing on Joint Application for Preliminary Approval of Class Action, the Honorable Peter G. Sheridan acknowledged Ms. Finegan's work, noting:

> *Ms. Finegan did a great job in testifying as to what the class administrator will do. So, I'm certain that all the class members or as many that can be found, will be given some very adequate notice in which they can perfect their claim.*

*Quinn v. Walgreen Co., Wal-Mart Stores Inc.,* 7:12 CV-8187-VB (NYSD) (Jt Hearing for Final App, March. 5, 2015, transcript page 40-41).  During the Hearing on Final Approval of Class Action, the Honorable Vincent L. Briccetti stated:

> *"The notice plan was the best practicable under the circumstances.  … [and] "the proof is in the pudding. This settlement has resulted in more than 45,000 claims which is 10,000 more than the Pearson case and more than 40,000 more than in a glucosamine case pending in the Southern District of California I've been advised about.  So the notice has reached a lot of people and a lot of people have made claims."*

*In Re: TracFone Unlimited Service Plan Litigation, No. C-13-3440 EMC (ND Ca).* In the Final Order and Judgment Granting Class Settlement, July 2, 2015, the Honorable Edward M. Chen noted:
> *"…[D]epending on the extent of the overlap between  those class members who will automatically receive a payment and those who filed claims, the total claims rate is estimated to be approximately 25-30%. This is an excellent result...*

*In Re:  Blue Buffalo Company, Ltd., Marketing and Sales Practices Litigation*, Case No. 4:14-MD-2562 RWS (E.D. Mo. 2015),  (Hearing for Final Approval, May 19, 2016 transcript p. 49). During the Hearing for Final Approval, the Honorable Rodney Sippel said:

> *It is my finding that notice was sufficiently provided to class members in the manner directed in my preliminary approval order and that notice met all applicable requirements of due process and any other applicable law and considerations.*

*DeHoyos, et al. v. Allstate Ins. Co.*, No. SA-01-CA-1010 (W.D.Tx. 2001).  In the Amended Final Order and Judgment Approving Class Action Settlement, the Honorable Fred Biery stated:

*[T]he undisputed evidence shows the notice program in this case was developed and implemented by a nationally recognized expert in class action notice programs. … This program was vigorous and specifically structured to reach the African-American and Hispanic class members.  Additionally, the program was based on a scientific methodology which is used throughout the advertising industry and which has been routinely embraced routinely [sic] by the Courts.  Specifically, in order to reach the identified targets directly and efficiently, the notice program utilized a multi-layered approach which included national magazines; magazines specifically appropriate to the targeted audiences; and newspapers in both English and Spanish.*

*In re: Reebok Easytone Litigation*, No. 10-CV-11977 (D. MA. 2011).  The Honorable F. Dennis Saylor IV stated in the Final Approval Order:

*The Court finds that the dissemination of the Class Notice, the publication of the Summary Settlement Notice, the establishment of a website containing settlement-related materials, the establishment of a toll-free telephone number, and all other notice methods set forth in the Settlement Agreement and [Ms. Finegan's] Declaration and the notice dissemination methodology implemented pursuant to the Settlement Agreement and this Court's Preliminary Approval Order… constituted the best practicable notice to Class Members under the circumstances of the Actions.*

**Bezdek v. Vibram USA and Vibram FiveFingers** LLC, No 12-10513 (D. MA) The Honorable Douglas P. Woodlock stated in the Final Memorandum and Order:

*…[O]n independent review I find that the notice program was robust, particularly in its online presence, and implemented as directed in my Order authorizing notice. …I find that notice was given to the Settlement class members by the best means "practicable under the circumstances." <u>Fed.R.Civ.P. 23(c)(2)</u>.*

*Gemelas v. The Dannon Company Inc.,* No. 08-cv-00236-DAP (N.D. Ohio).  In granting final approval for the settlement, the Honorable Dan A. Polster stated:

*In accordance with the Court's Preliminary Approval Order and the Court-approved notice program, [Ms. Finegan] caused the Class Notice to be distributed on a nationwide basis in magazines and newspapers (with circulation numbers exceeding 81 million) specifically chosen to reach Class Members. … The distribution of Class Notice constituted the best notice practicable under the circumstances, and fully satisfied the requirements of <u>Federal Rule of Civil Procedure 23</u>, the requirements of due process, 28 U.S.C. 1715, and any other applicable law.*

*Pashmova v. New Balance Athletic Shoes, Inc.*, 1:11-cv-10001-LTS (D. Mass.). The Honorable Leo T. Sorokin stated in the Final Approval Order:

> *The Class Notice, the Summary Settlement Notice, the web site, and all other notices in the Settlement Agreement and the Declaration of [Ms Finegan], and the notice methodology implemented pursuant to the Settlement Agreement: (a) constituted the best practicable notice under the circumstances; (b) constituted notice that was reasonably calculated to apprise Class Members of the pendency of the Actions, the terms of the Settlement and their rights under the settlement … met all applicable requirements of law, including, but not limited to, the Federal Rules of Civil Procedure, 28 U.S.C. § 1715, and the Due Process Clause(s) of the United States Constitution, as well as complied with the Federal Judicial Center's illustrative class action notices.*

*Hartless v. Clorox Company*, No. 06-CV-2705 (CAB) (S.D.Cal.).  In the Final Order Approving Settlement, the Honorable Cathy N. Bencivengo found:

> *The Class Notice advised Class members of the terms of the settlement; the Final Approval Hearing and their right to appear at such hearing; their rights to remain in or opt out of the Class and to object to the settlement; the procedures for exercising such rights; and the binding effect of this Judgment, whether favorable or unfavorable, to the Class. The distribution of the notice to the Class constituted the best notice practicable under the circumstances, and fully satisfied the requirements of Federal Rule of Civil Procedure 23, the requirements of due process, 28 U.S.C. §1715, and any other applicable law.*

*McDonough et al v. Toys 'R' Us et al,* No. 09:-cv-06151-AB (E.D. Pa.).  In the Final Order and Judgment Approving Settlement, the Honorable Anita Brody stated:

> *The Court finds that the Notice provided constituted the best notice practicable under the circumstances and constituted valid, due and sufficient notice to all persons entitled thereto.*

*In re: Pre-Filled Propane Tank Marketing & Sales Practices Litigation,* No. 4:09-md-02086-GAF (W.D. Mo)  In granting final approval to the settlement, the Honorable Gary A. Fenner stated:

> *The notice program included individual notice to class members who could be identified by Ferrellgas, publication notices, and notices affixed to Blue Rhino propane tank cylinders sold by Ferrellgas through various retailers. ... The Court finds the notice program fully complied with Federal Rule of Civil Procedure 23 and the requirements of due process and provided to the Class the best notice practicable under the circumstances.*

*Stern v. AT&T Mobility Wireless*, No. 09-cv-1112 CAS-AGR (C.D.Cal. 2009).  In the Final Approval Order, the Honorable Christina A. Snyder stated:



> *[T]he Court finds that the Parties have fully and adequately effectuated the Notice Plan, as required by the Preliminary Approval Order, and, in fact, have achieved better results than anticipated or required by the Preliminary Approval Order.*

*In re: Processed Egg Prods. Antitrust Litig.*, MDL No. 08-md-02002 (E.D.P.A.).  In the Order Granting Final Approval of Settlement, Judge Gene E.K. Pratter stated:

> *The Notice appropriately detailed the nature of the action, the Class claims, the definition of the Class and Subclasses, the terms of the proposed settlement agreement, and the class members' right to object or request exclusion from the settlement and the timing and manner for doing so.… Accordingly, the Court determines that the notice provided to the putative Class Members constitutes adequate notice in satisfaction of the demands of Rule 23.*

*In re Polyurethane Foam Antitrust Litigation*, 10- MD-2196 (N.D. OH). In the Order Granting Final Approval of Voluntary Dismissal and Settlement of Defendant Domfoam and Others, the Honorable Jack Zouhary stated:

> *The notice program included individual notice to members of the Class who could be identified through reasonable effort, as well as extensive publication of a summary notice. The Notice constituted the most effective and best notice practicable under the circumstances of the Settlement Agreements, and constituted due and sufficient notice for all other purposes to all persons and entities entitled to receive notice.*

*Rojas v Career Education Corporation*, No. 10-cv-05260 (N.D.E.D. IL) In the Final Approval Order dated October 25, 2012, the Honorable Virgina M. Kendall stated:

> *The Court Approved notice to the Settlement Class as the best notice practicable under the circumstance including individual notice via U.S. Mail and by email to the class members whose addresses were obtained from each Class Member's wireless carrier or from a commercially reasonable reverse cell phone number look-up service, nationwide magazine publication, website publication, targeted on-line advertising, and a press release.  Notice has been successfully implemented and satisfies the requirements of the Federal Rule of Civil Procedure 23 and Due Process.*

*Golloher v Todd Christopher International, Inc. DBA Vogue International (Organix)*, No. C 1206002 N.D CA.  In the Final Order and Judgment Approving Settlement, the Honorable Richard Seeborg stated:

> *The distribution of the notice to the Class constituted the best notice practicable under the circumstances, and fully satisfied the requirements of Federal Rule of Civil Procedure 23, the requirements of due process, 28 U.S.C. §1715, and any other applicable law.*

**HEFFLER CLAIMS** Group

*Stefanyshyn v. Consolidated Industries*, No. 79 D 01-9712-CT-59 (Tippecanoe County Sup. Ct.,
Ind.). In the Order Granting Final Approval of Settlement, Judge Randy Williams stated:

> *The long and short form notices provided a neutral, informative, and clear explanation
> of the Settlement. … The proposed notice program was properly designed,
> recommended, and implemented … and constitutes the "best practicable" notice of
> the proposed Settlement. The form and content of the notice program satisfied all
> applicable legal requirements. … The comprehensive class notice educated Settlement
> Class members about the defects in Consolidated furnaces and warned them that the
> continued use of their furnaces created a risk of fire and/or carbon monoxide. This
> alone provided substantial value.*

*McGee v. Continental Tire North America, Inc. et al*, No. 06-6234-(GEB) (D.N.J.).

> *The Class Notice, the Summary Settlement Notice, the web site, the toll-free telephone
> number, and all other notices in the Agreement, and the notice methodology
> implemented pursuant to the Agreement: (a) constituted the best practicable notice
> under the circumstances; (b) constituted notice that was reasonably calculated to
> apprise Class Members of the pendency of the Action, the terms of the settlement and
> their rights under the settlement, including, but not limited to, their right to object to
> or exclude themselves from the proposed settlement and to appear at the Fairness
> Hearing; (c) were reasonable and constituted due, adequate and sufficient notice to all
> persons entitled to receive notification; and (d) met all applicable requirements of law,
> including, but not limited to, the Federal Rules of Civil Procedure, <u>20 U.S.C. Sec. 1715</u>,
> and the Due Process Clause(s) of the United States Constitution, as well as complied
> with the Federal Judicial Center's illustrative class action notices,*

*Varacallo, et al. v. Massachusetts Mutual Life Insurance Company, et al*., No. 04-2702 (JLL)
(D.N.J.).  The Court stated that:

> [A]*ll of the notices are written in simple terminology, are readily understandable by
> Class Members, and comply with the Federal Judicial Center's illustrative class action
> notices. … By working with a nationally syndicated media research firm, [Finegan's
> firm] was able to define a target audience for the MassMutual Class Members, which
> provided a valid basis for determining the magazine and newspaper preferences of the
> Class Members. (Preliminary Approval Order at p. 9).  . . .  The Court agrees with Class
> Counsel that this was more than adequate.  (Id. at § 5.2).*

*In re: Nortel Network Corp., Sec. Litig.*, No. 01-CV-1855 (RMB) Master File No. <u>05 MD 1659</u>
(LAP) (S.D.N.Y).  Ms. Finegan designed and implemented the extensive United States and
Canadian notice programs in this case.  The Canadian program was published in both French
and English, and targeted virtually all investors of stock in Canada.  *See*

**Heffler Claims Group**

www.nortelsecuritieslitigation.com.  Of the U.S. notice program, the Honorable Loretta A. Preska stated:

> *The form and method of notifying the U.S. Global Class of the pendency of the action as a class action and of the terms and conditions of the proposed Settlement … constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.*

Regarding the B.C. Canadian Notice effort: *Jeffrey v. Nortel Networks*, [2007] BCSC 69 at para. 50, the Honourable Mr. Justice Groberman said:

> *The efforts to give notice to potential class members in this case have been thorough. There has been a broad media campaign to publicize the proposed settlement and the court processes.  There has also been a direct mail campaign directed at probable investors.  I am advised that over 1.2 million claim packages were mailed to persons around the world.  In addition, packages have been available through the worldwide web site nortelsecuritieslitigation.com  on the Internet.  Toll-free telephone lines have been set up, and it appears that class counsel and the Claims Administrator have received innumerable calls from potential class members. In short, all reasonable efforts have been made to ensure that potential members of the class have had notice of the proposal and a reasonable opportunity was provided for class members to register their objections, or seek exclusion from the settlement.*

*Mayo v. Walmart Stores and Sam's Club*, No. 5:06 CV-93-R (W.D.Ky.).  In the Order Granting Final Approval of Settlement, Judge Thomas B. Russell stated:

> *According to defendants' database, the Notice was estimated to have reached over 90% of the Settlement Class Members through direct mail.  The Settlement Administrator … has classified the parties' database as 'one of the most reliable and comprehensive databases [she] has worked with for the purposes of legal notice.'… The Court thus reaffirms its findings and conclusions in the Preliminary Approval Order that the form of the Notice and manner of giving notice satisfy the requirements of Fed. R. Civ. P. 23 and affords due process to the Settlement Class Members.*

*Fishbein v. All Market Inc*., (d/b/a **Vita Coco**) No. 11-cv-05580  (S.D.N.Y.).  In granting final approval of the settlement, the Honorable J. Paul Oetken stated:

> *"The Court finds that the dissemination of Class Notice pursuant to the Notice Program…constituted the best practicable notice to Settlement Class Members under the circumstances of this Litigation … and was reasonable and constituted due, adequate and sufficient notice to all persons entitled to such notice, and fully satisfied the requirements of the Federal Rules of Civil Procedure, including Rules 23(c)(2) and (e), the United States Constitution (including the Due Process Clause), the Rules of this Court, and any other applicable laws."*

*Lucas, et al. v. Kmart Corp.*, No. 99-cv-01923 (D.Colo.), wherein the Court recognized Jeanne Finegan as an expert in the design of notice programs, and stated:

> *The Court finds that the efforts of the parties and the proposed Claims Administrator in this respect go above and beyond the "reasonable efforts" required for identifying individual class members under F.R.C.P. 23(c)(2)(B).*

*In re: Johns-Manville Corp.* **(Statutory Direct Action Settlement, Common Law Direct Action and Hawaii Settlement)**, No 82-11656, 57, 660, 661, 665-73, 75 and 76 (BRL) (Bankr. S.D.N.Y.). The nearly half-billion dollar settlement incorporated three separate notification programs, which targeted all persons who had asbestos claims whether asserted or unasserted, against the Travelers Indemnity Company.  In the Findings of Fact and Conclusions of a Clarifying Order Approving the Settlements, slip op. at 47-48 (Aug. 17, 2004), the Honorable Burton R. Lifland, Chief Justice, stated:

> *As demonstrated by Findings of Fact (citation omitted), the Statutory Direct Action Settlement notice program was reasonably calculated under all circumstances to apprise the affected individuals of the proceedings and actions taken involving their interests, Mullane v. Cent. Hanover Bank & Trust Co.,* <u>339 U.S. 306, 314</u> *(1950), such program did apprise the overwhelming majority of potentially affected claimants and far exceeded the minimum notice required. . . . The results simply speak for themselves.*

*Pigford v. Glickman and U.S. Department of Agriculture*, No. 97-1978. 98-1693 (PLF) (D.D.C.). This matter was the largest civil rights case to settle in the United States in over 40 years. The highly publicized, nationwide paid media program was designed to alert all present and past African-American farmers of the opportunity to recover monetary damages against the U.S. Department of Agriculture for alleged loan discrimination.  In his Opinion, the Honorable Paul L. Friedman commended the parties with respect to the notice program, stating;

> *The parties also exerted extraordinary efforts to reach class members through a massive advertising campaign in general and African American targeted publications and television stations. . . . The Court concludes that class members have received more than adequate notice and have had sufficient opportunity to be heard on the fairness of the proposed Consent Decree.*

*In re: Louisiana-Pacific Inner-Seal Siding Litig.*, Nos. 879-JE, and 1453-JE (D.Or.).  Under the terms of the Settlement, three separate notice programs were to be implemented at three-year intervals over a period of six years.  In the first notice campaign, Ms. Finegan implemented the print advertising and Internet components of the Notice program.  In approving the legal notice communication plan, the Honorable Robert E. Jones stated:

**HEFFLER CLAIMS**
Group

> *The notice given to the members of the Class fully and accurately informed the Class members of all material elements of the settlement…[through] a broad and extensive multi-media notice campaign.*

Additionally, with regard to the third-year notice program for Louisiana-Pacific, the Honorable Richard Unis, Special Master, commented that the notice was:

> *…well formulated to conform to the definition set by the court as adequate and reasonable notice. Indeed, I believe the record should also reflect the Court's appreciation to Ms. Finegan for all the work she's done, ensuring that noticing was done correctly and professionally, while paying careful attention to overall costs. Her understanding of various notice requirements under Fed. R. Civ. P. 23, helped to insure that the notice given in this case was consistent with the highest standards of compliance with Rule 23(d)(2).*

*In re: Expedia Hotel Taxes and Fees Litigation*, No. 05-2-02060-1 (SEA) (Sup. Ct. of Wash. in and for King County). In the Order Granting Final Approval of Class Action Settlement, Judge Monica Benton stated:

> *The Notice of the Settlement given to the Class … was the best notice practicable under the circumstances. All of these forms of Notice directed Class Members to a Settlement Website providing key Settlement documents including instructions on how Class Members could exclude themselves from the Class, and how they could object to or comment upon the Settlement. The Notice provided due and adequate notice of these proceeding and of the matters set forth in the Agreement to all persons entitled to such notice, and said notice fully satisfied the requirements of CR 23 and due process.*

*Thomas A. Foster and Linda E. Foster v. ABTco Siding Litigation*, No. 95-151-M (Cir. Ct., Choctaw County, Ala.). This litigation focused on past and present owners of structures sided with Abitibi-Price siding. The notice program that Ms. Finegan designed and implemented was national in scope and received the following praise from the Honorable J. Lee McPhearson:

> *The Court finds that the Notice Program conducted by the Parties provided individual notice to all known Class Members and all Class Members who could be identified through reasonable efforts and constitutes the best notice practicable under the circumstances of this Action. This finding is based on the overwhelming evidence of the adequacy of the notice program. … The media campaign involved broad national notice through television and print media, regional and local newspapers, and the Internet (see id. ¶¶9-11) The result: over 90 percent of Abitibi and ABTco owners are estimated to have been reached by the direct media and direct mail campaign.*

*Wilson v. Massachusetts Mut. Life Ins. Co.*, No. D-101-CV 98-02814 (First Judicial Dist. Ct., County of Santa Fe, N.M.). This was a nationwide notification program that included all persons

**HEFFLER CLAIMS** Group

in the United States who owned, or had owned, a life or disability insurance policy with Massachusetts Mutual Life Insurance Company and had paid additional charges when paying their premium on an installment basis. The class was estimated to exceed 1.6 million individuals. www.insuranceclassclaims.com.  In granting preliminary approval to the settlement, the Honorable Art Encinias found:

> [*T*]*he Notice Plan [is] the best practicable notice that is reasonably calculated, under the circumstances of the action.  …[and] meets or exceeds all applicable requirements of the law, including Rule 1-023(C)(2) and (3) and 1-023(E), NMRA 2001, and the requirements of federal and/or state constitutional due process and any other applicable law.*

*Sparks v. AT&T Corp.*, No. 96-LM-983 (Third Judicial Cir., Madison County, Ill.). The litigation concerned all persons in the United States who leased certain AT&T telephones during the 1980's. Ms. Finegan designed and implemented a nationwide media program designed to target all persons who may have leased telephones during this time period, a class that included a large percentage of the entire population of the United States.
In granting final approval to the settlement, the Court found:

> *The Court further finds that the notice of the proposed settlement was sufficient and furnished Class Members with the information they needed to evaluate whether to participate in or opt out of the proposed settlement. The Court therefore concludes that the notice of the proposed settlement met all requirements required by law, including all Constitutional requirements.*

*In re: Georgia-Pacific Toxic Explosion Litig.*, No. 98 CVC05-3535 (Ct. of Common Pleas, Franklin County, Ohio).  Ms. Finegan designed and implemented a regional notice program that included network affiliate television, radio and newspaper.  The notice was designed to alert adults living near a Georgia-Pacific plant that they had been exposed to an air-born toxic plume and their rights under the terms of the class action settlement.   In the Order and Judgment finally approving the settlement, the Honorable Jennifer L. Bunner stated:

> *[N]otice of the settlement to the Class was the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.  The Court finds that such effort exceeded even reasonable effort and that the Notice complies with the requirements of Civ. R. 23(C).*

*In re: American Cyanamid*, No. CV-97-0581-BH-M (S.D.Al.).   The media program targeted Farmers who had purchased crop protection chemicals manufactured by American Cyanamid.  In the Final Order and Judgment, the Honorable Charles R. Butler Jr. wrote:

> *The Court finds that the form and method of notice used to notify the Temporary Settlement Class of the Settlement satisfied the requirements of Fed. R. Civ. P. 23 and due process, constituted the best notice practicable under the circumstances, and*

*constituted due and sufficient notice to all potential members of the Temporary Class Settlement.*

***In re: First Alert Smoke Alarm Litig.***, No. CV-98-C-1546-W (UWC) (N.D.Al.).  Ms. Finegan designed and implemented a nationwide legal notice and public information program.  The public information program ran over a two-year period to inform those with smoke alarms of the performance characteristics between photoelectric and ionization detection.  The media program included network and cable television, magazine and specialty trade publications.  In the Findings and Order Preliminarily Certifying the Class for Settlement Purposes, Preliminarily Approving Class Settlement, Appointing Class Counsel, Directing Issuance of Notice to the Class, and Scheduling a Fairness Hearing, the Honorable C.W. Clemon wrote that the notice plan:

> *…constitutes due, adequate and sufficient notice to all Class Members; and (v) meets or exceeds all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Alabama State Constitution, the Rules of the Court, and any other applicable law.*

***In re: James Hardie Roofing Litig.,*** No. 00-2-17945-65SEA (Sup. Ct. of Wash., King County). The nationwide legal notice program included advertising on television, in print and on the Internet.  The program was designed to reach all persons who own any structure with JHBP roofing products.  In the Final Order and Judgment, the Honorable Steven Scott stated:

> *The notice program required by the Preliminary Order has been fully carried out… [and was] extensive.  The notice provided fully and accurately informed the Class Members of all material elements of the proposed Settlement and their opportunity to participate in or be excluded from it; was the best notice practicable under the circumstances; was valid, due and sufficient notice to all Class Members; and complied fully with Civ. R. 23, the United States Constitution, due process, and other applicable law.*

***Barden v. Hurd Millwork Co. Inc., et al,*** No. 2:6-cv-00046 (LA) (E.D.Wis.) (*"The Court approves, as to form and content, the notice plan and finds that such notice is the best practicable under the circumstances under Federal Rule of Civil Procedure 23(c)(2)(B) and constitutes notice in a reasonable manner under Rule 23(e)(1)."*)

***Altieri v. Reebok,*** No. 4:10-cv-11977 (FDS) (D.C.Mass.) (*"The Court finds that the notices … constitute the best practicable notice… The Court further finds that all of the notices are written in simple terminology, are readily understandable by Class Members, and comply with the Federal Judicial Center's illustrative class action notices."*)

***Marenco v. Visa Inc.,*** No. CV 10-08022 (DMG) (C.D.Cal.) (*"[T]he Court finds that the notice plan…meets the requirements of due process, California law, and  other applicable precedent. The Court finds that the proposed notice program is designed to provide the Class with the best notice practicable, under the circumstances of this action, of the pendency of this*

**HEFFLER Claims** Group

*litigation and of the proposed Settlement's terms, conditions, and procedures, and shall constitute due and sufficient notice to all persons entitled thereto under California law, the United States Constitution, and any other applicable law."*)

*Palmer v. Sprint Solutions, Inc.,* No. 09-cv-01211 (JLR) (W.D.Wa.) (*"The means of notice were reasonable and constitute due, adequate, and sufficient notice to all persons entitled to be provide3d with notice."*)

*In re: Tyson Foods, Inc., Chicken Raised Without Antibiotics Consumer Litigation*, No. 1:08-md-01982 RDB (D. Md. N. Div.) (*"The notice, in form, method, and content, fully complied with the requirements of Rule 23 and due process, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons entitled to notice of the settlement."*)

*Sager v. Inamed Corp. and McGhan Medical Breast Implant Litigation*, No. 01043771 (Sup. Ct. Cal., County of Santa Barbara) (*"Notice provided was the best practicable under the circumstances."*).

*Deke, et al. v. Cardservice Internat'l,* Case No. BC 271679, slip op. at 3 (Sup. Ct. Cal., County of Los Angeles) (*"The Class Notice satisfied the requirements of California Rules of Court 1856 and 1859 and due process and constituted the best notice practicable under the circumstances."*).

*Levine, et al. v. Dr. Philip C. McGraw, et al*., Case No. BC 312830 (Los Angeles County Super. Ct., Cal.) (*"[T]he plan for notice to the Settlement Class … constitutes the best notice practicable under the circumstances and constituted due and sufficient notice to the members of the Settlement Class … and satisfies the requirements of California law and federal due process of law."*).

*In re: Canadian Air Cargo Shipping Class Actions*,  Court File No. 50389CP, Ontario Superior Court of Justice, Supreme Court of British Columbia, Quebec Superior Court (*"I am satisfied the proposed form of notice meets the requirements of s. 17(6) of the CPA  and the proposed method of notice is appropriate."*).

*Fischer et al v. IG Investment Management, Ltd. et al*, Court File No. 06-CV-307599CP, Ontario Superior Court of Justice.

*In re: Vivendi Universal, S.A. Securities Litigation*, No. 02-cv-5571 (RJH)(HBP) (S.D.N.Y.).

*In re: Air Cargo Shipping Services Antitrust Litigation*, No. 06-MD-1775 (JG) (VV) (E.D.N.Y.).

*Berger, et al., v. Property ID Corporation, et al.*, No. CV 05-5373-GHK (CWx) (C.D.Cal.).

*Lozano v. AT&T Mobility Wireless*, No. 02-cv-0090 CAS (AJWx) (C.D.Cal.).

Heffler Claims Group

*Howard A. Engle, M.D., et al., v. R.J. Reynolds Tobacco Co., Philip Morris, Inc., Brown & Williamson Tobacco Corp.,* No. 94-08273 CA (22) (11th Judicial Dist. Ct. of Miami-Dade County, Fla.).

*In re: Royal Dutch/Shell Transport Securities Litigation,* No. 04 Civ. 374 (JAP) (Consolidated Cases) (D. N.J.).

*In re: Epson Cartridge Cases, Judicial Council Coordination Proceeding*, No. 4347 (Sup. Ct. of Cal., County of Los Angeles).

*UAW v. General Motors Corporation*, No: 05-73991 (E.D.MI).

*Wicon, Inc. v. Cardservice Intern'l, Inc.*, BC 320215 (Sup. Ct. of Cal., County of Los Angeles).

*In re: SmithKline Beecham Clinical Billing Litig.*, No. CV. No. 97-L-1230 (Third Judicial Cir., Madison County, Ill.). Ms. Finegan designed and developed a national media and Internet site notification program in connection with the settlement of a nationwide class action concerning billings for clinical laboratory testing services.

*MacGregor v. Schering-Plough Corp.,* No. EC248041 (Sup. Ct. Cal., County of Los Angeles). This nationwide notification program was designed to reach all persons who had purchased or used an aerosol inhaler manufactured by Schering-Plough. Because no mailing list was available, notice was accomplished entirely through the media program.

*In re: Swiss Banks Holocaust Victim Asset Litig.*, No. CV-96-4849 (E.D.N.Y.). Ms. Finegan managed the design and implementation of the Internet site on this historic case. The site was developed in 21 native languages. It is a highly secure data gathering tool and information hub, central to the global outreach program of Holocaust survivors. www.swissbankclaims.com.

*In re: Exxon Valdez Oil Spill Litig.*, No. A89-095-CV (HRH) (Consolidated) (D. Alaska). Ms. Finegan designed and implemented two media campaigns to notify native Alaskan residents, trade workers, fisherman, and others impacted by the oil spill of the litigation and their rights under the settlement terms.

*In re: Johns-Manville Phenolic Foam Litig.*, No. CV 96-10069 (D. Mass). The nationwide multi-media legal notice program was designed to reach all Persons who owned any structure, including an industrial building, commercial building, school, condominium, apartment house, home, garage or other type of structure located in the United States or its territories, in which Johns-Manville PFRI was installed, in whole or in part, on top of a metal roof deck.

*Bristow v Fleetwood Enters Litig.*, No Civ 00-0082-S-EJL (D. Id). Ms. Finegan designed and implemented a legal notice campaign targeting present and former employees of Fleetwood Enterprises, Inc., or its subsidiaries who worked as hourly production workers at Fleetwood's

housing, travel trailer, or motor home manufacturing plants. The comprehensive notice campaign included print, radio and television advertising.

***In re: New Orleans Tank Car Leakage Fire Litig.***, No 87-16374 (Civil Dist. Ct., Parish of Orleans, LA) (2000). This case resulted in one of the largest settlements in U.S. history.  This campaign consisted of a media relations and paid advertising program to notify individuals of their rights under the terms of the settlement.

***Garria Spencer v. Shell Oil Co.***, No. CV 94-074(Dist. Ct., Harris County, Tex.).  The nationwide notification program was designed to reach individuals who owned real property or structures in the United States, which contained polybutylene plumbing with acetyl insert or metal insert fittings.

***In re: Hurd Millwork Heat Mirror™ Litig.***, No. CV-772488 (Sup. Ct. of Cal., County of Santa Clara).  This nationwide multi-media notice program was designed to reach class members with failed heat mirror seals on windows and doors, and alert them as to the actions that they needed to take to receive enhanced warranties or window and door replacement.

***Laborers Dist. Counsel of Alabama Health and Welfare Fund v. Clinical Lab. Servs., Inc***, No. CV–97-C-629-W (N.D. Ala.). Ms. Finegan designed and developed a national media and Internet site notification program in connection with the settlement of a nationwide class action concerning alleged billing discrepancies for clinical laboratory testing services.

***In re: StarLink Corn Prods. Liab. Litig.***, No. 01-C-1181 (N.D. Ill)..  Ms. Finegan designed and implemented a nationwide notification program designed to alert potential class members of the terms of the settlement.

***In re: MCI Non-Subscriber Rate Payers Litig.***, MDL Docket No. 1275, 3:99-cv-01275 (S.D.Ill.). The advertising and media notice program, found to be "more than adequate" by the Court, was designed with the understanding that the litigation affected all persons or entities who were customers of record for telephone lines presubscribed to MCI/World Com, and were charged the higher non-subscriber rates and surcharges for direct-dialed long distance calls placed on those lines. www.rateclaims.com.

***In re: Albertson's Back Pay Litig.***, No. 97-0159-S-BLW (D.Id.).  Ms. Finegan designed and developed a secure Internet site, where claimants could seek case information confidentially.

***In re: Georgia Pacific Hardboard Siding Recovering Program***, No. CV-95-3330-RG (Cir. Ct., Mobile County, Ala.).  Ms. Finegan designed and implemented a multi-media legal notice program, which was designed to reach class members with failed G-P siding and alert them of the pending matter. Notice was provided through advertisements, which aired on national cable networks, magazines of nationwide distribution, local newspaper, press releases and trade magazines.



*In re: Diet Drugs* **(Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig**., Nos. 1203, 99-20593.  Ms. Finegan worked as a consultant to the National Diet Drug Settlement Committee on notification issues.   The resulting notice program was described and complimented at length in the Court's Memorandum and Pretrial Order 1415, approving the settlement,

*In re: Diet Drugs* **(Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig**., 2000 WL 1222042, Nos. 1203, 99-20593 (E.D.Pa. Aug. 28, 2002).

Ms. Finegan designed the Notice programs for multiple state antitrust cases filed against the Microsoft Corporation.  In those cases, it was generally alleged that Microsoft unlawfully used anticompetitive means to maintain a monopoly in markets for certain software, and that as a result, it overcharged consumers who licensed its MS-DOS, Windows, Word, Excel and Office software. The multiple legal notice programs designed by Jeanne Finegan and listed below targeted both individual users and business users of this software.  The scientifically designed notice programs took into consideration both media usage habits and demographic characteristics of the targeted class members.

*In re: Florida Microsoft Antitrust Litig. Settlement*, No.  99-27340 CA 11 (11th Judicial Dist. Ct. of Miami-Dade County, Fla.).

*In re: Montana Microsoft Antitrust Litig. Settlement*, No. DCV 2000 219 (First Judicial Dist. Ct., Lewis & Clark Co., Mt.).

*In re: South Dakota Microsoft Antitrust Litig. Settlement*, No. 00-235(Sixth Judicial Cir., County of Hughes, S.D.).

*In re: Kansas Microsoft Antitrust Litig. Settlement*, No. 99C17089 Division No. 15 Consolidated Cases (Dist. Ct., Johnson County, Kan.) ("The Class Notice provided was the best notice practicable under the circumstances and fully complied in all respects with the requirements of due process and of the Kansas State. Annot. §60-22.3.").

*In re: North Carolina Microsoft Antitrust Litig. Settlement*, No. 00-CvS-4073 (Wake) 00-CvS-1246 (Lincoln) (General Court of Justice Sup. Ct., Wake and Lincoln Counties, N.C.).

*In re: ABS II Pipes Litig.*, No. 3126 (Sup. Ct. of Cal., Contra Costa County). The Court approved regional notification program designed to alert those individuals who owned structures with the pipe that they were eligible to recover the cost of replacing the pipe.

*In re: Avenue A Inc. Internet Privacy Litig.*, No: C00-1964C (W.D. Wash.).

*In re: Lorazepam and Clorazepate Antitrust Litig.*, No. 1290 (TFH) (D.C.C.).

*In re: Providian Fin. Corp. ERISA Litig.*, No C-01-5027 (N.D. Cal.).

*In re: H & R Block., et al Tax Refund Litig.*, No. 97195023/CC4111 (MD Cir. Ct., Baltimore City).

*In re: American Premier Underwriters, Inc, U.S. Railroad Vest Corp.*, No. 06C01-9912 (Cir. Ct., Boone County, Ind.).

*In re: Sprint Corp. Optical Fiber Litig.*, No: 9907 CV 284 (Dist. Ct., Leavenworth County, Kan).

*In re: Shelter Mutual Ins. Co. Litig.*, No. CJ-2002-263 (Dist.Ct., Canadian County. Ok).

*In re: Conseco, Inc. Sec. Litig.*, No: IP-00-0585-C Y/S CA (S.D. Ind.).

*In re: Nat'l Treasury Employees Union, et al.*, 54 Fed. Cl. 791 (2002).

*In re: City of Miami Parking Litig.*, Nos. 99-21456 CA-10, 99-23765 – CA-10 (11th Judicial Dist. Ct. of Miami-Dade County, Fla.).

*In re: Prime Co. Incorporated D/B/A/ Prime Co. Personal Comm.*, No. L 1:01CV658 (E.D. Tx.).

*Alsea Veneer v. State of Oregon A.A.*, No. 88C-11289-88C-11300.



**INTERNATIONAL EXPERIENCE**

***Bell v. Canadian Imperial Bank of Commerce***, *et al, Court File No.: CV-08-359335 (Ontario Superior Court of Justice); (2016).*

***In re: Canadian Air Cargo Shipping Class Actions*** *(Ontario Superior Court of Justice, Court File No. 50389CP, Supreme Court of British Columbia.*

***In re: Canadian Air Cargo Shipping Class Actions (****Québec Superior Court).*

***Fischer v. IG Investment Management LTD.****, No. 06-CV-307599CP (Ontario Superior Court of Justice).*

***In Re Nortel I & II Securities Litigation****, Civil Action No. 01-CV-1855 (RMB), Master File No. <u>05 MD 1659</u> (LAP) (S.D.N.Y. 2006).*

***Frohlinger v. Nortel Networks Corporation*** *et al., Court File No.: 02-CL-4605 (Ontario Superior Court of Justice).*

***Association de Protection des Épargnants et Investissuers du Québec v. Corporation Nortel Networks****, No.: 500-06-0002316-017 (Superior Court of Québec).*

***Jeffery v. Nortel Networks Corporation*** *et al., Court File No.: S015159 (Supreme Court of British Columbia).*

***Gallardi v. Nortel Networks Corporation****, No. 05-CV-285606CP (Ontario Superior Court).*

***Skarstedt v. Corporation Nortel Networks****, No. 500-06-000277-059 (Superior Court of Québec).*

**SEC ENFORCEMENT NOTICE PROGRAM EXPERIENCE**

***SEC v. Vivendi Universal, S.A., et al.,*** *Case No. 02 Civ. 5571 (RJH) (HBP) (S.D.N.Y.).*
The Notice program included publication in 11 different countries and eight different languages.

***SEC v. Royal Dutch Petroleum Company****, No.04-3359 (S.D. Tex.)*

## FEDERAL TRADE COMMISSION NOTICE PROGRAM EXPERIENCE

*FTC v. TracFone Wireless, Inc.*, Case No. 15-cv-00392-EMC.

*FTC v. Skechers U.S.A., Inc.,* No. 1:12-cv-01214-JG (N.D. Ohio).

*FTC  v. Reebok International Ltd.*,  No. 11-cv-02046 (N.D. Ohio)

*FTC v. Chanery and RTC Research and Development LLC [Nutraquest]*, No :05-cv-03460 (D.N.J.)

## BANKRUPTCY EXPERIENCE

Ms. Finegan has designed and implemented hundreds of domestic and international bankruptcy notice programs.  A sample case list includes the following:

**In Re: PG&E Corporation Case**  No . 19-30088 Bankr. N.D. Cal. 2019). Hearing Establishing, Deadline for Filing Proofs of Claim, (II) establishing the  Form and Manner of  Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar  Date and Other Information to all Creditors and Potential  Creditors PG&E. *June 26, 2019,  Transcript of Hearing  p. 21:1, the Honorable Dennis Montali stated: …the technology and the thought that goes into all these plans is almost incomprehensible.  He further stated,   p. 201:20 … Ms. Finegan has really impressed me today…*

**In re AMR Corporation [American Airlines], et al.**, No. 11-15463 (SHL) (Bankr. S.D.N.Y.) **(***"due and proper notice [was] provided, and … no other or further notice need be provided."*)

**In re Jackson Hewitt Tax Service Inc.**, et al., No 11-11587 (Bankr. D.Del.) (2011). The debtors sought to provide notice of their filing as well as the hearing to approve their disclosure statement and confirm their plan to a large group of current and former customers, many of whom current and viable addresses promised to be a difficult (if not impossible) and costly undertaking. The court approved a publication notice program designed and implemented by Finegan and the administrator, that included more than 350 local newspaper and television websites, two national online networks (24/7 Real Media, Inc. and Microsoft Media Network), a website notice linked to a press release and notice on eight major websites, including CNN and Yahoo. These online efforts supplemented the print publication and direct-mail notice provided to known claimants and their attorneys, as well as to the state attorneys general of all 50 states. The *Jackson Hewitt* notice program constituted one of the first large chapter 11 cases to incorporate online advertising.

**In re: Nutraquest Inc.**, No. 03-44147 (Bankr. D.N.J.)

**In re: General Motors Corp. et al**, No. 09-50026 (Bankr. S.D.N.Y.).  This case is the 4th largest bankruptcy in U.S. history.   Ms. Finegan and her team worked with General Motors restructuring attorneys to design and implement the legal notice program.



*In re: ACandS, Inc.,* No. 0212687 (Bankr. D.Del.) (2007) (*"Adequate notice of the Motion and of the hearing on the Motion was given."*).

*In re: United Airlines*, No. 02-B-48191 (Bankr. N.D Ill.).  Ms. Finegan worked with United and its restructuring attorneys to design and implement global legal notice programs.  The notice was published in 11 countries and translated into 6 languages. Ms. Finegan worked closely with legal counsel and UAL's advertising team to select the appropriate media and to negotiate the most favorable advertising rates. www.pd-ual.com.

*In re: Enron*, No. 01-16034 (Bankr. S.D.N.Y.).   Ms. Finegan worked with Enron and its restructuring attorneys to publish various legal notices.

*In re: Dow Corning,* No. 95-20512 (Bankr. E.D. Mich.).   Ms. Finegan originally designed the information website.  This Internet site is a major information hub that has various forms in 15 languages.

*In re: Harnischfeger Inds.*, No. 99-2171 (RJW) Jointly Administered (Bankr. D. Del.).  Ms. Finegan designed and implemented 6 domestic and international notice programs for this case. The notice was translated into 14 different languages and published in 16 countries.

*In re: Keene Corp.*, No. 93B 46090 (SMB), (Bankr. E.D. MO.).   Ms. Finegan designed and implemented multiple domestic bankruptcy notice programs including notice on the plan of reorganization directed to all creditors and all Class 4 asbestos-related claimants and counsel.

*In re: Lamonts*, No. 00-00045 (Bankr. W.D. Wash.).   Ms. Finegan designed an implemented multiple bankruptcy notice programs.

*In re: Monet Group Holdings*, Nos. 00-1936 (MFW) (Bankr. D. Del.).  Ms. Finegan designed and implemented a bar date notice.

*In re: Laclede Steel Co.*, No. 98-53121-399 (Bankr. E.D. MO.).   Ms. Finegan designed and implemented multiple bankruptcy notice programs.

*In re: Columbia Gas Transmission Corp.*, No. 91-804 (Bankr. S.D.N.Y.).  Ms. Finegan developed multiple nationwide legal notice notification programs for this case.

*In re: U.S.H. Corp. of New York, et al*. (Bankr. S.D.N.Y).  Ms. Finegan designed and implemented a bar date advertising notification campaign.

*In re: Best Prods. Co., Inc.,* No. 96-35267-T, (Bankr. E.D. Va.). Ms. Finegan implemented a national legal notice program that included multiple advertising campaigns for notice of sale, bar date, disclosure and plan confirmation.

*In re: Lodgian, Inc., et al.*, No. 16345 (BRL) Factory Card Outlet – 99-685 (JCA), 99-686 (JCA) (Bankr. S.D.N.Y.).

*In re: Internat'l Total Servs, Inc., et al.*, Nos. 01-21812, 01-21818, 01-21820, 01-21882, 01-21824, 01-21826, 01-21827 (CD) Under Case No: 01-21812 (Bankr. E.D.N.Y.).

*In re: Decora Inds., Inc. and Decora, Incorp.*, Nos. 00-4459 and 00-4460 (JJF) (Bankr. D. Del.).

*In re: Genesis Health Ventures, Inc., et al*, No. 002692 (PJW) (Bankr. D. Del.).

*In re: Tel. Warehouse, Inc., et al*, No. 00-2105 through 00-2110 (MFW) (Bankr. D. Del.).

*In re: United Cos. Fin. Corp., et al*, No. 99-450 (MFW) through 99-461 (MFW) (Bankr. D. Del.).

*In re: Caldor, Inc. New York, The Caldor Corp., Caldor, Inc. CT, et al.*, No. 95-B44080 (JLG) (Bankr. S.D.N.Y.).

*In re: Physicians Health Corp., et al.*, No. 00-4482 (MFW) (Bankr. D. Del.).

*In re: GC Cos., et al.*, Nos. 00-3897 through 00-3927 (MFW) (Bankr. D. Del.).

*In re: Heilig-Meyers Co., et al.*, Nos. 00-34533 through 00-34538 (Bankr. E.D. Va.).


## PRODUCT RECALL AND CRISIS COMMUNICATION EXPERIENCE

*Reser's Fine Foods.*  Reser's is a nationally distributed brand and manufacturer of food products through giants such as Albertsons, Costco, Food Lion, WinnDixie, Ingles, Safeway and Walmart. Ms. Finegan designed an enterprise-wide crisis communication plan that included communications objectives, crisis team roles and responsibilities, crisis response procedures, regulatory protocols, definitions of incidents that require various levels of notice, target audiences, and threat assessment protocols.   Ms. Finegan worked with the company through two nationwide, high profile recalls, conducting extensive media relations efforts.

*Gulf Coast Claims Facility Notice Campaign.* Finegan coordinated a massive outreach effort throughout the Gulf Coast region to notify those who have claims as a result of damages caused by the Deep Water Horizon Oil spill.  The notice campaign included extensive advertising in newspapers throughout the region, Internet notice through local newspaper, television and radio websites and media relations. The Gulf Coast Claims Facility (GCCF) was an independent claims facility, funded by BP, for the resolution of claims by individuals and businesses for damages incurred as a result of the oil discharges due to the Deepwater Horizon incident on April 20, 2010.



*City of New Orleans Tax Revisions, Post-Hurricane Katrina.* In 2007, the City of New Orleans revised property tax assessments for property owners. As part of this process, it received numerous appeals to the assessments. An administration firm served as liaison between the city and property owners, coordinating the hearing schedule and providing important information to property owners on the status of their appeal. Central to this effort was the comprehensive outreach program designed by Ms. Finegan, which included a website and a heavy schedule of television, radio and newspaper advertising, along with the coordination of key news interviews about the project picked up by local media.

## ARTICLES/ SOCIAL MEDIA

Tweet Chat: Contributing Panelist *#Law360SocialChat*, A live Tweet workshop concerning the benefits and pit-falls of social media, Lexttalk.com, November 7, 2019.

Author, "Top Class Settlement Admin Factors to Consider in 2020" Law360, New York, (October 31, 2019, 5:44 PM ET).

Author, "Creating a Class Notice Program that Satisfies Due Process" Law360, New York, (February 13, 2018 12:58 PM ET).

Author, "3 Considerations for Class Action Notice Brand Safety" Law360, New York, (October 2, 2017  12:24 PM ET).

Author, "What Would Class Action Reform Mean for Notice?" Law360, New York, (April 13, 2017 11:50 AM ET).

Author, "Bots Can Silently Steal your Due Process Notice." Wisconsin Law Journal, April 2017.

Author, "*Don't Turn a Blind Eye to Bots*. Ad Fraud and Bots are a Reality of the Digital Environment." LinkedIn article March 6, 2107.

Co-Author,  "Modern Notice Requirements Through the Lens of *Eisen* and *Mullane"* – Bloomberg - BNA Class Action Litigation Report, 17 CLASS 1077, (October 14, 2016).

Author, "Think All Internet Impressions Are The Same? Think Again" – Law360.com, New York (March 16, 2016, 3:39 ET).

Author, "Why Class Members Should See an Online Ad More Than Once" – Law360.com, New York, (December 3, 2015, 2:52 PM ET).

Author, 'Being 'Media-Relevant' — What It Means and Why It Matters - Law360.com, New York (September 11, 2013, 2:50 PM ET).

Co-Author, "New Media Creates New Expectations for Bankruptcy Notice Programs," ABI Journal, Vol. XXX, No 9, (November 2011).

Quoted Expert, "Effective Class Action Notice Promotes Access to Justice: Insight from a New U.S. Federal Judicial Center Checklist," Canadian Supreme Court Law Review, (2011), 53 S.C.L.R. (2d).

Co-Author, with Hon. Dickran Tevrizian – "Expert Opinion: It's More Than Just a Report…Why Qualified Legal Experts Are Needed to Navigate the Changing Media Landscape," BNA Class Action Litigation Report, 12 CLASS 464, May 27, 2011.

Co-Author, with Hon. Dickran Tevrizian, Your Insight, "Expert Opinion: It's More Than Just a Report -Why Qualified Legal Experts Are Needed to Navigate the Changing Media Landscape," TXLR, Vol. 26, No. 21, May 26, 2011.

Quoted Expert, "Analysis of the FJC's 2010 Judges' Class Action Notice and Claims Process Checklist and Guide:  A New Roadmap to Adequate Notice and Beyond," BNA Class Action Litigation Report, 12 CLASS 165, February 25, 2011.

Author, Five Key Considerations for a Successful International Notice Program, BNA Class Action Litigation Report, April, 9, 2010 Vol. 11, No. 7 p. 343.

Quoted Expert, "Communication Technology Trends Pose Novel Notification Issues for Class Litigators," BNA Electronic Commerce and Law, 15 ECLR 109 January 27, 2010.

Author, "Legal Notice: R U ready 2 adapt?" BNA Class Action Report, Vol. 10 Class 702, July 24, 2009.

Author, "On Demand Media Could Change the Future of Best Practicable Notice," BNA Class Action Litigation Report, Vol. 9, No. 7, April 11, 2008, pp. 307-310.

Quoted Expert, "Warranty Conference: Globalization of Warranty and Legal Aspects of Extended Warranty," Warranty Week, warrantyweek.com/archive/ww20070228.html/ February 28, 2007.

Co-Author, "Approaches to Notice in State Court Class Actions," For The Defense, Vol. 45, No. 11, November, 2003.

Citation, "Recall Effectiveness Research: A Review and Summary of the Literature on Consumer Motivation and Behavior," U.S. Consumer Product Safety Commission, CPSC-F-02-1391, p.10, Heiden Associates, July 2003.

Author, "The Web Offers Near, Real-Time Cost Efficient Notice," American Bankruptcy Institute, ABI Journal, Vol. XXII, No. 5., 2003.

Author, "Determining Adequate Notice in Rule 23 Actions," For The Defense, Vol. 44, No. 9 September, 2002.

Author, "Legal Notice, What You Need to Know and Why," Monograph, July 2002.

Co-Author, "The Electronic Nature of Legal Noticing," The American Bankruptcy Institute Journal, Vol. XXI, No. 3, April 2002.

Author, "Three Important Mantras for CEO's and Risk Managers," - International Risk Management Institute, irmi.com, January 2002.

Co-Author, "Used the Bat Signal Lately," The National Law Journal, Special Litigation Section, February 19, 2001.

Author, "How Much is Enough Notice," Dispute Resolution Alert, Vol. 1, No. 6. March 2001.

Author, "Monitoring the Internet Buzz," The Risk Report, Vol. XXIII, No. 5, Jan. 2001.

Author, "High-Profile Product Recalls Need More Than the Bat Signal," - International Risk Management Institute, irmi.com, July 2001.

Co-Author, "Do You Know What 100 Million People are Buzzing About Today?" Risk and Insurance Management, March 2001.

Quoted Article, "Keep Up with Class Action," Kentucky Courier Journal, March 13, 2000.

Author, "The Great Debate - How Much is Enough Legal Notice?" American Bar Association – Class Actions and Derivatives Suits Newsletter, winter edition 1999.

### SPEAKER/EXPERT PANELIST/PRESENTER

| | |
|---|---|
| Chief Litigation Counsel Association (CLCA) | Speaker, "Four Factors Impacting the Cost of Your Class Action Settlement and Notice," Houston TX, May 1, 2019 |
| CLE Webinar | "Rule 23 Changes to Notice, Are You Ready for the Digital Wild, Wild West?" October 23, 2018,  https://bit.ly/2RIRvZq |
| American Bar Assn. | Faculty Panelist, 4th Annual Western Regional CLE Class Actions, "Big Brother, Information Privacy, and Class Actions: How Big Data and Social Media are Changing the Class Action Landscape" San Francisco, CA  June, 2018. |
| Miami Law Class Action | Faculty Panelist, " Settlement and Resolution of Class Actions," |



| & Complex Litigation Forum | Miami, FL December 2, 2016. |
| --- | --- |
| The Knowledge Group | Faculty Panelist, "Class Action Settlements: Hot Topics 2016 and Beyond," Live Webcast, www.theknowledgegroup.org, October 2016. |
| ABA National Symposium | Faculty Panelist, "Ethical Considerations in Settling Class Actions," New Orleans, LA, March 2016. |
| S.F. Banking Attorney Assn. | Speaker, "How a Class Action Notice can Make or Break your Client's Settlement," San Francisco, CA, May 2015. |
| Perrin Class Action Conf. | Faculty Panelist, "Being Media Relevant, What It Means and Why It Matters – The Social Media Evolution: Trends, Challenges and Opportunities," Chicago, IL May 2015. |
| Bridgeport Continuing Ed. | Speaker, Webinar "Media Relevant in the Class Notice Context." July, 2014. |
| Bridgeport Continuing Ed. | Faculty Panelist, "Media Relevant in the Class Notice Context." Los Angeles, California, April 2014. |
| CASD 5th Annual | Speaker, "The Impact of Social Media on Class Action Notice." Consumer Attorneys of San Diego Class Action Symposium, San Diego, California, September 2012. |
| Law Seminars International | Speaker, "Class Action Notice: Rules and Statutes Governing FRCP (b)(3) Best Practicable… What constitutes a best practicable notice? What practitioners and courts should expect in the new era of online and social media."  Chicago, IL, October 2011. ***Voted by attendees as one of the best presentations given.*** |
| CASD 4th Annual | Faculty Panelist, "Reasonable Notice - Insight for practitioners on the FJC's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*. Consumer Attorneys of San Diego Class Action Symposium, San Diego, California, October 2011. |
| CLE International | Faculty Panelist, Building a Workable Settlement Structure, CLE International, San Francisco, California May, 2011. |
| CASD | Faculty Panelist, "21st Century Class Notice and Outreach." 3rd Annual Class Action Symposium CASD Symposium, San Diego, California, October 2010. |



| | |
|---|---|
| CASD | Faculty Panelist, "The Future of Notice." 2nd Annual Class Action Symposium CASD Symposium, San Diego California, October 2009. |
| American Bar Association | Speaker, 2008 Annual Meeting, "Practical Advice for Class Action Settlements:  The Future of Notice In the United States and Internationally – Meeting the Best Practicable Standard."  Section of Business Law Business and Corporate Litigation Committee – Class and Derivative Actions Subcommittee, New York, NY, August 2008. |
| Women Lawyers Assn. | Faculty Panelist, Women Lawyers Association of Los Angeles "The Anatomy of a Class Action." Los Angeles, CA, February, 2008. |
| Warranty Chain Mgmt. | Faculty Panelist, Presentation Product Recall Simulation.  Tampa, Florida, March 2007. |
| Practicing Law Institute. | Faculty Panelist, CLE Presentation, 11th Annual Consumer Financial Services Litigation. Presentation: Class Action Settlement Structures – Evolving Notice Standards in the Internet Age.  New York/Boston (simulcast), NY March 2006; Chicago, IL April 2006 and San Francisco, CA, May 2006. |
| U.S. Consumer Product Safety Commission | Ms. Finegan participated as an invited expert panelist to the CPSC to discuss ways in which the CPSC could enhance and measure the recall process. As a panelist, Ms Finegan discussed how the CPSC could better motivate consumers to take action on recalls and how companies could scientifically measure and defend their outreach efforts.  Bethesda, MD, September 2003. |
| Weil, Gotshal & Manges | Presenter, CLE presentation, "A Scientific Approach to Legal Notice Communication." New York, June 2003. |
| Sidley & Austin | Presenter, CLE presentation, "A Scientific Approach to Legal Notice Communication." Los Angeles, May 2003. |
| Kirkland & Ellis | Speaker to restructuring group addressing "The Best Practicable Methods to Give Notice in a Tort Bankruptcy." Chicago, April 2002. |
| Georgetown University Law Center | Faculty, CLE White Paper: "What are the best practicable methods to Mass Tort Litigation give notice? Dispelling the communications myth – A notice Institute disseminated is a notice communicated," Mass Tort Litigation Institute. Washington D.C., November, 2001. |



| | |
|---|---|
| American Bar Association | Presenter, "How to Bullet-Proof Notice Programs and What Communication Barriers Present Due Process Concerns in Legal Notice," ABA Litigation Section Committee on Class Actions & Derivative Suits. Chicago, IL, August 6, 2001. |
| McCutchin, Doyle, Brown | Speaker to litigation group in San Francisco and simulcast to four other McCutchin locations, addressing the definition of effective notice and barriers to communication that affect due process in legal notice.  San Francisco, CA, June 2001. |
| Marylhurst University | Guest lecturer on public relations research methods. Portland, OR, February 2001. |
| University of Oregon | Guest speaker to MBA candidates on quantitative and qualitative research for marketing and communications programs. Portland, OR, May 2001. |
| Judicial Arbitration & Mediation Services (JAMS) | Speaker on the definition of effective notice.  San Francisco and Los Angeles, CA, June 2000. |
| International Risk Management Institute | Past Expert Commentator on Crisis and Litigation Communications. www.irmi.com. |
| The American Bankruptcy Institute Journal (ABI) | Past Contributing Editor – Beyond the Quill. www.abi.org. |

## BACKGROUND

Ms Finegan's past experience includes working in senior management for leading Class Action Administration firms including The Garden City Group ("GCG") and Poorman-Douglas Corp., ("EPIQ"). Ms. Finegan co-founded Huntington Advertising, a nationally recognized leader in legal notice communications.  After Fleet Bank purchased her firm in 1997, she grew the company into one of the nation's leading legal notice communication agencies.

Prior to that, Ms. Finegan spearheaded Huntington Communications, (an Internet development company) and The Huntington Group, Inc., (a public relations firm).  As a partner and consultant, she has worked on a wide variety of client marketing, research, advertising, public relations and Internet programs.  During her tenure at the Huntington Group, client projects included advertising (media planning and buying), shareholder meetings, direct mail, public relations (planning, financial communications) and community outreach programs. Her past client list includes large public and privately held companies: Code-A-Phone Corp., Thrifty-Payless Drug Stores, Hyster-Yale, The Portland Winter Hawks Hockey Team, U.S. National Bank, U.S. Trust Company, Morley Capital Management, and Durametal Corporation.



Prior to Huntington Advertising, Ms. Finegan worked as a consultant and public relations specialist for a West Coast-based Management and Public Relations Consulting firm.

Additionally, Ms. Finegan has experience in news and public affairs. Her professional background includes being a reporter, anchor and public affairs director for KWJJ/KJIB radio in Portland, Oregon, as well as reporter covering state government for KBZY radio in Salem, Oregon. Ms. Finegan worked as an assistant television program/promotion manager for KPDX directing $50 million in programming.  She was also the program/promotion manager at KECH-22 television.

Ms. Finegan's multi-level communication background gives her a thorough, hands-on understanding of media, the communication process, and how it relates to creating effective and efficient legal notice campaigns.

## MEMBERSHIPS, PROFESSIONAL CREDENTIALS

**APR**    Accredited. Universal Board of Accreditation Public Relations Society of America
- **Member of the Public Relations Society of America**
- **Member Canadian Public Relations Society**

**Board of Directors - Alliance for Audited Media**
Alliance for Audited Media ("AAM") is the recognized leader in cross-media verification. It was founded in 1914 as the Audit Bureau of Circulations (ABC) to bring order and transparency to the media industry. Today, more than 4,000 publishers, advertisers, agencies and technology vendors depend on its data-driven insights, technology certification audits and information services to transact with trust.

## SOCIAL MEDIA

*LinkedIn:* ***www.linkedin.com/in/jeanne-finegan-apr-7112341b***

EILEEN R. RIDLEY (SBN 151735)
   eridley@foley.com
ALAN R. OUELLETTE (SBN 272745)
   aouellette@foley.com
**FOLEY & LARDNER LLP**
555 California Street, Suite 1700
San Francisco, CA 94104-1520
T: 415.434.4484 // F: 415.434.4507

GEOFFREY M. RAUX (*pro hac vice*)
   graux@foley.com
**FOLEY & LARDNER LLP**
111 Huntington Avenue
Boston, MA 02199-7610
T: 617.342.4000 // F: 617.342.4001

ROBERT L. TEEL  (SBN 127081)
   lawoffice@rlteel.com
**LAW OFFICE OF ROBERT L. TEEL**
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
T: 866.833.5529 // F: 855.609.6911

Attorneys for Plaintiffs SYLVESTER OWINO,
JONATHAN GOMEZ, and the Proposed Class(es)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVESTER OWINO and JONATHAN GOMEZ, on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>          vs.<br><br>CORECIVIC, INC.,<br><br>                              Defendant. | Case No. 3:17-CV-01112-JLS-NLS<br><br>**CLASS ACTION**<br><br>**DECLARATION OF JEANNE C. FINEGAN REGARDING NOTICE PLAN** |
| CORECIVIC, INC.,<br><br>                   Counter-Claimant,<br><br>          vs.<br><br>SYLVESTER OWINO and JONATHAN GOMEZ, on behalf of themselves and all others similarly situated,<br><br>                   Counter-Defendants. | Judge:  Hon. Janis L. Sammartino<br>Magistrate:  Hon. Nita L. Stormes |

Case No. 17-CV-01112-JLS-NLS

I, Jeanne C. Finegan, declare as follows:

### **INTRODUCTION**

1.      I am President and Chief Media Officer of HF Media, LLC, Inc., a division of Heffler Claims Group LLC (collectively, "Heffler"). This Declaration is based on my personal knowledge, as well as information provided to me by my associates and staff, including information reasonably relied on in the fields of advertising media and communications.

2.      Plaintiffs have engaged Heffler to develop and implement a proposed legal Notice Program.

3.      This Notice Program will seek to provide actual notice to known Class Members where last known address information is available based on data produced by CoreCivic, Inc. ("CoreCivic"), both in the United States and internationally.

4.      Based on the data produced by CoreCivic, the availability of last known address information is limited and, where present, may be unreliable. Therefore, the outreach effort, necessarily, will be supplemented using a tiered, outreach program, which targets the top countries representing the vast majority of the Class Members' countries of origin. Based on key findings from over 1 million rows of data produced by CoreCivic regarding the Class Members, over 87% of the Class Members come from eight countries: Mexico, Guatemala, Honduras, El Salvador, Cuba, India, Nicaragua and Ecuador:

| Top Countries | Count | Percent |
|---|---|---|
| MEXICO | 441,956 | 42.15% |
| GUATEMALA | 152,841 | 14.58% |
| HONDURAS | 130,469 | 12.44% |
| EL SALVADOR | 123,635 | 11.79% |
| INDIA | 18,256 | 1.74% |
| CUBA[1] | 17,978 | 1.71% |
| ECUADOR | 14,728 | 1.40% |
| NICARAGUA | 13,276 | 1.27% |
| | | 87.08% |

---

[1] We have been informed that because of the current political environment and applicable laws/regulations, Heffler cannot buy advertising or provide any kind of paid media notification in Cuba.

-1-                    Case No. 17-CV-01112-JLS-NLS

5.      Accordingly, the media outreach will be tiered with the greatest media weight focusing on those countries representing the largest population of Class Members. A tiered approach to Notice has been approved by courts in other international notice programs, including *Air Cargo Shipping Servs. Antitrust Litig.*, No. 1:06-MD-01775-CBA-VVP (E.D.N.Y.); *Dover, et al. v. British Airways PLC*, No. 1:12-CV-05567 (E.D.N.Y.); *In re Mexico Money Transfer Litig. (W. Union & Valuta)*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000); *In re W. Union Money Transfer Litig.*, No. CV-01-0335 (CPS), 2004 WL 3709932 (E.D.N.Y. Oct. 19, 2004); and *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 437 F. Supp. 2d 467 (D. Md. 2006); among others.

6.      This Declaration will describe and detail the proposed Notice Program and address why it is consistent with other best practicable court-approved notice programs, the requirements of Federal Rule of Civil Procedure 23(c)(2)(B), and the Federal Judicial Center guidelines[2] for Best Practicable Due Process Notice.

## QUALIFICATIONS

7.      I previously set out detailed information concerning my credentials and qualifications in this case for the Court and provided my Curriculum Vitae in connection with Plaintiffs' July 14, 2020 submission to the Court. In summary, my credentials that qualify me to provide an expert opinion regarding notice in this matter include more than 30 years of communications and advertising experience. I have also planned and implemented over 1,000 high-profile, complex legal notice communication programs. I have extensive experience providing notice to international classes spanning more than 170 countries and over 40 languages. I am the only Notice Expert accredited in Public Relations (APR) by the Universal Accreditation Board, a program administered by the Public Relations Society of America. Further, I have provided testimony before Congress on issues of notice. I have lectured, published and been cited extensively on various aspects of legal noticing, product recall and crisis communications and have served the Consumer

---

[2] *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, Federal Judicial Center (2010), https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

Product Safety Commission (CPSC) as an expert to determine ways in which the CPSC can increase the effectiveness of its product recall campaigns. More recently, I was extensively involved as a contributing author for *"Guidelines and Best Practices Implementing 2018 Amendments to Rule 23 Class Action Settlement Provisions,"* published by Duke University School of Law. I am also a member of the Board of Directors for the Alliance for Audited Media.

8.     I have served as an expert, with day-to-day operational responsibilities, directly responsible for the design and implementation of class action notice programs, some of which are the largest and most complex programs ever implemented in both the United States and in Canada. My work includes a wide range of class actions and regulatory and consumer matters that include product liability, construction defect, antitrust, asbestos, medical, pharmaceutical, human rights, civil rights, telecommunications, media, environmental, securities, banking, insurance and bankruptcy.

9.     Additionally, I have been at the forefront of modern notice, including plain language as noted in a RAND study,[3] and importantly, I was the first Notice Expert to integrate digital media and social media into court-approved legal notice programs.

## SUMMARY OF NOTICE PROGRAM

10.     This Notice Program is designed to inform potential Class Members of the certification of this class and their rights and obligations. The members of the three certified classes fall within three categories:

(1) Individuals who were detained at any CoreCivic facility in the United States any time between December 23, 2008 and the present, **AND** were coerced or forced to clean areas of the facility outside of their personal living area under threat of punishment.

(2) Individuals who were detained at one of these CoreCivic facilities in California: Otay Mesa Detention Center in Otay Mesa, CA, the San Diego Correctional Facility in Otay Mesa, CA, or the California City Correctional Facility in California City, CA any time between January 1, 2006 and the

---

[3] Deborah R. Hensler et al., *Class Action Dilemmas: Pursuing Public Goals for Private Gain* (2000).

-3-                                    Case No. 17-CV-01112-JLS-NLS

present, **AND** were coerced or forced to clean areas of the facility outside of
their personal living area under threat of punishment.

(3) Individuals who were detained at any CoreCivic facility in California listed
above any time between May 31, 2013 and the present, **AND** participated in
the Voluntary Work Program.

## NOTICE PLAN METHODOLOGY

11.    To appropriately design and target the media outreach component of the
notice plan, Heffler is guided by well-established principles of communication and utilizes
best-in class nationally syndicated media research data relevant to individuals residing in
the United States and Mexico.  In the United States, media use across the Hispanic/Latino
population is tracked by GfK Mediamark Research and Intelligence, LLC ("MRI"),[4]
comScore,[5] Nielsen,[6] and Ad Age's Hispanic Fact Pact.[7]  In Mexico and Central America,
Heffler relied on comScore Latin America, among other sources, to provide media
consumption habits and audience delivery verification for the potential Class Members.

12.    The data resources on which this Notice Program relies are used by
advertising agencies nationwide as the basis to select the most appropriate media to reach
specific target audiences. These research reports are instrumental in our selection of media
channels and outlets for determining the estimated net audience reached through this

---

[4] GfK MRI's *Survey of the American Consumer*® is the industry standard for magazine
audience ratings in the U.S. and is used in the majority of media and marketing agencies
in the country. MRI provides comprehensive reports on demographic, lifestyle, product
usage and media exposure.
[5] comScore is a global Internet information provider on which leading companies and
advertising agencies rely for consumer behavior insight and Internet usage data. comScore
maintains a proprietary database of more than 2 million consumers who have given
comScore permission to monitor their browsing and transaction behavior, including online
and offline purchasing. This data includes and fuses first-party (website data), second-party
(data shared by websites for marketing purposes) and third-party data, tied to offline
purchasing behavior.
[6] The Nielsen Corporation measures and monitors television and radio audiences and media
delivery.  The company measures programming and advertising across all distribution
points, including, among others, network television and radio.  Nielsen's ratings are used
by advertisers and networks to shape the buying and selling of advertising.  *See generally*
The Nielsen Company (US), LLC, https://www.nielsen.com (last visited Aug. 27, 2020).
[7] Ad Age's Hispanic Fact Pack offers statistics on U.S. Hispanic marketing, media,  and
demographics, among other information.

-4-                           Case No. 17-CV-01112-JLS-NLS

Notice Plan. Specifically, this research identifies which media channels are favored by the target audience (*i.e.*, the potential Class Members) by considering browsing behaviors on the Internet, social media channels that are used, which magazines Class Members are reading, and which television programs people are watching.

13.     While traditional media[8] is typically purchased based on both demographic (*i.e.*, age, gender, ethnicity, income, education) and psychographic (*i.e.*, lifestyle, product and brand preference, media usage, and media definition) characteristics, online media, including Internet and mobile, may be purchased through more granular target audience characteristics. As a result, Heffler will apply the most sophisticated and modern media relevant approach to audience targeting.

14.     Based on these tools, Heffler is able to measure and report to the Court the percentage of the target Class that will be reached by the Notice Program and how many times the target audience will have the opportunity to see the message. In advertising, this is commonly referred to as a "Reach and Frequency" analysis, where "Reach" refers to the estimated percentage of the unduplicated audience exposed to the campaign, and "Frequency" refers to how many times, on average, the target audience had the opportunity to see the message. The calculations are used by advertising and communications firms worldwide and have become a critical element to help provide the basis for determining adequacy of notice in class actions.

## NOTICE PROGRAM SUMMARY

15.     The objective of the Notice Program is to successfully reach (through objective quantifiable validation measures described in Paragraph 13 above) and inform the potential Class Members of their rights and obligations. The notice procedures being implemented include direct, written notice (in the form of the Long Form Notice approved by the Court) to all known potential Class Members via first class physical mail at their last known addresses.

---

[8] Traditional media is a reference to pre-Internet media: magazine, newspaper, terrestrial radio, and broadcast and cable television.

-5-                    Case No. 17-CV-01112-JLS-NLS

16.     As written notice may not reach all potential Class Members, the Notice Program will supplement direct notice using various forms of media targeted to potential Class Members. The supplemental Notice Program will be tiered to weight the media where the greatest number of potential Class Members are found based on statistical and demographic research studies and available data.

17.     Tier 1 includes the United States and Mexico. Mexico alone represents the country of origin for over 42% of undocumented immigrants to the United States. The Supplemental Notice Plan being implemented in the United States and Mexico utilizes the following paid media channels to reach unknown potential Class Members for which direct notice may not be available:

### Tier 1 – United States

| Direct Mail | | | | |
|---|---|---|---|---|
| **Television** | Cable Television | Telemundo | :60-second commercials | Spanish |
| **Radio** | National Radio | Univision | :60-second commercials | Spanish |
| | Local Markets | Local Terrestrial | :60-second commercials | Spanish |
| **Online** | Display , Search, Video -YouTube | Pulpo | Banner and Video Ads | Spanish |
| **Social Media** | Facebook and Instagram | | Newsfeed Ads | Spanish |
| **Press Release** | USA 1 | | | English/Spanish |
| **Response Hubs** | Informational Website Toll-free line | | | |

## Tier 1 – Mexico

| Direct Mail | | | | |
|---|---|---|---|---|
| **Television** | Network Television | Televisa | :60-second commercials | Spanish |
| **Online** | Display , Search | Pulpo | Banner and Video Ads | Spanish |
| **Social Media** | Facebook and Instagram | | Newsfeed Ads | Spanish |
| **Press Release** | Latin America Network | | | Spanish |
| **Response Hubs** | Informational Website Toll-free line | | | |

## Tier 2 – All Other Countries

| Direct Mail | | | | |
|---|---|---|---|---|
| **Press Release** | Latin America Network India | | | English Spanish |

## U.S. TARGET AUDIENCE DEMOGRAPHICS AND POPULATION CONCENTRATIONS

18.    Our assumptions are derived from a number of research reports and data sources, including the Department of Homeland Security, Office of Immigration Statistics:

///

///

Population Estimates: Illegal Alien Population Residing in The United States,[9] U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report,[10] and MigrationPolicy.org: Unauthorized Immigrant Population Profiles.[11]  Our assumptions are also guided by the over 1 million rows of data produced by CoreCivic detailing the last known address, country of origin and demographic information for the potential Class Members.  The data was then sorted to determine the total migrant counts for each country.   Based on this analysis, Mexico, Guatemala, Honduras and El Salvador make up the country of origin for over 80% of the potential Class Members.  India, Cuba, Ecuador and Nicaragua increase that count by another 7%.

19.     The data also reveals key demographic information, such as race and ethnic considerations.  Over 94% of the potential Class Members are Hispanic (91% identify their ethnicity as Central American and Latino). Of the total detainee population, 76% are male and 24% are female. While the age categories range from 18-54 years of age, 83% of the potential Class Members are between 25-54 years of age.

20.     Further, research reports and data sources indicate that 84% of undocumented immigrants residing in the United States are age 18-54. Of this population, 53% are male and 47% are female.[12] Consistent with this data, the demographic data produced by CoreCivic indicates that 85.3% of the potential Class Members self-report as Hispanic. MigrationPolicy.Org reports that 41% of the undocumented immigrant population is found

---

[9]   Bryan Baker, *Population Estimates: Illegal Alien Population Residing in the United States: January 2015*, United States Department of Homeland Security (December 2018), https:// www.dhs.gov/sites/default/files/publications/18_1214_PLCY_pops-est-report.pdf
[10] *U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report*, U.S. Immigrations and Customs Enforcement, at 9, fig. 15 (2019), https://www.ice.gov/sites/default/files/documents/Document/2019/ eroReportFY2019.pdf.
[11]   *Unauthorized Immigrant Population Profiles*, Migration Policy Institute, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles (last visited Aug. 27, 2020).
[12] Baker, *supra* note 9.

-8-                        Case No. 17-CV-01112-JLS-NLS

in California and Texas.[13]

## U.S. MEDIA CHOICE RATIONALE

21.     The media channel selection is based on syndicated research data from MRI. This data provides insight into media consumption habits of various populations.  For individuals who identify as Hispanic with a birthplace outside of the United States, the data shows strong broadcast (television and radio) use along with heavy use of online and social media:

- **Television**: 90.4% have watched TV in the past 7 days.
- **Radio**: 84% have listened to radio in the past 7 days.
- **Digital Media: Search, Display & Social**
  - 72.3% have used the Internet in the past 30 days
  - 70.8% have used their smartphone to access the Internet in the past 30 days
  - 67.3% have used social media

## DIRECT NOTICE

22.     Heffler will perform an extensive analysis and cleansing of the Class Member data to identify records with possible mailing addresses in the United States and other countries.  At this time, Heffler is unable to determine the number of records with potentially valid mailing addresses.

23.     Once the records with mailing addresses are identified, Heffler will run the United States addresses through the United States Postal Service's (USPS) National Change of Address database to obtain current mailing addresses for Class Members who may have filed a change of address with the USPS in the last four years. Heffler will then integrate the updated addresses within the Class Member data set for mailing. Heffler will then send, by First-Class mail, the Long Form Notice approved by the Court to the United States addresses and to the addresses in countries outside of the United States. The final results of this analysis will be reported to the Court upon completion of the Notice Program.

## NETWORK BROADCAST TELEVISION

24.     The Notice Plan contemplates :60-second commercials that will air on

---

[13] *Unauthorized Immigrant Population Profiles*, *supra* note 11.

Telemundo, a Spanish Language Broadcast station.  An estimated total of approximately 153 network television commercials are planned to air. The specific programs selected are based on research provided by Nielsen for their reach among the target audiences described above.

## ONLINE NOTICE

25.     The online noticing efforts will feature banner ads in Spanish using a variety of creative styles to appeal to people of different demographics. Moreover, online display ads will be shown across multiple devices including desktop, tablet, and mobile devices. Multiple layers of ad fraud detection are used to reduce the risk of appearing on spoofed, fake, or offensive websites with counterfeit ad fraud inventory and fake audience profiles. The Notice Program will target Hispanics/Latinos age 18-54 with weighted delivery to States with the highest percent of undocumented immigrants. While the population of undocumented immigrants can be found throughout the United States, the population of undocumented immigrants is largely concentrated into several states as the chart below demonstrates. Accordingly, Heffler will place a heavy focus on these States using geotargeted online and social media. Additionally, Heffler will retarget users who visit the website with additional notice reminders to take action.

### National and State Estimates of the Undocumented Immigrant Population, 2016

| State | Total Unauthorized Population | Percent | % Mexico and Central America Origin |
|---|---|---|---|
| United States | 11,300,000 | 100% | |
| California | 3,059,000 | 27% | 81% |
| Texas | 1,597,000 | 14% | 84% |
| New York | 940,000 | 8% | 31% |
| Florida | 656,000 | 6% | 51% |
| New Jersey | 526,000 | 5% | 39% |
| Illinois | 487,000 | 4% | 67% |
| Georgia | 351,000 | 3% | 76% |

///

///

///

-10-                    Case No. 17-CV-01112-JLS-NLS



Unauthorized Immigrant Populations by Country and Region of Birth, Top State and County of Residence, 2012-2016

Graphic Source URL: *Unauthorized Immigrant Populations by Country and Region, Top States and Counties of Residence, 2012-16*, Migration Policy Institute, https://www.migrationpolicy.org/programs/data-hub/charts/unauthorized-immigrant-populations-country-and-region-top-state-and-county (last visited Aug. 27, 2020).

## SOCIAL MEDIA: FACEBOOK AND INSTAGRAM

26.     Heffler will target Hispanic/Latino adults age 18 to 54 in Spanish on the social media networks Facebook and Instagram with weighted delivery to States with higher populations of undocumented immigrants.

## INTERNET SEARCH TERMS

27.     This Notice Plan will employ Google keyword search terms.  When users search for target phrases and keywords identified for this Notice Plan on Google, ads will appear on the search result pages.  Representative key terms will include, but are not limited to, ICE class action, ICE litigation, ICE detention facilities, immigration enforcement, CoreCivic class action, CoreCivic litigation, CoreCivic detention facilities, and

-11-                    Case No. 17-CV-01112-JLS-NLS

immigration class action.

28.     The online ads will provide information for visitors to self-identify as potential Class Members, where they may "click" on the banner and then link directly to a website containing information about the lawsuit and how to opt-out of the Class.

## NATIONAL RADIO

29.     Network radio is highly useful for reaching potential Class Members in the United States.  According to MRI, 84% of Hispanics born outside the United States have listened to radio in the past 7 days.  Radio can provide nationwide reach across various listening formats to appropriately reach target audience subgroups across age, gender, ethnicity and cultural affiliation. Heffler will use Univision Radio, which is the top Hispanic radio network, carried in 74 markets through 226 stations.  Approximately 22,600 commercials will air across the network.

## LOCAL RADIO IN TOP DESIGNATED MARKET AREAS (DMAS)

30.     A more granular analysis of the geographical distribution on undocumented immigrants in the United States shows the top Designated Market Areas ("DMAs") and cities in the United States with the largest populations of undocumented immigrants. To increase outreach in these markets, Heffler will use local market radio in the following DMAs:

| DMA | Undocumented Population | % of Total |
|---|---|---|
| United States | 11,300,000 | 100% |
| Los Angeles, CA | 1,607,000 | 14.2% |
| San Francisco, CA | 501,000 | 4.4% |
| Houston, TX | 494,000 | 4.4% |
| Chicago, IL | 436,000 | 3.9% |
| Dallas, TX | 386,000 | 3.4% |

## MEXICO

31.     Based on the analysis of demographic data produced by CoreCivic pertaining to Mexican detainees, 90% are male and 10% are female.  Further, 89% are 25-54 years of age.  Therefore, our primary target in Mexico is men 25 to 54 years of age.

32.     Utilizing in-country media research from comScore and Nielsen, we see that

-12-                 Case No. 17-CV-01112-JLS-NLS

the media consumption habits in Mexico are similar to the United States. As a result,
Heffler will apply a similar media strategy. 93% of Mexicans report owning at least one
television set,[14] and 69% of Mexicans are active social media users, with 99% of these
users accessing social media via mobile phones.[15]

## MEXICO TELEVISION

33.     Televisa is the largest media company in the Spanish-speaking world, and an
important cable operator in Mexico, where the majority of households have at least one
television set. The Notice Plan contemplates 15-25 TV spots using :60-second Spanish
language commercials. The TV schedule will air over a three (3) week time period using a
variety of dayparts.[16]

## MEXICO ONLINE, SOCIAL MEDIA AND SEARCH NOTICE

34.     Within Mexico, Heffler will adopt the same digital media strategy as in the
United States with weighted delivery to Mexican states with higher populations of
undocumented immigrants to the United States. Ads will appear across multiple devices,
including desktop, tablet, and mobile devices using display, social media through Facebook
and Instagram, and on Google Search. The charts below summarize the Mexican state of
origin for undocumented immigrants from Mexico in the United States:

///

///

///

///

---

[14] *Television*, Media Landscapes, https://medialandscapes.org/country/mexico/media/television (last visited Aug. 27, 2020).

[15] Source: Hootsuite Digital 2020 Global Digital Yearbook

[16] A "daypart" is a term traditionally used when buying television but is also used for radio. It is a block of time that divides the day into segments for purchase, scheduling, and delivery.  The dayparting method is often used to tailor content to specific audiences throughout the day, *e.g.*, early morning is 5 a.m. to 9 a.m.; daytime is 9 a.m. to 4 p.m.; early fringe is 4 p.m. to 6 p.m.; evening news is 6 p.m. to 7 p.m.; prime time is 8 p.m. to 10 p.m. and late is 11:30 p.m. to 2 a.m.



Number and Share of Mexican Migrants to the United States by Mexican State of Residence, 2004-2015

Number of Mexican Migrants to the United States, 2004-2015

[Graphic Source URL: *Origins of Mexican Migrants to the United States by Mexican State of Residence, Number, and Share, 2004-2015,* Migration Policy Institute, https://www.migrationpolicy.org/programs/data-hub/charts/origins-mexican-migrants-united-states-mexican-state-residence-number-and?width=900&height=850&iframe=true

Number and Share of Mexican Migrants to the United States by Mexican State of Residence, 2004-2015 Data Chart.

| Mexican State | Total by State 2004-2015***** | % of Total |
|---|---|---|
| Guanajuato | 742,100 | 12.1% |
| Chiapas | 620,600 | 10.1% |
| Michoacán | 586,300 | 9.6% |
| Jalisco | 440,300 | 7.2% |
| Oaxaca | 353,400 | 5.8% |
| Veracruz | 328,600 | 5.4% |
| Sonora | 259,300 | 4.2% |
| Sinaloa | 253,800 | 4.1% |
| Mexico | 251,490 | 4.1% |
| Guerrero | 249,000 | 4.1% |

## TIER 2 – ALL OTHER COUNTRIES

35.    Tier 2 countries will be noticed through a general press release to PR Newswire's Full Latin America newsline (Argentina, Bolivia, Brazil, Chile, Colombia, Costa Rica, Ecuador, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Panama, Paraguay, Peru, Uruguay, Venezuela, Puerto Rico and Dominican Republic) and PR Newswire's India newsline. PR Newswire delivers to thousands of print and broadcast newsrooms worldwide, as well as websites, databases and online services including featured placement in news sections of leading portals.

## CONCLUSION

36.    The robust outreach efforts employed reflect a particularly appropriate, highly targeted, efficient, and modern way to provide notice to known and unknown Class

Members.  The notice procedures are broad and multi-faceted and are designed to reach an estimated 70 percent of Hispanic adults eighteen (18) to fifty-four (54) years with an average frequency of over two (2) times in the United States.  The Notice Plan is estimated to also reach 70 percent of men twenty-five (25) to fifty-four (54) years with an average frequency of two (2) times in Mexico.  The notice plan as described is reasonably calculated to provide notice that is  consistent with best practicable court approved notice programs in similar matters which are consistent with the Federal Judicial Center's guidelines concerning appropriate reach.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.  Executed on August 28, 2020 in Tigard, Oregon.


Jeanne C. Finegan

Case No. 17-CV-01112-JLS-NLS