Barrett S. Litt, SBN 45527
blitt@mbllegal.com
Lindsay Battles, SBN 262862
lbattles@mbllegal.com
MCLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Jennifer Pasquarella, SBN 263241
jpasquarella@aclusocal.org
Jessica Karp Bansal, SBN 277347
jbansal@aclusocal.org
Mohammad Tajsar, SBN 280152
Zoë Mckinney, SBN 312877
Jordan Wells, pro hac vice
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Phone:  (213) 977-9500
Facsimile:  (213) 977-5299

Attorneys for Plaintiffs
(Other counsel listed below)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUNCAN ROY, *et al*., | Case No. CV 12-09012 (FFMx) |
| Plaintiffs, | [Honorable André Birotte, Jr.] |
| vs. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS** |
| COUNTY OF LOS ANGELES, *et al*., | |
| Defendants. | [*FILED CONCURRENTLY WITH DECLARATION OF BARRETT S. LITT; EXHIBITS*] |
| . | **Date:** **November 19, 2021** |
| | **Time:** **10:00 A.M.** |
| | **Place:** **Courtroom 7B** |

CHRIS NEWMAN, SBN 255616
 newman@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Pkwy, Suite 106
Pasadena, California 91105
Telephone: (626) 799-2160
Facsimile: (626) 799-3560

MARK M. FLEMING (pro hac vice)
mfleming@heartlandalliance.org
NATIONAL IMMIGRANT JUSTICE CENTER
224 S. Michigan Avenue, Suite 600
Chicago, IL 60604
Telephone: (312) 660-1628
Facsimile: (312) 660-1505

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................... 1

II.   COUNSEL'S REQUESTED AWARD IS REASONABLE ......................... 2

   A.   In Common Fund Cases, Federal Courts Typically Award Fees Based on a Percentage of the Fund, With Reference to the Circumstances of the Case and Lodestar ........................................................................ 2

   B.   The Circumstances of this Case Support a One-Third Award ............. 5

      1.   The Exceptional Results in this Case Support a 1/3 Award ....... 5
         a)   The Settlement Provides Significant Direct Compensation to Class Members ................................................................ 5
         b)   The Litigation Provides Considerable Indirect Compensation Should Few Class Members Come Forward ......................... 7
         c)   The Litigation Conferred Substantial Benefits Beyond the Class Fund ........................................................................ 9

      2.   The Litigation was Handled on a Contingency Basis and Imposed Burdens and Risks that Support a One-Third Award 10
         a)   This Contingency Case Was Very Hard-Fought and Imposed Substantial Burdens on Plaintiffs' Counsel ......................... 10
         b)   The Case Carried Significant Risks Arising from the Complexity of the Legal Issues, Class Certification and Difficulty Locating Class Members .................................... 13

      3.   The Requested Award is At The Low End Of The Market Rate for Individual Civil Rights Cases ............................................. 17

   C.   A Lodestar Cross-Check Supports A One-Third Award ................... 17
      1.   Counsel's Rates are Reasonable ............................................... 18
      2.   Counsel's Hours Are Reasonable .............................................. 22
      3.   The Lodestar Cross-Check Produces a Low Multiplier of 1.4, Supporting the Requested Fee of 33% ..................................... 23

III.  THE COSTS ARE REASONABLE ........................................................ 25

IV.   CONCLUSION .................................................................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

## TABLE OF AUTHORITIES

### Federal Cases

*Acosta v. Frito-Lay, Inc.*,
  2018 WL 2088278 (N.D. Cal. May 4, 2018)...............................................4, 23

*Barjon v. Dalton*,
  132 F.3d 496 (9th Cir. 1997) ..........................................................................21

*Beaver v. Tarsadia Hotels*,
  2017 WL 4310707 (S.D. Cal. Sept. 28, 2017) ..........................................4, 24

*Blum v. Stenson*,
  465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ................................22

*Boyd v. Bank of Am. Corp.*,
  2014 WL 6473804 (C.D. Cal. Nov. 18, 2014) ..............................................16

*Bradburn Parent Teacher Store, Inc. v. 3M*,
  2007 WL 1468847 (E.D.Pa.,2007) .................................................................24

*Bynum v. D.C.*,
  412 F. Supp. 2d 73 (D.D.C. 2006) ...................................................................4

*Charlebois v. Angels Baseball LP*,
  993 F. Supp. 2d 1109 (C.D. Cal. 2012) .........................................................21

*Coles v. City of Oakland*,
  2007 WL 39304 (N.D.Cal. Jan. 4, 2007)........................................................22

*Craft v. Cty. of San Bernardino*,
  624 F. Supp. 2d 1113 (C.D. Cal. 2008) .........................................................25

*Davis v. Mutual Life Ins. Co.*,
  6 F.3d 367 (6th Cir. 1993) ..............................................................................16

*Fischel v. Equitable Life Assur. Soc'y of U.S.*,
  307 F.3d 997 (9th Cir. 2002) ....................................................................21, 23

*Fox v. Vice*,
  563 U.S. 826, 131 S. Ct. 2205, 180 L. Ed. 2d 45 (2011) ........................14, 23

*Gaskill v. Gordon*,
  160 F.3d 361 (7th Cir. 1998) ..........................................................................17

*Greer v. Dick's Sporting Goods, Inc.*,
  2020 WL 5535399 (E.D.Cal. 2020) .................................................................4

*Harris v. Marhoefer*,
   24 F.3d 16 (9th Cir. 1994) ...................................................................................25

*Hensley v. Eckhart*,
   461 U.S. 424 (1983)..........................................................................................4, 14

*Hopkins v. Stryker Sales Corp.*,
   2013 WL 496358 (N.D.Cal. Feb. 6, 2013) ........................................................23

*In re Apple Inc. Device Performance Litigation*,
   2021 WL 1022866 (N.D. Cal. 2021) ..................................................................19

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) .............................................................................2, 3

*In re Buspirone Antitrust Litig.*, Civ.A.No.,
   01-MD-1410 (S.D.N.Y. Apr. 11, 2003) (S.D.N.Y. Apr. 11, 2003) ...................24

*In re Cardizem CD Antitrust Litig.*, Civ.A.No.,
   99-MD-1278 (E.D.Mich. Nov. 26, 2002) (E.D.Mich. Nov. 26, 2002) ..............24

*In re Enron Corp. Securities, Derivative & ERISA Litigation*,
   586 F.Supp.2d 732 (S.D.Tex. 2008)......................................................................3

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
   2017 WL 6040065 (N.D. Cal. Dec. 6, 2017)......................................................24

*In re Omnivision Technologies, Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008)................................................................3

*In re Optical Disk Drive*,
   959 F.3d (9th Cir., 2020) ......................................................................................5

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998) ...............................................................................24

*In re Remeron Direct Purchaser Antitrust Litigation*,
   2005 WL 3008808 (D.N.J. 2005) ..................................................................17, 25

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3rd Cir. 2005) ..............................................................................22

*In re Vitamins Antitrust Litig.*, Civ.A.No. 99-197, MDL No. 1285,
   2001 WL 34312839 (D.D.C. July 16, 2001) ......................................................24

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994) ..............................................................................23

*Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at *12 (E.D. Cal. Sept. 1,
   2011) ......................................................................................................................5

iii

*Maley v. Del Glob. Techs. Corp.*,
 186 F. Supp. 2d 358 (S.D.N.Y. 2002) ...................................................25

*Mauss v. NuVasive, Inc.*,
 2018 WL 6421623 (S.D. Cal. Dec. 6, 2018) ....................................4, 13

*Missouri v. Jenkins*,
 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ......................21

*Moore v. James H. Matthews & Co.*,
 682 F.2d 830 (9th Cir. 1982) ...............................................................22

*Moreno v. City of Sacramento*,
 534 F.3d 1106 (9th Cir. 2008) .............................................................22

*Nachshin v. AOL, LLC*,
 663 F.3d 1034 (9th Cir. 2011) ...............................................................8

*Nat. Collegiate Athletic*,
 768 Fed.Appx. (9th Cir. 2019)...............................................................4

*Nichols v. SmithKline Beecham Corp.*,
 2005 WL 950616 (E.D.Pa.,2005) ...................................................4, 24

*Parker v. Vulcan Materials Co. Long Term Disability Plan*,
 2012 WL 843623 (C.D.Cal. Feb. 16, 2012) ........................................22

*Pena v. Taylor Farms Pacific, Inc.*,
 2021 WL 916257 (E.D. Cal. 2021) ........................................................3

*Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*,
 483 U.S. 711 (1987).............................................................................16

*Romero v. Producers Dairy Foods, Inc.*,
 2007 WL 3492841 (E.D. Cal. Nov. 14, 2007) .......................................4

*Roy v. Cty. of Los Angeles*,
 2018 WL 914773 (C.D. Cal. Feb. 7, 2018) ............................................9

*Seguin v. County of Tulare*,
 2018 WL 1919823 (E.D. Cal. Apr. 24, 2018) ......................................16

*Smith v. Experian Information Solutions, Inc.*,
 2020 WL 6689209 (C.D.Cal. 2020) .....................................................24

*Spann v. J.C. Penney Corp.*,
 211 F. Supp. 3d 1244 (C.D. Cal. 2016).................................................24

*Steiner v. Am. Broad. Co.*,
 248 Fed.Appx. 780 (9th Cir. 2007) ......................................................25

iv

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ...................................................................... Passim

*Williams v. MGM-Pathe Commun. Co.*,
   129 F.3d 1026 (9th Cir.1997) ................................................................................1

*Young v. Cty. of Cook*, No. 06 C 552,
   2017 WL 4164238 (N.D. Ill. Sept. 20, 2017)........................................................5

**State Cases**

Federal Statutes

42 U.S.C. § 1988..............................................................................................21

Federal Rules

FRCP Rule 23 .................................................................................................15

Other Authorities

*3 Newberg* §14.03...........................................................................................24

California Senate Bill No. 54 ..............................................................................9

## MEMORANDUM OF POINTS & AUTHORITIES

### I.   INTRODUCTION

This case arose from the Los Angeles County Sheriff's Department's ("LASD") practice of unlawfully holding persons on warrantless immigration detainers. It was filed in October 2012. In 2018, after six years of hard-fought litigation, Plaintiffs secured affirmative summary judgment on liability. They also secured an order re-affirming class certification and acknowledging the availability of classwide general damages. After these decisions, the parties scheduled a mediation, followed by nearly two years of further negotiations before a final settlement was reached. The settlement was approved by the County of Los Angeles in October 2020 and preliminarily approved by the Court on November 25, 2020. Dkt. 610.

The total size of the non-reversionary settlement fund is $14,000,000 from which costs of class administration, litigation costs, incentive awards, and attorneys' fees will be taken. The settlement provides for direct financial compensation to over 20,000 class members who were unlawfully incarcerated by the LASD pursuant to warrantless, immigration detainers. Assuming the claims rate falls within the expected range (addressed *infra*), all valid claimants will receive $1,000 per day for each day they were unlawfully detained (with a maximum of 25 days). On average, claimants will be entitled to several thousand dollars. The settlement also provides that funds, if any, left after paying class members, be used for indirect compensation to class members in the form of *cy pres* funding to programs that provide legal assistance to non-citizens who face immigration consequences as a result of their involvement with the Los Angeles County criminal justice system.

Through this motion, Plaintiffs' counsel requests an attorney's fee award equivalent to 33.3% (1/3) of the $14 million class fund ($4,660,620).[1] The lodestar

---

[1] For purposes of determining the size of the fund from which a percentage is taken, all funds – including attorneys' fees, litigation costs and class administration costs – are

cross-check strongly supports the reasonableness of the requested fee.  The requested award translates to a multiplier of approximately 1.4 (based on a total lodestar calculation of $3,334,730). A multiplier of less than 2 is considered very modest and at the lower end of multipliers routinely approved by courts in this circuit.

The requested fee is also reasonable given the specific circumstances of this case, including the novelty and complexity of the issues, the highly contested nature of this litigation, and the exceptional result for class members. This case involved over 4,300 hours of work spanning nearly nine years. It represents one of the most hard-fought, legally intricate, and risky cases Plaintiffs' counsel has taken on a contingency basis. Despite significant liability and class certification challenges, Plaintiffs' counsel ultimately negotiated a highly favorable settlement for class members ensuring substantial, monetary compensation for each day of unlawful incarceration and indirect compensation in the form of meaningful *cy pres* funding. *See* Decl. Barrett S. Litt ("Litt Dec."), ¶¶33-54 (detailing risks and favorable outcome).

## II.   COUNSEL'S REQUESTED AWARD IS REASONABLE

### A.   In Common Fund Cases, Federal Courts Typically Award Fees Based on a Percentage of the Fund, With Reference to the Circumstances of the Case and Lodestar

In common fund cases, Ninth Circuit courts use two alternate methods to calculate attorneys' fees: the lodestar method and the percentage of the fund approach. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941-942 (9th Cir. 2011). While either may be used, the percentage-of-the-fund method is by far

included in determining the size of the fund. *See Williams v. MGM-Pathe Commun. Co.*, 129 F.3d 1026 (9th Cir.1997) (reversing award of attorneys' fees because trial court failed to base fee award on the entire settlement, rather than the amount claimed; here, because the fund is non-reversionary, all funds go to claiming class members or specified programs to the extent there are funds left).

the dominant approach. *In re Omnivision Technologies, Inc.,* 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008) (citing, *inter alia*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *see also*, *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 748 (S.D.Tex. 2008) ("Most federal courts use the percentage of the fund approach in awarding attorneys' fees in common fund classes";" the primary basis of the [class] fee award remains the percentage [of the class fund] method."). The percentage of the fund approach is preferred because it most closely aligns the interests of counsel and the class by ensuring that counsel directly benefit from increasing the size of the class fund and working efficiently. *See e.g. Vizcaino*, 290 F.3d at 1050 ("lodestar method is merely a cross-check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee, since the lodestar method does not reward early settlement."); *In re Omnivision*, 559 F.Supp. at 1046 (citing *In re Activision Sec. Litig.*, 723 F.Supp.1373, 1374-77 (N.D. Cal. 1989) (collecting cases). *See also*, Litt Decl., ¶¶68-75.

In the Ninth Circuit, 25% is considered the benchmark or starting place for analyzing fees. *Vizcaino*, 290 F.3d at 1048. In most cases, however, the fee award *exceeds* the 25% benchmark. *In re Omnivision* 559 F. Supp. 2d at 1047 (N.D. Cal. 2009) ("This court's review of recent reported cases discloses that nearly all common fund awards range around 30%").

Any percentage award "must be supported by findings that take into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1050. Awards over the 25% benchmark are particularly appropriate "when counsel achieves exceptional results for the class, undertakes extremely risky litigation, generates benefits for the class beyond simply the cash settlement fund, or handles the case on a contingency basis." *See* e.g., *Pena v. Taylor Farms Pacific, Inc.,* 2021 WL 916257, at *4-6 (E.D. Cal. 2021).

Federal courts typically cross-check the reasonableness of a percentage award by calculating the lodestar and multiplier. *Vizcaino*, 290 F.3d at 1050; *Nat. Collegiate Athletic*, 768 Fed.Appx. at 654 (9th Cir. 2019); *Acosta v. Frito-Lay, Inc.*, 2018 WL 2088278, at *11-12 (N.D. Cal. May 4, 2018). To conduct a lodestar cross-check, a court takes "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckhart*, 461 U.S. 424, 33 (1983). Multipliers are expected. *See Vizcaino*, 290 F.3d at 1050. If the multiplier falls within an acceptable range, it further supports the conclusion that the fees sought are reasonable. *See id.* The majority of multipliers fall between 1.5 and 4. *Id.* A multiplier of less than two is low. *Acosta*, 2018 WL 2088278, at 14.

Percentage awards vary considerably with respect to both the actual percentage awarded and multiplier. Courts often approve awards equal to one-third of the class fund, sometimes more, depending on the relationship to lodestar and specific circumstances of the case. *Mauss v. NuVasive, Inc.,* No. 13CV2005 JM (JLB), 2018 WL 6421623, at *5–10 (S.D. Cal. Dec. 6, 2018) ("District courts in this circuit have routinely awarded fees of one-third of the common fund or higher after considering the particular facts and circumstances of each case") (citing *Beaver v. Tarsadia Hotels*, 2017 WL 4310707, at *10 (S.D. Cal. Sept. 28, 2017) (listing Ninth Circuit cases approving a fee award of one-third the common fund); *Greer v. Dick's Sporting Goods*, Inc., 2020 WL 5535399, at *8-11 (E.D.Cal. 2020) (approving 33% fee with 1.24 multiplier); *Romero v. Producers Dairy Foods, Inc.,* 2007 WL 3492841, at *4 (E.D. Cal. Nov. 14, 2007) ("Empirical studies show that…fee awards in class actions average around one-third of the recovery" citing Newberg (4th Ed.)).

These decisions are consistent with decisions in other circuits. *See e.g., Nichols v. SmithKline Beecham Corp.*, 2005 WL 950616 (E.D.Pa.,2005) ("[s]ince *Vizcaino,* courts have awarded attorneys' fees amounting to between 25% and 35% of the common fund" in a wide range of cases); *Bynum v. D.C.*, 412 F. Supp. 2d 73

(D.D.C. 2006) (awarding 1/3 of $12 Million fund); *Young v. Cty. of Cook*, No. 06 C 552, 2017 WL 4164238, at *1 (N.D. Ill. Sept. 20, 2017) (noting the availability of 1/3 of the fund as attorney fees; awarding 1/3 in the follow-on insurance litigation); *Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at *12 (E.D. Cal. Sept. 1, 2011) (fees in common fund cases average 32% or 34.64%).[2]

Here, Plaintiffs' counsel seeks an award equivalent to 33.3% of the class fund, which represents a lodestar multiplier of approximately 1.4. This low multiplier supports the reasonableness of a 1/3 fee award, particularly considering the challenging circumstances of this case and outstanding result.

## B. The Circumstances of this Case Support a One-Third Award

Any percentage of the fund award "must be supported by findings that take into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1050. In assessing reasonableness, courts may consider: (1) the results achieved; (2) the risk undertaken by class counsel, (3) whether the litigation generated benefits beyond a cash payment; (4) the market rate for similar representations; and (4) whether the representation was undertaken on a contingency basis. *In re Optical Disk Drive*, 959 F.3d at 930 (9th Cir., 2020) (citing *In Vizcaino,* 290 F.3d at 1048–50 (9th Cir. 2002). We address these factors below.

### 1. The Exceptional Results in this Case Support a 1/3 Award

#### a) The Settlement Provides Significant Direct Compensation to Class Members

Class counsel obtained a $14 million settlement with no reversion to the Defendants, which will result in significant recoveries to persons who were over-detained on ICE-holds. After costs and maximum fees, and assuming a 1/3 of the fund fee, there will be approximately $8,700,000 for distribution to class members.

---

[2] Mr. Litt has handled three over-detention class actions over the past 20 years, with settlements ranging from $6 Million to $27 Million (including strip searches), in each of which the fee award was 1/3 of the fund or higher. See Litt Dec., ¶¶42-45.

The amount of each claimant's share depends on the total number of valid claims. In Plaintiffs' counsel's experience, most jail class action cases have a claims rate of 10-25% depending on various factors, including the size of the class, the amount of potential recoveries, and duration of the litigation. Here, we anticipated a very low claims rate based on several considerations. First, significant time has elapsed since the relevant underlying events. Two class periods run from October 2010 to June 2014. The other class runs from October 2010 to October 2012. When the underlying events are so remote in time, class members may have less interest in pursuing claims and may be more difficult to locate given very old class data. Second, the class is comprised almost entirely of non-citizens who were facing both criminal charges and alleged civil immigration violations. A significant number were deported to Mexico and Central America, where they will be very difficult to reach. We anticipate that many of those who remained in Southern California may be reluctant to come forward due to fear that they could expose their immigration status. We also recognize that many class members struggle with financial difficulties that undermine their to maintain stable housing and phone numbers. Given these challenges, we expect a claims rate between 4% - 8%, even with a very robust outreach plan.[3] Litt Decl., ¶¶39-41.

Provided the claims rate is 10% or less – the maximum anticipated rate– all *Gerstein* and No Money Bail claimants will recover the maximum of $1,000 per day (up to a maximum of $25,000 per claimant).[4] The average *Gerstein* class

---

[3] There are currently 1,888 claims filed, which translates to a claims rate of 8.8%. Of these claims, however, 1,293 are non-targeted and have not been matched back to a valid class member. These claims are pending review. Counting only approved, validated claims, the claims rate is 2.7%. We anticipate that the final claims rate will fall between 4% and 8%, which is in the range of what we anticipated in light of the challenges in this case.. Litt Decl., ¶40.

[4] Including both the estimated *Gerstein* class members and all No-Money-Bail class members, there are a total of 80,063 over-detention days. Assuming that approximately 10% of No-Bail-Notation class members make claims, each of $250 (per the settlement agreement), the total award to that subclass would be $144,250, leaving $8,555,750 for

member has 2.3 days of unlawful incarceration, meaning their average award would be $2,300. The average No-Money-Bail class member has 4 days of incarceration. Their average award would be $4,000. Approximately 1,500 individuals belong to both classes and will likely see average awards of over $5,000. Litt Decl., ¶41.

The individual recoveries fall on the higher side of recoveries in jail over-detention class actions. Class counsel, Barrett Litt, has extensive experience with over-detention class actions and has handled several throughout the United States. The recovery in this case - $1,000 per day – is substantially more than claimants recovered in any of his prior cases, even after recoveries in those cases are adjusted for inflation. His most recent case, *Barnes v. District of Columbia*, Case 1:06-cv-00315-RCL-02-956 (RCL) (D.D.C.), settled in 2014 with an over-detention recovery for the first day of $370 ($415 accounting for inflation), and $250 for each day after that. Litt Decl., ¶42-43.

The individual recoveries in this case also represent an exceptional outcome given the difficulty class members would have experienced litigating individual cases. Given the value of the average claim, the overwhelming majority could not have pursued financially viable individual claims, especially given the risks arising from the absence of clear precedent establishing liability. And while some class members have larger claims, many would have been unavailable or reluctant to come forward for fear of exposing their immigration status.

### b) The Litigation Provides Considerable Indirect Compensation Should Few Class Members Come Forward

Even if the claims rate remains relatively low, the lawsuit will provide substantial indirect benefits to the class. If the maximum available for distribution

---

distribution to the *Gerstein* and No-Money-Bail class members. This would compensate 8,556 days at $1,000 per day, which constitutes 10.7% of the total over-detention days attributable to class members.

is not consumed by all valid claims (paid at the maximum per-diem award), any remainder will be used to fund legal services for non-citizens in Los Angeles County who face potential immigration consequences as a result of their involvement with the Los Angeles County criminal justice system.

The settlement agreement provides that the parties will each be able to designate the use of 50% of the *cy pres* funds to qualifying programs, with reasonable approval from the other party. Although both parties have elected to defer their designations until after the notice period closes and the total *cy pres* amount is calculated, based on discussions so far, it is likely that at least some funds will be distributed to the Immigration Unit of the Los Angeles County's Public Defender's Office ("LACPD ") and the possibly LA Justice Fund. (Both the settlement agreement and the law limit *cy pres* designations related to the issues in this case. *See, e.g., Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011)) (*cy pres* remedy should "account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members").

The Immigration Unit of the LACPD provides critical criminal-immigration legal support to public defenders handling cases of immigrants whose criminal charge(s) may impact their immigration status. The work of this unit is vital to ensuring that public defenders meet their constitutional obligation to advise clients of the immigration consequences of any conviction and to mitigate adverse immigration consequences from a conviction. *Cy pres* funds could be used to support the Immigration Unit's ongoing development of a more holistic immigration legal services model, including fund additional attorney positions to represent LACPD clients.

The Los Angeles Justice Fund is a fund devoted to increasing legal representation for individuals and families subject to removal proceedings in Los Angeles County. The Fund is a partnership between Los Angeles County, the City

8

of Los Angeles, the Weingart Foundation, and the California Community Foundation (CCF). While most LAJF grants are dedicated to funding legal representation for those who cannot otherwise afford a lawyer to represent them in immigration court, consistent with the settlement agreement, funding from the *Roy* settlement could be dedicated specifically to legal representation of detained individuals with a criminal conviction. These services would specifically benefit *Roy* class members and people who are currently in the custody of the Los Angeles Sheriff's Department and are facing immigration consequences as a result.

Below is a chart estimating the total amount of *cy pres* funding based on various claims rates we consider to be possible. *See* Litt Decl., ¶¶47-51.

| Direct Compensation vs. Indirect (Cy Pres) Distribution | | | | | |
|---|---|---|---|---|---|
| Claims Rate | Est. # of Class Members | Est. Compensated Days | Per Day Recovery | Total for Class Members | Total *Cy Pres* |
| 4% | 743 | 2,860 | $1,000 | $2,860,000 | $5,940,000 |
| 5% | 928 | 3,575 | $1,000 | $3,575,000 | $5,225,000 |
| 6% | 1,114 | 4,290 | $1,000 | $4,290,000 | $4,510,000 |
| 7% | 1,300 | 5,005 | $1,000 | $5,005,000 | $3,795,000 |
| 8% | 1,486 | 5,720 | $1,000 | $5,720,000 | $3,080,000 |

       c)       ***The Litigation Conferred Substantial Benefits Beyond the Class Fund***

The settlement conferred substantial benefits to the class beyond compensation to class members and *cy pres* funding.  A week after the lawsuit was filed, LASD issued a policy directive emphasizing that immigration holds should not prevent arrestees from posting bails. This directive ensured that immigration detainers would no longer interfere with class members' constitutionally protected right to post bail. In June 2014, the LASD ceased holding persons solely on the basis of immigration detainers. The lawsuit was a significant contributing factor in the cessation of LASD's unlawful detainer policies.[5]

---

[5] While the Court found that the passage of Senate Bill No. 54, which went into effect on January 1, 2018, prohibit the Roy Defendants from engaging in the challenged conduct of

9

The lawsuit also represents the first successful class action litigation to hold a large law enforcement agency financially responsible for unlawfully detaining non-citizens on immigration detainers. The settlement itself – against the largest law enforcement agency in the United States – will have a significant deterrent effect on other law enforcement agencies that have considered honoring warrantless detainers from ICE. Litt Decl., ¶¶52-54.

### 2. The Litigation was Handled on a Contingency Basis and Imposed Burdens and Risks that Support a One-Third Award

Counsel has invested over 4,300 hours over the nearly nine-year duration of this case, including on the investigation; prefiling settlement efforts; litigating discovery, class certification, and dispositive motions; settlement negotiations spanning two years. This investment of time and effort carried significant risk given the complexity of the legal issues, uncertainty of the outcome, and contingency nature of the litigation. *See* Litt Decl., ¶¶33-38.

### a) This Contingency Case Was Very Hard-Fought and Imposed Substantial Burdens on Plaintiffs' Counsel

This was an exceptionally hard-fought case. From the outset, Defendants made clear that they would vigorously resist any classwide resolution involving damages. Despite their approach, Plaintiffs made every effort to resolve the case as efficiently as possible by initiating settlement discussions prefiling, approximately one year into the litigation, and after dispositive motions were decided. Litt Decl., ¶59.

In 2012, after completing their preliminary investigation, Plaintiffs' counsel initiated pre-filing settlement discussions. Although the County engaged in these negotiations, no progress was made towards changing its detainer policies. Plaintiffs filed this lawsuit on October 12, 2012. Over the course of the next year,

---

detaining an individual on the basis of an immigration hold, and thus rendered the claim moot (*Roy v. Cty. of Los Angeles*, 2018 WL 914773, at *27 (C.D. Cal. Feb. 7, 2018), the Defendants had ceased this practice in light of the current litigation well before that.

Plaintiffs continued to advocate for an early resolution, deferring formal discovery while the parties engaged in informal exchanges of information to facilitate an early mediation. During this time period, Plaintiffs advocated strenuously to obtain database information that would enable them to determine the size of the class and calculate how long class members were over-detained. Litt Decl., ¶60.

The first mediation session occurred in March 2014 before Michael Moorehead. While the parties made some progress towards settling Duncan Roy's individual damages claim, they were not able to make progress towards a classwide settlement, in part, because several key liability issues remained heavily contested. Plaintiffs also determined that no productive discussions concerning classwide settlement could occur until the County disclosed database information necessary to identify persons who had been over-detained on immigration holds and to calculate the number of days they were held. Litt Decl., ¶61.

Following the March 2014 mediation, the parties commenced formal discovery. Plaintiffs' counsel expended considerable time and resources analyzing voluminous policy documents, ESI, and taking depositions. Plaintiffs' counsel analyzed over 400,000 pages of discovery produced by the County as well as significant discovery produced by the Department of Homeland Security in the related Gonzalez case. Counsel also took ten depositions related to liability issues including LASD policies and practices concerning immigration detainers, release record-keeping and database systems related to the release process. Counsel also defended the depositions of class reps, propounded written discovery and responded to discovery. Litt Decl., ¶62.

The ESI analysis was extremely labor intensive and consumed tremendous resources. Defendants initially maintained that no database information existed that would permit the identification of class members. After numerous exchanges between Plaintiffs' counsel and the County, Plaintiffs were able to secure at least temporary access to lists of fields and code tables to begin to identify what

database information could be used to identify class members. Through extensive consultation, Plaintiffs' counsel's database experts were eventually able to draft database queries and code to identify class members. Most of the costs incurred on this case related to consultation with database experts to devise queries to identify class members. Litt Decl., ¶63.

In 2016, Plaintiffs' counsel moved for class certification. Defendants vigorously opposed the motion, contesting whether common liability issues existed and whether it was possible to identify class members using the County's database systems. Plaintiffs' counsel spent considerable time and resources working with their database experts to demonstrate that it was possible to identify persons who had been held solely on detainers and that they could identify persons corresponding to specific classes and subclasses arising from various theories of liability. Defendants also contested class treatment was appropriate for non-economic damages for unlawful incarceration. On September 9, 2016, the Court certified two injunctive relief classes and four damages classes (including one subclass). Dkt. 184, 9/9/16 Class Cert Order. Litt Decl., ¶64.

After class certification issued, the parties litigated cross motions for summary judgment. On February 8, 2018, the Court granted summary judgment to Plaintiffs on their Fourth Amendment and Equal Protection claims. *See* Dkt. 395, p. 6. The Court's summary judgment decision issued on February 8, 2018. Defendants filed a motion for reconsideration, which was denied on July 11, 2018. (Dkt. 395) The Court simultaneously issued an order denying Defendants' motion to decertify the class and finding that class members were entitled to classwide general damages. (Dkt. 394) ("The Court agrees with these decisions and finds that general damages are available on a class-wide basis here."). The Court also granted Plaintiffs' motion to expand the certified 48 Hour *Gerstein* class to a general *Gerstein* class to conform to the summary judgment ruling. (Dkt. 396). Litt Decl., ¶65.

Following the liability and class certification decisions, the parties entered settlement negotiations, which proved significantly more protracted than expected. On December 3, 2018, the parties participated in a full day settlement conference before Antonio Piazza, a well-known and highly regarded mediator. The December 3, 2018 conference resulted in a settlement in principle, but did not resolve several key terms and a dispute regarding the class size. Even after reaching a settlement in principle, it took well over a year and numerous discussions among or between counsel and Mr. Piazza to agree to the specific settlement terms. The final settlement agreement was approved by the County in October 2020. Litt Decl., ¶66.

Since preliminary was approval granted, Plaintiffs' counsel have expended significant hours working with the claims administrator to develop the strongest possible notice and outreach plan. Plaintiffs' counsel has participated closely in the development of the notice packets, case website, paid advertising (television, radio and social media) and monitoring of the response to the notice and outreach campaign. Litt Decl., ¶67.

Contingency work of this magnitude obviously requires that counsel turn down other cases. Counsel advanced all costs and went without any compensation throughout the years it was litigated. These considerations support a fee of 33%. *See*, *Vizcaino*, 290 F.3d at 1049 (emphasizing that "counsel's representation of the class-on a contingency basis-extended over eleven years, entailed hundreds of thousands of dollars of expense, and required counsel to forgo significant other work, resulting in a decline in the firm's annual income;" and noting that counsel pursued the case "in the absence of supporting precedents" making the case "extremely risky."). *See also, e.g., Mauss,* 2018 WL 6421623, at *5-10.

**b)**   ***The Case Carried Significant Risks Arising from the Complexity of the Legal Issues, Class Certification and Difficulty Locating Class Members***

Plaintiffs' counsel assumed significant risks in litigating this case. While all

13

contingent fee cases are risky, class actions tend to be especially precarious given the demanding standards for class certification and higher stakes involved. In Plaintiffs' counsel's assessment, this case was exceptionally high risk among class actions because it involved highly  complex legal issues and no clear precedent governing the outcome. As counsel's billing records demonstrate, the lion's share of work on this case work occurred over a six-year period *before* there was a liability decision or any meaningful indication that Plaintiffs would prevail. From the first mediation session in 2014, defense counsel made clear they contested Plaintiffs' liability analysis and would vigorously oppose class certification.

The outcome of this case was always tenuous. Plaintiffs' counsel initiated the case based on a preliminary investigation revealing that the LASD routinely held non-citizens based on warrantless immigration detainers issued by ICE. There appeared to be viable claims, but given the lack of clear precedent governing this practice, considerable work was required to develop specific theories of liability. Liability hinged on a complex analysis of the intersection between federal immigration law; the federal Constitution's protections under the Fourth, Fifth and Fourteenth Amendments; and California state law state law restrictions on the authority of state or local officers to enforce federal civil immigration law.[6] As the Court is aware, this area of the law has remained in flux through the pendency of this litigation and remains in flux today. The case also involved complex analysis of potential causes of action under state law (false imprisonment, violation of California Bane Act) and state law immunities applicable to government entities.

---

[6] Although Plaintiffs did not ultimately prevail on the state law claims, the time spent on them is compensable because we explained in all reasonable time spent in achieving the favorable outcome is compensable, even if "the plaintiff failed to prevail on every contention." *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). See also *Fox v. Vice*, 563 U.S. 826, 834, 131 S. Ct. 2205, 2214, 180 L. Ed. 2d 45 (2011) (presence of "unsuccessful claims does not immunize a defendant against paying for the attorney's fees that the plaintiff reasonably incurred in remedying a breach of his civil rights").

*See* Litt Decl., ¶33.

Class certification presented several significant risks, arising in part from the complex liability analysis and its intersection with Rule 23's commonality requirement. Plaintiffs' counsel had to establish that the specific, alternate theories of liability supporting their claims could be translated to classes and subclasses that would satisfy FRCP Rule 23's commonality requirement. Plaintiffs' counsel also had to demonstrate that persons satisfying each of the definitions could be sufficiently identified using a combination of data stored in various LASD databases (AJIS, DIMMS and DHS databases). Plaintiffs' counsel invested substantial time and resources developing queries from which release dates could be calculated, with no guarantee that this work would yield the answers they needed. Even as late as 2018 when the parties designated experts, Defendants maintained that it was not possible to identify class members. It was not until April 2019, months after the mediation session in which the case was settled in principle, that Defendants acknowledged that Plaintiffs had developed an appropriate methodology for identifying class members.  Litt Decl., ¶34.

The risk surrounding class certification was compounded by the difficulty in securing appropriate class representatives. Two of the class representatives had been deported, including one of the two original damages class representatives – Annika Alliksoo. Ms. Alliksoo had been deported to Estonia, making it very difficult for her to participate in the litigation. She was eventually dismissed from the lawsuit. The only remaining damages class representative was Alain Martinez-Perez. Given the circumstances underlying this case, and the reluctance of non-citizens to come forward to prosecute a case against a large law enforcement agency, there was always significant risk of losing the sole damages class representative and not being able to find a suitable replacement.  Litt Decl., ¶35.

Even with class certification and affirmative summary judgment, it was unclear whether Plaintiffs would be able to secure any meaningful recovery for

class members. Though the Court issued an order recognizing the availability of classwide damages, the amount of damages was left to be decided by a jury. The uncertainty of what jurors might award to persons who had been accused of both criminal and civil immigration offenses presented a significant risk. This risk was compounded by the difficulty in locating class members to come forward to participate in a jury trial on damages. In light of these considerations, there was a considerable risk that the case could result in a very small financial recovery (low per day damages multiplied by only the small fraction of class members willing to come forward to participate in a trial). Litt Decl., ¶36.

In the context of these risks, Plaintiffs' counsel's ability to settle the case in a way that guaranteed substantial financial recoveries for class members who could be located, coupled with indirect compensation to account for difficulties locating class members, is a testament to their skill and commitment to class members. The risks involved heavily weigh in favor of a 1/3 fee award.[7] *See Seguin v. County of Tulare*, 2018 WL 1919823, at *6 (E.D. Cal. Apr. 24, 2018) (approving 35% award where case was lengthy, hard-fought, complex and where counsel accepted the case on a contingency basis when the outcome was uncertain and litigation risky – emphasizing that "thousands of class members – many of them in difficult financial and social circumstances – will receive hundreds of dollars on average).

---

[7] Small firms such as those here face even greater risks in litigating large class actions with no guarantee of payment. *Boyd v. Bank of Am. Corp.*, No. SACV 13-0561-DOC, 2014 WL 6473804 (C.D. Cal. Nov. 18, 2014) (C.D. Cal. Nov. 18, 2014) (fee award of 33% rather than 25% benchmark, finding heightened risk of small firm representation should be rewarded with larger percentage fee for good result); *see also, Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, 483 U.S. 711, 750 (1987) (Delaware Valley II) (plurality opinion) ("Contingent litigation may pose great risks to a small firm or a solo practitioner because of the risk of nonpayment may not be offset so easily by the presence of paying work. . .."); *Davis v. Mutual Life Ins. Co.*, 6 F.3d 367, 382 (6th Cir. 1993) ("[T]he maintenance of comparatively large pieces of litigation preens small firms from diversifying risk by taking on additional clients . . ..").

**3.**     ***The Requested Award is At The Low End Of The Market Rate for Individual Civil Rights Cases***

The fee of 33% is reasonable in relation to the market for contingent fees. An award of 33% is at the low end of the market rate for contingency work. Litt Dec., ¶32 (1/3 of the recovery is a low contingency fee for cases that are heavily litigated; 40% is common for complex cases that go through summary judgment or trial). In defining a 'reasonable fee' in representative actions, the law should 'mimic the market.' *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998) ("When a fee is set by a court rather than by contract, the object is to set it at a level that will approximate what the market would set."). Attorneys "regularly contract for contingent fees between 30% and 40%." *In re Remeron Direct Purchaser Antitrust Litigation,* 2005 WL 3008808, 16 (D.N.J. 2005) (citing cases).

## C. A Lodestar Cross-Check Supports A One-Third Award

Plaintiffs' counsel has calculated their lodestar at **$3,334,730.** See Litt Dec., ¶101. [8] This represents a multiplier of approximately 1.4. The tables below provide relevant information for each biller, and the relevant detailed timesheets are submitted as an exhibit to Mr. Litt's declaration. The time cutoff for hours worked is March 31, 2021.[9] These calculations omit work performed exclusively on the related *Gonzalez* case and in negotiating a settlement of Duncan Roy's individual damages claims.[10] Litt Decl., ¶101.

| MCLANE, BEDNARSKI & LITT (and previous Litt firms) |
|---|

---

[8] This does not account for the remaining work, which includes work done after April 1 on this motion, the yet to be drafted motion for Final Approval and Order, responses to objections to the extent necessary, and ongoing work with the Class Administrator and class members as needed, which time will be provided for the Final Approval Hearing.
[9] The Litt firms had nine billers who billed under 2 hours on the case; all of those were eliminated.
[10] The Litt firms excluded 66.3 hours for work performed exclusively on Gonzalez and 220.7 for work performed exclusively on Duncan Roy's individual case. Litt Decl., ¶101.

| Name | Practice Years | Hours | Rate | Total |
|---|---|---|---|---|
| Barrett Litt | 52 (1969) | 622.4 | $1,275.00 | $793,560 |
| Lindsay Battles | 13 (2008) | 1,829.1 | $750.00 | $1,371,825 |
| Julia White | Sr. Paralegal | 31 | $375.00 | $11,625 |
| Marie Bolanos | Sr. Paralegal | 246.8 | $375.00 | $92,550 |
| Esteban Gil | Jr. Paralegal | 196.3 | $190.00 | $37,297 |
| Michelle Angeles | Exp. Paralegal | 50.1 | $285.00 | $14,278 |
| **Litt Total** | | | | **$2,321,136** |
| **ACLU OF SOUTHERN CALIFORNIA** | | | | |
| Peter Eliasberg | 27 (1994) | 41.32 | $950 | $39,254 |
| Ahilan Arulanantham | 22 (1999) | 9.17 | $875 | $8,024 |
| Peter Bibring | 19 (2002) | 12 | $825 | $9,900 |
| Jennifer Pasquarella | 15 (2006) | 643.65 | $775 | $498,829 |
| Katie Traverso | 09 (2012) | 160.35 | $600 | $96,210 |
| Maricela Lopez-Krulak | Sr. Paralegal | 10 | $375 | $3,750 |
| Jessica Karp Bansal | 12 (2009) | 1.53 | $725 | $1,109 |
| Sandra Kang | Paralegal | 2.11 | $375 | $791 |
| **ACLU Total** | | | | **$657,867** |
| **National Day Laborer Organizing Network** | | | | |
| Jessica Karp Bansal | 12 (2009) | 424.5 | $725 | **$307,763** |
| **National Immigrant Justice Center** | | | | |
| Mark Fleming | 15 (2006) | 36.5 | $775 | **$28,288** |
| **ACLU Immigrant Rights Project** | | | | |
| Katherine Desmoreau | 12 (2009) | 21.4 | $725 | $15,515 |
| Mariam Azhar | Jr. Paralegal | 21.9 | $190 | $4,161 |
| **IRP Total** | | | | **$19,676** |
| | | | | |
| **TOTAL** | | **4,360.13** | | **$3,334,730** |

### 1. *Counsel's Rates are Reasonable*

The reasonableness of the rates used for the lodestar cross-check are supported by the declaration of Barrett S. Litt. Litt Decl. ¶¶94-129, as well as the Declaration of Carol Sobel (to be filed as a supplemental declaration during the week of April 26 because Ms. Sobel is unavailable due to the press of other matters until then). Both are experienced civil rights attorneys, who have been recognized

as attorney fee experts by various courts. The attorney rates range from $600-
$1275, and $125-$375 for paralegals of various levels of experience. These rates
are well supported by rates for similarly experienced legal professionals in other
practice areas.

Class Counsel are highly experienced litigators in the fields of immigration,
civil rights, and class actions. *In re Apple Inc. Device Performance Litigation*,
2021 WL 1022866, at *8-9 (N.D. Cal. 2021) (approving 28.3% of the fund fee
award of $80,600,000, resulting in multiplier of 2.232 in a megafund settlement of
$310 Million; emphasizing that class counsel were "among the very best in their
practice area; their "strategic and efficient lawyering…encouraged a just and
efficient determination of [the] litigation;" and noting that megafund cases in the
nine figures generally have lower % awards).

Class counsel includes Barrett Litt and Lindsay Battles of McLane,
Bednarski & Litt. Mr. Litt is one of the most highly regarded civil rights lawyers in
California, and has extensive class action and civil rights experience, as his
Declaration and CV attest. He likely has more civil rights class action experience
than any attorney practicing in the Central District. Mr. Litt has been named a
Super Lawyer continuously since 2005 and is listed in Best Lawyers In America.
Mr. Litt's Declaration and CV contain a variety of attestations to his skill,
experience and reputation from judges in this District. *See, e.g.*, *Rodriguez et al. v.
County of Los Angeles et al.*, CV 10-6342-CBM (AJWx) (Mr. Litt "is considered
one of the leading civil rights attorneys in the country"). His CV identifies
numerous certified class actions in which he has been the, or one of the, lead
counsel as well as pending class actions.

Ms. Battles is also a highly experienced civil litigator in the area of class
actions and civil rights.  Ms. Battles career has primarily focused on civil rights
class actions. She served as co-lead counsel on class actions challenging LASD's
practice of performing highly invasive group strip searches on female jail

19

detainees. The case resulted in a settlement of $53 million against the LA County. She has also served as counsel on class actions challenging delays in transferring Ventura County jail detainees to hospitals for restorative psychiatric treatment and discriminatory jail practices affecting gay, bisexual and transgender inmates within the San Bernardino County jail. She has also worked on various individual civil rights cases arising from wrongful convictions and in-custody deaths. Litt Decl, ¶97-99 (detailing Ms. Battles' experience and recognition).

The core legal team includes nationally recognized experts in the area of federal immigration enforcement: Jennifer Pasquarella and Jessica Karp Bansal of the ACLU of Southern California and Mark Fleming of the National Immigrant Justice Center. Jennifer Pasquarella was co-lead counsel on this case and on the related case, *Gonzalez v. ICE*, CV-13-04416. She is the Director of the Immigrants' Rights Project at the ACLU of Southern California. She also directs and manages the statewide immigrants' rights advocacy for the ACLU of California, which works to curtail abusive immigration enforcement practices. Ms. Pasquarella has extensive experience litigating class action and individual cases challenging abuses within the immigration enforcement system. She serves as lead counsel on *Wagafe v. Trump*, Case No. 27-00094 (W. Dist. Wash 2017)), a class-action lawsuit challenging a government program that delayed immigration and citizenship applications by Muslims. She has also served as counsel on challenging backlogs in processing naturalization applications due to the FBI "name check," wage and hour violations against immigrant workers, and FBI surveillance of mosques and individuals on account of their religious practice. Litt Decl., ¶123 (including case names and numbers).

Jessica Karp Bansal is a staff attorney at the ACLU of Southern California and previously the Litigation Director of the National Day Laborer Organizing Network (also co-counsel on this case). She has spent her entire career working on immigrants' rights cases and has extensive experience representing immigrants in

class action cases addressing systemic issues in the federal immigration system. Ms. Bansal is co-lead counsel in the related *Gonzalez v. ICE* case. She has also served as counsel on class actions challenging the government's failure to appoint legal representatives for immigrants with serious mental abilities, the failure to protect immigration detainees from COVID-19, and state laws criminalizing the solicitation of day labor. Litt Decl. ¶124.

Mark Fleming is the associate director of the NIJC Federal Litigation Project where he focuses on litigation at the intersection of state and local law enforcement and civil immigration enforcement. He has litigated multiple class action cases related to ICE use of immigration detainers. Litt Decl. ¶125.

We use current rates for all work to account for the risk of non-payment. Current rates for complex federal litigation are commonly used in this District to adjust for delay in payment. *See, e.g., Missouri v. Jenkins,* 491 U.S. 274, 282, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ("adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute [42 U.S.C. § 1988]"); *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1010 (9th Cir. 2002) (use of current rates in class actions is a well established method of ensuring that "[a]ttorneys in common fund cases [are] compensated for any delay in payment"); *Barjon v. Dalton*, 132 F.3d 496, 502–03 (9th Cir. 1997); *Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109, 1119 (C.D. Cal. 2012) (lodestar award in settled class action, citing *Missouri v. Jenkins*;  use of current rates "is justified by comparable increases in the market" (citing *Coles v. City of Oakland,* 2007 WL 39304, *7 (N.D.Cal. Jan. 4, 2007) (adjustment factors include more than inflation, such as attorneys' additional years of experience or changes in the legal market) (quoting *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)); *see also Parker v. Vulcan Materials Co. Long Term Disability Plan,* 2012 WL 843623, *7 (C.D.Cal. Feb. 16, 2012) (approving as reasonable an approximate 10 percent

increase between 2011 rates and 2012 "to account for expertise gained over time, or to keep up with the increasing cost of maintaining a practice").

## 2.      *Counsel's Hours Are Reasonable*

Reasonable hours are those that "would have been undertaken by a reasonable and prudent lawyer to advance ,,, his client's interest in the pursuit of a successful recovery." *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir. 1982) (internal quotations omitted). Deference is due prevailing counsel's judgment regarding the hours reasonably spent; "lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee…. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; *after all, he won, and might not have, had he been more of a slacker*." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) (emphasis added).

Collectively, counsel invested approximately 4,300 hours. The hours invested in this case are extremely reasonable considering the duration of the litigation, the complexity of the liability issues, and Defendants' vigorous opposition to liability and class certification. We support our calculations with detailed billing records, submitted as Exhibits C, D, and E to the Litt Declaration. *See In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 306–07 (3rd Cir. 2005) (noting that "[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean-counting" and that "[t]he district courts may rely on summaries submitted by the attorneys and need not review actual billing records"); *Fox v. Vice*, 563 U.S. 826, 838 (2011) ("[T]he determination of fees 'should not result in a second major litigation' and 'trial courts need not, and indeed should not, become green-eyeshade accountants.")  These records demonstrate the immense effort expended into developing the liability theories, analyzing database information,

conducting discovery, litigating class certification, litigating dispositive motions, and advocating for the class in settlement discussions, which spanned two years.

### 3.    The Lodestar Cross-Check Produces a Low Multiplier of 1.4, Supporting the Requested Fee of 33%

After determining the lodestar, the Court divides the total fees sought by the lodestar to arrive at the multiplier. *Acosta*, 2018 WL 2088278, at \*13 (N.D.Cal., 2018). If the multiplier falls within an acceptable range, it further supports the conclusion that the fees sought are, in fact, reasonable. *Id.* Here, the requested fee represents a multiplier of approximately 1.4, which falls on the end of reasonable multipliers. *Id.* at \*14  (observing that a 1.94 multiplier is "…at the lower end of the Ninth Circuit's scale").

Multipliers are expected in successful class action litigation. "The purpose of [a] multiplier is to account for the risk Class Counsel assumes when they take on a contingent-fee case." *Hopkins v. Stryker Sales Corp.,* 2013 WL 496358, at \*4 (N.D.Cal. Feb. 6, 2013); *see also, e.g., In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295 n.2 (9th Cir. 1994) (reversing denial of risk multiplier in class action; "[i]f this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing," distinguishing common fund cases from fee shifting awards because the class pays the attorneys from the common fund); *Fischel v. Equitable Life Assur. Soc'y of U.S.,* 307 F.3d at 1008 (abuse of discretion to deny multiplier in risky class action where lodestar is based on non-contingent rates).

Percentage awards resulting in a fee of **one to four** times the lodestar are common. *Vizcaino*, 290 F.3d at 1051, n.6 (approving multiplier of 3.65 at 28% of class fund) (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."

(quoting *3 Newberg* §14.03 at 14–15)). The majority of awards translate to multipliers greater than 1.5. *Vizcaino*, 290 F.3d at 1051, n.6.

Numerous recent decisions have approved multipliers far exceeding the multiplier presented here. *See e.g., In re Apple Inc. Device Performance Litigation*, 2021 WL 10228666, at *8-9 (N.D. Cal. 2021) (approving fee award of $80,600,000, resulting in multiplier of 2.232; awarding 26% of class fund); *Nichols v. SmithKline Beecham Corp.*, 2005 WL 950616 (E.D.Pa.,2005) (awarding 30% of a $65 Million class fund resulting in a 3.15 multiplier);[11] *Smith v. Experian Information Solutions, Inc.*, 2020 WL 6689209, at *6-7 (C.D.Cal. 2020) (Multiplier of 3.8 appropriate where counsel "…took the case on a contingency at a time when the outcome was tenuous and achieved an excellent result;" awarding 25% of class fund); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2017 WL 6040065, at *9 (N.D. Cal. Dec. 6, 2017) (3.66 multiplier is "well within the range of multipliers awarded in similar cases;" citing cases); *Beaver,* 2017 WL 4310707, at *8–14 (S.D. Cal. Sept. 28, 2017) (1/3 of approximately $51 Million fund, analyzing propriety of fee under both California and federal law) (multiplier of 2.89); *Spann v. J.C. Penney Corp.,* 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016) (27% of the fund, resulting in multiplier of 3.07); *Bradburn Parent Teacher Store, Inc. v. 3M*(, 2007 WL 1468847 (E.D.Pa.,2007) (35% of nearly $40 Million fund; multiplier of 2.5); *In re Remeron Direct Purchaser Antitrust Litigation*, 2005 WL 3008808, *11 (D.N.J.,2005), (awarding 1/3 of $75 Million class fund resulting in 1.8 multiplier); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 370-71 (S.D.N.Y. 2002) (awarding 33 1/3% of fund, which translated to "the modest multiplier of 4.65"); *see also*, *Steiner v. Am. Broad. Co.*, 248 Fed.Appx. 780, 783 (9th Cir. 2007) (6.85

---

[11] The cases listed by the *Nichols* court were *In re Buspirone Antitrust Litig.,* Civ.A.No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003) (awarding 33.3% of a $220 million dollar fund; multiplier of 8.46); *In re Cardizem CD Antitrust Litig.,* Civ.A.No. 99-MD-1278 (E.D.Mich. Nov. 26, 2002) (awarding 30% of a $110 million fund; multiplier of 3.7); *In re Vitamins Antitrust Litig.,* Civ.A.No. 99-197, MDL No. 1285, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (awarding about 34% of an approximately $360 million fund; multiplier of 3.5).

multiplier "falls well within the range of multipliers that courts have allowed"); *Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113 (C.D. Cal. 2008) (awarding 25% of fund in early settlement, resulting in multiplier in excess of 5; canvassing class cases with high multipliers). Given the low multiplier of 1.4, the requested fee is strongly supported by the lodestar cross-check.

## III.   THE COSTS ARE REASONABLE

An attorney is entitled to "recover as part of the award of attorney's fees those out-of-pocked expenses that would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (citation omitted). Class counsel seeks slightly above **$230,378** in costs (exclusive of class administration), predominantly for expert fees and mediation costs. The expert fees relate primarily to database experts who extensively analyzed database information produced by LASD and DHS. Costs are calculated through March 31, 2021. Limited additional expert costs may be incurred to assist with calculating distributions to class members. Contained at ¶131 of Mr. Litt's Declaration is a summary list of expenses by category and the total amount advanced for each category. The cost detail is available should the Court wish to see it.

The costs of class administration are not included in the costs listed above. They are estimated at $350,000 plus additional funds for transnational outreach campaigns. Plaintiffs' counsel has advanced $25,000 for transnational outreach (included in the total above) and anticipate an additional $25,000 to be paid at the end of the notice period.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' counsel's motion should be granted.

1   DATED: April 22, 2021          Respectfully submitted,

2
                                   McLANE, BEDNARSKI & LITT, LLP
3

4                                  By: */s/ Barrett S. Litt*
                                        Barrett S. Litt
5

6                                  By: */s/ Lindsay Battles*
                                        Lindsay Battles
7

8                                  Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28