1   BARRETT S. LITT, SBN 45527
    blitt@mbllegal.com
2   LINDSAY B. BATTLES, SBN 262862
    lbattles@mbllegal.com
3   McLANE, BEDNARSKI & LITT, LLP
    975 E. Green Street
4   Pasadena, California 91106
    Telephone: (626) 844-7600
5   Facsimile: (626) 844-7670
6
7   Jennifer Pasquarella, SBN 263241
    jpasquarella@aclusocal.org
8   Jessica Karp Bansal, SBN 277347
    jbansal@aclusocal.org
9   ACLU FOUNDATION OF SOUTHERN
    CALIFORNIA
10  1313 W. 8th Street
    Los Angeles, CA 90017
11  Phone:  (213) 977-9500
    Facsimile:  (213) 977-5299
12
13  Attorneys for Plaintiffs
14
15                  UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
16

| | |
|---|---|
| 17   DUNCAN ROY, *et al*., | Case No. CV 12-09012 (FFMx) |
| 18            Plaintiffs, | [Honorable André Birotte, Jr.] |
| 19 | **NOTICE OF MOTION AND MOTION** |
| 20       vs. | **FOR FINAL APPROVAL OF CLASS** |
| | **ACTION SETTLEMENT; [PROPOSED]** |
| 21   COUNTY OF LOS ANGELES, *et al*., | **ORDER; DECLARATIONS AND** |
| | **EXHIBITS** |
| 22            Defendants. | |
| 23   . | **Date:        November 12, 2021** |
| | **Time:        10:00 A.M.** |
| 24 | **Place:       Courtroom 7B** |

25
26
27
28

TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on November 12, 2021, at 10:00 a.m., or as soon thereafter as this matter may be heard in Courtroom 7B of the United States District Court for the Central District of California, 350 West First Street, Los Angeles, California 90012, Plaintiffs will, and hereby do, move the Court to grant final approval to the settlement in this case.  This motion is unopposed and is based on the accompanying Memorandum of Law, the stipulation of all parties to entry of the proposed Final Approval Order, the proposed Final Approval Order and exhibits thereto filed concurrently, the files and records in this case, and on such further evidence as may be presented at a hearing on the motion.

DATED: October 25, 2021              Respectfully submitted,

McLane, Bednarski & Litt, LLP
By: */s/ Barrett S. Litt*
    Barrett S. Litt
    Attorneys for Plaintiffs

By: */s/ Lindsay Battles*
    Lindsay Battles
    Attorneys for Plaintiffs

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................1

II.     SUMMARY OF SETTLEMENT TERMS & CY PRES PROPOSAL ..........3

        A.      Overview of the Settlement Structure.....................................3
        B.      *Cy Pres* Funds Will be Used to Form a Removal Defense Division
                within the Los Angeles Public Defender's Office's Immigration
                Unit.........................................................................................6

III.    FINAL APPROVAL STANDARD UNDER FRCP 23(E)(2).....................11

IV.     THE SETTLEMENT SATISFIES THE CRITERIA FOR FINAL
        APPROVAL .......................................................................................11

        A.      The Settlement Provides Adequate Relief to Class Members............11

                1.      Individual Recoveries Represent an Excellent Outcome
                        Considering the Costs, Risks and Delay of Trial and Appeal..12

                2.      The Cy Pres Distribution Will Facilitate Transformative
                        Improvements to Criminal-Immigration Defense in Los
                        Angeles .................................................................14

                3.      The Settlement Employs a Fair and Effective Means of
                        Distributing the Settlement to Class Members........................15

                        a)  Plaintiffs Implemented a Comprehensive Notice & Outreach
                            Plan ...............................................................16

                        b)  The Settlement Provided a Straightforward Claims
                            Procedure and Distribution Model ..................................18

                4.      The Court Will Decide a Fair and Reasonable Fee .................19

        B.      Adequacy of Representation ...................................................19

        C.      Equitable Treatment of Class Members..............................21

        D.      Arms-Length Negotiations.................................................22

        E.      Objections ................................................................22

i

       1.     Victor Diaz.............................................................................22

       2.     Esteban Hernandez ...............................................................22

       3.     Sundiata Bakaba ...................................................................23

  F.     Late Claims ....................................................................................25

V.     CONCLUSION ........................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Federal Cases**

*Hopson v. Hanesbrands Inc.*,
  2009 WL 928133 (N.D. Cal. 2009) ........................................................22

*In re Easysaver Rewards Litigation*,
  906 F.3d 747 (9th Cir. 2018) ...............................................................14

*In re Online DVD—Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir.2015) ...............................................................16

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
  2016 WL 153265 (N.D. Cal. Jan. 13, 2016)..........................................22

*Nachshin v. AOL, LLC*,
  663 F.3d 1034 (9th Cir. 2011) ............................................................14

*Padilla v. Kentucky*,
  559 U.S. 356 (2010)...............................................................................7

*Rodriguez v. West Publishing Corp.*,
  563 F.3d 948 (9th Cir. 2009) .............................................................21

*Roy v. Cty. of Los Angeles*,
  2018 WL 914773 (C.D. Cal. Feb. 7, 2018) .........................................12

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
  904 F.2d 1301 (9th Cir.1990) ............................................................16

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) .............................................................21

**Statutes**

Cal. Pen. Code § 1016.3(a) ....................................................................7

**Rules**

Fed.R.Civ.Pro. 23(e) ......................................................................3, 11, 19

**Other Authorities**

Senate Bill No. 54 ................................................................................................12

## <u>MEMORANDUM OF POINTS & AUTHORITIES</u>

## I.   INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 23(e)(2), Plaintiffs seek final approval of this class settlement arising from the Los Angeles Sheriff's Department (LASD)'s former policy of detaining persons solely on the basis of immigration detainers, which are issued by Immigration and Customs Enforcement (ICE) for suspected civil immigration violations. The $14 million settlement will provide direct payments to class members who were illegally detained by the LASD for suspected civil immigration violations. Each claimant will receive $1,000 per day of over-detention, up to $25,000, plus $250 for those class members who were subject to a no-bail notation. Calculations are still being finalized, but we estimate a minimum of $3.9M in direct payments to class members.[1]

In addition to direct compensation, the settlement provides for *cy pres* distribution  to local programs to fund legal services for non-citizens who face potential immigration consequences as a result of a criminal arrest or conviction in Los Angeles County. Assuming $3.9M in direct payments to class members, Plaintiffs estimate at least $5M for *cy pres* distribution. Under the settlement agreement, each side is entitled to designate 50% of the *cy pres* funds, with reasonable approval from the other side. [2]  Plaintiffs propose designating *cy pres* funds to the Los Angeles County Public Defender's Office ("LACPD")'s Immigration Unit. The Immigration Unit provides critical criminal-immigration legal support to public defenders handling cases of immigrants whose criminal

---

[1] This is a rough estimate and will change as the administrator finalizes calculations of each class members total over-detention days. Plaintiffs will file a declaration advising the Court of a more precise number before the final approval hearing.

[2] The settlement agreement provides that each side shall designate half of the *cy pres* funds with reasonable approval of the other party; should a dispute arise, parties agreed to work in good faith to reach an agreement regarding the organizations or programs to receive those funds based on the foregoing criteria.

charges may impact their immigration status. *Cy pres* funds will be used to support the Immigration Unit's ongoing development of a more holistic immigration legal services model by expanding the scope of practice to include removal defense, and by funding additional post-conviction relief work. Because the LACPD Immigration Unit is the only Los Angeles County agency with a mission closely aligned to the goals of the litigation, a close relationship to the relevant population, and sufficient expertise in the intersection between criminal and immigration law, Plaintiffs believe the entire *cy pres* fund is most appropriately directed to the LACPD. Plaintiffs propose designating the entire *cy pres* fund for this purpose.

Plaintiffs advised the County of estimated *cy pres* distribution amounts on 9/16/21 and requested to meet-and-confer. Class Counsel shared their proposal during a phone conference on 10/13/21. The County cannot yet advise whether it approves of Plaintiffs' 50% designation and has made no proposal for the designation of its own 50%. The As detailed in Section IV, A, 2 (below) and in the proposed final approval order, Plaintiffs propose that the Court set a schedule for the County to advise regarding its position, followed by a meet-and-confer period. If the parties cannot agree, they will seek a determination by the Court.[3]

The settlement is the product of over eight years of hard-fought litigation. This case was filed on October 12, 2012. The damages classes were certified on September 9, 2016, (Dkt. 184), with a 42-page decision issued by Judge Beverly Reid O'Connell. In 2018, this Court granted Plaintiffs summary judgment on their Fourth Amendment liability claims. The Court subsequently granted a motion to expand the Fourth Amendment Gerstein class and denied the County's motion for decertification. (Dkt. Nos. 394, 396) Following the class certification and liability decisions, the parties reached a settlement in principle during a full-day, arms-length

---

[3] The settlement agreement provides that each side shall designate half of the *cy pres* funds with reasonable approval of the other party; should a dispute arise, parties agreed to work in good faith to reach an agreement regarding the organizations or programs to receive those funds based on the foregoing criteria.

mediation session before Antonio Piazza.

On November 25, 2020, this Court granted preliminary approval of the settlement, thereby indicating a likelihood of final approval. (Dkt. 610) *See* Fed.R.Civ.Pro. 23(e)(1)(B)(i) (district court must find that it is "likely" to grant final approval before authorizing that notice of the proposed settlement be sent to the class.) Plaintiffs' counsel's motion for attorney's fees is pending before the court. (Dkt. 615)

The allocation between direct payments to class members and the *cy pres* distribution is a function of the claims rate. At the time of preliminary approval, the parties could not predict the claims rate and were therefore unable to estimate the total funds to be distributed directly to class members vs. *cy pres*. Through intensive outreach efforts, the administrator and class counsel were able to secure claims from over 1,182 valid class members, representing a claims rate of 5.9%. *See* Declaration of Jeanne Finegan (Claims Administrator). Although this is lower than the typical jail class action, it is consistent with what the parties anticipated given the unique notice challenges in this case. Many class members were arrested by ICE and deported from the U.S.

There were 15 exclusion requests and three objections, none of which contest the fairness of the settlement itself. Two objectors indicate that they would be interested in pursuing claims against LAPD and ICE, beyond the scope of claims addressed in this lawsuit. One, Sundiata Bakaba, objects primarily on the basis that the settlement does not adequately compensate his individual damages. It is Class Counsel's understanding that Mr. Bakaba may seek leave to exclude himself from the settlement (see Section IV, E, 3, below). Mr. Bakaba seeks to address the court by video-conference using a French interpreter.

## II.   SUMMARY OF SETTLEMENT TERMS & CY PRES PROPOSAL

### A.   Overview of the Settlement Structure

The total size of the non-reversionary settlement fund is $14,000,000 from

which costs of class administration, consultant/expert and litigation costs, mediation costs, incentive awards ($10,000 for each of two class representatives), and attorneys' fees will be taken.

The settlement provides that each over-detention claimant (i.e. each claimant who belongs to either the No-Money-Bail and/or *Gerstein* class) will be compensated per-day of over detention. Each claimant's share of the total settlement fund is calculated as the percentage represented by their individual number of over-detention days among the total over-detention days corresponding to all valid claims. The total number of over-detention days corresponding to valid claims is calculated by adding the over-detention days for each valid claimant. (To illustrate, if 1,000 class members submitted claims corresponding to a total of 10,000 over-detention days, a claimant with 10 over-detention days would be entitled to 0.1% ($8,700) of the settlement, or $870 per day.).

Depending on the total number of claims, the per-diem rate increases to a total daily maximum of $1,000 and a total of $25,000 for Gerstein and No-Money-Bail class members. Should the total direct compensation to class members (total claims paid at maximum per-day rates) not consume the entire distribution fund, the settlement provides for *cy pres* distribution. The caps on per-day and per-individual compensation were negotiated to address Defendants' concern that a sufficiently low claims rate would result in windfall compensation to the relatively few class members. Although the parties disagreed as to what would constitute a windfall, Plaintiffs recognized the possibility of an unusually low claims rate in this case, which could result in very high per-day recoveries. While plaintiffs agreed that some cap on per-day compensation could be appropriate, the per-day and per-individual caps of $1,000 and $25,000 represent compromise numbers for both parties, proposed by the mediator when the parties were at an impasse. Each No-Bail-Notation class member is entitled to a flat payment of $250.

There were sufficiently few claims to trigger the per-diem maximum rates and

*cy pres* provisions. After an 8-month notice period, 1,182 class members submitted claims, which represents 5.9% of the class, consistent with the parties' expectations. Based on preliminary calculations, the amount to be distributed to class members will be at least $3.9 million.

As far as the parties can determine, the amount remaining for *cy-pres* will be at least $5 million, depending on final calculation of payments to class members and the resolution of the pending attorneys' fee motion. As a form of indirect compensation to absent Class Members, *cy pres* funds are reserved *solely* to fund Los Angeles County programs that "provide legal representation to persons who face immigration consequences as a result of a criminal arrest or conviction in Los Angeles County." The agreement expressly provides that the settlement is non-reversionary; none of the *cy pres* funds shall be used to support LASD programs. The settlement agreement further provides that any such disbursements must *augment* (emphasis in settlement agreement) the funding already provided by the County of Los Angeles to support activities that these programs would not be able to pursue without the *cy pres* funds.

Below is an overview of the anticipated settlement distribution

**$14 Million Settlement Fund**
**(Assuming $3.9M in Direct Payments to Class Members)**

|  | Amount |
|---|---|
| *Cy Pres* Distribution (contingent on fee award) | Range: $5,014,717 - $6,129,007 |
| Direct Payments to Class Members | $3,900,000 (estimated; will change as individual distribution amounts are finalized) |
| Attorneys' Fees (TBD; fee motion pending) | Range: $3,343,002 – $4,457,291 |
| Class Administration | $350,000 |

5

|  | **Amount** |
|---|---|
| Litigation Costs + Transnational Outreach by Centro de Los Derechos del Migrante | $257,991.04[4] (includes $50,000 for transnational outreach during notice period). |
| Class Representative Incentive Awards | $20,000 |

**B.** **Cy Pres Funds Will be Used to Form a Removal Defense Division within the Los Angeles Public Defender's Office's Immigration Unit**

The parties estimate a significant *cy pres* distribution of at least $5 million dollars. The settlement agreement requires that these funds be reserved *solely* to fund Los Angeles County programs that "provide legal representation to persons who face immigration consequences as a result of a criminal arrest or conviction in Los Angeles County." Upon approval from the County, Plaintiffs propose directing at least 50% of the *cy pres* fund to LACPD's Immigration Unit. The funds will be used specifically to expand the Immigration Unit's practice to include removal defense in immigration court. In addition, the funds will provide additional capacity for post-conviction relief.  For the reasons explained below, Plaintiffs believe that the entire *cy pres* fund is most appropriately directed to the LACPD Immigration Unit and have requested that the County consider designating 100% of the funds for this purpose. (The County is considering this proposal and will advise the Court and Plaintiffs of its position).

Within Los Angeles County, the LACPD is uniquely positioned to realize the underlying goals of the litigation due to its close relationship to noncitizens facing immigration consequences due to criminal matters and extensive criminal-immigration expertise. Corresponding to the noncitizen make-up of approximately 17 percent in Los Angeles County,[5] a significant proportion of LACPD's clients are

---

[4] This reflects $230,378.69 in costs incurred by MBL, the ACLU and NIJC through the motion for attorneys' fees, plus $2,612.35 in additional costs incurred by MBL since the attorney fee motion, and an additional $25,000 for the remaining portion of transnational outreach.

[5] *See Selected Social Characteristics—California*, U.S. CENSUS AM. CMTY. SURV., https://www.census.gov/acs/www/data/data-tables-and-tools/data-profiles/ (to locate, click the

6

noncitizens.[6] Public defender noncitizen clients are often placed in removal proceedings after or even *during* their criminal cases. Any contact with the criminal legal system can subject clients to removal proceedings, and a litany of criminal convictions make removal either mandatory or likely under immigration law. As LACPD already represents a considerable portion of "persons facing immigration consequences because of a criminal arrest or conviction in Los Angeles County," no other Los Angeles County agency is more connected to this population. *See* Declaration of Prof. Ingrid Eagly, ¶¶11-12.

The LACPD Immigration Unit has developed extensive expertise in the intersection of criminal and immigration law. Currently, LACPD's priority is to provide *Padilla* plea consultations, thereby ensuring that public defenders meet their vital constitutional obligation to advise clients of the immigration consequences of any conviction and to mitigate adverse immigration consequences from a conviction. *See Padilla v. Kentucky*, 559 U.S. 356 (2010); CAL. PEN. CODE § 1016.3(a). When a noncitizen client, youth or adult, is charged with a criminal offense, the assigned defender can consult with the Immigration Unit, which researches and advises on the immigration consequences of the case, and works with the defender to minimize those consequences whenever possible. *See* Eagly Decl, ¶¶4-6. Immigration Unit attorneys also work on a host of other tasks that require criminal-immigration legal expertise. These include resolving emergencies that involve noncitizen clients; developing up-to-date materials and providing regular, mandatory trainings on criminal-immigration law and emerging enforcement trends; providing guidance on immigration issues affecting the criminal justice system to LACPD's leadership and other county entities; and handling post-conviction relief matters.

---

2018 tab, select "state" for Geography Type, select "California" from the drop down menu, select "get data profile links," select "social characteristics," select customize table, select "1 Geo," select county, select California, select "Los Angeles County").

[6] *See* ACLU SOCAL, DEFEND LA: TRANSFORMING PUBLIC DEFENSE IN THE ERA OF MASS DEPORTATION 49 (MAY 2018), https://www.aclusocal.org/sites/default/files/ aclu_socal_defend_la.pdf.

Nevertheless, while constitutionally mandated *Padilla* consultations are a necessary component of quality defense for noncitizens, they do not ensure quality, comprehensive representation to clients facing removal proceedings. There is no legal right to appointed counsel in removal proceedings, and pro bono counsel offer limited capacity and expertise for noncitizens facing deportation due to criminal charges or convictions. Even when clients can afford private immigration attorneys, these attorneys may not be sufficiently fluent in criminal law and practice to provide high-quality representation. Consequently, even after public defenders have gone to great lengths to obtain plea bargains mitigating immigration consequences, they may see the benefit of those bargains evaporate when clients are detained and deported because they lacked sufficiently qualified immigration counsel or any counsel at all. Eagly Decl., ¶¶4-7.

Leading public defender offices – including in New York City, San Francisco, Alameda County, and Contra Costa County, among many other jurisdictions – recognize that the most effective and efficient way to ensure client-centered, high-quality representation for noncitizen clients is to develop a holistic criminal-immigration representation model, in which embedded immigration attorneys provide removal defense to public defender clients, cultivating a culture and practice of seamless integration of criminal and immigration defense. Eagly Decl., ¶¶7-10.

No such model exists in Los Angeles County. LACPD Immigration Unit attorneys are currently unable to provide direct representation in immigration proceedings. Their assistance in removal proceedings is limited to making referrals to other local agencies and nonprofits, which largely lack the capacity and expertise to represent clients in criminal matters, such as post-conviction relief matters. In fact, LACPD has supported nonprofits and the private immigration bar with limited post-conviction relief actions in cases of noncitizens facing removal proceedings based on a conviction in Los Angeles County.

As other jurisdictions have demonstrated, a holistic criminal-immigration

representation model facilitates better outcomes in both criminal and immigration proceedings. Public defenders and embedded immigration attorneys are cross-trained and set up strategically to communicate and work closely together. *Id.* On criminal matters, in-house immigration attorneys can draw upon their experiences with and nuanced understanding of immigration proceedings to support defenders in best predicting the type of immigration consequences that follow certain dispositions. For example, many immigration benefits or forms of relief require a favorable discretionary decision by an immigration judge or officer, and one's chances of winning are often specific to varying factors such as the individual judge, the Immigration and Customs Enforcement (ICE) trial attorney, and the court or office location. It often takes an attorney with experience in immigration law and practice to know realistically how a judge may rule based on the facts. In-house immigration attorneys can consult on the more complex plea consultations and increase the efficacy of such consultations. *See* Eagly Decl., ¶¶9-10.

On immigration matters, if removal proceedings follow, clients already know their immigration attorneys, who can intervene early, prepare, and gather evidence. This involvement of the in-house immigration attorney during the pendency of the criminal case facilitates trust and clear communication, which deepen over time; it builds a big-picture, holistic relationship between counsel and client. This early access to immigration counsel can also help avoid problematic concessions that can happen when clients are first processed in pretrial custody by public defenders without expertise in immigration law. *See* Eagly Decl., ¶¶9-10.

An integrated criminal-immigration model also ensures removal defense representation by attorneys who are sufficiently fluent in criminal law to provide high quality representation. Immigration lawyers without sufficient expertise in criminal law may not know to request their clients criminal records or may not know how to reconstruct their rap sheets. In contrast, embedded immigration attorneys have specialized expertise on criminal-immigration law, as well as seamless access

to the public defenders. Trial counsel is often most familiar with the immigration defense because they crafted it during the criminal case. In short, in-house immigration attorneys are in the best position to put to best use the favorable bargains that defenders win during criminal proceedings. *See* Eagly Decl., ¶¶9-10.

A holistic criminal-immigration representation model cannot exist in Los Angeles County until there is funding to enable the LACPD to provide direct representation in removal proceedings. No other agencies or organizations can fill this role. Within the Los Angeles region, only the LACPD Immigration Unit has sufficient expertise in the highly complicated intersection between federal immigration law and state criminal law to supervise and guide embedded immigration attorneys as they provide adequate representation to noncitizen clients facing removal proceedings based on a criminal arrest or conviction. *See* Eagly Decl., ¶¶11-12.

Accordingly, the parties propose that the *cy pres* funds support expansion of the LACPD Immigration Unit by establishing a Removal Defense division in which LACPD immigration attorneys would represent public defender clients in removal proceedings, including providing appropriate related advocacy, where removal proceedings are initiated following an arrest or conviction in Los Angeles County. The funding would also help to expand the office's capacity to pursue post-conviction relief needing such relief to avoid immigration consequences.[7] Although the specifics have not been finalized, an effective program requires a critical number of in-house immigration attorneys to adequately match the number of defenders, the noncitizen client caseload, and the overall workload. The parties preliminarily propose expenditures over a period of 5 years for positions including supervising removal defense attorneys, additional attorneys, paralegals, investigators, social workers, and interpreters. These positions will be fully devoted to representing

---

[7] The Immigration Unit already handles post-conviction relief claims for clients and former clients, but its capacity is limited. This funding would expand its capacity to handle more cases and meet the community need.

noncitizen clients in removal proceedings and in matters related to  removal defense.

## III.   FINAL APPROVAL STANDARD UNDER FRCP 23(e)(2)

Federal Rule of Civil Procedure 23(e)(2) provides the criteria for final judicial approval of a class settlement. Under Rule 23(e)(2), a settlement may be approved only on a finding that it is fair, reasonable, and adequate after considering the following factors:

(A)   the class representatives and class counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's length;

(C)   the relief provided for the class is adequate, taking into account:

(i)   the costs, risks, and delay of trial and appeal,

(ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)   the terms of any proposed award of attorney's fees, including timing of payment;

(D)   any agreement required to be identified under Rule 23(e)(3); and

(E)   the proposal treats class members equitably relative to each other.

As we address below, the settlement in this case easily satisfies each of these factors. We do not address (D) as there are no agreements required to be identified under Rule 23(e)(3) other than the parties' settlement agreement.

## IV.   THE SETTLEMENT SATISFIES THE CRITERIA FOR FINAL APPROVAL

### A.   The Settlement Provides Adequate Relief to Class Members

The $14 million settlement provides significant relief in the form of direct compensation to class members and a substantial *cy pres* award that carries the potential to transform the quality of representation for Los Angeles residents facing removal proceedings due to a criminal arrest or conviction.

11

Even beyond direct compensation and *cy pres* funding, the litigation conferred substantial benefits to the class.  A week after the lawsuit was filed, LASD issued a policy directive emphasizing that immigration holds should not prevent arrestees from posting bails. This directive ensured that immigration detainers would no longer interfere with class members' constitutionally protected right to post bail. In June 2014, the LASD ceased holding persons solely on the basis of immigration detainers. The lawsuit was a significant contributing factor in the cessation of LASD's unlawful detainer policies.[8]

The lawsuit also represents the first successful class action litigation to hold a large law enforcement agency financially responsible for unlawfully detaining non-citizens on immigration detainers. The settlement itself – against the largest jail system in the United States – will have a significant deterrent effect on other law enforcement agencies that have considered honoring warrantless detainers from ICE. (Dkt. 615-2, Declaration of Barrett Litt in Support of Plaintiffs' Fee Motion ("Litt Fee Decl."), ¶¶52-54.)

### 1.   *Individual Recoveries Represent an Excellent Outcome Considering the Costs, Risks and Delay of Trial and Appeal*

The individual recoveries in this case represent a very favorable outcome for class members. All *Gerstein* and No Money Bail classes will receive the maximum of $1,000 per day for each day of over-detention (to a maximum of $25,000). The individual recoveries fall on the higher side of recoveries in jail over-detention class actions. Class counsel, Barrett Litt, has extensive experience with over-detention class actions and has handled several throughout the United States. The

---

[8] While the Court found that the passage of Senate Bill No. 54, which went into effect on January 1, 2018, prohibit the Roy Defendants from engaging in the challenged conduct of detaining an individual on the basis of an immigration hold, and thus rendered the injunctive relief claim moot (*Roy v. Cty. of Los Angeles*, 2018 WL 914773, at *27 (C.D. Cal. Feb. 7, 2018), the Defendants had ceased this practice in light of the current litigation well before that.

12

recovery in this case - $1,000 per day – is substantially more than claimants recovered in any of his prior over-detention cases, even after recoveries in those cases are adjusted for inflation. His most recent case, *Barnes v. District of Columbia*, Case 1:06-cv-00315-RCL-02-956 (RCL) (D.D.C.), settled in 2014 with an over-detention recovery for the first day of $370 ($415 accounting for inflation), and $250 for each day after that. (Dkt. 615-2, Litt Fee Decl., ¶42-43.)

The individual recoveries in this case also represent an exceptional outcome given the difficulty class members would have experienced litigating individual cases. Given the value of the average claim, the overwhelming majority could not have pursued financially viable individual claims, especially given the risks arising from the absence of clear precedent establishing liability. And while some class members have larger claims, many would have been unavailable or reluctant to come forward for fear of exposing their immigration status.

The recoveries are even more favorable considering that the outcome of this case was always tenuous. In Plaintiffs' counsel's assessment, this case was exceptionally high risk among class actions because it involved highly complex legal issues and no clear precedent governing the outcome. Plaintiffs' counsel initiated the case based on a preliminary investigation revealing that the LASD routinely held non-citizens based on warrantless immigration detainers issued by ICE. There appeared to be viable claims but given the lack of clear precedent governing this practice, considerable work was required to develop specific theories of liability. Liability hinged on a complex analysis of the intersection between federal immigration law; the federal Constitution's protections under the Fourth, Fifth and Fourteenth Amendments; and California state law restrictions on the authority of state or local officers to enforce federal civil immigration law. As the Court is aware, this area of the law has remained in flux through the pendency of this litigation and remains in flux today. *See* Dkt. 615-2, Litt Fee Decl., ¶33.

### 2. The Cy Pres Distribution Will Facilitate Transformative Improvements to Criminal-Immigration Defense

Plaintiffs' proposed *cy pres* award is appropriate given the extraordinary difficulty locating class members and the close alignment between class members' interests and the purpose for which the funds will be used. As the Ninth Circuit recognizes, *cy pres* provides a mechanism for distributing unclaimed funds "to the 'next best' class of beneficiaries." *In re Easysaver Rewards Litigation*, 906 F.3d 747, 760 (9th Cir. 2018) (quoting *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011)). There must be "a driving nexus between the plaintiff class and *cy pres* beneficiaries." *Nachshin*, 663 F.3d at 1038. "*Cy pres* recipients should be selected in light of the objectives of the underlying statutes and the interests of the silent class members, including their geographic diversity. *In re Easysaver*, 906 F.3d at 761. The American Law Institute has also adopted a rule for *cy pres* awards requiring parties "to identify a recipient whose interests reasonably approximate those being pursued by the class." *See id.* at 1039, n. 2.

A *cy pres* award aligns with the objectives of the underlying statute when the *cy pres* recipient's mission and the statute's goals have a non-tenuous connection. *See Nachshin*, 663 F.3d at 1040. Class members in this case asserted §1983 claims arising from the LASD's systemic disregard for their Fourth and Fourteenth Amendment rights via LASD's longstanding practice of unlawfully detaining non-citizens on the basis of suspected civil immigration violations. The *cy pres* award in this case aligns closely with the objectives of the litigation by limiting funds to programs that provide legal representation to noncitizens who face removal proceedings after having become entangled in the criminal justice system. The *cy pres* distribution provides an enormous benefit by enabling the LACPD to provide direct representation in immigration court. Establishing a removal defense division within the Immigration Unit will help ensure the highest possible representation, transforming access to immigration defense on behalf of persons whose cases

14

require special expertise in the intersection between criminal and immigration law.

The LACPD is an appropriate *cy pres* recipient. In Plaintiffs' assessment, the LACPD Immigration Unit is the only Los Angeles County entity that has a mission and focus that closely dovetails with the underlying objectives of this litigation, and the purpose to which the *cy pres* are to be used. LACPD currently represents tens of thousands of clients who face immigration consequences as a result of an arrest or conviction in Los Angeles County. In addition to *Padilla* consultations, the LACPD Immigration Unit has increasingly played an expert role in criminal-immigration issues both in county-wide or inter-agency efforts and in cross-training and providing support to the county's nonprofit and private immigration bar. The *cy pres* award in this case would enable the LACPD to expand the scope of its practice to direct representation in immigration proceedings, providing truly integrated criminal-immigration representation.

The County has not finalized its position regarding *cy pres* distribution. The County has not decided whether to approve Plaintiffs' 50% designation and has not made any proposal for its own 50% designation. As detailed in the proposed final approval order, Plaintiffs propose that the Court set a deadline for the County to advise regarding its position. Should the parties disagree regarding the *cy pres* designations, they will meet-and-confer. If they cannot reach an agreement , they will brief the Court on their respective positions, and the Court will resolve the matter at a hearing. Plaintiffs propose a schedule because the *cy pres* is an important component of the settlement and should not linger.

### 3. *The Settlement Employs a Fair and Effective Means of Distributing the Settlement to Class Members*

Plaintiffs' counsel invested considerable effort and resources into locating as many class members as possible. The final claims rate, 5.9%, is low for class actions generally, but consistent with the parties' expectation in this case. Although this is a relatively low claims rate, the Ninth Circuit has recognized that a low claims rate

approval is appropriate where the circumstances justify it. *See, e.g., In re Online DVD—Rental Antitrust Litig.,* 779 F.3d 934, 944–45 (9th Cir.2015) (approving 35 million-member settlement class when less than 4% filed claims; "settlements have been approved where less than five percent of class members file claims") (quoting *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1306 (9th Cir.1990).

### a)       Comprehensive Notice & Outreach Plan

The parties expected a low claims rate based on several considerations. Jail class actions often have a relatively low claims rate because formerly incarcerated persons are more likely to suffer from economic and housing instability, making it more difficult to locate them post-incarceration. The more time that lapses between the relevant events and the beginning of the notice period, the more outdated jail contact information becomes, and the more difficult it is to locate class members. It is possible to generate updated contact information using credit reporting databases such as TransUnion and Equifax, but these tools only work for persons whose information is captured in such databases via utility, bank and credit accounts held in their own name. People who experience financial or housing instability are significantly less likely to be captured in such credit reporting databases.

In this case, all class members were formerly incarcerated and virtually all are non-citizens, many of whom lack documentation. Their incarcerations occurred between October 2010 and June 2014, meaning that any contact information supplied by the LASD was at least 6 years out of date by 2020. The duration of the litigation alone indicated that the claims rate could be quite low.

Notice challenges were compounded by the fact that a significant percentage of Class Members were transferred to ICE custody and subsequently deported (most to Mexico and Central America). Credit reporting databases rarely include non-citizens who are living abroad, meaning that it would not be possible to secure updated contact information necessary to send direct notice to many class

16

members.

Without a means to secure updated addresses, email addresses and cell phone numbers, a claims administrator must rely on forms of indirect notice, such as paid advertising and earned media. These strategies typically reach far fewer class members than direct notice. Based on the class period (extending back to 2010), and characteristics of the class, Plaintiffs' counsel anticipated that the claims rate would fall between 5% - 10%, and very possibly lower.

Plaintiffs' counsel coordinated closely with the claims administrator to develop the strongest possible notice and outreach plan. *See* Declaration of Jeanne Finegan. The plan included multiple channels of direct notice, tiered media outreach, and community-based outreach. Before issuing notice, the Class Administrator used skip trace databases to locate updated address, mobile phone number and email address information for as many class members as possible. Using this information, the Administrator issue direct notice to all class members using mail, text, email, direct social media contacts (Facebook and Instagram for all class members whose email address, mobile phone number or name matches a Facebook or Instagram account). Initial direct notice was reinforced with reminder and follow-up messages for the duration of the class period, 180 days.  *See* Finegan Decl., ¶¶13-23.

The Administrator also developed a tiered media outreach strategy, which provided the heaviest media weight in the Los Angeles media market and extended the outreach throughout California, nationwide, in Mexico, and, where data instructs, other Central American countries. The media plan included approximately 400, 30-second television commercials to air in Spanish in the Los Angeles Area and approximately 300, 60-second radio commercials.  *See* Finegan Decl., ¶¶28-35. In addition to conventional claims administration, Class counsel coordinated closely with the Mexican Consulate to generate updated contact information for approximately 500 class members. ACLU interns reached out individually to each person for whom contact information could be generated to explain the purpose of

1 the litigation, settlement terms and process for submitting claims. Battles Decl., ¶13.

2 Class counsel also worked closely with Centro de Derechos del Migrante
3 (CDM), an organization that specializes in transnational outreach efforts for migrant
4 workers and undocumented persons, particularly in civil rights and employment
5 class actions. CDM developed and implemented an outreach campaign focusing on
6 earned media in major markets in Mexico. Declaration of Evy Peña, ¶¶2-4.
7 Unfortunately, despite these efforts, very few class members living abroad submitted
8 claims.

9                    *b)*     ***Straightforward Claims Procedure and Distribution Model***

10 For class members who could be located, the settlement involved a
11 straightforward claims procedure which permitted online or mail-in claims. The
12 parties agreed to an atypically long notice period – 10 months – to help ensure
13 sufficient time for as many class members as possible to learn of the lawsuit and
14 submit claims. The website, class notice, and paid advertising materials were
15 presented in both Spanish and English. For the first 5 months of the 10-month notice
16 period, any person who believed they belonged to the class could submit an online
17 claim without restriction. After July 2021, the administrator required that potential
18 claimants confirm their class membership before submitting a claim.

19 The distribution method was equally straightforward. All *Gerstein* and No-
20 Money-Bail class members are compensated for each day they were unlawfully
21 detained. The model does not differentiate between unlawful detention days endured
22 by the *Gerstein* and No-Money-Bail classes. Each No-Bail-Notation class member
23 who responds to the notice by attesting that they would have posted bail will receive
24 a flat amount of $250, irrespective of how long they spent in pretrial custody.
25 Individuals who belong to both the No Bail Notation **and** No Money Bail classes
26 will receive compensation pursuant to the No Money Bail formula (per-diem
27 compensation), but will not receive an extra flat amount as members of the No Bail
28 Notation class.

### 4.     The Court Will Decide a Fair and Reasonable Fee

Class counsel filed a motion for attorneys' fees and costs to be approved by the Court. (Dkt. 615)

### B.     Adequacy of Representation

At the final approval stage, courts assess the adequacy of representation by evaluating the "*actual* performance" of counsel. Fed.R.Civ.Pro. 23(e)(2) *Advisory Committee Notes to the 2018 Amendment* (emphasis supplied). District courts should specifically consider whether class counsel negotiated the settlement with an "adequate information base" given relevant circumstances, including, for example, the nature and amount of discovery and the outcome as compared to other similar cases. *Ibid.* (" … the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base.").

This case was hard-fought and vigorously litigated. From the outset, Defendants made clear that they would strenuously resist any classwide resolution involving damages. Despite their approach, Plaintiffs' counsel made every effort to resolve the case expeditiously. In 2012, after completing their preliminary investigation, Plaintiffs' counsel initiated pre-filing settlement discussions. Although the County engaged in these negotiations, they refused to change their detainer policies, leaving Plaintiffs with no choice but to file the lawsuit. The lawsuit was filed on October 12, 2012.

After filing, the parties exchanged information in preparation for an early mediation session before Michael Moorehead. Because Defendants refused to produce classwide data, the parties were unable to make significant progress towards resolution of class claims. Following the March 2014 mediation, the parties commenced formal discovery. Plaintiffs' counsel expended considerable time and resources analyzing voluminous policy documents, ESI, and taking depositions. Plaintiffs' counsel analyzed over 400,000 pages of discovery produced by the

19

County as well as significant discovery produced by the Department of Homeland Security in the related *Gonzalez* case. Counsel also took ten depositions related to liability issues including LASD policies and practices concerning immigration detainers, release record-keeping and database systems related to the release process. Counsel defended the depositions of class reps, propounded written discovery and responded to discovery. (Dkt. 615-2, Litt Fee Decl., ¶62.)

In 2016, Plaintiffs' counsel moved for class certification. Defendants vigorously opposed the motion, contesting whether common liability issues existed and whether it was possible to identify class members using the County's database systems. Plaintiffs' counsel spent considerable time and resources working with their database experts to demonstrate that it was possible to identify persons who had been held solely on detainers and that they could identify persons corresponding to specific classes and subclasses arising from various theories of liability. On September 9, 2016, the Court certified two injunctive relief classes and four damages classes (including one subclass). (Dkt. 184, 9/9/16 Class Cert Order; Dkt. 615-2, Litt Fee Decl., ¶64.)

After class certification issued, the parties litigated cross motions for summary judgment. On February 8, 2018, the Court granted summary judgment to Plaintiffs on their Fourth Amendment and Equal Protection claims. *See* Dkt. 395, p. 6. The Court's summary judgment decision issued on February 8, 2018. Defendants filed a motion for reconsideration, which was denied on July 11, 2018. (Dkt. 395) The Court simultaneously issued an order denying Defendants' motion to decertify the class and finding that class members were entitled to classwide general damages. (Dkt. 394) ("The Court agrees with these decisions and finds that general damages are available on a class-wide basis here."). The Court also granted Plaintiffs' motion to expand the certified 48 Hour *Gerstein* class to a general *Gerstein* class to conform to the summary judgment ruling. (Dkt. 396; Dkt. 615-2, Litt Fee Decl., ¶65.)

Following the liability and class certification decisions, the parties entered

20

settlement negotiations, which proved significantly more protracted than expected. On December 3, 2018, the parties participated in a full day settlement conference before Antonio Piazza, a well-known and highly regarded mediator. The December 3, 2018 conference resulted in a settlement in principle, but did not resolve several key terms and a dispute regarding the class size. Even after reaching a settlement in principle, it took well over a year and numerous discussions among or between counsel and Mr. Piazza to agree to the specific settlement terms. The final settlement agreement was approved by the County in October 2020. (Dkt. 615-2, Litt Fee Decl., ¶66.)

### C.    Equitable Treatment of Class Members

The treatment of class members is equitable. All class members who were unlawfully detained solely on the basis of immigration detainers will receive the same per-diem compensation of $1,000 per day. All class members who were deprived of the opportunity to post bail will receive the same flat amount, $250, irrespective of whether they can establish that they would have been able to post bail. The cap of $25,000 reflects the fact that longer over-detentions tend to be compensated at a lower per-diem rate than shorter over-detentions. As indicated above, the daily cap of $1,000 and the per class member cap of $25,000 were hotly disputed issues in drafting the settlement agreement, and were ultimately the result of a mediator's proposal because the parties were unable to agree. (Dkt. 604-1, Declaration of Barrett Litt in Support of Preliminary Approval, ¶5.)

The proposed settlement does not reflect unduly preferential treatment of class representatives. It provides a slight benefit to the two class representatives ($10,000 in addition to their class member formula award). The requested $10,000 incentive award is well within the range of reasonable incentive awards. *See Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (identifying factors to consider in evaluating the reasonableness of incentive awards); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009) (incentive awards are "intended to compensate

class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general"); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 153265, at *2–3 (N.D. Cal. Jan. 13, 2016). The awards here – totaling $20,00 – represent a very small proportion (less than 0.15%) of the Class Fund, also a factor in evaluating the reasonableness of proposed incentive awards. *See, e.g.., id.* at *3 (0.196%.of class fund); *Hopson v. Hanesbrands Inc.*, 2009 WL 928133, *10 (N.D. Cal. 2009) (1.25% of the settlement amount).

### D.    Arms-Length Negotiations

The settlement terms were negotiated at arms' length with the assistance of an experienced mediator, Antonio Piazza, after one in person mediation session and follow-up sessions. (Dkt. 604-1, Litt Prelim. App. Decl., ¶¶5, 6.)

### E.    Objections

#### 1.    *Victor Diaz*

Victor Diaz objected on the basis to request additional relief not available under the settlement agreement including expungement of criminal charges and compensation for time required by ICE to wear an ankle bracelet. He does not object to the terms of the settlement agreement itself, nor does he object to the compensation provided for his over-detention. Expungement of criminal charges is not relief available in a classwide damages lawsuit. Any claims against ICE for liberty violations arising from the ankle monitor fall outside the scope of this lawsuit. Declaration of Lindsay Battles, ¶2, Ex. A.

#### 2.    *Esteban Hernandez*

Esteban Hernandez objects on the basis that the claims in this case did not include claims against the Los Angeles Police Department (LAPD), the agency responsible for his initial arrest. Any potential claims against the LAPD are

22

independent from the liability issues in this case. Mr. Hernandez specifically does not object to the financial terms of the settlement agreement, nor to any other terms of the settlement agreement.  Battles Decl., ¶3, Ex. B.

### 3.    *Sundiata Bakaba*

On October 9, 2021, class member Sundiata Bakaba emailed objections to the settlement agreement, followed by hard copies in the mail. According to LASD records, Ms. Bakaba was over-detained for six days in 2011, and would therefore be entitled to approximately $6,000 in compensation under the settlement agreement. Mr. Bakaba objects to the settlement primarily on the basis that it does not adequately compensate his individual damages flowing from his over-detention.

Mr. Bakaba asserts that he suffered a loss of contracts for music performances scheduled to occur during the time he was over-detained in July 2011. (Mr. Bakaba attached the relevant contracts.) As a result of his over-detention, he also suffered harm to relationship with his wife, who has continued living in California since he returned to France in 2011. Mr. Bakaba requests that the Court adjust his recovery to $25,000, the maximum compensation available for persons over-detained 25 days or more. He also seeks individual immigration relief in the form of a U-visa or parole to re-enter the United States. Class counsel has advised Mr. Bakaba that it is not possible to increase his recovery in such a manner that would treat him far more favorably than other class members, nor is it possible to negotiate for individual immigration relief, which is not available under the terms of the settlement. Battles Decl., ¶6, Ex. C.

These objections do not constitute objections to the terms of the settlement agreement itself, but instead, relate to individualized damages issues that cannot be addressed effectively in the context of a classwide settlement agreement. Class counsel has repeatedly advised Mr. Bakaba that he has the right to exclude himself from the settlement agreement if he does not believe it adequately compensates his individual damages. On October 12, 2021, Mr. Bakaba called class counsel and

23

1   advised that, after submitting objections, he realized that he may be interested in

2   requesting leave to submit a late opt-out or exclusion request from the settlement so

3   that he can pursue individual damages claims. Mr. Bakaba has not yet clarified

4   whether he indeed seeks to exclude himself from the settlement. Battles, ¶8, Ex. C.

5       Mr. Bakaba has long been aware of the option to exclude himself and has

6   previously advised that he is consulting with an independent attorney regarding his

7   decision to opt-out and the viability of individual damages claims. Mr. Bakaba first

8   contacted Class counsel on March 19, 2021, 5 weeks after class notice issued.[9]

9   During communications in March, Mr. Bakaba advised that he sustained

10  considerable individual damages as a result of his over-detention including lost

11  contracts for music performances in California. Mr. Bakaba requested copies of

12  settlement documents for review by his attorney, Bret Lewis, an attorney in Santa

13  Monica, California. Class counsel directed Mr. Bakaba to the relevant documents

14  and advised him of his right to exclude himself from the lawsuit to pursue an

15  individual case. Battles, ¶9, Ex. C.

16      Aside from individual damages issues, Mr. Bakaba objects on the basis that

17  he did not learn of the settlement until February 2021. This objection has no merit.

18  Mr. Bakaba learned of the settlement at the same time as other class members. The

19  court-approved class notice issued to all class members on February 10, 2021, eight

20  months before the claims filing deadline. Mr. Bakaba was clearly aware of the

21  settlement terms by March 19, 2021 when he first contacted class counsel.  Battles,

22  ¶10, Ex. C.

23      Mr. Bakaba also objects that he had difficulty reaching Class Counsel from

24

25  [9] During the call, counsel advised Mr. Bakaba that LASD records showed he had been over-
detained for 6 days. Mr. Bakaba objected to the calculation and insisted he had been over-

26  detained longer than 6 days. Class counsel thoroughly investigated Mr. Bakaba's incarcerations
in LASD's class data. This investigation revealed that Mr. Bakaba had been incarcerated two

27  additional times, beyond the incarceration associated with the 6-day over-detention. The other
two periods of incarceration do not implicate the claims in this case because there were no ICE

28  holds that would have resulted in over-detention.

an international phone number. Class counsel is aware of no instance in which Mr. Bakaba was unable to contact them by phone or email. Mr. Bakaba called class counsel at least three times and has sent numerous emails, all of which were been promptly addressed. Battles, ¶11, Ex. C. Lastly, Mr. Bakaba objects that there is a "hidden" written clause in the settlement agreement that makes it difficult for international class members to receive payment. He does not indicate the clause to which he is referring. Battles, ¶12, Ex. C. Class counsel is assisting Mr. Bakaba to make arrangements for a virtual appearance at the Final Approval Hearing. Counsel has also contacted the clerk to assist Mr. Bakaba in securing a French interpreter.

### F.    Late Claims

Plaintiffs request the Court approve 8 of claims received since October 10, 2021, and any additional late claims through distribution. To avoid successive stipulations for approval of late claims, Class Counsel requests that the Court peremptorily approve any late claims received prior to distribution where the parties agree they should be paid, and without the need to file a stipulation for review by the Court.

## V.    CONCLUSION

Based on the factors enumerated in FRCP 23(e)(2), the settlement is fair, reasonable, adequate and should be approved.


DATED: October 25, 2020        Respectfully submitted,

McLANE, BEDNARSKI & LITT,    LLP

By: */s/ Barrett S. Litt*
      Barrett S. Litt

By: */s/ Lindsay Battles*
      Lindsay Battles

Attorneys for Plaintiffs

25